UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-62215-CIV-DIMITROULEAS/SNOW

JEAN SUAREZ,

    Plaintiff,

v.

CITY OF HOLLYWOOD,

    Defendant.

_____/

## CITY OF HOLLYWOOD'S MOTION TO PRECLUDE EXPERT WITNESS TESTIMONY AND INCORPORATED MEMORANDUM OF LAW

The CITY OF HOLLYWOOD ("the City"), by its undersigned counsel, hereby files this Motion to Preclude Expert Witness Testimony of Roy Taylor, Mark Shuman, and Daniel Wohlgelernter.

## BACKGROUND

Two important issues in this case are whether the City's police officers utilized excessive force and, if so, whether the excessive force caused Daniel Tyson's death. Plaintiff alleges that the City's police officers "used unnecessary and unreasonable excessive force against Mr. Tyson, who suffered from mental illness at the time of his death, by repeatedly discharging a Taser stun gun on Mr. Tyson, as well as applying physical force, after police had restrained him in handcuffs and leg shackles face down on the ground." ECF No. 76 ¶ 1. According to Plaintiff, "Mr. Tyson suffered physical injury, pain and suffering, and ultimately died as a direct and proximate result of being tased repeatedly while multiple officers applied physical pressure and force to Mr. Tyson's body." *Id.* ¶ 37. To address these issues, the parties have hired both medical experts and police practices experts.

    I.    **Medical Fact Witnesses**

Following Tyson's death, Associate Medical Examiner, Dr. Marlon S. Osbourne, concluded that Tyson's cause and manner of death could not be determined. Exhibit 1 at 6. He stated:

> This 30 year-old, white male, Daniel Tyson, had a history of a psychiatric disorder. The autopsy revealed that the decedent was struck once with an electomuscular [sic] disruptive device (EDD) however, police statements and emergency medical documentation indicate that decedent did not immediately become unresponsive after receiving the discharges from the EDD. Toxicology revealed no bath salts or synthetic stimulant drugs. Examination of his heart revealed severe coronary arteriosclerosis as well as congenial disorder involving the cardiac conduction system. Independent of one another either condition could lead sudden cardiac death. It can be discerned to what degree if any the struggle with the police and subsequent discharge from the EDD affect his underlying natural disease. Therefore the cause of death to a reasonable degree of medical certainty is undetermined.

*Id.*

Prior to forming his conclusion, Dr. Osbourne consulted Dr. Michael Bell, a cardiovascular pathologist. *Id.* at 11–12. When Dr. Bell examined Tyson's heart under a microscope, he found that Tyson had severe blockage in four main arteries that supply blood to the heart. *Id.* at 12. He also found that Tyson had additional blockage in two other arteries that supply the electrical components of the heart. *Id.* During his deposition, Dr. Bell confirmed that the narrowing in at least two of Tyson's main arteries was so severe that it *alone* could have caused sudden cardiac arrest at any minute. *See* Exhibit 2 at 33–34. He also testified that the combination of significant multiple heart defects would have a synergistic effect, meaning that the total effect of each of Tyson's heart conditions would be greater than the sum of each effect when taken in isolation. *Id.* at 34.

## II. Plaintiff's Initial Expert Witnesses

On March 8, 2018, Plaintiff initially disclosed two expert witnesses. Exhibit 3. According to Plaintiff, Roy G. Taylor "is being offered as an expert relating to police practices," and Dr. Mark Shuman "is being offered as a Medical Examiner and Forensic Pathology expert for the purposes of the cause and manner of Daniel Tyson's death." *Id.* at 1.

In his report, Dr. Shuman opined that Tyson's cause of death was the result of a combination of factors:

> The cause of his death was cardiopulmonary arrest following a violent struggle and prone restraint while in a state of excited delirium associated with bipolar disorder. Coronary atherosclerosis and fibromuscular dysplasia of the SA and AV nodal arteries

> contributed to his death. The use of a Taser conductive energy device may have contributed to his death as the result of additional stress caused by pain, but only if there was a temporal association with the cardiopulmonary arrest and the last discharge.

Exhibit 4 at 5.

In his report, Taylor opined as follows:

> In summary, the nine applications of the TASER by Officer Pantaloukas to Mr. Tyson was an excessive use of force. In addition, it was inconsistent with the policies and procedures used in law enforcement in 2014 and a violation of Hollywood Police Department's Use of Force: Special Impact Weapons & Chemical Agents Standard Operating Procedure #201, dated: 11/01/2001. This policy states the TASER will be prohibited from use when (4e) "The subject is handcuffed, unless they are exhibiting aggressive physical resistance, actively attempting to escape from custody, or trying to harm themselves or others." These circumstances were not present on October 27, 2014. Therefore, the continued use of the TASER was not authorized and ultimately was a proximal cause of death to Mr. Tyson.

Exhibit 5 at 7.

On May 1, 2018, the City took Taylor's deposition. Exhibit 6. During his deposition, Taylor slightly retracted his opinion by testifying that his only criticism regarding the officer's use of a Taser comes after Tyson was handcuffed. *Id.* at 83. However, Taylor also offered two additional opinions that were not contained in his report.

First, notwithstanding his lack of medical training, Taylor testified that the use of a Taser can cause death in general and that, in this particular case, he believes "the excessive use of it and partially the positional asphyxia [Tyson] probably suffered due to five officers holding him down were all proximal causes of his death." *Id.* at 120–21.

