```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2            CIVIL ACTION NO.: 16-62215-CV-WPD

 3

   JEAN SUAREZ, individually and as a
 4 Personal Representative of the
   Estate of DANIEL TYSON, deceased,
 5
                   Plaintiff,
 6
         vs.
 7

   CITY OF HOLLYWOOD, a Florida
 8 Municipal Corporation, CHIEF OF
   POLICE TOMAS SANCHEZ, in his
 9 official capacity, TASER
   INTERNATIONAL, INC., and
10 JOHN DOES 1-20, individually,

11                 Defendants.

12

13 VIDEOCONFERENCE

14 DEPOSITION OF:   ROY G. TAYLOR

15 DATE:            May 1, 2018

16 TIME:            10:17 a.m.

17 LOCATION:        1201 Main Street
                    Columbia, SC
18
   TAKEN BY:        Counsel for the Defendant
19
   REPORTED BY:     Susan M. Valsecchi, CRR
20                  Registered Professional Reporter

21

22

23

24

25
```

Verbatim Support Services

```
 1    APPEARANCES OF COUNSEL:

 2

 3         ATTORNEYS FOR THE PLAINTIFF
                JEAN SUAREZ, individually and as a
 4              Personal Representative of the Estate
                of DANIEL TYSON, deceased:
 5
                COLSON HICKS EIDSON
 6              BY:  DENISE H. GEORGES
                255 Alhambra Circle, Penthouse
 7              Coral Gables, FL  33134
                (305) 476-7400
 8              denise@colson.com

 9

10         ATTORNEYS FOR THE DEFENDANT
                CITY OF HOLLYWOOD, a Florida Municipal
11              Corporation:

12              WEISS, SEROTA, HELFMAN,
                COLE & BIERMAN, P.L.
13              BY:  DANIEL L. ABBOTT
                (VIA VIDEOCONFERENCE)
14              200 E. Broward Boulevard, Suite 1900
                Fort Lauderdale, FL  33301
15              (954) 763-4242
                dabbott@wsh-law.com
16

17

18

19

20

21

22

23

24

25
```

Taylor, Roy                    May 01, 2018                    Page 3

```
 1                    I N D E X
 2
 3                                    Page    Line
 4   ROY G. TAYLOR                     4       1
 5   EXAMINATION                       4       3
 6   BY MR. ABBOTT
 7   EXAMINATION                      129      9
 8   BY MS. GEORGES
 9   EXAMINATION                      148      11
10   BY MR. ABBOTT
11   CERTIFICATE OF REPORTER          151      1
12
13
14                  E X H I B I T S
15                                    Page    Line
16   (No exhibits were proffered.)
17
18
19
20
21
22
23
24
25
```

Verbatim Support Services

```
 1                    ROY G. TAYLOR
 2   being first duly sworn, testified as follows:
 3                    EXAMINATION
 4   BY MR. ABBOTT:
 5        Q.    Would you please state your name for
 6   the record, sir.
 7        A.    Roy G. Taylor.
 8        Q.    Thank you.
 9              Mr. Taylor, we have been provided some
10   of the documents that you have prepared in
11   connection with this litigation and I think I'm
12   going to begin on a document called the Fee and
13   Expense Policy.
14              Do you have that in front of you, sir?
15        A.    Yes, sir, I do.
16        Q.    I see at the top that you are a
17   criminal justice and security consultant?
18        A.    Yes, sir.
19        Q.    And do you provide those services
20   individually or through a corporate entity of some
21   sort?
22        A.    I'm an LLC, single member.
23        Q.    And what is the name of that LLC, sir?
24        A.    Taylor Law Enforcement Consulting
25   Group.
```

1          Q.    And where is that LLC incorporated?

2          A.    North Carolina.

3          Q.    I see under the Case Preparation

4    section of that Fee and Expense Policy it indicates

5    that you receive a $5,000 non-refundable case

6    preparation fee?

7          A.    Yes, sir; that's correct.

8          Q.    And have you, in fact, received that

9    fee from the Plaintiffs or the Plaintiffs'

10   attorneys in this case?

11         A.    Yes, sir, I have.

12         Q.    And I see within that paragraph that

13   that fee is based upon a thought that you'll expend

14   approximately 40 hours at $125 an hour in

15   developing your opinions?

16         A.    Yes, sir.

17         Q.    And have you, in fact, sir, expended

18   about 40 hours in developing your opinions in this

19   case?

20         A.    Yes, sir, over 40 hours.

21         Q.    Over 40.  But under your fee

22   arrangement, the Plaintiffs don't owe you any more

23   money?

24         A.    Correct.

25         Q.    And you are charging me for this

1   deposition, $1500?

2        A.   Yes, sir, that's correct.

3        Q.   And at $125 an hour, does that mean

4   that you expect that I'm going to be asking you

5   questions for about twelve hours?

6        A.   It sometimes comes to that, but I don't

7   know how deep your questioning will go.  Plus, my

8   preparation time, driving time, all of that is

9   encompassed in that flat fee.

10        Q.   Okay.  How much time did you expend,

11   sir, in preparing for this deposition, as opposed

12   to developing your opinions?

13        A.   About four hours yesterday reviewing

14   all of the material that I had.

15        Q.   And how long was the drive for you this

16   morning?

17        A.   A little over an hour.

18        Q.   I hope this doesn't unduly disappoint

19   you, Mr. Taylor, but I very much doubt that I even

20   have seven more hours of questions for you.

21        A.   I'm disappointed.

22        Q.   The next document I had a few questions

23   for you about was your CV.  Do you have that in

24   front of you?

25        A.   Yes, sir.

Taylor, Roy                    May 01, 2018                    Page 7

```
 1          Q.    And I want to go to the section
 2    entitled Professional Experience.
 3                Are you with me?
 4          A.    One second, please.
 5          Q.    Yes, sir.
 6          A.    Okay, sir.
 7          Q.    Under Professional Experience, are you,
 8    sir, the -- well, let me ask you this first.
 9                Is this CV that I have up to date?
10          A.    The only thing that's changed since
11    this one was printed was that I moved from the
12    National Guard to the Army Reserve.  I'm now the
13    Commander of a unit in Nashville, Tennessee.
14                At the time, I was a lieutenant colonel
15    with the -- well, I was actually in the Army
16    Reserve.  I was stationed at Fort Bragg when this
17    one was written.
18          Q.    Okay.  Other than that, the CV doesn't
19    require any additions or deletions?
20          A.    No, sir, unless you want to add I just
21    got back from a training conference with the
22    International Law Enforcement Trainers and
23    Educators Association in St. Louis, and it doesn't
24    reflect the courses I took there.
25          Q.    And you would add that, what, under the
```

1    training section of the CV?

2         A.    Yes, sir.

3         Q.    Okay.  Any other additions or deletions

4    required of the CV?

5         A.    No, sir.

6         Q.    You are the chief of police for Blue

7    Ridge Public Safety?

8         A.    Yes, sir.

9         Q.    And have been since April of 2014?

10        A.    Correct.

11        Q.    What is Blue Ridge Public Safety?

12        A.    It's a private law enforcement company

13   that's been in existence for about 45 years now.

14   We service million-dollar homes that are in

15   Property Owner Associations where, you know, people

16   like yourself in Florida want to escape the heat in

17   the summer, they have secondary homes in the

18   mountains, and the area of the county is

19   unincorporated so there's only one deputy covering

20   about 250 square miles.

21             And in order to provide law enforcement

22   services, they contract with us to protect their

23   property and meet any law enforcement or security

24   needs they may have.

25        Q.    And you say that corporation has been

```
 1    in existence for about 45 years?
 2              A.   Yes, sir.
 3              Q.   Do you have any role in that
 4    corporation, sir, other than to be employed,
 5    presumably, as the chief of police?
 6              A.   I owned the corporation until January
 7    of this year and I sold it, but they retained me as
 8    the chief of police to run all of the operations.
 9              Q.   Okay.  And so is that entity also a
10    limited liability corporation?
11              A.   No, sir, it's a C corporation.
12              Q.   Incorporated in North Carolina?
13              A.   Yes, sir.
14              Q.   And when did you acquire the
15    corporation?
16              A.   April of 2014.
17              Q.   Was there an existing chief of police
18    when you acquired the corporation?
19              A.   Yes, sir, the previous owner.
20              Q.   And who was that?
21              A.   David Finn, F-i-n-n.
22              Q.   So in April of 2014 you acquired the
23    corporation and amongst other things appointed
24    yourself to be chief of police?
25              A.   Correct.  I'm certified through the
```

```
 1   State of North Carolina.  I don't really appoint
 2   myself, but I'm commissioned through the State of
 3   North Carolina for that position.
 4        Q.   You are commissioned as a police
 5   officer in general, or the state commissions you as
 6   being the chief of police of this private
 7   corporation?
 8        A.   They commission me as the chief of
 9   police, so it's a regular law enforcement
10   commission, but my position is a full-time police
11   chief.
12        Q.   And what does that entail, for the
13   State of North Carolina to commission a police
14   chief in a private security firm?
15        A.   We're not a security firm.  It's a law
16   enforcement agency, just like any agency; we're
17   just not tax supported.
18             And the requirements are the same as it
19   is for any other municipal agency, fill out an
20   investigative background form, investigation's
21   performed, have to take a written examination, and
22   then a physical, a drug screen, firearms
23   qualification.
24             And then after all of that packet is
25   rolled up and they adjudicate it, then my
```

```
 1    commission is issued.
 2          Q.    And is that background any more
 3    detailed than the background to be certified for a
 4    police officer?
 5          A.    It's a little more stringent.  The
 6    State oversees it instead of the local department,
 7    so the Criminal Justice and Training Standards
 8    Commission of North Carolina has an office called
 9    the Company Police Office and those administrators
10    verify that everything is done and then it's sent
11    over to the regular commissioning side of training
12    and standards that would commission all of the
13    other law enforcement officers.
14                So we have higher standards in that we
15    can have fewer convictions in our background and
16    we're also required to take a written examination
17    that other officers are not required to take and
18    the State maintains all of our documentation, so
19    it's a little more stringent.
20                As a municipal police chief, all that
21    had to be submitted to the State was one piece of
22    paper that said all of those things were
23    accomplished, but there was no direct oversight to
24    ensure that they were.
25          Q.    So this was a more detailed process
```

```
 1   than when you were commissioned to be chief of
 2   police for local law enforcement agencies?
 3        A.    Yes, sir.
 4        Q.    How many employees, sir, does Blue
 5   Ridge Public Safety have?
 6        A.    16.
 7        Q.    And how many of those are
 8   state-certified police officers?
 9        A.    Six.
10        Q.    And do those officers work for Blue
11   Ridge full time?
12        A.    Yes, sir.  They work a modified DuPont
13   schedule, twelve-hour shifts.
14        Q.    And who are they -- who is the current
15   client, or who are the current clients of Blue
16   Ridge?
17        A.    We have 39 property owner associations.
18   We call them property owners instead of homeowners
19   because this is a secondary home, so we have 39
20   property owner associations and over 1200
21   individual customers that contract us for alarm
22   response.
23             And then we have a number of commercial
24   entities, different businesses in the area, that
25   contract with us for protection as well.
```

```
 1            Q.   Is Mr. Finn still associated with Blue
 2     Ridge in any way?
 3            A.   He's still sworn in as a reserve
 4     officer to hold his commission, but he doesn't
 5     work.  He has not worked since I took over, but we
 6     maintain his certification as part of my agreement
 7     with him when I purchased the business.
 8            Q.   He maintains his state certification?
 9            A.   Yes, sir, he attends 24 hours of
10     in-service training annually and firearm
11     qualification annually.
12            Q.   Did you acquire Blue Ridge from
13     Mr. Finn before or after he shot his son in the
14     head?
15            A.   It was afterwards.  And that was all
16     dismissed.
17            Q.   I'm sorry?
18            A.   That case was dismissed.
19            Q.   You anticipated my question, sir.
20                 Were there criminal proceedings brought
21     in connection with that incident?
22                 MS. GEORGES:  Object to the form.
23                 THE WITNESS:  Both Mr. Finn and his son
24     were both arrested; and because of the ongoing
25     issues with his son having mental problems, the
```

Taylor, Roy                    May 01, 2018                    Page 14

```
 1   cases were dismissed on both their behalves, both

 2   parts.

 3   BY MR. ABBOTT:

 4        Q.   Both criminal cases were dismissed?

 5        A.   Yes.

 6        Q.   And was any civil litigation initiated,

 7   to the best of your knowledge?

 8             MS. GEORGES:  Form.

 9             THE WITNESS:  No, sir.

10   BY MR. ABBOTT:

11        Q.   Were you, sir, or any of your

12   corporations retained in connection with those

13   criminal proceedings?

14        A.   No, sir.

15        Q.   The next entry -- other than your

16   litigation consultant business -- well, let's spend

17   a moment on that.

18             You've been a litigation consultant

19   since December of 2013?

20        A.   Yes, sir.

21        Q.   And that has been through criminal

22   justice -- forgive me.

23             That has been through the C corporation

24   that you told me about earlier.

25        A.   No, sir, the LLC, Taylor Consulting
```

Taylor, Roy                    May 01, 2018                    Page 15

```
 1   Group.  Blue Ridge Public Safety is a C
 2   corporation.
 3              Q.   Okay, forgive me.
 4                   Thank you for clarifying that.
 5                   You are the president and CEO of Signal
 6   88 Security of Charlotte?
 7              A.   Yes, sir.
 8              Q.   And you have been since July of 2012?
 9              A.   Yes, sir.
10              Q.   Are you also an employee of that
11   corporation?
12              A.   I don't receive any pay from it any
13   longer.  I sold all of my law enforcement and
14   security businesses in January and then I was
15   retained in my current role as, you know, CEO and
16   director of operations, basically, but I receive
17   one salary through Blue Ridge and that's the only
18   income I derive from my previous businesses.
19              Q.   What kind of services does Signal 88
20   Security of Charlotte provide?
21              A.   Primarily armed security guard patrol
22   service.  They contract with a number of different
23   locations and a security officer patrols them for
24   roughly eight to ten minutes on the contracted
25   number of times each night.
```

Taylor, Roy                    May 01, 2018                    Page 16

```
 1              So your office complex may contract
 2    with us to check the doors and the parking lots
 3    three times a night over a period of like 6 p.m. to
 4    6 a.m., an officer will come by, check the
 5    business, make sure everything is secure, there's
 6    no loitering or vandalism, and then continue on
 7    their way.
 8         Q.    And do I understand from your earlier
 9    testimony, sir, that you used to have an ownership
10    interest in Signal 88?
11         A.    Yes, sir.
12         Q.    Until when, sir?
13         A.    January of 2018.
14         Q.    And when did your ownership of that
15    business begin?
16         A.    In July of 2012.
17         Q.    Did you sell that business to a
18    gentleman named Chad Burke?
19         A.    No, he owns another franchise in
20    Charlotte.  Signal 88 is a franchise security
21    company and Mr. Burke owns a separate entity.  I
22    have never owned the one that he has.
23         Q.    Do you know what his entity is called?
24         A.    I think it's Signal 88 of North
25    Charlotte.
```

Taylor, Roy                    May 01, 2018                    Page 17

```
1            Q.    Okay.  And the entity we're talking

2    about is called Signal 88 Security of Charlotte?

3            A.    Yes, sir.

4            Q.    And is that entity incorporated?

5            A.    Yes, sir, it's an S corporation.

6            Q.    In what state?

7            A.    North Carolina.  Actually, the new

8    owners have converted it to an LLC now.

9            Q.    Okay.  But during the time that you

10   owned it, it was a North Carolina corporation?

11           A.    Yes, sir, an S. Corp.

12           Q.    You are the president and CEO of

13   Capitol Special Patrol?

14           A.    Yes, sir.

15           Q.    And have been since February of 2012?

16           A.    Yes, sir.

17           Q.    And what business does Capitol Special

18   Patrol engage in?

19           A.    Armed security in the Raleigh area and

20   then we've got an office in Charlotte as well, so

21   we do dedicated and patrol services.

22           Q.    Okay.  Do you hold any other offices in

23   Capitol Special Patrol other than being a president

24   and CEO?

25           A.    Instructor.  I teach the unarmed and
```

Verbatim Support Services

```
 1  armed guard training.
 2         Q.    Do you have an ownership interest in
 3  that entity?
 4         A.    No, sir, not at this time.
 5         Q.    Did you at one time?
 6         A.    Yes, sir, until January of 2018.
 7         Q.    So you owned it from February of 2012
 8  until January of 2018?
 9         A.    Correct.
10         Q.    Does that entity have a position called
11  chief of police?
12         A.    No, sir, it's not a police agency.
13         Q.    You are the chief of police for Capitol
14  Special Police?
15         A.    Yes, sir.
16         Q.    And you have been since August of 2002?
17         A.    Yes, sir.
18         Q.    Do you have any role in that
19  corporation other than being an employee with the
20  title chief of police?
21         A.    No, sir.
22         Q.    You don't have any ownership interest
23  in that entity?
24         A.    No, sir.
25         Q.    And you are not an officer of any sort
```

```
 1    in that corporation?

 2         A.   I have a title of executive vice

 3    president of operation for all of the companies and

 4    the overarching company that owns them, H.G.

 5    Security Services; I'm an executive vice president.

 6    And they own all of the businesses.

 7         Q.   Have you ever had an ownership in

 8    Capitol Special Police?

 9         A.   Up to January of 2018.

10         Q.   So from August of 2002 until earlier

11    this year, you were an owner of that corporation?

12         A.   Yes, sir, I owned 100 percent of it.

13         Q.   And so as owner, you hired yourself to

14    be the chief of police?

15         A.   Yes, sir.

16         Q.   You were the chief of police for the

17    National Geospatial Intelligence Agency?

18         A.   Yes, sir.

19         Q.   And what kind of an agency was that?

20    What law enforcement services were required for

21    that agency?

22         A.   Like any other federal agency,

23    primarily made sure that the area was secured, was

24    a top-secret facility.  Actually, three locations

25    were top secret.  And we maintained all of the
```

1   normal law enforcement duties that any federal

2   agency would, you know, control traffic, control

3   entry control, control access to the building,

4   respond to any type of criminal activity that

5   occurs on the property.  So it was a typical, you

6   know, federal law enforcement agency.  You know, it

7   was three separate complexes, so we didn't have any

8   residential communities.  It was most of the

9   facilities operated on a normal office hour type of

10  schedule.

11          We did have a few 24-hour operations in

12  different sections of the organization; but as a

13  whole, it was kind of like a typical business type

14  of complex.

15          Q.   You served as the chief of police there

16  for, I guess, a little bit less than a year?

17          A.   Yes, sir, 11 months.

18          Q.   Why did you separate from being chief

19  of police for that agency?

20          A.   The National Guard hired me full time

21  to be the provost marshal, so I was in charge of

22  all of their law enforcement, security, operation

23  security and anti-terrorism programs and eventually

24  emergency management as well; so it allowed me to

25  keep my same salary but move to Southern Virginia,

 1   get out of the high cost of DC.

 2        Q.   When you were chief of police for the

 3   National Geospatial Intelligence Agency, was that

 4   in your individual capacity, or was that through

 5   one of the corporations that we've been discussing

 6   here today?

 7        A.   Individual, sir.  That's a federal

 8   agency.  It's a federal intelligence agency.

 9        Q.   Forgive me.  I forgot to ask you about

10   some of these other agencies.

11            Do you know, sir, how many employees

12   Signal 88 Security of Charlotte has?

13        A.   Currently around 20, 22, I'm not

14   exactly sure; it fluctuates.  But usually around

15   20.

16        Q.   And are some of those employees sworn

17   police officers?

18        A.   No, sir, they're all security guards.

19   A majority of them are armed security guards.  We

20   may have a couple of unarmed, but the majority are

21   unarmed security.

22        Q.   Capitol Special Patrol, do you know how

23   many employees that entity has?

24        A.   Approximately 15.

25        Q.   And are some of those 15, sworn police

 1   officers?

 2        A.    No, sir, they're all armed security as

 3   well, maybe one or two unarmed.

 4        Q.    And, finally, Capitol Special Police,

 5   how many employees does it currently have?

 6        A.    Twelve sworn police officers at the

 7   current time.

 8        Q.    And who are the current clients of

 9   Capitol Special Police?

10        A.    We have a variety.  We have several

11   homeowners associations that we patrol.  Three of

12   them are full time.  Every day we have a number

13   that are contracted for a certain number of hours

14   every week.  We also have commercial properties

15   that we patrol.  We have some dedicated sites, like

16   the IHOP restaurant employs us full time.  We have

17   several shopping centers that have us there for a

18   dedicated number of hours when they experience

19   trouble, so it's basically anybody that needs

20   additional law enforcement services.

21        Q.    You were the chief of police for

22   Dorothea Dix Hospital Police --

23        A.    Yes, sir.

24        Q.    -- for about a year in the late 1990s?

25        A.    Yes, sir.

1    Q.   And was that in your individual

2    capacity, sir?

3        A.   Yes, sir.  That's a state agency.

4        Q.   And what law enforcement services did

5    the hospital police provide?

6        A.   It's a large campus.  We do have

7    residential sections.  We have medical treatment

8    facilities.  We have a high school, two elementary

9    schools, different entities, like a locksmith shop

10   and different support services, but basically

11   typical law enforcement.  You know, we patrol the

12   campus, we enforced traffic law, we enforced

13   parking regulations, entry control.  Again, typical

14   campus type of law enforcement similar to what I

15   did at National Geospatial Intelligence Agency.

16       Q.   Did any other local police have

17   jurisdiction on hospital grounds?

18       A.   We were in the City of Raleigh, located

19   in Wake County, so those two entities, Wake County

20   Sheriff's Office and the Raleigh Police would have

21   had jurisdiction if they needed to come on

22   property.

23            But since we were the primary agency, I

24   don't recall them ever coming and handling any

25   situations on the campus, other than if we asked

Taylor, Roy                    May 01, 2018                    Page 24

```
 1   for backup.
 2        Q.   And why, sir, did you leave Dorothea
 3   Dix?
 4        A.   I had an officer steal some money from
 5   the found property room and I went to my boss and
 6   told him about it and he told me to basically
 7   remove that officer from having any access to the
 8   property; so I did what I was told to do and then
 9   the hospital manager found out about it and I
10   resigned.
11        Q.   Who was the boss that you're referring
12   to at Dorothea Dix that you made report to?
13        A.   His name was Manley Fishel and he was
14   the director of support services.  He was also
15   their budget manager.
16        Q.   Why, sir, did you resign when the
17   hospital manager learned that you had, I guess,
18   discharged the police officer?
19        A.   Actually, I didn't initially resign,
20   you know, because I hadn't done anything wrong; I
21   had met all of the state requirements of reporting.
22   And, you know, I was just following the orders of
23   my supervisor and I didn't see that there was
24   anything wrong, since the officer was disciplined
25   and there was corrective actions taken.
```

```
 1              But, you know, they moved to terminate
 2    me, had a hearing, they upheld the termination and
 3    I appealed it and was allowed to resign because of
 4    some improprieties in the handling of the
 5    situation.
 6              They basically used an attorney that
 7    was already hired by the hospital, but they didn't
 8    disclose that fact.
 9         Q.   You were chief of police in Liberty,
10    North Carolina?
11         A.   Yes, sir.
12         Q.   For about three months in 1997?
13         A.   Yes, sir.
14         Q.   Could you describe to me the size of
15    that agency?
16         A.   I believe we had 15 full-time officers
17    and three part-time officers.
18         Q.   Did you have any employment with that
19    agency other than to serve as its chief in 1997?
20         A.   No, sir.
21         Q.   Why did you separate from that position
22    in December of 1997?
23         A.   Too much political upheaval.  I
24    had -- it was right at the turnover of several
25    board members and all of the board members that
```

```
 1    supported the police department decided not to run

 2    and I had a lady that I had terminated her son from

 3    the police department; she ran and had an agenda.

 4              I had another gentleman, we arrested

 5    his son for trafficking of marijuana and he had an

 6    agenda against the police department.

 7              All of them were making statements

 8    about the changes they were going to make and I

 9    decided it was better for me to go ahead and go

10    before they were sworn, than to stay.

11              It was just a very tumultuous

12    community.  I think I was their eighth police chief

13    in five years.  And it was my fault for not doing a

14    better job of finding out how tumultuous it was.

15         Q.   When you were at Liberty, did you

16    report -- does the chief of police report directly

17    to the board, or was there a city manager?

18         A.   It was a manager/council form of

19    government, so I reported directly to the manager.

20         Q.   Did you have any communications with

21    the city manager on the subject of your

22    resignation?

23         A.   Only that, you know, I thought it was

24    best for me.  I just thought it was getting too

25    hot.  Even he was worried about his continued
```

```
 1   employment.

 2          Q.   You were chief of police in Norwood,

 3   North Carolina --

 4          A.   Yes, sir.

 5          Q.   -- for about nearly a year and a half?

 6          A.   Yeah, just less than two years.

 7          Q.   I have between April of '96 and

 8   September of '97.

 9               Is that the approximate range?

10          A.   Yes, sir.

11          Q.   And did you have any relationship with

12   Norwood other than that period of time that you

13   were the chief of police?

14          A.   No, sir.

15          Q.   And what were the circumstances of your

16   separation from Norwood?

17          A.   I was hired as the Liberty police

18   chief.

19          Q.   What is Sapphire Valley Public Safety,

20   Inc.?

21          A.   That is the security arm of my

22   operations in Blue Ridge.  Blue Ridge Public Safety

23   is the police and Sapphire Valley Public Safety are

24   the security officers, similar to Capitol Special

25   Police being police and Capitol Special Patrol
```

```
 1   being security for my other entity.
 2          Q.    And what is your relationship with
 3   Sapphire?
 4          A.    I'm the director of security.
 5          Q.    Are you also an officer of that
 6   corporation?
 7          A.    Yes, sir.  Again, they're all owned by
 8   H.G. Security where I'm an executive vice
 9   president.  And I believe I'm listed as vice
10   president on all of the North Carolina filings now.
11          Q.    Do you have an ownership interest in
12   Sapphire Valley?
13          A.    No, sir.
14          Q.    Have you ever?
15          A.    Up until I sold it in January of 2018.
16          Q.    And for how long a period did you own
17   it prior to January of 2018?
18          A.    From April 2014 until January of 2018.
19          Q.    Is there any reason why your CV doesn't
20   discuss your role with Sapphire Valley Public
21   Safety.
22                MS. GEORGES:  Form.
23                THE WITNESS:  No reason other than just
24   my CV is long already and it just makes it more
25   confusing to add additional positions which are
```

 1  basically all rolled into one.  My duties aren't

 2  any different.

 3          You know, when I'm there, I take care

 4  of payroll and disciplinary matters, hiring.  All

 5  of it is rolled into -- it's basically like one

 6  position.  But because they can't be the same

 7  entity because of different licensing requirements,

 8  that's the only reason there are two separate

 9  corporations.

10  BY MR. ABBOTT:

11      Q.   Have you ever been accepted or

12  recognized as an expert witness by a federal court?

13      A.   Yes, sir.

14      Q.   And can you tell me approximately how

15  many times that has occurred?

16      A.   I've only had to testify in federal

17  court as an expert one time so far, and that was in

18  Miami.

19      Q.   And do you recall what the style of

20  that case was?

21      A.   What the what, sir?

22      Q.   The name of the case.  I said the

23  style, but the name of the case.

24      A.   Yes, sir.  Let me look it up for you

25  real quick.  It's back in the litigation section.

```
 1              It was listed as Number 14 on Appendix
 2    B and that's Juan Perez, Plaintiff, versus City of
 3    Sweetwater, et al., and it was Civil Action
 4    1:16-CV-24-267.
 5         Q.    To the best of your knowledge, sir, has
 6    there ever been a motion filed in a federal court
 7    challenging your ability to give expert testimony
 8    in whole or in part?
 9         A.    I'm not sure where it's at, but the
10    case that I have in Elizabethtown, Kentucky, has
11    filed a Daubert motion, but I don't think it's gone
12    anywhere other than, you know, the attorneys that
13    hired me have filed a rebuttal to it.  I don't
14    think it's been ruled on.
15         Q.    Okay.  So that motion is pending?
16         A.    Yes, sir.
17         Q.    And is that the only time a Daubert
18    motion has been filed, to your knowledge, with
19    regard to your proposed expert testimony?
20         A.    That's the only Daubert one.  I've been
21    told in another deposition, but I have never seen
22    it myself, that I believe the case I had against
23    Columbus, Ohio, police, that they had filed some
24    type of motion, but I have not seen it and I was
25    never contacted about anything regarding it, so I
```

```
 1   have no firsthand knowledge.
 2          Q.    That Columbus, Ohio, matter remains
 3   pending?
 4          A.    I don't know, sir.  I don't know what
 5   the status is.
 6          Q.    But, I mean, as far as you know, you're
 7   still providing services in connection with that
 8   case?
 9          A.    Yes, sir.
10          Q.    And there may have been a motion filed
11   in that case, but it's all secondhand information,
12   as far as you're concerned?
13          A.    Yes, sir.
14          Q.    And are those the only Daubert motions
15   you're aware of that have been filed with regard to
16   your proposed testimony?
17          A.    Yes, sir.
18          Q.    You're not aware of one having been
19   filed in the Perez case that we talked about
20   earlier?
21          A.    No, sir.
22          Q.    Let's move forward, sir, if we could,
23   to this case and your report.  You provided
24   us -- and I think it's Appendix C to your
25   report -- the materials that you reviewed.
```

```
 1          A.   Yes, sir.
 2          Q.   And can you double check and can you
 3   confirm for me, sir, that those are the materials
 4   that you reviewed in order to develop your opinions
 5   in this case?
 6          A.   Yes, for this initial report, but since
 7   that time I've been provided with additional
 8   depositions and other materials.
 9          Q.   Have any of those additional materials
10   caused you to author a supplemental report or
11   anything of the sort?
12          A.   I haven't at this point; no, sir.
13          Q.   Do you intend to?
14          A.   I may.  I think there's still a few
15   depositions that are out, so once all of the
16   material is in, I would like to review everything
17   and then work with counsel if they would like it.
18   If they felt it was necessary, I would certainly
19   amend it.
20          Q.   Well, as we sit here, have any of those
21   additional materials caused you to change any of
22   your opinions or to develop any additional
23   opinions?
24          A.   Yes, sir.
25          Q.   They have?
```

```
 1          A.   Yes, sir.
 2          Q.   Well, I'm not sure that without a
 3   supplemental report that's something I should be
 4   overly concerned about, but I guess I should ask
 5   you.
 6               What opinions of yours have changed or
 7   what additional opinions have you developed that
 8   are not contained in your report?
 9          A.   Primarily my biggest concern is with
10   the Hollywood Police Department and the policies
11   that they have and the training that they're
12   providing their officers.
13          Q.   All right.  Those are two different
14   opinions, the policies and the training?
15          A.   Yes, sir.  And the supervision.
16          Q.   All right.  What's your concern about
17   Hollywood police policies?
18               MS. GEORGES:  Form.
19               THE WITNESS:  The policies do not
20   discuss responding to people with mental illness
21   that are suffering from psychotic episodes.  They
22   have one policy that basically talks about the
23   Baker Act but only has a few lines about responding
24   and leaves it pretty much open to the officer's
25   discretion.
```

```
 1              And with the number of cases that
 2    they've had and the amount of force used, I feel
 3    that additional guidance is needed to limit the use
 4    of force against people in those situations.
 5    BY MR. ABBOTT:
 6         Q.    And what in particular would be
 7    appropriate policies with regard to police
 8    encounters with the mentally ill or people having
 9    psychotic episodes?
10         A.    You know, primarily I would recommend
11    that they use more deescalation techniques, that
12    the use of any type of weapon would be limited,
13    that they contact EMS early on for help with
14    restraint.
15              And, again, not knowing off hand the
16    medical protocols that the EMS in that area are
17    authorized, but many EMS around the country are
18    allowed to administer different drugs to people in
19    those situations to calm them down, so I think a
20    policy recommending initial EMS activation would be
21    warranted, as well as to insure that an adequate
22    number of officers respond to the situation prior
23    to interaction with the person in crisis, if at all
24    possible.  There's also been a lot of very good
25    programs around the country that have utilized
```

```
 1   counselors that are actually out on patrol and
 2   respond directly to the scene to assist officers in
 3   dealing with these situations.
 4        Q.   Does Blue Ridge Public Safety have an
 5   operations manual or some other collection of
 6   policies?
 7        A.   It does.
 8        Q.   And just so I don't stumble over it in
 9   the future, what do I call that document?
10        A.   Policy and Procedure Manual.
11        Q.   What does the Blue Ridge Public Safety
12   Policy and Procedure Manual provide for in terms of
13   dealing with the mentally ill or those having
14   psychotic episodes?
15        A.   Well, unfortunately, without reviewing
16   it specifically, I don't think we have anything
17   that addresses it, either.
18        Q.   What does the Blue Ridge Public Safety
19   Operations Manual provide for in terms of limiting
20   use of force against those who are mentally ill or
21   those that are having psychotic episodes?
22        A.   Basically it's to use the least amount
23   of force necessary to overcome any resistance.
24        Q.   And that's a policy specifically for
25   the mentally ill?
```

```
 1          A.    No, it's a general use-of-force policy.
 2          Q.    The City of Hollywood has a general
 3    use-of-force policy as well; doesn't it?
 4          A.    It does.
 5          Q.    Is it materially different than the
 6    Blue Ridge Public Safety use-of-force policy?
 7          A.    It is, in that it does address it to
 8    some extent.  It does have the Baker Act, and we
 9    don't currently have anything similar to that in
10    North Carolina.
11                We have involuntary commitments, but
12    the officers are not able to seek that unless the
13    person is obviously a danger to himself and others
14    and there's no family member or emergency contact
15    we can reach.
16          Q.    Well, let me ask my question more
17    directly.
18                Does the Blue Ridge Public Safety
19    Operations Manual have a policy with regard to
20    limiting use of force that is superior than the
21    City of Hollywood's?
22                MS. GEORGES:  Form.
23                THE WITNESS:  No, it doesn't.
24    BY MR. ABBOTT:
25          Q.    What is the Blue Ridge Public Safety
```

```
 1    Policy with regard to deescalation, presumably

 2    deescalation of encounters with those who are

 3    mentally ill or having psychotic episodes?

 4          A.   As I mentioned, I don't think I have

 5    a -- I know there's a tab about dealing with mental

 6    illness, but I don't obviously remember what it

 7    says, and I don't have a computer where I can look

 8    it up for you, but I'm happy to supply that for

 9    you.

10          Q.   Is it your recollection of those, sir,

11    that there is a provision with regard to

12    deescalation teaching or training when encountering

13    the mentally ill or those having psychotic

14    episodes?

15          A.   I don't have a direct recollection of

16    doing that, no.

17          Q.   Does the Blue Ridge Public Safety

18    Operations Manual provide for limited weapons when

19    encountering the mentally ill or those having

20    psychotic episodes?

21          A.   My officers only carry pepper spray.

22    They don't carry ASP batons or any kind of impact

23    weapon or tasers, so they pretty much are limited

24    to pepper spray, or hands on.

25          Q.   So then is the answer to my question,
```

```
 1   sir, that there's no particular policy with regard

 2   to limiting weapons when encountering the mentally

 3   ill?

 4          A.    No, there's not.

 5          Q.    Do any of the agencies for which you

 6   are chief of police -- do any of those officers

 7   carry an ECW?

 8          A.    Yes, my police officers in Raleigh,

 9   Capitol Special Police do.

10          Q.    Does Blue Ridge Public Safety have a

11   policy in the operations manual regarding

12   contacting EMS when an officer encounters a

13   mentally ill subject?

14          A.    I don't recall exactly what it says.

15          Q.    Well, all right, I won't hold you to

16   the specifics, but is it your recollection, sir,

17   that there's a policy that deals with the subject

18   of contacting EMS early if a police officer

19   encounters a mentally ill subject?

20          A.    No, it doesn't.

21          Q.    Is there a policy or procedure that

22   calls for a different number of police officers to

23   respond when the subject is mentally ill or having

24   a psychotic episode?

25          A.    No, specifically it does not.  My
```

