```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF FLORIDA

 3                 CASE NO.: 0:16-CV-62215-WPD

 4    JEAN SUAREZ, individually and as

 5    Personal Representative of the Estate of

 6    Daniel Tyson, deceased,

 7              Plaintiff,

 8    v.

 9    CITY OF HOLLYWOOD, a Florida municipal

10    corporation and TASER INTERNATIONAL, INC.,

11              Defendants.

12    _____/

13              DEPOSITION OF MARK J. SHUMAN, M.D.

14              TAKEN ON BEHALF OF DEFENDANT

15                   MAY 2, 2018

16                4:02 p.m. - 5:24 p.m.

17

18              GOLDBETTER

19              1031 IVES DAIRY ROAD

20              BUILDING H, SUITE 228

21              NORTH MIAMI, FLORIDA 33179

22

23    REPORTED BY:

24    GABRIELA GONZALEZ, COURT REPORTER

25    NOTARY PUBLIC, STATE OF FLORIDA
```

Mark Shuman                    May 02, 2018                    Page 2

```
 1                    INDEX TO APPEARANCES

 2

 3    ON BEHALF OF PLAINTIFF:

 4              DENISE H. GEORGES, ESQ.

 5               COLSON, HICKS, EIDSON

 6              255 ALHAMBRA CIRCLE, PENTHOUSE

 7               CORAL GABLES, FLORIDA 33134

 8

 9    ON BEHALF OF DEFENDANT, CITY OF HOLLYWOOD:

10              DANIEL L. ABBOTT, ESQ.

11               ADAM M. HAPNER, ESQ.

12               200 EAST LAS OLAS BOULEVARD

13              SUITE 1900

14              FORT LAUDERDALE, FLORIDA 33301

15

16

17

18

19

20

21

22

23

24

25
```

Mark Shuman                May 02, 2018                Page 3

```
1                  INDEX TO EXAMINATIONS

2

3    DIRECT EXAMINATION

4                                              Page

5    By DANIEL ABBOTT, ESQ.                      5

6

7    CROSS EXAMINATION

8    By DENISE GEORGES, ESQ.                     48

9

10   RE-DIRECT EXAMINATION

11   By DANIEL ABBOTT, ESQ.                      60

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Mark Shuman               May 02, 2018                Page 4

```
 1                    INDEX TO EXHIBITS

 2      NUMBER              DESCRIPTION            PAGE

 3   DEFENDANT'S EXHIBITS

 4       1          DOCUMENTS ENTERED INTO THE RECORD    10

 5   PLAINTIFF'S EXHIBITS

 6       1          DOCUMENT ENTERED INTO THE RECORD     49

 7       2          FIRE RESCUE REPORT                   50

 8       3          PHOTOGRAPH                           58

 9       4          PHOTOGRAPH                           59

10       5          PHOTOGRAPH                           59

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    DEPOSITION OF MARK J. SHUMAN, M.D.

2                    MAY 2, 2018

3              MARK J. SHUMAN, M.D.,

4      having first been duly sworn, testified as

5    follows:

6      COURT REPORTER:  We are here today in the matter

7    of Jean Suarez vs. City of Hollywood.  The case number

8    is 0:16-CV-62215-WPD.  My name is Gabriela Gonzalez, I

9    am the court reporter present.  Today's date is

10   May 2, 2018.  The time is approximately 4:03 p.m.  This

11   deposition is being held at Goldbetter, located at 1031

12   Ives Dairy Road, Building 4, North Miami, Florida

13   33179.  Would all attorneys present please identify

14   themselves, their firm, anybody with them and the party

15   they represent starting with the party noticing this

16   proceeding?

17     MR. ABBOTT:  My name is Dan Abbott.  I am here

18   with Adam Hapner.  We are attorneys with a law firm

19   called Weiss, Serota and Helfman.  And we represent the

20   Defendant, City of Hollywood.

21     MS. GEORGES:  And Denise Georges on behalf of the

22   Plaintiff, Jean Suarez.

23                  DIRECT EXAMINATION

24     BY DANIEL ABBOTT, ESQ.:

25     Q   (MR. ABBOTT)  Would you please state your name

```
 1    for the record sir?

 2         A   Mark Shuman, S-H-U-M-A-N.

 3         Q   You are a medical doctor sir?

 4         A   Yes.

 5         Q   I should call you Dr. Shuman for the

 6    deposition?

 7         A   That would be appropriate.

 8         Q   Okay.  Doctor, what did you do to prepare

 9    yourself for this deposition, if any?

10         A   I just looked over my report.

11         Q   You didn't do any additional research in

12    preparation for the deposition?

13         A   I'd say yes and no.  I mean I didn't do

14    anything specific in conversations with Ms. Georges

15    here.  She mentioned some things that had been said

16    about the restraint and studies.  So I did look up to

17    see if I could find what it was that she was talking

18    about and you know, found a few, but you know I just

19    kind of perused them just to see what was out there, if

20    anything was new.

21         Q   Okay.  Well, before I ask you the details of

22    that --

23         A   Yes.

24         Q   Let me ask you this.  Do you have any opinions

25    for the purposes of this case that are not contained in
```

```
 1   your report?
 2        A   No.
 3        Q   Do you remember the particular areas that you
 4   were informed that there has been some testimony about
 5   and that you did some supplemental research about?
 6        A   It was issues with the -- with restraint
 7   asphyxia and that I believe that she said that the
 8   court is saying that somebody they've you know gone as
 9   high as two hundred and fifty pounds on people's back
10   without affect.  I couldn't find anything that heavy.
11   So --
12        Q   Okay.  Other than that conversation you had
13   with Ms. Georges and the research that you did, had you
14   done anything else in this case since you authored your
15   report of March 8, 2018?
16        A   No.
17        Q   I'm going to spend most of my time talking
18   about that report.  Do you have a copy of it in front
19   of you?
20        A   I do.
21        Q   The first page of the report recites the
22   materials that you have reviewed?
23        A   Yes.
24        Q   And have you reviewed any additional materials
25   other than those listed on page one?
```

```
 1      A  No.

 2      Q  Page two begins with the heading called

 3  "Summary of Circumstances."

 4      A  Yes.

 5      Q  And is the material that formed the basis of

 6  the Summary of Circumstances, is that what you derived

 7  from the materials that are described on page one?

 8      A  Yes.

 9      Q  And have you assumed these circumstances to be

10  true for purposes of rendering your opinions in this

11  case?

12      A  Yes.

13      Q  I think the Summary of Circumstances largely

14  speak for themselves.  I just want to make brief note,

15  the second full paragraph --

16      A  Yes.

17      Q  -- near the bottom, suggests that there were

18  taser marks in Mr. Tyson's upper back.  I think in --

19  elsewhere in the report, there's reference to

20  Mr. Tyson's lower back.  Do you have any thoughts about

21  that subject?

22      A  Well, it was either an error by me or an error

23  by them.  So I can -- I got to go through my notes and

24  see if I could see where it was that they -- let's see.

25      MS. GEORGES:  And Dr. Shuman, if it assists you
```

1    with your testimony here today, I've not only brought

2    the autopsy photographs, but I also have the autopsy

3    report in its entirety.

4         THE WITNESS:  Okay.  I was looking to see through

5    my notes if I have the -- in the EMS --

6         MS. GEORGES:  And in addition, I do have the fire

7    rescue report.

8         THE WITNESS:  The Fire Action Report would help.

9         MS. GEORGES:  Dan, I have an additional copy if

10   you need.

11        MR. ABBOTT:  You're very kind, but that's okay.

12   I'm not sure it's the most important thing in the

13   world.  I just want to make sure we're on the same

14   page.

15        THE WITNESS:  The exhibit -- the EMS report on the

16   objective back states two barbs on the upper back from

17   PD taser.

18        Q  (MR. ABBOTT)  Okay.  And without going through

19   all -- all of the reports, is it -- has it been your

20   thought that the taser probed in Mr. Tyson were in fact

21   in his upper back?

22        MS. GEORGES:  Form.

23        THE WITNESS:  I think they were in the lower back.

24        Q  (MR. ABBOTT)  Lower back.

25        A  Yes.

Mark Shuman                    May 02, 2018                    Page 10

```
 1      Q  Okay.
 2      A  I do have one to add from a previous question.
 3   I did read one more -- I read the extra report of
 4   Gary Vilke after the report -- my report was authored.
 5      Q  Okay.
 6      A  Which is written on here.  So when you get --
 7   on my notes.
 8      Q  In your notes.  What -- and thanks for
 9   reminding me Doctor, we did have a conversation briefly
10   before the deposition began.  And I think you told us
11   that you took certain notes when you reviewed the
12   materials that are listed on page one of your report?
13      A  Yes.
14      Q  And if we could mark those as Exhibit 1, we'll
15   attach those to the deposition.
16      (Thereupon, Exhibit 1 was entered into the
17   record).
18      MR. ABBOTT:  Counsel, were there other materials
19   that we were going to append in the deposition, do you
20   recall?
21      MS. GEORGES:  There is a timesheet in there.
22      MR. ABBOTT:  I don't care much about the timesheet
23   unless you do.
24      MS. GEORGES:  I don't.
25      Q  (MR. ABBOTT)  Okay.  Did you develop any
```

Verbatim Support Services

1   opinions in your review of Dr. Vilke's report you say?

2        A   No.   I mean I think the opinion and I mostly

3   agree with each other.

4        Q   That report certainly hasn't had you alter any

5   view or opinions in the case?

6        A   That's correct.

7        Q   Do you recall reading anything in Dr. Vilke's

8   report to which you disagreed?

9        A   I -- yes, there's some minor differences.   I

10  think he basically was saying there's no restraint

11  asphyxia.   I -- I'm not sure if there was or there

12  wasn't, but I think that the you know, the act of

13  active restraint was one of the stressors that led to

14  his death and I think he -- Dr. Vilke called it

15  something resistance -- exertional resistance.   And I

16  think we just had different words for what was said.

17  So he said the restraining process didn't cause -- send

18  him to cardiac arrest and death.   And he said that the

19  cause of death was excited delirium syndrome and --

20  coronary disease combined with exertional resistance.

21  And I would say exertional resistance and the actual

22  you know restraint are the same thing.

23       Q   There -- I'm sorry Doctor, I'm not following

24  what you -- when you say they are the same thing, you

25  think -- are you telling me that Dr. Vilke has drawn a

```
 1  distinction from your opinion that you don't think
 2  exists?  You think -- you're saying the same thing as
 3  he?
 4       A  I think we're saying the same thing and I think
 5  that you know, he's trying to exclude some type of --
 6  the restraint as being a cause, but he's putting this
 7  exertional resistance, but I -- so I think it's just a
 8  different way of saying that the -- that you know, the
 9  act of restraining him and him resisting against that
10  restraint you know were you know, factors in his death.
11  That's a different way of saying the same thing.
12       Q  I see.  Let me see if I can follow.  Tell me if
13  I'm wrong.
14       A  You believe, and you think that Dr. Vilke also
15  believes, that exertional resistance may have played a
16  role in Mr. Tyson's death?
17       A  That's the term that he used in his report,
18  yes.
19       Q  And you agree with that?
20       A  Yes.
21       Q  You just -- but you want to make clear that you
22  think that the restraint of Mr. Tyson was a component
23  of exertional resistance?
24       A  That's what he -- yes, he wouldn't have been
25  resisting anybody if he wasn't actually being
```

```
 1   restrained.  So I think there's like a you know, it's

 2   all the same process.

 3       Q  And just so I'm clear, is the restraint we're

 4   talking about handcuffs and leg restraints or are we

 5   talking more about physical restraint from the police

 6   officers were trying to control Mr. Tyson?

 7       A  It was -- it was more of the physical restraint

 8   you know, aspect of it than the handcuffs and the leg

 9   restraints.

10       Q  Okay.  So then -- and again, tell me if I'm

11   wrong.  You think that the police officers who were

12   struggling with Mr. Tyson on the ground constituted

13   exertional resistance that Mr. Tyson was feeling?

14       MS. GEORGES:  Form.

15       THE WITNESS:  Right.  I think he was, you know,

16   the stressor on him was he was resisting them and that

17   exertion was what -- is what Dr. Vilke's talking about.

18       Q  (MR. ABBOTT)  Okay.

19       A  Yes.

20       Q  Thank you for that.  Do you recall anything

21   else from Dr. Vilke's report that you disagreed with?

22       A  I mean I -- I think that if -- there's some

23   subtle differences.  I mean he's saying the restraint

24   process did not cause cardiac arrest, but he's using

25   this exertional resistance term which I think is part
```

1   of the restraining process.  And he also said, the

2   taser did not cause any tribute to his death and I -- I

3   agree with that as far as the electrical aspects of it,

4   not -- not causing and contributing to his death.  But

5   like I said in my report, the pain component can be a

6   stressor that can be part of this as long as the

7   temporal timing of it is right.

8       Q   Okay.

9       A   Yes.

10      Q   Thank you.  Does that then conclude the areas

11  in which you disagreed with any portion of Dr. Vilke's

12  report?

13      A   Yes.

14      Q   Returning to your report, if we can return to

15  what's listed at -- as page two.

16      A   Yes.

17      Q   And I want to talk about the first footnote.

18      A   Okay.

19      Q   I think that you say that Dr. -- that,

20  "Mr. Tyson received a total of ten taser shots in a

21  period of ten minutes.  All except one was for five

22  seconds and it was for nine seconds."  First of all,

23  did I read that correctly?

24      A   Yes.

25      Q   And Doctor, where did you obtain that

1   information from?

2      A   I recall seeing a table of the taser readout or

3   the taser readout.

4      Q   Okay.

5      A   Yes.

6      Q   And is it your understanding sir, that that

7   readout contained the number of taser discharges and

8   the duration that the device was delivering a charge?

9      A   Yes, I believe it was -- I would say the

10  information obtained from downloading the taser itself.

11  So it actually tracks every time a taser is discharged

12  and how long it was discharged for.  So it didn't say

13  the number, you have to count the number.

14     Q   Okay.  Do you know sir if those numbers that

15  you saw necessarily relate the charge that was

16  delivered to Mr. Tyson?

17     A   No.

18     Q   Do you have any opinion sir in terms of the

19  duration of the electrical charge actually delivered to

20  Mr. Tyson?

21     MS. GEORGES:  Form.

22     THE WITNESS:  No.

23     Q   (MR. ABBOTT)  Do you have -- I didn't see it in

24  your report, do you know what the distance was between

25  the two probes that were in Mr. Tyson's I think you

Mark Shuman                    May 02, 2018                    Page 16

```
 1   said lower back?
 2       A   I'd have to check my notes of the autopsy.   I
 3   mean I didn't -- I didn't record how far apart they
 4   were.   They were not that far apart so --
 5       Q   Do you have an opinion sir in terms of whether
 6   or not the distance between those probes would have
 7   allowed for neuromuscular incapacitation?
 8       A   I don't -- not independent of the actual
 9   circumstances.   I mean, you know, when you get them
10   closer together, you're you know less likely to have
11   the nerve muscular incapacitation.   And based on the
12   information from the police officers, it was not
13   incapacitating him in that way.   When a -- when the
14   shock was delivered through the probes, it was not
15   incapacitating it.
16       Q   Okay.   Do you have any opinion sir in whether
17   or not any of the subsequent uses of the device where
18   the device was I think you described it drive-stun
19   mode, whether or not those taser usages caused
20   neuromuscular incapacitation of Mr. Tyson?
21       A   Well according to the police officers, it did.
22   So it must have been in drive-stun mode with the
23   cassette still -- with the cartridge still in place to
24   allow for the distance between the probes and the point
25   of drive-stun.
```

1    Q  And is that your opinion sir for every use of

2  the device in drive-stun mode that each of those uses

3  caused neuromuscular incapacitation of Mr. Tyson?

4    A  I can't account for every single one of them.

5  I'm not sure you know, but you know, from the

6  information that was given, that was the only way they

7  got neuromuscular disruption from him.

8    Q  Okay.  Let's move forward to the top of page

9  three of your report.  You make reference to a urine

10  drug screen?

11    A  Yes.

12    Q  And it was noted as being positive for opioids,

13  amphetamine and cannabinoids?

14    A  Right.

15    Q  As well as for ethanol?

16    A  That's serum ethanol.  So the urine drug screen

17  was in urine and serum ethanol concentration was in

18  serum.

19    Q  Okay.  In the next section under post-mortem

20  examination --

21    A  Yes.

22    Q  -- there's a reference to toxicology testing?

23    A  Yes.

24    Q  And is that testing through something other

25  than urine testing?

 1      A   Yes.   This would be -- the testing in the

 2   hospital was a urine drug screen.   That's not a

 3   forensic tested, so probably an antibody-type test.   A

 4   lot of false positives and the toxicology testing done

 5   through the medical examiner's forensic quality testing

 6   and in blood, so that's the one to believe.

 7      Q   Okay.   I think you may have anticipated my next

 8   question.   The urine drug screen found presence of

 9   opioids.

10      A   Yes.

11      Q   The post-mortem examination toxicology screen

12   did not find opioids?

13      A   That's correct.

14      Q   And are you telling us Doctor, the best way to

15   read that is that there were in fact no opioids in

16   Mr. Tyson and that the urine strain presented a false

17   positive on that?

18      A   Most likely, yes.   If it was actually a true

19   positive, it -- it's no longer present in his blood in

20   any significant concentration.

21      Q   Is it possible that he just metabolized the

22   opioids or do you think that the urine strain presented

23   a false positive or do you have an opinion on that?

