UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ,

     Plaintiff,

v.

CITY OF HOLLYWOOD,

     Defendant.

_____/

## CITY OF HOLLYWOOD'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

     Defendant, City of Hollywood ("the City"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby files this Statement of Material Facts in Support of its Motion for Summary Judgment. The following facts are set forth as material facts as to which it is contended there does not exist a genuine issue to be tried.

### Background

1. On or about October 15, 2014, Daniel Tyson moved into 1836 Jackson Street, Apt. 12, Hollywood, Florida 33020. Ex. 2.

2. Tyson was previously diagnosed with schizoaffective disorder and prescribed Wellbutrin, an antidepressant medication. Ex. 3 at 16, 21, 26–27

3. Sometime before October 27, 2014, Tyson stopped taking his Wellbutrin medication. *See* Ex. 4 at 59–61, 78.

4. On October 26, 2014, Tyson physically assaulted his romantic partner of ten years, John Collette. *See* Ex. 5 at 31–32. Specifically, after stabbing a chair with a knife, Tyson cornered Collette in the kitchen, grabbed his hair, and threw him down to the floor. *Id.*

5. That night, Tyson hardly slept and his mental condition got progressively worse. Ex. 4 at 56, 62. However, Tyson refused to go to a hospital for medical treatment. *Id.* at 59–60, 63.

6. On October 27, 2014, several of Tyson's neighbors observed Tyson displaying aggressive, intimidating, and bizarre behavior. *See infra* ¶¶ 7–9, 14.

7. Around 10:00 A.M., Tyson knocked on Robert Brown's door to ask for a cigarette or a bucket. Ex. 6 at 6, 12. Brown asked Tyson to leave his apartment because he did not want Tyson around his two minor children. *Id.* Brown described Tyson's behavior as "intimidating" or "aggressive." *Id.* at 6–7.

8. Between 11:00 and 11:30 A.M., Leonarda Moore observed Tyson being really loud, ranting and raving about injustice to women. Ex. 7 at 28. Tyson appeared agitated, and Tyson's behavior scared Moore's 65-pound Siberian Husky, who is not easily scared. *Id.* at 23, 28–29.

9. Between 11:30 A.M. and 1:00 P.M., Moore and another neighbor, Patrick McConnell, observed Tyson throwing large objects from his second-story balcony to the courtyard below. *Id.* at 31–33; Ex. 8 at 2–3.

10. Both Moore and McConnell called their landlord, Xavier Lesmarie, to report Tyson's behavior. Ex. 7 at 31; Ex. 8 at 3.

11. Moore was concerned for the safety of Tyson and of property. Ex. 7 at 31.

12. Around 1:00 P.M., a friend of Tyson's, Jessica Auerbach, arrived at Tyson's apartment to check on him. Ex. 4 at 68. Tyson's new apartment was "trashed" and Tyson was nude, save a single costume boot. *Id.* at 68.

13. Auerbach was worried that Tyson might hurt or even kill himself, so Auerbach left Tyson's apartment to request help.[1] *Id.* at 73–75.

14. After Auerbach left Tyson's apartment, Moore observed Tyson on his balcony, naked and talking to inanimate objects. Ex. 7 at 34–35.

15. Moore relayed her observations to Lesmarie, who called the police. Ex. 7 at 35; Ex. 9 at 40.

16. Lesmarie told the dispatcher that Tyson was manic depressive and "needs medication." Ex. 9 at 41, 72–73.

### The Initial Police Response

17. At 2:47 P.M., the Broward Sherriff's Office (BSO) dispatched two Hollywood Police Officers, Alexis Ramirez and Andreas Pantaloukas, to respond to the scene.[2] Ex. 12 at 2; Ex. 13.

---

[1] Around 2:00 P.M., Collette called Tyson's treating psychiatrist to request help. Ex. 5 at 36–37, 63–64. However, no one from the psychiatrist's office ever returned his call. *Id.* at 65.