Second, Taylor opined that after he submitted his report, he reviewed additional materials that caused him concern. *Id.* at 32–33. Based solely upon his review of Response to Resistance Reports from 2012–2014, he testified that he now believes that the City's policies, training, and supervision are inadequate for various reasons. *Id.*

### III. The City's Expert Witnesses

On April 9, 2018, the City disclosed its two expert witnesses: Chuck Drago, a police practices expert, and Dr. Gary Vilke, an emergency medicine physician and clinical professor.

In his report, Drago offers the following opinions:

1. There is no evidence in the materials reviewed that the Hollywood Police Department failed to properly train their police officers in the proper use of the Taser CED.

2. There is no evidence in the materials reviewed that the Hollywood Police Department failed to properly train their police officers in the proper procedures for dealing with the mentally ill.

3. The Hollywood Police Department policies on Use of Force meet or exceeds accepted standards. There is also no evidence in the materials reviewed that the Hollywood Police Department failed to properly train or supervise their police officers in the proper Use of Force.

Exhibit 7 at 4, 7, 11.

In his report, Dr. Vilke offers the following opinions:

1. The restraining process did not cause the sudden cardiac arrest and death in Mr. Tyson.

2. The use of the TASER ECD on Mr. Tyson did not cause or contribute to his cardiac arrest or death.

3. Mr. Tyson was exhibiting signs and symptoms consistent with excited delirium syndrome (ExDS), which along with his severely diseased heart and continued exertion from resistance, is the probable cause of his sudden cardiac arrest and death.

Exhibit 8 at 5–6.

### IV. Plaintiff's Rebuttal Expert Witness

On May 18, 2018, Plaintiff disclosed a "rebuttal" expert witness. Exhibit 9. According to Plaintiff, "Daniel Wohlgelernter, M.D. is an expert in the field of cardiology and may be called as an expert witness to testify to Daniel Tyson's cause and manner of death." *Id.* at 1 (emphasis added).

In his report, Dr. Wohlgelernter opined that "Tyson's death was due to restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA cardiac arrest." Exhibit 10 at 3. In his report, Dr. Wohlgelernter also stated that he "totally reject[s] the contention that the cause of the sudden cardiac arrest and death in Mr. Tyson was Excited Delirium Syndrome

(ExDS), as suggested by Dr. Vilke." *Id.* at 4. Finally, regarding Tyson's heart conditions, he stated, "There is no evidence that this disease process contributed to Tyson's death." *Id.* at 5.

## STANDARD

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert witness testimony. Under Rule 26, a party who wishes to offer expert testimony on a subject must first disclose the expert and provide a written report to the opposing party. Fed. R. Civ. P. 26(a)(2). Among other things, "[t]he report must contain . . . a *complete* statement of *all* opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." *Id.* at 26(a)(2)(B) (emphasis added).

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Under Rule 702, an expert witness may offer an opinion on a topic only if: (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "The proponent of the expert testimony bears the burden of establishing that each of these criteria are satisfied." *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 808 (11th Cir. 2017).

The Court has considerable discretion in determining whether to admit or exclude the testimony of a proposed expert. *Id.*; *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). At the same time, however, "Rule 702 requires the district court to perform a critical gatekeeping function regarding the admissibility of expert testimony." *Knight*, 856 F.3d at 808; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. The primary focus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify."); *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1244–45 (11th Cir. 2018) ("To properly serve as a gatekeeper, the trial court must perform 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'").

# ARGUMENT

### I. Roy Taylor should be precluded from testifying that the use of a Taser can cause a person's death and that the use of a Taser in fact caused Tyson's death.

Roy Taylor is not qualified by knowledge, skill, experience, training, or education to offer an opinion as to whether the use of a Taser can cause a person's death, and he is especially not qualified to offer an opinion as to whether the use of a Taser caused Tyson's death. Taylor was offered by Plaintiff "as an expert relating to police practices." Exhibit 3. His report fails to provide the necessary qualifications to opine about any other subject. *See* Fed. R. Civ. P. 26(a)(2)(B)(iv).

Taylor is currently the President and CEO of various private security firms in North Carolina. Exhibit 5 at 9. Although he was previously an Emergency Medical Technician (EMT) for almost forty years, Exhibit 6 at 118, he has never been a licensed medical doctor, and he did not go to medical school. He did not even obtain a paramedic license. *Id.* at 121–22.

Nevertheless, Taylor proposes to testify that "the excessive use of [the Taser] and partially the positional asphyxia [Tyson] probably suffered due to five officers holding him down were all proximal causes of his death." *See id.* at 117–21. The basis for Taylor's opinion that the use of a Taser may have contributed to Tyson's death comes not from his knowledge of science and medicine, but from two hearsay sources: (1) a supposed warning from Taser (Axon) that was purportedly provided to the City's law enforcement officers;[1] and (2) the testimony of a "coroner in Georgia" that he heard about. *Id.* at 118–19. In fact, Taylor specifically stated that he is "testifying as an instructor for Taser," rather than as a medical expert. *Id.* Taylor offered no basis for his opinion regarding positional asphyxia.

Taylor should be precluded from testifying that the use of a Taser can cause death in general, and about Tyson's cause of death in particular, because he lacks the requisite foundation of knowledge and experience to qualify as an expert witness on those topics. According to Plaintiff's own medical expert, Dr. Shuman, the use of a Taser can cause death "only under very rare specific circumstances." *See* Exhibit 11 at 37.