Taylor, Roy                May 01, 2018                Page 39

```
 1   agencies are relatively small and we haven't had
 2   that issue; but with my growing experience in this
 3   field, with this being an issue, I am adopting it,
 4   and one of the things I'm looking at in my Ph.D.
 5   is actually the crisis intervention team and how to
 6   make it more effective and looking at other
 7   countries to see the differences in how they
 8   respond.
 9              So I see that this has been a very big
10   eye opener for me as a police chief to see the
11   number of times that law enforcement interacts with
12   people experiencing psychotic episodes and the need
13   for this policy and extra training, so I'm looking
14   forward to going to CIT training myself and then
15   using that information to further guide my
16   agencies.
17        Q.   And this is knowledge that you've
18   obtained since your retention in this case?
19        A.   This and I've had several other cases
20   where emotionally disturbed persons have been
21   killed because of, you know, the police response,
22   and I see that there is a definitive need for
23   additional guidance in law enforcement.
24        Q.   And what have you done, sir, in
25   connection with your employment with Blue Ridge to
```

```
 1    have enacted some of those changes that you now

 2    deem to be important?

 3            A.    At the current time, I'm researching it

 4    and trying to determine what those changes should

 5    be and if there's other model policies that

 6    agencies have to, you know, help guide mine.

 7            Q.    And for Capitol Special Police, do they

 8    have a policy and procedures manual?

 9            A.    They do.  It's exactly the same as Blue

10    Ridge.

11            Q.    And those are the two entities, Blue

12    Ridge and Capitol Special Police, for which you are

13    currently a chief of police?

14            A.    Yes, sir.

15            Q.    And the last time you were a chief of

16    police for any other entity was back in 2007?

17            A.    That's correct, unless you call provost

18    marshal being the chief law enforcement officer for

19    the military.

20            Q.    Would you so describe it?

21            A.    That's one of my jobs, yes, sir, one of

22    the duties.

23            Q.    And in connection with those duties,

24    are you authorized to make additions or alterations

25    to the applicable policies and procedures manual?
```

```
 1          A.    Well, that comes out of the Pentagon,

 2   so if there was something that needed

 3   recommendation, I would have to take it up the

 4   chain of command eventually to TRADOC, which is our

 5   Training and Doctrine Command, and if they felt

 6   changes were necessary, it would have to be looked

 7   at by the joint chiefs, or at least the secretary

 8   of the Army.

 9          Q.    But there is a policy and procedures

10   manual?

11          A.    They have different uses of force based

12   on the mission.  Every single operation would have

13   a use-of-force policy that would be administered to

14   the soldiers.

15          Q.    And does that policy call for treating

16   encounters with the mentally ill or those having

17   psychotic episodes differently than other police

18   encounters?

19          A.    I have not seen anything that addressed

20   it at all.  Again, I think it's an important issue

21   that we need to look at.

22          Q.    What is your criticism about the City

23   of Hollywood training practices?

24          A.    That they don't go into how to deal

25   with the mentally ill any further than leaving it
```

Taylor, Roy                    May 01, 2018                    Page 42

```
 1    up to the officer's discretion.
 2              I read in Officer Pantaloukas's
 3    deposition that he has since gone through the CIT
 4    training in 2016, I believe he said, so I applaud
 5    them for getting more officers through this.
 6              And, you know, it's a program that, you
 7    know, based on my knowledge of the training at this
 8    time, I think would be beneficial for all law
 9    enforcement officers to attend.
10         Q.   Do your police officers at Blue Ridge
11    Public Safety have continuing training?
12         A.   Yes, sir, they do.
13         Q.   And do they have specific training in
14    terms of how they deal with the mentally ill?
15         A.   Yes, sir, they have.
16         Q.   And describe for me what training that
17    has been.
18         A.   Each year the State of North Carolina
19    requires 24 hours of mandatory training and
20    provides different courses.  Several are mandated
21    and then there are several that were optional.
22              And I believe two years ago there was a
23    class on dealing with the mentally disturbed; that
24    was one of the optional classes that I made sure
25    that all of my officers attended.
```

```
 1          Q.   Are you familiar with the requirements

 2    for mandatory training for police officers in the

 3    State of Florida?

 4          A.   I did read in one of the statutes that

 5    there was a required number of hours each year, but

 6    I don't recall the number of hours off hand.

 7          Q.   Do you know if in Florida some of the

 8    continuing education classes are required, while

 9    others are optional?

10               MS. GEORGES:  Form.

11               THE WITNESS:  No, sir, I'm not sure

12    what their discretion is in those classes.

13    BY MR. ABBOTT:

14          Q.   Do you know, sir, if there is a

15    continuing education course in Florida for police

16    officers who deal with the mentally disturbed?

17          A.   Not specifically, no.

18          Q.   So you wouldn't know, if such a course

19    existed, if it was mandatory or optional?

20          A.   No, sir, I wouldn't.  I know

21    Pantaloukas stated that they did have in-service

22    training on dealing with the Baker Act, which is

23    affiliated with dealing with the mentally ill, but

24    I don't know if that was mandated by Hollywood or

25    if that was mandated by the state.
```

Taylor, Roy                    May 01, 2018                    Page 44

```
 1          Q.   And how about for Capitol Special
 2    Police.  Do you -- those police officers are
 3    subject to similar North Carolina standards for
 4    continuing training?
 5          A.   Yes, sir, they are.
 6          Q.   And those officers being North Carolina
 7    officers, some courses are required and some are
 8    optional?
 9          A.   Yes, sir, same requirement.
10          Q.   And have you required your subordinate
11    officers at Capitol Special Police to take the
12    optional course on dealing with the mentally
13    disturbed?
14          A.   Yes, sir, I did.
15          Q.   Have you, sir, attended the continuing
16    education course on dealing with the mentally
17    disturbed?
18          A.   Yes, sir, I did.
19          Q.   And how many hours is that training?
20          A.   I believe that was a two-hour block of
21    training.
22          Q.   And who performed the training that you
23    attended, sir?
24          A.   An instructor from Delta Company
25    Police.
```

Taylor, Roy                    May 01, 2018                    Page 45

```
 1            Q.   Do you remember that individual's name?
 2            A.   I can look it up on my phone real
 3   quick.  Joel Vannorman, V-a-n-n-o-r-m-a-n.
 4            Q.   What is Delta Company Police?
 5            A.   Same as Blue Ridge Public Safety and
 6   Capitol Special Police.  It's a certified special
 7   police agency in North Carolina.
 8            Q.   And would you describe for me, sir,
 9   what you learned in that two-hour course, what was
10   taught by Mr. Vannorman?
11            A.   Primarily the different types of mental
12   abnormalities that people may experience that law
13   enforcement may encounter, how to deal with it
14   primarily through deescalation, recommends not
15   responding with lights and sirens, turn lights off
16   to try to keep things as low key as possible, to
17   use as much time as necessary to gain compliance,
18   to avoid intimidation or authoritarian, you know,
19   type of actions, to insure that you have adequate
20   support, meaning other officers, in dealing with
21   the circumstances.  That's basically the gist that
22   I recall at this time.
23            Q.   Let me ask you this:  When did you take
24   that training course?
25            A.   I believe it was for our 2016
```

```
 1   in-service training.  I don't believe it was last
 2   year and we haven't done the 2018 yet.
 3             Q.    With that benefit of hindsight, sir,
 4   have you developed any opinions in this case with
 5   regard to whether Officer Ramirez failed to use
 6   appropriate deescalation techniques in his dealing
 7   with Mr. Tyson?
 8             A.    No, sir, I did not.
 9             Q.    No opinion?  Okay.
10             A.    But --
11             Q.    Do you know, for instance, whether or
12   not Officer Ramirez arrived at the scene with his
13   lights and sirens on?
14             A.    I don't know.  The only way I can
15   categorize it is that the witness -- I believe her
16   name was Ms. Moore -- said initially when he
17   contacted Mr. Tyson and told him that he couldn't
18   be outside without any clothes on, that he wasn't
19   authoritative, that it sounded more like a normal
20   conversation, is my understanding of her
21   deposition.  Other than that, I don't have any
22   other way to characterize it.
23             Q.    Okay.  Is it safe to conclude, then,
24   that Officer Ramirez conducted himself, as was
25   suggested in that training session put on by
```

```
 1   Mr. Vannorman?

 2              MS. GEORGES:  Form.

 3              THE WITNESS:  Other than he didn't have

 4   adequate backup when he arrived, that he was by

 5   himself.

 6   BY MR. ABBOTT:

 7        Q.   What is your criticism, sir, about the

 8   City of Hollywood Police Department's supervision

 9   practices?

10        A.   That I believe it was Officer

11   Pantaloukas's field training officer was

12   actually -- because he was a member of a SWAT team,

13   that his day starts out with physical fitness

14   training, so he was not actually on the road and

15   being able to respond, with him, to any calls that

16   he might be dispatched to.

17              And in the shadow phase, my experience

18   with a field training officer program is -- and we

19   called it solo phase, but shadow phase is their

20   terminology -- that the field training officer

21   shows up on just about every single call, or at

22   least is headed in that direction.  And.

23              In this situation, he was not available

24   to respond and only Officer Kern responded to

25   oversee how Officer Ramirez was handling the call.
```

Taylor, Roy                    May 01, 2018                    Page 48

```
 1          My opinion as a police chief, I would
 2   say that the field training officers needed to be
 3   on duty and available anytime that their trainee is
 4   out on the street answering calls, and especially
 5   when they're dispatched to a call where you have,
 6   you know, obvious information that this is going to
 7   be involving somebody that's experiencing a
 8   psychotic episode.
 9          He's talking to the tree, he's talking
10   to the air, he's been throwing things off the
11   balcony during the day, had been involved in a
12   verbal dispute heard by the neighbors.  So it was
13   obvious that there was a situation that may be
14   requiring the seniority and the experience of a
15   seasoned officer and not two officers who have only
16   been out of the Academy a few months.
17        Q.   Does Blue Ridge Public Safety appoint
18   certain of its officers to be field training
19   officers?
20        A.   Yes, sir.
21        Q.   And is it a policy of Blue Ridge Public
22   Safety that an officer, a trainee in the shadow
23   phase, is never on duty when his field training
24   officer is not?
25        A.   Correct.  Until they're released from
```

Taylor, Roy                     May 01, 2018                     Page 49

```
 1   training, there's always a supervisor or a trainer
 2   assigned to them.
 3           Q.   Is that a written policy that I would
 4   find in the policies and procedures manual?
 5           A.   I would have to go back and research
 6   that.  I don't know if it specifically spells that
 7   out, but that's the intent.
 8           Q.   Have you, sir, in this case, also
 9   received certain use-of-force reports prepared by
10   Hollywood police officers?
11           A.   Yes, sir, I have.
12           Q.   You received those documents on March
13   1st of this year?
14           A.   I don't recall when I received them.
15           Q.   Did you review them?
16           A.   Yes, sir, I have.
17           Q.   Did you develop any opinions based on
18   your review of those reports?
19           A.   I did.
20           Q.   Did you commit those opinions to a
21   report?
22           A.   Not at this point; no, sir.
23           Q.   Did you commit those opinions to
24   writing in any way?
25           A.   Other than a few notes that I made
```

```
 1    myself.

 2           Q.    Do you have those notes with you today?

 3           A.    No, sir.

 4           Q.    Where are those notes?

 5           A.    In my home office.

 6           Q.    Do you remember what you put down on

 7    your notes?

 8           A.    Primarily roughly 30 percent of the

 9    emotionally disturbed people that the Hollywood

10    Police Department interacted with had a Taser used

11    against them, and sometimes multiple times, that

12    there appeared to be an issue that out of reviewing

13    2012, 2013 and 2014 reports, that I didn't see any

14    that were referred for further investigation or to

15    internal affairs, or for internal review, that

16    every single use-of-force case was automatically

17    moved to be filed.

18                 And I find that that's unusual, then,

19    that -- you know, in my career as a law enforcement

20    officer, there were a number of investigations

21    about the use of force, whether it was through a

22    complaint or, you know, through other allegations.

23                 But for nothing to have been referred

24    over a three-year period and that a third of the

25    people that were deemed to have been a Baker Act
```

```
 1    type of response, that 30 percent or a third had
 2    the Taser used against them showed me, you know, a
 3    practice of excessive force, and that there were no
 4    follow-up investigations.
 5         Q.   Which of those excessive force reports
 6    should have been referred for additional
 7    investigation?
 8         A.   The first thing that I would look at
 9    is, any time a Taser is used for more than three
10    cycles, it should be investigated.
11              Police Executive Research Forum, as
12    well as the IACP, said that after three cycles,
13    they looked at that as a deadly force situation and
14    needed further review in case the officer needed
15    additional training, additional guidance; or the
16    situation may have warranted it.
17              But it would certainly cause me as a
18    chief of police to want to look at it initially.
19    If I see there were four separate ECW cycles, I
20    would look at that report closely if I'm the
21    supervisor and then I think that needs to be
22    forwarded on up the chain for further review,
23    especially into our training section.
24              An agency as large as Hollywood,
25    Florida, you know, certainly has the resources to
```

```
 1   be able to look at these things statistically,

 2   determine trends, and provide training that will

 3   help lower those trends to make sure they're

 4   providing the type of services that the citizens

 5   would desire.

 6        Q.   What use-of-force reports have you

 7   reviewed, sir, that describe a use of a Taser for

 8   more than three cycles?

 9        A.   There were numerous reports that had

10   more than three cycles.

11        Q.   Can you provide me any further guidance

12   in identifying those reports?

13        A.   Not from memory, sir.

14        Q.   Which of those use-of-force reports

15   demonstrate to you, sir, that, in fact, excessive

16   force was used by the police officer?

17        A.   Anytime I saw more than three cycles

18   applied to someone.

19        Q.   That's true by definition?  Anytime an

20   ECW is used for more than three cycles, in your

21   opinion, that's excessive force?

22        A.   Yes, sir, it certainly deserves

23   investigation.

24        Q.   All right.  But let me try again and

25   see if it isn't your opinion.
```

```
 1              Is it your opinion, sir, that any time
 2    a police officer deploys his Taser for more than
 3    three times, was that an act of excessive force?
 4              MS. GEORGES:  Form.
 5              THE WITNESS:  Each incident has to be
 6    looked at separately.  I can't make a general
 7    characterization that all fourth or fifth cycles
 8    would be unwarranted, because there could be
 9    extenuating circumstances.
10              So I don't see anyone that would make a
11    policy that says anything after three is deadly
12    force, or anything after three has to be
13    investigated, but I think, as a prudent law
14    enforcement manager, it needs to be at least looked
15    at.
16    BY MR. ABBOTT:
17         Q.   So then I'm back to asking, sir, did
18    you develop an opinion that any of those
19    use-of-force reports demonstrated that a Hollywood
20    police officer used excessive force?
21              MS. GEORGES:  Form.
22              THE WITNESS:  Again, on the surface of
23    just reading what the supervisors had checked,
24    certainly rose questions in my mind that they
25    required further investigation other than just the
```

Taylor, Roy                    May 01, 2018                    Page 54

```
 1   supervisor looking at the report.
 2   BY MR. ABBOTT:
 3        Q.   But you have not concluded that any of
 4   those matters demonstrated instances of excessive
 5   force?
 6             MS. GEORGES:  Form.
 7             THE WITNESS:  No, because I don't have
 8   all of the information.  I would have to have, you
 9   know, the ability to go in and investigate the
10   entire situation and have the availability of all
11   the documentation and records before I could make
12   that determination.
13   BY MR. ABBOTT:
14        Q.   Exhibit D to your report, sir, has a
15   list of facts that you have assumed to be true?
16        A.   Yes, sir.
17        Q.   Are you with me?
18        A.   Yes, sir.
19        Q.   Fact Number 2 says that you assumed
20   that Mr. Tyson was exhibiting unusual behaviors?
21        A.   Yes, sir.
22        Q.   Why did you choose that particular
23   language, sir, exhibiting unusual behaviors?
24             MS. GEORGES:  Form.
25             THE WITNESS:  Talking to the air,
```

```
 1  talking to trees, would all be considered, in my

 2  opinion, to be unusual.  It's not something we see

 3  every day.

 4  BY MR. ABBOTT:

 5       Q.   All right.  He also bashed a police

 6  officer over the head with a sundial; didn't he?

 7            MS. GEORGES:  Form.

 8            THE WITNESS:  Yes, sir, he did hit

 9  Officer Ramirez in the head.  It was actually a

10  battery powered clock.  It wasn't a sundial.

11  BY MR. ABBOTT:

12       Q.   You would agree with me that that's

13  conduct, perhaps, more severe than exhibiting

14  unusual behavior?

15            MS. GEORGES:  Form.

16            THE WITNESS:  Yes, sir, but that's not

17  what prompted the telephone call to the Hollywood

18  Police Department.

19            And number two, I was characterizing

20  his conduct as reported by Ms. Moore to her

21  landlord Mr. Xavier Les Marie.

22  BY MR. ABBOTT:

23       Q.   Where else in the facts that you have

24  assumed to be true do you relate the fact that

25  Mr. Tyson attacked a police officer and struck him
```

Taylor, Roy                     May 01, 2018                     Page 56

```
 1   over the head?
 2             MS. GEORGES:  Form.
 3             THE WITNESS:  I agree that it happened.
 4   I'm not sure what your question is.
 5   BY MR. ABBOTT:
 6        Q.   You didn't deem that fact to be worthy
 7   to include on this list of facts assumed to be
 8   true?
 9             MS. GEORGES:  Form.
10             THE WITNESS:  It certainly could be
11   included.  You know, I have no reason not to
12   exclude it.
13   BY MR. ABBOTT:
14        Q.   Fact Number 4 -- and I think I see this
15   in your report as well -- that Xavier called the
16   police department's non-emergency number.
17             Did I read that correctly?
18        A.   Yes, sir.
19        Q.   Is it of significance to you, sir, that
20   the call to the police department was not a 911
21   call?
22        A.   No, sir, Mr. Xavier Les Marie lives in
23   Miami.  He would not have been able to call 911 to
24   get to that sheriff's office, or dispatch center.
25   I believe the Broward County Sheriff's Office
```

Taylor, Roy                    May 01, 2018                    Page 57

```
 1   dispatches Hollywood now.  So in order for him to
 2   reach the appropriate agency, he would have had to
 3   use a non-emergency number, since he was out of the
 4   area.
 5           Q.   So this non-emergency number is not a
 6   matter of significance to you in developing any of
 7   your opinions in the case?
 8           A.   No, sir.  It was still a recorded line.
 9           Q.   Fact number 8 suggests that Officer
10   Pantaloukas drive stunned Mr. Tyson eight times
11   after the initial Taser deployment.
12           Did I read that correctly?
13           A.   Yes, sir.
14           Q.   Have you developed any opinions, sir,
15   in terms of whether or not any of the ECW usage by
16   Officer Pantaloukas caused neuromuscular
17   incapacitation on Mr. Tyson?
18           A.   Yes, sir.
19           Q.   I'm sorry?
20           A.   Yes, sir.
21           Q.   And what is that opinion, sir?
22           A.   According to Officer Pantaloukas, every
23   one of his drive stuns caused NMI.  That's why he
24   was shocking him in the calf/ankle area, so that
25   the -- the initial deployment with the probes were
```

Verbatim Support Services

```
 1  close together, they were just a few inches apart,

 2  in the lower back, and did not cause any

 3  neuromuscular incapacitation to occur.

 4              That's why he started using the lower

 5  leg, so that it would spread the electrical charge

 6  across those lower muscles and leg muscles, and he

 7  testified that each one of those achieved NMI.

 8         Q.   Did you observe or did you review any

 9  contrary testimony -- any suggestion from any other

10  witnesses -- that those uses of the ECW did not

11  cause neuromuscular incapacitation?

12              MS. GEORGES:  Form.

13              THE WITNESS:  Not that I recall.

14  BY MR. ABBOTT:

15         Q.   Do you recall each witness testifying

16  that each use of the Taser caused NMI?

17         A.   No, sir, I don't.

18         Q.   You don't recall that?

19         A.   I don't recall, you know, the

20  characterization of each utilization; no, sir.

21         Q.   Okay.  Do you have an opinion, sir, in

22  terms of whether or not any of the -- well, strike

23  that.

24              Do you have an opinion, sir, with

25  regard to whether both of the ECW probes remained
```

```
 1    in Mr. Tyson throughout the duration of the

 2    encounter?

 3          A.    Yes, sir.

 4          Q.    I'm sorry, I missed that.

 5          A.    Yes, sir, I do.

 6          Q.    And what is that opinion, sir?

 7          A.    That the probes did remain in him.  The

 8    autopsy photos show that they were still imbedded

 9    in Mr. Tyson's back, and they have a photo where

10    they actually surgically removed them and showed

11    the depth in tissue.

12          Q.    Who is Mel Tucker?

13          A.    He's another expert witness.

14          Q.    He testifies on what subject?

15          A.    Just like I do.  He's a use-of-force

16    expert, a police procedures expert,

17    hiring/retention issues.  He's a well-respected

18    expert in the field.

19          Q.    Where does he conduct his business?

20          A.    He has a home office in Raleigh, North

21    Carolina.

22          Q.    Do you have professional dealings with

23    Mr. Tucker?

24          A.    I do.  He's one of my students.  He's a

25    retired police chief from Florida and he carries
```

```
 1    his weapon concealed, so under HR 218, the Federal
 2    Law Enforcement Safety Act, he has to go through
 3    training every year for firearms qualification and
 4    use-of-force training, so he's one of my clients
 5    that does that, and he was the one that introduced
 6    me to being an expert witness.
 7            Q.   Let's move onto Exhibit 1, sir, which I
 8    believe is your expert report.
 9            A.   Okay, sir.
10            Q.   Do you have that in front of you, sir?
11            A.   I do.
12            Q.   So let's start in the beginning, on
13    Page 1.  You say that you were retained by the
14    Plaintiff in this case?
15            A.   The attorneys that represent him, yes,
16    sir.
17            Q.   And when were you so retained?
18            A.   My best recollection is it was in May.
19                 MS. GEORGES:  We're in May now.
20                 THE WITNESS:  Oh, March.  I'm sorry.  I
21    knew it was an M word.
22    BY MR. ABBOTT:
23            Q.   March of 2018?
24            A.   Yes, sir, I believe so.
25            Q.   And you don't recall the particular
```

1    day?

2         A.    No, sir, I don't.

3         Q.    Okay.  Flipping over to Page 2, you are

4    certified as a Taser instructor?

5         A.    Yes, sir.

6         Q.    And tell me what that entails.  What

7    did you go through?

8         A.    Initially -- I don't remember if it was

9    a 40-hour class.  It was several days.  It was

10   longer than two days.  But I attended an instructor

11   training class at the North Carolina State Highway

12   Patrol's Training Facility that was put on by a

13   master instructor from Taser.  And they went

14   through the basic operator's class.  They showed us

15   how they wanted it presented, demonstrated all of

16   the course material, all of the practical skills

17   exercises, reviewed the written examination.  They

18   had a portion on how to be an instructor as far as,

19   you know, how to develop a lesson plan and present

20   it.

21              Then they had us go out and practice

22   different portions of the lesson plan, present part

23   of it, and then run several of the practical skills

24   exercises to demonstrate our proficiency in doing

25   that.

```
 1           Q.   And you did that in 2005?

 2           A.   Yes, sir.

 3           Q.   And they deemed you certified, and,

 4   what, gave you a certificate of some sort?

 5           A.   Yes, sir.  The certificates are good

 6   for two years and then every two years you'd go

 7   through a recertification class.  It's a one-day

 8   eight-hour class, but there's also a mandatory

 9   online training.  So they were able to shorten it

10   from two days to one day by you completing an

11   online course that reviews all of the basic

12   information about the Taser, how it works, its

13   applications, and then they have in-classroom

14   experiences, again, review of the high-liability

15   issues and then reviewing the practical skills

16   test.

17           Q.   And you have undergone that

18   recertification process six or seven times?

19           A.   Yes, sir, most recently in January of

20   this year.

21           Q.   Page 2 begins a section entitled

22   Objectivity.

23           A.   Yes, sir.

24           Q.   And your first sentence there says:

25   During the past four years my expert witness
```

```
 1    services have been approximately 85 percent
 2    plaintiff and 15 percent defendants.
 3          A.   Yes, sir.
 4          Q.   Now, Appendix B to your report recites
 5    your litigation experience over the last four years
 6    or so.
 7          A.   Yes, sir.
 8          Q.   I've got a question about some of them,
 9    just because who is the plaintiff and who is the
10    defendant sometimes isn't intuitive.
11               The first case on the list, the Norton
12    versus Kappa Alpha Psi --
13          A.   Yes, sir.
14          Q.   -- what was that case about, sir?
15          A.   Unfortunately a young man was shot to
16    death in a parking lot.  The alumni chapter of
17    Kappa Alpha Psi fraternity was holding a party for
18    high school seniors and they were holding it -- and
19    I don't recall if it was like a moose lodge.  It
20    was something like that.  They had rented a
21    facility.  And they had contracted with the local
22    police department to provide security and they had
23    a gang member that had infiltrated the party.  He
24    was disruptive and he had been ejected and he
25    secreted himself in the woods with a firearm.
```

Taylor, Roy                    May 01, 2018                    Page 64

```
 1            About 11:30 that night the party got
 2    out of control and the owners of the property shut
 3    it down, so all of the children or teenagers were
 4    moved outside into the parking lot to wait for
 5    their rides home, and this gang member started
 6    firing into the crowd and killed one of the
 7    participants.
 8            And the family was suing, saying that
 9    the police had failed to provided adequate
10    security, you know, based on the circumstances.
11            And I represented the law enforcement
12    officers and said that, based on the number of
13    people that were anticipated, that they had an
14    adequate number of officers there and that for
15    someone to secrete themselves in a wooden area or a
16    grown-up area around the facility was unusual and
17    wouldn't be something that they would normally go
18    out and walk around in the woods to look for a
19    sniper, basically.
20        Q.   Were the defendants in that case the
21    individual police officers or a police agency?
22        A.   I believe it was the agency.
23        Q.   The City of Tallahassee Police
24    Department?
25        A.   Yes, sir, and I think the officers were
```

```
 1   named, but I don't remember if it was in their
 2   individual capacity or their professional capacity.
 3          Q.   But in any event, you were retained by
 4   the attorney that represented the police in that
 5   case?
 6          A.   Yes, sir.
 7          Q.   Okay.  The Talley case, was that a
 8   cases of alleged police misconduct?
 9          A.   Yes, sir.  She was in custody for
10   shoplifting and was very violent in the back of the
11   patrol car and she was banging her head against the
12   protective screen and had injured herself.
13               The officers left her unattended while
14   they went to go look for a HOBOL in another
15   vehicle.  And they came back and she had strangled
16   herself with a seatbelt and there was permanent
17   brain injuries.
18          Q.   Got you.
19               Case number three, North Carolina
20   versus Simmons, you testified at trial on behalf of
21   Mr. Simmons.
22          A.   Yes, sir, that was a state court.  And
23   Mr. Simmons was charged with assault on a law
24   enforcement officer inflicting serious bodily
25   injury, and in fact this was a Taser case where one
```

```
 1    deputy fired a Taser into Mr. Simmons chest and had
 2    some NMI, he didn't fall over, he was still erect.
 3              And another deputy saw Mr. Simmons
 4    standing there, didn't realize the other deputy had
 5    Tasered him, and the deputy with a Taser had
 6    decided to give him a second iteration of the ECW
 7    and simultaneously the other officer grabbed him
 8    and came in contact with the wires, was shocked,
 9    and immediately released and fell back and hit his
10    head on the pavement, clearly nothing to do with
11    Mr. Simmons' actions, it was simply an accident,
12    and they were yet charging Mr. Simmons with this
13    felony.  So I represented him in how the Taser
14    works so that he was not convicted of that charge.
15         Q.   Did you testify that the Taser
16    deployment by the police officers was
17    inappropriate?
18         A.   Yes, sir, the deputy using it didn't
19    give a Taser warning, which was, you know, in
20    effect one to hopefully reduce and de-escalate the
21    situation where it doesn't have to be used.  And
22    it's also to warn other officers.  Had he given
23    that warning, the other officer wouldn't have run
24    up and grabbed ahold of him.
25              And also both barbs were in his --
```

1   basically the breastplate -- which doesn't have

2   very many muscles, so NMI is very minimal.

3          And, again, that's one of the areas

4   that's deemed not to target due to the proximity of

5   the heart, as well as to the lack of effect that

6   it's going to elicit.

7          Q.   Okay, Case Number 4, the Thomas versus

8   City of Columbus case, was that a police misconduct

9   case?

10          A.   It was a shooting where it was a home

11   invasion and the victim of the home invasion

12   actually wrestled the gun away from the robber and

13   was chasing him out of his apartment and the police

14   saw the victim run out of the apartment with a gun

15   in his hand and shot him automatically and killed

16   him.

17          Q.   And you testified for the plaintiff

18   that that police officer behaved inappropriately?

19          A.   Yes, sir.

20          Q.   Case number 5, the Bryant versus Bald

21   Head Island North Carolina, was that also a police

22   misconduct case?

23          A.   No, sir, it was a wrongful termination

24   case where I represented the officers that were

25   wrongfully discharged.

```
 1         Q.   Case Number 6, McKenney versus
 2   Cumberland County Sheriff's Office; was that a
 3   police misconduct case?
 4         A.   Yes, sir, it was, again, a situation
 5   involving an emotionally disturbed person who was
 6   standing in his driveway with a pistol in his hand
 7   and a deputy who had a civilian ride-along with
 8   him, pulls up at the end of the driveway with
 9   unfortunately the right side of the vehicle closest
10   to the person with a gun, but the deputy deployed
11   his rifle, took a barricaded position across the
12   hood of his car, after several minutes basically,
13   you know, decided that he was tired of waiting and
14   shot the plaintiff in the head and killed him, and
15   he said that reaction beats -- or action beats
16   reaction and that because the guy had a gun in his
17   hand, he could have raised it and shot at him at
18   any moment, so he felt that it was justified that
19   he shot him.
20         Q.   Case Number 7 is state versus Barnes
21   and you testified for Mr. Barnes?
22         A.   Yes, sir.
23         Q.   What was the substance of that
24   testimony?
25         A.   Mr. Barnes was incarcerated in
```

```
 1   Edgefield County Jail and he was not a model
 2   prisoner.  He threw feces and urine on the
 3   detention officers.  And he did this several times
 4   over the course of, I don't know, maybe a week.
 5              And at one point, the detention
 6   officers were tired of it, they called a deputy in,
 7   the deputy went into the cell and just started
 8   Tasering the plaintiff.  And he basically tortured
 9   him for, I believe, 32 seconds is all the video we
10   could recover, but there were sections of the video
11   missing, so we couldn't determine how much longer,
12   but we did have video of 32 seconds of Tasering of
13   a prisoner.
14        Q.   Okay.  The case is styled as a criminal
15   matter.  Did the police charge Mr. Barnes with an
16   offense?
17        A.   Yes, they did.
18        Q.   And in connection with that criminal
19   prosecution, you testified that the use of the
20   Taser against Mr. Barnes was inappropriate?
21        A.   Yes, sir.
22        Q.   And Case Number 8, Conner versus Bald
23   Head Island, was that a police misconduct case?
24        A.   No, sir, it's other co-defendants to
25   the other wrongful termination suit.  There were a
```

 1    number of people terminated.

 2         Q.   Case Number 9, I don't see a defendant

 3    listed.  The Poetzsch case, what was that about?

 4         A.   Number 9, sir?

 5         Q.   Yes, sir.

 6         A.   Oh, I'm sorry, yeah, you're right.  I

 7    did leave that off.

 8              It was the City of Charlotte, it was

 9    the Charlotte Mecklenburg Police Department.  And,

10    again, this was an emotionally disturbed person.

11    Police respond.  The plaintiff was sitting on the

12    floor of his front porch.  He had a small utility

13    knife that he was holding to his neck.  One of the

14    police officers directly approached him, stood at

15    the top of the stairs talking to him.

16              He, you know, became upset, got up,

17    moved to the other end of the porch.  The other

18    officer who responded got behind him and was going

19    to fire his Taser into his back to achieve NMI and

20    not taking into account there were bushes and a

21    railing with pickets in it that would have blocked,

22    or could block the Taser.