24      A   I can't say.   I mean the only way to tell,

25   would be to do the forensic testing on the urine drug

```
 1   screen with confirmation.

 2        Q   Okay.

 3        A   I mean, but the -- the thing is, it's not in

 4   his blood anymore.  So it's not something I don't -- it

 5   wasn't metabolized between the time that it was taken

 6   in the hospital and the time he you know, the autopsy

 7   was done.  It would have been something that he would

 8   have taken maybe a day or so before and was -- the

 9   effect of it was gone from his blood because it was --

10   it would be in a concentration too low to detect.

11        Q   Okay.  I think I know the answer to this

12   question, but let me make it clear.  These sorts of

13   opinions in these readings, you gain these from reading

14   reports from the medical examiner and from others?

15        A   That's correct.

16        Q   Did you do any personal testing in this case?

17        A   No.

18        Q   You are a medical examiner?

19        A   Yes, but I'm not a toxicologist.

20        Q   Okay.  But none of the opinions that you

21   reached in this case involve your actually examining

22   Mr. Tyson or Mr. Tyson's body, true?

23        A   That's correct, yes.

24        Q   Okay.  Let's move forward to the post-mortem

25   examination.  You described Mr. Tyson as having a large
```

```
 1   build?
 2        A   I believe that was the -- the post-mortem
 3   examination that I'm reading here is, is basically as
 4   described in the autopsy report.
 5        Q   Okay.  Did you discover from that report or
 6   elsewhere any more specific description of Mr. Tyson's
 7   body, height and weight and --
 8        A   I'm sure it's in there.  You know, I didn't
 9   record it though.
10        Q   Was Mr. Tyson's height and weight and body mass
11   index significant to you in any way in developing your
12   opinions in this case?
13        MS. GEORGES:  Form.
14        THE WITNESS:  Not particularly.  I mean he was
15   larger, but he wasn't all -- it wasn't -- it wasn't
16   like something that really suck out to me.  If I could
17   see his autopsy report, we can look at it.
18        Q   (MR. ABBOTT)  Sure.
19        A   Okay.  Yes, so he's 68 inches, so he's 5'8 220
20   pounds.
21        Q   Would you agree that that height and weight
22   would make Mr. Tyson have been clinically obese?
23        A   Yes.
24        Q   And is that of significance to you in
25   evaluating this case in any way?
```

```
 1          MS. GEORGES:  Form.
 2          THE WITNESS:  Not particularly because you know,
 3     calculating a BMI and looking at somebody are
 4     different.  When I look at him, I didn't see the
 5     obesity that I would normally see for somebody that I
 6     would consider this being an issue.  So he didn't have
 7     like the kind of -- obesity.  He was just kind of a
 8     larger guy.  So when you have an increase in muscle
 9     mass, your weight will be higher and your BMI will be
10     higher, but it doesn't really take into account you
11     know your fat content.  The cases that -- of obesity
12     that I would be concerned with in -- restraint, are the
13     ones that have large abdominal fat pads or you know or
14     fat in there because when you place and prone on their
15     abdomen, it pushes up into their abdomen and pushes
16     their diaphragms up into their lungs and he did not
17     have that type of build from the photos I saw.
18          Q  (MR. ABBOTT)  Okay.  You were talking about
19     potential positional asphyxia there?
20          A  Right, yes.
21          Q  And if I understand you correctly, if a person
22     -- an obese person or a person with an extended
23     abdominal type of obesity is more prone to positional
24     asphyxia?
25          A  Yes.
```

```
 1        Q  But in Mr. Tyson's particular case, you didn't
 2   deem his weight to be a significant factor?
 3        A  Right.  No, I -- yes, not in that respect.  No.
 4        Q  The ME's office there was a cardiac pathologist
 5   that looked at Mr. Tyson's heart?
 6        A  Yes.
 7        Q  And that examination revealed severed coronary
 8   atherosclerosis?
 9        A  Yes.
10        Q  And what is that sir?
11        A  That's coronary artery disease, hardening of
12   the arteries.
13        Q  Do you believe that that condition was a factor
14   in Mr. Tyson's cause of death?
15        A  Yes.
16        Q  The next thing I see is fibromuscular dysplasia
17   of the SA and AV nodal arteries.  Could you tell us
18   what that means please?
19        A  Yes.  It's a congenital thickening of the
20   artery -- thickening and narrowing of the arteries to
21   the two main -- well the pacemaker, the SA node and
22   then the main node that transmits the signal from the
23   atria to the ventral.
24        Q  Do you know what the cause was of that defect?
25        A  No, it's congenital.  It could be genetic.  It
```

1  could be you know something else.

2      Q   And was that condition a factor in Mr. Tyson's

3  death?

4      A   I think yes.  I mean this is -- it's a known

5  cause of sudden death you know.

6      Q   The next thing I see is, "focal amount of

7  nuclear cell of infiltrate of the right atrial

8  myocardium in the SA node?"

9      A   Yes.

10     Q   And what does that mean?

11     A   There was a small amount of chronic

12 inflammation in those areas.

13     Q   Okay.  Was that a factor in his death?

14     A   That's probably not.

15     Q   And what is a dilated TV and PV annuli?

16     A   A tricuspid valve and pulmonary valve were

17 dilated.

18     Q   And do you know why, what was the cause of that

19 dilation?

20     A   It's likely a result of pulmonary hypertension.

21     Q   Was that a factor in Mr. Tyson's death?

22     A   I don't know if it's a factor in his death or

23 part of the dying process.  I don't know you know,

24 something that -- usually you don't see that acutely,

25 but sometimes we see you know dilation of the right

```
 1   side of the heart you know acutely.  So -- I mean I
 2   think he's got enough other stuff wrong with his heart
 3   that his heart definitely you know, was a factor in his
 4   death.
 5        Q   Okay.  And the cardiac pathologist also made
 6   note of sickled red blood cells?
 7        A   Yes.
 8        Q   Is that of significance to you Doctor?
 9        A   Potentially.  It depends on where else they're
10   seen.  If he had a lot of sickling like in his spleen
11   you know, then it would have been something that you
12   know would have probably warranted doing a serum -- not
13   serum, a hemoglobin electrophoresis to see if he had a
14   sickle cell trait.
15        Q   And were those studies done --
16        A   No.
17        Q   -- to your knowledge?
18        A   No.  And I never saw the histology slide, so I
19   don't know if the sickle cells were again found in any
20   other organs.  Now some -- you know -- the actual
21   process of processing tissue can cause sickling of
22   cells, but usually it only causes it in somebody who
23   has an underlying trait.  So whether it's significant
24   or not, it depends on whether or not he has a trait and
25   then it depends on whether or not it's in other organs
```

```
 1   and you know also you know would there be an issue of
 2   sickle crisis you know because of the struggling and so
 3   forth.
 4        Q   Okay.   So as we sit here, you don't know the
 5   answer to whether or not the sickle cells were
 6   evidenced in other organs of Mr. Tyson?
 7        A   That's correct, I do not know.
 8        Q   And so you don't know if it had a role in his
 9   death?
10        A   Right.
11        Q   And I see you make note here that the Broward
12   County Medical Examiner deemed the cause of death to be
13   undetermined?
14        A   Yes.
15        Q   And do you criticize the medical examiner for
16   that finding?
17        MS. GEORGES:   Form.
18        THE WITNESS:   Yes I did.
19        Q   (MR. ABBOTT)   Why so?
20        A   In his report, he said since he -- since there
21   was all these factors going on, he doesn't know which
22   one was the cause of his death and I think that as I
23   described in my report, that you know that we don't
24   need to pick out which one it is when they're all
25   there.   They all caused his death, so --
```

Mark Shuman                May 02, 2018                Page 26

```
 1      Q   Okay.  The next part of your report discusses
 2  your opinions.
 3      A   Yes.
 4      Q   And if you look in the first sentence, did you
 5  -- have you diagnosed Mr. Tyson as having suffered from
 6  excited delirium syndrome?
 7      A   I believe that he was in a state consistent
 8  with that, yes.
 9      Q   Okay.  Would you agree with me sir that some of
10  the symptoms or some of the diagnostic criteria to
11  determine if somebody was suffering from excited
12  delirium syndrome are whether or not they've exhibited,
13  attempted violence or hyper-aggression?
14      MS. GEORGES:  Form.
15      THE WITNESS:  I don't know if there are any set
16  diagnostic criteria for excited delirium.  I mean he
17  was in a state consistent with that.  He was
18  incoherent.  He was in a delirious state and he was in
19  an excited state obviously and -- and some people just
20  call it an acute psychosis.
21      Q   (MR. ABBOTT)  Okay.  He attacked a police
22  officer?
23      A   Yes.
24      Q   And would it be fair to call that an act of
25  aggression or hyper-aggression?
```

```
 1        MS. GEORGES:  Form.
 2        THE WITNESS:  Yes.
 3        Q  (MR. ABBOTT)  And is that the sort of behavior
 4   that has been noted in patients who are in excited
 5   delirium?
 6        A  Yes.
 7        Q  Okay.  Patients who are experiencing excited
 8   delirium show unexpected strength?
 9        A  Yes.
10        Q  And in your review of the statements and the
11   materials, does it -- did it appear to you as if
12   Mr. Tyson did in fact show signs of unexpected
13   strength?
14        MS. GEORGES:  Form.
15        THE WITNESS:  Yes.
16        Q  (MR. ABBOTT)  Is one of the recognized symptoms
17   I guess of excited delirium having a very high body
18   temperature?
19        A  Yes.
20        Q  Or hyperthermia?
21        A  Yes.
22        Q  I see in your recap of the summary of
23   circumstances that Mr. Tyson was initially wearing sort
24   of an open robe?
25        A  That's correct.
```

1        Q   And he took that robe off?

2        A   Yes.

3        Q   Is that sort of behavior consistent with

4    somebody who was suffering from excited delirium?

5        MS. GEORGES:   Form.

6        THE WITNESS:   Yes.

7        Q   (MR. ABBOTT)   Excited delirium has been

8    associated with mental illness?

9        A   That's correct, yes.

10       Q   And Mr. Tyson had been diagnosed as suffering

11   from a mental illness?

12       A   Yes.

13       Q   What particular mental illness?

14       A   I believe it was bipolar disorder was what I

15   saw.

16       Q   And has bipolar disorder in particular been

17   attributed to acceptability to excited delirium?

18       A   Yes.

19       Q   Have patients who have rapidly stopped taking

20   their medications or their antipsychotic medications,

21   has that been noted as a potentially causative factor

22   in excited delirium event?

23       A   I'm not sure if it's -- if that is or is not.

24   I mean that would be something that would certainly be

25   consistent with somebody going into acute psychosis

```
 1    from you know, from their disorder if they stopped
 2    taking their medication.  But as far as if it's you
 3    know -- if it's more often seen or not, I don't know.
 4        Q  Did your review of the materials suggest that
 5    Mr. Tyson did in fact stop taking his antipsychotic
 6    medications?
 7        A  Yes.
 8        Q  Does the medical literature recognize that
 9    people who are undergoing an excited delirium event
10    sometimes have incoherent speech?
11        A  That's correct, yes.
12        Q  And did you see evidence that Mr. Tyson was
13    engaged in incoherent speech on the day of his death?
14        A  Yes.
15        Q  Do people who are suffering in excited delirium
16    event often times have hallucinations?
17        A  Well we don't know, but we suspect they're
18    having some type of -- responding to some type of
19    internal stimuli because they're not telling you what
20    they're seeing.
21        Q  Did you see some evidence that Mr. Tyson before
22    he encountered the Hollywood Police officers was
23    talking to the air and talking to a tree?
24        A  Yes.
25        Q  Do you deem that to be consistent with somebody
```

```
 1   who is in the midst of an excited delirium syndrome?
 2        MS. GEORGES:  Form.
 3        THE WITNESS:  Yes.
 4        Q  (MR. ABBOTT)  Is your opinion sir, that
 5   Mr. Tyson was in an excited delirium syndrome made
 6   within a reasonable degree of medical probability?
 7        A  Yes.
 8        Q  I see your report suggested, and tell me if I'm
 9   wrong, that excited delirium syndrome itself can result
10   in death?
11        A  Yes.
12        Q  I see at the very bottom of page three sir you
13   state that individuals in the state excited delirium
14   often die during encounters with law enforcement
15   personnel --
16        A  Yes.
17        Q  -- did I read that correctly?
18        A  That's correct, yes.
19        Q  Are you there sir, noting a temporal connection
20   that the literature suggests that individuals who are
21   experiencing excited delirium and have an encounter
22   with a police officer, some of them end up in -- with
23   fatalities or are you drawing a causal connection
24   there?
25        MS. GEORGES:  Form.
```

1      THE WITNESS:  It's not a causal connection, it's a

2  -- I think it's more of a -- they encounter police

3  because of the state that they're in.

4      Q  (MR. ABBOTT)  Okay.  Let's move to the top of

5  page four of your report.  The first paragraph begins

6  with a discussion of sudden death during prone

7  restraint.

8      A  Yes.

9      Q  Before we go through the details of this

10 paragraph, do you have an opinion sir in terms of

11 whether or not Mr. Tyson did experience a sudden death

12 during prone restraint?

13     A  Yes.

14     Q  And what is that opinion?

15     A  He did suffer sudden death during a prone

16 restraint.

17     Q  Okay.  What was the status of the restraint

18 that Mr. Tyson was under at the time of his death or at

19 his cardiac event?

20     A  He was still being restrained by four police

21 officers and he was in handcuffs and leg shackles.  At

22 the time, they recognized he wasn't breathing.

23     Q  Do you know what in particular the four police

24 officers were doing in terms of how they were

25 restraining Mr. Tyson at that point?

1    A  I mean I can't go into specifics, but I believe

2  there was one in each corner of his body.  So two at

3  the top of his back on either side and the other two

4  holding his legs or lower back.

5    Q  Is it your opinion sir that all four of those

6  police officers were placing some degree of force on

7  Mr. Tyson?

8    A  I believe that the evidence is they were at the

9  time.

10    Q  And were they applying that force by using

11  their body weight or were they pushing Mr. Tyson down

12  or do you know?

13    A  I don't know the exact specifics, no.

14    Q  Is it significant to you sir, in expressing

15  your opinion with regard to sudden death during prone

16  restraint the degree of pressure that was being applied

17  to Mr. Tyson at the time?

18    A  In this case, no because I'm not -- I'm not

19  trying to say that he was -- that this is a restraint

20  asphyxia.  So I'm not saying a primary cause of death

21  was restraint asphyxia.  So -- in this case, I think

22  the restraint was a factor as a stressor on his body

23  with the underlying heart disease and not a restriction

24  of his ability to breathe or blood flow to his heart or

25  something like that.

1       Q   I understand.  So this is not -- he did not die

2   from restraint asphyxia?

3       A   That's correct.

4       Q   You think he had a cardiac event as a result of

5   a number of stressors?

6       A   Yes.

7       Q   And the fact that he was having an encounter

8   and was involved with four police officers was a

9   stressor?

10      A   Yes.

11      Q   The next paragraph of your report, and I think

12  we've covered this, you don't know if Mr. Tyson

13  underwent a sickle cell crisis?

14      A   That's correct.

15      Q   The next section of your report involves the

16  taser.

17      A   I think first I describe -- discuss natural

18  diseases and then taser.

19      Q   Okay.

20      A   Yes.

21      Q   The natural diseases, have we covered those

22  earlier or were there additional diseases that

23  Mr. Tyson was suffering from that you think were a

24  factor in his death?

25      A   We discussed everything in there.

1    Q   Okay.  The first use of a taser or a conducted

2  energy device on Mr. Tyson was employed by a police

3  officer named Ramirez?

4    A   Yes.

5    Q   Do you have an opinion sir one way or the other

6  whether or not that taser just discharged, that --

7  discharged from Officer Ramirez delivered a charge to

8  Mr. Tyson?

9    MS. GEORGES:  Form.

10    THE WITNESS:  I think there was some effect of the

11  electricity based on the look of the probe site looked

12  like.  I don't -- there was not electro-muscular

13  disruption.

14    Q   (MR. ABBOTT)  I think your -- you know that

15  there was an abrasion and a linear abrasion in the

16  right upper quadrant of the abdomen?

17    A   Right.

18    Q   And those may have represented marks from the

19  second probe?

20    A   Yes.

21    Q   Do you know if that second probe in fact lodged

22  in the body of Mr. Tyson?

23    A   It may have been dislodged or it may have just

24  bounced off or something.  It may not have actually hit

25  into him.

```
 1       Q  If it bounced off, that taser would not have

 2   delivered an electrical charge to Mr. Tyson, true?

 3       MS. GEORGES:  Form.

 4       THE WITNESS:  Yes, but it looked like from the

 5   other probe, it also looked like it had electrical --

 6   what you see when you have an electric discharge from

 7   where the -- we know where the actual one probe hit.

 8   So --

 9       Q  (MR. ABBOTT)  So based on that, you have

10   concluded that the second probe must have been in

11   Mr. Tyson for some period of time?

12       A  I don't know if it was in him or on him, yes.

13       Q  But you think that that taser discharge from

14   Officer Ramirez did result in an electrical charge

15   being delivered to Mr. Tyson?

16       A  At least his skin.

17       Q  Okay.  You don't know the depths of those

18   probes from Officer Ramirez' taser?

19       A  No.  I believe one was still in him, but maybe

20   not -- maybe it wasn't in him anymore, but it was

21   clearly went in him.  But like I said, I think you

22   know, the circumstances showed it was not effective at

23   electro-muscular disruption.

24       Q  And then the second officer that used his

25   conducted energy device, was Officer Pantaloukas?
```

```
 1        A   Yes.
 2        Q   And the taser discharge -- the -- from
 3   Officer Pantaloukas, resulted in the taser probes
 4   ending up in Mr. Tyson's lower back?
 5        A   Yes, that's correct.
 6        Q   And your report notes that that I guess the
 7   first use of the taser by Officer Pantaloukas, that did
 8   not result in neuromuscular incapacitation?
 9        A   That's correct.
10        Q   And you think that's probably because the
11   probes were too close together?
12        A   Yes.
13        Q   Okay.  And you conclude the paragraph by saying
14   that Officer Pantaloukas then used his taser in
15   drive-stun mode?
16        A   Yes -- yes.
17        Q   And I think we talked about this earlier.  You
18   think that one or more of those taser charges did
19   result in neuromuscular incapacitation?
20        A   Yes.
21        Q   But you don't know how many or which one?
22        A   That's correct.
23        Q   The next paragraph begins with the sentence of
24   "whether a conducted energy device can cause death is
25   contentious."  Did I read that correctly?
```

Mark Shuman                  May 02, 2018                  Page 37

```
 1        A   Yes.

 2        Q   Do you agree that that subject is contentious?

 3        A   Yes.

 4        Q   Do you have an opinion one way or the other

 5   Doctor in terms of whether or not a conducted energy

 6   device can cause death?

 7        MS. GEORGES:  Form.

 8        THE WITNESS:  Yes.  I -- my opinion, they can

 9   cause electrical death, but only under very rare

10   specific circumstances.

11        Q   (MR. ABBOTT)  And what are those circumstances

12   sir?

13        A   After a thin subject in the probe has to hit in

14   a specific area near the heart and the probe has to get

15   close enough to the heart to get electrical capture of

16   the cardiac rhythm.  So it would only occur in a thin

17   person with a perfect dark strike.

18        Q   And that's not what happened in the case of

19   Mr. Tyson?

20        A   That's correct.

21        Q   So can we agree that the use of the taser did

22   not cause the death of Mr. Tyson?

23        MS. GEORGES:  Form.

24        THE WITNESS:  Right.  Not caused by electrical

25   means, yes.
```

Mark Shuman                    May 02, 2018                    Page 38

```
 1        Q   (MR. ABBOTT)  As we move then to the top of
 2   page five of your report, you say, "if the taser
 3   discharge had any role in Mr. Tyson's death, it was as
 4   an additional stressor from pain of the discharge."
 5   Did I read that correctly?
 6        A   Yes.
 7        Q   So let me ask you this, do you have an opinion
 8   in terms of what was Mr. Tyson's cause of death?
 9        A   Yes.
10        Q   And what is that?
11        A   As I stated on my last or second to the last
12   paragraph here I guess, "cardiopulmonary arrest
13   following a violent struggle and prone restraint while
14   in a state of excited delirium associated with bipolar
15   disorder with other significant conditions of coronary
16   atherosclerosis and firbromuscular dysplasia of the SA
17   and AV nodes.
18        Q   And then do you have an opinion that certain
19   stressors that Mr. Tyson was experiencing had a role in
20   his death?
21        A   Yes.
22        Q   And what are some of the stressors that you
23   have identified?
24        A   Stressors would be the excited delirium, the
25   violent struggle and the restraint.  And like I said,
```

1    possibly the taser pain from the taser, depending on

2    the time of the last taser discharge and his cardiac

3    arrest.