[2] On October 27, 2014, the Broward Sheriff's Office, Regional Communications Division, was responsible for fielding emergency and non-emergency calls for police, fire, and medical services within Broward County, including the City of Hollywood. Ex. 10 ¶ 5; *see also* Ex. 11 at 82.

2

18. The dispatcher advised the officers that Tyson was reportedly "very agitated," "naked only wearing boots," and "talking to tress." Ex. 12 at 2. Additionally, the dispatcher stated that Tyson was reportedly "manic depressant and does not have his medications." *Id.* However, the dispatcher did not inform the officers whether the incoming call was a non-emergency or not. *See generally* Ex. 12; Ex. 14 at 48.

19. At 2:48 P.M., Officer Ramirez arrived on scene and began speaking to Moore. Ex. 13; Ex. 7 at 36–37. Moore advised Officer Ramirez that Tyson was "acting strangely" and "appeared to be angry or mad." Ex. 15 at 3. At that time, Tyson was back in his apartment. Ex. 7 at 37.

20. While Officer Ramirez was speaking to Moore, Tyson emerged from his apartment wearing an open robe with nothing underneath. *Id.* at 39. Tyson appeared irate. Ex. 16 at 94. Officer Ramirez asked Moore to go back inside for her safety, which she did. *Id.*

21. After Moore returned inside, Officer Ramirez tried to begin a dialogue with Tyson. *Id.* at 95. While Tyson remained on the upstairs balcony, Officer Ramirez communicated from the courtyard below, approximately twenty-five (25) feet away. *Id.* at 95–96, 101.

22. In a friendly tone, Officer Ramirez informed Tyson, "Sir, you can't be outside like that." *Id.* at 101; Ex. 7 at 39.

23. Tyson responded, "no no, do you know who I am?" and took his robe off. Ex. 7 at 39.

24. Officer Ramirez again tried to connect with Tyson to deescalate the situation. Ex. 16 at 101, 104–05,108. But Tyson became even more irate. *Id.* at 108.

25. While inside, Moore observed Officer Ramirez interacting with Tyson from her dining room and backdoor windows, which faced the courtyard.  Ex. 7 at 37. According to Moore, Officer Ramirez was "very nice" and "professional." *Id.* at 36, 38. Officer Ramirez did not speak in an aggressive tone, and his voice was not elevated. *Id.* at 65.

26. Due to Tyson's aggressive and unusual behavior, Officer Ramirez was concerned for Tyson's, Moore's, and his own safety. Ex. 15 at 6–7, 14; Ex. 16 at 102–04, 106.

### The Violent Attack

27. While Officer Ramirez was still in the courtyard, Tyson grabbed a black metal sundial from the exterior wall and proceeded quickly down the stairs into the courtyard. Ex. 7 at 39–40.

28. Officer Ramirez informed Tyson, "Stop or I'm going to tase you." *Id.* at 40.

29. Tyson charged at Officer Ramirez like a bull while holding the sundial over his head with both hands. Ex. 15 at 7–12; Ex. 16 at 116.

3

30. At 2:53:26, Officer Ramirez deployed his Taser,[3] which did not have any effect on Tyson because one of the two Taser prongs missed contact. Ex. 13; Ex. 15 at 10–11. Ex. 16 at 117, 121–22.

31. Tyson struck Officer Ramirez over the head with the metal sundial, shattering the sundial and causing a significant laceration and permanent disfigurement to the top of Officer Ramirez's head. Ex. 16 at 122; Ex. 15 at 12, 34–35.

32. After being assaulted, Officer Ramirez tried to control and detain Tyson. Ex. 16 at 123. At that time, Officer Ramirez was 5'7", 145–50 pounds, *id.* at 123, and Tyson was 5'7", 220 pounds, "large build," Ex. 17 at 2. The two engaged in a "constant fight" in the grass of the courtyard. Ex. 16 at 128

33. Officer Ramirez struggled to gain control of Tyson not only due to his injuries and Tyson's superior size and strength, but also because there was blood and sweat everywhere. *Id.* at 126–28; Ex. 18 at 19; Ex. 15 at 26. Additionally, Officer Ramirez could not see anything because he had blood in his eyes. Ex. 11 at 95; Ex. 16 at 127.