One circumstance is when there is a "perfect dart strike" that is very close to the heart, which could theoretically cause death by electrocution in a thin subject. *Id.* at 37. However, Dr.

---

[1] The City specifically asked Taylor to produce the warning he generically references. ECF No. 91-1 at 11. His response was consistently generic: "Already in the possession of the Defendant." ECF No. 91-2 at 2.

Shuman concedes that Tyson's death was not caused by electrical means. *Id.* Dr. Shuman testified that the only other way the use of a Taser could have possibly contributed to Tyson's death was if it caused a physiological response in Tyson and there was a close temporal proximity between its use and the sudden cardiac arrest. *See id.* at 38–45. However, because Taylor lacks the necessary foundation of knowledge and experience, Taylor's opinion regarding medical causation ignores these important limitations and instead primarily relies on a generic legal disclaimer of liability from Taser. Thus, if not for anything else, Taylor's opinion should be precluded as misleading and unduly prejudicial. *See* Fed. R. Evid. 403.

### II. Roy Taylor should be precluded from testifying that the City's policies, training, and supervision are inadequate.

Taylor is arguably not qualified to offer an expert opinion regarding the City's policing policies and procedures either. But, even if he was qualified to opine on that topic, he should still be precluded from testifying that the City's policies, training, and supervision are inadequate because those opinions are unreliable and not included within his report.

Taylor testified that the City's policies do not sufficiently address responding to individuals with mental illness. Exhibit 6 at 33. His personal opinion is that the policies provide officers with too much discretion. *Id.* at 33–34. However, Taylor admitted that the limitations he would like to see, such as more de-escalation techniques and limitations on the use of a weapon, are not even included in his own companies' policies. *Id.* at 34–36, 39–40. He stated that he is currently researching the issue and trying to determine what changes may be necessary. *Id.* at 39–40.

Based upon his review of prior use of force reports from 2012 to 2014, Taylor also testified that the Hollywood Police Department should have conducted "follow-up investigations" into past incidents involving the use of a Taser on the mentally ill, especially those involving three or more deployments. *See id.* at 49–52. According to Taylor, the City "certainly has the resources to be able to look at these things statistically, determine trends, and provide training that will help lower those trends to make sure they're providing the type of services that the citizens would desire." *Id.* at 51–52. However, Taylor admitted that he could not determine from the use-of-force reports alone whether the force used in the past was excessive. *Id.* at 54. Nor did he specifically explain what training should have been provided, but was not.

Regarding supervision, Taylor's only criticism is that at the time of the incident, Officer Pantaloukas' assigned field training officer (FTO) was temporarily unavailable while preparing

for his role on SWAT Team. *Id.* at 47–48. However, he failed to explain how the availability of another FTO would have made any difference. Officer Ramirez—not Officer Pantaloukas—was the first responding officer, and Taylor does not take issue with Officer Ramirez's application of de-escalation techniques once on scene. *See id.* at 46–47. Moreover, Taylor acknowledges that a different FTO immediately responded to the scene. *See id.* at 47.

Taylor's hypocritical opinions regarding the City's customs and practices are insufficient to avoid summary judgment because he has failed "to provide specific facts from the record to support [his] conclusory allegations." *See Buckler v. Israel*, 680 Fed. Appx. 831, 835–36 (11th Cir. 2017) (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). Additionally, his conclusory opinions were not included within his report, placing the City at a severe disadvantage when preparing its defense.

Pursuant to Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts routinely preclude expert witness testimony on subjects and opinions that were not memorialized in a report, prior to the close of discovery. *See, e.g.*, *Campbell v. Moon Palace, Inc.*, 11-60274-CIV, 2012 WL 399218, at *4 (S.D. Fla. Feb. 7, 2012); *In Carreno v. Home Transport, Inc*., No. 3:08-cv-1206-J-32JRK, 2010 WL 2293391, at *2 (M.D. Fla. June 7, 2010); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 616 F. Supp. 2d 1250, 1256 (M.D. Fla. 2009); *Access for the Disabled, Inc. v. T.S. Margate Co., Ltd*., 08-60483-CIV, 2008 WL 2761284, at *1 (S.D. Fla. July 15, 2008); *Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1168 (S.D. Fla. 2008), *aff'd in part sub nom. Sensormatic Elecs., LLC v. Kahle*, 367 Fed. Appx. 143 (Fed. Cir. 2010); *see also Romero v. Drummond Co., Inc.*, 552 F.3d 1303 (11th Cir. 2008); *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947-J-34HTS, 2009 WL 1139575 at *1 (M.D. Fla. April 27, 2009).

Here, the failure to disclose a report on these subjects was not substantially justified. Taylor testified that he was provided the use of force reports <u>after</u> he submitted his initial report. *Id.* at 32. However, Plaintiff possessed all of the City's policies, training materials, and use of force reports for over a year prior, *see* ECF No. 73 at 4; ECF No. 73-4, so there is no reason why Taylor was not provided those materials earlier.