23              So he fires the Taser.  The other

24    officer heard the pop of the Taser.  And instead of

25    waiting to see if the Taser was effective, he

Taylor, Roy                    May 01, 2018                    Page 71

```
 1    rushed in and grabbed ahold of the guy and then

 2    realized the gentleman was resisting him and

 3    quickly backed off and ended up shooting him and

 4    killing him because of his close proximity to the

 5    edged weapon, or potential edged weapon.

 6         Q.   And you testified against the City of

 7    Charlotte suggesting that that use of the Taser was

 8    inappropriate?

 9         A.   Mostly it was that they've caused the

10    situation by rushing in, failed to wait to see that

11    the Taser was effective.  I didn't say the use of

12    the Taser was wrong; they just didn't deploy it

13    correctly and didn't take enough into

14    consideration.

15         Q.   I understand.

16              Case number 10, North Carolina versus

17    George, what was your testimony in that case?

18         A.   Mr. George was a police officer and he

19    was accused of using excessive force.  He had

20    arrested a young lady over basically a parking

21    violation.  She appeared to be somewhat

22    intoxicated.  She was abusive and disruptive,

23    uncooperative the entire time.

24              He got her to the jail at the police

25    department and opened the back door and he expected
```

Taylor, Roy                    May 01, 2018                    Page 72

```
 1   her to resist his efforts to get her out of the car
 2   and he yanked her out and unfortunately she didn't
 3   resist; and with his strength, he pulled her clear
 4   of the car, she fell on the ground and had some
 5   facial injuries and he was charged with excessive
 6   force criminally, or with assault and battery on a
 7   female, and I wrote a report on his behalf.
 8        Q.   So did you say that he did not use
 9   excessive force?
10        A.   Right, that he didn't intentionally,
11   you know, cause those injuries.
12        Q.   Okay.  The Robinson versus Las Vegas
13   case, that was a police misconduct case that you
14   had testified for the plaintiff?
15        A.   Yes, sir, it really resulted in -- it
16   was a negligent discharge and the officer tried to
17   cover it up by planting a knife on the individual
18   and saying that the guy had a knife and was
19   reaching for it at the time that he shot him.
20        Q.   Okay.  Case Number 12, McNeil versus
21   Greenway, there you testified on behalf of a police
22   officer?
23        A.   Yes, sir, a police officer observed
24   what he thought was a drug transaction occurring in
25   a parking lot of a gas station, and he approached
```

```
 1   on foot and challenged the people at gunpoint and
 2   the driver started moving forward and part of the
 3   car hit the officer and the officer fired into the
 4   car, injuring the driver.
 5        Q.   Okay.  Case Number 13, Christian versus
 6   City of Charleston, was that a police misconduct
 7   case that you testified for the plaintiff?
 8        A.   No, it was a security case involving a
 9   lack of proper lighting.
10        Q.   What was the claim against the City of
11   Charleston?
12        A.   It was a parking lot that they owned
13   and that was managed by ABM Parking Services.  They
14   had just lost a million-dollar judgment the year
15   before for lack of lighting, didn't do anything to
16   correct it.
17             And I believe the lady was a
18   neurosurgeon, was attacked during a robbery, a
19   strong-arm robbery, knocked to the ground and
20   suffered some spinal injuries that caused her
21   to -- I don't know if she was permanently disabled,
22   but, anyway, she lost a significant amount of time
23   at work, which resulted in a lot of money that was
24   lost.
25        Q.   Okay.  The remainder of the cases on
```

```
 1    this list were cases that you testified for the
 2    plaintiff in civil actions?
 3         A.   Yes, sir.
 4         Q.   And did all of those cases involve
 5    alleged police misconduct?
 6         A.   Yes, sir.
 7         Q.   I'm sorry, Mr. Taylor, I may have
 8    digressed.  All of that was after we were looking
 9    at Page 2 of your report.
10              Let's move over to Page 3.  And you
11    will see in the first full paragraph there, sir,
12    you, in a couple of instances, refer to your
13    opinions as preliminary.
14              Do you see that?
15         A.   Yes, sir.
16         Q.   Would you still characterize the
17    opinions contained in this report as preliminary or
18    are these now your final opinions?
19         A.   Still preliminary, because there are
20    still some depositions that are remaining.  And
21    then, again, I added a few more opinions in
22    addition to the excessive force opinion.
23              My opinion about the amount of force
24    used is still the same, but I now also have those
25    concerns about training and supervision and
```

```
 1    policies.

 2              And I would leave them preliminary

 3    until after I have reviewed all of the material

 4    that's been made available to me.

 5         Q.   Let's move forward to Page 4.

 6              In your opinion, you describe Mr. Tyson

 7    as experiencing a psychotic episode.

 8         A.   Yes, sir.

 9         Q.   Okay.  And what do you base that

10    portion of your opinion on?

11         A.   Primarily Ms. Moore's telephone

12    conversation to Xavier Les Marie.

13         Q.   In the next paragraph you suggest that

14    the dispatcher dispatched Officers Ramirez and

15    Pantaloukas for a potential psychological

16    emergency?

17         A.   Yes, sir.

18         Q.   Do you, sir, remember what the actual

19    dispatch language was?  Did the dispatchers say for

20    a psychological emergency, or did the dispatcher

21    say something different?

22         A.   She said a signal 20, which is their

23    code for a Baker Act, which would be a mental ill

24    type of situation.

25              But I don't like to use signals unless
```

Taylor, Roy                    May 01, 2018                    Page 76

1   I define them in the report.  Again, these are

2   written for attorneys and jurors that aren't going

3   to be familiar with those codes.

4            And, again, in North Carolina, we don't

5   use Signal 20 as a code for mentally ill; we use

6   the code 1096.

7        Q.   Okay.  And is it your recollection --

8   sir, is it your belief that that was the extent of

9   the instruction from the dispatcher, saying that we

10  have a Signal 20?

11       A.   No, sir.  She described Mr. Tyson as a

12  5'6 white male that was having a mental issue and

13  was off his medication.

14       Q.   Okay.  The final partial paragraph on

15  Page 4 and up to Page 5 describes Mr. Tyson's

16  initial interaction with Officer Ramirez.

17            Let me ask you this, sir:  Were Officer

18  Ramirez's actions, as recapped in this paragraph,

19  consistent with appropriate law enforcement

20  standards, in your opinion, sir?

21       A.   Only in that he didn't wait for his

22  backup.

23            MS. GEORGES:  Object to the form of the

24  last question.

25            THE WITNESS:  He should have waited

```
 1   until his backup officer was on scene before he

 2   made his initial approach.

 3           There was nothing, you know, that

 4   suggested any urgency, that anyone was in any

 5   danger.

 6           Everything that Mr. Tyson had been

 7   reported doing was obviously obscene, in that we

 8   don't want to look at a naked man walking around,

 9   and that he was throwing his own property on the

10   ground and he was talking to the tree and talking

11   to the air.

12           But, again, there was nothing that made

13   this an emergency where he needed to go in by

14   himself.

15           And, again, given his lack of --

16   BY MR. ABBOTT:

17       Q.   Do you attribute Officer Ramirez's

18   failure to wait for backup as having proximately

19   caused the death of Mr. Tyson?

20           MS. GEORGES:  Form.

21           THE WITNESS:  I believe it may have had

22   a different outcome had he waited for another

23   officer to arrive.  And had their field training

24   officers arrived, there would have been four

25   officers on the scene within a few minutes.
```

```
 1              If their field training officers would

 2   have been monitoring more actively, they may have

 3   told them to stand by until their arrival.

 4   BY MR. ABBOTT:

 5        Q.   And then, what, Mr. Tyson wouldn't have

 6   hit somebody in the head with a sundial?

 7              MS. GEORGES:  Form.

 8              THE WITNESS:  We don't know what would

 9   have happened, because there would have been no

10   one-on-one interaction.

11   BY MR. ABBOTT:

12        Q.   Okay.  Then are you willing to testify

13   with any reasonable degree of professional

14   certainty that had Officer Ramirez waited for

15   backup, that Mr. Tyson would not have died that

16   day?

17              MS. GEORGES:  Form.

18              THE WITNESS:  I don't know what would

19   have happened, sir.

20   BY MR. ABBOTT:

21        Q.   How about Officer Ramirez's deployment

22   of his Taser; do you criticize him for that in any

23   way?

24        A.   No, I think he waited a little bit too

25   long.  If you look at the evidence photographs, you
```

```
 1   can see where the Taser wires didn't even unfurl

 2   the entire way and that a portion of that battery

 3   operated clock has the Taser wire wrapped up in it.

 4           My belief is that one probe made

 5   contact with Mr. Tyson's chest, based on an injury

 6   in his autopsy report, and that the other wire

 7   became tangled in the clock and the second barb

 8   never touched him.

 9           So he never experienced any pain or any

10   NMI from the initial Taser deployment.

11       Q.   Is there a reason why that opinion is

12   not contained in the report?

13       A.   Again, you know, I didn't have access

14   to all of the reports at the time that I wrote

15   this.  So, you know, again, looking at all of the

16   information that I've been provided in more detail,

17   that's what my hypothesis is that occurred.  That's

18   why he didn't get an NMI initially.

19           I think if he would have deployed his

20   Taser earlier and tried to split the belt, you

21   know, one barb going into the abdominal area and

22   one into the leg, that that may have caused

23   Mr. Tyson to experience NMI and go down before he

24   reached him.

25       Q.   The next couple of paragraphs in the
```

```
 1   report begin to describe Officer Ramirez and

 2   Mr. Tyson rolling around on the ground fighting.

 3             Do you criticize Officer Ramirez for

 4   any of those activities?

 5             MS. GEORGES:  Form.

 6             THE WITNESS:  No, only that if he would

 7   have had his backup there, they would have been

 8   more likely to take him into custody quicker.

 9   BY MR. ABBOTT:

10        Q.   All right.  Let's then move to the next

11   paragraph.  Officer Pantaloukas arrived and moved

12   toward Mr. Tyson's feet to try and keep him from

13   thrashing around.

14             Do you criticize Officer Pantaloukas

15   for that?

16        A.   No, sir.

17        Q.   Next sentence:  Officer Pantaloukas

18   then decided to use his Taser to immobilize

19   Mr. Tyson.

20             Do you criticize Officer Pantaloukas

21   for that?

22        A.   No, sir.

23        Q.   Then it says:  However, Officer

24   Pantaloukas fired the Taser very close to

25   Mr. Tyson's lower back, which resulted in a minimal
```

Taylor, Roy                     May 01, 2018                     Page 81

```
 1   spread of the Taser projectiles, thereby reducing
 2   its effectiveness.
 3              Do you criticize Officer Pantaloukas
 4   for the fact that the Taser prongs were close
 5   together in Mr. Tyson's back?
 6              MS. GEORGES:  Form.
 7              THE WITNESS:  No, I don't criticize
 8   him.  His reasoning was he didn't want to strike
 9   Officer Ramirez, because of the close proximity of
10   the officer.
11   BY MR. ABBOTT:
12        Q.   And that makes sense to you?
13        A.   Yes, sir.
14        Q.   Okay.  And I think I asked you this
15   earlier, but let me just make sure.  It is your
16   opinion that the -- that this Taser usage from
17   Officer Pantaloukas -- that the darts or prongs
18   remained in Mr. Tyson's back for the duration of
19   the encounter?
20        A.   Yes, sir.
21        Q.   And is it your opinion that after that
22   first usage of the Taser by Officer Pantaloukas,
23   that Mr. Tyson was in neuromuscular incapacitation?
24        A.   No, sir, not after the first usage.
25        Q.   My question might not have been clear.
```

```
 1    I meant to say the first usage by Officer

 2    Pantaloukas.  And if I didn't, I apologize.

 3              So this is the second deployment of the

 4    Taser but the first one by Officer Pantaloukas?

 5         A.   Well, his first deployment didn't

 6    result in an NMI because of the close spread, but

 7    the subsequent eight did.

 8         Q.   Okay.  I understand.

 9         A.   Because my definition is each time he

10    pulled the trigger would be a separate deployment.

11         Q.   I understand what you're saying.

12              So the first usage from Officer

13    Pantaloukas, the prongs were too close together, so

14    NMI did not result?

15         A.   Correct.

16         Q.   Beginning in the next paragraph:

17              Officer Pantaloukas positioned himself

18    again by Mr. Tyson's feet and performed a drive

19    stun to his ankle.  And then the remainder of the

20    paragraph describes why Officer Pantaloukas would

21    want to do that.

22              Do you criticize Officer Pantaloukas

23    for this second usage of his Taser?

24         A.   No, sir.

25         Q.   Beginning in the next paragraph,
```

Taylor, Roy                    May 01, 2018                    Page 83

```
 1    Officer Pantaloukas delivered at least two drive
 2    stuns to Mr. Tyson in an attempt to cause him to
 3    stop resisting.
 4              Do you criticize Officer Pantaloukas
 5    for the second or maybe subsequent drive stuns to
 6    Mr. Tyson's ankle?
 7              MS. GEORGES:  Form.
 8              THE WITNESS:  I don't have any
 9    criticism until after Mr. Tyson is handcuffed
10    behind his back, and at that point I believe it was
11    excessive.
12    BY MR. ABBOTT:
13         Q.   Do you have any opinions, sir, in terms
14    of how many times the Taser was deployed on
15    Mr. Tyson before he was placed in handcuffs?
16         A.   From the testimony, it's difficult to
17    determine.  Officer Pantaloukas testified in his
18    deposition that he did continue to drive stun him
19    after the handcuffs were placed on and he continued
20    at least twice after the leg irons were placed on
21    his legs.  So other than that, you know, it's just
22    a guess.
23              You know, we can look at the Taser
24    downloads and the number of seconds in between, but
25    it's all speculation as to at what point were the
```

1    handcuffs on, at what point were the leg irons on.

2         Q.   Okay.  Moving progressively through the

3    report, the next paragraph says that Officer Kern

4    got ahold of Mr. Tyson's left arm and began to move

5    it behind his back for handcuffing, and that

6    allowed Officer Ramirez to gain control of the

7    right arm and handcuff him.

8              Did I read that correctly?

9         A.   Yes, sir.

10        Q.   And do you criticize either of the

11   police officers for those maneuvers?

12        A.   No, sir.

13        Q.   Next paragraph:

14             Reportedly Mr. Tyson was thrashing

15   around on the ground and would not lie still.

16             Do you have any reason to doubt that

17   account, sir?

18        A.   No, sir, but it doesn't justify any

19   type of use of force.  The only time force is

20   authorized is when they're endangering somebody

21   else, or an escape risk, or it could be that

22   they're a danger to themselves.

23             And laying in a grassy area thrashing

24   about is not going to cause any more injury than

25   five police officers holding him down and grounding

```
 1   him.
 2        Q.   Okay.  I'm just curious, because you
 3   prefaced that sentence with the word reportedly.
 4             That doesn't mean that you are doubting
 5   the subsequent facts in this sentence?
 6             MS. GEORGES:  Form.
 7             THE WITNESS:  No, sir, I don't doubt
 8   that he was still moving around, but, again, I
 9   don't see that it justified the use of force.
10   BY MR. ABBOTT:
11        Q.   Okay.  Is it your recollection, sir,
12   that the testimony of the witnesses was that
13   Mr. Tyson was only thrashing around on the ground
14   and would not lie still?
15             MS. GEORGES:  Object to form.
16             THE WITNESS:  They may have
17   characterized it a little differently.  I mean,
18   Officer Pantaloukas said he was like the Tasmanian
19   devil.
20             But, again, my opinion is he was fully
21   restrained.  They could have backed away from him.
22   Nobody was in danger.  He certainly wasn't able to
23   get up off the ground and run anywhere.  There's
24   seven police officers total there.  There's only
25   one way out.  He's not going to run off.  Obviously
```

```
 1   he's not a danger to anybody but himself laying on
 2   the ground.
 3   BY MR. ABBOTT:
 4       Q.   This is when only the handcuffs are on
 5   him, that's your opinion?
 6       A.   No, after the leg irons were on him.
 7   That's when the majority of the other officers --
 8   the witnesses, if you will, were on scene and were
 9   characterizing his moving around.  And, again,
10   that's not illegal and that's not a danger to
11   anyone else.
12       Q.   All right.  Just so we stick with the
13   chronology here, we're on this paragraph that
14   begins, Reportedly Mr. Tyson was thrashing around.
15           At this point, he's only in handcuffs,
16   true?
17       A.   Yes, sir.
18       Q.   What is your recollection for what the
19   witnesses had to say with regard to Mr. Tyson's
20   behavior when he was handcuffed but not
21   leg-shackled?
22       A.   His legs were still moving around.  But
23   the last paragraph of that same -- or the last
24   sentence of that same paragraph, reportedly, it
25   says that Officer Kern went to his patrol car and
```

```
 1    retrieved a set of leg irons which were placed on

 2    Mr. Tyson's ankles.

 3              So, again, my understanding is it was

 4    still only those initially responding officers that

 5    saw him without the leg irons on.

 6              My understanding is that the other

 7    officers arrived after those leg irons were on.

 8         Q.   Okay.  All right.  So I'm still at the

 9    point that Mr. Tyson is handcuffed but no leg irons

10    had been applied.

11              What do you recall any witness having

12    to say with regard to Mr. Tyson's behavior at that

13    point?

14         A.   That he was still, you know, thrashing

15    around on the ground, moving his legs, and yelling

16    and screaming.

17         Q.   Okay.  And then the next sentence is

18    that Officer Pantaloukas administered several more

19    drive stuns to Mr. Tyson's lower leg.

20              Do you criticize Officer Pantaloukas

21    for those uses of his ECW?

22         A.   Yes, sir.

23         Q.   Why?

24         A.   Because he's not a danger to anybody,

25    he's not able to get up and escape, so there was no
```

Taylor, Roy                    May 01, 2018                    Page 88

```
 1  reason to continue administering a very painful
 2  application of electricity to his body.  It served
 3  no purpose.
 4        Q.   Why couldn't Mr. Tyson get up and
 5  escape when he was handcuffed?
 6        A.   Because he was handcuffed behind his
 7  back.  He was somewhat obese, so his weight and his
 8  physical condition probably would not have allowed
 9  him to get up.  And even with just three officers
10  there, they would have been able to maintain him on
11  the ground, not allowing him to get up.
12             If he rolled over on his side, lifted
13  his knee to his chest, sit up -- I mean, if you
14  know how to do it, you know, you can do it without
15  your hands, but most people can't.
16             And somebody in his apparent physical
17  condition, based on his height and weight, probably
18  would not have been able to, and certainly would
19  not have been able to with the three officers
20  standing there.
21        Q.   It's your belief that there were three
22  officers on scene at this point?
23        A.   Yes, sir, Officer Ramirez, Officer
24  Pantaloukas and Officer Kern.
25        Q.   Have you seen any reports that suggest
```

```
 1   that Mr. Tyson was kicking at and in fact actually

 2   striking and kicking the police officers when he

 3   was handcuffed but before the leg irons were used?

 4              MS. GEORGES:  Form.

 5              THE WITNESS:  No, sir, I don't recall

 6   that.

 7   BY MR. ABBOTT:

 8        Q.   How many times was the Taser deployed

 9   on Mr. Tyson when he was handcuffed but not placed

10   in leg irons?

11        A.   Again, you know, reading his testimony,

12   it's difficult to say, but, you know, again, it

13   would just be an estimate, it wouldn't be accurate,

14   it would be just my personal perception.

15        Q.   So you don't have any opinion on the

16   subject?

17        A.   I think any application after he was

18   handcuffed was excessive and that at some point

19   they did retrieve leg irons; and then the

20   applications after that were unreasonable and

21   excessive.

22        Q.   All right.  So I'm still on the

23   handcuffs part.  You don't have an opinion in terms

24   of how many times the Taser was used in drive stun

25   mode when Mr. Tyson was only in handcuffs?
```

```
 1        A.   Again, in my opinion, it would be four
 2   to five times, but the only thing I can go off of
 3   is Officer Pantaloukas, who was the one that was
 4   pulling the trigger, and he wasn't certain.
 5        Q.   Four to five times, is your estimate?
 6        A.   At minimum; yes, sir.
 7        Q.   Four to five minimum.
 8             All right.  Then the leg irons were
 9   placed on.  What is your understanding of what that
10   device was?  What did they put on Mr. Tyson's
11   ankles?
12        A.   They referred to it as leg shackles.
13   And my familiarity with leg shackles are they're
14   basically a larger version of handcuffs with enough
15   links of chain to allow a person to have about a
16   half of a normal gait as they walk.  So they can
17   kind of shuffle, but they can't run with those leg
18   irons on.
19             And I know Ms. Moore wasn't sure if
20   they were metal or plastic, like flex cuffs, so I
21   didn't see anything that said we applied Peerless
22   brand leg irons.  I didn't see anything that said
23   we applied zip cuffs.
24             They were only referred to as leg
25   shackles.
```

```
 1          Q.   Is it your opinion that Mr. Tyson

 2   presented no danger to the police officers or to

 3   the public after those leg irons were applied --

 4          A.   Yes, sir.

 5          Q.   -- and the drive stun applications of

 6   the Taser were excessive?

 7          A.   And unreasonable.

 8          Q.   Let me ask you this, sir:  Would those

 9   uses of the Taser have been excessive and

10   unreasonable had Mr. Tyson not been undergoing a

11   psychotic episode?

12          A.   No, sir, I would believe it would be

13   excessive on any person.

14          Q.   Is there anything about this incident

15   that you can determine, sir, that it made any

16   difference that Mr. Tyson was having a psychotic

17   episode?

18               Any opinions that you have that would

19   have been different had Mr. Tyson not been

20   undergoing a psychotic episode?

21               MS. GEORGES:  Form.

22               THE WITNESS:  I believe that the

23   approach the officers would have used would have

24   been different, and should have been different.

25               I think they approached this like any
```

```
 1    criminal matter where you have a felon or a serious

 2    misdemean that needs to be arrested, and that's how

 3    they treated him, instead of a person undergoing a

 4    mental crisis.  Again, he's not in control of his

 5    faculties.

 6    BY MR. ABBOTT:

 7         Q.   How about at any point after --

 8              THE COURT REPORTER:  Hold on, hold on.

 9              (Off-the-record discussion.)

10              THE COURT REPORTER:  Hold on a second.

11    You spoke over the witness in the first part of

12    your question and I didn't get any of your

13    question.

14              MR. ABBOTT:  Okay.

15              MS. GEORGES:  Dan, he wasn't finished

16    answering your question when you started with

17    another question.

18              MR. ABBOTT:  Oh, forgive me.  I didn't

19    know that.

20    BY MR. ABBOTT:

21         Q.   Mr. Taylor, were you not done answering

22    my previous question?  Did you want to complete

23    your thought?

24         A.   I will have to remember what the

25    question was.  I was trying to concentrate on what
```

```
 1   your next question was, and I couldn't, so I'm

 2   sorry.

 3              MR. ABBOTT:  Madam Reporter, I hate to

 4   ask you, but I would hate to be unclear and suggest

 5   that I cut the witness off.

 6              Could you read the previous question

 7   that you got and the answer, to allow the witness

 8   to complete his thought.

 9              THE COURT REPORTER:  Yes.

10              (The record was read as requested.)

11              THE WITNESS:  So I believe that if they

12   would have approached it as a person having a

13   mental crisis, they would have waited until the

14   adequate number of officers were there, and then

15   they would have approached.

16   BY MR. ABBOTT:

17       Q.   Mr. Taylor, let me ask you this.

18              After Mr. Tyson struck Officer Ramirez

19   with the clock, do any of your further opinions

20   turn upon the issue of whether or not Mr. Tyson was

21   undergoing a psychotic episode?

22              MS. GEORGES:  Form.

23              THE WITNESS:  I don't understand what

24   your question is.  I'm sorry.

25   BY MR. ABBOTT:
```

```
 1          Q.   Here's why I ask.  And we've covered

 2   the testimony earlier.  You think that after

 3   Mr. Tyson was handcuffed and certainly after he was

 4   shackled, that the use of the Taser was

 5   inappropriate, true?

 6          A.   Yes, sir.

 7          Q.   But it would also be inappropriate had

 8   a handcuffed and leg-shackled suspect not been

 9   having a psychotic episode?

10              MS. GEORGES:  Form.

11              THE WITNESS:  Yes, sir.

12   BY MR. ABBOTT:

13          Q.   So that's the purpose of my question.

14              Is it of any further significance to

15   you, after Officer Ramirez was hit by a clock, that

16   Mr. Tyson was undergoing a psychotic episode?

17              MS. GEORGES:  Form.

18              THE WITNESS:  No, he was still

19   undergoing -- the entire episode was based on him

20   going through a psychotic episode.

21              We don't know that he would have been

22   assaultive to a law enforcement officer had he been

23   in his proper state of mind.  We don't know what he

24   was seeing; he could have been seeing him as some

25   type of devil or any number of imaginable things.
```

```
 1              So we don't understand, as a rational
 2    person, what he was experiencing.
 3    BY MR. ABBOTT:
 4         Q.    Was Mr. Tyson drive-stunned with a
 5    Taser after Mr. Tyson was placed in leg irons?
 6         A.    Yes, sir, according to Officer
 7    Pantaloukas's deposition, he said at least twice.
 8         Q.    How many times was Mr. Tyson
 9    drive-stunned in total?
10         A.    Eight times.
11         Q.    Do you have any opinions, sir, in terms
12    of the duration of each of those electrical charges
13    from the usage of the Taser?
14         A.    Yes, sir, the first application was for
15    nine seconds, four seconds longer than the standard
16    cycle.  The Taser, when you pull the trigger and
17    release it, automatically cycles for five seconds.
18              Officer Pantaloukas stated in his
19    deposition he kept the trigger pulled back to allow
20    it to go past five seconds, because his initial
21    Taser probe that was shot into the back of
22    Mr. Tyson was not effective, that he did not
23    experience the neuromuscular incapacitation that he
24    expected, so that's why he left it on longer than
25    five seconds.  The subsequent Taserings, which were
```

 1  all drive stuns, were for five seconds each.

 2        Q.    Five seconds is how long the Taser was

 3  emitting an electrical charge?

 4        A.    Yes.

 5        Q.    Do you have an opinion, sir, in terms

 6  of whether that charge was being delivered to

 7  Mr. Tyson for the entirety of each of those

 8  five-second durations?

 9        A.    Yes, I do.  Officer Pantaloukas said

10  that he derived NMI from each one of those, and

11  that was the only time they had to catch their

12  breath, was every time they delivered a drive stun,

13  that Mr. Tyson was not able to resist them and they

14  were able to catch their breath, was his words.

15        Q.    All right.  I'm not sure that answered

16  my question.  I might have had a bad question.

17              Here is my question:  The pull of the

18  Taser trigger delivers an electrical charge for

19  five seconds.

20              True?

21        A.    Yes, sir.

22        Q.    That doesn't necessarily mean that that

23  charge is delivered to a person.

24              True?

25              MS. GEORGES:  Form.

Taylor, Roy                    May 01, 2018                    Page 97

```
 1              THE WITNESS:  Right.  It wouldn't be
 2    able to determine that from the Taser download.
 3    BY MR. ABBOTT:
 4         Q.   And thus the reason for my question.
 5              Do you have any opinion, sir, in terms
 6    of the duration that those electrical charges were
 7    being given to Mr. Tyson?
 8         A.   Yes, sir, I believe Officer Pantaloukas
 9    left it on there for the entire time.
10         Q.   And what is the basis for that opinion,
11    sir?
12         A.   His testimony in his deposition that
13    that was the only time they could catch their
14    breath, so he left them on there to let him
15    experience a full five seconds each time, is what
16    my opinion is.
17         Q.   The testimony is that Mr. Tyson was
18    continuing to kick his legs and thrash about.
19              True?
20         A.   Yes, sir.
21              MS. GEORGES:  Form.
22    BY MR. ABBOTT:
23         Q.   How, then, are you comfortable in
24    testifying that none of that kicking or thrashing
25    caused the Taser to lose contact with Mr. Tyson's
```

```
 1   body?
 2             MS. GEORGES:  Form.
 3             THE WITNESS:  Because Officer
 4   Pantaloukas was holding his legs underneath his arm
 5   and using his other hand to deliver the drive stun.
 6   BY MR. ABBOTT:
 7        Q.   And so it is your opinion that Officer
 8   Pantaloukas had full control of Mr. Tyson's lower
 9   extremities?
10        A.   Yes, sir.
11        Q.   Let's move forward to Page 6 of your
12   report, sir, where we're talking about the
13   standard.  So I guess I'm on the third paragraph
14   down.  Are you with me?  Force is Defined...
15        A.   Yes, sir.
16        Q.   Force is defined as the exercise of
17   strength, energy or power to impose one's will.
18             Where did you obtain that definition,
19   sir?
20        A.   It was out of a use-of-force manual
21   that I was reading.  I don't recall which one.
22   It's, you know, I think a good way to define what
23   it is.
24        Q.   That's a manual for any particular
25   police department or police force?
```

Taylor, Roy                    May 01, 2018                    Page 99

```
 1        A.    I believe it's a book that was written
 2  by a retired FBI agent on the use of force.
 3        Q.    Do you remember the agent's name or the
 4  title of his book?
 5        A.    John Hall was his name.  I think the
 6  book was something to the effect of In Defense of
 7  Self and Others and something along the lines of
 8  the reasonableness of police use of force.
 9        Q.    And do you know where Mr. Hall gained
10  that definition?
11        A.    He is an attorney and one of the head
12  trainers, or at the time he had just retired as one
13  of the head trainers for the FBI.
14        Q.    All right.  Do you know where he
15  obtained this definition of force?
16        A.    No, sir; I don't.  I don't recall.
17        Q.    You go on:  The most common definition
18  of appropriate force is that which is reasonably
19  necessary to effect an arrest or overcome
20  resistance.
21              Where does that definition come from?
22        A.    It's pretty standard in all of our
23  use-of-force training that I conduct.
24        Q.    Oh, for the training that you conduct.
25  And where did you obtain the definition so as to
```

```
 1    include that in your -- in the training you

 2    conduct?

 3         A.   From the State of North Carolina.  I've

 4    been a use-of-force instructor since, I believe,

 5    1994 and using materials that the State provides.

 6         Q.   Do you have any reason to believe that

 7    that is the definition most prevalent throughout

 8    the country?

 9         A.   I do.  I believe it's very similar and

10    would be in agreement with, you know, Graham versus

11    Conner, the U.S. Supreme Court case from 1989.

12         Q.   So you have read the Graham decision?

13         A.   Yes, sir.  It was a Charlotte, North

14    Carolina case, so it was right in my backyard, so I

15    had a lot of interest in it.

16         Q.   Okay.  And is that where you obtained

17    this definition?

18         A.   It's consistent with that.  I don't

19    know if that's where I specifically got this from.

20         Q.   Okay.  The next paragraph draws a

21    distinction between excessive force and

22    unreasonable force.

23              True?

24         A.   Yes, sir.

25         Q.   And where did you obtain the source
```

1   material for this paragraph, or that distinction

2   that you're drawing?

3         A.   Again, the materials provided by the

4   State of North Carolina from our use-of-force

5   manuals.

6         Q.   How does the State provide those

7   materials?

8              In Florida, we have a state agency

9   called FDLE, The Florida Department of Law

10  Enforcement.

11             Is there some similar North Carolina

12  agency that oversees, in any way, police conduct?

13        A.   Yes, sir, the North Carolina Criminal

14  Justice Training and Standards Commission.

15        Q.   And is that entity that you're talking

16  about how they provided the source materials for

17  some of these definitions?

18        A.   Yes, sir.  Most of the material comes

19  from the North Carolina Justice Academy, but that

20  is a subdivision of the North Carolina Criminal

21  Justice Training and Standards Commission.

22             They are overseen and all of the

23  material has to be approved by the full Commission

24  before it's allowed to be released.