4         Q   Okay.  Mr. Tyson was noticed having drugs in

5    his system?

6         MS. GEORGES:  Form.

7         THE WITNESS:  He had TAC in his system.

8         Q   (MR. ABBOTT)  Would you deem that to be a

9    stressor?

10        A   No.

11        Q   Mr. Tyson was noted as having alcohol in his

12   system?

13        A   Yes.

14        MS. GEORGES:  Form.

15        Q   (MR. ABBOTT)  Would you deem that to be a

16   stressor?

17        A   No.

18        Q   Do you know whether or not Mr. Tyson was

19   suffering from sleep deprivation?

20        A   I do not.

21        Q   Have you recounted all of the stressors that

22   you are aware of that you think may have contributed to

23   Mr. Tyson's death?

24        A   Yes.

25        Q   Doctor, you note on page three of your report,

1    and I'm here under opinions and discussions.

2         A   Okay.

3         Q   That one of the characteristics of suffering

4    from excited delirium syndrome is numbness to pain?

5         A   Yes.

6         Q   And Mr. Tyson was in a state of excited

7    delirium?

8         A   Yes.

9         Q   So you would presume that he was numb to pain?

10        MS. GEORGES:  Form.

11        THE WITNESS:  I think the term numbness to pain is

12   what we are seeing in that person.  I don't know what

13   they're actually experiencing.  So in other words,

14   stun-guns don't seem to affect them, but I don't know

15   if they're actually feeling pain or they just don't

16   care about it.

17        Q   (MR. ABBOTT)  You don't know one way or the

18   other?

19        A   No.

20        Q   Do you know if Mr. Tyson was experiencing any

21   pain as a result of the taser?

22        MS. GEORGES:  Form.

23        THE WITNESS:  I mean he -- he likely was

24   experiencing pain.  You know, what his brain was doing

25   processing it, I don't know.

```
 1      Q  (MR. ABBOTT)  Well what does the phrase
 2   "numbness to pain" mean?
 3      A  Right.  What I'm saying is, I think when they
 4   say that and then it's -- you know, written in the
 5   books and in the articles, what they're referring to is
 6   they don't respond to pain.  So they don't seem to have
 7   the same response as a person who's awake and alert
 8   does.  The pain receptors are there, the pain receptors
 9   are going to send the pain signal to the brain.  And
10   then what the brain does with it, you know, that's
11   different.  So it may be that they just don't care
12   there's pain, but we don't know -- I don't know
13   physiologically.  I don't know if anybody knows
14   physiologically what it's doing.
15      Q  Well do you have an opinion then sir, in terms
16   of whether or not the use of the taser -- use of a
17   taser on somebody who is experiencing excited delirium
18   is a stressor from a cardiac perspective?
19      A  I mean I think if it's causing pain and it's --
20   and it could be a stressor, yes.  I don't know for
21   sure.
22      Q  But you don't know if it's causing pain I think
23   we just discussed?
24      A  I said --
25      MS. GEORGES:  Form.
```

1    THE WITNESS:  -- it is causing pain.  I just don't

2  know -- causing pain meaning it's causing pain

3  receptors to fire and send signal to the brain this is

4  painful.  It's what the brain does with it after that,

5  I don't know.  And whether or not that results in you

6  know -- the fact that they're not acting like they're

7  in pain doesn't mean that they're not having the same

8  physiologic response to the pain such as an increase in

9  blood pressure and heartrate and all that.

10    Q  (MR. ABBOTT)  Let me ask you this way Doctor,

11  do you have an opinion within a reasonable degree of

12  medical probability whether the discharge of a taser on

13  an individual who's in a state of excited delirium is a

14  cardiac stressor?

15    A  Again, I can't say for sure.  I don't know.  I

16  don't know if anybody knows what the physiological

17  response to pain is in somebody in that state.

18    Q  The rest of the sentence that I think you -- we

19  started off on says, "that the use of a taser would be

20  a factor only if there was a temporal association with

21  the cardiopulmonary arrest and the last conductive

22  energy device discharge."  Did I read that correctly?

23    A  Yes.

24    Q  And do you have an opinion sir in terms of

25  whether there is a sufficient temporal association?

```
 1        MS. GEORGES:  Form.
 2        THE WITNESS:  I don't know one way or the other.
 3   Like I said on page five, the -- indicate the last
 4   discharge ended at 3:01 which is the same time of his
 5   initial contact with EMS.  So I don't know if these
 6   times are synchronized and I really don't know.  A
 7   witness says that the -- and the EMS report seems to
 8   say that there was a time lapse between those times,
 9   but I don't know.
10        Q   (MR. ABBOTT)  When you say there has to be a
11   temporal association, what is the amount of time
12   between the discharge of the taser and the cardiac
13   event, the cardiac arrest that's sufficiently
14   temporally --
15        A   It has to be a short period of time because the
16   pain of the taser's going to be while the discharge is
17   occurring.  When the discharge stops, the pain's going
18   to go away.  So the physiologics is going to end.  So
19   it's going to be within -- probably within seconds of
20   the end of the discharge.
21        Q   Any thought of how many seconds from the end of
22   the discharge?
23        A   I wouldn't want to put a specific number on it.
24        Q   Is there any medical literature that you're
25   aware of that has tried to evaluate that --
```

```
 1        A  Not that I'm --

 2        Q  -- subject?

 3        A  Not that I'm aware of, no.  I mean, plenty of

 4   people have been tased you know and I -- I haven't

 5   experienced it myself, but I watch videos and I see

 6   them.  They appear to be in pain you know for as long

 7   as the charge goes and then soon after, they're back to

 8   normal.

 9        Q  Immediately thereafter -- I mean do you have

10   any thought -- does pain last longer than the

11   electrical discharge?  In other words, does pain remain

12   when the -- when there is no electrical charge from the

13   delays?

14        A  No.  The pain will stop.  The physiological

15   response probably will lag behind a little bit before

16   it goes back to normal.

17        Q  And you think that that's a matter of seconds,

18   but you're not sure how many seconds?

19        A  That's correct.

20        Q  Seconds certainly means less than a minute?

21        A  Yes.

22        Q  So if I understand your testimony Doctor, and

23   correct me if I'm wrong, you're not sure whether or not

24   Mr. Tyson was experiencing pain or at least how that

25   pain might constitute a stressor that could be
```

 1    correlated to his cardiac event?

 2         MS. GEORGES:  Form.

 3         THE WITNESS:  I'm sure that the pain was there

 4    because you know the receptors were there.  I just

 5    don't know what the physiologic response -- I'm not --

 6    I can't say a hundred percent for sure what that is.

 7         Q  (MR. ABBOTT)  Right.

 8         A  I suspect it's still there, but you know, the

 9    perception of pain is not.

10         Q  Well -- but it's the physiological -- by the

11    physiological response, you mean having a role on the

12    cardiac event?

13         A  Right.  Yes, increase in blood pressure,

14    increase in pulse.  Those kind of responses to pain not

15    "ouch, that hurts."

16         Q  All right.  Do you know if a patient in a state

17    of excited delirium shows those physiological effects

18    of what would otherwise be a painful event?

19         A  I do not know.

20         Q  Okay.  And you're also not sure if there is a

21    sufficient temporal proximity to deem the use of the

22    taser to be a possible stressor that had a relation of

23    the cardiac event?

24         MS. GEORGES:  Form.

25         THE WITNESS:  Right.  I don't know if the timing

1    is right.

2         Q  (MR. ABBOTT)  Okay.

3         A  Yes.

4         Q  Would you forgive me, can we take a break for a

5    minute or two and I'm going to talk to my brighter

6    colleague

7         A  Okay, no problem.

8         Q  Thank you.

9         A  Sure.

10        (Off the record).

11        (Deposition resumed).

12        Q  (MR. ABBOTT)  I have three more real quick

13   areas.  I promise it's just going to take a couple of

14   minutes.  My first question is, and I want you to

15   assume this to be the case.  I don't know if the record

16   will support it.  That Mr. Tyson was prescribed

17   Wellbutrin?

18        A  Yes.

19        Q  Would you expect any of the toxicology strains

20   to reveal the presence of Wellbutrin had Mr. Tyson been

21   taking it?

22        MS. GEORGES:  Form.

23        THE WITNESS:  I'm looking at -- for -- the

24   toxicology report.

25        MS. GEORGES:  And it's bates stamped as 4021.

```
 1        THE WITNESS:  Yes, I have it.  Found it.  I was
 2   looking to see if -- I don't know.  That's something
 3   you'd have to ask the toxicology lab at Broward County
 4   Office of Medical Examiner.
 5        Q  (MR. ABBOTT)  Fair enough.  The second area is
 6   this.  Do you remember Dr. -- earlier in your
 7   deposition, we talked about whether or not those with a
 8   bipolar disorder have a propensity to have excited
 9   delirium event.
10        A  Yes.
11        Q  Do you know if the same is true with regard to
12   individuals who have been diagnosed with a
13   psycho-effective disorder?
14        A  I believe so.  I mean most of the psychiatric
15   disorders have been associated with excited delirium.
16        Q  Thanks.  And one last question, and I don't
17   know if you can help me anymore, and again we're
18   talking about the temporal proximity between a pain
19   event in terms of whether it can be a stressor to cause
20   a cardiac event.
21        A  Yes.
22        Q  And I think you told me it has to be close, it
23   has to be seconds and seconds means less than a minute.
24        A  Yes.
25        Q  Can you decrease that timeframe anymore or is
```

Mark Shuman                    May 02, 2018                    Page 48

 1  that as far as it's fair to press you on the subject?

 2       A   I mean it's probably you know on the lower side

 3  of that, but I don't want to get boxed into any

 4  particular number because I really don't know the

 5  actual number.

 6       Q   Closer to a second or two than a minute, but

 7  you don't want to put an outside edge anymore than a

 8  minute?

 9       A   Correct.

10       MS. GEORGES:  Form.

11       THE WITNESS:  That's right.  Yes.

12       Q   (MR. ABBOTT)  Okay.  Thank you very much

13  Doctor.  I don't have any other questions for you.

14                    CROSS EXAMINATION

15       Q   (MS. GEORGES)  Doctor, a few questions.  Since

16  we're on the toxicology report.

17       A   Yes.

18       Q   Did Broward County Medical Examiner's Office

19  tested for bath salts, correct?

20       A   They sent a -- they sent it out to NMS for that

21  particular test.

22       Q   And what were the results of that toxicology

23  screen as it pertains to bath salts?

24       A   None were detected.

25       Q   And the only thing that was detected was seven

1  monograms per milliliter of THC, correct?

2      A   It was actually the Delta 9 carboxy THC.

3      Q   And how long is -- does that last in one's

4  body?

5      A   I honestly don't know, but a lot of these

6  metabolites of THC can be days or weeks.

7      Q   It's very different than cocaine that has a

8  shorter path life, correct?

9      A   Yes, that's correct.

10      Q   So you can't tell us within a reasonable degree

11  of medical probability whether Mr. Tyson had ingested

12  that THS on October 27, 2014 verses a week prior to

13  that, correct?

14      A   That's correct, yes.

15      Q   And it is also your finding within a reasonable

16  degree of medical probability that the THC did not

17  cause or contribute to Mr. Tyson's death?

18      A   That's correct, yes.

19      Q   Now back to the temporal connection between the

20  last tasing cycle and Mr. Tyson being found to be

21  unresponsive.  Now I'm going to have this Exhibit

22  marked as Plaintiff's Exhibit 1.

23      (Thereupon, Plaintiff's Exhibit 1 was entered into

24  the record).

25      Q   (MS. GEORGES)  And this came from Detective

```
 1   Rollos' Homicide Report which documents the ten

 2   tasings.  I'll provide that to you and also counsel.

 3   And if you can take an opportunity and review that.

 4        MR. ABBOTT:  I'm sorry, what exhibit number is

 5   that?

 6        MS. GEORGES:  One.

 7        THE WITNESS:  Okay.

 8        Q  (MS. GEORGES)  Now based on the chart that you

 9   have before you, what time was the last tasing cycle

10   delivered to Mr. Tyson, according to Detective Rollos'

11   chart that's before you?

12        A  It's a 14:59:56.

13        Q  And how long was that last cycle for?

14        A  Five seconds.

15        Q  Now, I'm also going to show you what has been

16   marked as Plaintiff's Exhibit 2 which is the Fire

17   Rescue report.

18        A  Yes.

19        (Thereupon, Exhibit 2 was entered into the

20   record).

21        Q  (MS. GEORGES)  Do you recognize that document

22   Dr. Shuman?

23        A  Yes.

24        Q  And have you reviewed that document prior to

25   your deposition today?
```

 1        A   Yes.

 2        Q   And that was given to you in the case

 3   materials?

 4        A   That's correct, yes.

 5        Q   Now if Mr. Tyson was tased at 2:59:56 p.m. for

 6   five seconds, when did that cycle end?

 7        A   It would have been 3:0 -- well, 3 -- yes, like

 8   3:01 or 3 -- yes, 3:01:01, is that right?

 9        Q   Okay.  So adding five seconds to 2:59:56 would

10   take us to 3:00 p.m. followed by a hundredth of a

11   second.

12        A   Right.

13        Q   Now according to the Fire Rescue Report, at

14   what point did fire rescue make contact with Mr. Tyson?

15        A   3:01.

16        Q   So, would that have been 59 hundredths of a

17   second after the last charge ended?

18        A   It would be right at the time the last charge

19   ended -- I mean obviously they're not going to the

20   hundredth of a second in there.  So it would be at the

21   same time.

22        Q   Okay.  Now at some point, you read in your

23   materials and you included in your report that

24   Mr. Tyson was noted to be turning blue, correct?

25        A   Yes.

```
 1        Q   And that the police officers who were holding

 2   point, discovered that he was not breathing?

 3        A   That's correct.

 4        Q   Now based on that timeline, do you find that

 5   there is a temporal connection between the last charge

 6   that was delivered and Mr. Tyson being discovered by

 7   the police officers to be unresponsive and blue?

 8        A   I -- I noted in my report those times and based

 9   on those times, yes.  But I'm not sure based on the

10   circumstances is that -- it was actually that way.

11        Q   So what leads you to believe that?

12        A   It was -- I mean there was other people in the

13   way that they describe what happened.  There was some

14   time period between the last taser discharge and when

15   fire rescue was called over.  So, I don't know what

16   that time is.  I don't know if it's a very short period

17   of time or a longer period of time, I couldn't get that

18   information.

19        Q   Okay.  But just using the data that is before

20   you, that is Plaintiff's Exhibit 1 --

21        A   Right.

22        Q   -- which is -- comes from the download of the

23   taser.

24        A   Right.

25        Q   And also the fire rescue report.
```

```
 1        A  Yes.

 2        Q  And just relying on those two materials.

 3        A  That's correct.

 4        Q  Do you find there to be a temporal association

 5   between the last taser charge and fire rescue tending

 6   to Mr. Tyson.

 7        MR. ABBOTT:  Object to the form.

 8        THE WITNESS:  I mean based solely on this, yes.

 9        Q  (MS. GEORGES)  And how did fire rescue --

10   strike that.  Did fire rescue do an initial assessment?

11        A  Yes.

12        Q  And did they have to initiate CPR based on

13   their initial assessment?

14        A  Yes.

15        Q  Now we can agree Dr. Shuman that this is by no

16   way an electrical death, correct?

17        A  That's correct.

18        Q  And we're not assuming that it's an electrical

19   death, correct?

20        A  That's correct.

21        Q  Now did Mr. Tyson drop dead because he went for

22   a jog on October 27, 2014?

23        A  No.

24        Q  There was a cause, correct?

25        A  Yes.
```

```
 1        Q   There was a series of causes?

 2        A   That's correct, yes.

 3        Q   And you have listed them as factors that caused

 4   stress to Mr. Tyson and contributed to his death?

 5        A   Yes.

 6        Q   And those stressors were a pre-existing heart

 7   condition?

 8        A   That's right, yes.

 9        Q   It was also --

10        A   Those aren't the stressors.  That's the

11   underlying disorder.  The stressors would be you know,

12   everything else that's going on.

13        Q   And everything else that was going on was the

14   tasings, correct?

15        A   It would be the excited delirium syndrome, the

16   struggle, the restraint and potentially the taser.

17        Q   Okay.  And the restraint we're talking about,

18   Mr. Tyson being in a prone position, handcuffed and leg

19   shackled?

20        A   Right.  But more importantly, the actual

21   officers holding him down, that struggle.

22        Q   In addition to being handcuffed and leg

23   shackled?

24        A   I mean that's all part of the restraint, but I

25   think you know, if you just leave somebody handcuffed
```

 1   and leg shackled, they're not going to be really you

 2   know -- that's not going to cause all that much stress.

 3   It's the you know, the process that's going on to do

 4   that and everything else that's going on at the time.

 5        Q   Have you ever been handcuffed Dr. Shuman?

 6        A   Not -- no.

 7        Q   Have you ever been leg shackled?

 8        A   No.

 9        Q   Would you be able to rule out the possibility

10   that being handcuffed and leg shackled in a prone

11   position can cause stress to one's body?

12        MR. ABBOTT:  Object to the form.

13        THE WITNESS:  I think it's pretty clear in the

14   studies that that position alone is not really

15   stressful.

16        Q   (MS. GEORGES)  Can it cause pain?

17        A   If the handcuffs are too tight, yes.

18        Q   How about leg shackles?

19        A   Same thing.

20        Q   How about if they were using Flex-Cuf, cuffs as

21   leg shackles, could that cause pain?

22        MR. ABBOTT:  Objection to the form.

23        THE WITNESS:  Yes, if they're tight.  Yes.

24        Q   (MS. GEORGES)  Now absent the police struggle

25   -- strike that.  Can someone turn blue in five seconds

Mark Shuman                    May 02, 2018                    Page 56

```
 1   as described here in the case materials?
 2        MR. ABBOTT:  Object to the form.
 3        THE WITNESS:  I mean it happens quickly.  So I
 4   think so, yes.
 5        Q   (MS. GEORGES)  Now you criticized the Broward
 6   County Medical Examiner's cause of death as
 7   undetermined, correct?
 8        A   Yes.
 9        Q   And why did you criticize their cause of death
10   as undetermined?
11        A   I think it's a cop-out.  I think that you can
12   you know, when you have this situation, which is not an
13   unusual situation, the cause of death is everything you
14   have.  I mean it's not -- you can't pick and choose one
15   thing or the other you know.  It's the whole thing.
16   And that's why if it were my case, I would have had a
17   descriptive as I did in my report.  There would have
18   been a descriptive cause of death, not just one line of
19   you know, heart attack or you know coronary disease or
20   something like that.  But it would be descriptive,
21   trying to take into all parts that was going on at the
22   time of his death.
23        Q   And Doctor, within a reasonable degree of
24   medical certainty, you can't rule out the use of a
25   taser as a cardiac stressor, correct?
```

1        MR. ABBOTT:  Object to the form.

2        THE WITNESS:  That's correct.

3        Q  (MS. GEORGES)  And you also can't rule out the

4    prone position that Mr. Tyson was in --

5        MR. ABBOTT:  Object to the form.

6        Q  (MS. GEORGES)  -- as a contribution to his

7    death?