34. During the struggle, Officer Ramirez was concerned about passing out from his injuries and Tyson trying to harm him further. Ex. 16 at 126. Additionally, Officer Ramirez was concerned for the safety of others, including the people inside the apartments and the children from a nearby school. *Id.*

35. At approximately 2:53 P.M., Officer Pantaloukas arrived on scene and requested emergency backup assistance. *See* Ex. 13. At that time, Officer Pantaloukas observed Tyson swinging his fists, attempting to get up, and striking Officer Ramirez. Ex. 11 at 93–98; Ex. 15 at 18–19; Ex. 18 at 3–4. Officer Ramirez was visibly shaken, badly injured, and pleading for help. Ex. 11 at 93–98.

36. While Officer Ramirez was trying to control Tyson on the ground, Officer Pantaloukas tried to gain control of Tyson's legs. Ex. 16 at 130–31.

37. Tyson then began kicking Officer Pantaloukas. *Id.*; Ex. 18 at 7; Ex. 15 at 22.

38. At 2:53:55 P.M., after providing a verbal warning, Officer Pantaloukas deployed his Taser, launching the Taser probes into Tyson's lower back. Ex. 13; Ex. 16 at 130; Ex. 11 at 98–99;

---

[3] A Taser is a Conducted Electrical Weapon (CEW), also known as an Electronic Control Device (ECD) that utilizes patented Neuromuscular Disruption technology that affects both the sensory and motor nervous systems to cause incapacitation. Ex. 20 ¶ 5.

     Ex. 15 at 22. However, the nine-second Taser deployment did not incapacitate Tyson because the probes were too close together. Ex. 13; Ex. 11 at 100; Ex. 15 at 22; *see also* Ex. 19 at 10.

39. Tyson continued fighting, flailing his arms, trying to get up, kicking Officer Pantaloukas, and hitting Officer Ramirez. Ex. 11 at 100; Ex. 16 at 135,–37; Ex. 15 at 21, 25; Ex. 18 at 13; Ex. 19 at 4–5.

40. Within the next minute, Officer Pantaloukas deployed his Taser three more times in drive stun mode at or near Tyson's ankles. Ex. 13.

41. In "drive stun mode," the front of the Taser is physically pressed against the target. Ex. 20 ¶ 8. When a drive stun is applied with the probes still attached, electrical impulses are transmitted through two fixed electrodes on the sides of the cartridge that held the probes. *Id.* ¶ 12

42. At 2:55:12, with the assistance of a third officer, Officer Brian Kerns, Tyson was placed in handcuffs. Ex. 14 at 70; Ex. 16 at 149–50; Ex. 15 at 28–29.

### The Struggle to Control Tyson

43. Despite being placed in handcuffs, Tyson continued fighting, screaming incoherent or odd statements, trying to kick the officers, attempting to spit at the officers, and trying to escape. Ex. 16 at 151; Ex. 11 at 51–52; Ex. 14 at 73–75; Ex. 21 at 57; Ex. 22 at 65; Ex. 23 at 67–68, 70; Ex. 24 at 72–73, 83; Ex. 15 at 29–31; Ex. 18 at 21–22, 24; Ex. 19 at 10–11; Ex. 25 at 5–6; Ex. 26 at 4–5.

44. As additional officers arrived on scene to assist, Officer Kerns returned to his vehicle to secure metal leg restraints because Tyson continued to use his legs as a weapon. Ex. 14 at 75.

45. It took several attempts to place Tyson in leg restraints because he kept flailing his body and kicking his legs. *Id.* at 75–76; Ex. 19 at 12; Ex. 23 at 80. The leg restraints were never attached to the handcuffs.