Moreover, Taylor specifically acknowledged that he "may" author a supplemental report, which he certainly had time to do. *Id.* at 32. He stated that he would "like to review everything and then work with counsel if they would like it. If they felt it was necessary, I would certainly amend it." *Id.* at 32; *see also id.* at 74–75 ("My opinion about the amount of force used is still the same, but I now also have those concerns about training and supervision and policies. *And I would leave them preliminary* until after I have reviewed all of the material that's been made available to me." (emphasis added)). Apparently, Plaintiff's counsel and/or Taylor ultimately concluded it was unnecessary to offer a final opinion on these subjects because Taylor did not amend or supplement his report, and the deadline to do so has now expired.

The failure to timely disclose a report on these subjects was also not harmless. "The specific purpose of the requirement to exchange expert reports is to eliminate unfair surprise to the opposing party and to conserve resources." *Headley v. Ferro Corp.*, 630 F. Supp. 2d 1261, 1266 (W.D. Wash. 2008). Here, the City was prejudiced at Taylor's deposition because it was unable to discuss in detail any past incidents involving use of force. *See* Exhibit 6 at 32–33, 49; *United States v. Marder*, 318 F.R.D. 186, 192 (S.D. Fla. 2016). Had the City been on notice that Taylor was going to offer an opinion on the City's policies and training pertaining to mental illness, or the City's past incidents involving use of force, the City would have prepared differently and would have further explored those subjects at Taylor's deposition.

Accordingly, Taylor should be precluded from testifying that the City's policies, training, and supervision regarding mental illness and use of Taser are inadequate.

### III. Roy Taylor should be precluded from testifying that the officers' use of force was "excessive" or "unreasonable" or violated departmental policy.

Taylor should also be precluded from testifying that the officers' use of force in this case was "excessive," "unreasonable," or violated departmental policy because such an opinion does not require scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue. Rather, Taylor's opinion regarding the degree of force used is simply manufactured evidence intended to bolster Plaintiff's claims.

"Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Knight*, 856 F.3d at 808–09. In this case, a critical issue that must be resolved by the Court or a jury is whether the officers' conduct was objectively reasonable in light of the facts confronting the officers at the time. *See id.*

(citing *Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003)). Although an expert may generally testify about an ultimate issue, Fed. R. Evid. 704, a determination as to whether the force used was "excessive" or "unreasonable" in this case does not require any specialized knowledge, and can be argued by the lawyers based upon the actual facts of record.

Taylor is expected to testify that every deployment of the officer's Taser after Tyson was in handcuffs was "excessive." Exhibit 6 at 83. However, a review of his deposition testimony reveals that Taylor's opinion is based solely upon his own interpretation of select evidence of record. For example, although Taylor can only speculate as to when handcuffs were actually applied, *id.* at 83–84, 89, Taylor was able to form the belief that *at that time*, Tyson ceased exhibiting potentially violent behavior, was "immobilized," and had no ability to resist detainment. *Id.* at 113. Although Taylor concedes that Tyson was still kicking at the officers, he further believes that the officers "could have avoided it" and that Officer Pantaloukas had "full control" of his legs. *Id.* at 98, 114. All of these premises to his use-of-force opinion—e.g., Tyson stopped resisting and Officer Pantaloukas had full control of his legs—are not only unsupported by the record, but are also findings of fact that invade the province of the jury and do not depend on any specialized knowledge to form. *See Sloan v. Long*, 4:16 CV 86 (JMB), 2018 WL 1243664, at *4 (E.D. Mo. Mar. 9, 2018) ("Dr. Lyman's conclusion that plaintiff was compliant and unlikely to be attempting to strike Deputy Butler improperly assesses the credibility of the witnesses and invades the province of the jury.").

Relatedly, Taylor is also expected to testify that the officers' use of force violated the department's Standard Operating Procedures (SOP) 200 and 201 concerning use of force. In particular, SOP 201, Use of Force: Special Impact Weapons & Chemical Agents, provides that the use of a Taser is prohibited "when the subject is handcuffed, unless they are exhibiting aggressive physical resistance, actively attempting to escape from custody or trying to harm themselves or others." Exhibit 5 at 7. Again, Taylor will opine that the officer should not have deployed his Taser after Tyson was in handcuffs because Taylor believes that Tyson was under control at that time. *See id.* ("These circumstances were not present on October 27, 2014."). However, either Tyson was "exhibiting aggressive physical resistance, actively attempting to escape from custody or

trying to harm themselves or others," or he was not. The Court or the jury can easily make this determination without expert assistance.[2]

Taylor's testimony, when applied to the City's use of force policies, is especially problematic due to the risk that it would confuse jurors by leading them to believe that they could find liability based on a violation of the use of force policy, rather than on a violation of the applicable law. *See Knight*, 856 F.3d at 814. As Taylor well knows, many police departments, like the City of Hollywood's, have internal procedures that are more restrictive of conduct than what is otherwise permitted under state and federal law. *See id.*; *Thomas v. City of Columbus*, 2:14-CV-906, 2016 WL 1090963, at *6 (S.D. Ohio Mar. 21, 2016), *aff'd sub nom. Thomas v. City of Columbus, Ohio*, 854 F.3d 361 (6th Cir. 2017); *see also* Exhibit 7 at 11–13.