25        Q.   And then they are distributed to local

```
 1   police agencies for training purposes?

 2         A.   All of the agencies in the state -- so

 3   state, local, county, all of them that are required

 4   to be certified by North Carolina -- would receive

 5   the material.

 6         Q.   And have you seen any similar materials

 7   provided by the State of Florida for police

 8   departments located in the state?

 9         A.   I don't recall reading any

10   specifically; no, sir.

11         Q.   This paragraph concludes with a

12   statement that certain actions can lead to civil

13   rights violations.

14              Do you have any opinion, sir, in terms

15   of whether or not any City of Hollywood police

16   officer violated Mr. Tyson's civil rights?

17         A.   My personal opinion, yes; but as an

18   expert, I'm not allowed to comment on law, so, I

19   mean, I'm happy to render my personal opinion, but

20   I don't want to...

21         Q.   So is that, then, not an opinion that

22   you anticipate sharing with the jury?

23         A.   No, sir.

24         Q.   Okay.  I've got a similar question.

25   The next paragraph talks about Fourth Amendment
```

```
 1    standards.
 2              Do you intend to tell the jury, sir,
 3    what your belief is in terms of the Fourth
 4    Amendment standards for use of force?
 5              MS. GEORGES:  Form.
 6              THE WITNESS:  No, sir.
 7    BY MR. ABBOTT:
 8         Q.   Let me flip over to Page 7 and the
 9    first full paragraph there.
10         A.   Would you mind if we took a break?
11         Q.   Law enforcement officers are also
12    taught when an officer's action is questioned...
13              And then the sentence continues.
14              Which law enforcement officers are you
15    referring to there?
16         A.   Throughout the United States.
17              MS. GEORGES:  Dan, can we take a
18    bathroom break, considering we've been going --
19              MR. ABBOTT:  Anything you want, of
20    course.
21              MS. GEORGES:  Thank you.
22              (A brief recess was held.)
23    BY MR. ABBOTT:
24         Q.   Mr. Taylor, I think when we left off,
25    we were at the top of Page 7 of your report and the
```

```
 1    first full paragraph.  And I was asking you where

 2    law enforcement officers are taught about the

 3    remainder of that paragraph, and you were telling

 4    me that that's true throughout the United States.

 5              Is that your recollection of where we

 6    left off?

 7         A.   Yes, sir.

 8         Q.   And how is it that you know that, sir?

 9              How do you know that police officers

10    throughout the United States are taught about this

11    use-of-force standard?

12         A.   Through my membership in International

13    Chiefs of Police Association, the Police Executive

14    Research Forum, the International Association of

15    Law Enforcement Educators and Trainers.

16              I won't say that every state has

17    exactly the same, but most states base their police

18    procedures off of Supreme Court rulings, and with

19    Graham versus Conner and Tennessee vs. Garner, you

20    know, are all kind of the benchmarks that everyone

21    uses.

22              I have not, in my experience as a

23    litigation consultant or in my experience as a law

24    enforcement officer traveling around to different

25    courses, found that there was anybody that was
```

```
 1   inconsistent with that.
 2        Q.    Let's move to the next paragraph:
 3             While there are circumstances under
 4   which multiple Taser cycles may be appropriate and
 5   reasonable, officers should consider an attempt to
 6   move in and control the subject while a Taser CEW
 7   is cycling and it is practical and reasonably safe
 8   to do so.
 9             Did I read that correctly?
10        A.    Yes, sir.
11        Q.    In this particular case, sir, did City
12   of Hollywood police officers consider an attempt to
13   move in and control Mr. Tyson while the Taser was
14   cycling?
15        A.    Yes, sir.
16             Officer Pantaloukas testified that when
17   they were -- when Officer Kern was getting the left
18   arm behind his back, that he actually felt some of
19   the shock.  So that told me that while this NMI was
20   going on, that that's when they got him handcuffed.
21        Q.    So this, then, is an instance in which
22   multiple Taser cycles were appropriate?
23        A.    Yes, sir, but not after that point.
24        Q.    The next sentence:  The International
25   Association of Police Chiefs, as well as the Police
```

```
 1   Executive Research Forum, both recommend that no

 2   more than three five-second Taser cycles be used,

 3   unless deadly force would be authorized under the

 4   existing circumstances.

 5                Did I read that correctly?

 6        A.    Yes, sir.

 7        Q.    And that is, in fact, your opinion?

 8        A.    Yes, sir, that's what officers -- in

 9   this case, the Taser Version 19 training that these

10   officers took in July of 2014, that was actually

11   one of the slides that was in their training

12   material.

13        Q.    All right.  But I'm talking about these

14   two sources here.  Let's talk about that in

15   particular.

16                In what manner does the International

17   Association of Police Chiefs recommend that no more

18   than three five-second Taser cycles be used unless

19   deadly force would be authorized?

20        A.    Again, the Taser lesson plan the

21   officers were shown during their training has this

22   specific example that police executive research

23   forums said, I believe, in March of 2010, and the

24   IACP, International Association of Chiefs of Police

25   said in April of 2011 this exact statement, that
```

Taylor, Roy                    May 01, 2018                    Page 107

```
 1   any more than three cycles would be considered

 2   deadly force.

 3              The International Association of Police

 4   Chiefs has a list of model policies that agencies

 5   can choose to use, if they so desire, to help them

 6   get started on their policy manual.  And that's

 7   where this came from, was through their Electrical

 8   Control Weapons Model Policy.

 9        Q.   Okay, good.  Let me break that down a

10   little bit.

11              So we're starting with the

12   International Association of Police Chiefs.  And

13   this standard that you read comes from one of their

14   model policies?

15        A.   Right.  I actually got it from the

16   Taser lesson plan.

17        Q.   You didn't see the source material for

18   what the IACP put out?

19        A.   When I looked at it online, you know,

20   the policy may have changed.  I didn't see where it

21   said that it had anything -- it said it may be

22   considered deadly force.  I didn't see that on the

23   version I looked at online and I don't have a way

24   to find out what the policy was back in 2012 when

25   this was written, so it may have been changed at
```

```
 1   some point.
 2        Q.   All right.  And so as we sit here
 3   today, sir, do you believe that the International
 4   Association of Police Chiefs have recommended that
 5   no more than three five-second Taser cycles be used
 6   unless deadly force would be authorized?
 7             MS. GEORGES:  Form.
 8             THE WITNESS:  That was my understanding
 9   from the Taser lesson plan from that time period;
10   yes, sir.
11   BY MR. ABBOTT:
12        Q.   Okay.  So that remains your opinion
13   today, that there is a model policy of the
14   International Association of Police Chiefs that
15   announces that standard?
16        A.   In 2014, yes, sir.
17             As of today, no.
18             Again, I have to go --
19        Q.   What is the -- what is the current
20   International Association of Police Chiefs model
21   policy with regard to Taser usage?
22        A.   My recollection is that it's to use the
23   minimum number of cycles needed.
24        Q.   Okay.  Do you know, sir, whether or not
25   the International Association of Police Chiefs'
```

```
 1    model policy on ECW usage employs a concept of

 2    sensitive population groups?

 3          A.    Yes, sir, it does.

 4          Q.    And was Mr. Tyson a member of a

 5    sensitive population group?

 6          A.    No, sir.  Unfortunately, it doesn't

 7    list people with mental illness as a subgroup

 8    specifically.

 9               It lists young children, pregnant

10    women, people that are unusually thin and anybody

11    that's on an elevated platform where they may fall

12    and be injured, driving a motor vehicle.  Those

13    type of things would be prohibited.

14          Q.    Do you know, sir, whether the

15    International Association of Police Chiefs Model

16    Policy prohibits the use of an ECW on a suspect in

17    handcuffs?

18               MS. GEORGES:  Form.

19               THE WITNESS:  I can't answer

20    specifically on that, what that policy specifically

21    says, no, sir.  I don't recall.

22    BY MR. ABBOTT:

23          Q.    Do you know, sir, of any policy or

24    other recognized standard on the use of ECWs that

25    suggest that the use of an ECW on a handcuffed
```

```
 1    subject is never appropriate?

 2              MS. GEORGES:  Form.

 3              THE WITNESS:  Yes, sir, in the Taser

 4    training that the officers were provided it says

 5    not to Taser anybody once they were restrained in

 6    handcuffs.

 7    BY MR. ABBOTT:

 8         Q.   Okay.

 9         A.   And also the department use of force --

10         Q.   -- in reference to that Taser training

11    as the standard that you were relying upon?

12              THE COURT REPORTER:  I missed the

13    beginning of the sentence.

14              MS. GEORGES:  You're, again, talking

15    over the witness.

16    BY MR. ABBOTT:

17         Q.   I'm sorry, Mr. Taylor, I didn't know

18    that.  If you were not finished answering the

19    previous question, please finish up.

20         A.   The Hollywood Police Department's

21    policy manual advises officers not to use a Taser

22    once somebody is secured in handcuffs.

23         Q.   Okay.  So the Taser training manual and

24    the City of Hollywood policy both suggest to never

25    use a Taser on a handcuffed suspect?
```

```
 1              MS. GEORGES:  Form.
 2              THE WITNESS:  It says should not.  It
 3    doesn't use the word never.
 4              Again, very few agencies or
 5    manufacturers are going to get themselves boxed
 6    into an absolute, just because there are always
 7    going to be -- or can be -- extenuating
 8    circumstances that may make it justifiable.
 9              But on a day-to-day normal situation,
10    no, sir, they would not use a Taser on someone who
11    has been restrained.
12    BY MR. ABBOTT:
13         Q.   Do you remember the particular
14    Taser -- by the company, Taser -- do you remember
15    the specifics of their recommended training with
16    regard to a handcuffed suspect?
17         A.   My recollection is it was on one of the
18    slides when not to use the Taser.
19         Q.   And without further qualification, one
20    of the times it would be inappropriate to use the
21    Taser, according to that slide, was if the suspect
22    is in handcuffs?
23         A.   That's my recollection; yes, sir.
24         Q.   All right.  So if we have completed
25    discussing the International Association of Police
```

```
 1   Chiefs, the sentence also suggests that the Police

 2   Executive Research Forum has recommended that no

 3   more than three five-second Taser cycles be used,

 4   unless deadly force would be authorized.

 5              Did I read that correctly?

 6        A.    Yes, sir.

 7        Q.    And how are you aware of this Police

 8   Executive Research Forum recommendation?

 9        A.    It's on one of the slides in the

10   Version 19 Training Presentation the officers were

11   taught in July of 2014.

12        Q.    So you have not seen from the source

13   document -- and in this case the source document

14   I'm talking about is the Police Executive Research

15   Forum -- you have not seen that entity recommend

16   that tasers not be used on handcuffed suspects?

17        A.    No, sir, I was not able to find it.

18              It was in conjunction with a bulletin

19   that was put out by the U.S. Department of Justice

20   and the Office of Community Policing in association

21   with Police Executive Research Forum, and I have

22   not been able to find it myself.

23        Q.    The next sentence talks about when a

24   Taser can be used and should be used where there

25   are instances of active resistance by the suspect.
```

```
 1          A.   Yes, sir.
 2          Q.   One instance of active resistance is if
 3  the suspect had used force against the officer or
 4  another person?
 5          A.   Yes, sir.
 6          Q.   Did Mr. Tyson use force against a
 7  police officer or another person?
 8          A.   Yes, sir, he did.
 9          Q.   The next section says violent,
10  threatening or potentially violent behavior.
11          Did Mr. Tyson exhibit that behavior?
12          A.   Yes, sir, he did.
13          Q.   Was there any point in time that
14  Mr. Tyson stopped exhibiting that behavior?
15          A.   Yes, sir, after he was handcuffed.
16          Q.   And what did Mr. Tyson do after he was
17  handcuffed to suggest that he was no longer
18  violent, threatening or potentially violent?
19          A.   That he was immobilized and didn't have
20  that capability.  He was also not communicating in
21  any fashion.
22          Q.   He was immobilized because he had
23  handcuffs on?
24          A.   Yes, sir, handcuffs behind the back.
25          Q.   Did those handcuffs prevent Mr. Tyson
```

```
 1   from using his legs in a violent way?

 2        A.   Didn't prevent him, but there was no

 3   indication that he was doing so.

 4        Q.   You saw no suggestion from any witness

 5   that Mr. Tyson continued to strike and attempt to

 6   strike people with his legs after being handcuffed?

 7             MS. GEORGES:  Form.

 8             THE WITNESS:  I remember him

 9   characterizing he was just thrashing around on the

10   ground, moving his legs, kicking his legs.  But

11   obviously the officers could have avoided that by

12   widening the perimeter around him.  They could be

13   out of his reach.  So, again, that doesn't justify

14   the uses of force.

15   BY MR. ABBOTT:

16        Q.   And how long would you recommend that

17   the police officers do that, leave the handcuffed

18   thrashing suspect on the ground and just get out of

19   striking range?  How long should they do that?

20        A.   My opinion is that they would have

21   summoned EMS, as was their protocol; and when EMS

22   arrived, they would be able to restrain him, get

23   him put on to a cot and then strapped down, so that

24   he would be immobilized.  So however long the

25   response time for EMS would have been.
```

Taylor, Roy                    May 01, 2018                    Page 115

```
 1          Q.    In this particular case, at this

 2   juncture, trying to take Mr. Tyson into custody,

 3   EMS was already on scene; weren't they?

 4               MS. GEORGES:  Object to form.

 5               THE WITNESS:  At some point, they were,

 6   but they were focused on treating Officer Ramirez's

 7   laceration.

 8   BY MR. ABBOTT:

 9          Q.    So do I understand you correctly to

10   suggest that the police officers should have left

11   Mr. Tyson and it should have been EMS that

12   attempted to further take Mr. Tyson into custody?

13               MS. GEORGES:  Form.

14               THE WITNESS:  No, sir.

15               According to their policy under the

16   Baker Act, the officers would immobilize him and

17   use EMS to transport, but it would be up to the

18   officers as to how he was immobilized, according to

19   their policy.

20               My opinion is --

21   BY MR. ABBOTT:

22          Q.    At what point was Mr. Tyson

23   immobilized, in your opinion, sir?

24          A.    He was fully immobilized after the leg

25   shackles were applied.
```

```
1          Q.    This final paragraph goes on to suggest
2    that Officer Pantaloukas acted in violation of the
3    City of Hollywood's use-of-force policy?
4          A.    Yes, sir, the Special Impact Weapons
5    and Chemical Standards Operating Policy Number 201.
6          Q.    That policy provides that use of the
7    Taser is prohibited when the subject is handcuffed
8    unless they are exhibiting aggressive physical
9    resistance, actively attempting to escape from
10   custody or trying to harm themselves or others?
11         A.    That's correct.
12         Q.    Let me ask you this, sir:  Is that an
13   appropriate police policy?
14         A.    Yes, sir.
15         Q.    And in this particular case, you are of
16   the opinion that Officer Pantaloukas acted in
17   violation of this policy?
18         A.    Absolutely.
19         Q.    So it is your opinion that after
20   Mr. Tyson was placed in handcuffs, he was not
21   exhibiting aggressive physical resistance?
22              MS. GEORGES:  Form.
23              THE WITNESS:  I don't think someone
24   thrashing around is active physical resistance.
25   BY MR. ABBOTT:
```

```
 1          Q.    Would you give me an example, sir, of a
 2    handcuffed individual who is exhibiting aggressive
 3    physical resistance?
 4          A.    If he's trying to strike people with
 5    his feet, if he's trying to strike people with his
 6    head, trying to bite people, using his body as a
 7    weapon.  But, again, there's no indication of that,
 8    only that his legs were moving around.
 9          Q.    The policy suggests that the use of the
10    Taser on a handcuffed suspect is appropriate if the
11    suspect is trying to harm others?
12          A.    Correct.
13          Q.    And you agree that's an appropriate
14    policy?
15          A.    I do.
16          Q.    And then is it your opinion that
17    Mr. Tyson was not trying to harm others at the time
18    he was being administered the Taser while in
19    handcuffs?
20          A.    Correct.
21          Q.    The very last couple of words of your
22    report suggests that the use of the Taser was a
23    proximal cause of death to Mr. Tyson?
24          A.    Yes, sir.
25          Q.    Do you propose to offer that expert
```

```
 1   testimony?

 2        A.   Based on the Taser lesson plan that

 3   they were provided, multiple uses of the CEW can

 4   result in metabolic and physiological changes.

 5   It's also very stressful on the body.

 6             And given the cardiac problem that he

 7   was not -- or no one was aware of, apparently --

 8   this was a proximal cause of his death.

 9        Q.   Could you please give me the benefit of

10   your medical training and experience, sir?

11             MS. GEORGES:  Form.

12             THE WITNESS:  I was an emergency

13   medical technician for almost 40 years, ran

14   full-time EMS for two years as a firefighter in

15   Sandusky, Ohio, and maintained my certification,

16   and did it as a volunteer for a number of years as

17   well.

18             And I finally let it go after the

19   continuing education requirements became too

20   burdensome with my full-time law enforcement

21   career.

22             But, again, you know, you don't need

23   expert medical testimony.  You know, you read the

24   lesson plan.  It was very clear to the officers at

25   that time that this type of activity could result
```

```
 1   in death.  So it's simply I'm testifying as an
 2   instructor for Taser.
 3   BY MR. ABBOTT:
 4        Q.   In terms of the actual mechanism of
 5   death?
 6        A.   I didn't say it was an actual
 7   mechanism.  I said it was a proximal cause, meaning
 8   that it was one of several.
 9        Q.   Have you heard of anyone else who has
10   expressed that opinion, sir, any other person or
11   professional who has expressed the opinion that the
12   use of the Taser was a proximal cause of
13   Mr. Tyson's death?
14             MS. GEORGES:  Form.
15             THE WITNESS:  Yes, sir, I have.
16   BY MR. ABBOTT:
17        Q.   Who?
18        A.   It was a coroner in Georgia.
19        Q.   And you have consulted with that
20   coroner in Georgia in connection with your
21   retention?
22        A.   No, sir, I have heard the testimony
23   about it.
24        Q.   About the death of Mr. Tyson?
25        A.   No, about the death of a person that
```

```
 1    was exposed to a Taser CEW.

 2          Q.   Well, Mr. Taylor, maybe my question is

 3    not clear.

 4               You want to testify that the use of a

 5    CEW can cause death?

 6          A.   Yes, that's based on a lesson plan that

 7    Taser provides.

 8          Q.   And my question to you, sir, is:  Your

 9    report suggested that it was, in fact, a cause of

10    death to Mr. Tyson?

11               MS. GEORGES:  Form.

12               THE WITNESS:  My opinion is that it's

13    one of the reasons that he did die; yes, sir.

14    BY MR. ABBOTT:

15          Q.   And my question to you, sir, is:  Have

16    you heard anyone else in the universe express that

17    medical opinion, that Mr. Tyson died in part

18    because of the use of the Taser?

19               MS. GEORGES:  Object to the form of the

20    question.

21               THE WITNESS:  Not Mr. Tyson

22    specifically, no, but that wasn't your question.

23               You asked have I heard of any other

24    cases that this was a proximal cause of death.

25    That's what I was testifying to.
```

```
 1              Specifically to Mr. Tyson, I have not
 2    heard anybody express any other opinion.  You know,
 3    the medical examiner that performed the autopsy
 4    didn't rule it that way.
 5    BY MR. ABBOTT:
 6         Q.   So you disagree with the medical
 7    examiner.  You reached a conclusion that the ME
 8    could not.
 9         A.   No, I concur with the medical examiner,
10    but he wasn't able to rule it out all the way.
11         Q.   Is that your testimony, then, sir, you
12    were not able to rule out all the way whether or
13    not the use of the Taser was a cause of Mr. Tyson's
14    death?
15         A.   Correct.
16              MS. GEORGES:  Form.
17              THE WITNESS:  I believe the excessive
18    use of it and partially the positional asphyxia he
19    probably suffered due to five officers holding him
20    down were all proximal causes of his death.
21    BY MR. ABBOTT:
22         Q.   All, in fact, proximal causes?
23         A.   Yes, sir, I think they were cumulative.
24         Q.   And that opinion is based upon your
25    being a Taser instructor and used to have been a
```

```
 1   paramedic?
 2          A.   Well, I was not a paramedic, I was an
 3   advanced EMT.
 4          Q.   Okay.  That's the basis of that
 5   opinion?
 6          A.   And my use of -- my experience as an
 7   instructor in use of force and reviewing these type
 8   of cases, you know, throughout my career.
 9          Q.   All right.  Have you, sir, reviewed any
10   studies that have been conducted to determine the
11   likelihood of permanent injury or death after use
12   of an ETW?
13          A.    I've read material that Taser publishes
14   to the instructors.  I didn't read the entire
15   study.  But they reference studies that they have
16   conducted and other people have conducted.  So a
17   summary, maybe, would be more applicable.
18          Q.   Are you aware of whether or not studies
19   have been done to determine the number of
20   fatalities or other permanent injuries for those
21   who have been subjected to Taser usage?
22              MS. GEORGES:  Form.
23              THE WITNESS:  Again, I have read what
24   Taser, you know, publishes to the instructors.
25   BY MR. ABBOTT:
```

Taylor, Roy                    May 01, 2018                    Page 123

```
 1          Q.   So is the answer to my question, no,
 2    you have not seen any of those source studies?
 3               MS. GEORGES:   Same objection.
 4               THE WITNESS:   Not in their entirety,
 5    no.  I have not read the entire study to find out
 6    how many subjects.
 7               I have just read the summaries that
 8    have been published by Taser and the material that
 9    they want us to instruct to our students that, you
10    know, these things can lead to death and that there
11    are certain high-risk individuals or certain
12    high-risk activities they may conduct that could
13    lead to death, and to avoid those.
14    BY MR. ABBOTT:
15          Q.   How many people have died as a result
16    of Taser usage?
17          A.   I don't know.
18               MS. GEORGES:   Form.
19    BY MR. ABBOTT:
20          Q.   What are the high-risk factors that you
21    believe that Taser has identified?
22          A.   The number of CEU exposures, location
23    of the darts on the body in close proximity to the
24    heart, use on high-risk individuals, use in
25    high-risk situations.
```

Taylor, Roy                    May 01, 2018                    Page 124

```
 1          Q.    Mr. Tyson was not subject to electrical

 2   charges near his heart; was he?

 3          A.    No, sir; not to my knowledge.

 4          Q.    Mr. Tyson was not a high-risk

 5   individual, was he?

 6               MS. GEORGES:  Form.

 7               THE WITNESS:  Not according to Taser,

 8   no.

 9   BY MR. ABBOTT:

10          Q.    Was Mr. Tyson in a high-risk situation?

11               MS. GEORGES:  Form.

12               THE WITNESS:  No.

13   BY MR. ABBOTT:

14          Q.    Do you believe Officer Ramirez was in a

15   position of physical risk when he was on the ground

16   with Mr. Tyson?

17               MS. GEORGES:  Form.

18               THE WITNESS:  When he was alone by

19   himself?

20   BY MR. ABBOTT:

21          Q.    Well, we can start there.

22          A.    Yes, sir, he was at risk, as he would

23   be with any altercation with another person.

24          Q.    And how about when Officer Pantaloukas

25   joined the fray; was Officer Ramirez still at risk?
```

```
 1              MS. GEORGES:  Form.
 2              THE WITNESS:  I would assess that he
 3   was at a lower risk since now he had backup and it
 4   was now two people against one.
 5   BY MR. ABBOTT:
 6         Q.   Was he still at risk?
 7         A.   There was some risk; yes, sir.
 8         Q.   Do you have an opinion of who was
 9   winning the fight between Mr. Tyson and Officer
10   Ramirez before Officer Pantaloukas intervened?
11              MS. GEORGES:  Form.
12              THE WITNESS:  Apparently, according to
13   Ms. Moore, that Officer Pantaloukas had Mr. Tyson
14   on his face part of the time.
15              It wasn't quite clear from Officer
16   Pantaloukas's testimony.  He said that Officer
17   Ramirez was up on his knees when he got there, and
18   they were kind of stomach to stomach, so I'm
19   assuming that meant that Mr. Tyson had got up on
20   his knees as well.
21              But, at most, I would say it was a
22   stalemate, that it was mano a mano, and neither one
23   was winning.  They were an even match.
24   BY MR. ABBOTT:
25         Q.   Do you know the relative physical sizes
```

```
 1   of Mr. Tyson and Officer Ramirez?

 2          A.   I remember Mr. Tyson was described as

 3   5'6, about 240 pounds.  And I believe Ramirez was

 4   around that same size, about 5'7, and he was

 5   obviously a thinner build.  He was in pretty good

 6   physical condition.  So I would estimate his weight

 7   from the pictures -- and I don't recall what it was

 8   on his deposition -- but I think he was around 175

 9   to 180 pounds.  But, again, he was in good physical

10   condition from all of the running and exercises

11   that they went through at the Academy, as well as

12   the training they received when they returned to

13   Hollywood, Florida.  His testimony was that they

14   would, you know, run them and exercise them until

15   they puked.

16          Q.   He'd also just gotten hit on the head

17   with a clock and was bleeding profusely from his

18   head, right?

19               MS. GEORGES:  Form.

20               THE WITNESS:  All head wounds do bleed

21   profusely.  That doesn't really suggest the

22   severity of it.

23   BY MR. ABBOTT:

24          Q.   Well, what was the severity of Officer

25   Ramirez's head injury?
```

Taylor, Roy                    May 01, 2018                    Page 127

```
 1        A.   He had almost a three-inch laceration
 2  on the top of his head.  I believe it was on the
 3  left side.
 4        Q.   Could the fact that Mr. Tyson was
 5  undergoing a psychotic episode have affected his
 6  strength at all?
 7             MS. GEORGES:  Form.
 8             THE WITNESS:  No, it doesn't affect
 9  their strength.  They're always just as strong as
10  they always are, but they sometimes feel like
11  they're impervious to pain, where they do not
12  succumb to pain as much as we would in a normal
13  state.
14  BY MR. ABBOTT:
15        Q.   And was Mr. Tyson in such a state that
16  he was impervious to pain?
17        A.   I can't answer that question.
18             MS. GEORGES:  Form.
19             THE WITNESS:  From the audiotape on the
20  911 call, you can hear him moaning in the
21  background.  So if he's moaning, he's probably
22  experiencing pain.
23  BY MR. ABBOTT:
24        Q.   Did you see any description from
25  Officer Pantaloukas with regard to the strength
```

1    that Mr. Tyson was exhibiting?

2         A.   One of them characterized him as having

3    superhuman strength.  I remember Pantaloukas

4    specifically said he was like a Tasmanian devil.

5              But, again, that's all subjective.  I

6    don't know exactly what a Tasmanian devil does,

7    other than the Bugs Bunny cartoon.

8         Q.   Well, then, let me ask you this:  Do

9    you have any opinion in terms of the strength that

10   Mr. Tyson was, in fact, exhibiting?

11              MS. GEORGES:  Form.

12   BY MR. ABBOTT:

13        Q.   That he would, you know, be as strong

14   as any average size male would be.  And if me and

15   you were in a fight, we would, you know, both have

16   a hard time taking each other down.  We're

17   relatively, it looks like, the same size.

18              So once you have more people on one

19   person, you're going to hopefully be able to

20   overpower them.

21              But mano a mano is a very difficult

22   situation to be in, especially in law enforcement,

23   where we don't try to injure people.  We're not an

24   MMA fighter, kicking and striking.  We're trying to

25   overcome resistance with shear force and maybe some

```
 1    pressure points.

 2         Q.    Chief Taylor, that was a very kind

 3    overestimation of my particular physical talents,

 4    so I will just leave it right there.  I don't have

 5    any other questions for you, sir.

 6         A.    Thank you, sir.

 7              MS. GEORGES:  Hopefully just a few.

 8    Those, I know, are famous last words.

 9                          EXAMINATION

10    BY MS. GEORGES:

11         Q.    Mr. Taylor, how many officers were

12    holding positional points on Mr. Tyson after he was

13    placed in handcuffs?

14         A.    Once all of the officers were on scene,

15    I think it went from six to five.

16              Ramirez said that somebody tapped him

17    out and took his place.  And then Pantaloukas said

18    that somebody tapped him out, because, in his

19    words, he was gassed out, and he went over and sat

20    down on the side.  So I believe there were five

21    total for the duration of Mr. Tyson's life.

22    BY MS. GEORGES:

23         Q.    And were these police officers holding

24    positional points on Mr. Tyson while he was in a

25    prone position?
```

Taylor, Roy                    May 01, 2018                    Page 130

```
 1        A.   Yes, ma'am, he was face down and
 2   handcuffed behind his back and his legs were
 3   shackled.
 4        Q.   And were these police officers holding
 5   positional points as Mr. Tyson was in a prone
 6   position, handcuffed and leg-shackled, until one of
 7   the officers discovered that he was unresponsive?
 8        A.   Yes, ma'am; that was my understanding.
 9        Q.   Now, up until the point where one of
10   the officers noticed that Mr. Tyson was
11   unresponsive, did EMS ever tend to Mr. Tyson?
12        A.   No, ma'am, not from the testimony
13   given.
14        Q.   Now, you've had an opportunity to
15   review the dispatch audio?
16        A.   Yes, ma'am.
17        Q.   And you have also had an opportunity to
18   review the dispatch notes?
19        A.   Yes, ma'am.
20        Q.   Now, was there an initial fire/rescue
21   truck dispatched to the scene?
22        A.   Yes, ma'am, to treat Officer Ramirez's
23   laceration.
24        Q.   And at what point was a second rescue
25   truck dispatched to the scene?
```

```
 1        A.   When Officer Kern radioed for another
 2   EMS vehicle to respond.
 3        Q.   And was that after Mr. Tyson was
 4   discovered to be unresponsive?
 5        A.   That's my understanding of the
 6   timeline, yes.
 7        Q.   Mr. Taylor, shouldn't Mr. Tyson's
 8   psychotic break and mental illness have been a
 9   consideration during the entire police encounter?
10        A.   Yes, it should.
11             MR. ABBOTT:  Object to the form.
12   BY MS. GEORGES:
13        Q.   So, therefore, the officers who arrived
14   after Ramirez and Pantaloukas and Kern should have
15   taken into consideration the source of Mr. Tyson's
16   behavior during this encounter, correct?
17        A.   They should have, yes.
18        Q.   And it was very clear over the dispatch
19   that Mr. Tyson was suffering from some form of a
20   mental illness, correct?
21        A.   It was.
22             MR. ABBOTT:  Object to the form.
23   BY MS. GEORGES:
24        Q.   And it went out over the radio that
25   Mr. Tyson was possibly schizoaffective, correct?
```

```
 1        A.   I believe it said he was suffering from
 2   some mental illness.  I don't think they
 3   specifically used that terminology.
 4        Q.   Did dispatch also relay over the radio
 5   to all of the City of Hollywood police officers
 6   that Mr. Tyson was potentially off of his
 7   medication?
 8        A.   Yes, that was the general broadcast on
 9   their main frequency.
10        Q.   So, therefore, isn't it fair to say
11   that the City of Hollywood police officers who
12   responded to the scene were on notice of
13   Mr. Tyson's mental illness?
14             MR. ABBOTT:  Object to the form.
15             THE WITNESS:  If they were paying
16   attention -- and I know that their testimony was
17   that they did not specifically remember hearing
18   that, and I will give them -- you know, I will give
19   it to them that they were probably busy with other
20   issues going on and they were not directly
21   responding to a call they were dispatched to
22   initially, so they probably weren't paying close
23   attention to the initial dispatch.
24             However, I think that once that call
25   was broadcast and needed help, I think there should
```

 1  have been some secondary information provided to

 2  them, given the fact that they are now responding

 3  to that specific incident.

 4  BY MS. GEORGES:

 5      Q.   Now, wouldn't the amount of force --

 6  strike that.

 7           Shouldn't Mr. Tyson's mental illness

 8  have been taken into consideration by the police

 9  officers while they were applying pressure to

10  Mr. Tyson while he was in a prone position?

11      A.   It should have.  I questioned why they

12  were doing it in the first place.  That's what I

13  don't understand, why they felt the need for him to

14  be totally immobilized on the ground, when there

15  was nowhere for him to go or any injuries he could

16  have inflicted.

17      Q.   You've had an opportunity to review the

18  crime scene photographs?

19      A.   I have.

20      Q.   And isn't the location of this incident

21  within a gated courtyard?

22      A.   It is.

23      Q.   And how many entrance and exit points

24  are there into this courtyard?

25      A.   There's several, but there was only one

Taylor, Roy                    May 01, 2018                    Page 134

```
 1   that was unlocked at the time, the gait that they

 2   all entered through.  The rest, there was pictures

 3   of the padlocks on the gates.

 4         Q.   Now, at the time that Mr. Tyson was

 5   placed in a prone position, handcuffed and

 6   leg-shackled, approximately how many City of

 7   Hollywood police officers were on the scene?

 8         A.   Before he passed away, I believe there

 9   was seven, from what I can determine.

10         Q.   And those seven police officers could

11   have prevented Mr. Tyson from fleeing, if, in fact,

12   he ever hopped back up on his feet, correct?

13         A.   They could have.

14              MR. ABBOTT:  Object to form.

15   BY MS. GEORGES:

16         Q.   Did Mr. Tyson ever get back up on his

17   feet after he was handcuffed and leg-shackled?

18         A.   No, ma'am.

19         Q.   Did Mr. Tyson ever have an opportunity

20   to escape from these seven police officers?

21         A.   He did not.

22         Q.   You've had an opportunity to review the

23   dispatch and you just testified that you heard

24   moaning.  Isn't that correct?

25         A.   Yes.  When the officer radioed for the
```

```
 1   ambulance, you could hear Mr. Tyson moaning in the
 2   background in pain.
 3        Q.   Did you also hear, prior to the
 4   moaning, that a police officer went out over the
 5   radio and stated:  I just need a couple units to
 6   help detain the subject; he's in custody now.
 7        A.   Yes, I did.
 8        Q.   And after that statement was declared
 9   over the radio, you could also hear Mr. Tyson
10   moaning.
11        A.   Yes, you could.
12        Q.   Is it possible that Mr. Tyson's failure
13   to remain still while in a prone position was due
14   to him being in distress?
15             MR. ABBOTT:  Object to the form.
16             THE WITNESS:  It's possible, yes.
17   BY MS. GEORGES:
18        Q.   Can that be ruled out from the realm of
19   reasonable possibilities?
20        A.   It cannot.
21             MR. ABBOTT:  Object to the form.
22   BY MS. GEORGES:
23        Q.   And it's fair to say that, based on the
24   autopsy report, Mr. Tyson had a preexisting heart
25   condition?
```

```
 1          A.    Very serious conditions, yes.
 2          Q.    Now, are you aware of any studies
 3    conducted by Taser or any other entity that tested
 4    or studied the physiological or metabolic effect of
 5    the exposure of a Taser on someone who has a
 6    preexisting heart condition?
 7                MR. ABBOTT:  Object to the form.
 8                THE WITNESS:  Again, I have not read
 9    the entire study, but the material that Taser
10    provides to the instructors has a summary of those
11    studies, and I have that they found that pH level
12    in blood has been changed, that the body
13    experiences a very severe condition, just like you
14    would have run up a lot of steps, that it's a very
15    exhausting situation.  And combining that with
16    physically struggling against officers, it can
17    certainly put somebody into distress.
18    BY MS. GEORGES:
19          Q.    Now, are you aware of any Taser
20    training as it pertains to the exposure of the use
21    of the Taser on those that are deemed to be
22    physiologically or metabolically compromised
23    persons?
24          A.    One of the slides in the presentation,
25    Version 19, that the officer is shown, said that it
```

 1   can cause death from prolonged exposures.

 2          Q.   And it's a sudden death, correct?

 3          A.   Yes.  It was -- I want to say it was

 4   like A-R-D -- I can't remember what the exact

 5   acronym was at this time.

 6          Q.   And those that -- strike that.

 7               Individuals in crisis are deemed to be

 8   physiologically or metabolically compromised and

 9   therefore susceptible to arrest-related death,

10   according to the Taser training.

11          A.   It is.

12               MR. ABBOTT:  Object to the form.

13   BY MS. GEORGES:

14          Q.   And it was that same Taser training

15   that was given to both Officers Ramirez and

16   Pantaloukas in July of 2014, correct?

17          A.   Yes, and they were provided a written

18   examination and both were scored 100 percent.

19          Q.   So, therefore, Officers Ramirez and

20   Pantaloukas was aware, correct?

21          A.   Yes, they were aware of those

22   situations.