8        A  I mean, like I said, I don't it's the position

9    itself.  I think it's the actual being restrained

10   definitely as a stress.

11       Q  We spoke about earlier your -- you did review

12   the autopsy photographs, correct?

13       A  Yes.

14       Q  And you noted that there was evidence in the

15   chest and abdomen area of the insertion of a taser

16   probe, correct?

17       A  Right.  Well there's one actual insertion point

18   of their taser probe and then there's two other things

19   that were called abrasions that to me may be little

20   burn marks from the other taser probe.

21       Q  Okay.  And I'm going to show you what has been

22   marked as Plaintiff's Exhibit 3.  It's also bates

23   stamped as Tyson's 4102.  You can take an opportunity

24   to review that.

25       (Thereupon, Exhibit 3 was entered into the

```
 1   record).

 2        Q   (MS. GEORGES)  Do you recognize that

 3   photograph?

 4        A   Yes.

 5        Q   What do you recognize that photograph to be?

 6        A   That's a -- an autopsy photograph of Mr. Tyson.

 7        Q   Now does this photograph depict the abrasion?

 8        A   Yes, and also it depicts the actual taser probe

 9   strike area, the one that actually went in.

10        Q   And can you turn that photograph around and

11   circle that please?

12        A   Which one?

13        Q   The taser probe insertion.

14        A   I'm putting an arrow.

15        Q   And what are those other marks in the center of

16   Mr. Tyson's abdomen?

17        A   This is what was called abrasions in the

18   autopsy report and I was wondering if they were little

19   burn marks or kind of I guess you would call them

20   aborted taser probe entry where it kind of struck his

21   skin, but didn't stick in there.

22        Q   I'm also going to show you what is marked as

23   Plaintiff's Exhibit 4 which is bates stamped as Tyson

24   4123.

25            (Thereupon, Exhibit 4 was entered into the
```

```
 1   record).

 2        Q   (MS. GEORGES)  If you can take an opportunity

 3   to review that photograph.

 4        A   Okay.

 5        Q   Do you recognize that photograph?

 6        A   Yes.

 7        Q   What do you recognize that photograph to be?

 8        A   This is a -- the -- another autopsy photograph

 9   of his back with the taser probe still in place.

10        Q   And does that photograph fairly and accurately

11   depict the spread of the probes in Mr. Tyson's left

12   lower back?

13        A   Yes.

14        Q   I'll show you Plaintiff's Exhibit 6 which is

15   bates stamped as Tyson 4131.

16        MR. ABBOTT:  I think you're on 5.

17        MS. GEORGES:  Sorry, five.

18        (Thereupon, Exhibit 5 was entered into the

19   record).

20        Q   (MS. GEORGES)  Do you recognize that

21   photograph?

22        A   Yes.

23        Q   What do you recognize that photograph to be?

24        A   Another autopsy photograph of Mr. Tyson's back

25   --
```

```
 1        Q   Does --
 2        A   -- after they've removed the probes and the
 3   skin around the probes.
 4        Q   Now, upon removing the probes, does that also
 5   remove the skin and some flesh?
 6        A   Not necessarily.  This was done intentionally
 7   to take sections for microscopic examination.
 8        Q   Upon your review of the autopsy report in the
 9   photographs, did you find other signs of lacerations or
10   other abrasions to the front of Mr. Tyson's body?
11        A   Let's see.  Yes, he had some on his knees and
12   forearms and legs.
13        Q   And were those injuries consistent with being
14   in a prone position?
15        A   Yes.
16        Q   Absent the interaction with City of Hollywood
17   police officers, would Mr. Tyson have gone into cardiac
18   arrest at approximately 3:00 p.m. on October 27, 2014?
19        A   Probably not.
20        Q   I don't have anything further.
21                      RE-DIRECT EXAMINATION
22        Q   (MR. ABBOTT)  Doctor, I have one question.
23        A   Okay.
24        Q   Before your engagement in this case, did you
25   know the Plaintiff's attorney or her law firm?
```

```
 1       A  I don't think so.

 2       Q  Okay.  No further questions.  Thank you for

 3  your time sir.

 4       A  I have one correction though.  I noticed an

 5  error in my report when I was reading this toxicology

 6  report.  The ethanol found at the time of the autopsy

 7  is in ocular fluid, but not in the blood.  So --

 8       MS. GEORGES:  Is there a clinical significance

 9  with that?

10       THE WITNESS:  Since he had some alcohol in his

11  blood at the time we went to the hospital, I don't know

12  how to explain that.  I mean, it wouldn't take long to

13  metabolize that much ethanol.  It's not that much.

14  It's you know .031 percent.  So it's possible that it

15  was metabolized and you know, the amount that was found

16  in his ocular fluid is consistent with that amount.

17  Why it wasn't detected in his blood at the time of the

18  autopsy, I don't know.  I don't know what their

19  detection limit is.  It may be .01.

20       MS. GEORGES:  I don't have anything else.  Read or

21  waive?

22       THE WITNESS:  I'll waive if you don't mind.

23       MR. ABBOTT:  Thanks, and I'll order it.  Thank you

24  very much.

25       MS. GEORGES:  As far as the autopsy reports, I --
```

Mark Shuman                    May 02, 2018                    Page 62

```
 1    I mean the photographs, I want those under seal.
 2         MR. ABBOTT:  Oh okay, that's fine.  You know, I
 3    don't even mind if you don't actually append them to
 4    the depo.
 5         MS. GEORGES:  Okay.
 6         MR. ABBOTT:  You can take them with you if you
 7    want.  If you want to scan them and just send them to
 8    me and then otherwise so we'll know what they are.
 9         MS. GEORGES:  I mean you took the photos back as
10    well, right?
11         MR. HAPNER:  Yes, but let me make sure I have the
12    right numbers.
13         (Simultaneous conversation).
14         MR. ABBOTT:  So Madam Court Reporter, you're going
15    to take possession of these exhibits and put them into
16    the depo?
17         COURT REPORTER:  I will.
18         MR. ABBOTT:  Thanks again.
19         (DEPOSITION CONCLUDED).
20         (READING AND SIGNING OF THE DEPOSITION BY THE
21    WITNESS HAS BEEN WAIVE).
22
23
24
25                    CERTIFICATE OF REPORTER
```

Mark Shuman                    May 02, 2018                    Page 63

```
 1
 2        STATE OF FLORIDA
 3        COUNTY OF MIAMI-DADE
 4
 5             I, GABRIELA GONZALEZ, do hereby certify
 6  that the foregoing testimony was taken before me; that the
 7  witness was duly sworn by me; and that the foregoing
 8  pages constitute a true record of the testimony given
 9  by said witness.
10             I further certify that I am not a relative
11  or employee or attorney or counsel of any of the parties,
12  or a relative or employee of such attorney or counsel,
13  nor financially interested in the action.
14             Under penalties of perjury, I declare that
15  I have read the foregoing certificate and that the facts
16  stated herein are true.
17             Signed this 2nd day of May, 2018.
18
19
20        --------------------------
21        GABRIELA GONZALEZ
22
23
24
25
```

Verbatim Support Services

```
 1                    CERTIFICATE OF OATH

 2

 3

 4        STATE OF FLORIDA

 5        COUNTY OF MIAMI-DADE

 6

 7            I, the undersigned authority, certify that

 8   MARK SHUMAN, M.D. personally appeared before me and was

 9   duly sworn.

10

11            Witness my hand and official seal this 2nd day

12   of May 2018.

13

14   _____

15   GABRIELA GONZALEZ, Court Reporter

16   Notary Public, State of Florida

17   Commission No.: FF 963750

18   Commission Expiration: 02/23/2020

19

20

21

22

23

24

25
```

Mark Shuman                     May 02, 2018                            Page 65

**0**

**01**
  61:19

**031**
  61:14

**0:16-CV-62215-WPD**
  5:8

**1**

**1**
  10:14,16
  49:22,23 52:20

**1031**
  5:11

**14:59:56**
  50:12

**2**

**2**
  5:10 50:16,19

**2014**
  49:12 53:22
  60:18

**2018**
  5:10 7:15

**220**
  20:19

**27**
  49:12 53:22
  60:18

**2:59:56**

51:5,9

**3**

**3**
  51:7,8 57:22,
  25

**33179**
  5:13

**3:0**
  51:7

**3:00**
  51:10 60:18

**3:01**
  43:4 51:8,15

**3:01:01**
  51:8

**4**

**4**
  5:12 58:23,25

**4021**
  46:25

**4102**
  57:23

**4123**
  58:24

**4131**
  59:15

**4:03**
  5:10

**5**

**5**

59:16,18

**59**
  51:16

**5'8**
  20:19

**6**

**6**
  59:14

**68**
  20:19

**8**

**8**
  7:15

**9**

**9**
  49:2

**A**

**Abbott**
  5:17,24,25
  9:11,18,24
  10:18,22,25
  13:18 15:23
  20:18 21:18
  25:19 26:21
  27:3,16 28:7
  30:4 31:4
  34:14 35:9
  37:11 38:1
  39:8,15 40:17
  41:1 42:10

43:10 45:7
46:2,12 47:5
48:12 50:4
53:7 55:12,22
56:2 57:1,5
59:16 60:22
61:23 62:2,6,
14,18

**abdomen**
  21:15 34:16
  57:15 58:16

**abdominal**
  21:13,23

**ability**
  32:24

**able**
  55:9

**aborted**
  58:20

**abrasion**
  34:15 58:7

**abrasions**
  57:19 58:17
  60:10

**absent**
  55:24 60:16

**acceptability**
  28:17

**according**
  16:21 50:10
  51:13

**account**
  17:4 21:10

**accurately**
  59:10

**act**
  11:12 12:9
  26:24

**acting**
  42:6

**Action**
  9:8

**active**
  11:13

**actual**
  11:21 16:8
  24:20 35:7
  48:5 54:20
  57:9,17 58:8

**actually**
  12:25 15:11,19
  18:18 19:21
  34:24 40:13,15
  49:2 52:10
  58:9 62:3

**acute**
  26:20 28:25

**acutely**
  23:24 24:1

**Adam**
  5:18

**add**
  10:2

**adding**
  51:9

**addition**
  9:6 54:22

**additional**
  6:11 7:24 9:9
  33:22 38:4

**affect**
7:10 40:14

**after**
10:4 37:13
42:4 44:7
51:17 60:2

**again**
13:10 24:19
42:15 47:17
62:18

**against**
12:9

**aggression**
26:25

**agree**
11:3 12:19
14:3 20:21
26:9 37:2,21
53:15

**air**
29:23

**alcohol**
39:11 61:10

**alert**
41:7

**all**
5:13 9:19 13:2
14:21,22 20:15
25:21,24,25
32:5 39:21
42:9 45:16
54:24 55:2
56:21

**allow**
16:24

**allowed**
16:7

**alone**
55:14

**also**
9:2 12:14 14:1
24:5 25:1 35:5
45:20 49:15
50:2,15 52:25
54:9 57:3,22
58:8,22 60:4

**alter**
11:4

**amount**
23:6,11 43:11
61:15,16

**amphetamine**
17:13

**annuli**
23:15

**another**
59:8,24

**antibody-type**
18:3

**anticipated**
18:7

**antipsychotic**
28:20 29:5

**anybody**
5:14 12:25
41:13 42:16

**anymore**
19:4 35:20
47:17,25 48:7

**anything**

**6:14,20 7:10,**
14 11:7 13:20
60:20 61:20

**apart**
16:3,4

**appear**
27:11 44:6

**append**
10:19 62:3

**applied**
32:16

**applying**
32:10

**appropriate**
6:7

**approximately**
5:10 60:18

**area**
37:14 47:5
57:15 58:9

**areas**
7:3 14:10
23:12 46:13

**aren't**
54:10

**around**
58:10 60:3

**arrest**
11:18 13:24
38:12 39:3
42:21 43:13
60:18

**arrow**
58:14

**arteries**
22:12,17,20

**artery**
22:11,20

**articles**
41:5

**aspect**
13:8

**aspects**
14:3

**asphyxia**
7:7 11:11
21:19,24
32:20,21 33:2

**assessment**
53:10,13

**assists**
8:25

**associated**
28:8 38:14
47:15

**association**
42:20,25 43:11
53:4

**assume**
46:15

**assumed**
8:9

**assuming**
53:18

**atherosclerosi
s**
22:8 38:16

**atria**

**22:23**

**atrial**
23:7

**attach**
10:15

**attack**
56:19

**attacked**
26:21

**attempted**
26:13

**attorney**
60:25

**attorneys**
5:13,18

**attributed**
28:17

**authored**
7:14 10:4

**autopsy**
9:2 16:2 19:6
20:4,17 57:12
58:6,18 59:8,
24 60:8 61:6,
18,25

**AV**
22:17 38:17

**awake**
41:7

**aware**
39:22 43:25
44:3

**away**
43:18

Mark Shuman                    May 02, 2018                    Page 67

**B**

**back**
7:9 8:18,20
9:16,21,23,24
16:1 32:3,4
36:4 44:7,16
49:19 59:9,12,
24 62:9

**barbs**
9:16

**based**
16:11 34:11
35:9 50:8 52:4,
8,9 53:8,12

**basically**
11:10 20:3

**basis**
8:5

**bates**
46:25 57:22
58:23 59:15

**bath**
48:19,23

**before**
6:21 10:10
19:8 29:21
31:9 44:15
50:9,11 52:19
60:24

**began**
10:10

**begins**
8:2 31:5 36:23

**behalf**

5:21

**behavior**
27:3 28:3

**behind**
44:15

**being**
5:11 12:6,25
17:12 21:6
31:20 32:16
35:15 49:20
52:6 54:18,22
55:10 57:9
60:13

**believe**
7:7 12:14 15:9
18:6 20:2
22:13 26:7
28:14 32:1,8
35:19 47:14
52:11

**believes**
12:15

**best**
18:14

**between**
15:24 16:6,24
19:5 43:8,12
47:18 49:19
52:5,14 53:5

**bipolar**
28:14,16 38:14
47:8

**bit**
44:15

**blood**
18:6,19 19:4,9

24:6 32:24
42:9 45:13
61:7,11,17

**blue**
51:24 52:7
55:25

**BMI**
21:3,9

**body**
19:22 20:7,10
27:17 32:2,11,
22 34:22 49:4
55:11 60:10

**books**
41:5

**bottom**
8:17 30:12

**bounced**
34:24 35:1

**boxed**
48:3

**brain**
40:24 41:9,10
42:3,4

**break**
46:4

**breathe**
32:24

**breathing**
31:22 52:2

**brief**
8:14

**briefly**
10:9

**brighter**
46:5

**brought**
9:1

**Broward**
25:11 47:3
48:18 56:5

**build**
20:1 21:17

**Building**
5:12

**burn**
57:20 58:19

**C**

**calculating**
21:3

**call**
6:5 26:20,24
58:19

**called**
5:19 8:2 11:14
52:15 57:19
58:17

**came**
49:25

**cannabinoids**
17:13

**can't**
17:4 18:24
32:1 42:15
45:6 49:10
56:14,24 57:3

**capture**

37:15

**carboxy**
49:2

**cardiac**
11:18 13:24
22:4 24:5
31:19 33:4
37:16 39:2
41:18 42:14
43:12,13 45:1,
12,23 47:20
56:25 60:17

**cardiopulmona
ry**
38:12 42:21

**care**
10:22 40:16
41:11

**cartridge**
16:23

**case**
5:7 6:25 7:14
8:11 11:5
19:16,21
20:12,25 22:1
32:18,21 37:18
46:15 51:2
56:1,16 60:24

**cases**
21:11

**cassette**
16:23

**causal**
30:23 31:1

**causative**
28:21

Mark Shuman                    May 02, 2018                    Page 68

**cause**
11:17,19 12:6
13:24 14:2
22:14,24 23:5,
18 24:21
25:12,22 32:20
36:24 37:6,9,
22 38:8 47:19
49:17 53:24
55:2,11,16,21
56:6,9,13,18

**caused**
16:19 17:3
25:25 37:24
54:3

**causes**
24:22 54:1

**causing**
14:4 41:19,22
42:1,2

**cell**
23:7 24:14
33:13

**cells**
24:6,19,22
25:5

**center**
58:15

**certain**
10:11 38:18

**certainly**
11:4 28:24
44:20

**certainty**
56:24

**characteristics**

**40:3**

**charge**
15:8,15,19
34:7 35:2,14
44:7,12 51:17,
18 52:5 53:5

**charges**
36:18

**chart**
50:8,11

**check**
16:2

**chest**
57:15

**choose**
56:14

**chronic**
23:11

**circle**
58:11

**circumstances**
8:3,6,9,13 16:9
27:23 35:22
37:10,11 52:10

**City**
5:7,20 60:16

**clear**
12:21 13:3
19:12 55:13

**clearly**
35:21

**clinical**
61:8

**clinically**

**20:22**

**close**
36:11 37:15
47:22

**closer**
16:10 48:6

**cocaine**
49:7

**colleague**
46:6

**combined**
11:20

**comes**
52:22

**component**
12:22 14:5

**concentration**
17:17 18:20
19:10

**concerned**
21:12

**conclude**
14:10 36:13

**concluded**
35:10

**condition**
22:13 23:2
54:7

**conditions**
38:15

**conducted**
34:1 35:25
36:24 37:5

**conductive**

**42:21**

**confirmation**
19:1

**congenital**
22:19,25

**connection**
30:19,23 31:1
49:19 52:5

**consider**
21:6

**consistent**
26:7,17 28:3,
25 29:25 60:13
61:16

**constitute**
44:25

**constituted**
13:12

**contact**
43:5 51:14

**contained**
6:25 15:7

**content**
21:11

**contentious**
36:25 37:2

**contribute**
49:17

**contributed**
39:22 54:4

**contributing**
14:4

**contribution**
57:6

**control**
13:6

**conversation**
7:12 10:9
62:13

**conversations**
6:14

**cop-out**
56:11

**copy**
7:18 9:9

**corner**
32:2

**coronary**
11:20 22:7,11
38:15 56:19

**correct**
11:6 18:13
19:15,23 25:7
27:25 28:9
29:11 30:18
33:3,14 36:5,9,
22 37:20
44:19,23 48:9,
19 49:1,8,9,13,
14,18 51:4,24
52:3 53:3,16,
17,19,20,24
54:2,14 56:7,
25 57:2,12,16