46. After Tyson was in handcuffs and leg restraints, Tyson continued to violently resist the officers by rolling and flailing around, attempting to escape, and kicking and striking the officers. Ex. 14 at 87; Ex. 22 at 109, 111–12, 167; Ex. 24 at 89, 96; Ex. 23 at 81; Ex. 18 at 28, 30; Ex. 19 at 13–14; Ex. 25 at 12–13; Ex. 27 ¶¶ 7, 14; Ex. 28 ¶¶ 9, 13; Ex. 29 ¶¶ 6, 13; *see also* ¶¶ 67, 73–76, *infra.*

47. During the struggle, Officer Ramirez was near the right side of Tyson's torso until he was relieved by Officer Alejandro Falcon so that Officer Ramirez could obtain medical treatment. Ex. 16 at 153; Ex. 14 at 85. Officer Ramirez attempted to hold Tyson down by utilizing his

hands and knees on Tyson's right shoulder blade. Ex. 16 at 153; Ex. 23 at 74. At one point earlier in the encounter, Officer Ramirez said he laid on Tyson because he was so exhausted. Ex. 16 at 153.

48. During the struggle, Officer Falcon held Tyson's left shoulder blade down using his knee and body weight. Ex. 21 at 58; Ex. 24 at 91.

49. During the struggle, Officer Pantaloukas was crouched down near Tyson's feet, holding one or both of Tyson's legs. Ex. 11 at 122; Ex. 22 at 118–19.

50. During the struggle, Officer Kerns was on the left side of Tyson's body. Ex. 16 at 153. Officer Kerns applied minimal pressure using his hands to gain control of Tyson's arms and legs. Ex. 14 at 85.

51. During the struggle, Officer Anthony Truntz was on one knee or squatting near Tyson's left elbow. Ex. 22 at 107–08, 119. However, at two points during the encounter, Truntz stopped applying pressure: (1) to talk to Moore; and (2) when Officer Falcon relieved Officer Ramirez. *Id.* at 125, 128.

52. During the struggle, Officer Kyle Karl grabbed Tyson's right arm (tricep) and put his knee on Tyson's upper leg area, near Tyson's buttocks. Ex. 24 at 72, 77–78, 81, 90.

53. During the struggle, Officer Kyle Wagner maintained scene security and did not touch or apply any pressure to Tyson. Ex. 23 at 85.

54. During the struggle, Tyson displayed "superhuman strength" and was highly energized. Ex. 11 at 145; Ex. 21 at 58, 61; Ex. 15 at 23; Ex. 18 at 23; Ex. 25 at 15; Ex. 32 at 2; Ex. 14 at 68–69.

55. Even after he was in handcuffs and leg restraints, Tyson was still able to lift the officers who were applying pressure to various areas of Tyson's body in an attempt to control him and prevent escape. Ex. 21 at 58–59, 62; Ex. 24 at 96; Ex. 18 at 23; Ex. 31 at 18–19.

56. During the struggle, the officers repeatedly told Tyson to calm down, relax, and stop resisting. Ex. 14 at 53, 74; Ex. 21 at 64, 76; Ex. 23 at 70; Ex. 18 at 22–23, 26; Ex. 19 at 7, 11; Ex. 25 at 14; Ex. 30 at 7.

57. During the struggle, there was no indication that Tyson was in pain or that he could not breath. Ex. 14 at 74; Ex. 21 at 65; Ex. 24 at 96–97; Ex. 11 at 113, 117.

58. During the struggle, the officers did not have the opportunity to turn Tyson over because he was constantly moving and fighting. Ex. 23 at 81.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

59. Between 2:56:15 and 2:59:56 P.M. (approx. 3.5 minutes), Officer Pantaloukas deployed his Taser five more times in drive stun mode at or near Tyson's ankles. Ex. 13.

60. Officer Pantaloukas' final Taser deployment cycle ended at 3:00:01 P.M.. *See id.*

61. After each five-second Taser cycle, and sometimes even during the cycle, Tyson went right back to fighting, striking Officer Ramirez, kicking Officer Pantaloukas, flailing, and trying to get on top of the officers. Ex. 11 at 111–116; Ex. 14 at 68; Ex. 15 at 22; Ex. 18 at 16–17, 21, 25; Ex. 19 at 7; Ex. 25 at 10; Ex. 16 at 135–36.