Moreover, if the City's policies have any relevance in this case, they are only relevant to Count IV, which alleges the City has a custom, policy, or practice of overusing Tasers on individuals with a mental illness, ECF No. 76 ¶ 70, and of failing to supervise, discipline, or train its officers "in the appropriate and reasonable use of force and use of Tasers on the mentally ill," *id.* ¶ 73. In this regard, the City generally does not dispute that a qualified police practices expert may opine on whether a particular policy or practice meets or exceeds certain accepted standards. But, for whatever reason, Taylor was not offered for that purpose. *See* Arg., Part II, *supra*. In fact, Taylor specifically testified that he is not even aware of the model policy regarding use of force on a subject who is in handcuffs. *Id.* at 109. Nor has he identified any deficiency in the City's policy itself.

The real reason Taylor was hired in this case is to strengthen Plaintiff's argument for Count I, a state-law claim for wrongful death. Taylor is essentially a conduit for opposing counsel to argue through her case-in-chief that the City's officers used "excessive" force, which caused Tyson's death. This is unduly prejudicial and improper under Rule 403 and 702. Accordingly, Taylor should be precluded from testifying that the officers' use of force in this case was "excessive," "unreasonable," or violated departmental policy.

---

[2] Ironically, Taylor stated that attempting to strike an officer with ones feet is an example of "aggressive physical resistance." *Id.* at 117.

### IV.  Dr. Mark Shuman should be precluded from testifying that the use of a Taser contributed to Tyson's death.

Dr. Shuman should be precluded from testifying that the use of a Taser contributed to Tyson's death because his opinion is admittedly based upon insufficient facts and data.

According to Dr. Shuman, the use of a Taser conductive energy device "may have contributed to [Tyson's] death as the result of additional stress caused by pain, but only if there was a temporal association with the cardiopulmonary arrest and the last discharge." Exhibit 4 at 5. However, Dr. Shuman also opined that Tyson was suffering from ExDS, and that patients experiencing ExDS are often numb to pain. *Id.* at 3. When asked about the apparent conflict between his two opinions, Dr. Shuman candidly testified that he does not know for sure whether the patients who are experiencing ExDS are actually feeling pain "or they just don't care about it." Exhibit 11 at 40–41. He further stated, "I don't know if anybody knows physiologically what it's doing." *Id.* at 41.

Dr. Vilke does. In 2007, Dr. Vilke and his colleagues performed one of the first studies to investigate the extent of physiologic stress after exposure to the Taser X26 on human subjects. *See* Exhibit 12. "In summary, this preliminary work in humans demonstrate[d] no clinically relevant changes in ventilation, acid-base status, electrolyte concentrations (calcium, sodium, potassium), troponin I level, or ECGs." *Id.* at 6. Therefore, the authors concluded, "a 5-second exposure of a Taser X-26 to healthy subjects does not result in clinically significant changes in ventilatory or blood characteristics of physiologic stress." *Id.*

Additionally, Dr. Vilke and others have performed numerous studies that investigated the physiological effects of a Taser during strenuous physical activity. This was very important because the Taser is "frequently used on suspects who are combative." Exhibit 13 at 5. When a subject is already under stress from strenuous physical activity, such as exercise or physically resisting a law enforcement officer, these doctors found, the exposure to a Taser cycle "does not result in clinically significant changes in ventilator or blood parameters of physiologic stress." *Id.* at 6. Moreover, in the first study to evaluate the human acid/base and catecholamine response of a resisting subject during a simulated law enforcement authority custodial arrest encounter, the authors found that the actions of physically resisting and fleeing were the most harmful with respect to acid/base and catecholamine physiology, not the use of a Taser. Exhibit 14 at 8. These results were consistent with prior research, which "has shown that in exhausted subjects, TASER

exposures are not associated with worsening acidosis differently than continued exertion." *Id.* at 7.

In the instant case, the undisputed material evidence will show that Tyson was highly combative and violent in the minutes leading up to his death. Therefore, Dr. Shuman's opinion that the use of a Taser conductive energy device "may have contributed to [Tyson's] death as the result of *additional* stress caused by pain" is not reliable or sound. The medical literature on this subject definitively establishes that the use of a Taser does not result in clinically significant changes in measures of physiologic stress, especially when the subject is already involved strenuous physical activity. *See* Exhibits 12–14. Moreover, Dr. Shuman admitted he would have to speculate as to whether there is actually a change in measures of physiologic stress when a subject is experiencing ExDS, as was Tyson. Exhibit 11 at 40–41. Accordingly, Dr. Shuman should be precluded from testifying that the use of a Taser contributed to Tyson's death because he cannot state within a reasonable degree of medical certainty that the use of a Taser actually caused a physiological response in Tyson's circumstances.

## V. Dr. Wohlgelernter should be precluded from testifying.

Dr. Wohlgelernter should be precluded from testifying in general because he is a classically improper rebuttal expert witness. Dr. Wohlgelernter was purportedly offered by Plaintiff to rebut the opinions of the City's medical causation expert, Dr. Gary Vilke. Dr. Wohlgelernter is expected to testify: (1) that Tyson died from restraint/compressive asphyxia with resultant hypoxia/hypoxemia; (2) that Tyson was not experiencing ExDS at the time of his death; and (3) that Tyson's preexisting heart conditions did not contribute to his death. All three of these opinions were expressly considered and rejected by Plaintiff's first medical causation expert, Dr. Shuman.