23               MR. ABBOTT:  Objection.

24   BY MS. GEORGES:

25          Q.   And the other involved police officers

```
 1    all testified in their depositions that they had

 2    undergone Taser training, correct?

 3         A.   Yes.

 4         Q.   And many had been recertified, correct?

 5         A.   Yes, ma'am.

 6         Q.   Do you know how long Taser has been

 7    educating police officers on the susceptibility of

 8    arrest-related deaths in those that are deemed to

 9    be physiologically or metabolically compromised

10    persons?

11         A.   I don't know in its entirety.  I know

12    since 2005, since I became a Taser instructor, that

13    we've had that material in the lesson plan; but

14    prior to that, I can't speak to what they had.

15         Q.   Now, you've had an opportunity to

16    review some of City of Hollywood's standard

17    operating procedures, correct?

18         A.   Yes, ma'am.

19         Q.   And have you had an opportunity to

20    review Standard Operating Procedure Number 201?

21         A.   I have.

22         Q.   And 201 speaks to the use of a Taser,

23    correct?

24         A.   Yes.

25         Q.   Does the City of Hollywood Standard
```

Taylor, Roy                    May 01, 2018                    Page 139

```
 1    Operating Procedure Number 201 prohibit the Tasing
 2    of individuals that are leg-shackled?
 3             A.   It doesn't specifically address it.  It
 4    just says those persons who are handcuffed, but it
 5    doesn't specifically say anything other than that.
 6             Q.   It's actually silent on the Tasing of
 7    individuals that are both handcuffed and
 8    leg-shackled, correct?
 9             A.   Yes, ma'am, it doesn't mention it at
10    all.
11             Q.   So what do police officers at the City
12    of Hollywood look to in determining whether they
13    can Tase an individual who is handcuffed and
14    leg-shackled?
15             A.   All of the policies leave it up to the
16    officer's discretion.
17             Q.   Now, you've had an opportunity to
18    review the City of Hollywood's use-of-force reports
19    from 2012 through 2015, correct?
20             A.   Through 2014.  I don't remember 2015.
21             Q.   Sorry.  2012 through 2014.
22             A.   Correct.
23             Q.   Is it your opinion that the City of
24    Hollywood needs to institute better policies and
25    training as it pertains to dealing with the
```

1    mentally ill, based upon your review of the City of

2    Hollywood's use-of-force reports from 2012 through

3    2014?

4         A.   Yes, my opinion is that they do need to

5    address it, because they have such a large number

6    of occurrences, that they need to do something to

7    educate the officers so they can properly respond,

8    to avoid these type of tragic situations.

9         Q.   So, therefore, it is your opinion that

10   the City of Hollywood has been on notice that there

11   is a pattern and practice of the use of their

12   Tasers on the mentally ill?

13              MR. ABBOTT:  Object to the form.

14              THE WITNESS:  By review of the

15   document, I determined that.  I don't know if

16   anybody from the City of Hollywood has taken the

17   time to review the facts.  And the thing I found

18   that was shocking was that none of these cases were

19   referred for administrative review or to internal

20   affairs.  They were all marked to go to file.

21              So if I'm the chief of police and

22   nothing is brought to my attention, I'm not going

23   to know that there's an issue, so I feel like it's

24   a first-line supervisor, or whatever level

25   supervisor that fills out that supervisory report

```
 1   and makes that referral, I think that's where the
 2   first step of the problem lies.  They need to be
 3   honest in how they mark those reports.
 4   BY MS. GEORGES:
 5        Q.   Just a few preliminary matters.
 6             You've testified on behalf of
 7   defendants before, correct?
 8        A.   Yes, ma'am, I have.
 9        Q.   Did Mr. Abbott ask you about the cases
10   in which you testified on behalf of the defendant
11   and what the facts and circumstances of those
12   events were here in your deposition today?
13        A.   To some extent, yes, ma'am.
14        Q.   On which cases?
15        A.   Ones where I represented police
16   officers as defendants.
17        Q.   And you have testified on behalf of
18   police agencies and also police officers, correct?
19        A.   I have.
20        Q.   And you've defended police officers and
21   police agencies?
22        A.   Yes, I have.
23        Q.   Now, Mel Tucker's name came up.
24   Mr. Tucker does consulting work, correct?
25        A.   He does.
```

```
 1          Q.   Do you know if Mr. Tucker does
 2   consulting work in South Florida?
 3          A.   He normally avoids it, because he was
 4   the police chief, I believe, of Tallahassee, and he
 5   doesn't want any conflict of interest.
 6          Q.   You testified previously about the
 7   failure to supervise, specifically the FTOs
 8   involved here.
 9               Do you remember that testimony?
10          A.   I do.
11          Q.   Now, did you read, in Officer Ramirez's
12   deposition, that he contacted Officer Pantaloukas
13   on his cellular phone after arriving on scene?
14          A.   I did.  I thought that was very
15   unusual, that he should have used his radio so that
16   other officers in the area would have known there
17   was an issue and they would have been able to
18   respond maybe faster than Pantaloukas did.
19          Q.   And Officer Ramirez failed to go out
20   over the radio and tell dispatch that he felt
21   uncomfortable about the scene in which he responded
22   to, correct?
23          A.   He did.
24          Q.   And he decided that he was just going
25   to call Officer Pantaloukas, versus his supervisor
```

```
 1    or his FTO, correct?

 2           A.   Correct, that's what he did.

 3           Q.   Is it your opinion that that is a

 4    product of insufficient supervision?

 5                MR. ABBOTT:  Object to the form.

 6                THE WITNESS:  I think it was a poor

 7    decision on his part.  He should have been

 8    instructed, anytime he needed backup, to put it out

 9    over the radio so that other people would hear the

10    call, that any individual call on the cell phone

11    would have been basically ineffective.

12                So the radio was the primary key.

13                Either he or Officer Pantaloukas said

14    that there was an unusual amount of radio traffic

15    and that was why he made the phone call instead of

16    putting it on the radio.

17                But in listening to the tapes, it was a

18    very light traffic day, as I would assess.

19    BY MS. GEORGES:

20           Q.   Is there a Standard Operating Procedure

21    at the City of Hollywood as to the use of someone's

22    personal cell phone to contact another officer,

23    versus the radio?

24           A.   Not that I reviewed.

25           Q.   Do you know if there's a general policy
```

```
 1    in all police agencies of the use of one's police

 2    radio versus cellular telephone?

 3         A.    Not that I'm aware of.  I believe it's

 4    just more of a commonsense type of issue that they

 5    should have been trained on to know that, you know,

 6    we want everybody to hear that we're having an

 7    issue, because we may not get another opportunity

 8    to call.

 9              And in this situation, neither Officer

10    Ramirez nor Pantaloukas put anything out over the

11    radio about the type of issues they were having.

12         Q.    Did you ever hear any distress calls on

13    the audio dispatch?

14         A.    No.   That's what I'm saying, that

15    neither one of them put out a distress call, which

16    I find surprising.

17              As soon as Pantaloukas got on scene and

18    observed the fight in progress, he should have

19    gotten on the radio immediately and requested

20    backup, that there was a fight in progress.

21         Q.    So therefore the audio dispatch is

22    devoid of any distress calls by any of the involved

23    police officers.

24         A.    Correct.

25         Q.    Do you have an opinion as to whether
```

```
1    Officer Ramirez violated City of Hollywood's
2    Standard Operating Procedure Number 212?
3         A.   And which one was that?  I don't
4    remember now.
5         Q.   This is the Baker Act SOP and
6    specifically as it pertains to two police officers
7    being dispatched.
8         A.   The policy is that two officers are
9    dispatched to each call.  And if that's not clear
10   enough for them to understand that they need to
11   wait for the other officer to arrive, then it
12   should be included in the policy.  It should be
13   increased -- or it should be elaborated upon --
14   that that means that you wait for the second
15   officer, not just that we're going to dispatch two,
16   but don't rush into a situation that requires two
17   officers to be present.
18        Q.   Now, what is the purpose of this
19   provision within the City of Hollywood's standard
20   operating procedures?
21        A.   My opinion would be that it's for
22   officer safety so that the officers have immediate
23   back-up so that if they encounter a situation like
24   this where you have one person running at them with
25   a clock, they would both be able to charge him,
```

Taylor, Roy                    May 01, 2018                    Page 146

```
 1   take him down and overpower him immediately.
 2          Q.    Are you aware that both Officers
 3   Ramirez and Pantaloukas were in week two of the
 4   shadow phase of their field training program?
 5          A.    I was.   That's why I thought that their
 6   field training officer should have immediately been
 7   responding to those areas and possibly even tell
 8   them to wait until they arrived.
 9                I thought that was part of the poor
10   supervision, that they weren't actively giving them
11   instructions on how to respond to this call.
12          Q.    Have you had an opportunity to review
13   City of Hollywood's Standard Operating Procedure
14   Number 203 as it pertains to arrest procedures?
15          A.    I did read it, yes.
16          Q.    Now, were you aware of a provision that
17   states:  Officer will make every effort to place
18   the person in an upright position as soon as
19   situation allows, avoiding the possibility of
20   positional asphyxia?
21          A.    Yes, ma'am; I read that.
22          Q.    And that is contained within the City
23   of Hollywood's arrest procedures, correct?
24          A.    It is.
25          Q.    And what is the purpose of that
```

 1   provision?

 2         A.    To prevent positional affixation that

 3   has been well documented in law enforcement, that

 4   persons laying on their chest cavity in a

 5   handcuffed position, it believes it puts a lot of

 6   pressure on the chest, makes it difficult to

 7   breathe, and that they can go into respiratory

 8   arrest and then into cardiac arrest.

 9         Q.    Did the City of Hollywood ever seat

10   Mr. Tyson in an upright position after he was

11   handcuffed?

12         A.    No, they did not.

13         Q.    Did the City of Hollywood ever seat

14   Mr. Tyson in an upright position after he was

15   leg-shackled?

16         A.    They did not.

17         Q.    Should they have?

18         A.    According to their policy, yes.  And

19   good police practice, they should have.

20         Q.    It's fair to say that Mr. Tyson was in

21   a prone position while handcuffed and leg-shackled

22   until EMS rendered treatment?

23         A.    And I would add that he was being held

24   down by five officers, which is putting a lot of

25   pressure on him, but we don't know exactly, you

```
 1    know, if there was somebody that may have been
 2    compressing his ribcage or his spine that would
 3    make it more difficult to breathe, or if they were
 4    placing pressure on his head.  I mean, there was a
 5    lot of things that could have added to his
 6    distress.
 7              MS. GEORGES:  Mr. Taylor, I don't have
 8    anything further for you.
 9              MR. ABBOTT:  Just two quick questions
10    and we'll be done.
11                        EXAMINATION
12    BY MR. ABBOTT:
13         Q.   You told us, Mr. Taylor, on
14    cross-examination that at least at some point there
15    were five police officers engaged with Mr. Tyson?
16         A.   Yes, sir.
17         Q.   Was Mr. Tyson subjected to the use of a
18    Taser at any point after those five officers were
19    engaged with him?
20         A.   Once Officer Pantaloukas left, which
21    was the sixth officer, he was not Tased any
22    further.  Officer Pantaloukas was the one that
23    delivered all of the Tasings.
24         Q.   All right.  Well, that helps a little
25    bit.  I'm not sure that gets us all the way there.
```

```
 1              Was Mr. Tyson subjected to the use of a

 2   Taser at any point after he was being engaged by

 3   five police officers?

 4         A.    No.

 5         Q.    The other thing I wanted to ask you

 6   about is you told us on cross-examination that the

 7   subsequent responding officers should have

 8   considered Mr. Tyson's mental condition in

 9   responding.

10              Do you remember that testimony?

11         A.    Yes, sir.

12         Q.    What do you propose they should have

13   done differently based upon Mr. Tyson's mental

14   state?

15         A.    That they should have put him in a

16   seated position once they got there.  Once they

17   were on scene, they could have gotten him in the

18   seated position and maintained him in that position

19   so they don't worry about the positional asphyxia.

20              They could have put him in a

21   left-to-right lateral recumbent position on his

22   side to reduce the amount of pressure on his chest.

23              They could have put him on a supine

24   position, if necessary, if the others wouldn't

25   work, again, to reduce the pressure on his chest
```

```
 1   and de-escalate the situation.
 2        Q.   And, Mr. Taylor, each of those things,
 3   you would suggest is what should have been done
 4   with a person not having a psychotic episode?
 5        A.   I would say either way, sir, either
 6   situation.
 7             MR. ABBOTT:  Thank you, sir.  No
 8   further questions.
 9             And we'll order the deposition
10   transcript.
11             MS. GEORGES:  Thanks, Dan.
12             MR. ABBOTT:  Thank you for your time,
13   sir.
14             THE WITNESS:  Thank you.  Have a nice
15   day.
16             THE COURT REPORTER:  Do you want to
17   reserve signature or waive?
18             THE WITNESS:  Waive.
19             THE COURT REPORTER:  Ms. George, do you
20   want a copy of the transcript?
21             MS. GEORGES:  Yes, ma'am.
22             (The witness, after having been advised
23   of his right to read and sign this transcript,
24   waives that right.)
25             (The deposition concluded at 1:28 p.m.)
```

Taylor, Roy                     May 01, 2018                    Page 151

```
 1              CERTIFICATE OF REPORTER

 2

 3              I, Susan M. Valsecchi, Registered

 4    Professional Reporter and Notary Public for the

 5    State of South Carolina at Large, do hereby certify

 6    that the foregoing transcript is a true, accurate,

 7    and complete record.

 8              I further certify that I am neither

 9    related to nor counsel for any party to the cause

10    pending or interested in the events thereof.

11              Witness my hand, I have hereunto

12    affixed my official seal this 14th day of May, 2018

13    at Columbia, Richland County, South Carolina.

14

15

16

17

18

19

20

21

22

23    _____
      Susan M. Valsecchi, RPR, CRR
24    My Commission expires
      December 4, 2024
25
```

Verbatim Support Services

Taylor, Roy                     May 01, 2018                          Page 152

**$**

**$125**
5:14 6:3

**$1500**
6:1

**$5,000**
5:5

**1**

**1**
60:7,13

**10**
71:16

**100**
19:12 137:18

**1096**
76:6

**11**
20:17

**11:30**
64:1

**12**
72:20

**1200**
12:20

**13**
73:5

**14**
30:1

**15**
21:24,25 25:16
63:2

**16**
12:6

**175**
126:8

**180**
126:9

**19**
106:9 112:10
136:25

**1989**
100:11

**1990s**
22:24

**1994**
100:5

**1997**
25:12,19,22

**1:16-CV-24-267**
30:4

**1st**
49:13

**2**

**2**
54:19 61:3
62:21 74:9

**20**
21:13,15 75:22
76:5,10

**2002**
18:16 19:10

**2005**
62:1 138:12

**2007**
40:16

**201**
116:5 138:20,
22 139:1

**2010**
106:23

**2011**
106:25

**2012**
15:8 16:16
17:15 18:7
50:13 107:24
139:19,21
140:2

**2013**
14:19 50:13

**2014**
8:9 9:16,22
28:18 50:13
106:10 108:16
112:11 137:16
139:20,21
140:3

**2015**
139:19,20

**2016**
42:4 45:25

**2018**
16:13 18:6,8
19:9 28:15,17,
18 46:2 60:23

**203**
146:14

**212**
145:2

**218**
60:1

**22**
21:13

**24**
13:9 42:19

**24-hour**
20:11

**240**
126:3

**250**
8:20

**3**

**3**
74:10

**30**
50:8 51:1

**32**
69:9,12

**39**
12:17,19

**4**

**4**
56:14 67:7
75:5 76:15

**40**
5:14,18,20,21
118:13

**40-hour**
61:9

**45**

8:13 9:1

**5**

**5**
67:20 76:15

**5'6**
76:12 126:3

**5'7**
126:4

**6**

**6**
16:3,4 68:1
98:11

**7**

**7**
68:20 103:8,25

**8**

**8**
57:9 69:22

**85**
63:1

**88**
15:6,19 16:10,
20,24 17:2
21:12

**9**

**9**
70:2,4

Taylor, Roy                          May 01, 2018                          Page 153

**911**
56:20,23
127:20

**96**
27:7

**97**
27:8

---

**A**

---

**A-R-D**
137:4

**a.m.**
16:4

**Abbott**
14:3,10 29:10
34:5 36:24
43:13 47:6
53:16 54:2,13
55:4,11,22
56:5,13 58:14
60:22 77:16
78:4,11,20
80:9 81:11
83:12 85:10
86:3 89:7 92:6,
14,18,20 93:3,
16,25 94:12
95:3 97:3,22
98:6 103:7,19,
23 108:11
109:22 110:7,
16 111:12
114:15 115:8,
21 116:25
119:3,16
120:14 121:5,
21 122:25
123:14,19

124:9,13,20
125:5,24
126:23 127:14,
23 128:12
131:11,22
132:14 134:14
135:15,21
136:7 137:12,
23 140:13
141:9 143:5
148:9,12
150:7,12

**abdominal**
79:21

**ability**
30:7 54:9

**able**
36:12 47:15
52:1 56:23
62:9 85:22
87:25 88:10,
18,19 96:13,14
97:2 112:17,22
114:22 121:10,
12 128:19
142:17 145:25

**ABM**
73:13

**abnormalities**
45:12

**absolute**
111:6

**Absolutely**
116:18

**abusive**
71:22

**Academy**
48:16 101:19
126:11

**accepted**
29:11

**access**
20:3 24:7
79:13

**accident**
66:11

**accomplished**
11:23

**according**
57:22 95:6
111:21 115:15,
18 124:7
125:12 137:10
147:18

**account**
70:20 84:17

**accurate**
89:13

**accused**
71:19

**achieve**
70:19

**achieved**
58:7

**acquire**
9:14 13:12

**acquired**
9:18,22

**acronym**
137:5

**across**
58:6 68:11

**act**
33:23 36:8
43:22 50:25
53:3 60:2
75:23 115:16
145:5

**acted**
116:2,16

**action**
30:3 68:15
103:12

**actions**
24:25 45:19
66:11 74:2
76:18 102:12

**activation**
34:20

**active**
112:25 113:2
116:24

**actively**
78:2 116:9
146:10

**activities**
80:4 123:12

**activity**
20:4 118:25

**actual**
75:18 119:4,6

**actually**
7:15 17:7
19:24 24:19
35:1 39:5
47:12,14 55:9

**59:10 67:12**
89:1 105:18
106:10 107:15
139:6

**add**
7:20,25 28:25
147:23

**added**
74:21 148:5

**addition**
74:22

**additional**
22:20 28:25
32:7,9,21,22
33:7 34:3
39:23 51:6,15

**additions**
7:19 8:3 40:24

**address**
36:7 139:3
140:5

**addressed**
41:19

**addresses**
35:17

**adequate**
34:21 45:19
47:4 64:9,14
93:14

**adjudicate**
10:25

**administer**
34:18

**administered**
41:13 87:18

Taylor, Roy                    May 01, 2018                    Page 154

117:18

**administering**
88:1

**administrative**
140:19

**administrators**
11:9

**adopting**
39:3

**advanced**
122:3

**advises**
110:21

**affairs**
50:15 140:20

**affect**
127:8

**affected**
127:5

**affiliated**
43:23

**affixation**
147:2

**after**
10:24 13:13
51:12 53:11,12
57:11 68:12
74:8 75:3
81:21,24 83:9,
19,20 86:6
87:7 89:17,20
91:3 92:7
93:18 94:2,3,
15 95:5 105:23
113:15,16

114:6 115:24
116:19 118:18
122:11 129:12
131:3,14
134:17 135:8
142:13 147:10,
14 148:18
149:2

**afterwards**
13:15

**again**
23:13 28:7
34:15 41:20
52:24 53:22
62:14 67:3
68:4 70:10
74:21 76:1,4
77:12,15
79:13,15 82:18
85:8,20 86:9
87:3 89:11,12
90:1 92:4
101:3 106:20
108:18 110:14
111:4 114:13
117:7 118:22
122:23 126:9
128:5 136:8
149:25

**against**
26:6 30:22
34:4 35:20
50:11 51:2
65:11 69:20
71:6 73:10
113:3,6 125:4
136:16

**agencies**
12:2 21:10

38:5 39:1,16
40:6 102:1,2
107:4 111:4
141:18,21
144:1

**agency**
10:16,19 18:12
19:17,19,21,22
20:2,6,19 21:3,
8 23:3,15,23
25:15,19 45:7
51:24 57:2
64:21,22
101:8,12

**agenda**
26:3,6

**agent**
99:2

**agent's**
99:3

**aggressive**
116:8,21 117:2

**ago**
42:22

**agree**
55:12 56:3
117:13

**agreement**
13:6 100:10

**ahead**
26:9

**ahold**
66:24 71:1
84:4

**air**
48:10 54:25

77:11

**alarm**
12:21

**all**
6:8,14 9:8
10:24 11:12,
18,20,22 13:15
15:13 19:3,6,
25 20:22 21:18
22:2 25:25
26:7 28:7,10
29:1,4 31:11
32:15 33:13,16
34:23 38:15
41:20 42:8,25
52:24 53:7
54:8,10 55:1,5
61:15,16 62:11
64:3 69:9 74:4,
8 75:3 79:14,
15 80:10 83:25
86:12 87:8
89:22 90:8
96:1,15 99:14,
22 101:22
102:2,3 104:20
106:13 108:2
111:24 121:10,
12,20,22 122:9
126:10,20
127:6 128:5
129:14 132:5
134:2 138:1
139:10,15
140:20 144:1
148:23,24,25

**allegations**
50:22

**alleged**

65:8 74:5

**allow**
90:15 93:7
95:19

**allowed**
20:24 25:3
34:18 84:6
88:8 101:24
102:18

**allowing**
88:11

**allows**
146:19

**almost**
118:13 127:1

**alone**
124:18

**along**
99:7

**Alpha**
63:12,17

**already**
25:7 28:24
115:3

**also**
9:9 11:16
15:10 22:14
24:14 28:5
34:24 49:8
55:5 62:8
66:22,25 67:21
74:24 94:7
103:11 110:9
112:1 113:20
118:5 126:16
130:17 132:4

Taylor, Roy                     May 01, 2018                     Page 155

135:3,9 141:18

**alterations**
40:24

**altercation**
124:23

**alumni**
63:16

**always**
49:1 111:6
127:9,10

**ambulance**
135:1

**amend**
32:19

**Amendment**
102:25 103:4

**amongst**
9:23

**amount**
34:2 35:22
73:22 74:23
133:5 143:14
149:22

**ankle**
82:19 83:6

**ankles**
87:2 90:11

**announces**
108:15

**annually**
13:10,11

**another**
16:19 26:4
30:21 59:13

65:14 66:3
77:22 92:17
113:4,7 124:23
131:1 143:22
144:7

**answering**
48:4 92:16,21
110:18

**anti-terrorism**
20:23

**anticipate**
102:22

**anticipated**
13:19 64:13

**anybody**
22:19 86:1
87:24 104:25
109:10 110:5
121:2 140:16

**anyone**
53:10 77:4
86:11 119:9
120:16

**anything**
24:20,24 30:25
32:11 35:16
36:9 41:19
53:11,12 73:15
90:21,22 91:14
103:19 107:21
139:5 144:10
148:8

**anytime**
48:3 52:17,19
143:8

**anyway**
73:22

**anywhere**
30:12 85:23

**apart**
58:1

**apartment**
67:13,14

**apologize**
82:2

**apparent**
88:16

**apparently**
118:7 125:12

**appealed**
25:3

**appeared**
50:12 71:21

**Appendix**
30:1 31:24
63:4

**applaud**
42:4

**applicable**
40:25 122:17

**application**
88:2 89:17
95:14

**applications**
62:13 89:20
91:5

**applied**
52:18 87:10
90:21,23 91:3
115:25

**applying**

133:9

**appoint**
10:1 48:17

**appointed**
9:23

**approach**
77:2 91:23

**approached**
70:14 72:25
91:25 93:12,15

**appropriate**
34:7 46:6 57:2
76:19 99:18
105:4,22 110:1
116:13 117:10,
13

**approved**
101:23

**approximate**
27:9

**approximately**
5:14 21:24
29:14 63:1
134:6

**April**
8:9 9:16,22
27:7 28:18
106:25

**area**
8:18 12:24
17:19 19:23
34:16 57:4,24
64:15,16 79:21
84:23 142:16

**areas**
67:3 146:7

**arm**
27:21 84:4,7
98:4 105:18

**armed**
15:21 17:19
18:1 21:19
22:2

**Army**
7:12,15 41:8

**around**
21:13,14
34:17,25
64:16,18 77:8
80:2,13 84:15
85:8,13 86:9,
14,22 87:15
104:24 114:9,
12 116:24
117:8 126:4,8

**arrangement**
5:22

**arrest**
99:19 146:14,
23 147:8

**arrest-related**
137:9 138:8

**arrested**
13:24 26:4
71:20 92:2

**arrival**
78:3

**arrive**
77:23 145:11

**arrived**
46:12 47:4
77:24 80:11

Taylor, Roy                    May 01, 2018                    Page 156

87:7 114:22
131:13 146:8

**arriving**
142:13

**ASP**
37:22

**asphyxia**
121:18 146:20
149:19

**assault**
65:23 72:6

**assaultive**
94:22

**assess**
125:2 143:18

**assigned**
49:2

**assist**
35:2

**associated**
13:1

**association**
7:23 104:13,14
105:25 106:17,
24 107:3,12
108:4,14,20,25
109:15 111:25
112:20

**associations**
8:15 12:17,20
22:11

**assumed**
54:15,19 55:24
56:7

**assuming**

125:19

**attacked**
55:25 73:18

**attempt**
83:2 105:5,12
114:5

**attempted**
115:12

**attempting**
116:9

**attend**
42:9

**attended**
42:25 44:15,23
61:10

**attends**
13:9

**attention**
132:16,23
140:22

**attorney**
25:6 65:4
99:11

**attorneys**
5:10 30:12
60:15 76:2

**attribute**
77:17

**audio**
130:15 144:13,
21

**audiotape**
127:19

**August**

18:16 19:10

**author**
32:10

**authoritarian**
45:18

**authoritative**
46:19

**authorized**
34:17 40:24
84:20 106:3,19
108:6 112:4

**automatically**
50:16 67:15
95:17

**autopsy**
59:8 79:6
121:3 135:24

**availability**
54:10

**available**
47:23 48:3
75:4

**average**
128:14

**avoid**
45:18 123:13
140:8

**avoided**
114:11

**avoiding**
146:19

**avoids**
142:3

**aware**

31:15,18 112:7
118:7 122:18
136:2,19
137:20,21
144:3 146:2,16

**away**
67:12 85:21
134:8

_____

**B**
_____

**back**
7:21 29:25
40:16 49:5
53:17 58:2
59:9 65:10,15
66:9 70:19
71:25 80:25
81:5,18 83:10
84:5 88:7
95:19,21
105:18 107:24
113:24 130:2
134:12,16

**back-up**
145:23

**backed**
71:3 85:21

**background**
10:20 11:2,3,
15 127:21
135:2

**backup**
24:1 47:4
76:22 77:1,18
78:15 80:7
125:3 143:8
144:20

**backyard**
100:14

**bad**
96:16

**Baker**
33:23 36:8
43:22 50:25
75:23 115:16
145:5

**balcony**
48:11

**Bald**
67:20 69:22

**banging**
65:11

**barb**
79:7,21

**barbs**
66:25

**Barnes**
68:20,21,25
69:15,20

**barricaded**
68:11

**base**
75:9 104:17

**based**
5:13 41:11
42:7 49:17
64:10,12 79:5
88:17 94:19
118:2 120:6
121:24 135:23
140:1 149:13

**bashed**

Taylor, Roy                    May 01, 2018                    Page 157

55:5

**basic**
61:14 62:11

**basically**
15:16 22:19
23:10 24:6
25:6 29:1,5
33:22 35:22
45:21 64:19
67:1 68:12
69:8 71:20
90:14 143:11

**basis**
97:10 122:4

**bathroom**
103:18

**batons**
37:22

**battery**
55:10 72:6
79:2

**beats**
68:15

**became**
70:16 79:7
118:19 138:12

**before**
13:13 26:10
54:11 73:15
77:1 79:23
83:15 89:3
101:24 125:10
134:8 141:7

**began**
84:4

**begin**
4:12 16:15
80:1

**beginning**
60:12 82:16,25
110:13

**begins**
62:21 86:14

**behalf**
65:20 72:7,21
141:6,10,17

**behalves**
14:1

**behaved**
67:18

**behavior**
55:14 86:20
87:12 113:10,
11,14 131:16

**behaviors**
54:20,23

**behind**
70:18 83:10
84:5 88:6
105:18 113:24
130:2

**being**
10:6 17:23
18:19 20:18
27:25 28:1
39:3 40:18
44:6 47:15
60:6 96:6 97:7
114:6 117:18
121:25 135:14
145:7 147:23
149:2

**belief**
76:8 79:4
88:21 103:3

**believe**
25:16 28:9
30:22 42:4,22
44:20 45:25
46:1,15 47:10
56:25 60:8,24
64:22 69:9
73:17 77:21
83:10 91:12,22
93:11 97:8
99:1 100:4,6,9
106:23 108:3
121:17 123:21
124:14 126:3
127:2 129:20
132:1 134:8
142:4 144:3

**believes**
147:5

**belt**
79:20

**benchmarks**
104:20

**beneficial**
42:8

**benefit**
46:3 118:9

**best**
14:7 26:24
30:5 60:18

**better**
26:9,14 139:24

**between**
27:7 83:24

100:21 125:9

**big**
39:9

**biggest**
33:9

**bit**
20:16 78:24
107:10 148:25

**bite**
117:6

**bleed**
126:20

**bleeding**
126:17

**block**
44:20 70:22

**blocked**
70:21

**blood**
136:12

**Blue**
8:6,11 12:4,10,
15 13:1,12
15:1,17 27:22
35:4,11,18
36:6,18,25
37:17 38:10
39:25 40:9,11
42:10 45:5
48:17,21

**board**
25:25 26:17

**bodily**
65:24

**body**

88:2 98:1
117:6 118:5
123:23 136:12

**book**
99:1,4,6

**boss**
24:5,11

**both**
13:23,24 14:1,
4 58:25 66:25
106:1 110:24
128:15 137:15,
18 139:7
145:25 146:2

**boxed**
111:5

**Bragg**
7:16

**brain**
65:17

**brand**
90:22

**break**
103:10,18
107:9 131:8

**breastplate**
67:1

**breath**
96:12,14 97:14

**breathe**
147:7 148:3

**brief**
103:22

**broadcast**
132:8,25

**brought**
13:20 140:22

**Broward**
56:25

**Bryant**
67:20

**budget**
24:15

**Bugs**
128:7

**build**
126:5

**building**
20:3

**bulletin**
112:18

**Bunny**
128:7

**burdensome**
118:20

**Burke**
16:18,21

**bushes**
70:20

**business**
13:7 14:16
16:5,15,17
17:17 20:13
59:19

**businesses**
12:24 15:14,18
19:6

**busy**
132:19

---

**C**

---

**calf/ankle**
57:24

**call**
12:18 35:9
40:17 41:15
47:21,25 48:5
55:17 56:20,
21,23 127:20
132:21,24
142:25 143:10,
15 144:8,15
145:9 146:11

**called**
4:12 11:8
16:23 17:2
18:10 47:19
56:15 69:6
101:9

**calls**
38:22 47:15
48:4 144:12,22

**calm**
34:19

**came**
65:15 66:8
107:7 141:23

**campus**
23:6,12,14,25

**can't**
29:6 53:6
88:15 90:17
109:19 127:17
137:4 138:14

**cannot**

---

135:20

**capability**
113:20

**capacity**
21:4 23:2 65:2

**Capitol**
17:13,17,23
18:13 19:8
21:22 22:4,9
27:24,25 38:9
40:7,12 44:1,
11 45:6

**car**
65:11 68:12
72:1,4 73:3,4
86:25

**cardiac**
118:6 147:8

**care**
29:3

**career**
50:19 118:21
122:8

**Carolina**
5:2 9:12 10:1,
3,13 11:8 17:7,
10 25:10 27:3
28:10 36:10
42:18 44:3,6
45:7 59:21
61:11 65:19
67:21 71:16
76:4 100:3,14
101:4,11,13,
19,20 102:4

**carries**
59:25

---

**carry**
37:21,22 38:7

**cartoon**
128:7

**case**
5:3,5,10,19
13:18 29:20,
22,23 30:10,22
31:8,11,19,23
32:5 39:18
46:4 49:8
50:16 51:14
57:7 60:14
63:11,14 64:20
65:5,7,19,25
67:7,8,9,20,22,
24 68:1,3,20
69:14,22,23
70:2,3 71:16,
17 72:13,20
73:5,7,8
100:11,14
105:11 106:9
112:13 115:1
116:15