**correction**
61:4

**correctly**
14:23 21:21
30:17 36:25
38:5 42:22

correlated
45:1

couldn't
7:10 52:17

counsel
10:18 50:2

count
15:13

County
25:12 47:3
48:18 56:6

couple
46:13

court
5:6,9 7:8
62:14,17

covered
33:12,21

CPR
53:12

crisis
25:2 33:13

criteria
26:10,16

criticize
25:15 56:9

criticized
56:5

CROSS
48:14

cuffs
55:20

cycle
49:20 50:9,13

51:6

—————————
      D
—————————

Dairy
5:12

Dan
5:17 9:9

DANIEL
5:24

dark
37:17

data
52:19

date
5:9

day
19:8 29:13

days
49:6

dead
53:21

death
11:14,18,19
12:10,16 14:2,
4 22:14 23:3,5,
13,21,22 24:4
25:9,12,22,25
29:13 30:10
31:6,11,15,18
32:15,20 33:24
36:24 37:6,9,
22 38:3,8,20
39:23 49:17
53:16,19 54:4
56:6,9,13,18,

22 57:7

decrease
47:25

deem
22:2 29:25
39:8,15 45:21

deemed
25:12

defect
22:24

Defendant
5:20

definitely
24:3 57:10

degree
30:6 32:6,16
42:11 49:10,16
56:23

delays
44:13

delirious
26:18

delirium
11:19 26:6,12,
16 27:5,8,17
28:4,7,17,22
29:9,15 30:1,5,
9,13,21 38:14,
24 40:4,7
41:17 42:13
45:17 47:9,15
54:15

delivered
15:16,19 16:14
34:7 35:2,15
50:10 52:6

delivering
15:8

Delta
49:2

Denise
5:21

depending
39:1

depends
24:9,24,25

depict
58:7 59:11

depicts
58:8

depo
62:4,16

deposition
5:11 6:6,9,12
10:10,15,19
46:11 47:7
50:25

deprivation
39:19

depths
35:17

derived
8:6

describe
33:17 52:13

described
8:7 16:18
19:25 20:4
25:23 56:1

description

20:6

descriptive
56:17,18,20

details
6:21 31:9

detect
19:10

detected
48:24,25 61:17

detection
61:19

Detective
49:25 50:10

determine
26:11

develop
10:25

developing
20:11

device
15:8 16:17,18
17:2 34:2
35:25 36:24
37:6 42:22

diagnosed
26:5 28:10
47:12

diagnostic
26:10,16

diaphragms
21:16

didn't
6:11,13 11:17
15:12,23 16:3

20:8 21:4,6
22:1 58:21

**die**
30:14 33:1

**differences**
11:9 13:23

**different**
11:16 12:8,11
21:4 41:11
49:7

**dilated**
23:15,17

**dilation**
23:19,25

**DIRECT**
5:23

**disagreed**
11:8 13:21
14:11

**discharge**
35:6,13 36:2
38:3,4 39:2
42:12,22 43:4,
12,16,17,20,22
44:11 52:14

**discharged**
15:11,12 34:6,
7

**discharges**
15:7

**discover**
20:5

**discovered**
52:2,6

**discuss**

33:17

**discussed**
33:25 41:23

**discusses**
26:1

**discussion**
31:6

**discussions**
40:1

**disease**
11:20 22:11
32:23 56:19

**diseases**
33:18,21,22

**dislodged**
34:23

**disorder**
28:14,16 29:1
38:15 47:8,13
54:11

**disorders**
47:15

**disruption**
17:7 34:13
35:23

**distance**
15:24 16:6,24

**distinction**
12:1

**doctor**
6:3,8 10:9
11:23 14:25
18:14 24:8
37:5 39:25
42:10 44:22

48:13,15 56:23
60:22

**document**
50:21,24

**documents**
50:1

**doesn't**
21:10 25:21
42:7

**done**
7:14 18:4 19:7
24:15 60:6

**don't**
10:22,24 12:1
16:8 19:4
23:22,23,24
24:19 25:4,8,
23 26:15 29:3,
17 32:13 33:12
34:12 35:12,17
36:21 40:12,
14,15,17,25
41:6,11,12,13,
20,22 42:1,5,
15,16 43:2,5,6,
9 45:5,25
46:15 47:2,16
48:3,4,7,13
49:5 52:15,16
57:8 60:20
61:1,11,18,20,
22 62:3

**down**
32:11 54:21

**download**
52:22

**downloading**

15:10

**drawing**
30:23

**drawn**
11:25

**drive-stun**
16:18,22,25
17:2 36:15

**drop**
53:21

**drug**
17:10,16 18:2,
8,25

**drugs**
39:4

**duration**
15:8,19

**during**
30:14 31:6,12,
15 32:15

**dying**
23:23

**dysplasia**
22:16 38:16

---

**E**

**each**
11:3 17:2 32:2

**earlier**
33:22 36:17
47:6 57:11

**edge**
48:7

**effect**
19:9 34:10

**effective**
35:22

**effects**
45:17

**either**
8:22 32:3

**electric**
35:6

**electrical**
14:3 15:19
35:2,5,14 37:9,
15,24 44:11,12
53:16,18

**electricity**
34:11

**electro-
muscular**
34:12 35:23

**electrophoresi
s**
24:13

**elsewhere**
8:19 20:6

**employed**
34:2

**EMS**
9:5,15 43:5,7

**encounter**
30:21 31:2
33:7

**encountered**
29:22

**encounters**
30:14

**end**
30:22 43:18,
20,21 51:6

**ended**
43:4 51:17,19

**ending**
36:4

**energy**
34:2 35:25
36:24 37:5
42:22

**enforcement**
30:14

**engaged**
29:13

**engagement**
60:24

**enough**
24:2 37:15
47:5

**entered**
10:16 49:23
50:19 57:25
58:25 59:18

**entirety**
9:3

**entry**
58:20

**error**
8:22 61:5

**ESQ**
5:24

**ethanol**
17:15,16,17
61:6,13

**evaluate**
43:25

**evaluating**
20:25

**even**
62:3

**event**
28:22 29:9,16
31:19 33:4
43:13 45:1,12,
18,23 47:9,19,
20

**every**
15:11 17:1,4

**everything**
33:25 54:12,13
55:4 56:13

**evidence**
29:12,21 32:8
57:14

**evidenced**
25:6

**exact**
32:13

**examination**
5:23 17:20
18:11 19:25
20:3 22:7
48:14 60:7,21

**examiner**
19:14,18
25:12,15 47:4

**examiner's**
18:5 48:18
56:6

**examining**
19:21

**except**
14:21

**excited**
11:19 26:6,11,
16,19 27:4,7,
17 28:4,7,17,
22 29:9,15
30:1,5,9,13,21
38:14,24 40:4,
6 41:17 42:13
45:17 47:8,15
54:15

**exclude**
12:5

**exertion**
13:17

**exertional**
11:15,20,21
12:7,15,23
13:13,25

**exhibit**
9:15 10:14,16
49:21,22,23
50:4,16,19
52:20 57:22,25
58:23,25
59:14,18

**exhibited**
26:12

**exhibits**
62:15

**exists**
12:2

**expect**
46:19

**experience**
31:11

**experienced**
44:5

**experiencing**
27:7 30:21
38:19 40:13,
20,24 41:17
44:24

**explain**
61:12

**expressing**
32:14

**extended**
21:22

**extra**
10:3

---

**F**

**fact**
9:20 18:15
27:12 29:5
33:7 34:21
42:6

**factor**
22:2,13 23:2,
13,21,22 24:3
28:21 32:22
33:24 42:20

**factors**
12:10 25:21

**54:3**

**fair**
26:24 47:5
48:1

**fairly**
59:10

**false**
18:4,16,23

**far**
14:3 16:3,4
29:2 48:1
61:25

**fat**
21:11,13,14

**fatalities**
30:23

**feeling**
13:13 40:15

**few**
6:18 48:15

**fibromuscular**
22:16

**fifty**
7:9

**find**
6:17 7:10
18:12 52:4
53:4 60:9

**finding**
25:16 49:15

**fine**
62:2

**firbromuscular**
38:16

**fire**
9:6,8 42:3
50:16 51:13,14
52:15,25 53:5,
9,10

**firm**
5:14,18 60:25

**first**
7:21 14:17,22
26:4 31:5
33:17 34:1
36:7 46:14

**five**
14:21 38:2
43:3 50:14
51:6,9 55:25
59:17

**flesh**
60:5

**Flex-cuf**
55:20

**Florida**
5:12

**flow**
32:24

**fluid**
61:7,16

**focal**
23:6

**follow**
12:12

**followed**
51:10

**following**
11:23 38:13

**footnote**
14:17

**force**
32:6,10

**forearms**
60:12

**forensic**
18:3,5,25

**forgive**
46:4

**form**
9:22 13:14
15:21 20:13
21:1 25:17
26:14 27:1,14
28:5 30:2,25
34:9 35:3 37:7,
23 39:6,14
40:10,22 41:25
43:1 45:2,24
46:22 48:10
53:7 55:12,22
56:2 57:1,5

**formed**
8:5

**forward**
17:8 19:24

**found**
6:18 18:8
24:19 47:1
49:20 61:6,15

**four**
31:5,20,23
32:5 33:8

**front**
7:18 60:10

**full**
8:15

**further**
60:20 61:2

---

**G**

**Gabriela**
5:8

**gain**
19:13

**Gary**
10:4

**genetic**
22:25

**Georges**
5:21 6:14 7:13
8:25 9:6,9,22
10:21,24 13:14
15:21 20:13
21:1 25:17
26:14 27:1,14
28:5 30:2,25
34:9 35:3 37:7,
23 39:6,14
40:10,22 41:25
43:1 45:2,24
46:22,25
48:10,15 49:25
50:6,8,21 53:9
55:16,24 56:5
57:3,6 58:2
59:2,17,20
61:8,20,25
62:5,9

**given**
17:6 51:2

**goes**
44:7,16

**Goldbetter**
5:11

**gone**
7:8 19:9 60:17

**Gonzalez**
5:8

**ground**
13:12

**guess**
27:17 36:6
38:12 58:19

**guy**
21:8

---

**H**

**hallucinations**
29:16

**handcuffed**
54:18,22,25
55:5,10

**handcuffs**
13:4,8 31:21
55:17

**Hapner**
5:18 62:11

**happened**
37:18 52:13

**happens**
56:3

**hardening**
22:11

**hasn't**
11:4

**haven't**
44:4

**having**
19:25 26:5
27:17 29:18
33:7 39:4,11
42:7 45:11

**heading**
8:2

**heart**
22:5 24:1,2,3
32:23,24
37:14,15 54:6
56:19

**heartrate**
42:9

**heavy**
7:10

**height**
20:7,10,21

**held**
5:11

**Helfman**
5:19

**help**
9:8 47:17

**hemoglobin**
24:13

**here**
5:6,17 6:15 9:1
10:6 20:3 25:4,
11 38:12 40:1
56:1

**he's**
12:5,6 13:23,
24 20:19 24:2

**high**
7:9 27:17

**higher**
21:9,10

**histology**
24:18

**hit**
34:24 35:7
37:13

**holding**
32:4 52:1
54:21

**Hollywood**
5:7,20 29:22
60:16

**Homicide**
50:1

**honestly**
49:5

**hospital**
18:2 19:6
61:11

**hundred**
7:9 45:6

**hundredth**
51:10,20

**hundredths**
51:16

**hurts**
45:15

**hyper-aggression**
26:13,25

**hypertension**
23:20

**hyperthermia**
27:20

_____

**I**

**identified**
38:23

**identify**
5:13

**illness**
28:8,11,13

**Immediately**
44:9

**important**
9:12

**importantly**
54:20

**incapacitating**
16:13,15

**incapacitation**
16:7,11,20
17:3 36:8,19

**inches**
20:19

**included**
51:23

**incoherent**
26:18 29:10,13

**increase**

21:8 42:8
45:13,14

**independent**
16:8

**index**
20:11

**indicate**
43:3

**individual**
42:13

**individuals**
30:13,20 47:12

**infiltrate**
23:7

**inflammation**
23:12

**information**
15:1,10 16:12
17:6 52:18

**informed**
7:4

**ingested**
49:11

**initial**
43:5 53:10,13

**initially**
27:23

**initiate**
53:12

**injuries**
60:13

**insertion**
57:15,17 58:13

**intentionally**
60:6

**interaction**
60:16

**internal**
29:19

**into**
10:16 21:10,
15,16 28:25
32:1 34:25
48:3 49:23
50:19 56:21
57:25 58:25
59:18 60:17
62:15

**involve**
19:21

**involved**
33:8

**involves**
33:15

**issue**
21:6 25:1

**issues**
7:6

**it's**
9:12 12:7 13:1
18:19 19:3,4
20:8 22:19,25
23:4,20,22
24:23,25 28:23
29:2,3 31:1,2
41:4,14,19,22
42:2,4 43:19
45:8,10 46:13,
25 48:1,2 49:7
50:12 52:16

53:18 55:3,13
56:11,14,15
57:8,9,22
61:13,14

**Ives**
5:12

**I'd**
6:13 16:2

**I'll**
50:2 59:14
61:22,23

**I'm**
7:17 9:12
11:11,23 12:13
13:3,10 17:5
19:19 20:3,8
28:23 30:8
32:18,20 40:1
41:3 44:1,3,23
45:3,5 46:5,23
49:21 50:4,15
52:9 57:21
58:14,22

**I've**
9:1

_____

**J**

**Jean**
5:7,22

**jog**
53:22

_____

**K**

**kind**
6:19 9:11 21:7

45:14 58:19,20

**knees**
60:11

**knowledge**
24:17

**known**
23:4

**knows**
41:13 42:16

---

**L**

**lab**
47:3

**lacerations**
60:9

**lag**
44:15

**lapse**
43:8

**large**
19:25 21:13

**largely**
8:13

**larger**
20:15 21:8

**last**
38:11 39:2
42:21 43:3
44:10 47:16
49:3,20 50:9,
13 51:17,18
52:5,14 53:5

**law**
5:18 30:14

60:25

**leads**
52:11

**least**
35:16 44:24

**leave**
54:25

**led**
11:13

**left**
59:11

**leg**
13:4,8 31:21
54:18,22 55:1,
7,10,18,21

**legs**
32:4 60:12

**less**
16:10 44:20
47:23

**let**
6:24 12:12
19:12 38:7
42:10 62:11

**let's**
8:24 17:8
19:24 31:4
60:11

**life**
49:8

**like**
13:1 14:5
20:16 21:7
24:10 32:25
34:12 35:4,5,

21 38:25 42:6
43:3 51:7
56:20 57:8

**likely**
16:10 18:18
23:20 40:23

**limit**
61:19

**line**
56:18

**linear**
34:15

**listed**
7:25 10:12
14:15 54:3

**literature**
29:8 30:20
43:24

**little**
44:15 57:19
58:18

**located**
5:11

**lodged**
34:21

**long**
14:6 15:12
44:6 49:3
50:13 61:12

**longer**
18:19 44:10
52:17

**looked**
6:10 22:5
34:11 35:4,5

**looking**
9:4 21:3 46:23
47:2

**lot**
18:4 24:10
49:5

**low**
19:10

**lower**
8:20 9:23,24
16:1 32:4 36:4
48:2 59:12

**lungs**
21:16

---

**M**

**Madam**
62:14

**made**
24:5 30:5

**main**
22:21,22

**make**
8:14 9:13
12:21 17:9
19:12 20:22
25:11 51:14
62:11

**many**
36:21 43:21
44:18

**March**
7:15

**mark**
6:2 10:14

**marked**
49:22 50:16
57:22 58:22

**marks**
8:18 34:18
57:20 58:15,19

**mass**
20:10 21:9

**material**
8:5

**materials**
7:22,24 8:7
10:12,18 27:11
29:4 51:3,23
53:2 56:1

**matter**
5:6 44:17

**may**
5:10 12:15
18:7 34:18,23,
24 39:22 41:11
57:19 61:19

**maybe**
19:8 35:19,20

**mean**
6:13 11:2
13:22,23 16:3,
9 18:24 19:3
20:14 23:4,10
24:1 26:16
28:24 32:1
40:23 41:2,19
42:7 44:3,9
45:11 47:14
48:2 51:19
52:12 53:8
54:24 56:3,14

57:8 61:12
62:1,9

**meaning**
42:2

**means**
22:18 37:25
44:20 47:23

**medical**
6:3 18:5 19:14,
18 25:12,15
29:8 30:6
42:12 43:24
47:4 48:18
49:11,16 56:6,
24

**medication**
29:2

**medications**
28:20 29:6

**mental**
28:8,11,13

**mentioned**
6:15

**metabolites**
49:6

**metabolize**
61:13

**metabolized**
18:21 19:5
61:15

**ME'S**
22:4

**Miami**
5:12

**microscopic**

60:7

**midst**
30:1

**might**
44:25

**milliliter**
49:1

**mind**
61:22 62:3

**minor**
11:9

**minute**
44:20 46:5
47:23 48:6,8

**minutes**
14:21 46:14

**mode**
16:19,22 17:2
36:15

**monograms**
49:1

**more**
10:3 13:5,7
20:6 21:23
29:3 31:2
36:18 46:12
54:20

**most**
7:17 9:12
18:18 47:14

**mostly**
11:2

**move**
17:8 19:24
31:4 38:1

**much**
10:22 48:12
55:2 61:13,24

**muscle**
21:8

**muscular**
16:11

**must**
16:22 35:10

**myocardium**
23:8

---

**N**

**name**
5:8,17,25

**named**
34:3

**narrowing**
22:20

**natural**
33:17,21

**near**
8:17 37:14

**necessarily**
15:15 60:6

**need**
9:10 25:24

**nerve**
16:11

**neuromuscular**
16:7,20 17:3,7
36:8,19

**never**

24:18

**new**
6:20

**next**
17:19 18:7
22:16 23:6
26:1 33:11,15
36:23

**nine**
14:22

**NMS**
48:20

**nodal**
22:17

**node**
22:21,22 23:8

**nodes**
38:17

**none**
19:20 48:24

**normal**
44:8,16

**normally**
21:5

**North**
5:12

**note**
8:14 24:6
25:11 39:25

**noted**
17:12 27:4
28:21 39:11
51:24 52:8
57:14

**notes**
8:23 9:5 10:7,
8,11 16:2 36:6

**noticed**
39:4 61:4

**noticing**
5:15

**noting**
30:19

**nuclear**
23:7

**numb**
40:9

**number**
5:7 15:7,13
33:5 43:23
48:4,5 50:4

**numbers**
15:14 62:12

**numbness**
40:4,11 41:2

---

**O**

**obese**
20:22 21:22

**obesity**
21:5,7,11,23

**Object**
53:7 55:12
56:2 57:1,5

**Objection**
55:22

**objective**
9:16

**obtain**
14:25

**obtained**
15:10

**obviously**
26:19 51:19

**occur**
37:16

**occurring**
43:17

**October**
49:12 53:22
60:18

**ocular**
61:7,16

**off**
28:1 34:24
35:1 42:19
46:10

**office**
22:4 47:4
48:18

**officer**
26:22 30:22
34:3,7 35:14,
18,24,25 36:3,
7,14

**officers**
13:6,11 16:12,
21 29:22
31:21,24 32:6
33:8 52:1,7
54:21 60:17

**often**
29:3,16 30:14

**one**
7:25 8:7 10:2,
3,12 11:13
14:21 17:4
18:6 25:22,24
27:16 32:2
34:5 35:7,19
36:18,21 37:4
40:3,17 43:2
47:16 50:6
56:14,18 57:17
58:9,12 60:22
61:4