62. Officer Pantaloukas, who was closest to Tyson's feet, viewed Tyson's legs as a potentially deadly weapon. Ex. 11 at 129. Officer Pantaloukas was concerned for his own safety, but also others, including children from a nearby elementary school. *Id.* at 118–19. Officer Pantaloukas was also concerned that Tyson may run out into a nearby road and get hit by a car. *Id.* at 119.

63. Officer Pantloukas testified that he may have deployed his Taser after Tyson was in handcuffs and leg restraints, although he could not be certain how many times. *Id.* at 129.

64. Officer Pantaloukas conceded that the number of Taser deployments may <u>seem</u> excessive, "but that's the only time we were able to get a breather and be in control and not have him try to attack us or get up and possibly attack someone else. There's an elementary school half a block away from the location of incident. It was early afternoon when probably and most likely there are kids outside. Now, if he gets up and gets away, I can't let him hurt someone else or even hurt himself. If he ran out into Federal Highway and gets hit by a car running away from us, now what?" *Id.* at 119.

65. Officer Karl was almost struck in the face more than once by Tyson's feet and leg restraints. Ex. 24 at 89; Ex. 23 at 79.

### Independent Witnesses

66. Moore testified that after Tyson struck Officer Ramirez over the head, Officer Ramirez "hip flipped" Tyson to the ground. Ex. 7 at 43. From that point forward, she could only see from Tyson's elbows down. *Id.*

67. Moore testified that after Tyson was in handcuffs and leg restraints, Tyson "was still being combative," was not calm, and refused to comply with the officers' commands. *Id.* at 42, 45. She also stated that Tyson's "body was moving around and he was just yelling." *Id.* at 45.

68. As she was witnessing the altercation, Moore told Lesmarie that Tyson was very agitated and "very strong." Ex. 31 at 18. She stated, "The police cannot control him" and that Tyson was able to move three of four officers who were trying to hold him down. *Id.* at 18–19.

69. At one point during the struggle, Moore exited her apartment and began speaking to Officer Truntz. Ex. 7 at 47. Officer Truntz instructed her to go back inside so she would not get in the way or get hurt. Ex. 22 at 115. Officer Truntz also informed Moore that they were trying to get Tyson into an ambulance. Ex. 7 at 47.

70. Brown observed from twenty seconds to less than one minute of the beginning of the struggle when there were only two or three officers on scene. Ex. 6 at 17, 40. Brown testified that he did not see Tyson strike an officer and that Tyson was unable to move because one or two officers were "on him." *Id.* at 16–20, 32, 39–40.

71. According to Brown, the police would say "Stop," and Tyson would say "Nooo." *Id.* at 17. Brown stated, "[Tyson] was clearly resisting, but he was -- he really was -- they really had him pretty well under control <u>at that point that I saw</u>. They were, you know, sitting on him or applying their weight. When I think sitting, I think of like using their butt. They clearly weren't doing that." *Id.* at 23 (emphasis added).

72. Brown also testified that "[Tyson] was a big guy, and so it took a couple of them to -- to keep him from resisting <u>further</u>." *Id.* at 20–21 (emphasis added).

73. Christine Corbo testified that Tyson was "just crazed" and his "power was just phenomenal." Ex. 32 at 2. According to her:

> [The officers] talked to [Tyson], they tried to calm him down, they did everything they could and he was just attacking and attacking and attacking and, uh, the officers, you know, put him down and basically begged him to calm down and they said that, uh, you know, they didn't wanna taser him but they couldn't control him. I mean it was just incredible. And again, like I said, all you could see were his arms flailing and, and, and, and the men just trying to, to, uh, get him under control.