"Evidence can be divided into two categories: that which goes to proof of a party's case in chief, and that which responds or rebuts evidence of an adverse party." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 252 (S.D.N.Y. 2014). "It is typically the case that evidence presented in defense to a claim would be 'rebuttal' evidence; if it is not, it would be, in effect, irrelevant under Rule 401. Of course, a plaintiff may himself proffer rebuttal evidence to counter evidence offered by a defendant to defeat the plaintiff's claim." *Id.* "To determine whether evidence is 'rebuttal' evidence, a court must ask whether the rebuttal evidence is proffered to counter evidence that the defendant has offered, or whether it is simply a continuation of the plaintiff's case in-chief." *Id.*

In *Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287 (M.D. Fla. 2016), the Court discussed the proper function of rebuttal expert testimony:

> "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party." *Cage v. City of Chicago*, 2012 WL 5557410, at *2 (N.D.Ill. Nov. 14, 2012). "A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *Id.* "A 'plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief." *Id.* As a result, **a plaintiff may not seize upon language used in a defendant's expert report "as a chance to re-do their opening expert report."** *See Kirola v. City and Cty. of San Francisco*, 2010 WL 373817, at *1 (N.D. Cal. Jan. 29, 2010). This is particularly true where the expert evidence being offered on rebuttal is evidence that supports an element of the plaintiff's prima facie case. *See Sports Area Mgmt., Inc. v. K & K Ins. Grp., Inc.*, 2008 WL 4877452, at *1–2 (N.D.Ill. June 26, 2008).

*Id.* at 1291 (emphasis added); *see also Krueger v. Wyeth, Inc.*, 03CV2496-JAH MDD, 2012 WL 3637276, at *4 (S.D. Cal. Aug. 22, 2012) ("Rebuttal designations and disclosures are not intended to provide a party with the opportunity to select a more appealing expert, in terms of qualifications, to present the same opinions provided previously by their initial experts.").

Here, as in *Timber Pines Plaza*, Dr. Wohlgelernter's opinion that Tyson's death was caused by positional restraint asphyxia, rather than by his heart conditions or ExDS, goes directly to Plaintiff's prima facie case. Plaintiff—not the City—has the burden of proving Tyson's death was caused by wrongful conduct. To meet her burden, Plaintiff hired Dr. Shuman, who addressed all three <u>potential</u> causes of Tyson's death, as any prudent pathologist would do.

In his report, Dr. Shuman clearly opined that Tyson was in a state of excited delirium when he died. Exhibit 4 at 5. Dr. Shuman also opined that "[c]oronary atherosclerosis and fibromuscular dysplasia of the SA and AV nodal arteries contributed to his death." *Id*. Additionally, Dr. Shuman's report contains a thorough discussion of "sudden death during prone restraint." *Id.* at 4–5. During his deposition, Dr. Shuman clarified that he believes the process of active restraint was one of the "stressors" that contributed to Tyson's death. Exhibit 11 at 11–13. However, based upon his review of the same evidence as Dr. Wohlgelernter, Dr. Shuman stated that he could not opine within a reasonable degree of medical certainty whether there was or was not restraint asphyxia in Tyson's case. *Id.* at 11. Thus, "at best, [Dr. Wohlgelernter's] opinion bolsters the opinion[] of the Plaintiff's

initial expert witness, [Dr. Shuman], and at worst constitutes an attempt to obtain a do-over of [Dr. Shuman's] initial report. Under either scenario, [Dr. Wohlgelernter's] report is not a proper rebuttal report under Rule 26(a)(2)(D)(ii)." *Timber Pines Plaza*, 192 F. Supp. 3d at 1291.

It is true that Dr. Vilke also opined on Tyson's cause of death, but he did not inject new theories into the case. In fact, he and Dr. Shuman are essentially in agreement. Both Dr. Vilke and Dr. Shuman agree that Tyson was suffering from ExDS at the time of his death. They both agree that Tyson's severe preexisting heart conditions also contributed to his death. To the extent their opinions differ, it is only with respect to what extent, if any, the use of a Taser and/or the restraint process contributed to Tyson's death.[3] *See* Exhibit 11 at 11–13. But, this is not a valid reason for Plaintiff to offer a "better" expert with a more preferable opinion on the same subjects. *See Timber Pines Plaza*, 192 F. Supp. 3d at 1291; *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."). "A plaintiff may not seize upon language used in a defendant's expert report 'as a chance to re-do their opening expert report,'" but that is exactly what happened here. *See Timber Pines Plaza*, 192 F. Supp. 3d at 1291; *see also SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1515 (10th Cir. 1990) ("We have reviewed the record in this regard and we agree with the district court's assessment that Freeman's proffered rebuttal testimony was really an attempt by Sil–Flo, Inc. to introduce or interpret exhibits more properly part of its case-in-chief and that Mr. Freeman was not the proper party to sponsor or interpret such exhibits. Consequently, the testimony was properly excluded.").

A review of the relevant timeline reveals that Dr. Wohlgelernter was hired at the eleventh hour, suggesting that his true role was to "fix" Plaintiff's case, rather than to diffuse the impact of Dr. Vilke's opinion. Pursuant to an agreement between the parties, the rebuttal expert disclosure deadline was originally set for May 16, 2018. On April 9, 2018, Plaintiff received Dr. Vilke's report. On April 24, 2018, Plaintiff took Dr. Vilke's deposition. On May 2, 2018, the City took Dr. Shuman's deposition. Then, on May 15, 2018—the day before the rebuttal expert disclosure deadline—Plaintiff first contacted Dr. Wohlgelernter. Exhibit 15 at 1. That night, at 6:25 P.M., Plaintiff's counsel sent him some materials to review. *Id.* at 4. Interestingly, however, the expert report of Dr. Vilke was not sent until the following afternoon—the day of the actual deadline—

---

[3] Dr. Wohlgelernter also opined that the use of a Taser did <u>not</u> have any role in the cause of Tyson's death. Exhibit 18 at 40–41.

and there is no indication that Dr. Wohlgelernter was ever provided Dr. Vilke's deposition transcript. *See id.* at 1, 4. After Plaintiff requested an additional extension, the City received Dr. Wohlgelernter's report two days later, on May 18, 2018. But the City was not able to depose Dr. Wohlgelernter until discovery was effectively closed. *See* ECF No. 82.