**cases**
14:1,4 34:1
39:19 65:8
73:25 74:1,4
120:24 122:8
140:18 141:9,
14

**catch**
96:11,14 97:13

**categorize**
46:15

**cause**
51:17 58:2,11

---

**carry**
72:11 83:2
84:24 117:23
118:8 119:7,12
120:5,9,24
121:13 137:1

**caused**
32:10,21
57:16,23 58:16
71:9 73:20
77:19 79:22
97:25

**causes**
121:20,22

**cavity**
147:4

**cell**
69:7 143:10,22

**cellular**
142:13 144:2

**center**
56:24

**centers**
22:17

**CEO**
15:5,15 17:12,
24

**certain**
22:13 48:18
49:9 90:4
102:12 123:11

**certainly**
32:18 51:17,25
52:22 53:24
56:10 85:22
88:18 94:3
136:17

Taylor, Roy                    May 01, 2018                    Page 159

certainty
78:14

certificate
62:4

certificates
62:5

certification
13:6,8 118:15

certified
9:25 11:3 45:6
61:4 62:3
102:4

CEU
123:22

CEW
105:6 118:3
120:1,5

Chad
16:18

chain
41:4 51:22
90:15

challenged
73:1

challenging
30:7

change
32:21

changed
7:10 33:6
107:20,25
136:12

changes
26:8 40:1,4
41:6 118:4

chapter
63:16

characterizatio
n
53:7 58:20

characterize
46:22 74:16

characterized
85:17 128:2

characterizing
55:19 86:9
114:9

charge
20:21 58:5
66:14 69:15
96:3,6,18,23
145:25

charged
65:23 72:5

charges
95:12 97:6
124:2

charging
5:25 66:12

Charleston
73:6,11

Charlotte
15:6,20 16:20,
25 17:2,20
21:12 70:8,9
71:7 100:13

chasing
67:13

check
16:2,4 32:2

checked
53:23

Chemical
116:5

chest
66:1 79:5
88:13 147:4,6
149:22,25

chief
8:6 9:5,8,17,24
10:6,8,11,14
11:20 12:1
18:11,13,20
19:14,16
20:15,18 21:2
22:21 25:9,19
26:12,16 27:2,
13,18 38:6
39:10 40:13,
15,18 48:1
51:18 59:25
129:2 140:21
142:4

chiefs
41:7 104:13
105:25 106:17,
24 107:4,12
108:4,14,20
109:15 112:1

Chiefs'
108:25

children
64:3 109:9

choose
54:22 107:5

Christian
73:5

chronology
86:13

circumstances
27:15 45:21
53:9 64:10
105:3 106:4
111:8 141:11

CIT
39:14 42:3

citizens
52:4

city
23:18 26:17,21
30:2 36:2,21
41:22 47:8
64:23 67:8
70:8 71:6 73:6,
10 102:15
105:11 110:24
116:3 132:5,11
134:6 138:16,
25 139:11,18,
23 140:1,10,16
143:21 145:1,
19 146:13,22
147:9,13

civil
14:6 30:3 74:2
102:12,16

civilian
68:7

claim
73:10

clarifying
15:4

class
42:23 61:9,11,

14 62:7,8

classes
42:24 43:8,12

clear
72:3 81:25
118:24 120:3
125:15 131:18
145:9

clearly
66:10

client
12:15

clients
12:15 22:8
60:4

clock
55:10 79:3,7
93:19 94:15
126:17 145:25

close
58:1 71:4
80:24 81:4,9
82:6,13 123:23
132:22

closely
51:20

closest
68:9

clothes
46:18

co-defendants
69:24

code
75:23 76:5,6

codes

76:3

**collection**
35:5

**colonel**
7:14

**Columbus**
30:23 31:2
67:8

**combining**
136:15

**come**
16:4 23:21
99:21

**comes**
6:6 41:1
101:18 107:13

**comfortable**
97:23

**coming**
23:24

**command**
41:4,5

**Commander**
7:13

**comment**
102:18

**commercial**
12:23 22:14

**commission**
10:8,10,13
11:1,8,12 13:4
101:14,21,23

**commissioned**
10:2,4 12:1

**commissioning**
11:11

**commissions**
10:5

**commit**
49:20,23

**commitments**
36:11

**common**
99:17

**commonsense**
144:4

**communicating**
113:20

**communications**
26:20

**communities**
20:8

**community**
26:12 112:20

**companies**
19:3

**company**
8:12 11:9
16:21 19:4
44:24 45:4
111:14

**complaint**
50:22

**complete**
92:22 93:8

**completed**

111:24

**completing**
62:10

**complex**
16:1 20:14

**complexes**
20:7

**compliance**
45:17

**compressing**
148:2

**compromised**
136:22 137:8
138:9

**computer**
37:7

**concealed**
60:1

**concentrate**
92:25

**concept**
109:1

**concern**
33:9,16

**concerned**
31:12 33:4

**concerns**
74:25

**conclude**
46:23

**concluded**
54:3

**concludes**

102:11

**conclusion**
121:7

**concur**
121:9

**condition**
88:8,17 126:6,
10 135:25
136:6,13 149:8

**conditions**
136:1

**conduct**
55:13,20 59:19
99:23,24 100:2
101:12 123:12

**conducted**
46:24 122:10,
16 136:3

**conference**
7:21

**confirm**
32:3

**conflict**
142:5

**confusing**
28:25

**conjunction**
112:18

**connection**
4:11 13:21
14:12 31:7
39:25 40:23
69:18 119:20

**Conner**
69:22 100:11

104:19

**consider**
105:5,12

**consideration**
71:14 131:9,15
133:8

**considered**
55:1 107:1,22
149:8

**considering**
103:18

**consistent**
76:19 100:18

**consultant**
4:17 14:16,18
104:23

**consulted**
119:19

**consulting**
4:24 14:25
141:24 142:2

**contact**
34:13 36:14
66:8 79:5
97:25 143:22

**contacted**
30:25 46:17
142:12

**contacting**
38:12,18

**contained**
33:8 74:17
79:12 146:22

**continue**
16:6 83:18

88:1

**continued**
26:25 83:19
114:5

**continues**
103:13

**continuing**
42:11 43:8,15
44:4,15 97:18
118:19

**contract**
8:22 12:21,25
15:22 16:1

**contracted**
15:24 22:13
63:21

**contrary**
58:9

**control**
20:2,3 23:13
64:2 84:6 92:4
98:8 105:6,13
107:8

**conversation**
46:20 75:12

**converted**
17:8

**convicted**
66:14

**convictions**
11:15

**copy**
150:20

**coroner**
119:18,20

**Corp**
17:11

**corporate**
4:20

**corporation**
8:25 9:4,6,10,
11,15,18,23
10:7 14:23
15:2,11 17:5,
10 18:19 19:1,
11 28:6

**corporations**
14:12 21:5
29:9

**correct**
5:7,24 6:2 8:10
9:25 18:9
40:17 48:25
73:16 82:15
116:11 117:12,
20 121:15
131:16,20,25
134:12,24
137:2,16,20
138:2,4,17,23
139:8,19,22
141:7,18,24
142:22 143:1,2
144:24 146:23

**corrective**
24:25

**correctly**
56:17 57:12
71:13 84:8
105:9 106:5
112:5 115:9

**cost**
21:1

**cot**
114:23

**counsel**
32:17

**counselors**
35:1

**countries**
39:7

**country**
34:17,25 100:8

**county**
8:18 23:19
56:25 68:2
69:1 102:3

**couple**
21:20 74:12
79:25 117:21
135:5

**course**
43:15,18
44:12,16 45:9,
24 61:16 62:11
69:4 103:20

**courses**
7:24 42:20
44:7 104:25

**court**
29:12,17 30:6
65:22 92:8,10
93:9 100:11
104:18 110:12
150:16,19

**courtyard**
133:21,24

**cover**
72:17

**covered**
94:1

**covering**
8:19

**crime**
133:18

**criminal**
4:17 11:7
13:20 14:4,13,
21 20:4 69:14,
18 92:1
101:13,20

**criminally**
72:6

**crisis**
34:23 39:5
92:4 93:13
137:7

**criticism**
41:22 47:7
83:9

**criticize**
78:22 80:3,14,
20 81:3,7
82:22 83:4
84:10 87:20

**cross-
examination**
148:14 149:6

**crowd**
64:6

**cuffs**
90:20,23

**Cumberland**
68:2

**cumulative**
121:23

**curious**
85:2

**current**
12:14,15 15:15
22:7,8 40:3
108:19

**currently**
21:13 22:5
36:9 40:13

**custody**
65:9 80:8
115:2,12
116:10 135:6

**customers**
12:21

**cut**
93:5

**CV**
6:23 7:9,18
8:1,4 28:19,24

**cycle**
95:16

**cycles**
51:10,12,19
52:8,10,17,20
53:7 95:17
105:4,22
106:2,18 107:1
108:5,23 112:3

**cycling**
105:7,14

Taylor, Roy                          May 01, 2018                          Page 162

---

**D**

---

**Dan**
92:15 103:17
150:11

**danger**
36:13 77:5
84:22 85:22
86:1,10 87:24
91:2

**darts**
81:17 123:23

**date**
7:9

**Daubert**
30:11,17,20
31:14

**David**
9:21

**day**
22:12 47:13
48:11 55:3
61:1 62:10
78:16 143:18
150:15

**day-to-day**
111:9

**days**
61:9,10 62:10

**DC**
21:1

**de-escalate**
66:20 150:1

**deadly**
51:13 53:11

106:3,19
107:2,22 108:6
112:4

**deal**
41:24 42:14
43:16 45:13

**dealing**
35:3,13 37:5
42:23 43:22,23
44:12,16 45:20
46:6 139:25

**dealings**
59:22

**deals**
38:17

**death**
63:16 77:19
117:23 118:8
119:1,5,13,24,
25 120:5,10,24
121:14,20
122:11 123:10,
13 137:1,2,9

**deaths**
138:8

**December**
14:19 25:22

**decided**
26:1,9 66:6
68:13 80:18
142:24

**decision**
100:12 143:7

**declared**
135:8

**dedicated**
17:21 22:15,18

**deem**
40:2 56:6

**deemed**
50:25 62:3
67:4 136:21
137:7 138:8

**deep**
6:7

**deescalation**
34:11 37:1,2,
12 45:14 46:6

**defendant**
63:10 70:2
141:10

**defendants**
63:2 64:20
141:7,16

**defended**
141:20

**Defense**
99:6

**define**
76:1 98:22

**defined**
98:14,16

**definition**
52:19 82:9
98:18 99:10,
15,17,21,25
100:7,17

**definitions**
101:17

**definitive**

39:22

**degree**
78:13

**deletions**
7:19 8:3

**deliver**
98:5

**delivered**
83:1 96:6,12,
23 148:23

**delivers**
96:18

**Delta**
44:24 45:4

**demonstrate**
52:15 61:24

**demonstrated**
53:19 54:4
61:15

**department**
11:6 26:1,3,6
33:10 50:10
55:18 56:20
63:22 64:24
70:9 71:25
98:25 101:9
110:9 112:19

**department's**
47:8 56:16
110:20

**departments**
102:8

**deploy**
71:12

**deployed**

68:10 79:19
83:14 89:8

**deployment**
57:11,25 66:16
78:21 79:10
82:3,5,10

**deploys**
53:2

**deposition**
6:1,11 30:21
42:3 46:21
83:18 95:7,19
97:12 126:8
141:12 142:12
150:9

**depositions**
32:8,15 74:20
138:1

**depth**
59:11

**deputy**
8:19 66:1,3,4,
5,18 68:7,10
69:6,7

**derive**
15:18

**derived**
96:10

**describe**
25:14 40:20
42:16 45:8
52:7 75:6 80:1

**described**
76:11 126:2

**describes**
76:15 82:20

description
127:24

deserves
52:22

desire
52:5 107:5

detail
79:16

detailed
11:3,25

detain
135:6

detention
69:3,5

determination
54:12

determine
40:4 52:2
69:11 83:17
91:15 97:2
122:10,19
134:9

determined
140:15

determining
139:12

develop
32:4,22 49:17
53:18 61:19

developed
33:7 46:4
57:14

developing
5:15,18 6:12
57:6

device
90:10

devil
85:19 94:25
128:4,6

devoid
144:22

die
120:13

died
78:15 120:17
123:15

difference
91:16

differences
39:7

different
12:24 15:22
20:12 23:9,10
29:2,7 33:13
34:18 36:5
38:22 41:11
42:20 45:11
61:22 75:21
77:22 91:19,24
104:24

differently
41:17 85:17
149:13

difficult
83:16 89:12
128:21 147:6
148:3

digressed
74:8

direct
11:23 37:15

direction
47:22

directly
26:16,19 35:2
36:17 70:14
132:20

director
15:16 24:14
28:4

disabled
73:21

disagree
121:6

disappoint
6:18

disappointed
6:21

discharge
72:16

discharged
24:18 67:25

disciplinary
29:4

disciplined
24:24

disclose
25:8

discovered
130:7 131:4

discretion
33:25 42:1
43:12 139:16

discuss
28:20 33:20

discussing
21:5 111:25

discussion
92:9

dismissed
13:16,18 14:1,
4

dispatch
56:24 75:19
130:15,18
131:18 132:4,
23 134:23
142:20 144:13,
21 145:15

dispatched
47:16 48:5
75:14 130:21,
25 132:21
145:7,9

dispatcher
75:14,20 76:9

dispatchers
75:19

dispatches
57:1

dispute
48:12

disruptive
63:24 71:22

distinction
100:21 101:1

distress
135:14 136:17

144:12,15,22
148:6

distributed
101:25

disturbed
39:20 42:23
43:16 44:13,17
50:9 68:5
70:10

Dix
22:22 24:3,12

Doctrine
41:5

document
4:12 6:22 35:9
112:13 140:15

documentation
11:18 54:11

documented
147:3

documents
4:10 49:12

done
11:10 24:20
39:24 46:2
92:21 122:19
148:10 149:13
150:3

door
71:25

doors
16:2

Dorothea
22:22 24:2,12

double

32:2

**doubt**
6:19 84:16
85:7

**doubting**
85:4

**down**
34:19 50:6
64:3 79:23
84:25 98:14
107:9 114:23
121:20 128:16
129:20 130:1
146:1 147:24

**download**
97:2

**downloads**
83:24

**drawing**
101:2

**draws**
100:20

**drive**
6:15 57:10,23
82:18 83:1,5,
18 87:19 89:24
91:5 96:1,12
98:5

**drive-stunned**
95:4,9

**driver**
73:2,4

**driveway**
68:6,8

**driving**

6:8 109:12

**drug**
10:22 72:24

**drugs**
34:18

**due**
67:4 121:19
135:13

**Dupont**
12:12

**duration**
59:1 81:18
95:12 97:6
129:21

**durations**
96:8

**during**
17:9 48:11
62:25 73:18
106:21 131:9,
16

**duties**
20:1 29:1
40:22,23

**duty**
48:3,23

---

**E**

---

**each**
15:25 42:18
43:5 53:5 58:7,
15,16,20 82:9
95:12 96:1,7,
10 97:15
128:16 145:9

150:2

**earlier**
14:24 16:8
19:10 31:20
79:20 81:15
94:2

**early**
34:13 38:18

**ECW**
38:7 51:19
52:20 57:15
58:10,25 66:6
87:21 109:1,
16,25

**ECWS**
109:24

**edged**
71:5

**Edgefield**
69:1

**educate**
140:7

**educating**
138:7

**education**
43:8,15 44:16
118:19

**Educators**
7:23 104:15

**effect**
66:20 67:5
99:6,19 136:4

**effective**
39:6 70:25
71:11 95:22

**effectiveness**
81:2

**effort**
146:17

**efforts**
72:1

**eight**
15:24 57:10
82:7 95:10

**eight-hour**
62:8

**eighth**
26:12

**either**
35:17 84:10
143:13 150:5

**ejected**
63:24

**elaborated**
145:13

**electrical**
58:5 95:12
96:3,18 97:6
107:7 124:1

**electricity**
88:2

**elementary**
23:8

**elevated**
109:11

**elicit**
67:6

**Elizabethtown**
30:10

**emergency**
20:24 36:14
75:16,20 77:13
118:12

**emitting**
96:3

**emotionally**
39:20 50:9
68:5 70:10

**employed**
9:4

**employee**
15:10 18:19

**employees**
12:4 21:11,16,
23 22:5

**employment**
25:18 27:1
39:25

**employs**
22:16 109:1

**EMS**
34:13,16,17,20
38:12,18
114:21,25
115:3,11,17
118:14 130:11
131:2 147:22

**EMT**
122:3

**enacted**
40:1

**encompassed**
6:9

**encounter**

45:13 59:2
81:19 131:9,16
145:23

**encountering**
37:12,19 38:2

**encounters**
34:8 37:2
38:12,19
41:16,18

**end**
68:8 70:17

**endangering**
84:20

**ended**
71:3

**energy**
98:17

**enforced**
23:12

**enforcement**
4:24 7:22 8:12,
21,23 10:9,16
11:13 12:2
15:13 19:20
20:1,6,22
22:20 23:4,11,
14 39:11,23
40:18 42:9
45:13 50:19
53:14 60:2
64:11 65:24
76:19 94:22
101:10 103:11,
14 104:2,15,24
118:20 128:22
147:3

**engage**
17:18

**engaged**
148:15,19
149:2

**enough**
71:13 90:14
145:10

**ensure**
11:24

**entail**
10:12

**entails**
61:6

**entered**
134:2

**entire**
54:10 71:23
79:2 94:19
97:9 122:14
123:5 131:9
136:9

**entirety**
96:7 123:4
138:11

**entities**
12:24 23:9,19
40:11

**entitled**
7:2 62:21

**entity**
4:20 9:9 16:21,
23 17:1,4 18:3,
10,23 21:23
28:1 29:7
40:16 101:15

112:15 136:3

**entrance**
133:23

**entry**
14:15 20:3
23:13

**episode**
38:24 48:8
75:7 91:11,17,
20 93:21 94:9,
16,19,20 127:5
150:4

**episodes**
33:21 34:9
35:14,21 37:3,
14,20 39:12
41:17

**erect**
66:2

**escape**
8:16 84:21
87:25 88:5
116:9 134:20

**especially**
48:4 51:23
128:22

**estimate**
89:13 90:5
126:6

**et al**
30:3

**ETW**
122:12

**even**
6:19 26:25
79:1 88:9

125:23 146:7

**event**
65:3

**events**
141:12

**eventually**
20:23 41:4

**every**
22:12,14 41:12
47:21 50:16
55:3 57:22
60:3 62:6
96:12 104:16
146:17

**everybody**
144:6

**everyone**
104:20

**everything**
11:10 16:5
32:16 77:6

**evidence**
78:25

**exact**
106:25 137:4

**exactly**
21:14 38:14
40:9 104:17
128:6 147:25

**examination**
10:21 11:16
61:17 129:9
137:18 148:11

**examiner**
121:3,7,9

**example**
106:22 117:1

**excessive**
51:3,5 52:15,
21 53:3,20
54:4 71:19
72:5,9 74:22
83:11 89:18,21
91:6,9,13
100:21 121:17

**exclude**
56:12

**executive**
19:2,5 28:8
51:11 104:13
106:1,22
112:2,8,14,21

**exercise**
98:16 126:14

**exercises**
61:17,24
126:10

**exhausting**
136:15

**exhibit**
54:14 60:7
113:11

**exhibiting**
54:20,23 55:13
113:14 116:8,
21 117:2
128:1,10

**existed**
43:19

**existence**
8:13 9:1

**existing**
9:17 106:4

**exit**
133:23

**expect**
6:4

**expected**
71:25 95:24

**expend**
5:13 6:10

**expended**
5:17

**Expense**
4:13 5:4

**experience**
7:2,7 22:18
39:2 45:12
47:17 48:14
63:5 79:23
95:23 97:15
104:22,23
118:10 122:6

**experienced**
79:9

**experiences**
62:14 136:13

**experiencing**
39:12 48:7
75:7 95:2
127:22

**expert**
29:12,17 30:7,
19 59:13,16,18
60:6,8 62:25
102:18 117:25
118:23

**exposed**
120:1

**exposure**
136:5,20

**exposures**
123:22 137:1

**express**
120:16 121:2

**expressed**
119:10,11

**extent**
36:8 76:8
141:13

**extenuating**
53:9 111:7

**extra**
39:13

**extremities**
98:9

**eye**
39:10

———————
**F**
———————

**F-I-N-N**
9:21

**face**
125:14 130:1

**facial**
72:5

**facilities**
20:9 23:8

**facility**
19:24 61:12

63:21 64:16

**fact**
5:8,17 25:8
52:15 54:19
55:24 56:6,14
57:9 65:25
81:4 89:1
106:7 120:9
121:22 127:4
128:10 133:2
134:11

**factors**
123:20

**facts**
54:15 55:23
56:7 85:5
140:17 141:11

**faculties**
92:5

**failed**
46:5 64:9
71:10 142:19

**failure**
77:18 135:12
142:7

**fair**
132:10 135:23
147:20

**fall**
66:2 109:11

**familiar**
43:1 76:3

**familiarity**
90:13

**family**
36:14 64:8

**famous**
129:8

**far**
29:17 31:6,12
61:18

**fashion**
113:21

**faster**
142:18

**fatalities**
122:20

**fault**
26:13

**FBI**
99:2,13

**FDLE**
101:9

**February**
17:15 18:7

**feces**
69:2

**federal**
19:22 20:1,6
21:7,8 29:12,
16 30:6 60:1

**fee**
4:12 5:4,6,9,
13,21 6:9

**feel**
34:2 127:10
140:23

**feet**
80:12 82:18
117:5 134:12,
17

**fell**
66:9 72:4

**felon**
92:1

**felony**
66:13

**felt**
32:18 41:5
68:18 105:18
133:13 142:20

**female**
72:7

**few**
6:22 20:11
32:14 33:23
48:16 49:25
58:1 74:21
77:25 111:4
129:7 141:5

**fewer**
11:15

**field**
39:3 47:11,18,
20 48:2,18,23
59:18 77:23
78:1 146:4,6

**fifth**
53:7

**fight**
125:9 128:15
144:18,20

**fighter**
128:24

**fighting**
80:2

Taylor, Roy                    May 01, 2018                    Page 167

**file**
140:20

**filed**
30:6,11,13,18, 23 31:10,15,19 50:17

**filings**
28:10

**fill**
10:19

**fills**
140:25

**final**
74:18 76:14 116:1

**finally**
22:4 118:18

**find**
49:4 50:18 107:24 112:17, 22 123:5 144:16

**finding**
26:14

**finish**
110:19

**finished**
92:15 110:18

**Finn**
9:21 13:1,13, 23

**fire**
70:19

**fire/rescue**
130:20

**firearm**
13:10 63:25

**firearms**
10:22 60:3

**fired**
66:1 73:3 80:24

**firefighter**
118:14

**fires**
70:23

**firing**
64:6

**firm**
10:14,15

**first**
7:8 51:8 62:24 63:11 74:11 81:22,24 82:1, 4,5,12 92:11 95:14 103:9 104:1 133:12 141:2

**first-line**
140:24

**firsthand**
31:1

**Fishel**
24:13

**fitness**
47:13

**five**
26:13 84:25 90:2,5,7 95:17, 20,25 96:1,2,

19 97:15 121:19 129:15, 20 147:24 148:15,18 149:3

**five-second**
96:8 106:2,18 108:5 112:3

**flat**
6:9

**fleeing**
134:11

**flex**
90:20

**flip**
103:8

**Flipping**
61:3

**floor**
70:12

**Florida**
8:16 43:3,7,15 51:25 59:25 101:8,9 102:7 126:13 142:2

**fluctuates**
21:14

**focused**
115:6

**follow-up**
51:4

**following**
24:22

**foot**
73:1

**force**
34:2,4 35:20, 23 36:20 41:11 50:21 51:3,5, 13 52:16,21 53:3,12,20 54:5 71:19 72:6,9 74:22, 23 84:19 85:9 98:14,16,25 99:2,8,15,18 100:21,22 103:4 106:3,19 107:2,22 108:6 110:9 112:4 113:3,6 114:14 122:7 128:25 133:5

**forgive**
14:22 15:3 21:9 92:18

**forgot**
21:9

**form**
10:20 13:22 14:8 26:18 28:22 33:18 36:22 43:10 47:2 53:4,21 54:6,24 55:7, 15 56:2,9 58:12 76:23 77:20 78:7,17 80:5 81:6 83:7 85:6,15 89:4 91:21 93:22 94:10,17 96:25 97:21 98:2 103:5 108:7 109:18 110:2

111:1 114:7 115:4,13 116:22 118:11 119:14 120:11, 19 121:16 122:22 123:18 124:6,11,17 125:1,11 126:19 127:7, 18 128:11 131:11,19,22 132:14 134:14 135:15,21 136:7 137:12 140:13 143:5

**Fort**
7:16

**Forum**
51:11 104:14 106:1 112:2,8, 15,21

**forums**
106:23

**forward**
31:22 39:14 73:2 75:5 98:11

**forwarded**
51:22

**found**
24:5,9 104:25 136:11 140:17

**four**
6:13 51:19 62:25 63:5 77:24 90:1,5,7 95:15

Taylor, Roy                    May 01, 2018                    Page 168

**fourth**
53:7 102:25
103:3

**franchise**
16:19,20

**fraternity**
63:17

**fray**
124:25

**frequency**
132:9

**front**
4:14 6:24
60:10 70:12

**FTO**
143:1

**FTOS**
142:7

**full**
12:11 20:20
22:12,16 74:11
97:15 98:8
101:23 103:9
104:1

**full-time**
10:10 25:16
118:14,20

**fully**
85:20 115:24

**further**
39:15 41:25
50:14 51:14,22
52:11 53:25
93:19 94:14
111:19 115:12
148:8,22 150:8

**future**
35:9

___

**G**

___

**gain**
45:17 84:6

**gained**
99:9

**gait**
90:16 134:1

**gang**
63:23 64:5

**Garner**
104:19

**gas**
72:25

**gassed**
129:19

**gated**
133:21

**gates**
134:3

**gave**
62:4

**general**
10:5 36:1,2
53:6 132:8
143:25

**gentleman**
16:18 26:4
71:2

**George**
71:17,18
150:19

**GEORGES**
13:22 14:8
28:22 33:18
36:22 43:10
47:2 53:4,21
54:6,24 55:7,
15 56:2,9
58:12 60:19
76:23 77:20
78:7,17 80:5
81:6 83:7 85:6,
15 89:4 91:21
92:15 93:22
94:10,17 96:25
97:21 98:2
103:5,17,21
108:7 109:18
110:2,14 111:1
114:7 115:4,13
116:22 118:11
119:14 120:11,
19 121:16
122:22 123:3,
18 124:6,11,17
125:1,11
126:19 127:7,
18 128:11
129:7,10,22
131:12,23
133:4 134:15
135:17,22
136:18 137:13,
24 141:4
143:19 148:7
150:11,21

**Georgia**
119:18,20

**Geospatial**
19:17 21:3
23:15

**getting**
26:24 42:5
105:17

**gist**
45:21

**give**
30:7 66:6,19
117:1 118:9
132:18

**given**
66:22 77:15
97:7 118:6
130:13 133:2
137:15

**giving**
146:10

**goes**
116:1

**gone**
30:11 42:3

**good**
34:24 62:5
98:22 107:9
126:5,9 147:19

**gotten**
126:16 144:19
149:17

**government**
26:19

**grabbed**
66:7,24 71:1

**Graham**
100:10,12
104:19

**grassy**

84:23

**Greenway**
72:21

**ground**
72:4 73:19
77:10 80:2
84:15 85:13,23
86:2 87:15
88:11 114:10,
18 124:15
133:14

**grounding**
84:25

**grounds**
23:17

**group**
4:25 15:1
109:5

**groups**
109:2

**growing**
39:2

**grown-up**
64:16

**guard**
7:12 15:21
18:1 20:20

**guards**
21:18,19

**guess**
20:16 24:17
33:4 83:22
98:13

**guidance**
34:3 39:23

Taylor, Roy                    May 01, 2018                    Page 169

51:15 52:11

**guide**
39:15 40:6

**gun**
67:12,14
68:10,16

**gunpoint**
73:1

**guy**
68:16 71:1
72:18

---

**H**

**H.G.**
19:4 28:8

**half**
27:5 90:16

**Hall**
99:5,9

**hand**
34:15 43:6
67:15 68:6,17
98:5

**handcuff**
84:7

**handcuffed**
83:9 86:20
87:9 88:5,6
89:3,9,18 94:3,
8 105:20
109:25 110:25
111:16 112:16
113:15,17
114:6,17 116:7
117:2,10

130:2,6 134:5,
17 139:4,7,13
147:5,11,21

**handcuffing**
84:5

**handcuffs**
83:15,19 84:1
86:4,15 89:23,
25 90:14
109:17 110:6,
22 111:22
113:23,24,25
116:20 117:19
129:13

**handling**
23:24 25:4
47:25

**hands**
37:24 88:15

**happened**
56:3 78:9,19

**happy**
37:8 102:19

**hard**
128:16

**harm**
116:10 117:11,
17

**hate**
93:3,4

**having**
13:25 24:7
31:18 34:8
35:13,21 37:3,
13,19 38:23
41:16 76:12

77:18 87:11
91:16 93:12
94:9 128:2
144:6,11 150:4

**head**
13:14 55:6,9
56:1 65:11
66:10 67:21
68:14 69:23
78:6 99:11,13
117:6 126:16,
18,20,25 127:2
148:4

**headed**
47:22

**hear**
127:20 135:1,
3,9 143:9
144:6,12

**heard**
48:12 70:24
119:9,22
120:16,23
121:2 134:23

**hearing**
25:2 132:17

**heart**
67:5 123:24
124:2 135:24
136:6

**heat**
8:16

**height**
88:17

**held**
103:22 147:23

**help**
34:13 40:6
52:3 107:5
132:25 135:6

**helps**
148:24

**here**
21:6 32:20
86:13 96:17
106:14 108:2
141:12 142:8

**Here's**
94:1

**herself**
65:12,16

**high**
21:1 23:8
63:18

**high-liability**
62:14

**high-risk**
123:11,12,20,
24,25 124:4,10

**higher**
11:14

**Highway**
61:11

**himself**
36:13 46:24
47:5 63:25
77:14 82:17
86:1 124:19

**hindsight**
46:3

**hired**

19:13 20:20
25:7 27:17
30:13

**hiring**
29:4

**hiring/retention**
59:17

**hit**
55:8 66:9 73:3
78:6 94:15
126:16

**HOBOL**
65:14

**hold**
13:4 17:22
38:15 92:8,10

**holding**
63:17,18 70:13
84:25 98:4
121:19 129:12,
23 130:4

**Hollywood**
33:10,17 36:2
41:23 43:24
47:8 49:10
50:9 51:24
53:19 55:17
57:1 102:15
105:12 110:20,
24 126:13
132:5,11 134:7
138:25 139:12,
24 140:10,16
143:21 147:9,
13

**Hollywood's**
36:21 116:3

Taylor, Roy                    May 01, 2018                    Page 170

138:16 139:18
140:2 145:1,19
146:13,23

**home**
12:19 50:5
59:20 64:5
67:10,11

**homeowners**
12:18 22:11

**homes**
8:14,17

**honest**
141:3

**hood**
68:12

**hope**
6:18

**hopefully**
66:20 128:19
129:7

**hopped**
134:12

**hospital**
22:22 23:5,17
24:9,17 25:7

**hot**
26:25

**hour**
5:14 6:3,17
20:9

**hours**
5:14,18,20 6:5,
13,20 13:9
22:13,18 42:19
43:5,6 44:19

**however**
80:23 114:24
132:24

**HR**
60:1

**hypothesis**
79:17

---

**I**

**IACP**
51:12 106:24
107:18

**identified**
123:21

**identifying**
52:12

**IHOP**
22:16

**ill**
34:8 35:13,20,
25 37:3,13,19
38:3,13,19,23
41:16,25 42:14
43:23 75:23
76:5 140:1,12

**illegal**
86:10

**illness**
33:20 37:6
109:7 131:8,20
132:2,13 133:7

**imaginable**
94:25

**imbedded**
59:8

**immediate**
145:22

**immediately**
66:9 144:19
146:1,6

**immobilize**
80:18 115:16

**immobilized**
113:19,22
114:24 115:18,
23,24 133:14

**impact**
37:22 116:4

**impervious**
127:11,16

**important**
40:2 41:20

**impose**
98:17

**improprieties**
25:4

**in-classroom**
62:13

**in-service**
13:10 43:21
46:1

**inappropriate**
66:17 69:20
71:8 94:5,7
111:20

**inappropriately**
67:18

**incapacitation**
57:17 58:3,11
81:23 95:23

**incarcerated**
68:25

**inches**
58:1

**incident**
13:21 53:5
91:14 133:3,20

**include**
56:7 100:1

**included**
56:11 145:12

**income**
15:18

**inconsistent**
105:1

**incorporated**
5:1 9:12 17:4

**increased**
145:13

**indicates**
5:4

**indication**
114:3 117:7

**individual**
12:21 21:4,7
23:1 64:21
65:2 72:17
117:2 124:5
139:13 143:10

**individual's**
45:1

**individually**
4:20

**individuals**

**123**:11,24
137:7 139:2,7

**ineffective**
143:11

**infiltrated**
63:23

**inflicted**
133:16

**inflicting**
65:24

**information**
31:11 39:15
48:6 54:8
62:12 79:16
133:1

**initial**
32:6 34:20
57:11,25 76:16
77:2 79:10
95:20 130:20
132:23

**initially**
24:19 46:16
51:18 61:8
79:18 87:4
132:22

**initiated**
14:6

**injure**
128:23

**injured**
65:12 109:12

**injuries**
65:17 72:5,11
73:20 122:20
133:15

injuring
73:4

injury
65:25 79:5
84:24 122:11
126:25

instance
46:11 105:21
113:2

instances
54:4 74:12
112:25

instead
11:6 12:18
70:24 92:3
143:15

institute
139:24

instruct
123:9

instructed
143:8

instruction
76:9

instructions
146:11

instructor
17:25 44:24
61:4,10,13,18
100:4 119:2
121:25 122:7
138:12

instructors
122:14,24
136:10

insufficient
143:4

insure
34:21 45:19

intelligence
19:17 21:3,8
23:15

intend
32:13 103:2

intent
49:7

intentionally
72:10

interacted
50:10

interaction
34:23 76:16
78:10

interacts
39:11

interest
16:10 18:2,22
28:11 100:15
142:5

internal
50:15 140:19

International
7:22 104:12,14
105:24 106:16,
24 107:3,12
108:3,14,20,25
109:15 111:25

intervened
125:10

intervention

39:5

intimidation
45:18

into
29:1,5 41:24
51:23 64:4,6
66:1 69:7
70:19,20 71:13
73:3 79:21,22
80:8 95:21
111:6 115:2,12
131:15 133:8,
24 136:17
145:16 147:7,8

intoxicated
71:22

introduced
60:5

intuitive
63:10

invasion
67:11

investigate
54:9

investigated
51:10 53:13

investigation
50:14 51:7
52:23 53:25

investigation's
10:20

investigations
50:20 51:4

investigative
10:20

involuntary
36:11

involve
74:4

involved
48:11 137:25
142:8 144:22

involving
48:7 68:5 73:8

irons
83:20 84:1
86:6 87:1,5,7,9
89:3,10,19
90:8,18,22
91:3 95:5

Island
67:21 69:23

issue
39:2,3 41:20
50:12 76:12
93:20 140:23
142:17 144:4,7

issued
11:1

issues
13:25 59:17
62:15 132:20
144:11

iteration
66:6

___

**J**

jail
69:1 71:24

January

9:6 15:14
16:13 18:6,8
19:9 28:15,17,
18 62:19

job
26:14

jobs
40:21

Joel
45:3

John
99:5

joined
124:25

joint
41:7

Juan
30:2

judgment
73:14

July
15:8 16:16
106:10 112:11
137:16

juncture
115:2

jurisdiction
23:17,21

jurors
76:2

jury
102:22 103:2

justice
4:17 11:7

Taylor, Roy                    May 01, 2018                    Page 172

14:22 101:14,
19,21 112:19

**justifiable**
111:8

**justified**
68:18 85:9

**justify**
84:18 114:13

---

**K**

**Kappa**
63:12,17

**keep**
20:25 45:16
80:12

**Kentucky**
30:10

**kept**
95:19

**Kern**
47:24 84:3
86:25 88:24
105:17 131:1,
14

**key**
45:16 143:12

**kick**
97:18

**kicking**
89:1,2 97:24
114:10 128:24

**killed**
39:21 64:6
67:15 68:14

**killing**
71:4

**kind**
15:19 19:19
20:13 37:22
90:17 104:20
125:18 129:2

**knee**
88:13

**knees**
125:17,20

**knew**
60:21

**knife**
70:13 72:17,18

**knocked**
73:19

**knowing**
34:15

**knowledge**
14:7 30:5,18
31:1 39:17
42:7 124:3

**known**
142:16

---

**L**

**laceration**
115:7 127:1
130:23

**lack**
67:5 73:9,15
77:15

**lady**

26:2 71:20
73:17

**landlord**
55:21

**language**
54:23 75:19

**large**
23:6 51:24
140:5

**larger**
90:14

**Las**
72:12

**last**
40:15 46:1
63:5 76:24
86:23 117:21
129:8

**late**
22:24

**lateral**
149:21

**law**
4:24 7:22 8:12,
21,23 10:9,15
11:13 12:2
15:13 19:20
20:1,6,22
22:20 23:4,11,
12,14 39:11,23
40:18 42:8
45:12 50:19
53:13 60:2
64:11 65:23
76:19 94:22
101:9 102:18
103:11,14