**ones**
21:13

**one's**
49:3 55:11

**only**
9:1 17:6 18:24
24:22 37:9,16
42:20 48:25

**open**
27:24

**opinion**
11:2 12:1
15:18 16:5,16
17:1 18:23
30:4 31:10,14
32:5,15 34:5
37:4,8 38:7,18
41:15 42:11,24

**opinions**
6:24 8:10 11:1,
5 19:13,20
20:12 26:2
40:1

**opioids**
17:12 18:9,12,

15,22

**opportunity**
50:3 57:23
59:2

**order**
61:23

**organs**
24:20,25 25:6

**others**
19:14

**otherwise**
45:18 62:8

**ouch**
45:15

**outside**
48:7

**over**
6:10 52:15

---

**P**

---

**p.m.**
5:10 51:5,10
60:18

**pacemaker**
22:21

**pads**
21:13

**pain**
14:5 38:4 39:1
40:4,9,11,15,
21,24 41:2,6,8,
9,12,19,22
42:1,2,7,8,17
43:16 44:6,10,

11,14,24,25
45:3,9,14
47:18 55:16,21

**painful**
42:4 45:18

**pain's**
43:17

**Pantaloukas**
35:25 36:3,7,
14

**paragraph**
8:15 31:5,10
33:11 36:13,23
38:12

**part**
13:25 14:6
23:23 26:1
54:24

**particular**
7:3 22:1 28:13,
16 31:23 48:4,
21

**particularly**
20:14 21:2

**parts**
56:21

**party**
5:14,15

**path**
49:8

**pathologist**
22:4 24:5

**patient**
45:16

**patients**

27:4,7 28:19

**PD**
9:17

**people**
26:19 29:9,15
44:4 52:12

**people's**
7:9

**percent**
45:6 61:14

**perception**
45:9

**perfect**
37:17

**period**
14:21 35:11
43:15 52:14,
16,17

**person**
21:21,22 37:17
40:12 41:7

**personal**
19:16

**personnel**
30:15

**perspective**
41:18

**pertains**
48:23

**perused**
6:19

**photograph**
58:3,5,6,7,10
59:3,5,7,8,10,

21,23,24

**photographs**
9:2 57:12 60:9
62:1

**photos**
21:17 62:9

**phrase**
41:1

**physical**
13:5,7

**physiologic**
42:8 45:5

**physiological**
42:16 44:14
45:10,11,17

**physiologically**
41:13,14

**physiologics**
43:18

**pick**
25:24 56:14

**place**
16:23 21:14
59:9

**placing**
32:6

**Plaintiff**
5:22

**Plaintiff's**
49:22,23 50:16
52:20 57:22
58:23 59:14
60:25

**played**

12:15

**plenty**
44:3

**point**
16:24 31:25
51:14,22 52:2
57:17

**police**
13:5,11 16:12,
21 26:21 29:22
30:22 31:2,20,
23 32:6 33:8
34:2 52:1,7
55:24 60:17

**portion**
14:11

**position**
54:18 55:11,14
57:4,8 60:14

**positional**
21:19,23

**positive**
17:12 18:17,
19,23

**positives**
18:4

**possession**
62:15

**possibility**
55:9

**possible**
18:21 45:22
61:14

**possibly**
39:1

**post-mortem**
17:19 18:11
19:24 20:2

**potential**
21:19

**potentially**
24:9 28:21
54:16

**pounds**
7:9 20:20

**pre-existing**
54:6

**preparation**
6:12

**prepare**
6:8

**prescribed**
46:16

**presence**
18:8 46:20

**present**
5:9,13 18:19

**presented**
18:16,22

**press**
48:1

**pressure**
32:16 42:9
45:13

**presume**
40:9

**pretty**
55:13

**previous**

10:2

**primary**
32:20

**prior**
49:12 50:24

**probability**
30:6 42:12
49:11,16

**probably**
18:3 23:14
24:12 36:10
43:19 44:15
48:2 60:19

**probe**
34:11,19,21
35:5,7,10
37:13,14
57:16,18,20
58:8,13,20
59:9

**probed**
9:20

**probes**
15:25 16:6,14,
24 35:18 36:3,
11 59:11 60:2,
3,4

**problem**
46:7

**proceeding**
5:16

**process**
11:17 13:2,24
14:1 23:23
24:21 55:3

**processing**
24:21 40:25

**promise**
46:13

**prone**
21:14,23 31:6,
12,15 32:15
38:13 54:18
55:10 57:4
60:14

**propensity**
47:8

**provide**
50:2

**proximity**
45:21 47:18

**psychiatric**
47:14

**psycho-effective**
47:13

**psychosis**
26:20 28:25

**pulmonary**
23:16,20

**pulse**
45:14

**purposes**
6:25 8:10

**pushes**
21:15

**pushing**
32:11

**put**

43:23 48:7
62:15

**putting**
12:6 58:14

**PV**
23:15

---

**Q**

**quadrant**
34:16

**quality**
18:5

**question**
10:2 18:8
19:12 46:14
47:16 60:22

**questions**
48:13,15 61:2

**quick**
46:12

**quickly**
56:3

---

**R**

**Ramirez**
34:3,7 35:14,
18

**rapidly**
28:19

**rare**
37:9

**RE-DIRECT**
60:21

**reached**
19:21

**read**
10:3 14:23
18:15 30:17
36:25 38:5
42:22 51:22
61:20

**reading**
11:7 19:13
20:3 61:5

**readings**
19:13

**readout**
15:2,3,7

**real**
46:12

**really**
20:16 21:10
43:6 48:4 55:1,
14

**reasonable**
30:6 42:11
49:10,15 56:23

**recall**
10:20 11:7
13:20 15:2

**recap**
27:22

**received**
14:20

**receptors**
41:8 42:3 45:4

**recites**
7:21

**recognize**
29:8 50:21
58:2,5 59:5,7,
20,23

**recognized**
27:16 31:22

**record**
6:1 10:17 16:3
20:9 46:10,15
49:24 50:20
58:1 59:1,19

**recounted**
39:21

**red**
24:6

**reference**
8:19 17:9,22

**referring**
41:5

**regard**
32:15 47:11

**relate**
15:15

**relation**
45:22

**relying**
53:2

**remain**
44:11

**remember**
7:3 47:6

**reminding**
10:9

**remove**

60:5

**removed**
60:2

**removing**
60:4

**rendering**
8:10

**report**
6:10 7:1,15,18,
21 8:19 9:3,7,
8,15 10:3,4,12
11:1,4,8 12:17
13:21 14:5,12,
14 15:24 17:9
20:4,5,17
25:20,23 26:1
30:8 31:5
33:11,15 36:6
38:2 39:25
43:7 46:24
48:16 50:1,17
51:13,23 52:8,
25 56:17 58:18
60:8 61:5,6

**reporter**
5:6,9 62:14,17

**reports**
9:19 19:14
61:25

**represent**
5:15,19

**represented**
34:18

**rescue**
9:7 50:17
51:13,14
52:15,25 53:5,

9,10

**research**
6:11 7:5,13

**resistance**
11:15,20,21
12:7,15,23
13:13,25

**resisting**
12:9,25 13:16

**respect**
22:3

**respond**
41:6

**responding**
29:18

**response**
41:7 42:8,17
44:15 45:5,11

**responses**
45:14

**rest**
42:18

**restrained**
13:1 31:20
57:9

**restraining**
11:17 12:9
14:1 31:25

**restraint**
6:16 7:6 11:10,
13,22 12:6,10,
22 13:3,5,7,23
21:12 31:7,12,
16,17 32:16,
19,21,22 33:2

38:13,25
54:16,17,24

**restraints**
13:4,9

**restriction**
32:23

**result**
23:20 30:9
33:4 35:14
36:8,19 40:21

**resulted**
36:3

**results**
42:5 48:22

**resumed**
46:11

**return**
14:14

**Returning**
14:14

**reveal**
46:20

**revealed**
22:7

**review**
11:1 27:10
29:4 50:3
57:11,24 59:3
60:8

**reviewed**
7:22,24 10:11
50:24

**rhythm**
37:16

**Road**
5:12

**robe**
27:24 28:1

**role**
12:16 25:8
38:3,19 45:11

**Rollos**
50:1,10

**rule**
55:9 56:24
57:3

---

**S**

---

**S-H-U-M-A-N**
6:2

**SA**
22:17,21 23:8
38:16

**said**
6:15 7:7 11:16,
17,18 14:1,5
16:1 25:20
35:21 38:25
41:24 43:3
57:8

**salts**
48:19,23

**same**
9:13 11:22,24
12:2,4,11 13:2
41:7 42:7 43:4
47:11 51:21
55:19

**saw**

15:15 21:17
24:18 28:15

**say**
6:13 11:1,21,
24 14:19 15:9,
12 18:24 32:19
38:2 41:4
42:15 43:8,10
45:6

**saying**
7:8 11:10 12:2,
4,8,11 13:23
32:20 36:13
41:3

**says**
42:19 43:7

**scan**
62:7

**screen**
17:10,16 18:2,
8,11 19:1
48:23

**seal**
62:1

**second**
8:15 34:19,21
35:10,24 38:11
47:5 48:6
51:11,17,20

**seconds**
14:22 43:19,21
44:17,18,20
47:23 50:14
51:6,9 55:25

**section**
17:19 33:15

**sections**
60:7

**seem**
40:14 41:6

**seems**
43:7

**seen**
24:10 29:3

**send**
11:17 41:9
42:3 62:7

**sent**
48:20

**sentence**
26:4 36:23
42:18

**series**
54:1

**Serota**
5:19

**serum**
17:16,17,18
24:12,13

**set**
26:15

**seven**
48:25

**severed**
22:7

**shackled**
54:19,23 55:1,
7,10

**shackles**
31:21 55:18,21

**shock**
16:14

**short**
43:15 52:16

**shorter**
49:8

**shots**
14:20

**should**
6:5

**show**
27:8,12 50:15
57:21 58:22
59:14

**showed**
35:22

**shows**
45:17

**Shuman**
6:2,5 8:25
50:22 53:15
55:5

**sickle**
24:14,19 25:2,
5 33:13

**sickled**
24:6

**sickling**
24:10,21

**side**
24:1 32:3 48:2

**signal**
22:22 41:9
42:3

**significance**
20:24 24:8
61:8

**significant**
18:20 20:11
22:2 24:23
32:14 38:15

**signs**
27:12 60:9

**simultaneous**
62:13

**since**
7:14 25:20
48:15 61:10

**single**
17:4

**sir**
6:1,3 15:6,14,
18 16:5,16
17:1 22:10
26:9 30:4,12,
19 31:10 32:5,
14 34:5 37:12
41:15 42:24
61:3

**sit**
25:4

**site**
34:11

**situation**
56:12,13

**skin**
35:16 58:21
60:3,5

**sleep**
39:19

**slide**
24:18

**small**
23:11

**solely**
53:8

**somebody**
7:8 21:3,5
24:22 26:11
28:4,25 29:25
41:17 42:17
54:25

**someone**
55:25

**something**
11:15 17:24
19:4,7 20:16
23:1,24 24:11
28:24 32:25
34:24 47:2
56:20

**sometimes**
23:25 29:10

**soon**
44:7

**sorry**
11:23 50:4
59:17

**sort**
27:3,23 28:3

**sorts**
19:12

**speak**
8:14

**specific**

**6:14 20:6**
37:10,14 43:23

**specifics**
32:1,13

**speech**
29:10,13

**spend**
7:17

**spleen**
24:10

**spoke**
57:11

**spread**
59:11

**stamped**
46:25 57:23
58:23 59:15

**started**
42:19

**starting**
5:15

**state**
5:25 26:7,17,
18,19 30:13
31:3 38:14
40:6 42:13,17
45:16

**stated**
38:11

**statements**
27:10

**states**
9:16

**status**

**31:17**

**stick**
58:21

**still**
16:23 31:20
35:19 45:8
59:9

**stimuli**
29:19

**stop**
29:5 44:14

**stopped**
28:19 29:1

**stops**
43:17

**strain**
18:16,22

**strains**
46:19

**strength**
27:8,13

**stress**
54:4 55:2,11
57:10

**stressful**
55:15

**stressor**
13:16 14:6
32:22 33:9
38:4 39:9,16
41:18,20 42:14
44:25 45:22
47:19 56:25

**stressors**
11:13 33:5

**38:19,22,24**
39:21 54:6,10,
11

**strike**
37:17 53:10
55:25 58:9

**struck**
58:20

**struggle**
38:13,25
54:16,21 55:24

**struggling**
13:12 25:2

**studies**
6:16 24:15
55:14

**stuff**
24:2

**stun-guns**
40:14

**Suarez**
5:7,22

**subject**
8:21 37:2,13
44:2 48:1

**subsequent**
16:17

**subtle**
13:23

**such**
42:8

**suck**
20:16

**sudden**

23:5 31:6,11,
15 32:15

**suffer**
31:15

**suffered**
26:5

**suffering**
26:11 28:4,10
29:15 33:23
39:19 40:3

**sufficient**
42:25 45:21

**sufficiently**
43:13

**suggest**
29:4

**suggested**
30:8

**suggests**
8:17 30:20

**summary**
8:3,6,13 27:22

**supplemental**
7:5

**support**
46:16

**suspect**
29:17 45:8

**symptoms**
26:10 27:16

**synchronized**
43:6

**syndrome**
11:19 26:6,12

30:1,5,9 40:4
54:15

**system**
39:5,7,12

_____

**T**

**table**
15:2

**TAC**
39:7

**take**
21:10 46:4,13
50:3 51:10
56:21 57:23
59:2 60:7
61:12 62:6,15

**taken**
19:5,8

**taking**
28:19 29:2,5
46:21

**talk**
14:17 46:5

**talked**
36:17 47:7

**talking**
6:17 7:17 13:4,
5,17 21:18
29:23 47:18
54:17

**tased**
44:4 51:5

**taser**
8:18 9:17,20
14:2,20 15:2,3,

7,10,11 16:19
33:16,18 34:1,
6 35:1,13,18
36:2,3,7,14,18
37:21 38:2
39:1,2 40:21
41:16,17
42:12,19 43:12
45:22 52:14,23
53:5 54:16
56:25 57:15,
18,20 58:8,13,
20 59:9

**taser's**
43:16

**tasing**
49:20 50:9

**tasings**
50:2 54:14

**telling**
11:25 18:14
29:19

**temperature**
27:18

**temporal**
14:7 30:19
42:20,25 43:11
45:21 47:18
49:19 52:5
53:4

**temporally**
43:14

**ten**
14:20,21 50:1

**tending**
53:5

**term**
12:17 13:25
40:11

**terms**
15:18 16:5
31:10,24 37:5
38:8 41:15
42:24 47:19

**test**
18:3 48:21

**tested**
18:3 48:19

**testimony**
7:4 9:1 44:22

**testing**
17:22,24,25
18:1,4,5,25
19:16

**than**
7:12,25 13:8
17:25 44:10,20
47:23 48:6,7
49:7

**that's**
9:11 11:6
12:11,17,24
17:16 18:2,6,
13 19:15,23
22:11 23:14
25:7 27:25
28:9 29:11
30:18 33:3,14
36:5,9,10,22
37:18,20 41:10
43:13 44:17,19
47:2 48:11
49:9,14,18
50:11 51:4

52:3 53:3,17,
20 54:2,8,10,
12,24 55:2,3,4
56:16 57:2
58:6 62:2

**THC**
49:1,2,6,16

**their**
5:14 21:14,15,
16 28:20 29:1,
2 32:11 53:13
56:9 57:18
61:18

**themselves**
5:14 8:14

**thereafter**
44:9

**thereupon**
10:16 49:23
50:19 57:25
58:25 59:18

**there's**
8:19 11:9,10
13:1,22 17:22
41:12 57:17,18

**they're**
24:9 25:24
29:17,19,20
31:3 40:13,15
41:5 42:6,7
44:7 51:19
55:1,23

**they've**
7:8 26:12 60:2

**thickening**
22:19,20

**thin**
37:13,16

**thing**
9:12 11:22,24
12:2,4,11 19:3
22:16 23:6
48:25 55:19
56:15

**things**
6:15 57:18

**thought**
9:20 43:21
44:10

**thoughts**
8:20

**three**
17:9 30:12
39:25 46:12

**through**
8:23 9:4,18
16:14 17:24
18:5 31:9

**THS**
49:12

**tight**
55:17,23

**time**
5:10 7:17
15:11 19:5,6
31:18,22 32:9,
17 35:11 39:2
43:4,8,11,15
50:9 51:18,21
52:14,16,17
55:4 56:22
61:3,6,11,17

**timeframe**
47:25

**timeline**
52:4

**times**
29:16 43:6,8
52:8,9

**timesheet**
10:21,22

**timing**
14:7 45:25

**tissue**
24:21

**today**
5:6 9:1 50:25

**Today's**
5:9

**together**
16:10 36:11

**told**
10:10 47:22

**took**
10:11 28:1
62:9

**top**
17:8 31:4 32:3
38:1

**total**
14:20

**toxicologist**
19:19

**toxicology**
17:22 18:4,11
46:19,24 47:3

48:16,22 61:5

**tracks**
15:11

**trait**
24:14,23,24

**transmits**
22:22

**tree**
29:23

**tribute**
14:2

**tricuspid**
23:16

**tried**
43:25

**true**
8:10 18:18
19:22 35:2
47:11

**trying**
12:5 13:6
32:19 56:21

**turn**
55:25 58:10

**turning**
51:24

**TV**
23:15

**two**
7:9 8:2 9:16
14:15 15:25
22:21 32:2,3
46:5 48:6 53:2
57:18

**type**
12:5 21:17,23
29:18

**Tyson**
9:20 12:22
13:6,12,13
14:20 15:16,20
16:20 17:3
18:16 19:22,25
20:22 25:6
26:5 27:12,23
28:10 29:5,12,
21 30:5 31:11,
18,25 32:7,11,
17 33:12,23
34:2,8,22 35:2,
11,15 37:19,22
38:19 39:4,11,
18 40:6,20
44:24 46:16,20
49:11,20 50:10
51:5,14,24
52:6 53:6,21
54:4,18 57:4
58:6,23 59:15
60:17