> *Id.*

74. Jennifer Corbo testified that the officers were talking to Tyson "very rationally, tryin' to reason with him to get him to calm down and, you know, just remain calm and stay still and he was fighting them and fighting them and, and screaming I am Daniel, I am Daniel and they said sir please, I mean they pleaded with him. They couldn't have been more professional and, you know, tryin' to put him at ease." Ex. 33 at 3.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

75. Jennifer Corbo observed Tyson constantly moving his body and flailing his arms. *Id.* at 4. She also stated that Tyson "seemed like he was on something that was giving him way more strength than on an average day." *Id.*

76. Jennifer Corbo saw Tyson strike at least one of the officers in the head during the struggle. *Id.* at 7–8.

**Medical Care**

77. At approximately 3:01, Fire Rescue personnel arrived on scene and began to treat Officer Ramirez's head laceration, approximately ten to fifteen feet away in the courtyard. Ex. 13; Ex. 29 ¶ 5, 8.

78. At 3:01, the scene had not been declared safe by police, and Tyson was still combative by physically resisting the officers. Ex. 29 ¶ 6, 11; see also Ex. 16 at 21; Ex. 24 at 92–93.

79. At 3:01, Tyson did not display any physical conditions requiring emergency medical assistance. Ex. 29 ¶ 7.

80. On October 27, 2014, Sergeant Yasmanny Ruiz was the Patrol Supervisor for the East district. Ex. 27 ¶ 4. He responded to the scene in response to an officer in distress. *Id.* ¶ 5. When he arrived on scene, he observed Fire Rescue personnel already treating Officer Ramirez. *See* ¶¶ 6. At that time, Tyson was still physically resisting the officers' efforts to control him by flailing around and attempting to kick or strike the officers. *Id.* ¶ 7, 14.

81. At 3:03, Tyson suddenly became unresponsive, and Sergeant Ruiz ordered Fire Rescue to assess Tyson. *Id.* ¶ 9. Ex. 34 at 3; Ex. 29 ¶ 9; Ex. 21 at 60–61; Ex. 23 at 86–87; Ex. 22 at 129, 131–32.

82. Fire Rescue personnel immediately began treating Tyson. Ex. 34; Ex. 21 at 88–89; Ex. 23 at 86–87; Ex. 7 at 49; Ex. 18 at 34; Ex. 22 at 129, 131–32; Ex. 29 ¶ 10.

83. At 3:16, Tyson was transported to Memorial Regional Hospital, where he was pronounced dead. Ex. 34 at 3.

84. Tyson's treating psychiatrist does not accept or treat patients who meet the criteria to be Baker Acted. Ex. 35 ¶ 3–4.

85. A subsequent autopsy revealed that Tyson had <u>multiple</u> very serious heart conditions, which, independent of one another, could lead to sudden cardiac death. Ex. 17 at 6, 11–12.

86. The coroner found that "[Tyson] did not immediately become unresponsive after receiving the discharges from the [ECD]." *Id.* at 6.

9

87. Both Plaintiff's medical expert, Dr. Mark Shuman, and the City's medical expert, Dr. Gary Vilke, agree that Tyson's preexisting heart conditions, as well as Tyson's Excited Delirium Syndrome, were the actual and proximate causes of Tyson's death. Ex. 36 at 13–17; Ex. 37 at 5.

88. "Excited Delirium Syndrome is a state of delirium, an acute, transient disturbance in consciousness and cognition, with associated combative and/or violent behavior a state, which is often characterized by agitation, excitability, paranoia, aggression, great strength, and numbness to pain." Ex. 37 at 3; *see also* Ex. 36 at 14.

89. Tyson's Excited Delirium Syndrome was caused by his sub-optimally treated psychiatric disorder. Ex. 36 at 15; Ex. 37 at 3; Ex. 4 at 59, 60–61, 78.

## Prior Incidents

90. In 2012, there were a total of 1,200 reported incidents in which a City of Hollywood police officer took an individual into custody after determining that the individual met the criteria for involuntary examination and/or institutionalization. Ex. 10 ¶ 9.

91. In 2013, there were a total of 1,144 reported incidents in which a City of Hollywood police officer took an individual into custody after determining that the individual met the criteria for involuntary examination and/or institutionalization. *Id.* ¶ 10.