The City was especially prejudiced by the last-minute disclosure of Dr. Wohlgelernter's opinions because he injected an entirely new theory into the case. Unlike Dr. Shuman, who opines that the restraint process was merely a factor in Tyson's death, Dr. Wohlgelernter affirmatively opines "that Mr. Daniel Tyson's death was due to restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA cardiac arrest" and nothing else. Exhibit 10 at 3. Notably, Dr. Wohlgelernter offers an entirely new analysis to support his conclusion, which is centered around the paramedics' finding of Pulseless Electrical Activity (PEA) in Tyson's heart rhythms shortly after he became unresponsive. *See id.* at 3–4. In doing so, Dr. Wohlgelernter rejects a single premise offered by Dr. Vilke regarding the $CO_2$ levels found in Tyson. *See id.* at 4–5. But there is a fundamental difference between rejecting a single premise to a conclusion, and offering an entirely different conclusion. The latter is not introduced to contradict, impeach or defuse the impact of evidence offered by the City, but rather to offer a new theory of Tyson's cause of death, most likely because Plaintiff was not satisfied with Dr. Shuman's explanation.

Had Dr. Wohlgelernter's novel theory been disclosed to the City at the same time as, or in lieu of, Dr. Shuman's opinion, the City would have hired Dr. Richard M. Luceri in addition to, or in lieu of, Dr. Vilke. *See* Exhibit 16. Dr. Wohlgelernter "is an expert in the field of cardiology." Exhibit 9. As a renowned cardiac electrophysiologist himself, *see* Exhibit 17, Dr. Luceri could have easily explained that Dr. Wohlgelernter's PEA analysis is inaccurate and misleading. However, because the City was sandbagged, it can no longer disclose a cardiologist to rebut Dr. Wohlgelernter's opinions or analysis. *See Neuroth v. Mendocino County*, No. 15-03226, ECF No. 255 at 5 (N.D. Cal. May 7, 2018) ("Defendants believe they are prejudiced not only by late disclosure, but also by Dr. Wohlgelernter's introduction of a new theory not previously disclosed by plaintiff's other experts, to which defendants will not have sufficient time to organize a rebuttal without moving numerous other pretrial deadlines. Accordingly, because the late disclosure of Dr. Wohlegelernter as an expert was neither substantially justified not harmless, his report will be excluded and he will be precluded from testifying at trial.").

Accordingly, Dr. Wogleglernter should be stricken as an expert witness.

### VI. Dr. Wohlgelernter should be precluded from testifying about Tyson's cause of death.

Additionally, to the extent Dr. Wohlgelernter is not stricken as an expert witness entirely, he should be precluded from testifying about Tyson's cause of death because he is either not qualified or his opinion is not reliable, or both.

Again, Dr. Wohlgelernter is expected to testify "that Tyson's death was due to restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA cardiac arrest." Exhibit 10 at 3. To reach this conclusion, Dr. Wohlegelernter offered a differential diagnosis by ruling out other potential causes of PEA. *See* Exhibit 18 at 52. However, Dr. Wohlgelernter's purported basis for ruling out another known cause of PEA cardiac arrest—acidosis—is not reliable. Although Dr. Wohlgelernter believes that the degree of acidosis associated with ExDS is too mild to cause PEA, *id.* at 61–62, he is mistaken. "There are numerous authoritative medical papers, book chapters, and task force reviews published nationally and internationally supporting the proposition that ExDS causes, contributes to, or is associated with significant acidosis." Exhibit 19 at 1–2. A sampling of this literature (29 peer-reviewed articles) is listed in Exhibit 19, the Declaration of Dr. Gary Vilke. *See id.* at 2–4.

Additionally, Dr. Wohlgelernter is not qualified to opine "that Tyson's death was due to restraint/compressive asphyxia." Exhibit 10 at 3. "Position and restraint physiology is an area of specialty that a cardiologist would be unlikely to have specific experience in from daily activities and patient care." Exhibit 19 at 6. Indeed, "[a] review of [Dr. Wohlgelernter's] CV demonstrates that he has not participated in any research on this topic, nor published any textbook chapters or peer reviewed papers." *Id.* Moreover, during his deposition, Dr. Wohlgelernter admitted that he "did not specifically study the literature regarding the mechanisms and specific quantitative aspects of positional restraint coupled with compression." Exhibit 18 at 47. Nor could not opine on the duration or quantity of force applied to Tyson. *Id.* at 31–35, 37–38, 56. Therefore, not only is Dr. Wohlgelernter not qualified to offer a reliable opinion on whether Tyson's death was due to restraint/compressive asphyxia, *see* Fed. R. Civ. P. 26(a)(2)(B)(iv), his flawed opinion is admittedly based upon insufficient facts and data, too.