104:2,15,23
118:20 128:22
147:3

**laying**
84:23 86:1
147:4

**lead**
102:12 123:10,
13

**learned**
24:17 45:9

**least**
35:22 41:7
47:22 53:14
83:1,20 95:7
148:14

**leave**
24:2 70:7 75:2
114:17 129:4
139:15

**leaves**
33:24

**leaving**
41:25

**left**
65:13 84:4
95:24 97:9,14
103:24 104:6
105:17 115:10
127:3 148:20

**left-to-right**
149:21

**leg**
58:5,6 79:22
83:20 84:1
86:6 87:1,5,7,

9,19 89:3,10,
19 90:8,12,13,
17,22,24 91:3
95:5 115:24

**leg-shackled**
86:21 94:8
130:6 134:6,17
139:2,8,14
147:15,21

**legs**
83:21 86:22
87:15 97:18
98:4 114:1,6,
10 117:8 130:2

**Les**
55:21 56:22
75:12

**less**
20:16 27:6

**lesson**
61:19,22
106:20 107:16
108:9 118:2,24
120:6 138:13

**let**
7:8 29:24
36:16 45:23
52:24 76:17
81:15 91:8
93:17 97:14
103:8 107:9
116:12 118:18
128:8

**level**
136:11 140:24

**liability**
9:10

Taylor, Roy                    May 01, 2018                    Page 173

**Liberty**
25:9 26:15
27:17

**likely**
80:8

**limit**
34:3

**limited**
9:10 34:12
37:18,23

**limiting**
35:19 36:20
38:2

**line**
57:8

**lines**
33:23 99:7

**links**
90:15

**list**
54:15 56:7
63:11 74:1
107:4 109:7

**listed**
28:9 30:1 70:3

**listening**
143:17

**lists**
109:9

**litigation**
4:11 14:6,16,
18 29:25 63:5
104:23

**little**
6:17 11:5,19
20:16 78:24
85:17 107:10
148:24

**licensing**
29:7

**lie**
84:15 85:14

**lies**
141:2

**lieutenant**
7:14

**life**
129:21

**lifted**
88:12

**light**
143:18

**lighting**
73:9,15

**lights**
45:15 46:13

**like**
8:16 10:16
16:3 19:22
20:13 22:15
23:9 29:5
32:16,17 46:19
59:15 63:19,20
75:25 85:18
90:20 91:25
127:10 128:4,
17 136:13
137:4 140:23
145:23

**likelihood**
122:11

**lives**
56:22

**LLC**
4:22,23 5:1
14:25 17:8

**local**
11:6 12:2
23:16 63:21
101:25 102:3

**located**
23:18 102:8

**location**
123:22 133:20

**locations**
15:23 19:24

**locksmith**
23:9

**lodge**
63:19

**loitering**
16:6

**long**
6:15 28:16,24
78:25 96:2
114:16,19,24
138:6

**longer**
15:13 61:10
69:11 95:15,24
113:17

**looked**
41:6 51:13
53:6,14
107:19,23

**looking**

39:4,6,13 54:1
74:8 79:15

**looks**
128:17

**lose**
97:25

**lost**
73:14,22,24

**lot**
34:24 63:16
64:4 72:25
73:12,23
100:15 136:14
147:5,24 148:5

**lots**
16:2

**Louis**
7:23

**low**
45:16

**lower**
52:3 58:2,4,6
80:25 87:19
98:8 125:3

— **M** —

**Madam**
93:3

**made**
19:23 24:12
42:24 49:25
75:4 77:2,12
79:4 91:15
143:15

**main**

132:9

**maintain**
13:6 88:10

**maintained**
19:25 118:15
149:18

**maintains**
11:18 13:8

**majority**
21:19,20 86:7

**make**
16:5 26:8 39:6
40:24 52:3
53:6,10 54:11
81:15 111:8
146:17 148:3

**makes**
28:24 81:12
141:1 147:6

**making**
26:7

**male**
76:12 128:14

**man**
63:15 77:8

**managed**
73:13

**management**
20:24

**manager**
24:9,15,17
26:17,19,21
53:14

**manager/
council**

26:18

**mandated**
42:20 43:24,25

**mandatory**
42:19 43:2,19
62:8

**maneuvers**
84:11

**Manley**
24:13

**manner**
106:16

**mano**
125:22 128:21

**manual**
35:5,10,12,19
36:19 37:18
38:11 40:8,25
41:10 49:4
98:20,24 107:6
110:21,23

**manuals**
101:5

**manufacturers**
111:5

**many**
12:4,7 21:11,
23 22:5 29:15
34:17 44:19
67:2 83:14
89:8,24 95:8
123:6,15
129:11 133:23
134:6 138:4

**March**
49:12 60:20,23

106:23

**Marie**
55:21 56:22
75:12

**marijuana**
26:5

**mark**
141:3

**marked**
140:20

**marshal**
20:21 40:18

**master**
61:13

**match**
125:23

**material**
6:14 32:16
61:16 75:3
101:1,18,23
102:5 106:12
107:17 122:13
123:8 136:9
138:13

**materially**
36:5

**materials**
31:25 32:3,8,9,
21 100:5
101:3,7,16
102:6

**matter**
31:2 57:6
69:15 92:1

**matters**

29:4 54:4
141:5

**may**
8:24 16:1
21:20 31:10
32:14 45:12,13
48:13 51:16
60:18,19 74:7
77:21 78:2
79:22 85:16
105:4 107:20,
21,25 109:11
111:8 123:12
144:7 148:1

**maybe**
22:3 69:4 83:5
120:2 122:17
128:25 142:18

**Mckenney**
68:1

**Mcneil**
72:20

**mean**
6:3 31:6 85:4,
17 88:13 96:22
102:19 148:4

**meaning**
45:20 119:7

**means**
145:14

**meant**
82:1 125:19

**mechanism**
119:4,7

**Mecklenburg**
70:9

**medical**
23:7 34:16
118:10,13,23
120:17 121:3,
6,9

**medication**
76:13 132:7

**meet**
8:23

**Mel**
59:12 141:23

**member**
4:22 36:14
47:12 63:23
64:5 109:4

**members**
25:25

**membership**
104:12

**memory**
52:13

**mental**
13:25 33:20
37:5 45:11
75:23 76:12
92:4 93:13
109:7 131:8,20
132:2,13 133:7
149:8,13

**mentally**
34:8 35:13,20,
25 37:3,13,19
38:2,13,19,23
41:16,25
42:14,23
43:16,23
44:12,16 76:5

140:1,12

**mention**
139:9

**mentioned**
37:4

**met all**
24:21

**metabolic**
118:4 136:4

**metabolically**
136:22 137:8
138:9

**metal**
90:20

**Miami**
29:18 56:23

**might**
47:16 81:25
96:16

**miles**
8:20

**military**
40:19

**million-dollar**
8:14 73:14

**mind**
53:24 94:23
103:10

**mine**
40:6

**minimal**
67:2 80:25

**minimum**
90:6,7 108:23

Taylor, Roy                    May 01, 2018                    Page 175

**minutes**
15:24 68:12
77:25

**misconduct**
65:8 67:8,22
68:3 69:23
72:13 73:6
74:5

**misdemean**
92:2

**missed**
59:4 110:12

**missing**
69:11

**mission**
41:12

**MMA**
128:24

**moaning**
127:20,21
134:24 135:1,
4,10

**mode**
89:25

**model**
40:5 69:1
107:4,8,14
108:13,20
109:1,15

**modified**
12:12

**moment**
14:17 68:18

**money**
5:23 24:4

73:23

**monitoring**
78:2

**months**
20:17 25:12
48:16

**Moore**
46:16 55:20
90:19 125:13

**Moore's**
75:11

**moose**
63:19

**more**
5:22 6:20 11:2,
5,19,25 28:24
34:11 36:16
39:6 42:5
46:19 51:9
52:8,10,17,20
53:2 55:13
74:21 78:2
79:16 80:8
84:24 87:18
106:2,17 107:1
108:5 112:3
122:17 128:18
144:4 148:3

**morning**
6:16

**most**
20:8 62:19
88:15 99:17
100:7 101:18
104:17 125:21

**Mostly**
71:9

**motion**
30:6,11,15,18,
24 31:10

**motions**
31:14

**motor**
109:12

**mountains**
8:18

**move**
20:25 31:22
60:7 74:10
75:5 80:10
84:4 98:11
105:2,6,13

**moved**
7:11 25:1
50:17 64:4
70:17 80:11

**moving**
73:2 84:2 85:8
86:9,22 87:15
114:10 117:8

**much**
6:10,19 25:23
33:24 37:23
45:17 69:11
127:12

**multiple**
50:11 105:4,22
118:3

**municipal**
10:19 11:20

**muscles**
58:6 67:2

---

**N**

**naked**
77:8

**name**
4:5,23 24:13
29:22,23 45:1
46:16 99:3,5
141:23

**named**
16:18 65:1

**Nashville**
7:13

**National**
7:12 19:17
20:20 21:3
23:15

**near**
124:2

**nearly**
27:5

**necessarily**
96:22

**necessary**
32:18 35:23
41:6 45:17
99:19 149:24

**neck**
70:13

**need**
39:12,22 41:21
118:22 133:13
135:5 140:4,6
141:2 145:10

**needed**

23:21 34:3
41:2 48:2
51:14 77:13
108:23 132:25
143:8

**needs**
8:24 22:19
51:21 53:14
92:2 139:24

**negligent**
72:16

**neighbors**
48:12

**neither**
125:22 144:9,
15

**neuromuscular**
57:16 58:3,11
81:23 95:23

**neurosurgeon**
73:18

**never**
16:22 30:21,25
48:23 79:8,9
110:1,24 111:3

**new**
17:7

**next**
6:22 14:15
75:13 79:25
80:10,17
82:16,25 84:3,
13 87:17 93:1
100:20 102:25
105:2,24
112:23 113:9

**nice**
150:14

**night**
15:25 16:3
64:1

**nine**
95:15

**NMI**
57:23 58:7,16
66:2 67:2
70:19 79:10,
18,23 82:6,14
96:10 105:19

**Nobody**
85:22

**non-emergency**
56:16 57:3,5

**non-refundable**
5:5

**none**
97:24 140:18

**normal**
20:1,9 46:19
90:16 111:9
127:12

**normally**
64:17 142:3

**North**
5:2 9:12 10:1,
3,13 11:8
16:24 17:7,10
25:10 27:3
28:10 36:10
42:18 44:3,6
45:7 59:20

61:11 65:19
67:21 71:16
76:4 100:3,13
101:4,11,13,
19,20 102:4

**Norton**
63:11

**Norwood**
27:2,12,16

**notes**
49:25 50:2,4,7
130:18

**nothing**
50:23 66:10
77:3,12 140:22

**notice**
132:12 140:10

**noticed**
130:10

**nowhere**
133:15

**number**
12:23 15:22,25
22:12,13,18
30:1 34:1,22
38:22 39:11
43:5,6 50:20
54:19 55:19
56:14,16 57:3,
5,9 64:12,14
65:19 67:7,20
68:1,20 69:22
70:1,2,4 71:16
72:20 73:5
83:24 93:14
94:25 108:23
116:5 118:16

122:19 123:22
138:20 139:1
140:5 145:2
146:14

**numerous**
52:9

---

**O**

**obese**
88:7

**Object**
13:22 76:23
85:15 115:4
120:19 131:11,
22 132:14
134:14 135:15,
21 136:7
137:12 140:13
143:5

**objection**
123:3 137:23

**Objectivity**
62:22

**obscene**
77:7

**observe**
58:8

**observed**
72:23 144:18

**obtain**
98:18 99:25
100:25

**obtained**
39:18 99:15
100:16

**obvious**
48:6,13

**obviously**
36:13 37:6
77:7 85:25
114:11 126:5

**occur**
58:3

**occurred**
29:15 79:17

**occurrences**
140:6

**occurring**
72:24

**occurs**
20:5

**off**
34:15 43:6
45:15 48:10
70:7 71:3
76:13 85:23,25
90:2 93:5
103:24 104:6,
18 132:6

**off-the-record**
92:9

**offense**
69:16

**offer**
117:25

**office**
11:8,9 16:1
17:20 20:9
23:20 50:5
56:24,25 59:20
68:2 112:20

**officer**
10:5 11:4 13:4
15:23 16:4
18:25 24:4,7,
18,24 28:5
38:12,18 40:18
42:2 46:5,12,
24 47:10,11,
18,20,24,25
48:15,22,24
50:20 51:14
52:16 53:2,20
55:6,9,25 57:9,
16,22 65:24
66:7,23 67:18
70:18,24 71:18
72:16,22,23
73:3 76:16,17
77:1,17,23
78:14,21 80:1,
3,11,14,17,20,
23 81:3,9,10,
17,22 82:1,4,
12,17,20,22
83:1,4,17 84:3,
6 85:18 86:25
87:18,20
88:23,24 90:3
93:18 94:15,22
95:6,18 96:9
97:8 98:3,7
102:16 104:24
105:16,17
113:3,7 115:6
116:2,16
124:14,24,25
125:9,10,13,
15,16 126:1,24
127:25 130:22
131:1 134:25
135:4 136:25

Taylor, Roy                    May 01, 2018                    Page 177

142:11,12,19,
25 143:13,22
144:9 145:1,
11,15,22
146:6,17
148:20,21,22

**officer's**
33:24 42:1
103:12 139:16

**officers**
11:13,17 12:8,
10 21:17 22:1,
6 25:16,17
27:24 33:12
34:22 35:2
36:12 37:21
38:6,8,22 42:5,
9,10,25 43:2,
16 44:2,6,7,11
45:20 48:2,15,
18,19 49:10
64:12,14,21,25
65:13 66:16,22
67:24 69:3,6
70:14 75:14
77:24,25 78:1
84:11,25 85:24
86:7 87:4,7
88:9,19,22
89:2 91:2,23
93:14 103:11,
14 104:2,9
105:5,12
106:8,10,21
110:4,21
112:10 114:11,
17 115:10,16,
18 118:24
121:19 129:11,
14,23 130:4,7,

10 131:13
132:5,11 133:9
134:7,10,20
136:16 137:15,
19,25 138:7
139:11 140:7
141:16,18,20
142:16 144:23
145:6,8,17,22
146:2 147:24
148:15,18
149:3,7

**offices**
17:22

**Ohio**
30:23 31:2
118:15

**once**
32:15 110:5,22
128:18 129:14
132:24 148:20
149:16

**one**
7:4,11,17 8:19
11:21 15:17
16:22 18:5
21:5 22:3 29:1,
5,17 30:20
31:18 33:22
39:4 40:21
42:24 43:4
57:23 58:7
59:24 60:4,5
62:10 64:6
65:25 66:20
67:3 69:5
70:13 79:4,21,
22 82:4 85:25
90:3 96:10

98:21 99:11,12
106:11 107:13
111:17,19
112:9 113:2
118:7 119:8
120:13 125:4,
22 128:2,18
130:6,9 133:25
136:24 144:15
145:3,24
148:22

**one's**
98:17 144:1

**one-day**
62:7

**one-on-one**
78:10

**Ones**
141:15

**ongoing**
13:24

**online**
62:9,11
107:19,23

**only**
7:10 8:19
15:17 26:23
29:8,16 30:17,
20 31:14 33:23
37:21 46:14
47:24 48:15
76:21 80:6
84:19 85:13,24
86:4,15 87:4
89:25 90:2,24
96:11 97:13
117:8 133:25

**open**
33:24

**opened**
71:25

**opener**
39:10

**operated**
20:9 79:3

**operating**
116:5 138:17,
20 139:1
143:20 145:2,
20 146:13

**operation**
19:3 20:22
41:12

**operations**
9:8 15:16
20:11 27:22
35:5,19 36:19
37:18 38:11

**operator's**
61:14

**opinion**
46:9 48:1
52:21,25 53:1,
18 55:2 57:21
58:21,24 59:6
74:22,23 75:6,
10 76:20 79:11
81:16,21 85:20
86:5 89:15,23
90:1 91:1 96:5
97:5,10,16
98:7 102:14,
17,19,21 106:7
108:12 114:20

115:20,23
116:16,19
117:16 119:10,
11 120:12,17
121:2,24 122:5
125:8 128:9
139:23 140:4,9
143:3 144:25
145:21

**opinions**
5:15,18 6:12
32:4,22,23
33:6,7,14 46:4
49:17,20,23
57:7,14 74:13,
17,18,21 83:13
91:18 93:19
95:11

**opportunity**
130:14,17
133:17 134:19,
22 138:15,19
139:17 144:7
146:12

**opposed**
6:11

**optional**
42:21,24 43:9,
19 44:8,12

**order**
8:21 32:4 57:1
150:9

**orders**
24:22

**organization**
20:12

**others**

Taylor, Roy                     May 01, 2018                        Page 178

36:13 43:9
99:7 116:10
117:11,17
149:24

**outcome**
77:22

**outside**
46:18 64:4

**over**
5:20,21 6:17
11:11 12:20
13:5 16:3 35:8
50:24 55:6
56:1 61:3 63:5
66:2 69:4
71:20 74:10
88:12 92:11
103:8 110:15
129:19 131:18,
24 132:4
135:4,9 142:20
143:9 144:10

**overarching**
19:4

**overcome**
35:23 99:19
128:25

**overestimation**
129:3

**overly**
33:4

**overpower**
128:20 146:1

**oversee**
47:25

**overseen**

101:22

**oversees**
11:6 101:12

**oversight**
11:23

**owe**
5:22

**own**
19:6 28:16
77:9

**owned**
9:6 16:22
17:10 18:7
19:12 28:7
73:12

**owner**
8:15 9:19
12:17,20
19:11,13

**owners**
12:18 17:8
64:2

**ownership**
16:9,14 18:2,
22 19:7 28:11

**owns**
16:19,21 19:4

_____

**P**
_____

**p.m.**
16:3

**packet**
10:24

**padlocks**

134:3

**pain**
79:9 127:11,
12,16,22 135:2

**painful**
88:1

**Pantaloukas**
43:21 57:10,
16,22 75:15
80:11,14,17,
20,24 81:3,17,
22 82:2,4,13,
17,20,22 83:1,
4,17 85:18
87:18,20 88:24
90:3 95:18
96:9 97:8 98:4,
8 105:16
116:2,16
124:24 125:10,
13 127:25
128:3 129:17
131:14 137:16,
20 142:12,18,
25 143:13
144:10,17
146:3 148:20,
22

**Pantaloukas's**
42:2 47:11
95:7 125:16

**paper**
11:22

**paragraph**
5:12 74:11
75:13 76:14,18
80:11 82:16,
20,25 84:3,13

86:13,23,24
98:13 100:20
101:1 102:11,
25 103:9
104:1,3 105:2
116:1

**paragraphs**
79:25

**paramedic**
122:1,2

**parking**
16:2 23:13
63:16 64:4
71:20 72:25
73:12,13

**part**
13:6 30:8
61:22 73:2
89:23 92:11
120:17 125:14
143:7 146:9

**part-time**
25:17

**partial**
76:14

**partially**
121:18

**participants**
64:7

**particular**
34:6 38:1
54:22 60:25
98:24 105:11
106:15 111:13
115:1 116:15
129:3

**parts**
14:2

**party**
63:17,23 64:1

**passed**
134:8

**past**
62:25 95:20

**patrol**
15:21 17:13,
18,21,23 21:22
22:11,15 23:11
27:25 35:1
65:11 86:25

**Patrol's**
61:12

**patrols**
15:23

**pattern**
140:11

**pavement**
66:10

**pay**
15:12

**paying**
132:15,22

**payroll**
29:4

**Peerless**
90:21

**pending**
30:15 31:3

**Pentagon**
41:1

**people**
8:15 33:20
34:4,8,18
39:12 45:12
50:9,25 64:13
70:1 73:1
88:15 109:7,10
114:6 117:4,5,
6 122:16
123:15 125:4
128:18,23
143:9

**pepper**
37:21,24

**percent**
19:12 50:8
51:1 63:1,2
137:18

**perception**
89:14

**Perez**
30:2 31:19

**performed**
10:21 44:22
82:18 121:3

**perhaps**
55:13

**perimeter**
114:12

**period**
16:3 27:12
28:16 50:24
108:9

**permanent**
65:16 122:11,
20

**permanently**
73:21

**person**
34:23 36:13
68:5,10 70:10
90:15 91:13
92:3 93:12
95:2 96:23
113:4,7
119:10,25
124:23 128:19
145:24 146:18
150:4

**personal**
89:14 102:17,
19 143:22

**persons**
39:20 136:23
138:10 139:4
147:4

**pertains**
136:20 139:25
145:6 146:14

**ph**
136:11

**Ph.d.**
39:4

**phase**
47:17,19 48:23
146:4

**phone**
45:2 142:13
143:10,15,22

**photo**
59:9

**photographs**

**photos**
59:8

**physical**
10:22 47:13
88:8,16 116:8,
21,24 117:3
124:15 125:25
126:6,9 129:3

**physically**
136:16

**physiological**
118:4 136:4

**physiologically**
136:22 137:8
138:9

**pickets**
70:21

**pictures**
126:7 134:2

**piece**
11:21

**pistol**
68:6

**place**
129:17 133:12
146:17

**placed**
83:15,19,20
87:1 89:9 90:9
95:5 116:20
129:13 134:5

**placing**
148:4

**plaintiff**

**30:2 60:14
63:2,9 67:17
68:14 69:8
70:11 72:14
73:7 74:2

**Plaintiffs**
5:9,22

**Plaintiffs'**
5:9

**plan**
61:19,22
106:20 107:16
108:9 118:2,24
120:6 138:13

**planting**
72:17

**plastic**
90:20

**platform**
109:11

**Plus**
6:7

**Poetzsch**
70:3

**point**
32:12 49:22
69:5 83:10,25
84:1 86:15
87:9,13 88:22
89:18 92:7
105:23 108:1
113:13 115:5,
22 130:9,24
148:14,18
149:2

**points**

129:1,12,24
130:5 133:23

**police**
8:6 9:5,8,17,24
10:4,6,9,10,13
11:4,9,20 12:2,
8 18:11,12,13,
14,20 19:8,14,
16 20:15,19
21:2,17,25
22:4,6,9,21,22
23:5,16,20
24:18 25:9
26:1,3,6,12,16
27:2,13,17,23,
25 30:23
33:10,17 34:7
38:6,8,9,18,22
39:10,21 40:7,
12,13,16 41:17
42:10 43:2,15
44:2,11,25
45:4,6,7 47:8
48:1 49:10
50:10 51:11,18
52:16 53:2,20
55:5,18,25
56:16,20
59:16,25 63:22
64:9,21,23
65:4,8 66:16
67:8,13,18,21
68:3 69:15,23
70:9,11,14
71:18,24
72:13,21,23
73:6 74:5
84:11,25 85:24
89:2 91:2
98:25 99:8
101:12 102:1,

Taylor, Roy                    May 01, 2018                    Page 180

7,15 104:9,13,
17 105:12,25
106:17,22,24
107:3,12
108:4,14,20,25
109:15 110:20
111:25 112:1,
7,14,21 113:7
114:17 115:10
116:13 129:23
130:4 131:9
132:5,11 133:8
134:7,10,20
135:4 137:25
138:7 139:11
140:21 141:15,
18,20,21 142:4
144:1,23 145:6
147:19 148:15
149:3

**policies**
33:10,14,17,19
34:7 35:6 40:5,
25 49:4 75:1
107:4,14
139:15,24

**Policing**
112:20

**policy**
4:13 5:4 33:22
34:20 35:10,
12,24 36:1,3,6,
19 37:1 38:1,
11,17,21 39:13
40:8 41:9,13,
15 48:21 49:3
53:11 107:6,8,
20,24 108:13,
21 109:1,16,
20,23 110:21,

24 115:15,19
116:3,5,6,13,
17 117:9,14
143:25 145:8,
12 147:18

**political**
25:23

**poor**
143:6 146:9

**pop**
70:24

**population**
109:2,5

**porch**
70:12,17

**portion**
61:18 75:10
79:2

**portions**
61:22

**position**
10:3,10 18:10
25:21 29:6
68:11 124:15
129:25 130:6
133:10 134:5
135:13 146:18
147:5,10,14,21
149:16,18,21,
24

**positional**
121:18 129:12,
24 130:5
146:20 147:2
149:19

**positioned**

82:17

**positions**
28:25

**possibilities**
135:19

**possibility**
146:19

**possible**
34:24 45:16
135:12,16

**possibly**
131:25 146:7

**potential**
71:5 75:15

**potentially**
113:10,18
132:6

**pounds**
126:3,9

**power**
98:17

**powered**
55:10

**practical**
61:16,23 62:15
105:7

**practice**
51:3 61:21
140:11 147:19

**practices**
41:23 47:9

**preexisting**
135:24 136:6

**prefaced**

85:3

**pregnant**
109:9

**preliminary**
74:13,17,19
75:2 141:5

**preparation**
5:3,6 6:8

**prepared**
4:10 49:9

**preparing**
6:11

**present**
61:19,22
145:17

**presentation**
112:10 136:24

**presented**
61:15 91:2

**president**
15:5 17:12,23
19:3,5 28:9,10

**pressure**
129:1 133:9
147:6,25 148:4
149:22,25

**presumably**
9:5 37:1

**pretty**
33:24 37:23
99:22 126:5

**prevalent**
100:7

**prevent**

113:25 114:2
147:2

**prevented**
134:11

**previous**
9:19 15:18
92:22 93:6
110:19

**previously**
142:6

**primarily**
15:21 19:23
33:9 34:10
45:11,14 50:8
75:11

**primary**
23:23 143:12

**printed**
7:11

**prior**
28:17 34:22
135:3 138:14

**prisoner**
69:2,13

**private**
8:12 10:6,14

**probably**
88:8,17 121:19
127:21 132:19,
22

**probe**
79:4 95:21

**probes**
57:25 58:25
59:7

Taylor, Roy                    May 01, 2018                    Page 181

**problem**
118:6 141:2

**problems**
13:25

**procedure**
35:10,12 38:21
138:20 139:1
143:20 145:2
146:13

**procedures**
40:8,25 41:9
49:4 59:16
104:18 138:17
145:20 146:14,
23

**proceedings**
13:20 14:13

**process**
11:25 62:18

**product**
143:4

**professional**
7:2,7 59:22
65:2 78:13
119:11

**proficiency**
61:24

**profusely**
126:17,21

**program**
42:6 47:18
146:4

**programs**
20:23 34:25

**progress**

144:18,20

**progressively**
84:2

**prohibit**
139:1

**prohibited**
109:13 116:7

**prohibits**
109:16

**projectiles**
81:1

**prolonged**
137:1

**prompted**
55:17

**prone**
129:25 130:5
133:10 134:5
135:13 147:21

**prongs**
81:4,17 82:13

**proper**
73:9 94:23

**properly**
140:7

**properties**
22:14

**property**
8:15,23 12:17,
18,20 20:5
23:22 24:5,8
64:2 77:9

**propose**
117:25 149:12

**proposed**
30:19 31:16

**prosecution**
69:19

**protect**
8:22

**protection**
12:25

**protective**
65:12

**protocol**
114:21

**protocols**
34:16

**provide**
4:19 8:21
15:20 23:5
35:12,19 37:18
52:2,11 63:22
101:6

**provided**
4:9 31:23 32:7
64:9 79:16
101:3,16 102:7
110:4 118:3
133:1 137:17

**provides**
42:20 100:5
116:6 120:7
136:10

**providing**
31:7 33:12
52:4

**provision**
37:11 145:19
146:16 147:1

**provost**
20:21 40:17

**proximal**
117:23 118:8
119:7,12
120:24 121:20,
22

**proximately**
77:18

**proximity**
67:4 71:4 81:9
123:23

**prudent**
53:13

**Psi**
63:12,17

**psychological**
75:15,20

**psychotic**
33:21 34:9
35:14,21 37:3,
13,20 38:24
39:12 41:17
48:8 75:7
91:11,16,20
93:21 94:9,16,
20 127:5 131:8
150:4

**public**
8:7,11 12:5
15:1 27:19,22,
23 28:20 35:4,
11,18 36:6,18,
25 37:17 38:10
42:11 45:5
48:17,21 91:3

**published**
123:8

**publishes**
122:13,24

**puked**
126:15

**pull**
95:16 96:17

**pulled**
72:3 82:10
95:19

**pulling**
90:4

**pulls**
68:8

**purchased**
13:7

**purpose**
88:3 94:13
145:18 146:25

**purposes**
102:1

**put**
46:25 50:6
61:12 90:10
107:18 112:19
114:23 136:17
143:8 144:10,
15 149:15,20,
23

**puts**
147:5

**putting**
143:16 147:24

Taylor, Roy                    May 01, 2018                    Page 182

## Q

**qualification**
10:23 13:11
60:3 111:19

**question**
13:19 36:16
37:25 56:4
63:8 76:24
81:25 92:12,
13,16,17,22,25
93:1,6,24
94:13 96:16,17
97:4 102:24
110:19 120:2,
8,15,20,22
123:1 127:17

**questioned**
103:12 133:11

**questioning**
6:7

**questions**
6:5,20,22
53:24 129:5
148:9 150:8

**quick**
29:25 45:3
148:9

**quicker**
80:8

**quickly**
71:3

**quite**
125:15

## R

**radio**
131:24 132:4
135:5,9
142:15,20
143:9,12,14,
16,23 144:2,
11,19

**radioed**
131:1 134:25

**railing**
70:21

**raised**
68:17

**Raleigh**
17:19 23:18,20
38:8 59:20

**Ramirez**
46:5,12,24
47:25 55:9
75:14 76:16
78:14 80:1,3
81:9 84:6
88:23 93:18
94:15 124:14,
25 125:10,17
126:1,3 129:16
131:14 137:15,
19 142:19
144:10 145:1
146:3

**Ramirez's**
76:18 77:17
78:21 115:6
126:25 130:22
142:11

**ran**
26:3 118:13

**range**
27:9 114:19

**rational**
95:1

**reach**
36:15 57:2
114:13

**reached**
79:24 121:7

**reaching**
72:19

**reaction**
68:15,16

**read**
42:2 43:4
56:17 57:12
84:8 93:6,10
100:12 105:9
106:5 107:13
112:5 118:23
122:13,14,23
123:5,7 136:8
142:11 146:15,
21

**reading**
53:23 89:11
98:21 102:9

**real**
29:25 45:2

**realize**
66:4

**realized**
71:2

**really**
10:1 72:15
126:21

**realm**
135:18

**reason**
28:19,23 29:8
56:11 79:11
84:16 88:1
97:4 100:6

**reasonable**
78:13 105:5
135:19

**reasonablenes
s**
99:8

**reasonably**
99:18 105:7

**reasoning**
81:8

**reasons**
120:13

**rebuttal**
30:13

**recall**
23:24 29:19
38:14 43:6
45:22 49:14
58:13,15,18,19
60:25 63:19
87:11 89:5
98:21 99:16
102:9 109:21
126:7

**recapped**
76:18

**receive**
5:5 15:12,16
102:4

**received**
5:8 49:9,12,14
126:12

**recently**
62:19

**recertification**
62:7,18

**recertified**
138:4

**recess**
103:22

**recites**
63:4

**recognized**
29:12 109:24

**recollection**
37:10,15 38:16
60:18 76:7
85:11 86:18
104:5 108:22
111:17,23

**recommend**
34:10 106:1,17
112:15 114:16

**recommendati
on**
41:3 112:8

**recommended**
108:4 111:15
112:2

**recommending**
34:20

**recommends**
45:14

**record**
4:6 93:10

**recorded**
57:8

**records**
54:11

**recover**
69:10

**recumbent**
149:21

**reduce**
66:20 149:22,
25

**reducing**
81:1

**refer**
74:12

**reference**
110:10 122:15

**referral**
141:1

**referred**
50:14,23 51:6
90:12,24
140:19

**referring**
24:11 103:15

**reflect**
7:24

**regard**
30:19 31:15
34:7 36:19

37:1,11 38:1
46:5 58:25
86:19 87:12
108:21 111:16
127:25

**regarding**
30:25 38:11

**regular**
10:9 11:11

**regulations**
23:13

**relate**
55:24

**relationship**
27:11 28:2

**relative**
125:25

**relatively**
39:1 128:17

**relay**
132:4

**release**
95:17

**released**
48:25 66:9
101:24

**relying**
110:11

**remain**
59:7 135:13

**remainder**
73:25 82:19
104:3

**remained**

58:25 81:18

**remaining**
74:20

**remains**
31:2 108:12

**remember**
37:6 45:1 50:6
61:8 65:1
75:18 92:24
99:3 111:13,14
114:8 126:2
128:3 132:17
137:4 139:20
142:9 145:4
149:10

**remove**
24:7

**removed**
59:10

**render**
102:19

**rendered**
147:22

**rented**
63:20

**report**
24:12 26:16
31:23,25 32:6,
10 33:3,8
49:21 51:20
54:1,14 56:15
60:8 63:4 72:7
74:9,17 76:1
79:6,12 80:1
84:3 98:12
103:25 117:22
120:9 135:24