**Tyson's**
8:18,20 12:16
15:25 19:22
20:6,10 22:1,5,
14 23:2,21
36:4 38:3,8
39:23 49:17
57:23 58:16
59:11,24 60:10

———————
**U**
———————

**under**
17:19 31:18

37:9 40:1 62:1

**undergoing**
29:9

**underlying**
24:23 32:23
54:11

**understand**
21:21 33:1
44:22

**understanding**
15:6

**underwent**
33:13

**undetermined**
25:13 56:7,10

**unexpected**
27:8,12

**unless**
10:23

**unresponsive**
49:21 52:7

**unusual**
56:13

**upper**
8:18 9:16,21
34:16

**urine**
17:9,16,17,25
18:2,8,16,22,
25

**usages**
16:19

**use**
17:1 34:1 36:7

37:21 41:16
42:19 45:21
56:24

**used**
12:17 35:24
36:14

**uses**
16:17 17:2

**using**
13:24 32:10
52:19 55:20

**usually**
23:24 24:22

---

**V**

**valve**
23:16

**ventral**
22:23

**verses**
49:12

**videos**
44:5

**view**
11:5

**Vilke**
10:4 11:14,25
12:14

**Vilke's**
11:1,7 13:17,
21 14:11

**violence**
26:13

**violent**

38:13,25

---

**W**

**waive**
61:21,22

**want**
8:14 9:13
12:21 14:17
43:23 46:14
48:3,7 62:1,7

**warranted**
24:12

**wasn't**
11:12 12:25
19:5 20:15
31:22 35:20
61:17

**watch**
44:5

**way**
12:8,11 16:13
17:6 18:14,24
20:11,25 34:5
37:4 40:17
42:10 43:2
52:10,13 53:16

**wearing**
27:23

**week**
49:12

**weeks**
49:6

**weight**
20:7,10,21
21:9 22:2

32:11

**Weiss**
5:19

**Wellbutrin**
46:17,20

**went**
35:21 53:21
58:9 61:11

**we'll**
10:14 62:8

**we're**
9:13 12:4 13:3
47:17 48:16
53:18 54:17

**we've**
33:12

**what's**
14:15

**whether**
16:5,16,19
24:23,24,25
25:5 26:12
31:11 34:6
36:24 37:5
39:18 41:16
42:5,12,25
44:23 47:7,19
49:11

**while**
38:13 43:16

**whole**
56:15

**who's**
41:7 42:13

**will**

21:9 44:14,15
46:16 62:17

**within**
30:6 42:11
43:19 49:10,15
56:23

**without**
7:10 9:18

**witness**
9:4,8,15,23
13:15 15:22
20:14 21:2
25:18 26:15
27:2,15 28:6
30:3 31:1
34:10 35:4
37:8,24 39:7
40:11,23 42:1
43:2,7 45:3,25
46:23 47:1
48:11 50:7
53:8 55:13,23
56:3 57:2
61:10,22

**wondering**
58:18

**words**
11:16 40:13
44:11

**world**
9:13

**wouldn't**
12:24 43:23
61:12

**written**
10:6 41:4

**wrong**
12:13 13:11
24:2 30:9
44:23

---

**Y**

**yourself**
6:9

**you'd**
47:3

**you're**
9:11 12:2
16:10 43:24
44:18,23 45:20
59:16 62:14

2016-44 Suarez v. City of Hollywood

Materials Reviewed:
1. Jean Suarez vs. City of Hollywood, et al. – Complaint
2. Table of Taser Discharges by Officers Ramirez and Pantaloukas
3. Hollywood Fire/Rescue & Beach Safety Department, Ambulance Record – October 27, 2014
4. Broward County Medical Examiner (BME2014-2848)
5. 76 autopsy photographs, including Lodox radiographs
6. Cardiac Pathology Report – Dr. Michael Bell
7. Neuropathology Report – Dr. Kenneth Hutchins
8. Transcripts of Sworn Statements of:
   a. Officer Andreas Pantaloukas
   b. Officer Alexis Ramirez
   c. Officer Brian Kerns
   d. Officer Alejandro Falcon
   e. Officer Kyle Karl
   f. Officer Kyle Wagner
   g. Officer Anthony Truntz
   h. Jennifer Corbo
   i. Christine Corbo
   j. Xavier Lesmarie
9. Notarized Statement of Leonarda Moore
10. Deposition Transcripts of:
    a. Officer Alejandro Falcon
    b. Officer Anthony Truntz
    c. Officer Kyle Wagner
11. Expert Report of Gary M. Vilke, MD


Daniel Tyson, DOB 6/13/1984, DOD 10/27/2014

Daniel Tyson was a 30 year old male who had a history of bipolar disorder.  On October 27, 2014, his neighbor observed him in an agitated state, speaking loudly with a woman who was visiting his apartment.  A few minutes later, he was seen naked on his balcony and talking to the air and a tree.  The neighbor called their landlord, and the landlord reported the incidence to the police. The police responded 5 to 10 minutes later.  Mr. Tyson was wearing a robe, but it was open in the front and exposing his body.  Officer Ramirez told Mr. Tyson that he could not be naked in public, and Mr. Tyson picked up a sundial and approached him.  Officer Ramirez told him to stop or he would utilize his Taser. Mr. Tyson continued to approach and Officer Ramirez discharged the Taser and incapacitated him. Officer Ramirez then "hip-flipped" him onto the ground and Mr. Tyson landed on his stomach.  He was placed in handcuffs and leg shackles and remained face down.  He was Tasered several more times while on the ground and a neighbor observed the police officers on top of his back.  Approximately 2-3 minutes later, the officers turned him over and noticed that he was limp. The handcuffs and leg shackles were removed and resuscitation was initiated by the officers and paramedics.

Mr. Tyson received a total of 10 Taser shocks in a period of 10 minutes; all except one was for 5 seconds, and the one was 9 seconds.



EXHIBIT
Defendants
1

1

Paramedics were dispatched at 2:56 p.m. and had contact with Mr. Tyson at 3:01 p.m. He was initially combative, but then became unresponsive, pulseless, apneic, and with fixed and dilated pupils. His blood glucose was 81 mg/dL by finger stick, and his cardiac rhythm was PEA. Two barbs from a Taser were in his upper back. He was transported to Memorial Regional Hospital with no change in his status. They arrived at the hospital at 3:23 p.m.

Mr. Tyson arrived in the emergency department of Memorial Regional Hospital at 3:24 p.m. He was unresponsive, and ACLS was continued for 12 minutes. A cardiac ultrasound revealed no cardiac activity and he was pronounced dead at 3:37 p.m. A chest x-ray revealed increased pulmonary markings suggestive of congestion. A pelvic x-ray revealed no fractures, but the exam was limited because of overlying medical intervention. A urine drug screen was positive for opiates, amphetamine, and cannabinoids. Serum ethanol was 31 mg/dL.

The autopsy revealed a well-developed, "large build" male who had a small abrasion with a punctate defect in the left side of the chest' small abrasions of the epigastric region, right upper quadrant of the abdomen, right knee, left forearm, and left leg; two metal barbs were in the left side of the lower back; severe coronary atherosclerosis, fibromuscular dysplasia of the cardiac conduction system, pulmonary congestion and edema, and hepatomegaly. Toxicology testing revealed delta-9 carboxy THC (7 ng/mL) and ethanol (0.03%) in peripheral blood. No amphetamine/methamphetamine, opiates, bath salts or designer stimulants were detected in peripheral blood.

The cause and manner of death were listed as "undetermined."

Examination of the heart by a cardiac pathologist revealed severe coronary atherosclerosis, fibromuscular dysplasia of the SA and AV nodal arteries, focal mononuclear cell infiltrate of the right atrial myocardium and SA node, dilated TV and PV annuli, and sickled red blood cells.

Examination of the brain by a neuropathologist revealed a normal brain with cerebral edema.

Officer Alexis Ramirez responded to a "Signal 20," which was a mentally ill white male who was naked. He was advised by a female at the scene that there was a male upstairs who was acting erratically and was naked. Officer Sanchez knew that his backup, Officer Andreas Pantaloukas was on the way and called him on his cell phone to see how far away he was, because he wasn't comfortable dealing with Tyson himself. Officer Ramirez noted that Tyson was mumbling random words, went inside and returned with a little can and started throwing marbles or metal balls over the balcony. Officer Ramirez told him to stop throwing things, and indicated that Tyson "flipped out" and came down the stairs at him. He grabbed a black object that was hanging on a wall outside and held it over his head with one hand. Officer Ramirez was giving commands for Tyson to drop the object, but Tyson did not comply and charged at him, so he deployed his Taser, but it had no effect and Tyson struck officer Ramirez in the head with the object that was in his hand. Ramirez then grabbed onto Tyson and they started to wrestle. Tyson was not complying with command and was flailing his arms and legs and yelling unintelligibly. Ramirez radioed for additional back up and then saw Officer Pantaloukas approaching and then he tried to gain control of Tyson's feet. Tyson continued to struggle and Ramirez heard Pantaloukas give warnings that he was going to deploy the Taser, and then he deployed the Taser. He gets more agitated after the Taser cycle and he sees Officer Kerns approach and help apply handcuffs. Tyson continued to struggle and he and Officer Kerns tried to maintain control of his torso. Ramirez was then pulled away to be tended to by paramedics.

2

Officer Andreas Pantaloukas responded to a "Signal 20," in which a mentally ill person was being aggressive, talking to trees, and was fully naked. When he arrived, he heard Officer Sanchez screaming for someone to get on the ground, stop resisting, and to calm down.  He jumped over a fence and observed Officer Ramirez with blood all over his face and trying to hold down the reportedly mentally ill person, Tyson. Tyson was naked, except for footwear, and was on the ground and reaching up for Ramirez.  Officer Pantaloukas stood beside them and started to give commands to Tyson. Ramirez told him that Tyson cut him, and Tyson's speech was incomprehensible. Tyson was prone on the ground, Officer Pantaloukas tried to control Tyson's legs, and Officer Ramirez was on his back. Officer Kerns arrived and started to manage the radio communications. Tyson was not responding to their commands and continued to fight, and Officer Pantaloukas then discharged his Taser. The Taser had no effect (i.e. no neuromuscular disruption), so he held the trigger down longer, but it still had no effect, and then he reached down and drive stunned his ankle and achieved neuromuscular incapacitation.  Once the Taser cycle stopped, Tyson immediately started fighting again, so he drive-stunned his ankle again. After the second cycle, Tyson became calm and they applied handcuffs. He only remained calm for about 5 seconds and then he started fighting again. Officer Pantaloukas drive-stunned him again, and doesn't recall how many times he did it, but each time Tyson would be calm for a few seconds after the Taser discharge and then started fighting again. Officer Kerns went back to his vehicle, returned with leg hobble restraints, and the restraints were put on Tyson's legs while he was still kicking.  After the leg restraints were on, Officer Pantaloukas physically restrained Tyson's legs. Other officers arrived.  Fire Rescue arrived and tended to Officer Ramirez's injuries. While rescue was tending to Ramirez, Tyson calmed down and another officer noticed that he wasn't breathing and called Fire Rescue to check him.

Officer Kerns was shadowing Ramirez and responded to his call.  He arrived as Ramirez called for backup. When he arrived, he observed Ramirez in a violent struggle on the ground with Tyson and Ramirez was bleeding profusely from his head.  Officer Pantaloukas was near Tyson's and they both were yelling commands at Tyson to stop resisting. Officer Kerns indicated that he did not comply with any commands and stated that "he appeared completely out of touch with reality." Officer Pantaloukas deployed his Taser to subdue Tyson and they were able to get handcuffs on him after several attempts. He continued to kick, so Kerns went to his vehicle, retrieved left restraints, and they put them on Tyson. He was with Ramirez while rescue was tending to him when they noted a problem with Tyson.

Officer Alejandro Falcon responded to a request for backup in which an officer was fighting with a combative, violent subject. When he arrived he found 5 or 6 officers struggling to hold down Tyson, who was violent and combative.  One of the officers asked him to relieve Officer Sanchez, who was injured, and he took his position at the top of his back. Tyson was grunting and thrashing about violently. Falcon placed his right knee on Tyson's right shoulder blade and his right hand on his left shoulder blade. Tyson had already been handcuffed and they were attempting to put leg restraints on him when Falcon arrived. He continued to struggle after he was placed in leg restraints and then suddenly became calm. They then noted that he wasn't breathing and they rolled him over and found him completely unresponsive.  Paramedics responded and they removed the handcuffs and leg restraints.

Officer Kyle Karl responded to a call where an officer needed assistance. When he arrived, he saw Officers Ramirez and Kerns struggling on the ground with a naked, white male. Officer Ramirez was at the top portion of Tyson and Officer Kerns was standing next to them. Tyson was already handcuffed with he arrived.  Tyson was hostile, aggressive, and almost uncontrollable.  He was bucking, screaming, shouting, and spitting. Officer Karl grabbed Tyson's right arm and put his body weight on his upper right leg. Officer Kerns retrieved the leg restraints and they put them on while he was fighting them.  Officer

3

Trunks started helped and Officer Falcon came and relieved Officer Ramirez.  Tyson suddenly became silent and they had paramedics assess him.

Officer Kyle Wagner responded to a stress call where an officer was requesting assistance.  When he arrives, he saw Officers Ramirez, Karl, Kerns, Falcon, and another officer trying to hold down a very large subject. The subject kept trying to get up and was screaming "gibberish." He was already handcuffed and was kicking his legs, so Officer Kerns went and retrieved leg restraints, which Officers Kerns and Falcon placed on him.  Officer Wagner did not touch Tyson. He established a security perimeter. He observed an Officer applying a Taser without effect before his legs were restrained.

Officer Anthony Truntz responded to an officer asking for assistance, a "signal 20,"  where a neighbor called and stated that a subject was naked and taking to trees in the yard. When he arrived, the subject was prone on the ground, naked except for shoes or socks, and he was "yelling and screaming and kicking with his legs."  Officer Ramirez was attempting to hold Tyson's upper body, Officer Karl was attempting to secure the right side of his body, and Officer Kerns was attempting to hold his legs and stop him from kicking. Officer Truntz attempted to hold or secure his left elbow. Another officer was towards Tyson's feet. Tyson did not comply with any verbal commands.  He was already handcuffed behind his back when he arrived and then someone got shackles on his legs.  The female complainant tried to approach and Truntz escorted her back inside. The Taser probes were already in his back and he was Tased one time while Truntz was present.  The Taser didn't seem to phase Tyson as he continued to fight.  Officer Ramirez was relieved to get medical attention.  Approximately 30 seconds after Ramirez was relieved, Tyson calmed down and they noted he was moving, talking or making any noises.  Truntz noticed Tyson's face turning blue and he told everyone to get off and he called for rescue to come over, because he thought Tyson might not be breathing.  They turned him over and removed the handcuffs and leg restraints.

Jennifer Corbo, a neighbor, heard screaming outside and as she was about to go outside, her mother ran in and told her that the police had their new neighbor Daniel on the ground. They looked through their fence and could see Tyson naked on the ground and screaming and struggling with police officers. They were pleading with him and trying to calm him down, but he kept fighting and screaming "I am Daniel." They were warning him that he would Tase him if he didn't comply. She and her mother were uncomfortable with him and were going to send a letter with his license plate number to the police.

Christine Corbo heard shouting and yelling in the property to the rear of her house.  She looked out her back door, but didn't see anything and then it quieted down. At approximately 2:00 p.m. she heard screaming and havoc in the back yard and she saw their new next door neighbor naked in the yard. Police officers arrived and tried to calm him down, but he charged at them and was attacking them. They put him on the ground and tried to calm him down. She heard them say that they didn't want to taser him.  He kept flailing around until he suddenly became still and then they went and got resuscitation equipment. Paramedics came and took him away.  She noticed that one police officer looked like he was struck in the head, but she didn't see him get hit. She and her daughter were uncomfortable with him and were going to send a letter with his license plate number to the police.

Xavier Lesmarie, owns part of the company that owns the property and manages the property. Mr. Tyson signed the lease on October 15 and got the key and moved in on October 17.  He knew the Mr. Tyson had some sort of disability, but it was not physical, and he showed a letter that he received $888.00 per month from the State. The morning of October 27, 2014, at approximately 10:00 or 11:00 am., he received a call from the renter, Patrick McConnell, in the efficiency below Tyson's and was told

that there was a lot of noise and banging in the apartment and he was "going crazy."  At 12:26 p.m., he received a text from Lekni that stated "okay, now he's getting weird. He's outside yelling at no one and throwing stuff in the yard and off his balcony." He asked Patrick to confirm, and when Patrick returned home around 1:00 p.m., he called and confirmed that there was still coming from Tyson's apartment and he was agitated.  Mr. Lesmarie called John Collette, who was listed as an emergency contact on Tyson's lease. He told Mr. Collette what was happening, and he confirmed that Tyson was acting erratically the night before. He was having a manic depressive episode and he punched Mr. Collette. Mr. Collette took Tyson's keys, because "he wasn't right."  He was contemplating calling the police when Lekni saw someone go to his apartment on a bicycle. They got into an argument and his friend was unable to calm him down. Tyson then went onto his balcony naked around 2:37 p.m. and he called the police around 2:40 p.m. He was on the phone with Lekni and she was telling him what was happening.

Leonarda Moore, a.k.a. Lekni, did not want to provide a sworn statement, but sent a notarized statement in which she says that she met Daniel Tyson when he moved into his apartment in October 2014. On October 27, 2014, she woke up and heard Tyson speaking loudly on his cell phone in the common area back yard. She looked out her bedroom window and saw him pacing back and forth and talking on his cell phone. After getting off the phone, she noticed that he was going up and down the stairs as he usually does and he had a bottle of beer in his hand.  He then had an interaction with neighbors and was talking loud. She took her dog for a walk and could hear him stating that he was tired of people judging him.  She spoke with another neighbor, Samanta, and stated that Tyson appeared agitated and she replied that she didn't know if he was "on something." She replied that maybe he didn't take his medication.  Later that morning, Tyson started yelling in his apartment with the door open about how woman need to stand up to men and he was tired of the injustice to woman, and was ranting about Zena Warrior Princess.  He went inside his apartment and she went into the backyard to brush her dog.  He came outside again and told her that she need to stand up for herself and that she had a beautiful dog. She ignored him and went back into her house.  She called the landlord and told him what was going on as Tyson was throwing things off of his balcony.  It got quiet for awhile and then she saw a woman ride up on a bicycle and go to Tyson's apartment.  She heard them start yelling. The woman was saying "you have to stop" and he kept yelling.  She contacted her landlord again and he asked if he needed to call the police.  She wasn't sure, because the woman was trying to calm him down. A few minutes later, he appeared on his balcony naked with a boot on and he was swinging his leg.  She texted the landlord and told him the situation and that someone should be called.  The discussed who to call and decided that he would call the non-emergency police number rather than 911. Tyson went back into his apartment. Approximately 5-10 minutes later, she saw a police officer in the back yard and she made contact with him and explained what was going on. Tyson came back out onto the balcony with a rob on, but it was open in the front. The officer was telling him that he couldn't be outside like that and Tyson replied "no, no, do you know who I am?" Tyson then took his robe off, grabbed a sundial that was on the wall and proceeded quickly to the bottom of the steps. The office warned him to stop or he would Tase him, and Tyson raised the sundial to about shoulder level and charged at the officer. The officer Tased him and he screamed but kept charging at the officer.  When he got to the officer, the officer flipped him onto the ground. He wrestled with the officer for about a minute before a second officer arrived. While these two officers struggled with Tyson more arrived and then the first officer walked off to get medical attention for blood coming from his head.  She did not see him get hit with the sundial.  Tyson kept screaming and yelling and they put handcuffs and leg shackles on him. There were about 5 or 6 officers and she could hear them state "stop fucking moving or we're going to tase you." She saw that one of the officers had a Taser against the area of Tyson's left calf, and she saw another office stomp on his right hamstring. He appeared to be restrained and she tried to speak with one of the

5

officers, but he told her to get back inside, and that they needed to get him in an ambulance and he would talk to her later. She went inside and saw more officers arrive. The officers were still struggling with Tyson and she could hear the Taser being used.  Approximately 2-3 minutes later, there was no more yelling or screaming and she saw an officer turn him over. He was limp and the shackles  were removed. They started CPR.  Then paramedics tended to him and took him away on a gurney. Internal affairs came to her door and she told them "you guys were wrong in what happened," but she refused to talk to them further and did not talk to the media.