92. In 2014, there were actually a total of 1,375 reported incidents in which a City of Hollywood police officer took an individual into custody after determining that the individual met the criteria for involuntary examination and/or institutionalization. *Id.* ¶ 11.

## HPD Policies

93. On October 27, 2014, the Hollywood Police Department had a comprehensive system of policies and procedures that address the appropriate treatment of individuals with disabilities, including mental illness, and use of force. Ex. 38.

94. SOP 120 provides a contact person for reporting ADA harassment or discrimination complaints. *Id.* at 341; *see also id.* at 13.

95. SOP 200 provides that mental illness is a "situational factor" to consider in determining whether to use force in general. *Id.* at 631–32.

96. SOP 203 instructs officers that "[c]are should be taken when restraining disabled, sick, injured, intoxicated, drug impaired, and mentally disturbed persons so as not to complicate or compound their condition." *Id.* at 678.

97. SOP 212 establishes guidelines and procedures for the handling, care and transportation of individuals who meet the criteria of Florida's Baker Act. *Id.* at 742–51.

98. SOP 216 requires accommodations to person with hearing disabilities. *Id.* at 817.

99. SOP 218 permits service animals within the department. *Id.* at 859.

100.   SOP 227 prohibits the use of a canine "[t]o apprehend a known mentally ill person, unless the subjects actions pose a physical threat to the general public." *Id.* at 904–05.

101.   All of the involved officers acknowledged receipt and understanding of the City's policies. Ex. 39.

102.   In October 2014, the Hollywood Police Department was an accredited agency, which means that its policies and procedures were approved by the State. Ex. 40 at 7, 70–71, 74.

103.   The City's policies on use of Taser, dealing with the mentally ill, and use of force meet or exceed nationally accepted standards. Ex. 41; *see also* Ex. 42.

### Response to Resistance Reports

104.   The City of Hollywood Chain of Command is: (1) Police Chief; (2) Assistant Police Chief; (3) Major; (4) Lieutenant; (5) Sergeant; (6) Police Officer. Ex. 38 at 15.

105.   Each Member of the Hollywood Police Department is accountable to only one Supervisor at any given time. *Id.* at 26.

106.   Patrol Supervisors are responsible for monitoring radio transmissions and responding to and assuming command of calls that are serious in nature, involve potential liability to the City, and/or incidents that may require the presence of a Supervisor for the purpose of assuming command. *Id.* at 816.

107.   Pursuant to departmental policy, a Response to Resistance Report, also known as a use-of-force report, must be completed by a supervisor (usually a Sergeant) whenever an officer uses force in response to a subject's resistance and the subject is charged with resisting with violence, the use of force resulted in injury, or the use of force involved a weapon, *inter alia*. *Id.* at 632–33.

108.   In each report, the supervisor will provide a brief narrative of the relevant events, as explained by the involved officers and witnesses. *See id.* at 633–34.

109.   Upon its completion, the report is submitted within 24 hours to a supervising Lieutenant and then the Division Major, who each separately review the incident. *Id.* at 634.

110. After his or her review, the Division Major can recommend that the report be forwarded for filing, that there be an administrative review, or that there be a separate internal affairs investigation. *Id.*

111. Each year, the City's Internal Affairs department also reviews and analyzes each report. *Id.* at 134.

### HPD Training

112. SOP 112 generally addresses the City's training and professional development standards. Ex. 38 at 205–69.

113. As a condition of employment, every City police officer must attend the police academy, which is a 720-hour training and education seminar provided by Broward College, and be certified by the State of Florida. *See* Ex. 40 at 25.

114. During the academy, officers receive standardized educational materials and practical training in accordance with Florida Department of Law Enforcement standards. *Id.* at 25.

115. During the academy, the officers are specifically educated and trained on how to respond to a crisis situation involving a person with a disability, including mental illness, as well as use of force on individuals suffering from a disability, including a mental illness. *Id.* at 24; Ex. 16 at 11–13; Ex. 11 at 8–9; Ex. 43 at 160–79; Ex. 44 at 59–63, 78, 213, 220.