Finally, in complete contradiction to Plaintiff's first medical expert, Dr. Wohlgelernter is expected to testify that Tyson was not suffering from ExDS at the time of his death. Exhibit 10 at 4. However, during his deposition, Dr. Wohlgelernter openly stated that he is "not an expert in

17

excited delirium." Exhibit 18 at 28. Further, based on his review of "the literature," Dr. Wohlgelernter agreed that Mr. Tyson exhibited all of the signs of ExDS on the date of his death. *Id.* at 28–29. Nevertheless, Dr. Wohlgelernter "totally reject[s] the contention that the cause of the sudden cardiac arrest and death in Mr. Tyson was Excited Delirium Syndrome (ExDS), as suggested by Dr. Vilke." Exhibit 10 at 4. According to Dr. Wohlgelernter, "the undeniable fact that the cardiac rhythm at the time of cardiac arrest was PEA is incompatible with the theory that ExDS was the culprit." *Id.* (emphasis added). But, this is, in fact, completely untrue.

There is actually a wealth of literature that establishes not only that the existence of PEA is compatible with a theory of ExDS, but also that directly links the two. *See* Exhibit 19 at 5. The existence of PEA is actually a defining feature or result of ExDS. *See id.* In contrast, the existence of VT and VF in known cases of ExDS is extremely rare. *See id.* at 5 ("[A] review of over 80 published papers and book chapters specifically on the topic of ExDS found only one ExDS patient who presented with VT and none with VF.").

In the end, it is apparent that Dr. Wohlgelernter's opinion regarding ExDS is based solely upon the flawed interpretation of a single sentence in an article by Dr. Deborah Mash.[4] *See* Exhibit 18 at 65–66. However, neither that sentence, nor the article or its sources, comes close to establishing that the existence of PEA is incompatible with a theory of ExDS. Rather, the sentence he relies on references VT and VF "only in the sense of it being a possible mechanism in SUDEP (sudden unexplained death in epilepsy), which has no known specific physiologic link to ExDS," and definitely no relevance in this case. Exhibit 19 at 4–5. Moreover, the article as a whole was reviewing "the brain basis for the cause or initiating factors for ExDS, not the physiologic manifestations, like acidosis or the ultimate causes of death in fatal cases." *Id.* at 6. Thus, to the extent that Dr. Wohlgelernter relies on the Dr. Mash article for support, his opinion is unsupported.

Accordingly, at the very least, Dr. Wohlgelernter should be precluded from testifying about Tyson's cause of death because he is either not qualified or his opinion is not reliable, or both.

## **CONCLUSION**

For the reasons stated above, the City respectfully requests that this Court make the following pretrial rulings, which limit the introduction of Plaintiff's expected expert testimony: (1) Roy Taylor is precluded from testifying that the use of a Taser can cause a person's death and

---

[4] Dr. Mash's article is included as Exhibit 20.

that the use of a Taser in fact caused Tyson's death; (2) Roy Taylor is precluded from testifying that the City's policies, training, and supervision are inadequate; (3) Roy Taylor is precluded from testifying that the officers' use of force was "excessive" or "unreasonable" or violated departmental policy; (4) Dr. Mark Shuman is precluded from testifying that the use of a Taser contributed to Tyson's death; and (5) Dr. Wohlgelernter is precluded from testifying in general and about Tyson's cause of death specifically.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that prior to filing the instant motion, the undersigned made reasonable efforts to confer with all parties who may be affected by the relief sought in this motion. However, the parties could not resolve by agreement the issues raised in this motion.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail on July 18, 2018 on all counsel of record on the attached Service List.

Respectfully submitted,

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Counsel for Defendant City of Hollywood*
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, FL  33301
Telephone:  (954) 763-4242
Telecopier:  (954) 764-7770

By: */s/ Adam M. Hapner*
    DANIEL L. ABBOTT
    Florida Bar No. 767115
    Primary email: dabbott@wsh-law.com
    Secondary email: pgrotto@wsh-law.com
    ADAM M. HAPNER
    Florida Bar No. 112006
    Primary email: ahapner@wsh-law.com
    Secondary email: mboschini@wsh-law.com

## SERVICE LIST

CASE NO.: 0:16-CIV-62215-DIMITROULEAS/SNOW

| | |
|---|---|
| **Joseph J. Kalbac, Jr., Esq.**<br>**Stephanie A. Casey, Esq.**<br>**Denise H. Georges, Esq.**<br>**Lindsey Lazopoulos Friedman, Esq.**<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, Florida 33134<br>Telephone: 305-476-7400<br>Facsimile: 305 476-7444<br>Email:eservice@colson.com;<br>nicky@colson.com; mabel@colson.com;<br>denise@colson.com; scasey@colson.com;<br>jkalbac@colson.com;<br>lindsey@colson.com<br><br>*Attorneys for Plaintiff* | **Daniel L. Abbott, Esq.**<br>**Adam M. Hapner, Esq.**<br>WEISS SEROTA HELFMAN<br>COLE & BIERMAN, P.L.<br>200 E. Broward Blvd., Suite 1900<br>Fort Lauderdale, FL 33301<br>Telephone: (954) 763-4242<br>dabbott@wsh-law.com<br>ahapner@wsh-law.com<br><br>*Attorneys for Defendant City of Hollywood* |