140:25

**reported**
26:19 55:20
77:7

**reportedly**
84:14 85:3
86:14,24

**Reporter**
92:8,10 93:3,9
110:12 150:16,
19

**reporting**
24:21

**reports**
49:9,18 50:13
51:5 52:6,9,12,
14 53:19 79:14
88:25 139:18
140:2 141:3

**represent**
60:15

**represented**
64:11 65:4
66:13 67:24
141:15

**requested**
93:10 144:19

**require**
7:19

**required**
8:4 11:16,17
19:20 43:5,8
44:7,10 53:25
102:3

**requirement**
44:9

**requirements**
10:18 24:21
29:7 43:1
118:19

**requires**
42:19 145:16

**requiring**
48:14

**rescue**
130:24

**research**
49:5 51:11
104:14 106:1,
22 112:2,8,14,
21

**researching**
40:3

**reserve**
7:12,16 13:3
150:17

**residential**
20:8 23:7

**resign**
24:16,19 25:3

**resignation**
26:22

**resigned**
24:10

**resist**
72:1,3 96:13

**resistance**
35:23 99:20
112:25 113:2
116:9,21,24
117:3 128:25

Taylor, Roy                    May 01, 2018                    Page 184

**resisting**
71:2 83:3

**resources**
51:25

**respiratory**
147:7

**respond**
20:4 34:22
35:2 38:23
39:8 47:15,24
70:11 131:2
140:7 142:18
146:11

**responded**
47:24 70:18
132:12 142:21

**responding**
33:20,23 45:15
87:4 132:21
133:2 146:7
149:7,9

**response**
12:22 39:21
51:1 114:25

**rest**
134:2

**restaurant**
22:16

**restrain**
114:22

**restrained**
85:21 110:5
111:11

**restraint**
34:14

**result**
82:6,14 118:4,
25 123:15

**resulted**
72:15 73:23
80:25

**retained**
9:7 14:12
15:15 60:13,17
65:3

**retention**
39:18 119:21

**retired**
59:25 99:2,12

**retrieve**
89:19

**retrieved**
87:1

**returned**
126:12

**review**
32:16 49:15,18
50:15 51:14,22
58:8 62:14
130:15,18
133:17 134:22
138:16,20
139:18 140:1,
14,17,19
146:12

**reviewed**
31:25 32:4
52:7 61:17
75:3 122:9
143:24

**reviewing**

6:13 35:15
50:12 62:15
122:7

**reviews**
62:11

**ribcage**
148:2

**ride-along**
68:7

**rides**
64:5

**Ridge**
8:7,11 12:5,11,
16 13:2,12
15:1,17 27:22
35:4,11,18
36:6,18,25
37:17 38:10
39:25 40:10,12
42:10 45:5
48:17,21

**rifle**
68:11

**rights**
102:13,16

**risk**
84:21 124:15,
22,25 125:3,6,
7

**road**
47:14

**robber**
67:12

**robbery**
73:18,19

**Robinson**
72:12

**role**
9:3 15:15
18:18 28:20

**rolled**
10:25 29:1,5
88:12

**rolling**
80:2

**room**
24:5

**rose**
53:24

**roughly**
15:24 50:8

**Roy**
4:7

**rule**
121:4,10,12

**ruled**
30:14 135:18

**rulings**
104:18

**run**
9:8 26:1 61:23
66:23 67:14
85:23,25 90:17
126:14 136:14

**running**
126:10 145:24

**rush**
145:16

**rushed**

71:1

**rushing**
71:10

---

**S**

**safe**
46:23 105:7

**safety**
8:7,11 12:5
15:1 27:19,22,
23 28:21 35:4,
11,18 36:6,18,
25 37:17 38:10
42:11 45:5
48:17,22 60:2
145:22

**said**
11:22 29:22
42:4 46:16
51:12 64:12
68:15 75:22
85:18 90:21,22
95:7 96:9
106:23,25
107:21 119:7
125:16 128:4
129:16,17
132:1 136:25
143:13

**salary**
15:17 20:25

**same**
10:18 20:25
29:6 40:9 44:9
45:5 74:24
86:23,24
104:17 123:3

Taylor, Roy                    May 01, 2018                    Page 185

126:4 128:17
137:14

**Sandusky**
118:15

**Sapphire**
27:19,23 28:3,
12,20

**sat**
129:19

**saw**
52:17 66:3
67:14 87:5
114:4

**say**
8:25 48:2
60:13 71:11
72:8 75:19,21
82:1 86:19
87:12 89:12
104:16 119:6
125:21 132:10
135:23 137:3
139:5 147:20
150:5

**saying**
64:8 72:18
76:9 82:11
144:14

**says**
37:7 38:14
53:11 54:19
62:24 80:23
84:3 86:25
109:21 110:4
111:2 113:9
139:4

**scene**

35:2 46:12
77:1,25 86:8
88:22 115:3
129:14 130:21,
25 132:12
133:18 134:7
142:13,21
144:17 149:17

**schedule**
12:13 20:10

**schizoaffective**
131:25

**school**
23:8 63:18

**schools**
23:9

**scored**
137:18

**screaming**
87:16

**screen**
10:22 65:12

**seasoned**
48:15

**seat**
147:9,13

**seatbelt**
65:16

**seated**
149:16,18

**second**
7:4 66:6 79:7
82:3,23 83:5
92:10 130:24
145:14

**secondary**
8:17 12:19
133:1

**secondhand**
31:11

**seconds**
69:9,12 83:24
95:15,17,20,25
96:1,2,19
97:15

**secret**
19:25

**secretary**
41:7

**secrete**
64:15

**secreted**
63:25

**section**
5:4 7:1 8:1
29:25 51:23
62:21 113:9

**sections**
20:12 23:7
69:10

**secure**
16:5

**secured**
19:23 110:22

**security**
4:17 8:23
10:14,15 15:6,
14,20,21,23
16:20 17:2,19
19:5 20:22,23
21:12,18,19,21

22:2 27:21,24
28:1,4,8 63:22
64:10 73:8

**seek**
36:12

**seen**
30:21,24 41:19
88:25 102:6
112:12,15
123:2

**sell**
16:17

**seniority**
48:14

**seniors**
63:18

**sense**
81:12

**sensitive**
109:2,5

**sent**
11:10

**sentence**
62:24 80:17
85:3,5 86:24
87:17 103:13
105:24 110:13
112:1,23

**separate**
16:21 20:7,18
25:21 29:8
51:19 82:10

**separately**
53:6

**separation**

27:16

**September**
27:8

**serious**
65:24 92:1
136:1

**serve**
25:19

**served**
20:15 88:2

**service**
8:14 15:22

**services**
4:19 8:22
15:19 17:21
19:5,20 22:20
23:4,10 24:14
31:7 52:4 63:1
73:13

**session**
46:25

**set**
87:1

**seven**
6:20 62:18
85:24 134:9,
10,20

**several**
22:10,17 25:24
39:19 42:20,21
61:9,23 68:12
69:3 87:18
119:8 133:25

**severe**
55:13 136:13

Taylor, Roy                    May 01, 2018                    Page 186

**severity**
126:22,24

**shackled**
94:4 130:3

**shackles**
90:12,13,25
115:25

**shadow**
47:17,19 48:22
146:4

**sharing**
102:22

**shear**
128:25

**sheriff's**
23:20 56:24,25
68:2

**shifts**
12:13

**shock**
105:19

**shocked**
66:8

**shocking**
57:24 140:18

**shooting**
67:10 71:3

**shop**
23:9

**shoplifting**
65:10

**shopping**
22:17

**shorten**

62:9

**shot**
13:13 63:15
67:15 68:14,
17,19 72:19
95:21

**should**
33:3,4 40:4
51:6,10 76:25
91:24 105:5
111:2 112:24
114:19 115:10,
11 131:10,14,
17 132:25
133:11 142:15
143:7 144:5,18
145:12,13
146:6 147:17,
19 149:7,12,15
150:3

**shouldn't**
131:7 133:7

**show**
59:8

**showed**
51:2 59:10
61:14

**shown**
106:21 136:25

**shows**
47:21

**shuffle**
90:17

**shut**
64:2

**side**

11:11 68:9
88:12 127:3
129:20 149:22

**signal**
15:5,19 16:10,
20,24 17:2
21:12 75:22
76:5,10

**signals**
75:25

**signature**
150:17

**significance**
56:19 57:6
94:14

**significant**
73:22

**silent**
139:6

**similar**
23:14 27:24
36:9 44:3
100:9 101:11
102:6,24

**Simmons**
65:20,21,23
66:1,3,12

**Simmons'**
66:11

**simply**
66:11 119:1

**simultaneously**
66:7

**since**
7:10 8:9 13:5

14:19 15:8
17:15 18:16
23:23 24:24
32:6 39:18
42:3 57:3
100:4 125:3
138:12

**single**
4:22 41:12
47:21 50:16

**sir**
4:6,14,15,18,
23 5:7,11,16,
17,20 6:2,11,
25 7:5,6,8,20
8:2,5,8 9:2,4,
11,13,19 12:3,
4,12 13:9,19
14:9,11,14,20,
25 15:7,9 16:9,
11,12 17:3,5,
11,14,16 18:4,
6,12,15,17,21,
24 19:12,15,18
20:17 21:7,11,
18 22:2,23,25
23:2,3 24:2,16
25:11,13,20
27:4,10,14
28:7,13 29:13,
21,24 30:5,16
31:4,9,13,17,
21,22 32:1,3,
12,24 33:1,15
37:10 38:1,16
39:24 40:14,21
42:12,15
43:11,14,20
44:5,9,14,15,
18,23 45:8

46:3,8 47:7
48:20 49:8,11,
16,22 50:3
52:7,13,15,22
53:1,17 54:14,
16,18,21,23
55:8,16 56:18,
19,22 57:8,13,
14,18,20,21
58:17,20,21,24
59:3,5,6 60:7,
9,10,16,24
61:2,5 62:2,5,
19,23 63:3,7,
13,14 64:25
65:6,9,22
66:18 67:19,23
68:4,22 69:21,
24 70:4,5
72:15,23 74:3,
6,11,15 75:8,
17,18 76:8,11,
17,20 78:19
80:16,22
81:13,20,24
82:24 83:13
84:9,12,17,18
85:7,11 86:17
87:22 88:23
89:5 90:6 91:4,
8,12,15 94:6,
11 95:6,11,14
96:5,21 97:5,8,
11,20 98:10,
12,15,19 99:16
100:13,24
101:13,18
102:10,14,23
103:2,6 104:7,
8 105:10,11,
15,23 106:6,8

Taylor, Roy                    May 01, 2018                    Page 187

108:3,10,16,24
109:3,6,14,21,
23 110:3
111:10,23
112:6,17
113:1,5,8,12,
15,24 115:14,
23 116:4,12,14
117:1,24
118:10 119:10,
15,22 120:8,
13,15 121:11,
23 122:9
124:3,22 125:7
129:5,6 148:16
149:11 150:5,
7,13

**sirens**
45:15 46:13

**sit**
32:20 88:13
108:2

**sites**
22:15

**sitting**
70:11

**situation**
25:5 34:22
47:23 48:13
51:13,16 54:10
66:21 68:4
71:10 75:24
111:9 124:10
128:22 136:15
144:9 145:16,
23 146:19
150:1,6

**situations**

23:25 34:4,19
35:3 123:25
137:22 140:8

**six**
12:9 62:18
129:15

**sixth**
148:21

**size**
25:14 126:4
128:14,17

**sizes**
125:25

**skills**
61:16,23 62:15

**slide**
111:21

**slides**
106:11 111:18
112:9 136:24

**small**
39:1 70:12

**sniper**
64:19

**sold**
9:7 15:13
28:15

**soldiers**
41:14

**solo**
47:19

**somebody**
48:7 78:6
84:20 88:16
110:22 129:16,

18 136:17
148:1

**someone**
52:18 64:15
111:10 116:23
136:5

**someone's**
143:21

**something**
33:3 41:2 55:2
63:20 64:17
75:21 99:6,7
140:6

**sometimes**
6:6 50:11
63:10 127:10

**somewhat**
71:21 88:7

**son**
13:13,23,25
26:2,5

**soon**
144:17 146:18

**SOP**
145:5

**sorry**
13:17 57:19
59:4 60:20
70:6 74:7 93:2,
24 110:17
139:21

**sort**
4:21 18:25
32:11 62:4

**sounded**
46:19

**source**
100:25 101:16
107:17 112:12,
13 123:2
131:15

**sources**
106:14

**South**
142:2

**Southern**
20:25

**speak**
138:14

**speaks**
138:22

**special**
17:13,17,23
18:14 19:8
21:22 22:4,9
27:24,25 38:9
40:7,12 44:1,
11 45:6 116:4

**specific**
42:13 106:22
133:3

**specifically**
35:16,24 38:25
43:17 49:6
100:19 102:10
109:8,20
120:22 121:1
128:4 132:3,17
139:3,5 142:7
145:6

**specifics**
38:16 111:15

**speculation**
83:25

**spells**
49:6

**spend**
14:16

**spinal**
73:20

**spine**
148:2

**split**
79:20

**spoke**
92:11

**spray**
37:21,24

**spread**
58:5 81:1 82:6

**square**
8:20

**St**
7:23

**stairs**
70:15

**stalemate**
125:22

**stand**
78:3

**standard**
95:15 98:13
99:22 104:11
107:13 108:15
109:24 110:11
138:16,20,25

143:20 145:2, 19 146:13

**standards** 11:7,12,14 44:3 76:20 101:14,21 103:1,4 116:5

**standing** 66:4 68:6 88:20

**start** 60:12 124:21

**started** 58:4 64:5 69:7 73:2 92:16 107:6

**starting** 107:11

**starts** 47:13

**state** 4:5 10:1,2,5,13 11:6,18,21 13:8 17:6 23:3 24:21 42:18 43:3,25 61:11 65:22 68:20 94:23 100:3,5 101:4,6,8 102:2,3,7,8 104:16 127:13, 15 149:14

**state-certified** 12:8

**stated** 43:21 95:18 135:5

**statement** 102:12 106:25 135:8

**statements** 26:7

**states** 103:16 104:4, 10,17 146:17

**station** 72:25

**stationed** 7:16

**statistically** 52:1

**status** 31:5

**statutes** 43:4

**stay** 26:10

**steal** 24:4

**step** 141:2

**steps** 136:14

**stick** 86:12

**still** 13:1,3 31:7 32:14 57:8 59:8 66:2 74:16,19,20,24 84:15 85:8,14 86:22 87:4,8,

14 89:22 94:18 124:25 125:6 135:13

**stomach** 125:18

**stood** 70:14

**stop** 83:3

**stopped** 113:14

**strangled** 65:15

**strapped** 114:23

**street** 48:4

**strength** 72:3 98:17 127:6,9,25 128:3,9

**stressful** 118:5

**strike** 58:22 81:8 114:5,6 117:4, 5 133:6 137:6

**striking** 89:2 114:19 128:24

**stringent** 11:5,19

**strong** 127:9 128:13

**strong-arm** 73:19

**struck** 55:25 93:18

**struggling** 136:16

**students** 59:24 123:9

**studied** 136:4

**studies** 122:10,15,18 123:2 136:2,11

**study** 122:15 123:5 136:9

**stumble** 35:8

**stun** 82:19 83:18 89:24 91:5 96:12 98:5

**stunned** 57:10

**stuns** 57:23 83:2,5 87:19 96:1

**style** 29:19,23

**styled** 69:14

**subdivision** 101:20

**subgroup**

109:7

**subject** 26:21 38:13, 17,19,23 44:3 59:14 89:16 105:6 110:1 116:7 124:1 135:6

**subjected** 122:21 148:17 149:1

**subjective** 128:5

**subjects** 123:6

**submitted** 11:21

**subordinate** 44:10

**subsequent** 82:7 83:5 85:5 95:25 149:7

**substance** 68:23

**succumb** 127:12

**such** 43:18 127:15 140:5

**sudden** 137:2

**suffered** 73:20 121:19

**suffering** 33:21 131:19

132:1

**suggest**
75:13 88:25
93:4 109:25
110:24 113:17
115:10 116:1
126:21 150:3

**suggested**
46:25 77:4
120:9

**suggesting**
71:7

**suggestion**
58:9 114:4

**suggests**
57:9 112:1
117:9,22

**suing**
64:8

**suit**
69:25

**summaries**
123:7

**summary**
122:17 136:10

**summer**
8:17

**summoned**
114:21

**sundial**
55:6,10 78:6

**superhuman**
128:3

**superior**

36:20

**supervise**
142:7

**supervision**
33:15 47:8
74:25 143:4
146:10

**supervisor**
24:23 49:1
51:21 54:1
140:24,25
142:25

**supervisors**
53:23

**supervisory**
140:25

**supine**
149:23

**supplemental**
32:10 33:3

**supply**
37:8

**support**
23:10 24:14
45:20

**supported**
10:17 26:1

**Supreme**
100:11 104:18

**surface**
53:22

**surgically**
59:10

**surprising**

144:16

**susceptibility**
138:7

**susceptible**
137:9

**suspect**
94:8 109:16
110:25 111:16,
21 112:25
113:3 114:18
117:10,11

**suspects**
112:16

**SWAT**
47:12

**Sweetwater**
30:3

**sworn**
13:3 21:16,25
22:6 26:10

---

**T**

**tab**
37:5

**take**
10:21 11:16,17
29:3 41:3
44:11 45:23
71:13 80:8
103:17 115:2,
12 146:1

**taken**
24:25 131:15
133:8 140:16

**taking**

70:20 128:16

**talents**
129:3

**talk**
106:14

**talked**
31:19

**talking**
17:1 48:9
54:25 55:1
70:15 77:10
98:12 101:15
106:13 110:14
112:14

**talks**
33:22 102:25
112:23

**Tallahassee**
64:23 142:4

**Talley**
65:7

**tangled**
79:7

**tapes**
143:17

**tapped**
129:16,18

**target**
67:4

**Tase**
139:13

**Tased**
148:21

**Taser**

50:10 51:2,9
52:7 53:2
57:11 58:16
61:4,13 62:12
65:25 66:1,5,
13,15,19 69:20
70:19,22,23,
24,25 71:7,11,
12 78:22 79:1,
3,10,20 80:18,
24 81:1,4,16,
22 82:4,23
83:14,23 89:8,
24 91:6,9 94:4
95:5,13,16,21
96:2,18 97:2,
25 105:4,6,13,
22 106:2,9,18,
20 107:16
108:5,9,21
110:3,5,10,21,
23,25 111:10,
14,18,21
112:3,24 116:7
117:10,18,22
118:2 119:2,12
120:1,7,18
121:13,25
122:13,21,24
123:8,16,21
124:7 136:3,5,
9,19,21
137:10,14
138:2,6,12,22
148:18 149:2

**Tasered**
66:5

**Tasering**
69:8,12

Taylor, Roy                    May 01, 2018                    Page 190

**Taserings**
95:25

**tasers**
37:23 112:16
140:12

**Tasing**
139:1,6

**Tasings**
148:23

**Tasmanian**
85:18 128:4,6

**taught**
45:10 103:12
104:2,10
112:11

**tax**
10:17

**Taylor**
4:7,9,24 6:19
14:25 74:7
92:21 93:17
103:24 110:17
120:2 129:2,11
131:7 148:7,13
150:2

**teach**
17:25

**teaching**
37:12

**team**
39:5 47:12

**technician**
118:13

**techniques**
34:11 46:6

**teenagers**
64:3

**telephone**
55:17 75:11
144:2

**telling**
104:3

**ten**
15:24

**tend**
130:11

**Tennessee**
7:13 104:19

**terminate**
25:1

**terminated**
26:2 70:1

**termination**
25:2 67:23
69:25

**terminology**
47:20 132:3

**terms**
35:12,19 42:14
57:15 58:22
83:13 89:23
95:11 96:5
97:5 102:14
103:3 119:4
128:9

**test**
62:16

**tested**
136:3

**testified**

58:7 65:20
67:17 68:21
69:19 71:6
72:14,21 73:7
74:1 83:17
105:16 134:23
138:1 141:6,
10,17 142:6

**testifies**
59:14

**testify**
29:16 66:15
78:12 120:4

**testifying**
58:15 97:24
119:1 120:25

**testimony**
16:9 30:7,19
31:16 58:9
68:24 71:17
83:16 85:12
89:11 94:2
97:12,17
118:1,23
119:22 121:11
125:16 126:13
130:12 132:16
142:9 149:10

**than**
7:18 9:4 11:3
12:1 14:15
17:23 18:19
20:16 23:25
25:19 26:10
27:6,12 28:23
30:12 36:5,20
41:17,25 46:21
47:3 49:25
51:9 52:8,10,

17,20 53:2,25
55:13 61:10
83:21 84:24
95:15,24
106:2,18 107:1
108:5 112:3
128:7 139:5
142:18

**their**
8:22 14:1 16:7
20:22 24:15
26:12 33:12
43:12 47:19
48:3 64:5 65:1,
2 75:22 77:23
78:1,3 96:11,
14 97:13
104:17 106:11,
21 107:6,7,13
111:15 114:21
115:15,19
123:4 127:9
132:9,16 138:1
140:11 146:4,5
147:4,18

**themselves**
64:15 84:22
111:5 116:10

**thereby**
81:1

**therefore**
131:13 132:10
137:9,19 140:9
144:21

**thin**
109:10

**thing**
7:10 51:8 90:2

140:17 149:5

**things**
9:23 11:22
39:4 45:16
48:10 52:1
94:25 109:13
123:10 148:5
150:2

**thinner**
126:5

**third**
50:24 51:1
98:13

**Thomas**
67:7

**thought**
5:13 26:23,24
72:24 92:23
93:8 142:14
146:5,9

**thrash**
97:18

**thrashing**
80:13 84:14,23
85:13 86:14
87:14 97:24
114:9,18
116:24

**threatening**
113:10,18

**three**
16:3 19:24
20:7 22:11
25:12,17 51:9,
12 52:8,10,17,
20 53:3,11,12
65:19 88:9,19,

Taylor, Roy                    May 01, 2018                    Page 191

21 106:2,18
107:1 108:5
112:3

**three-inch**
127:1

**three-year**
50:24

**threw**
69:2

**through**
4:20 9:25 10:2
14:21,23 15:17
21:4 42:3,5
45:14 50:21,22
60:2 61:7,14
62:7 84:2
94:20 104:12
107:7 126:11
134:2 139:19,
20,21 140:2

**throughout**
59:1 100:7
103:16 104:4,
10 122:8

**throwing**
48:10 77:9

**time**
6:8,10 7:14
12:11 17:9
18:4,5 20:20
22:7,12,16
27:12 29:17
30:17 32:7
40:3,15 42:8
45:17,22 51:9
53:1 71:23
72:19 73:22
79:14 82:9

84:19 96:11,12
97:9,13,15
99:12 108:9
113:13 114:25
117:17 118:25
125:14 128:16
134:1,4 137:5
140:17 150:12

**timeline**
131:6

**times**
15:25 16:3
29:15 39:11
50:11 53:3
57:10 62:18
69:3 83:14
89:8,24 90:2,5
95:8,10 111:20

**tired**
68:13 69:6

**tissue**
59:11

**title**
18:20 19:2
99:4

**today**
21:6 50:2
108:3,13,17
141:12

**together**
58:1 81:5
82:13

**told**
14:24 24:6,8
30:21 46:17
78:3 105:19
148:13 149:6

**took**
7:24 13:5
68:11 103:10
106:10 129:17

**top**
4:16 19:25
70:15 103:25
127:2

**top-secret**
19:24

**tortured**
69:8

**total**
85:24 95:9
129:21

**totally**
133:14

**touched**
79:8

**toward**
80:12

**TRADOC**
41:4

**traffic**
20:2 23:12
143:14,18

**trafficking**
26:5

**tragic**
140:8

**trained**
144:5

**trainee**
48:3,22

**trainer**
49:1

**trainers**
7:22 99:12,13
104:15

**training**
7:21 8:1 11:7,
11 13:10 18:1
33:11,14 37:12
39:13,14 41:5,
23 42:4,7,11,
13,16,19 43:2,
22 44:4,19,21,
22 45:24 46:1,
25 47:11,14,
18,20 48:2,18,
23 49:1 51:15,
23 52:2 60:3,4
61:11,12 62:9
74:25 77:23
78:1 99:23,24
100:1 101:14,
21 102:1
106:9,11,21
110:4,10,23
111:15 112:10
118:10 126:12
136:20 137:10,
14 138:2
139:25 146:4,6

**transaction**
72:24

**transcript**
150:10,20

**transport**
115:17

**traveling**
104:24

**treat**
130:22

**treated**
92:3

**treating**
41:15 115:6

**treatment**
23:7 147:22

**tree**
48:9 77:10

**trees**
55:1

**trends**
52:2,3

**trial**
65:20

**tried**
72:16 79:20

**trigger**
82:10 90:4
95:16,19 96:18

**trouble**
22:19

**truck**
130:21,25

**true**
52:19 54:15
55:24 56:8
86:16 94:5
96:20,24 97:19
100:23 104:4

**try**
45:16 52:24
80:12 128:23

Taylor, Roy                    May 01, 2018                    Page 192

**trying**
40:4 92:25
115:2 116:10
117:4,5,6,11,
17 128:24

**Tucker**
59:12,23
141:24 142:1

**Tucker's**
141:23

**tumultuous**
26:11,14

**turn**
45:15 93:20

**turnover**
25:24

**twelve**
6:5 22:6

**twelve-hour**
12:13

**twice**
83:20 95:7

**two**
22:3 23:8,19
27:6 29:8
33:13 40:11
42:22 48:15
55:19 61:10
62:6,10 83:1
106:14 118:14
125:4 145:6,8,
15,16 146:3
148:9

**two-hour**
44:20 45:9

**type**
20:4,9,13
23:14 30:24
34:12 45:19
51:1 52:4
75:24 84:19
94:25 109:13
118:25 122:7
140:8 144:4,11

**types**
45:11

**typical**
20:5,13 23:11,
13

**Tyson**
46:7,17 54:20
55:25 57:10,17
59:1 75:6
76:11 77:6,19
78:5,15 79:23
80:2,19 81:23
83:2,9,15
84:14 85:13
86:14 87:9
88:4 89:1,9,25
91:1,10,16,19
93:18,20 94:3,
16 95:4,5,8,22
96:7,13 97:7,
17 105:13
109:4 113:6,
11,14,16,25
114:5 115:2,
11,12,22
116:20 117:17,
23 119:24
120:10,17,21
121:1 124:1,4,
10,16 125:9,
13,19 126:1,2

127:4,15
128:1,10
129:12,24
130:5,10,11
131:3,19,25
132:6 133:10
134:4,11,16,19
135:1,9,24
147:10,14,20
148:15,17
149:1

**Tyson's**
59:9 76:15
79:5 80:12,25
81:5,18 82:18
83:6 84:4
86:19 87:2,12,
19 90:10 97:25
98:8 102:16
119:13 121:13
129:21 131:7,
15 132:13
133:7 135:12
149:8,13

——————

**U**

——————

**U.S.**
100:11 112:19

**unarmed**
17:25 21:20,21
22:3

**unattended**
65:13

**unclear**
93:4

**uncomfortable**
142:21

**uncooperative**
71:23

**under**
5:3,21 7:7,25
60:1 105:3
106:3 115:15

**undergoing**
91:10,20 92:3
93:21 94:16,19
127:5

**undergone**
62:17 138:2

**underneath**
98:4

**understand**
16:8 71:15
82:8,11 93:23
95:1 115:9
133:13 145:10

**understanding**
46:20 87:3,6
90:9 108:8
130:8 131:5

**unduly**
6:18

**unfortunately**
35:15 63:15
68:9 72:2
109:6

**unfurl**
79:1

**unincorporated**
8:19

**unit**
7:13

**United**
103:16 104:4,
10

**units**
135:5

**universe**
120:16

**unless**
7:20 36:12
40:17 75:25
106:3,18 108:6
112:4 116:8

**unlocked**
134:1

**unreasonable**
89:20 91:7,10
100:22

**unresponsive**
130:7,11 131:4

**until**
9:6 16:12 18:6,
8 19:10 28:15,
18 48:25 75:3
77:1 78:3 83:9
93:13 126:14
130:6,9 146:8
147:22

**unusual**
50:18 54:20,23
55:2,14 64:16
142:15 143:14

**unusually**
109:10

**unwarranted**
53:8

**upheaval**
25:23

**upheld**
25:2

**upright**
146:18 147:10, 14

**upset**
70:16

**urgency**
77:4

**urine**
69:2

**usage**
57:15 81:16, 22,24 82:1,12, 23 95:13 108:21 109:1 122:21 123:16

**use**
34:3,11,12 35:20,22 36:20 45:17 46:5 50:21 52:7 57:3 58:16 69:19 71:7,11 72:8 75:25 76:5 80:18 84:19 85:9 94:4 99:2,8 103:4 107:5 108:22 109:16, 24,25 110:9, 21,25 111:3, 10,18,20 113:6 115:17 116:6 117:9,22 119:12 120:4,

18 121:13,18 122:6,7,11 123:24 136:20 138:22 140:11 143:21 144:1 148:17 149:1

**use-of-force**
36:1,3,6 41:13 49:9 50:16 52:6,14 53:19 59:15 60:4 98:20 99:23 100:4 101:4 104:11 116:3 139:18 140:2

**used**
16:9 25:6 34:2 50:10 51:2,9 52:16,20 53:20 66:21 74:24 89:3,24 91:23 106:2,18 108:5 112:3,16,24 113:3 121:25 132:3 142:15

**uses**
41:11 58:10 87:21 91:9 104:21 114:14 118:3

**using**
39:15 58:4 66:18 71:19 98:5 100:5 114:1 117:6

**usually**
21:14

**utility**

70:12

**utilization**
58:20

**utilized**
34:25

———————

**V**

**V-A-N-N-O-R-M-A-N**
45:3

**Valley**
27:19,23 28:12,20

**vandalism**
16:6

**Vannorman**
45:3,10 47:1

**variety**
22:10

**Vegas**
72:12

**vehicle**
65:15 68:9 109:12 131:2

**verbal**
48:12

**verify**
11:10

**version**
90:14 106:9 107:23 112:10 136:25

**versus**
30:2 63:12

65:20 67:7,20 68:1,20 69:22 71:16 72:12,20 73:5 100:10 104:19 142:25 143:23 144:2

**vice**
19:2,5 28:8,9

**victim**
67:11,14

**video**
69:9,10,12

**violated**
102:16 145:1

**violation**
71:21 116:2,17

**violations**
102:13

**violent**
65:10 113:9, 10,18 114:1

**Virginia**
20:25

**volunteer**
118:16

———————

**W**

**wait**
64:4 71:10 76:21 77:18 145:11,14 146:8

**waited**
76:25 77:22 78:14,24 93:13

**waiting**
68:13 70:25

**waive**
150:17,18

**Wake**
23:19

**walk**
64:18 90:16

**walking**
77:8

**want**
7:1,20 8:16 51:18 77:8 81:8 82:21 92:22 102:20 103:19 120:4 123:9 137:3 142:5 144:6 150:16,20

**wanted**
61:15 149:5

**warn**
66:22

**warning**
66:19,23

**warranted**
34:21 51:16

**way**
13:2 16:7 46:14,22 49:24 78:23 79:2 85:25 98:22 101:12 107:23 114:1 121:4, 10,12 148:25 150:5

Taylor, Roy                    May 01, 2018                    Page 194

**weapon**
34:12 37:23
60:1 71:5
117:7

**weapons**
37:18 38:2
107:8 116:4

**week**
22:14 69:4
146:3

**weight**
88:7,17 126:6

**well-respected**
59:17

**went**
24:5 61:13
65:14 69:7
86:25 126:11
129:15,19
131:24 135:4

**whatever**
140:24

**whether**
46:5,11 50:21
57:15 58:22,25
93:20 96:6
102:15 108:24
109:14 121:12
122:18 139:12
144:25

**while**
43:8 65:13
105:3,6,13,19
117:18 129:24
133:9,10
135:13 147:21

**white**
76:12

**whole**
20:13 30:8

**widening**
114:12

**will**
6:7 16:4 52:2
74:11 86:8
92:24 98:17
129:4 132:18
146:17

**willing**
78:12

**winning**
125:9,23

**wire**
79:3,6

**wires**
66:8 79:1

**within**
5:12 77:25
133:21 145:19
146:22

**without**
33:2 35:15
46:18 87:5
88:14 111:19

**witness**
13:23 14:9
28:23 29:12
33:19 36:23
43:11 46:15
47:3 53:5,22
54:7,25 55:8,
16 56:3,10

58:13,15 59:13
60:6,20 62:25
76:25 77:21
78:8,18 80:6
81:7 83:8 85:7,
16 87:11 89:5
91:22 92:11
93:5,7,11,23
94:11,18 97:1
98:3 103:6
108:8 109:19
110:3,15 111:2
114:4,8 115:5,
14 116:23
118:12 119:15
120:12,21
121:17 122:23
123:4 124:7,
12,18 125:2,12
126:20 127:8,
19 132:15
135:16 136:8
140:14 143:6
150:14,18

**witnesses**
58:10 85:12
86:8,19

**women**
109:10

**wooden**
64:15

**woods**
63:25 64:18

**word**
60:21 85:3
111:3

**words**
96:14 117:21

129:8,19

**work**
12:10,12 13:5
32:17 73:23
141:24 142:2
149:25

**worked**
13:5

**works**
62:12 66:14

**worried**
26:25

**worry**
149:19

**worthy**
56:6

**wounds**
126:20

**wrapped**
79:3

**wrestled**
67:12

**writing**
49:24

**written**
7:17 10:21
11:16 49:3
61:17 76:2
99:1 107:25
137:17

**wrong**
24:20,24 71:12

**wrongful**
67:23 69:25

**wrongfully**
67:25

**wrote**
72:7 79:14

---

**X**

**Xavier**
55:21 56:15,22
75:12

---

**Y**

**yanked**
72:2

**year**
9:7 19:11
20:16 22:24
27:5 42:18
43:5 46:2
49:13 60:3
62:20 73:14

**years**
8:13 9:1 26:13
27:6 42:22
62:6,25 63:5
118:13,14,16

**yelling**
87:15

**yesterday**
6:13

**yet**
46:2 66:12

**young**
63:15 71:20
109:9

Taylor, Roy                    May 01, 2018                    Page 195

**yours**
  33:6

**yourself**
  8:16 9:24
  19:13

---

### Z

**zip**
  90:23