**Expert Report of Gary M. Vilke, MD**
- Emergency Department Physician
- "After careful review, it is my opinion to a reasonable degree of medical certainty that Mr. Tyson's cardiac arrest was not caused by the arrest and restraining process by the officers or the use of the TASER ECD, but rather from Excited Delirium Syndrome and his severe coronary artery disease combined with his exertional resistance."
- The restraining process did not cause the sudden cardiac arrest and death in Mr. Tyson
- The use of the TASER ECD did not cause or contribute to his cardiac arrest or death
- Mr. Tyson was exhibiting signs and symptoms consistent with excited delirium syndrome, which alone with his severely disease heart and continued exertion from resistance, is the probable cause of his sudden cardiac arrest and death

6

Request:
- ~~Autopsy Photographs~~
- ~~Witness statements~~
- Video???
- ~~Cardiac pathology and neuropathology reports~~

EXHIBIT B

| TASER | DURATION | TIME GAP |
|---|---|---|
| TIMES INDICATE CYCLE START TIME SYNCHING TASERS ON 10/28/14 TO REAL TIME | OF TASER USE | SECONDS BETWEEN USE |
|  |  |  |
| 14:53:26 RAMIREZ       33C7 | 5 SEC |  |
| 14:53:55 PANTALOUKAS  33C5 | 9 SEC | 29 SEC |
| 14:54:05 PANTALOUKAS  33C5 | 5 SEC | 10 SEC |
| 14:54:23 PANTALOUKAS  33C5 | 5 SEC | 18 SEC |
| 14:54:56 PANTALOUKAS  33C5 | 5 SEC | 33 SEC |
|  |  |  |
|  | 29 SEC |  |
|  |  |  |
| 14:56:15 PANTALOUKAS  33C5 | 5 | 79 |
| 14:58:23 PANTALOUKAS  33C5 | 5 | 128 |
| 14:59:03 PANTALOUKAS  33C5 | 5 | 40 |
| 14:59:29 PANTALOUKAS  33C5 | 5 | 26 |
| 14:59:56 PANTALOUKAS  33C5 | 5 | 27 |
|  |  |  |
|  | 25 SECONDS |  |
|  |  |  |
| TIME BETWEEN 1ST AND LAST 390 SECONDS | 54 SECONDS |  |
| 6 MINUTES AND 30 SECONDS | TOTAL |  |





| **Hollywood Fire/Rescue & Beach Safety Dept.** 2741 Stirling Road HOLLYWOOD, FL 33312 954-967-4248 | **AMBULANCE RECORD** 21659076 (rfuentes2) Page 1 of 7 |
|---|---|

### Trip Information

| Dispatch ID# | Date | | Responding Unit |
|---|---|---|---|
| 14-22593 | 10-27-2014 | | Rescue 105 |

| **Dispatched As** | **Patient Disposition** |
|---|---|
| Assault | Treated, Transported by EMS |

### Department Directive

| Dispatched | Enroute | Amb On Loc | Pt Contact | Depart Loc | Arrive Hosp | Clear Hosp | In Service |
|---|---|---|---|---|---|---|---|
| 14:56 | 14:57 | 15:00 | 15:01 | 15:16 | 15:23 | 16:11 | 16:22 |

| **Pickup** | | **Destination** | |
|---|---|---|---|
| S-Scene of Accident / Acute Ev 1836 Jackson St HOLLYWOOD, FL 33020 | | Memorial Regional Hospital 3501 Johnson St HOLLYWOOD, FL 33021 | |
| Response To Scene | 911 Response (EMS Scene Call) Lights & Sirens | Response From Scene | Lights & Sirens |
| Map Page: | 105C | Miles Transported | 2.84 |
| County | BROWARD | County | BROWARD |
| | | Number of Patients Transported | 1 |

### Patient Information

| **Patient Name** | | **Gender** | **Ethnicity** |
|---|---|---|---|
| Doe, John | | Male | White |
| **Patient Residence** | | **Date of Birth** | DL |
| 1836 Jackson St HOLLYWOOD FL 33020 | | 10-27-1976 (37 YO) | |
| Phone (H) | Phone (W) | | SSN |

### Patient Information

| Allergies | Unknown |
|---|---|
| Medications | Unknown |
| History | Unknown |
| Chief Complaint | unresponsive on initial assessment. Pt had been tased by PD aprox 5 min PTA of EMS.; Onset of event occurred 1 minutes Prior to Calling EMS. |

### Cardiac

| **Cardiac Arrest** | **Etiology** | **Resuscitation Attempt** |
|---|---|---|
| No | | |



PLAINTIFF'S EXHIBIT
7

| Fuentes, Rafael (LIC P) Officer | Li, Mitchell (LIC P) Crew #2 | Donadio, Michael (EMT-B) Crew #3 | |
|---|---|---|---|
| Patient Name: Doe, John | Incident Date: 10-27-2014 | | **TYSON 04008** |



**Hollywood Fire/Rescue & Beach Safety Dept.**
2741 Stirling Road
HOLLYWOOD, FL 33312
954-967-4248

**AMBULANCE RECORD**

21659076 (rfuentes2)
Page 2 of 7

## Initial Patient Assessment

| An ALS Assessment was Performed and Warranted | | | Patient's Condition was Life Threatening | | | |
|---|---|---|---|---|---|---|
| **LOC**<br>Unconscious | **BP**<br>0/0 Arterial Line | **SpO₂**<br>0% RA | **ETCO₂** | | | |
| **Breath Sounds Upper**<br>Left: Absent<br>Right: Absent | **Breath Sounds Lower**<br>Left: Absent<br>Right: Absent | | **Resp Rate**<br>0<br>Absent | **Pulses**<br>Left:<br>Right: | | |
| **Pulse Rate**<br>0<br>Regular | **Pupils**<br>Left: Fixed,Dilated<br>Right:<br>Fixed,Dilated | **Capillary Refill**<br>Over 4 seconds | | | | |
| **Skin Color**<br>Cyanotic | **Skin Moisture**<br>Clammy | **Skin Temp**<br>Warm | **Skin Appearance** | | | |
| **Blood Glucose**<br>81 mg/dL<br>Capillary/Finger Stick | | **Neurological Status** | | | | |

## Glasgow Coma Score

| GCS Total | Eye Opening | Verbal Response | Motor Response | RTS |
|---|---|---|---|---|
| 3 | 1 - Does Not Open Eyes | 1 - No Response | 1 - No Response | 0 |

Fuentes, Rafael (LIC P)
Officer

Li, Mitchell (LIC P)
Crew #2

Donadio, Michael (EMT-B)
Crew #3

Patient Name: Doe, John | Incident Date: 10-27-2014

**TYSON 04009**



**Hollywood Fire/Rescue & Beach Safety Dept.**
2741 Stirling Road
HOLLYWOOD, FL 33312
954-967-4248

**AMBULANCE RECORD**

21659076 (rfuentes2)
Page 3 of 7

## Sequence Chart

| Date | Time | Event | By | Description |
|------|------|-------|-----|-------------|
| 10-27-2014 | 14:56 | Dispatched | | |
| 10-27-2014 | 14:57 | Enroute | | |
| 10-27-2014 | 15:00 | On Location | | |
| 10-27-2014 | 15:01 | Patient Contact | RF | |
| 10-27-2014 | 15:03 | Assessment | RF | Pt was combative during initial pt contact and then became unresponsive, apneic and pulseless. CPR was then initiated. * |
| 10-27-2014 | 15:03 | Spinal Motion Restriction | MD | |
| 10-27-2014 | 15:03 | CPR | AS | |
| 10-27-2014 | 15:05 | EKG | RF | Pt Rhythm of PEA did not change throughout treatment. A Other ekg was obtained by Fuentes, Rafael. PEA. |
| 10-27-2014 | 15:06 | Oxygen | ML | Via BVM and OPA 15.00 LPM via Other/miscellaneous per On-Line. The Patient's condition was Unchanged. |
| 10-27-2014 | 15:06 | Vitals | | BP 0/0 Automated Cuff, Pulse 0, Respirations 0, SPO2 0% on O2 |
| 10-27-2014 | 15:07 | IV/IO | AS | A 15g IV was attempted in the Lower Extremity-Left by Sharpe, Adam with success. NS 1000cc Bag run at Bolus with a 10 gtt. Total Volume Infused 250.0. Blood was not drawn. |
| 10-27-2014 | 15:08 | Advanced Airway | RF | 5.0 i-gel Supraglottic Airway was established by Fuentes, Rafael. It was secured nullby Tape. It was confirmed by Auscultation of Bilateral Breath Sounds, Digital CO2 Confirmation, Visualization of the Chest Rising with ventilation. |
| 10-27-2014 | 15:09 | Drug Administration | AS | 1 MG Epi 1:10,000 administered Intraosseous by Sharpe, Adam. |
| 10-27-2014 | 15:10 | Drug Administration | AS | 2 MG Narcan administered Intraosseous by Sharpe, Adam. |
| 10-27-2014 | 15:11 | Vitals | | BP 0/0 Automated Cuff, Pulse 0, Respirations 0, ETCO2 22 mmHg |
| 10-27-2014 | 15:14 | Drug Administration | AS | 1 MG Epi 1:10,000 administered Intraosseous by Sharpe, Adam. |
| 10-27-2014 | 15:16 | Departed Location | | |
| 10-27-2014 | 15:17 | Report Called | RF | Trauma Code Relayed through MEDCOMM Report Called via Radio. Trauma alert activated. |
| 10-27-2014 | 15:17 | Vitals | | BP 0/0 Automated Cuff, Pulse 0, Respirations 0, ETCO2 18 mmHg |
| 10-27-2014 | 15:18 | Drug Administration | AS | 1 MG Epi 1:10,000 administered Intraosseous by Sharpe, Adam. |
| 10-27-2014 | 15:21 | Vitals | | BP 0/0 Automated Cuff, Pulse 0, Respirations 0, ETCO2 22 mmHg |
| 10-27-2014 | 15:22 | Drug Administration | AS | 1 MG Epi 1:10,000 administered Intraosseous by Sharpe, Adam. |
| 10-27-2014 | 15:23 | Arrived Destination | | |
| 10-27-2014 | 16:11 | Clear Hospital | | |
| 10-27-2014 | 16:22 | In Service | | |

Fuentes, Rafael (LIC P)
Officer

Li, Mitchell (LIC P)
Crew #2

Donadio, Michael (EMT-B)
Crew #3

Patient Name: Doe, John | Incident Date: 10-27-2014

**TYSON 04010**



**Hollywood Fire/Rescue & Beach Safety Dept.**
2741 Stirling Road
HOLLYWOOD, FL 33312
954-967-4248

**AMBULANCE RECORD**

21659076 (rfuentes2)
Page 4 of 7

## Patient Assessment at Destination

| LOC | BP | SpO2 | ETCO2 |
|---|---|---|---|
| Unconscious | 0/0 Automated Cuff | 90% O2 | 24 mm Hg |

| Breath Sounds Upper | Breath Sounds Lower | | Resp Rate | Pulses |
|---|---|---|---|---|
| Left: Absent Right: Absent | Left: Absent Right: Absent | | 0 Absent | Left: Right: |

| Pulse Rate | Pupils | Capillary Refill | | |
|---|---|---|---|---|
| 0 Absent | Left: Fixed,Dilated Right: Fixed,Dilated | Over 4 seconds | | |

| Skin Color | Skin Moisture | Skin Temp | Skin Appearance | |
|---|---|---|---|---|
| Cyanotic | Moist | Cool | | |

| Blood Glucose | | Neurological Status | |
|---|---|---|---|

## Department Specifics

| Category | Selection |
|---|---|
| Action Type | 34-Transport person |
| Incident Type | 321-EMS call, excluding vehicle accident with injury |
| Shift | Shift C |
| Property Use | 429-Multifamily dwellings |

Fuentes, Rafael (LIC P) Officer     Li, Mitchell (LIC P) Crew #2     Donadio, Michael (EMT-B) Crew #3

Patient Name: Doe, John | Incident Date: 10-27-2014

**TYSON 04011**



**Hollywood Fire/Rescue & Beach Safety Dept.**
2741 Stirling Road
HOLLYWOOD, FL 33312
954-967-4248

**AMBULANCE RECORD**

21859076 (rfuentes2)
Page 5 of 7

---

### Narrative

**Subjective:**
Rescue 105 dispatched to assault call of an injured police officer. During Tx of officer, the EMS crew directed to a subject being detained on the ground by PD. On initial contact, pt was unresponsive and assessment found pt to be unresponsive, apneic and pulseless. CPR was then initated. Pt was approximately a 37 y/o male with unknown medical history. Pt had been tased by PD aprox 5 min PTA of EMS.

**Objective:**
Upon EMS arrival, patient was lying supine.

Systemic Information - Assessment
Skin: no rashes, no lacerations, no abrasions
Head / Neck: atraumatic
Chest:  No obvious trauma
Back: no bony abnormalities, no bruising. Two barbs in upper back from PD taser
Abdomen: no trauma noted
Extremities: no trauma noted
Head/Face: no trauma noted
Neck: Normal
Abdomen: no trauma noted all fields
Back Cervical: Normal
Back Thoracic: Normal
Back Lumbar/Sacral: Normal
Extremities-Right Upper: Normal
Extremities-Right Lower: Normal
Extremities-Left Upper: Normal
Extremities-Left Lower: Normal

General: Unconscious, Pulseless,
Monitors:

**Assessment:**

**Plan:**
37 YO male found complaining of unresponsive on initial assessment. Pt had been tased by PD aprox 5 min PTA of EMS.. Initial assessment as indicated. The patient was pulseless and was not breathing. Patient contact made at time indicated above. An additional assessment was performed, as indicated. Spinal motion restriction was performed using standard BTLS technique. The patient's neck motion was restricted with manual cervical spine restriction and c-collar. The patient was secured to a long spine board.  Special care was taken to not manipulate the spine.  CPR was started. An EKG was performed by Fuentes, Rafael (LIC P). The patient's rhythm was PEA in lead .Oxygen was applied at 15.00 LPM via Other/miscellaneous. The patient's condition Unchanged. A 15g Lower Extremity-Left I/O was attempted by Sharpe, Adam (LIC P) with success. An i-gel Supraglottic Airway was placed by Fuentes, Rafael (LIC P)
and secured with Tape. Placement was confirmed as noted above. The patient's condition was . Epi 1:10,000 was administered as noted above. Narcan was administered as noted above. Epi 1:10,000 was administered as noted above. A patient report was called in to the receiving facility. Epi 1:10,000 was administered as noted above. Epi 1:10,000 was administered as noted above. Patient was transported lights & sirens to Memorial Regional Hospital and released to staff.

---

Fuentes, Rafael (LIC P)
Officer

Li, Mitchell (LIC P)
Crew #2

Donadio, Michael (EMT-B)
Crew #3

Patient Name: Doe, John | Incident Date: 10-27-2014

**TYSON 04012**



| | Hollywood Fire/Rescue & Beach Safety Dept.<br>2741 Stirling Road<br>HOLLYWOOD, FL 33312<br>954-967-4248 | AMBULANCE RECORD<br><br>21659076 (rfuentes2)<br>Page 6 of 7 |
| --- | --- | --- |

## Image 1/1

Hollywood Fire/Rescue
**Crew/Facility Signature Form**

Patient Name: John Doe                                   Transport Date: 10/27/2014

**RESCUE CREW AND RECEIVING FACILITY SIGNATURES**
Complete this form **only if**: (1) the patient was physically or mentally incapable of signing, **and** (2) no authorized representative was available or willing to sign on behalf of the patient at the time of service.

**A. Rescue Crew Member Statement** (*must* be completed by crew member at time of transport)
My signature below indicates that, at the time of service, the patient named above was physically or mentally incapable of signing, and that no authorized representatives were available or willing to sign on the patient's behalf. My signature is not an acceptance of financial responsibility for the services rendered.

Circumstances that make it impractical for the patient to sign: Patient Care Transferred
Patient Signature Signed By: EMS Personnel (Pt Unable/Pt Rep Unavail to sign)
Time at Receiving Facility: 16:34

| | | |
| --- | --- | --- |
| Crew Member Signature | R FUENTES<br>Printed Name and Title of Crew Member | 10/27/2014<br>Date |

**B. Receiving Facility Representative Signature**
The patient named on this form was received by this facility at the date and time indicated above. My signature is not an acceptance of financial responsibility for the services rendered to this patient.

| | | |
| --- | --- | --- |
| Signature of Receiving Facility Representative | hURST<br>Printed Name and Title of Receiving Facility Representative | 10/27/2014<br>Date |

Name of Receiving Facility: mrh

| | | |
| --- | --- | --- |
| Fuentes, Rafael (LIC P)<br>Officer | Li, Mitchell (LIC P)<br>Crew #2 | Donadio, Michael (EMT-B)<br>Crew #3 |

Patient Name: Doe, John | Incident Date: 10-27-2014                        **TYSON 04013**



| | **Hollywood Fire/Rescue & Beach Safety Dept.** 2741 Stirling Road HOLLYWOOD, FL 33312 954-967-4248 | **AMBULANCE RECORD** 21659076 (rfuentes2) Page 7 of 7 |
|---|---|---|

| Signatures | |
|---|---|
| | Medic #1 |

| Signatures | |
|---|---|
| | EMS Personnel (Pt Unable/Pt Rep Unavail to sign) Signed Patient Care Transferred |

| Signatures | |
|---|---|
| | hURST Facility Representative Signed 10/27/14 4:35 PM |

Fuentes, Rafael (LIC P)
Officer

LI, Mitchell (LIC P)
Crew #2

Donadio, Michael (EMT-B)
Crew #3

Patient Name: Doe, John | Incident Date: 10-27-2014

**TYSON 04014**

PLAINTIFF'S EXHIBIT

3

TYSON 04102



PLAINTIFF'S EXHIBIT

TYSON 04123



PLAINTIFF'S EXHIBIT

14-2848

TYSON 04131