116. Officer Ramirez and Pantaloukas received this specific training on February 21, 2014, and February 24, 2014. Ex. 45 at 6–7.

117. The use of a Taser is one of the least invasive methods of taking somebody into custody and causes less injuries than other acceptable forms of force. Ex. 18 at 11; Ex. 15 at 13. For example, in regard to the underlying incident, pepper spraying Tyson would have only made the situation worse. Ex. 21 at 31.

118. Officer Ramirez and Pantaloukas passed the State certification exam, evidencing their knowledge and understanding of what was taught in the academy. Ex. 46; Ex. 47.

119. After the academy, the City's police officers undergo additional in-house training over a period of four to five weeks. Ex. 40 at 25.

120. During in-house training, the officers are provided with the department's policies and procedures. *Id.* at 24–25. Additionally, the officers receive additional materials and training on Baker Act procedures, use of force, and use of a Taser, specifically. *See id.*

121.    The Taser materials are provided by the manufacturer. Ex. 40 at 50–52. The Taser materials address mental illness and excited delirium. *Id.* The City is not permitted to modify the materials. *Id.*

122.    In July 2014, Officers Ramirez and Pantaloukas obtained their Taser certifications. Ex. 48.

123.    After in-house training, the officers participate in the City's Field Training Program, where they receive hands-on training and supervision from a Field Training Officer (FTO) over the course of twelve to fifteen weeks, including how to respond to calls involving mental illness. Ex. 40 at 25; Ex. 14 at 20.

124.    On October 27, 2014, both Officers Ramirez and Pantaloukas were in the final phase of the Field Training Program, which means they had already undergone significant training and were still being "shadowed" by a FTO. Ex. 40 at 25.

125.    After the Field Training Program, the City's officers are required to undergo in-service refresher trainings on a regular basis. *See id.* at 50–51. For example, the officers must take additional Taser and use of force courses once a year and additional mental illness training every three years. *See id.*; Ex. 38 at 746.

126.    In October 2014, Officers Pantaloukas and Ramirez received supplemental Taser training. Ex. 40 at 53, 118

127.    The City also offers Crisis Intervention Team (CIT) training, which is a program specifically geared towards teaching officers about mental illness and de-escalation tactics. Ex. 40 at 17, 61, 111–12; Ex. 49.

128.    The City's training on the proper use of Taser, proper procedure for dealing with the mentally ill, and use of force meet or exceed nationally accepted standards. Ex. 41.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail on July 19, 2018 on all counsel of record on the attached Service List.

Respectfully submitted,

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Counsel for Defendant City of Hollywood*
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, FL  33301
Telephone:  (954) 763-4242
Telecopier:  (954) 764-7770

By: */s/ Adam M. Hapner*
       DANIEL L. ABBOTT
       Florida Bar No. 767115
       Primary email: dabbott@wsh-law.com
       Secondary email: pgrotto@wsh-law.com
       ADAM M. HAPNER
       Florida Bar No. 112006
       Primary email: ahapner@wsh-law.com
       Secondary email: mboschini@wsh-law.com

## SERVICE LIST

CASE NO.:  0:16-CIV-62215-DIMITROULEAS/SNOW

**Joseph J. Kalbac, Jr., Esq.**
**Stephanie A. Casey, Esq.**
**Denise H. Georges, Esq.**
**Lindsey Lazopoulos Friedman, Esq.**
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: 305-476-7400
Facsimile: 305 476-7444
Email:eservice@colson.com;
nicky@colson.com; mabel@colson.com;
denise@colson.com; scasey@colson.com;
jkalbac@colson.com;
lindsey@colson.com

*Attorneys for Plaintiff*

**Daniel L. Abbott, Esq.**
**Adam M. Hapner, Esq.**
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
200 E. Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
Telephone: (954) 763-4242
dabbott@wsh-law.com
ahapner@wsh-law.com

*Attorneys for Defendant City of Hollywood*