UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as
Personal Representative of the
Estate of DANIEL TYSON, deceased,

    Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida
municipal corporation,

    Defendant.
_____/

VIDEOTAPED DEPOSITION OF

OFFICER ANDREAS PANTALOUKAS

taken on Behalf of the Plaintiff

DATE TAKEN:  February 27, 2018

TIME:        9:31 a.m. - 12:21 p.m.

PLACE:       City Hall
             2600 Hollywood Boulevard
             Hollywood, Florida

Examination of the witness stenographically taken

before:

Lance W. Steinbeisser, RPR CSR FPR
Registered Professional Reporter

APPEARANCES FOR THE PLAINTIFF

Denise H. Georges, Esquire
COLSON HICKS EIDSON
255 Alhambra Circle
Penthouse
Coral Gables, Florida 33134
(305) 476-7400
denise@colson.com


APPEARANCES FOR THE DEFENDANT

Adam M. Hapner, Esquire
Weiss Serota Helfman
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
ahapner@wsh-law.com


ALSO PRESENT

Matthew Taylor, videographer

1                    I N D E X

2   WITNESS                                    PAGE

3   OFFICER ANDREAS PANTALOUKAS
    Direct Exam By Ms. Georges                    5
4   Cross-Exam By Mr. Hapner                    147

5

6   PLAINTIFF'S EXHIBITS              MARKED FOR ID

7     1      Case Supplemental Report            72
      2      transcript of statement             77
8     3      course list                         19
      4      Taser certificate                   22
9     5      Certificate of Commission           61
      6      Criminal Justice Certificate        61
10    7      Taser printout                     101
      8      photo                               54
11    9      photo                               56

12  (Exhibits attached hereto.)

13  Certificate of Oath ....................Page 150
    Reporter's Deposition Certificate .......Page 151
14  Errata Sheet ...........................Page 152
    Read Letter ............................Page 153

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  Today's date is

2      February 27, 2018.  The time is 9:31 a.m.

3      Would counsel please state their appearances

4      for the record.

5          MS. GEORGES:  Denise Georges on behalf

6      of the Estate of Daniel Tyson.

7          MR. HAPNER:  Adam Hapner on behalf of

8      the City.

9          THE VIDEOGRAPHER:  We're now on the

10     record.  Will the reporter please swear in

11     the witness.

12 Thereupon--

13              OFFICER ANDREAS PANTALOUKAS

14 was duly administered the oath:  Do you swear or

15 affirm that the testimony you are about to give in

16 this cause will be the truth, the whole truth and

17 nothing but the truth?

18          THE WITNESS:  Yes, sir.

19              DIRECT EXAMINATION

20 BY MS. GEORGES:

21     Q.   Good morning, officer.

22     A.   Good morning.

23     Q.   Would you please introduce yourself to

24 the jury.

25     A.   My name is Andreas Pantaloukas, police

1  officer with Hollywood.

2          Q.    How long have you been a police officer

3  with the City of Hollywood?

4          A.    Four years and a little over one month.

5          Q.    Now, prior to becoming a police officer

6  with the City of Hollywood, were you employed by

7  any other agency --

8          A.    No, ma'am.

9          Q.    -- as a police officer?

10          A.    No, ma'am.

11          Q.    Do you have any military experience?

12          A.    No, ma'am.

13          Q.    What year did you graduate from high

14  school?

15          A.    2007.

16          Q.    And where did you graduate high school

17  from?

18          A.    Middletown High School in New York,

19  Middletown, New York.

20          Q.    Where were you born?

21          A.    Middletown, New York.

22          Q.    How long did you live in Middletown,

23  New York?

24          A.    From when I was born up until my junior

25  year in college, I guess.

1      Q.    Where did you go to college?

2      A.    I started at SUNY Orange, and I finished

3   at John Jay College in New York.

4      Q.    What year did you finish at John Jay?

5      A.    2013.

6      Q.    Did you graduate?

7      A.    I'm one exam short of my bachelor's.

8      Q.    Bachelor's in what?

9      A.    International crime and justice.

10     Q.    Do you have any intention on completing

11  your degree?

12     A.    Absolutely.

13     Q.    Are you enrolled in classes currently?

14     A.    No.  It's just one exam that I can only

15  take at NYU, and I just haven't had a chance to get

16  up there and take it.

17     Q.    What year did you move down to Florida?

18     A.    2014.

19     Q.    Why did you move down to Florida?

20     A.    To be become a police officer here in

21  Hollywood.

22     Q.    Why here versus New York?

23     A.    I just -- all my nephews are down here

24  with my sisters.  I'm very close with them.  So

25  they were here a few years -- when I was in

1    college, they moved down.  So I just wanted to be

2    close to them.  I was always close with them; so --

3    and then I used to vacation down in Fort Lauderdale

4    with my mother.  So I just thought this would be a

5    great place to be a police officer, be close to

6    family and, you know, enjoy the nice weather.

7          Q.    Good choice.

8                Did you apply to any other police agency

9    other than the City of Hollywood?

10         A.    I have, yeah.

11         Q.    What other agencies have you applied to?

12         A.    I applied to border patrol, NYPD, New

13   York State Police, Connecticut State Police, and --

14   at the time, that's it -- and then Hollywood.

15         Q.    When did you get hired by the City of

16   Hollywood?

17         A.    My hire date was January 13, 2014.

18         Q.    Did you begin the academy?

19         A.    Yes, ma'am.

20         Q.    Where did you attend the academy?

21         A.    Broward College.

22         Q.    How many people did you attend the

23   academy with?

24         A.    A little over 30, I'd say.

25         Q.    How many other officers that had been

1    hired by City of Hollywood attended the academy

2    with you?

3           A.    Three other officers.

4           Q.    And who were those officers?

5           A.    Officer Britty Perez -- and now it's

6    Verde -- Officer Anthony Gorda and Officer Alexis

7    Ramirez.

8           Q.    When did you complete the academy?

9           A.    June of the same year, 2014.

10          Q.    After you completed the academy, did you

11   have in-house training at the City of Hollywood?

12          A.    Yes, ma'am.

13          Q.    What type of training?

14          A.    All types.  We did a lot of physical

15   training in the mornings -- a morning through a

16   day.  We would do physical training in the

17   mornings.  It was also, like, to get us mentally

18   fit for high-stress situations.  Like, they would

19   work us out until we would be ready to throw up,

20   and then they would just quiz us on what street

21   comes after Johnson Street, just north of or just

22   south of, and then they would quiz us on signals,

23   10 codes.

24                If you respond to this kind of call,

25   what do you do?  That kind of stuff.  Just to

1   really get us prepared for, I guess, high-stress

2   situations.  I think Hollywood does that better

3   than any other agency.

4            And then after that, we come back to the

5   department, and we just learn our SOPs, and we go

6   over, you know -- we had to get qualified in

7   shooting, things of that nature.

8        Q.   Did you also have to get qualified for

9   carrying the Taser?

10       A.   Yes, ma'am.

11       Q.   Do you know when you underwent the Taser

12   training program?

13       A.   We did one in the Academy but also back

14   at the PD during in-house training.  So maybe July

15   of that same year.

16       Q.   Tell me about the one during the

17   academy; foremost, who held the training.

18       A.   Just some of the instructors.  I

19   remember an Instructor Spaulding.  She was in

20   charge of like PT and defensive tactics.  She was

21   there for what.  Just going over the nomenclature

22   of the Taser and just getting us comfortable with

23   firing the Taser.

24       Q.   Do you recall who she was employed by?

25       A.   Before being employed by the college?

1          Q.     Well, that's my question.   Was she

2     employed directly by the college or was she

3     employed by a police agency?

4          A.     By the college.

5          Q.     Do you know if she was a law enforcement

6     officer?

7          A.     Prior to that, yes.

8          Q.     Do you know where?

9          A.     I believe Pembroke Pines.

10         Q.     Do you know for how long?

11         A.     I don't know.

12         Q.     Now, did anyone from Taser

13     International -- or now they're known as Axon --

14     hold any type of training during the academy stage?

15         A.     I don't believe so.

16         Q.     Okay.   Now, how about you've been a

17     police officer for four years.   Have you underwent

18     any training that was hosted by an instructor from

19     Taser International?

20         A.     I don't believe so, but we have

21     certified instructors with the department that --

22     that go over the Taser.

23         Q.     Who is the certified instructor that

24     hosted the July 2014 training?

25         A.     I believe it was at the time Officer

1    Perry Beckford, who is now a sergeant.

2         Q.    Do you know who Julio Alvarez is?

3         A.    I do.

4         Q.    Who is Julio Alvarez?

5         A.    He's another training officer who was

6    also there during the training for the Taser.

7         Q.    Now, during the academy, specifically

8    during your Taser training, were you instructed on

9    the effective rate as it pertains to tasing those

10   that are decompensating as a result of a mental

11   illness?

12              MR. HAPNER:   Form.

13        A.    I don't believe that specific topic was

14   covered, no.

15   BY MS. GEORGES:

16        Q.    Was the specific topic covered as to

17   tasing those that are mentally ill, generally?

18        A.    They just talk about tasing people in

19   general.  They never go into discussing their

20   mental health capacity or anything like that, not

21   that I recall.

22        Q.    How about during your in-house July 2014

23   training at the City of Hollywood, were you ever

24   educated on the efficacy rate of Tasers on those

25   that are decompensating as a result of a mental

1    illness?

2              MR. HAPNER:   Form.

3         A.   I don't believe so.

4    BY MS. GEORGES:

5         Q.   Were you ever trained as to specific

6    considerations to give to those that are

7    decompensating as a result of a mental illness

8    prior to tasing them?

9         A.   Like, dealing with people who are

10   mentally ill -- I'm sorry.  Can you ask your

11   question one more time?

12        Q.   Were you ever instructed at the City of

13   Hollywood during your July training as to special

14   considerations that should be given to those that

15   are decompensating as a result of a mental illness

16   prior to deploying your Taser?

17        A.   In reference to tasing or just dealing

18   with mentally ill people in general.  What are

19   you --

20        Q.   Tasing those that are mentally ill.

21        A.   I don't believe so.

22        Q.   So those that are mentally ill are to be

23   treated like any other citizen prior to deploying

24   your Taser?

25             MR. HAPNER:   Form.

1        A.    No.   We go under specific training for

2    dealing with the mentally ill.   Usually you want to

3    try to deescalate the situation with them, let them

4    know that you're there to help them.   Let them know

5    that.   You know, you're not there to -- we have to

6    put handcuffs on people we place in the back of our

7    cars, and we transport mentally ill people to the

8    hospital.   So they have to have handcuffs on them.

9    So just deescalating the situation and letting them

10   know:   Listen, you're not under arrest.   You're not

11   in any trouble.   These handcuffs are going on just

12   because it's policy that you have to wear them in

13   my backseat.

14   BY MS. GEORGES:

15       Q.    What training are you referencing?

16       A.    That would be training we learned in the

17   academy.   That would be training we learned on

18   mental health and in-house after the academy.

19       Q.    Have you ever taken crisis intervention

20   team training?

21       A.    I have.

22       Q.    When?

23       A.    I couldn't give you the exact date.   I

24   don't recall, but it was after that incident.   I

25   know that for sure.

1      Q.   Do you know what year you took crisis

2   intervention team training?

3      A.   I would just be guessing.  I don't --

4   I'd say 2016.

5      Q.   Now, what type of training did you have

6   during the academy of dealing with citizens who

7   were suffered from mental illness?

8      A.   Like I said earlier, you know, trying to

9   deescalate the situation.  A lot of times they're,

10   you know, in a heightened sense of paranoia or what

11   have you.  There's a reason why we're called there.

12   People aren't going to call the police for nothing.

13          So they're concerned about their

14   well-being.  A lot of times, people who are

15   suffering from mental illness, they don't

16   necessarily think they need the help sometimes, and

17   that can be an issue sometimes in trying to -- you

18   know, to build a rapport with them to try to let

19   them take -- or take them to the hospital to get

20   the treatment that they need.

21          So just really deescalation and, you

22   know, understanding that you may not understand

23   what they're going through if you haven't been

24   through it.  So just, you know, be patient with

25   them, I guess I would say, because they could be

1    just talking about one thing rambling on another,

2    and you just want to be patient with them.

3              They really just want you to listen

4    sometimes, and then ultimately when you build a

5    friendship or a rapport with them, you explain to

6    them, listen, you know, somebody called me in

7    reference to this.  I have to do my job and I have

8    to take you to the hospital based on my findings,

9    and then -- so let's go.

10        Q.   So is it fair to say that in the last

11   four years as a police officer, you have learned

12   how to handle these types of situations when it

13   comes to being called out for someone who's

14   suffering from mental illness?

15        A.   Absolutely.  I've dealt with the

16   mentally ill since I started, and I still continue

17   to deal with it today.

18        Q.   Now, when did you complete your in-house

19   training?

20        A.   August 2014.  It was like five weeks

21   long.  So, yeah, maybe August, I would say.

22        Q.   And then when did you hit the road?

23        A.   Right after that.  So August, the same

24   month.

25        Q.   And were you assigned to the field

1   training program?

2         A.    Yes, ma'am.

3         Q.    And what does it mean to be assigned to

4   the field training program?

5         A.    Well, with Hollywood, they work -- your

6   first week or two weeks -- I think it's two

7   weeks -- you just -- you're assigned with a

8   training officer who -- somebody who's been

9   through, you know, advanced training on helping out

10  and, you know, showing new guys around, I guess.

11         And those first two weeks you just watch

12  what they do, and you see how they handle

13  situations.  You see how they talk to people, how

14  they gather information, how they -- you know, how

15  they do their job.

16         And then after that, you know, they

17  slowly get you involved.  So maybe in like the

18  second week I was working the radio.  You know,

19  they always want you to know where you are; so

20  they're asking what street we're on and what corner

21  we're on.

22         And then on the way to calls -- at that

23  point, after two weeks of just following them

24  around, then they'd say:  All right.  You're going

25  to be driving today.  You're going to be handling

1  the calls, and I'm just going to be -- they sit in

2  your passenger's seat and go to calls with you and

3  watch how you handle calls, grade you.

4        Q.   So is that what it means to ride

5  two-man?

6        A.   Yeah.

7        Q.   So you were the driver, and then your

8  field training officer would have been the

9  passenger in your patrol car; correct?

10        A.   Correct.

11        Q.   And then how long did you ride two-man

12  with your FTO for?

13        A.   It was multiple FTOs, but I think it's

14  13 weeks, I think -- I believe it's a 13-week

15  program.

16        Q.   Okay.  How about specifically riding

17  two-man?  Is that the entire 13-week program?

18        A.   No.  The last two weeks is called the

19  shadow phase.  That's where -- if you make it to

20  that, if they think you're ready to be on your own,

21  you're not totally on your own, but you're riding

22  alone, and they just show up to some of your calls,

23  ones they think they should show up to or maybe

24  even all of them if they think you need to be

25  watched on all of your calls, and they drive in a

1    separate car and just show up to your calls and

2    watch --

3         Q.   On the date of this incident, were you

4    riding two-man with your FTO?

5         A.   No, ma'am.

6         Q.   Were you in the shadow phase?

7         A.   Yes, ma'am.

8         Q.   So how long exactly were you riding

9    two-man?  If you began the field training segment

10   at the end of August and this occurred on

11   October 27 of 2014, that's approximately two months

12   after you began the training program; correct?

13        A.   It sounds about right, yeah.

14        Q.   So how long were you riding two-man with

15   an FTO prior to the date of the incident?

16        A.   From the end of August until the end of

17   October when the incident occurred.  I was alone

18   one week prior -- the incident occurred on the

19   first day of the second week of the shadow phase.

20   So the end of August, say September.  Rode two-man

21   for most of August and, I guess, all of September,

22   and then, I guess, the first half of October.

23             (Plaintiff's Exhibit 3 was marked for

24        identification.)

25

Page 19

1   BY MS. GEORGES:

2        Q.   And I just want to establish a time line

3   as to your training and also your certifications.

4             So foremost, I'm going to hand you what

5   has been premarked as Plaintiff's Exhibit 3.  It is

6   also Bates-stamped as Tyson 1711 through 12, and

7   this is a list of classes that you attended at the

8   Hollywood Police Department that was furnished in

9   discovery.  If you can take an opportunity and just

10  review that document.

11       A.   Most of these are the Hollywood Police

12  Department, but there are a few that I took at the

13  Broward Institute of Public Safety as advanced

14  training courses.

15       Q.   Those classes that you took at

16  Hollywood, are they not included in this list?

17       A.   They are.

18       Q.   They are?

19       A.   They are, yes.

20       Q.   What classes did you take at the

21  Hollywood Institute?

22       A.   FCIC/NCIC limited access, taser issue

23  and training on the M26 course, human trafficking,

24  child abuse investigation, driver refresher course,

25  report writing, use of force stop sticks,

1  in-service first-aid, in-service property forms

2  training, Taser refresher, terrorism update,

3  handcuffing, driver improvement, driver

4  enhancement, in-service accreditation, domestic

5  violence initiative, firearm use, infectious

6  disease, social media, felony stops, Taser

7  refresher, traffic refresher, use of force third

8  quarter, administrative citations, Baker Act, CPR

9  first-aid, homicide investigations, lineup

10 training, FDLE mandate domestic violence, FDLE

11 mandate traffic stops, juvenile sex offender, human

12 intelligence, Taser X2 transition training, state

13 firearm qualifications, lineup training -- the rest

14 on that list -- do you want me to read them all,

15 but they're all at the Hollywood Police Department.

16      Q.   So we're talking page 2, which is

17 Bates-stamped as Tyson 1712.  Everything underneath

18 Taser X2 transition training was held at the

19 Hollywood Institute?

20      A.   Yes, ma'am.  The only ones that weren't

21 are the ones that are 40-hour courses on either

22 page.

23      Q.   Now, turning to page 1, is it fair to

24 say that you began the academy on January 21 of

25 2014?

1          A.     Yeah, yes.

2          Q.     The Taser issue and training M26 course

3     that was held on July 17th of 2014, who was the

4     instructor?

5          A.     It had to be either Perry Beckford or

6     Julio Alvarez.  They were our training instructors.

7          Q.     And they're both employed by the City of

8     Hollywood Police Department and were in that

9     capacity back in July of 2014?

10          A.     Yes, ma'am.

11          Q.     Now, based on Plaintiff's Exhibit 3 and

12     a list of classes that you attended, did you have

13     any Baker Act training prior to the date of

14     incident?

15          A.     In the Hollywood Police Department, I do

16     not see that on there prior to -- oh, I'm sorry --

17     oh, yeah, no, I haven't, not prior to that incident

18     at the Hollywood Police Department.

19          Q.     Now, prior to this date of incident, did

20     you have the benefit of crisis intervention team

21     training?

22          A.     No.

23               (Plaintiff's Exhibit 4 was marked for

24          identification.)

25

1  BY MS. GEORGES:

2        Q.    I'm handing you what has been marked as

3  Plaintiff's Exhibit 4, which is a Taser Certified

4  End User Certificate, dated July 17 of 2014.

5              Do you recognize that document, officer?

6        A.    I do.

7        Q.    What do you recognize that document to

8  be?

9        A.    Meaning this is my certification then

10 for use of the Taser.

11       Q.    Did you have to attend a Taser course?

12       A.    Yes.

13       Q.    How long was the course?

14       A.    I believe we did it in either one day of

15 in-house or two days of in-house.  I don't recall.

16       Q.    What do you recall of that training back

17 in July of 2014?

18       A.    I remember getting tased.  That was part

19 of it.  I will never forget that.

20       Q.    How were you tased?

21       A.    The prongs are already fired, and then

22 they hooked one up to my belt -- one to my belt and

23 then one to my shoelace.

24       Q.    How was it hooked up to your belt and

25 the other one to your shoelace?

1          A.    Just tied in there.

2          Q.    Okay.

3          A.    It's a prong connected to a string.  So

4     they just stuck it into my belt, so it stayed

5     there.  And then the same thing with my shoelace,

6     they just stuck it in there so that it was on

7     there.

8          Q.    Did they ever actually deploy the Taser

9     into your muscles?

10         A.    Shoot me like with the prongs?  No.

11         Q.    Yes.

12         A.    They just did that.  That's what they

13    do.

14         Q.    Okay.  And how long were you tased for?

15         A.    Five seconds.

16         Q.    How did it feel?

17         A.    Unpleasant.

18         Q.    How unpleasant?

19         A.    It just my entire body locked up.  It

20    just felt like the muscles were being pulled away

21    from my bones.

22         Q.    Was it incapacitating?

23         A.    It was.

24         Q.    Were you standing up?

25         A.    I was, but I was being held on both

Page 24

1   sides.

2        Q.    Did you fall down?

3        A.    No, because -- only because I was being

4   held up by other officers.

5        Q.    Following that tasing in July of 2014,

6   have you been tased since?

7        A.    No, ma'am.

8        Q.    Have you ever been drive-stunned?

9        A.    No, ma'am.

10       Q.    What is the purpose of a Taser?

11       A.    To incapacitate, to gain control.  Your

12   ideal response is a neuromuscular incapacitation,

13   just to get a suspect or somebody who you're tasing

14   to lock up and stop resisting.  And it gives you

15   time while they're locked up, while the five

16   seconds are cycling, to gain control of them,

17   handcuff them, tell them to stop resisting.

18       Q.    Is there a policy and procedure at the

19   City of Hollywood for how many times you can tase

20   someone?

21       A.    I think the latest training, it said

22   something -- I would be totally guessing, though --

23   it was a while ago.  It was after this incident --

24   that if you're not getting an affect or you're --

25   you know, you shouldn't do it more than -- I don't

1  know the number of times.  I would be guessing if I

2  just threw a number out at you.

3          Q.   How about prior to this incident, were

4  you ever trained on how many tasings you can

5  conduct prior to the actual weapon being deemed

6  ineffective?

7          A.   No, I don't believe so.

8          Q.   So what would you use as a guideline or

9  a measure to dictate whether or not the Taser's

10  been effective?

11          A.   If you're getting the response that you

12  want to get, the neuromuscular incapacitation.

13          Q.   What's the difference between just pain

14  compliance and incapacitation?

15          A.   With pain compliance, they're just

16  feeling pain in a strict, little area with the

17  incapacitation -- and they can still, you know,

18  swing limbs.  If that's not the area that's being

19  targeted, they can still move around.  They can

20  still do a lot.

21              If you're getting the neuromuscular

22  incapacitation, they're locking up.  There's --

23  when that happened to me, I couldn't do anything.

24  I was just locked up for those five seconds.

25          Q.   Well, do you know how the Taser affects

1  someone that is decompensating as a result of a

2  mental illness?

3        A.   I don't.

4        Q.   Do you know whether or not it has the

5  same effect as far as intermuscular incapacitation

6  as someone who is not decompensating as a result of

7  a mental illness?

8        A.   I don't know.

9        Q.   Were you ever trained?

10       A.   On that specific topic, no, I don't

11  believe so.

12       Q.   Have you been trained since this

13  incident on how the Taser affects someone who's

14  decompensating as a result of a mental illness?

15       A.   I don't believe so.

16       Q.   Were you ever educated on where to tase

17  someone in order to reach maximum effective rate?

18       A.   They say the back is great, midsection.

19  You just want to stay away from the person's head

20  and their genitals.  You just want a nice, you

21  know, long spread.  Because if they're too close

22  together -- the prongs are too close together,

23  you're just going to get pain compliance.  You're

24  not going to get the desired outcome.

25       Q.   So why would someone use the Taser in a

Page 27

1  manner to achieve pain compliance versus

2  incapacitation?

3           A.   I don't know.  I don't think that they

4  train you on that to try to get pain compliance.  I

5  don't recall being -- you know, ever told to, you

6  know, fire it at a close range and -- and just want

7  to get pain compliance.  There are many other

8  options for pain compliance, if that's what you

9  want to do.

10          Q.   What are the options to achieve pain

11  compliance?

12          A.   You can, you know, bend somebody's

13  wrist.  There are little -- what are they?  You

14  have nerves all over your body.  You know, you can

15  press here, behind the ear, under the nose.  Under

16  the jaw line there's a -- those are all pain

17  compliance.

18          Q.   And where were you taught those measures

19  for pain compliance?

20          A.   At the academy and at the Hollywood

21  Police Department.

22          Q.   Have you ever had to use those measures

23  in the field?

24          A.   I don't believe so.

25          Q.   Why not?

1      A.   I don't know.  I've been fortunate

2  enough not to get into a situation that that's

3  where I thought would be necessary; in other words,

4  I felt would work or help the situation.  I mean,

5  there's one under your nose.  Right?  I mean, it's

6  great in training, but I couldn't see myself

7  putting my hand next to somebody -- if somebody is

8  resisting -- physically resisting and I need to do

9  that, I don't see myself putting my hand close to

10 their mouth like that.  It just seems like a bad

11 idea.

12      Q.   Now, since you've been employed as a

13 City of Hollywood Police Officer, other than this

14 incident, have you had to use your Taser?

15      A.   Yes, ma'am.

16      Q.   How many times?

17      A.   I believe one other time.

18      Q.   When?

19      A.   It was just months later.

20      Q.   In what circumstance?

21      A.   Another officer conducted a traffic stop

22 in an alleyway.  The vehicle had a strong odor of

23 marijuana emanating from it, and the passenger took

24 off from us.  So we got into a foot chase, and when

25 we told him to stop -- asked him to stop, he didn't

1  stop.  He was really fast too.  And the officer --
2  initial officer fired his Taser.  It was
3  ineffective, and I fired mine which was effective.
4      Q.    Where did that officer deploy his Taser
5  prior to you deploying yours?
6      A.    Where...
7      Q.    Where on that subject's body?
8      A.    I think it was just in his back, but he
9  had a -- like a hoody on, and it was a zip-up
10 hoody, I believe, and it didn't -- I don't think it
11 connected at all because nothing happened to the
12 guy.  It just hit the sweater.  It didn't
13 penetrate -- I don't know, but there was no -- no
14 effect on him.
15     Q.    And then where did you deploy your
16 Taser?
17     A.    At that point, I think his sweater was
18 off, and I just deployed it -- I don't know.  I
19 think I may have hit him somewhere mid-section or
20 in his back.
21     Q.    What do you mean the sweater was off?
22     A.    He was wearing a hoody.  It was like a
23 zip-up hoody, and I just remember -- I don't think
24 that was it in the way of when I tased him.  So it
25 was either off or -- like off of him completely or

1    just off to the side.  I don't remember

2    specifically, but I know --

3         Q.    Do you know if he took it off or

4    somebody yanked it off?

5         A.    I don't recall.

6         Q.    And you think that you deployed your

7    Taser somewhere in the abdomen or back area?

8         A.    Yes.

9         Q.    And how many times did you use the

10   trigger on the Taser?

11        A.    Just the initial firing of it, and he

12   went down and we gained control, put him in

13   handcuffs, and that was it.

14        Q.    What was the length of that cycle?

15        A.    Five seconds.

16        Q.    Did you tase him a second time?

17        A.    I don't believe so.

18        Q.    Other than that incident, have you

19   deployed your Taser in any other circumstance while

20   out in the field?

21        A.    I don't believe so.

22        Q.    Have you been in circumstances where

23   other officers have deployed their Taser in your

24   presence?

25        A.    I don't recall any -- any time.  I don't

1    know.  I don't believe so.

2         Q.    Have you ever had to use your firearm?

3         A.    No.

4         Q.    Have you ever been suspended by the City

5    of Hollywood Police Department?

6         A.    No, ma'am.

7         Q.    Have you ever been disciplined by the

8    City of Hollywood Police Department?

9         A.    I've gotten like a verbal warning, I

10   think, once.

11        Q.    For what?

12        A.    When you first -- when you're new, they

13   throw you to the wolves; so you work afternoons,

14   which is our busiest shift, and they put you in the

15   busy zone, which is the largest zone -- it's

16   actually where we're sitting right now.  And, you

17   know, getting swamped, you know, six-seven reports

18   a day, and I had an accident report, and I had

19   totally forgot about it.

20              And I ran into the girl from the

21   accident's mother like a month later, and I was

22   like I think I know your daughter.  I know her from

23   somewhere.  She's like, yeah.  She got into an

24   accident.  I was like, oh, my God.  And I realized

25   I forgot to do the report; so I told her.  I was

1  like, yeah, I don't think I -- she was asking me

2  about it.  She was like:  Is that report ready for

3  us, because we're looking for it.

4          And I was like:  To be honest with you,

5  I totally forgot about it.  I have to go see if I

6  still have the paperwork from it, and they had

7  hired an attorney because they weren't at fault in

8  the accident.  The car was pretty damaged --

9  damaged pretty badly.  And they called the

10  department, and because I was on -- I was still on

11  probation, my sergeant saw it best to, I guess, put

12  an unsatisfactory in one of my monthly evals.  So

13  that was my getting, you know, written up, I guess.

14      Q.   What was the length of your probationary

15  period?

16      A.   I think it's a year from when you

17  complete the academy, and that includes FTO.

18      Q.   Do you know when you completed the FTO

19  program?

20      A.   After the incident, the incident we're

21  here for today.  I think they just -- when we

22  finally got back to the road, which was right after

23  Thanksgiving, they had us do just a couple weeks

24  refresher with FTOs just to see, you know, if -- if

25  that incident, you know, either affected us

1  mentally or we weren't fit to do our job.  They

2  just wanted to see us -- you know, see if we knew

3  what we were doing, see if we still remembered, see

4  if we were okay to work on our own at the time.  So

5  I think that was like another two weeks after

6  Thanksgiving, I believe.

7          Q.    Now, after the death of Daniel Tyson,

8  were you reassigned to a lighter duty?

9          A.    I was, ma'am, yes.

10         Q.    Okay.  And where were you assigned?

11         A.    I was assigned at the West Network

12  Center.  It's -- we don't use it anymore.  It's the

13  Boys and Girls Club.  We used to have an office out

14  there where a couple detectives, a major, and a

15  lieutenant were assigned, and we would occasionally

16  have walk-ins over there.  It's over on 69th Way,

17  just north of Johnson Street.  And they just had me

18  at the front desk.  And if there was a walk-in,

19  which I think there was only one in one month, you

20  know, I would just talk to them and see what they

21  needed.  That was about it.

22         Q.    How long were you assigned to desk duty

23  for?

24         A.    I think it was one month after the

25  incident.  I believe the weekend after -- or --

1   sorry -- the Monday after Thanksgiving we were back

2   in the department reassigned to the training unit

3   first and then to FTO again for a couple weeks.

4        Q.    When you say "we," are you talking about

5   Officer Ramirez?

6        A.    Yes, ma'am.

7        Q.    Do you know why you were assigned to

8   desk duty?

9        A.    I think just standard operating

10  procedure, I believe.  I don't know.  Because the

11  incident was a very, you know -- what's the word

12  I'm looking for?  It's not an incident, you know,

13  that many officers have been through or have had to

14  go through.  So I think -- I think it would be

15  normal.  I don't know.  You would have to ask

16  somebody -- somebody upstairs who assigned me

17  there.

18            The first stage of it, having internal

19  affairs, you know, take photographs of me.  I know

20  that's all standard operating procedure.  Have me

21  sign something saying that, you know, there's an

22  internal affairs investigation.  They came to my

23  house, had me sign some paperwork.  And then I had

24  to see a doctor the very next day after the

25  incident, I think.  I think it was the very next

Page 35

1  day or two days later.  That's all.

2       Q.    Who from internal affairs came to your

3  house to speak to you?

4       A.    Lieutenant Millares and --

5       Q.    Can you spell that?

6       A.    M-I-L-L-A-R-E-S.  So it look likes

7  Millares.

8       Q.    Who else from internal affairs?

9       A.    He's retired now.  I think his name is

10  Sergeant Julio Gonzalez.

11            They came.

12       Q.    Did they explain to you the procedure of

13  being under investigation by internal affairs?

14       A.    They did.  They said I had to call.  I

15  had to stay home during work hours, and I had to

16  call in to their secretary at like 9:00 a.m. and

17  then, once again, in the afternoon every day and

18  just say, "Hi, this is Officer Pantaloukas checking

19  in."

20       Q.    For how long did you have to do that?

21       A.    I think -- I hope a week, maybe.  I

22  don't remember exactly how long it was.

23       Q.    Do you know what the purpose was?

24       A.    I don't.  I think it's because they want

25  me to go see the doctor the very next day, and the

1  doctor needs to verify if they think I'm fit for

2  duty or if that incident affected me in a way that

3  should be of concern to the department.

4      Q.   So prior to being assigned to desk duty,

5  were you off duty for an entire week?

6      A.   I believe it was a week.  It may have

7  been shorter.  I don't remember.

8      Q.   What doctor did you go see?

9      A.   It was the same doctor that did my psych

10 eval before I got hired.  We had to go through

11 that.  I couldn't tell you his name.  I just know

12 he's a white male who's bald, and I think the

13 department still uses him.  He's down in Miami.

14 Nice guy.

15     Q.   Do you know who he is employed by?

16     A.   I don't know that either.

17     Q.   Do you know where in Miami he works out

18 of?

19     A.   Miami is like a different country to me.

20          I don't know.  I have no idea.

21     Q.   Do you know whether or not it's on the

22 northern sector of the city versus the center or

23 the south?

24     A.   I think it was out west somewhere.  I

25 don't know.  I'm guessing.  I mean --

1        Q.    If you wanted to obtain that name, could

2    you do so?

3        A.    I think so.  I believe, like I said, I

4    think they still use him for, you know, newly hired

5    officers, people trying to get employed by the

6    City.

7        Q.    And did you see that doctor following

8    this incident?

9        A.    Yes, ma'am.

10       Q.    How many times?

11       A.    Just the one day.

12       Q.    Do you know how many days after the

13   incident you saw this doctor?

14       A.    It was either the very next day or two

15   day -- like the second day after the incident.  I

16   don't recall exactly.

17       Q.    How long did you visit with this doctor?

18       A.    Maybe a couple of hours.

19       Q.    And what happened during your

20   appointment?  Did he examine you?

21       A.    We just talked.

22       Q.    For how long?

23       A.    Maybe a couple of hours -- an hour or

24   so, two hours, I don't know.

25       Q.    Did he prescribe any medication?

1      A.    No, ma'am.

2      Q.    Do you ever have trouble sleeping after

3  this incident?

4      A.    No, ma'am.

5      Q.    Do you ever suffer from any anxiety?

6      A.    No, ma'am.

7      Q.    How about any post-traumatic stress?

8      A.    No, ma'am.

9      Q.    Ever have any flashbacks?

10     A.    Really, when I drive by the house, I

11 think about it, but that's about it.  I frequent

12 that area quite often, actually.

13     Q.    Have you been apprehensive to use your

14 Taser after this incident?

15     A.    No.  If I have to use my Taser -- I

16 was -- I almost used it recently, but luckily I

17 received compliance from the subject, and I didn't

18 need to.  It was playing flashbacks because he was

19 a larger male, and there were just like a lot of

20 objects around.  If he was to fall down, I was --

21 he's going to hit his head on something, but he

22 stopped fighting, and I didn't need to use it.

23     Q.    Now, other than conversations that

24 you've had with Mr. Hapner, do you know the cause

25 of death of Daniel Tyson?

1      A.    I don't.  I can take a guess, but I'd

2   just be guessing.  I don't know the actual.

3      Q.    What's your guess?

4      A.    Overheating.  I don't know.

5      Q.    Overheating from what?

6      A.    That I don't know, but I hadn't had a

7   conversation.  I just heard, I guess, that he just

8   had a high body temperature.  I don't know who I

9   heard that from.

10      Q.    Do you know if you're still under

11   investigation by internal affairs?

12      A.    I don't believe so.

13      Q.    Do you know if you were cleared?

14      A.    I believe so.  Honestly, I've never

15   really had to deal with them in any other

16   circumstance.  So I don't know if -- I was under

17   the impression that they would have to let you know

18   or they let you know when things are clear or

19   closed up.  I don't think I was ever notified,

20   but -- I recently pulled a concise.

21      Q.    What's a concise?

22      A.    I think it's a -- just a little summary

23   of your internal affairs, either complaints or uses

24   of forces or what have you.

25            Like, the thing I told you about with

1    the accident, getting, you know, an unsatisfactory

2    on a monthly eval, that was on there.

3         Q.   Did you ever find anything in your

4    internal affairs file or your concise file that

5    pertains to this incident?

6         A.   I believe -- I saw it listed on there,

7    but honestly, I don't remember what it said and if

8    it was active or inactive or what.  I can't recall

9    that.

10        Q.   Well, in the last three plus years, have

11   you ever been curious about contacting internal

12   affairs and finding out where you stand with them?

13        A.   I called recently, maybe a month or two

14   ago.  I spoke with sergeant -- I think her name is

15   Cohen now.  It was Dechardt before.  Just explained

16   to her my situation that my wife and I are looking

17   to move; so I want to apply to other agencies.

18             And if I have an open internal affairs,

19   I don't think an agency would hire me unless that

20   was completed.  So I asked her about this incident,

21   and I believe she said she didn't see anything on

22   there that it was still active or anything like

23   that.  But I'm not a hundred percent sure.

24        Q.   Did you ask for written confirmation of

25   that?

Page 41

1        A.    No.

2        Q.    Where are you looking to move to?

3        A.    We want to move to Palm City/Stuart/Hope

4   Sound area.

5        Q.    Is there any specific reason?

6        A.    That's where -- like I had mentioned

7   earlier, I was close to my nephews.  They live -- I

8   have one in Palm City and three nephews in Stuart.

9   I just love the area up there.  It's an awesome

10  place.

11       Q.    Have you applied to any other police

12  agencies?

13       A.    Yes, ma'am.

14       Q.    As of when?

15       A.    Just a few weeks ago I applied to

16  Jupiter PD and Palm Beach Sheriff's Office.

17       Q.    Have you heard any response from either

18  Jupiter Police Department or Palm Beach Sheriff?

19       A.    Yes, ma'am.

20       Q.    What kind of response have you heard?

21       A.    I had an initial interview with Jupiter,

22  and then I also had an oral board with them.  I

23  don't know what the next step is, but that's where

24  I'm at with them.

25             And with PBSO, it's like an online

1   thing.  I guess they get a lot of applicants.  It's

2   a large agency.  My application was terminated

3   because they said my job history was incomplete.

4   Their website was really weird; so I had to

5   straighten that out.  And then it was activated,

6   and then it was pushed through to HR and then now

7   it's in saying available for -- I don't know.  I'm

8   like waiting to set something up for -- I guess the

9   oral board is the first -- the first stage for that

10  first.  Yeah.

11       Q.   While you've been at the City of

12  Hollywood Police Department, have you ever applied

13  to a specialized unit?

14       A.   Yes, ma'am.

15       Q.   What specialized units?

16       A.   The detective bureau -- I've applied

17  there twice -- and as a neighborhood team leader.

18  I applied for that once.

19       Q.   Have you been accepted to either of

20  those units?

21       A.   No, ma'am.

22       Q.   Do you know why?

23       A.   No.

24       Q.   Has there been anything about this

25  incident or the internal affairs investigation that

1    has prevented you from applying to any other unit?

2         A.    I don't believe so, no.

3         Q.    Has the pending investigation affected

4    you in any manner as far as either getting promoted

5    within the unit or being accepted by a specialized

6    unit?

7         A.    I thought about that, and I'm not sure

8    if that -- if that comes into play when they're

9    looking over the applicants.  I don't know.  I

10   don't know what the policy is on that.  I'm not

11   sure.

12        Q.    Now, other than this one visit to the

13   psychologist or psychiatrist following the

14   incident, have you sought any other counseling as a

15   result of this incident?

16        A.    Like when I had to -- for my grand jury,

17   like that counseling, or are you talk --

18        Q.    I'm talking about any type of mental

19   health --

20        A.    No.

21        Q.    -- treatment.

22        A.    No, ma'am.

23        Q.    Have you ever taken any type of

24   antidepressants or any antianxiety medication?

25        A.    No.

1          Q.    Have you ever been prescribed any

2    antianxiety medication?

3          A.    No.

4          Q.    Did you testify in front of the grand

5    jury this past October?

6          A.    Yes, ma'am.

7          Q.    Do you know if you testified on a

8    certain day versus another?  That was a bad

9    question.

10              Do you know how long the grand jury

11   convened for on this case?

12         A.    I don't.

13         Q.    Do you know how long testimony was

14   given?  Do you know if it was a day versus two

15   days?

16         A.    I believe it was one day, I believe.

17   I'm just guessing.

18         Q.    How long did you testify for?

19         A.    It felt like 30 minutes, maybe.

20         Q.    Who asked you questions?

21         A.    I think the lady in the back of the

22   room.  I don't know her name.

23         Q.    Who was the lady in the back of the

24   room?

25         A.    I guess she works for the State -- to be

1    honest with you, it was just such a blur.  My guess

2    is she works for the State.

3           Q.    Do you know if her name was Shari Tate?

4           A.    Yes, that's her.

5           Q.    Did you meet with Shari Tate prior to

6    your testimony at the grand jury?

7           A.    She introduced herself in the hallway.

8    She just said, "Hi, I'm Shari Tate.  That's it.

9           Q.    Why did you testify in front of the

10   grand jury?

11          A.    Because I was asked to -- because it was

12   about my involvement in the incident that ended

13   in -- you know, an in-custody death of Daniel

14   Tyson.

15          Q.    Who asked you to testify?

16          A.    I don't think -- I didn't -- I wasn't

17   asked.  I was just -- said, you know, you can or

18   you can't.  So it was up to me.

19          Q.    Who told you, though, you can or you

20   can't?

21          A.    My attorney.

22          Q.    And who is your attorney?

23                MR. HAPNER:  Jeremy Kroll.

24                And you don't have to reveal any

25          conversations --

Page 46

1          MS. GEORGES:  No.

2       A.   That's him.  Jeremy Kroll.

3   BY MS. GEORGES:

4       Q.   And who was he employed by?

5       A.   Dutko -- I don't know -- his law firm

6   has his name in it; that's all I know.

7       Q.   Is it someone from Mr. Hapner's law

8   firm?

9       A.   I don't know.

10      Q.   Was it Mr. Hapner?

11      A.   No.

12      Q.   Was it someone who's employed by the

13  PBA?

14      A.   Sorry.  Your original question:  Is he

15  employed by the PBA?

16      Q.   Yes.

17      A.   He was chosen by the PBA to represent

18  me, yes.

19      Q.   Who is Julio Gonzalez?

20      A.   An attorney with the PBA.

21      Q.   Was he present for your statement with

22  Detective Rillo?

23      A.   I don't recall if he was there, to be

24  honest with you.

25      Q.   Now, prior to your testimony at the

1  grand jury, did you talk to Officer Ramirez about

2  this incident?

3          A.   Yes.

4          Q.   What did you discuss?

5          A.   We just talked about it.  I asked, you

6  know -- I mean, nothing specific.  You know, we

7  just -- I don't know.  Usually we would just say,

8  hey, how are you doing -- I guess it's come up in

9  conversations -- I don't know how and what.  I

10 couldn't tell you what we talk about or even if we

11 have talked about it.  I just asked him how he was

12 feeling afterward.  You know, we're pretty close

13 friends.

14         Q.   How close?

15         A.   We're just friends.  I mean, I went to

16 his daughter's first birthday.  His wife came to my

17 daughter's first birthday.  We text each other.

18         Q.   So you guys are personal friends?

19         A.   We are.

20         Q.   How did this affect Officer Ramirez?

21              MR. HAPNER:   Form.

22         A.   You would have to ask him that.  To be

23 honest with you, I don't know how it affected him.

24 I mean, we're friends.  I'm not -- I don't know.

25 You would have to ask him.

Page 48

1    BY MS. GEORGES:

2         Q.   Do you know if he was stressed out after

3    this incident, whether or not he was feeling any

4    anxiety?

5              MR. HAPNER:   Form.

6         A.   You would have to ask him.

7    BY MS. GEORGES:

8         Q.   Okay.  So when you called to check up on

9    him after this incident, what were his responses?

10        A.   I was just saying, "How is your head

11   doing?  My head's fine.  I got six staples."

12   That's really all I could tell you.

13        Q.   Do you know if Officer Ramirez visited

14   the same doctor that you did after this incident?

15        A.   I don't know that.

16        Q.   Would he have undergone the same

17   psychological evaluation during the application

18   process as you would have?

19        A.   I would assume so, but you would have to

20   ask him.

21        Q.   Do you know by chance if you visited the

22   same doctor during the application process?

23        A.   I don't know that.  There are multiple

24   doctors in that building or for whatever -- you

25   know, so I don't know.  I don't know who he saw or

Page 49

1    who he talked to.

2          Q.    Do you know what the purpose of the

3    grand jury was?

4          A.    To see if anything we did was punishable

5    by law.

6          Q.    So you understood that you were being

7    investigated criminally?

8          A.    Yes.

9          Q.    Did you know what the potential charges

10   could be?

11         A.    No.  My guess would be, I don't know,

12   manslaughter.

13         Q.    Why did you testify?

14         A.    Because I had nothing to hide.  I still

15   don't have anything to hide.  And I just wanted

16   to -- and I felt, you know, in telling my story,

17   people would see it the same way I saw it.  I just

18   wanted to get it out there.

19         Q.    How did you see it?

20         A.    As an unfortunate event.  We lost a life

21   that day.  But I believe to this day that we did --

22   I did everything, you know, that I could have to

23   try to help him -- to try to avoid that, avoid that

24   outcome, and unfortunately that was the outcome

25   that still transpired.

1      Q.    How did you try to avoid the outcome?

2      A.    The way he was resisting on scene.  I

3   could have done a number of things.  I could

4   have -- I mean, he just almost killed an officer.

5   People say I could have shot him.  I never thought

6   about that, but I could have hit him in the head

7   with my ASP, which may have killed him.  It would

8   have or definitely permanently disfigured him.  I

9   didn't want that.  It would have knocked some teeth

10   out.  He would be missing his teeth for the rest of

11   his life.  It's not what I wanted to do.  It's not

12   what I'm about.  I wasn't there to hurt the man.  I

13   was just there to control him and get him to the

14   hospital, because he clearly needed some kind of

15   help.

16      Q.    Do you know what kind of help Daniel

17   Tyson needed on October 27 of 2014?

18      A.    No.  I didn't get a chance to talk to

19   him.

20      Q.    Do you know if he was decompensating as

21   a result of not being on his medication?

22      A.    I don't know that, no.  I didn't know

23   that, no.

24      Q.    Do you think that would have been an

25   important fact to know?

1        A.    It wouldn't have changed my -- what I
2    was -- my -- the role I took or the options I took;
3    so probably not, no.
4        Q.    And what was the role that you took?
5        A.    I tased the man.
6        Q.    Why?
7        A.    Because he was actively fighting
8    officers -- an officer on scene.  And when I came,
9    he was fighting with me too.
10       Q.    Do you know why he was actively fighting
11   Officer Ramirez?
12       A.    I have no idea.  I had no idea.
13       Q.    Do you know why he was actively fighting
14   you when you arrived on scene?
15       A.    No, I don't or I did not.
16       Q.    Did you ever consider that Daniel Tyson
17   was fighting both you and Officer Ramirez because
18   he was off of his medication and he was
19   decompensating as a result of his mental illness?
20       A.    Absolutely.  I took that into
21   consideration, sure, yeah, which is why I chose to
22   go to the route of using a Taser and not
23   permanently disfigure him with either a strong kick
24   or punching him in the head or something like that
25   or hitting him with a baton.

1          I just -- I knew -- I know what the

2     Taser is capable of, that it's going to lock you

3     up.  And when I got tased, I didn't want to get

4     tased again.  So unfortunately, it wasn't the same

5     with him.  He kept fighting.

6          Q.   Do you know why during the training they

7     just hooked the probes to your belt and also a

8     shoelace versus actually deploying the Taser into

9     your body?

10          A.   No.  No, I don't know why they don't do

11     that.  I do know some agencies that do do that,

12     though, they do shoot you in the back.

13          Q.   Did they ever explain to you why they

14     don't shoot you in the back?

15          A.   No, they did not.

16          Q.   Can you imagine that would be far more

17     painful to actually have probes inserted into your

18     muscles --

19               MR. HAPNER:  Form.

20          A.   No.

21     BY MS. GEORGES:

22          Q.   -- versus it just being taped to your

23     body?

24          A.   No.  Honestly, the spread that I had

25     from my belt to my shoelace was actually pretty

1   far.  So every muscle you can imagine between my

2   midsection to my foot was affected by it.  If I was

3   shot in my back, it would just be between the two

4   probes of my back.  I don't think that is nearly as

5   much area that would be affected.  No, so...

6          Q.    Have you ever seen the prongs actually

7   removed from someone's back?

8          A.    I have.

9          Q.    Does it leave like a laceration?

10         A.    Oh, I've seen people bleed from it.

11   It's like a little -- I guess there's like a little

12   fishhook, you know, when you pull it out.  So I've

13   seen blood come from those small, little holes,

14   yes.

15         Q.    Is it fair to say that those prongs

16   could lead to disfigurement?

17         A.    I don't believe so.  I don't -- but you

18   would have to ask a doctor who treats people

19   with -- removing prongs from them.  It's a tiny --

20   like a fishhook.  It's a very thin, small hook --

21   not a hook.  It's a...

22             (Plaintiff's Exhibit 8 was marked for

23             identification.)

24   BY MS. GEORGES:

25         Q.    I'll have this marked as Plaintiff's

1    Exhibit 8.  It's also Bates-stamped as Tyson 4123.

2    Do you recognize that photograph?

3         A.   Not really, no.

4         Q.   Is there a card on there or a ruler?

5         A.   Yes.

6         Q.   Do you recognize who's depicted in that

7    photograph?

8         A.   No.  I mean, I can guess at it, but I

9    don't want to guess.

10         Q.   Well, I can tell you those are

11    photographs that were furnished by the Broward

12    Medical Examiner's Office, and they depict the body

13    of Daniel Tyson.  Do you have any reason to dispute

14    that?

15         A.   No.

16         Q.   Is that the location in which you

17    deployed your Taser?

18         A.   I believe so.  I knew it was midsection.

19    I don't know where, right or left.  But that seems

20    accurate, yes.

21         Q.   Does that photograph fairly and

22    accurately depict where the probes were deployed on

23    Mr. Tyson's back?

24         A.   Yes.

25         Q.   Could you please turn that around and

1  show it for the camera.

2            And what is the material that's between

3  the two probes?

4            MR. HAPNER:  Form.

5        A.   The wiring.

6  BY MS. GEORGES:

7        Q.   Is that wiring?

8        A.   Yes.

9            (Plaintiff's Exhibit 9 was marked for

10           identification.)

11 BY MS. GEORGES:

12       Q.   I'm also going to show you what is

13 marked as Plaintiff's Exhibit 9.  It's also

14 Bates-stamped as Tyson 4091.  Do you recognize that

15 photograph?

16       A.   I mean, I don't recognize it, but I

17 would just be assuming that it's the same person.

18       Q.   Okay.  And I can also ask you to assume

19 that these are photographs that were furnished by

20 the Broward Medical Examiner's Office and depict

21 the chest and abdomen of Mr. Tyson.  Do you see any

22 lacerations there?

23       A.   Yes, I do.

24       Q.   Where do you see lacerations?

25       A.   I guess left ribcage area.

1     Q.   Can you turn the photograph around and
2  point it out, please.
3     A.   Here.
4     Q.   Do you know what caused that laceration?
5     A.   I don't.
6     Q.   Do you know if that was as a result of a
7  Taser probe?
8     A.   It could be.  I have one similar in my
9  midsection.  I don't know if it's still showing,
10  but it was there for a while.
11     Q.   Do you know if Officer Ramirez tased
12  Daniel Tyson in his chest and abdomen prior to your
13  arrival?
14     A.   I don't know.  You would have to ask
15  him.  Just in talking, I know that he fired his
16  Taser.  I don't know if he struck the man or what.
17  I don't know.
18     Q.   Did you ever have a conversation about
19  Officer Ramirez tasing Daniel Tyson prior to your
20  arrival?
21     A.   No.
22     Q.   Did he ever tell you that the Taser was
23  ineffective following him tasing him?
24     A.   If he kept coming at him, I would assume
25  that it was ineffective.  I don't know, though.

1     Q.    Do you know how many times Officer

2   Ramirez tased Daniel Tyson prior to your arrival?

3     A.    No, ma'am.

4     Q.    Did you ever ask him?

5     A.    No.

6     Q.    Don't you think that was an important

7   fact to know?

8     A.    When?  Now or --

9     Q.    Then.

10     A.    So when he was fighting with the man

11   with blood pouring down his face, I'm supposed to

12   ask him?

13     Q.    Yeah.

14     A.    No.  I don't see it that way.

15     Q.    Did you ever --

16     A.    No.

17     Q.    So if Officer Ramirez would have told

18   you, "Hey, I tased him 10 times, it didn't work.

19   What should we do now," would you have had any

20   suggestions as to how to handle that situation --

21          MR. HAPNER:  Form.

22   BY MS. GEORGES:

23     Q.    -- knowing that the taser was

24   ineffective after 10 times?

25     A.    Sure.  If he had said that, maybe that

1    would have crossed my mind, but he never said that.

2          Q.    Did he ever say anything as to his use

3    of a Taser?

4          A.    Really all he said was "I can't see, I

5    can't see.  He hit me.  He hit me."  Never said

6    anything about was tasing him.

7          Q.    You were tased one time for five

8    seconds; correct?

9          A.    Correct.

10          Q.    Do you know what it's like to be tased

11    five times for a total of 54 seconds?

12          A.    I would assume it's like my five

13    seconds, just for that period of time.  Unpleasant,

14    yes.  I've never been tased that long, no.

15          Q.    Do you know what effect it has on the

16    body to be tased for 54 seconds?

17                MR. HAPNER:  Form.

18          A.    I don't know.

19    BY MS. GEORGES:

20          Q.    Have you ever been educated on what it

21    would do to the human body after being tased for 54

22    seconds?

23                MR. HAPNER:  Form.

24          A.    No.

25

Page 59

1   BY MS. GEORGES:

2        Q.   Do you know how it affects the cardiac

3   system after being tased for 54 seconds?

4             MR. HAPNER:   Form.

5        A.   No.

6   BY MS. GEORGES:

7        Q.   Have you ever reviewed any literature as

8   to what effect being tased for 54 seconds has on

9   the human body?

10       A.   I mean, I know that that's why you want

11  to avoid the heart area -- you know, you don't want

12  to tase someone in the head.  You don't want to

13  tase somebody around the heart.  That's probably

14  why; to avoid, you know, something like that.

15       Q.   Is it fair to say that being tased

16  causes stress on the body?

17       A.   That's fair.

18       Q.   Is it fair to say that it causes stress

19  on something more than just your cardiac system?

20            MR. HAPNER:   Form.

21       A.   I just felt my muscles tensing up.  I --

22  which I believe is what the Taser is made to do or

23  designed to do.

24  BY MS. GEORGES:

25       Q.   Do you know anyone who's been tased for

Page 60

1    54 seconds and lived to see another day?

2              MR. HAPNER:  Form.

3         A.   No.

4    BY MS. GEORGES:

5         Q.   Have you ever had any conversations with

6    any other officers who have tased a subject for 54

7    seconds?

8         A.   No.

9              MS. GEORGES:  I think now is good time

10        for a break.

11             THE VIDEOGRAPHER:  The time is

12        10:31 a.m.  We're now going off the record.

13             (Break from 10:31 a.m. to 10:36 a.m.)

14             THE VIDEOGRAPHER:  The time is

15        10:36 a.m.  We're now back on the record.

16             (Plaintiff's Exhibit 5 was marked for

17        identification.)

18             (Plaintiff's Exhibit 6 was marked for

19        identification.)

20   BY MS. GEORGES:

21        Q.   Officer Pantaloukas, I'm going to hand

22   you what has been marked as Plaintiff's Exhibit 5

23   and also 6.  If you can just take an opportunity to

24   review those two documents, starting with No. 5.

25        A.   Okay.

Page 61

1    Q.   What do you recognize that document to

2    be?

3    A.   My certification as a police officer in

4    the State of Florida.

5    Q.   And what is the date on that?

6    A.   June 25th, 2015.

7    Q.   Is that when you completed your

8    probationary period with the City of Hollywood?

9    A.   Yes, ma'am, that would be.

10   Q.   So your probationary period would have

11   commenced somewhere around June 25 of 2014; is that

12   correct?

13   A.   Yeah, that was the day I completed the

14   state exam.  I think that's the year it starts, I

15   guess.  That's when it starts.  I guess the day

16   after the exam when you begin the training you're

17   in and all that, yes.

18   Q.   Now turning to Plaintiff's Exhibit 6, do

19   you recognize that document?

20   A.   Yes.

21   Q.   What do you recognize that document to

22   be?

23   A.   Completing the police academy for

24   Broward.

25   Q.   Okay.  So there are a series of dates on

1    there that were handwritten in, and I believe I

2    have them highlighted.  Starting with the bottom

3    right-hand corner, do you know what those dates

4    document?

5          A.    The start and the end of the police

6    academy.

7          Q.    And what's the start of the police

8    academy?

9          A.    January 21st and ends on June 24th.

10         Q.    And that's of 2014?

11         A.    Yes, ma'am.

12         Q.    And then is there another date on the

13   bottom right-hand corner?

14         A.    The left-hand corner?

15         Q.    Sorry.  The left-hand corner.

16         A.    Yeah.  August 26, 2014.

17         Q.    And what does the August 26, 2014, date

18   signify?

19         A.    I guess my grades came back from the --

20   I'd just be guessing, but I would assume it's

21   passing the state exam and becoming, you know,

22   certified in the State of Florida.

23         Q.    So do you know if you would have begun

24   the field training program prior to August 26 of

25   2014 or after?

1      A.    I believe after.  I don't know the exact

2  date.

3      Q.    Would you need this certificate prior to

4  beginning field training?

5      A.    I'd assume so, yes.

6      Q.    During your Taser training in July of

7  2014, was there any type of instruction on the use

8  of a Taser on someone who is suffering from a heart

9  condition?

10      A.    I don't recall if that was ever brought

11  up.

12      Q.    Since July of 2014, has that ever been

13  brought up about the use of a Taser on someone

14  who's suffering from a heart condition?

15      A.    I don't recall.

16      Q.    Is there a policy and procedure at the

17  Hollywood Police Department for the use of a Taser

18  on someone who is suffering from a heart condition?

19      A.    I'm not sure if the policy mentions

20  that.  I'm not sure.

21      Q.    What policy would you look to for

22  guidance?

23      A.    Maybe the use of force policy.

24      Q.    And what does the use of force policy

25  say generally about the use of a Taser?

1      A.    Well, use of force policy now, it

2  states, you know, use whatever force you think or

3  you feel is necessary in, you know, gaining your --

4  or to attain whatever your goal is, which is

5  usually to subdue or, you know, stop a threat.

6  That's what it is now.

7      Q.    Now, other than the one tasing

8  circumstance following this incident, have you ever

9  had to fill out a use of force report for something

10  that was nonTaser related?

11      A.    I don't recall, but I don't believe so.

12      Q.    When you do use force in the field, how

13  do you document it?

14      A.    In -- with a use of force paper --

15  there's proper paperwork.  I don't think I've ever

16  had to complete it; so I couldn't tell you about

17  it.

18      Q.    What is the paperwork?

19      A.    I think it's a form you fill out that

20  says what force you used -- you know, it's

21  accessible on our work computer.  And you document

22  your situation, explain your situation, why you

23  chose to use the force necessary that you chose to

24  use, and then I think that's it.  I don't know.  I

25  don't think I've ever had to do one.  I don't

1    believe so.

2          Q.    How about in this incident, did you have

3    to fill out a use of force report?

4          A.    For incident --

5          Q.    Yes.

6          A.    -- that we're here for today?

7          Q.    Yes.

8          A.    I don't believe so, no.

9          Q.    Do you know why?

10         A.    No.  I think, you know, because it ended

11   in the unfortunate death of this man, I think -- I

12   don't know.  They just wanted to get our statements

13   from -- or with the -- with the homicide detectives

14   and do a thorough police report of what happened.

15   I don't know why.  I'd just be guessing if I said

16   that's the reason.

17         Q.    Who investigated the death of Daniel

18   Tyson?

19         A.    I believe I saw Detective Rillo at the

20   grand jury.  So I'd assume him, but I would just be

21   guessing.

22         Q.    Do you know if anyone else other than

23   Detective Rillo investigated this death?

24         A.    He's the only detective that I remember

25   there at the grand jury.

1      Q.    And who is Detective Rillo employed by?

2      A.    The Hollywood Police Department.

3      Q.    Do you know if any member of the Florida

4  Department of Law Enforcement investigated this

5  death?

6      A.    I don't know.  I don't know.

7      Q.    Do you know if any member of any other

8  police agency outside of City of Hollywood

9  investigated the death of Daniel Tyson?

10      A.    I don't know.

11      Q.    Have you ever received notice that any

12  other police agency was investigating his death?

13      A.    I don't believe so.

14      Q.    Did you ever speak to any investigator

15  from the State Attorney's Office regarding this

16  death?

17      A.    I don't believe so.

18      Q.    Prior to your testimony at the grand

19  jury, did you ever meet with any member from the

20  State Attorney's Office?

21      A.    No.

22      Q.    Do you know if you were subpoenaed to

23  come to the grand jury?

24      A.    I don't believe so.

25      Q.    You just went voluntarily?

Page 67

1       A.    Yes, ma'am.

2       Q.    Do you know what a subpoena does?  No?

3       A.    Do I know what a subpoena does?

4       Q.    Yes.

5       A.    I mean -- no.  Do I know what a subpoena

6  is for or why they issue subpoenas?

7       Q.    Do you know how a subpoena affects

8  someone's immunity rights?

9       A.    Oh, no.  No.

10       Q.    Do you know if the other officers that

11  were involved other than Officer Ramirez were

12  subpoenaed in this case?

13       A.    I don't know.  I'd just be guessing.

14       Q.    How do you receive your subpoenas?

15       A.    Through a court liaison.  We have two of

16  them, court liaisons.

17       Q.    Do you have a program called eNotify?

18       A.    I don't know.

19       Q.    How do you receive your notices to

20  appear at court?

21       A.    Via email, our work email, our City

22  email.

23       Q.    So it's all electronically?

24       A.    No.  We also receive notices in a binder

25  at work.  There's a binder for each squad.  And

1  when you come to work, you're supposed to look

2  through the binder to see if you have any subpoenas

3  for depos or trials or things like that.  So they

4  notify us, I guess, both ways.

5      Q.   Do you know if you ever received a

6  subpoena to appear in front of the grand jury?

7      A.   I don't think I did.

8      Q.   How are you notified of the date and the

9  time to be present?

10     A.   Through my attorney.

11     Q.   And this is the same attorney that you

12  testified to earlier?

13     A.   Yes, ma'am.

14     Q.   Other than this matter, have you ever

15  been involved in a lawsuit either as a defendant or

16  a plaintiff?

17     A.   I was involved in an accident.  You can

18  see my scars.  I was told the guy is going to sue

19  me or is suing me, but I haven't heard anything.

20     Q.   Did this happen while you were on duty

21  or off duty?

22     A.   On duty.

23     Q.   When?

24     A.   August 30th of 2017.

25     Q.   What were the circumstances of that

Page 69

1   accident?

2        A.    I received -- well, this is what I read

3   in the police report.  I don't have any

4   recollection of even coming to work that night.

5             But I was told that an LPR, a license

6   plate reader, hit.  We received one for a vehicle

7   license plate that came back as being a stolen

8   vehicle taken in a robbery, which is pretty

9   serious, put a gun to someone's head and took their

10  car or what have you.

11            And so I was going to the area of where

12  that license plate reader hit was, and lights and

13  sirens, and -- I don't know if a guy or a girl --

14  somebody ran a red light right in front of my

15  police car, and I T-boned them, and I woke up in

16  the hospital the next day or -- yeah, the next day.

17       Q.    Did you have to file a workers' comp

18  claim?

19       A.    Yes, ma'am.

20       Q.    Were you off duty?

21       A.    Yes, ma'am.

22       Q.    For how long?

23       A.    It was right before the hurricane.  So I

24  missed all of that.  I don't know if it was a week

25  or two of not working at all.  And then the doctor

1    cleared me to go to with light duty, and then I did

2    light duty for a couple of weeks, and then I was

3    ready for the road.  And then I had some time off

4    for surgery, but that was in December when I left.

5            Q.    How many depositions have you given in

6    your career?

7            A.    I don't know the exact number.

8            Q.    More than 50?

9            A.    No.

10           Q.    More than 20?

11           A.    Probably right around 20, give or take,

12   plus or minus five.

13           Q.    Now, as a police officer, are you

14   subpoenaed regularly by criminal defense lawyers to

15   be deposed in a criminal case?

16           A.    No.  I write fairly good reports; so it

17   keeps me out of there, I think.  I don't know.  Not

18   regularly, no.

19           Q.    Back on October 27th of 2014, how tall

20   were you?

21           A.    6 feet.

22           Q.    6 feet today as well?

23           A.    I think so.

24           Q.    How much did you weigh back on

25   October 27th of 2014?

Page 71

1      A.    I don't want the next question after

2  that.

3            190 maybe, 185.

4      Q.    Okay.  How much do you weight today?

5      A.    Thanks.

6            Maybe like 215, 220 -- we'll say 210.

7  I've been on a diet.

8      Q.    What did you do to prepare for your

9  deposition today?

10     A.    Nothing.  Showed up.  Tried to keep

11 the -- I keep that event fresh in my mind.  I mean,

12 it's -- I've been -- I think about it probably

13 every day ever since; so I mean --

14     Q.    Why?

15     A.    It was a traumatic event, you know.

16 That's all.  I haven't had anything like that

17 since.

18     Q.    Did you review your police report prior

19 to coming in today?

20     A.    I started reading it.  Like I just said,

21 I write fairly good reports.  When I started

22 reading that one, I kind of got embarrassed I wrote

23 it; so I -- no, I didn't -- I didn't look it over

24 entirely, no.

25            (Plaintiff's Exhibit 1 was marked for

1      identification.)

2    BY MS. GEORGES:

3         Q.    Now I'm going to hand you what has been

4    marked as Plaintiff's Exhibit 1, which is also

5    Bates-stamped as Tyson 891 and 892.  If you can

6    take an opportunity to review that.

7         A.    Sure.

8         Q.    Is this the police report that you

9    authored that relates to this incident?

10        A.    Yes, ma'am.

11        Q.    Are there any other reports other than

12   that two-page document in front of you that you

13   authored that relate to this incident?

14        A.    I mean, I don't know if there's any more

15   because it ends with -- it says, "Tyson became" --

16   I don't know if there's another page.  I'm not

17   sure.

18             MR. HAPNER:  Off the record.

19             (Discussion off the record.)

20             MR. HAPNER:  Back on the record.

21   BY MS. GEORGES:

22        Q.    Okay.  So I also noticed yesterday in

23   looking at the reports that I did have that there

24   seems to be an incomplete sentence at the end of

25   page 2, and Mr. Hapner has assured me that he is

 1   going to receive the entirety of the police reports

 2   later today.

 3          Do you know how many pages your report

 4   was?

 5       A.    I have no idea.  It prints out

 6   differently than, you know -- I don't know.  I'd

 7   have to...

 8       Q.    Do you know if it's seven pages?

 9       A.    I don't think so.  I don't think it's

10   that long.

11       Q.    Are your reports generally wordy versus

12   others who give me two paragraphs?

13       A.    Well, in an instance like this, I would

14   like to be detailed, but I would like all my

15   reports to be detailed.  When I was on midnights, I

16   didn't want to come in for overtime; so I would be

17   very detailed and see what or think about what --

18   if I was deposed for my report what would I be

19   missing.  So I try to not miss anything; so I

20   wouldn't have to come in to explain something I was

21   missing from my report, since I am pretty detailed

22   in my reports.

23       Q.    What is the date of that report?

24       A.    It says 11/14/2014.

25       Q.    Did you have to submit that to a

Page 74

1    supervisor?

2          A.    Yes, ma'am.

3          Q.    And who was that supervisor?

4          A.    Yasmanny Ruiz.

5          Q.    Who is Yasmanny Ruiz?

6          A.    He was my immediate supervisor when I

7    was in the field training unit.  He was the

8    sergeant for the FTO squad on the afternoons.

9          Q.    Now, were there a few drafts of that

10   report or is that it?

11         A.    No, nobody sat with me.  I just sent it

12   and that was that.

13         Q.    Do you have any handwritten notes as it

14   pertains to this incident?

15         A.    No.

16         Q.    Have you kept a diary at all?

17         A.    No.

18         Q.    Now, other than beginning to review your

19   report, not being pleased with your writing style,

20   did you review any other documents in preparation

21   for your deposition today?

22         A.    No.

23         Q.    Did you review the statement that you

24   gave to Detective Rillo?

25         A.    I started reading it, and then it says,

1    "Ah, ah, ah, ah."  I mean, I guess a little bit,

2    yes.

3            Q.    Okay.  That statement, do you know if it

4    was taped?

5            A.    I believe so.

6            Q.    Do you know if it was just an audio

7    recorder or it was videotaped?

8            A.    I don't know.  I believe it was audio

9    recorded, but I don't know if there was a camera.

10   I don't remember.  I don't remember.

11           Q.    And where was the statement given?

12           A.    In the Hollywood Police Department in

13   one of the interview rooms upstairs in the

14   detective bureau.

15           Q.    Is there a homicide unit within the

16   detective bureau or it's just one general bureau?

17           A.    There's a homicide unit within the

18   bureau, yes.

19           Q.    Do you know how many homicide detectives

20   were assigned to the bureau back in October of

21   2014?

22           A.    I don't know that, no.

23           Q.    Do you know how many homicide detectives

24   there are currently with the City of Hollywood?

25           A.    No.

1      Q.    Now, prior to giving your statement, did

2   you meet with Detective Rillo and provide a

3   preinterview?

4      A.    No.

5      Q.    Do you know what a preinterview is?

6      A.    No.  I guess -- no, I don't.

7      Q.    Have you ever been taught in any of your

8   training courses on a preinterview where you

9   establish a rapport with somebody and then after

10  you have an initial discussion, you formally go on

11  tape and you essentially regurgitate what was said

12  during the preinterview?

13     A.    I don't believe I had that with him, no.

14     Q.    Okay.  So you gave one statement and one

15  statement only?

16     A.    Yes.

17           (Plaintiff's Exhibit 2 was marked for

18           identification.)

19  BY MS. GEORGES:

20     Q.    Now I'm going to hand you what has been

21  marked as Plaintiff's Exhibit 2, which is

22  Bates-stamped as Tyson 938 through 972, which is a

23  transcript of the statement that you provided to

24  Detective Rillo.  Please let me know if you

25  recognize that document.

1        A.    Yeah.  I received this in PDF format to

2   my email.

3        Q.    Is it a true and accurate copy of your

4   statement that you provided to Detective Rillo?

5        A.    Yes, ma'am.

6        Q.    Now, other than partially reviewing your

7   report and partially reviewing your statement, did

8   you review any other documents prior to coming in

9   for your deposition today?

10        A.    No.

11        Q.    Did you review any photographs?

12        A.    No.

13        Q.    Did you discuss with any of the other

14   officers that have been deposed as to the type of

15   questions that would be asked of them?

16        A.    No.

17        Q.    Other than Officer Ramirez, who you're

18   close friends with, do you have a personal

19   relationship with Officer Kerns?

20        A.    Not really.

21        Q.    Was he ever your field training officer

22   during this period?

23        A.    No, ma'am.

24        Q.    How about Officer Truntz, is he a

25   personal friend of yours?

Page 78

1       A.   No.

2            Q.   How about Officer Falcon, is he a close

3    personal friend or any type of friend of yours?

4            A.   We were pretty good friends at one

5    point -- and are.  We used to work on the same

6    squad in the afternoons together, but we haven't

7    hung out or talked, really.  I say hi to him once

8    in a while.  That's about it.

9            Q.   How about Detective Rillo, is he a

10   personal friend of yours?

11           A.   No.

12           Q.   Prior to October 27 of 2014, did you

13   ever have any prior contact with Daniel Tyson?

14           A.   No.

15           Q.   How about that location?

16           A.   No, ma'am.

17           Q.   Had you ever been called out to

18   1836 Jackson Street prior to that date?

19           A.   I don't believe so.

20           Q.   How about since that date?

21           A.   No, ma'am.

22           Q.   On the date of the incident, were you

23   using a cell phone?

24           A.   Yes, ma'am.

25           Q.   Is that your personal cell phone?

Page 79

1        A.    Yes, ma'am.

2        Q.    I'm going to ask you off the record

3    later for your cell phone number; okay?

4              Who was your carrier back in October of

5    2014?

6        A.    I'd guess AT&T.

7        Q.    Have you ever been an instructor or

8    hosted any courses at the City of Hollywood?

9        A.    No, ma'am.

10       Q.    Have you ever had any speaking

11   engagements at any local schools?

12       A.    I was a mentor for -- in a mentorship

13   program for a little while, but that was it.  I

14   didn't even speak, but I just met with a kid in

15   elementary school.

16       Q.    And who hosted that mentorship program?

17       A.    The Hollywood Police Department.

18       Q.    How old were these kids?

19       A.    They varied.  I was just troubled

20   youths, kids who were having issues at home that

21   they felt would be good to hang out with us and

22   build a rapport because they're having tough, you

23   know, troubles at home.  He was in third grade, I

24   believe, at the time, two years ago.

25       Q.    Have you ever spoken at the academy

1    since this incident?

2        A.    No, ma'am.

3        Q.    Do you know if this case has ever been

4    discussed in any type of Baker Act or mental health

5    training as to how to deal with citizens such as

6    this?

7        A.    I don't know.  It wasn't mentioned in

8    CIT.

9        Q.    What did you learn in CIT?

10       A.    Deescalation, listening, avoiding

11   triggers, see what triggers people if -- you know,

12   stalling, wait for backup.  A number of things.

13       Q.    What's the requirement for the number of

14   police officers that are to respond to signal 20s?

15       A.    At minimum two.

16       Q.    And what's the purpose of that policy?

17       A.    Safety.  Officer safety.

18       Q.    At what point must there be two police

19   officers on scene for a signal 20?

20       A.    We don't ride two men.  We ride

21   separately.  So we just try to get there as soon as

22   you can, you know.  If you don't feel comfortable,

23   then you should wait for your backup.

24       Q.    Is it fair to say that the policy and

25   procedure is in place so then two police officers

1    can actually approach and engage in an encounter

2    together?

3         A.   I think it's more for the safety

4    purposes if something happens, if somebody, you

5    know, decides to start fighting or what have you,

6    you have two people, you know.  It's a lot safer to

7    get into a struggle with two officers than one.

8         Q.   Well, here, did Officer Ramirez wait for

9    you to arrive on scene prior to engaging with

10   Daniel Tyson?

11        A.   I believe he attempted, yeah.

12        Q.   What do you mean he attempted?

13        A.   Well, he had called me while I was on my

14   way to the scene and said, something's not right

15   with this guy, asked me where I was.  I said, I'll

16   be right there.

17        Q.   Do you know why he called you?

18        A.   Just something didn't feel right, you

19   know.

20        Q.   Were you his backup that day?

21        A.   Yes, ma'am.

22        Q.   Do you know if Officer Ramirez called

23   his FTO?

24        A.   I don't know if he called.

25        Q.   Do you know why Officer Ramirez would

Page 82

1    have called you versus his FTO if something didn't

2    feel right to him?

3          A.    I was his backup.  I was the officer

4    responding to the scene.

5          Q.    Was Officer Ramirez also in field

6    training at that time?

7          A.    He was.

8          Q.    And did he also have a sergeant assigned

9    to him?

10          A.    Yes.

11          Q.    Do you know why he called you on his

12    cell phone and your cell phone versus using the

13    radio?

14          A.    A lot of times you don't want to take up

15    airtime.  You don't raise people -- well, I

16    guess -- you know, at the time, we had just

17    switched to Broward Sheriff's Office and the radio

18    was nonstop.  It's easier to just call somebody.  I

19    mean, you're not taking up valuable airtime in

20    doing so.  So I guess that's -- you would to ask

21    him for his reasoning, but I'd assume that's why.

22          Q.    Okay.  Prior to you arriving on the

23    scene, did you hear this call go out on the radio?

24          A.    I did.

25          Q.    And what did you hear of the call?

1       A.    "Mentally ill man talking to trees,

2   fully nude, exposing himself."  That's what I

3   heard.  All that came out was a mentally ill man, a

4   signal 20.

5       Q.    So what is a signal 20?

6       A.    A mentally ill person, but it's not

7   always -- they can call and say whatever they want,

8   you know.  A lot of times we encounter homeless

9   people who if it gets cold out here in South

10  Florida and they don't want to sleep outside, so

11  they call up and say, hey, I want to kill myself,

12  take me to the hospital, and that comes in as a

13  mentally ill person.

14          Now, I'm not a doctor, but in talking

15  with them, they'll tell you straight up:  Yeah, I

16  just know the game and I just want a bed for the

17  night.  But because they said that, you know, I

18  have to take them to the hospital and have them

19  checked out.

20      Q.    Do you know if this call went out as

21  someone who wanted to kill themselves?

22      A.    Then, no.  It just said, "Mentally ill

23  person.  Man talking to trees."

24      Q.    Do you know if this call went out as

25  someone who was mentally ill and off of their

Page 84

1    medication?

2         A.   I don't know that.

3         Q.   Do you think that would have been an

4    important fact to know for both yourself and

5    Officer Ramirez in handling this situation?

6         A.   That he's off his medication?

7         Q.   Yes.

8         A.   I would handle it the same way.  I mean,

9    I would approach it the same way.

10        Q.   Do you know what happens when someone is

11   off of their medication and suffering from a mental

12   illness?

13             MR. HAPNER:  Form.

14        A.   I have a sister who's bipolar.  She's

15   not really pleasant when she's off her meds.  She

16   keeps to herself.  She says nasty things, but I'm

17   not a doctor.  I don't really know -- I know every

18   case is, you know, different.

19   BY MS. GEORGES:

20        Q.   Okay.  What is your sister like when

21   she's stabilized and on her medication?

22        A.   She's okay.  She's still a little out

23   there.  She's not my favorite sister.  We don't

24   talk too often.

25        Q.   Okay.  And when she's off her meds, is

Page 85

1    she aggressive?

2         A.   Just mean.

3         Q.   Is she agitated when she's off her

4    medication?

5         A.   I don't know.  She lives in Pittsburgh.

6    We just talk on the phone.

7         Q.   Is it fair to say that people who are

8    suffering from mental illness have different

9    symptoms --

10        A.   Yes.  I think that's very fair.

11        Q.   -- and have different behavior when

12   they're off of their medication?

13        A.   I guess.  I don't know.  I'm not a

14   doctor, but it sounds good.

15        Q.   Okay.  Is it fair to say that no two

16   people are alike?

17        A.   Sure, that's fair.

18        Q.   Okay.  When Officer Ramirez calls you,

19   what does he tell you?

20        A.   Something's not right.  Where are you?

21        Q.   Did he tell you where he was when he

22   said, "Something's not right.  Where are you?"

23        A.   I don't know if he said on the phone,

24   you know, where he was.  I don't recall.

25        Q.   Do you know if he was sitting in his

1    patrol car when he told you "Something's not right.

2    Where you are?"

3         A.   I assume he was in the courtyard at the

4    time.

5         Q.   Why do you assume that he was in the

6    courtyard at the time?

7         A.   Because he's saying, you know,

8    something's not right with this man.  He's not -- I

9    don't know how he can say that from his police car

10   or -- he wouldn't retreat -- that's for sure --

11   back to his car -- or he didn't retreat.

12        Q.   Do you know why he didn't retreat?

13        A.   No idea.  You would have to ask him.

14   But I mean, I would never have retreated in his

15   situation either.

16        Q.   Why not?

17        A.   Well, if -- if he felt something was

18   wrong with this man when he arrived on the scene,

19   if it was me, we're not -- we're not here to go

20   hide in our cars if something isn't right like

21   some -- that's what we do in a stressful,

22   high-intense situation where the person who people

23   call for help -- if I was sitting in my car, who am

24   I going to help or who am I going to call for help?

25   But a lot of times we have to deal with people or

1    situations that are scary, and that's just what we

2    signed up to do.

3           Q.   Isn't there also a policy and procedure

4    in place by City of Hollywood that requires two

5    police officers to respond to signal 20s?

6           A.   There is, but it doesn't talk about, you

7    know, you have to wait for your backup.  I don't

8    believe so.

9               For domestic violence issues, it's the

10   same thing, a minimum of two officers.  But I've

11   been in situations where I've heard screaming in

12   the house.  I'm not going to wait for somebody to

13   come back me up to go into a house if someone's

14   getting hurt.

15          Q.   Well, this was a different situation,

16   wasn't it?

17          A.   It was.

18          Q.   You have a man who is naked outside,

19   talking to trees --

20          A.   Right.

21          Q.   -- clearly suffering from some type of a

22   mental illness?

23               MR. HAPNER:  Form.

24          A.   I don't know that or I didn't know that

25   at the time.

Page 88

1   BY MS. GEORGES:

2        Q.    What did you know at the time?  What did

3   you think was the source of his behavior?

4        A.    You know what?  I didn't know for a very

5   long time.  And months later, when I was still

6   working in the Federal Highway area, there was a

7   drug that made people act similarly that came out,

8   and at the time when I saw that -- when I saw a

9   bunch of cases of that, I figured that's what he

10  must have been suffering from.  That's what I

11  thought.

12       Q.    So you thought on that day that Daniel

13  Tyson was on some type of narcotics and that was

14  the reason for his behavior?

15       A.    I thought that was a possibility, yes.

16       Q.    Was mental illness a possibility?

17       A.    Sure.

18       Q.    Did you listen to the dispatch call?

19       A.    Yeah.

20       Q.    Did you read the dispatch notes?

21       A.    I did.

22       Q.    And did those notes or that call ever

23  communicate that this man was off of his medication

24  and was suffering from mental illness?

25       A.    I don't remember seeing anything about

1    off his meds.  I just remember "naked male talking

2    to trees and mentally ill" because the man was 20.

3    That's what I recall.

4         Q.    Was Mr. Tyson armed?

5         A.    At the time of my arrival, no.

6         Q.    Did the call ever go out as "naked man

7    armed with a gun"?

8         A.    No.

9         Q.    Did the call ever go out as "naked man

10   armed with a knife"?

11        A.    No.

12        Q.    Did the call ever go out that there were

13   screams coming from his apartment?

14        A.    No.

15        Q.    And did Officer Ramirez ever tell you

16   that he heard screams coming from Mr. Tyson's

17   apartment?

18        A.    No.

19        Q.    Did Officer Ramirez ever tell you that

20   anyone had been harmed?

21        A.    No.

22        Q.    So Officer Ramirez just tells you,

23   "Something's not right.  Where are you?"

24        A.    Correct.

25        Q.    And so therefore, he already is

1  anticipating that there's an issue that he doesn't

2  feel comfortable with handling alone?

3         A.   It sounds about right.

4              MR. HAPNER:   Form.

5  BY MS. GEORGES:

6         Q.   And he chose to call you because you

7  were his backup officer?

8         A.   Correct.

9         Q.   And it's fair to say that between the

10 both of you, you had about four months experience

11 in the field at the time?

12        A.   That's fair to say, yes.

13        Q.   And you probably had about four weeks

14 experience total riding by yourself without your

15 field training officer?

16        A.   Probably less, but yeah.

17        Q.   Less than four weeks?

18        A.   Yeah.

19        Q.   Less than two weeks total?

20        A.   No.  We had two weeks total.  It was --

21        Q.   After you got this call from Officer

22 Ramirez saying "something's not right, where are

23 you," did you call your field training officer?

24        A.   No.

25        Q.   Who was the field training officer that

```
 1    was shadowing you on October 27th?
 2         A.    Flores, Anthony Flores.
 3         Q.    Is he still with the City of Hollywood
 4    Police Department?
 5         A.    Yes, ma'am.
 6         Q.    And was your sergea0nt Ruiz on that day?
 7         A.    Yes, ma'am.
 8         Q.    Did you call Sergeant Ruiz after you got
 9    this call from Ramirez?
10         A.    No, ma'am.
11         Q.    And you didn't call your FTO?
12         A.    No, ma'am.
13         Q.    Did your FTO, Officer Anthony Flores,
14    respond to the scene?
15         A.    Later after, you know -- much later on
16    in the incident.
17         Q.    At what point?
18         A.    After the decedent was already removed
19    from the scene.  I believe that's when he showed
20    up.
21         Q.    Prior to this call, had you responded to
22    anything else?
23         A.    No.  I was en route to, I think, my
24    first call of the day, and then I took a delay on
25    that because this was -- took precedent over that.
```

1      Q.    And what was your first call of the day?

2      A.    I don't know, but it wasn't anything --

3  it was maybe a property crime, something delayed.

4      Q.    So when you say delayed, the crime had

5  already been committed and you were just going to

6  go out and take a report?

7      A.    Correct.

8      Q.    When you received the call from Ramirez,

9  how long did it take you to get to the scene after

10  that point?

11      A.    Maybe a minute or two.

12      Q.    Why didn't your FTO follow you?

13      A.    They don't go to every call with you.

14  But I don't believe my FTO was on the road at that

15  time.

16      Q.    Do you know where he was?

17      A.    He's on the S.W.A.T. team; so he's

18  afforded or allotted a workout schedule the

19  beginning of his shift.

20      Q.    Do you know if --

21      A.    So Officer Kerns was basically, I guess,

22  overseeing what we were up to.

23      Q.    And your FTO was training for S.W.A.T.

24  or working out for S.W.A.T.?

25      A.    Just working out, yeah.

1      Q.    In the minute that it takes you to get

2   to the scene, what do you see?

3      A.    When I arrive on scene, what do I see

4   or --

5      Q.    Yes.

6      A.    Well, I just walk up, and as I'm

7   approaching the property, I hear Officer Ramirez

8   screaming, just yelling, and it was high-pitched,

9   like he was in a struggle, and I just "pssht" took

10  off running towards his yells.

11     Q.    At what point do you hear him screaming

12  and yelling?  Are you in your patrol car?

13     A.    Exiting my patrol car.  I'm on the

14  sidewalk.

15     Q.    Where do you park your car?

16     A.    Just west of the address of incident.

17     Q.    And where was Ramirez parked?

18     A.    I believe right in front of my vehicle,

19  just a little west of my vehicle.

20     Q.    And what time of day was this?

21     A.    Early afternoon.

22     Q.    Was it broad daylight?

23     A.    Yes.

24     Q.    And how was the weather that day?

25     A.    Sunny.

1      Q.    Any rain?

2      A.    No, ma'am.

3      Q.    How was your visibility?

4      A.    Very clear.

5      Q.    Okay.  So you hear yelling and screaming

6   from Officer Ramirez.  What do you do?

7      A.    I start running towards his voice.  I

8   didn't even go through the gate.  I just jumped

9   over a wooden fence, and I run right up to him, and

10  I'm just trying to take in what's going on and

11  figure out my best approach to the situation.

12     Q.    Okay.  Where is Officer Ramirez?

13     A.    On the ground.

14     Q.    Where on the ground?

15     A.    In the middle of the courtyard of that

16  address.

17     Q.    And where was Mr. Tyson?

18     A.    Wrestling with him on the ground.

19     Q.    When you say wrestling, what do you

20  mean?

21     A.    They were both interlocked.  There's

22  like stomach down, like -- I guess like grabbing

23  him and hitting him, and they were both just on the

24  ground.

25     Q.    Do you know how tall Mr. Tyson was?

1          A.     No, I -- no.

2          Q.     Taller than you?  Shorter than you?

3          A.     I don't know.

4          Q.     Do you know Mr. Tyson's weight?

5          A.     He was heavyset.

6          Q.     Was he bigger than you back in October

7     of 2014?

8          A.     Yes.

9          Q.     How much bigger?

10         A.     Fairly bigger.  30 to 50 pounds bigger.

11         Q.     And you weighed 185?

12         A.     Yeah, I'd say.

13         Q.     What's the condition of Officer Ramirez

14    when you arrive?

15         A.     Bleeding badly, profusely, from his head

16    wound, coming down his eyes, and he tells me, you

17    know, "I can't see, he cut me, he cut me."

18         Q.     Did you know what Mr. Tyson had cut him

19    with?

20         A.     Well, at first I'm looking for a knife

21    in his hands, and I didn't see one.  I didn't know

22    what cut him.

23         Q.     Did you ask Ramirez if he had a weapon?

24         A.     Yeah, I believe so, but I didn't see

25    one.  He was just swinging his fists, and they

1  looked empty.  So I figured he may have just

2  dropped it already.

3        Q.   Did you suspect that Mr. Tyson had a

4  knife?

5        A.   I did.

6        Q.   Did you ask Officer Ramirez if he had a

7  knife?

8        A.   I don't recall if I asked him that.

9        Q.   Don't you think that would be important

10 to know, if he was armed with a knife?

11        A.    Absolutely.

12        Q.   Was there anything preventing you from

13 asking Officer Ramirez if he had a knife?

14        A.   I didn't see one in his hands; so I just

15 took action.

16        Q.   Well, why didn't you ask him what he had

17 cut him with?

18        A.   I thought that was irrelevant.

19        Q.   So you thought if Mr. Tyson was armed

20 with a knife, that was an irrelevant fact to know?

21             MR. HAPNER:   Form.

22        A.   He wasn't armed with a knife at the

23 time.  I can see his hands.  That's when I made the

24 decision that he wasn't armed at the time.

25

1  BY MS. GEORGES:

2       Q.   Did you know if there was a knife in

3  close proximity?

4       A.   I didn't know.

5       Q.   Wasn't that in the realm of possibility,

6  though, if you had suspected that he had a knife?

7       A.   Sure.

8       Q.   So why wouldn't you ask Officer Ramirez

9  if he had a knife?

10      A.   I don't know.  I may have asked him.  I

11  don't recall if I did or not, but...

12      Q.   At some point during this encounter, did

13  you learn what Ramirez had been struck with?

14      A.   Yes.

15      Q.   And what had he been struck with?

16      A.   It was just a wall -- it was this

17  heavy -- I don't know what it was made out of.  I'd

18  say -- it was superheavy.  I guess -- I don't

19  know -- like a weather vane, but it was more like a

20  wall ornament -- I mean, like a sundial type, but,

21  yeah, I don't know what it was made out of.

22      Q.   At what point did you learn that he had

23  been struck with that type of an object?

24      A.   I think during the altercation.  I

25  noticed that just west of us on the ground.

1      Q.    And did that eliminate the possibility

2   that Mr. Tyson had cut him with a knife?

3      A.    Yeah.

4      Q.    Did you ever suspect that Mr. Tyson had

5   a gun?

6      A.    No.

7      Q.    So when you say they were wrestling, was

8   someone on the ground versus on top?

9      A.    They were like -- so Officer Ramirez

10  was -- he was like on his, I guess -- trying to get

11  up, trying to get to his knees, and the decedent

12  was in front of him striking and trying to get up

13  as well, and Officer Ramirez was trying to just

14  hold him down on the floor, like that.

15     Q.    Could you hear anything that Mr. Tyson

16  was saying?

17     A.    Nothing made any sense.  He was just

18  yelling, like just -- just screaming.

19     Q.    Okay.  So what did you do?

20     A.    At that point, I thought the best option

21  there was to deploy my Taser, so we can gain

22  control of him, handcuff him, and move on.

23     Q.    Where did you deploy your Taser?

24     A.    His midsection.

25     Q.    Midsection of his abdomen or his back?

1        A.    His back.

2        Q.    How long did you deploy your Taser for?

3        A.    I believe the first one was extended.

4   It wasn't a normal five seconds, and the reason

5   being was I wasn't getting the desired outcome,

6   which is what the Taser is intended to do.

7        Q.    And what was the desired outcome?

8        A.    Neuromuscular incapacitation, him to

9   lock up, and, you know, give us an opportunity to

10  detain him.

11       Q.    What is the policy and procedure at

12  Hollywood Police Department for using your Taser

13  for more than the five-second cycle?

14       A.    I don't know that there is a policy that

15  discusses the length of it.

16       Q.    Were you trained during your class in

17  July of 2014 that the maximum number of seconds to

18  be utilized is five seconds?

19       A.    No, I don't believe so.  I wasn't

20  getting my -- the outcome necessary to, you know,

21  deescalate the situation at that point.

22       Q.    So you just placed your finger on the

23  trigger and continued pressing?

24       A.    And he was still fighting, and I was

25  just totally confused as to why, because I had just

Page 100

1    gotten tased a couple months prior, and I knew

2    what -- you know, what it does to the body.

3                    And at that point, I had to

4    realize -- you know, my training kicked in, and I

5    realize that the prongs were too close, and the

6    reasons why the prongs were too close was because

7    obviously they're wrestling on the ground.  I can't

8    get the desired spread I would like to get for the

9    Taser between the prongs, because I would be afraid

10   to hit the officer, and then both of them would be

11   getting tased.

12                   So while they're, you know, wrestling on

13   the floor, I put my taser fairly close to him when

14   I fired it, and that was just a pain compliance

15   between the two prongs.  So it wasn't doing

16   anything.  He was still fighting, you know, trying

17   to gain ground and still hitting Officer Ramirez,

18   trying to get up, and that's when I realize, oh,

19   what I can do is -- or what I learned is if you now

20   drive-stun the front part of the Taser to another

21   part of the body, now he'll get a connection from

22   the prongs to wherever the drive-stun is occurring,

23   and that's what I then did, which is why the first

24   one was longer than the others.

25                   (Plaintiff's Exhibit 7 was marked for

1          identification.)

2    BY MS. GEORGES:

3          Q.   Okay.  So I'm going to hand you what has

4    been marked as Plaintiff's Exhibit 7, and this is

5    the Taser printout from your cartridge, and then

6    I'm going to refer you to page 6 which pertains to

7    this day.  If you can review the entire document,

8    let me know if you recognize that.

9              MS. GEORGES:  Yeah, let's take a break

10        and then we can change the tape.

11             THE VIDEOGRAPHER:  The time is

12        11:21 a.m.  We're now going off the record.

13             (Break from 11:22 a.m. to 11:26 a.m.)

14             THE VIDEOGRAPHER:  The time is

15        11:26 a.m.  We're now back on the record.

16   BY MS. GEORGES:

17        Q.   Officer Pantaloukas, I handed you what

18   has been marked as Plaintiff's Exhibit 7, which is

19   a download of your Taser cartridge of that date,

20   and there are also other days.  Do you recognize

21   this document?

22        A.   Yes, ma'am.

23        Q.   Have you ever reviewed this document

24   prior to today?

25        A.   Yes, ma'am.

Page 102

1       Q.   What is it?

2       A.   It's just a -- when you download a

3  Taser, it shows you the times you either spark

4  tested which is, you know, just charging the

5  battery, getting it prepared if you ever need to

6  use it, and times you fired it or even -- I think

7  it records drive-stunning too.

8       Q.   Now, officer Pantaloukas --

9       A.   Sure.

10      Q.   -- this dates back to June 30 of 2010.

11  Do you see that on page 1?

12      A.   Yes, I do.

13      Q.   So is it fair to say that someone else

14  was in possession of this Taser cartridge back in

15  2010 through sometime in July of 2014?

16      A.   Yes, ma'am.

17      Q.   Do you know when you were assigned this

18  specific Taser?

19      A.   In in-house after the academy, so

20  sometime in July.

21      Q.   During your Taser training in July of

22  2014, were you given a Taser to use?

23      A.   Yes, ma'am.

24      Q.   And did you have to deploy it on a

25  dummy?

1        A.    It's a target, like a -- and when you

2    hit it, it actually has some magnetic field in it

3    where it shows the connection between the prongs.

4    It's a special target, like a shooting range

5    target, but this one has some kind of special

6    material that shows you -- visibly shows you the

7    connection between the prongs.

8        Q.    But during your training, you didn't get

9    to tase another police officer?

10       A.    No.

11       Q.    Who tased you?

12       A.    Officer Julio Alvarez.

13       Q.    Have you ever been in a training program

14   for a Taser where you have been able to tase

15   another officer?

16       A.    No, ma'am.

17       Q.    So it's fair to say that all of the data

18   that predates July of 2014 does not relate to you

19   possessing this Taser cartridge?

20       A.    Taser, yeah -- yes.  The cartridge is

21   the front piece -- those are interchangeable.  This

22   is the actual Taser itself.

23       Q.    This gets downloaded from the actual

24   Taser --

25       A.    Yes, ma'am.

1      Q.    -- which has a serial number?

2      A.    Yes, ma'am.

3      Q.    And that serial number is documented on

4  page 1 of this document?

5      A.    Yes, ma'am.

6      Q.    And what is the serial number?

7      A.    X00578574.

8      Q.    Now, at some point after this incident,

9  was your Taser impounded?

10     A.    Yes, ma'am.

11     Q.    And it was given to homicide for

12  processing?

13     A.    Yes, ma'am.

14     Q.    And they downloaded the actual Taser and

15  then created this spreadsheet --

16     A.    Correct.

17     Q.    -- or data sheet?

18     A.    Yes.

19     Q.    Were you ever given that Taser back?

20     A.    No.

21     Q.    Were you reissued a new Taser?

22     A.    Yes, ma'am.

23     Q.    And that had a different serial number?

24     A.    Yes, ma'am.

25     Q.    What's a spark test, again?

1      A.   It just charges the Taser.  If you go

2   without using it for a while, sometimes if you were

3   to pull the trigger when it was on, it may not

4   fire.  So spark testing just charges it up, you

5   know, and helps in eliminating a possibility of it

6   not working.

7      Q.   How many seconds do you generally spark

8   test for?

9      A.   It's always random.  You can do it for

10  less than a second all the way up to the five

11  seconds.

12     Q.   Now I want to direct your attention to

13  page 5 of this document.

14     A.   Sure.

15     Q.   At the top of the page it has sequence

16  145 through 155, and they're all dated on July 28th

17  of 2014.  Do you see that?

18     A.   Yes, ma'am.

19     Q.   Did you deploy this Taser on July 28th?

20     A.   I'd assume so.

21     Q.   Do you know where you deployed this

22  Taser?

23     A.   At the Hollywood Police Department.

24     Q.   Do you know if you were in training on

25  July 28th?

1        A.    I believe so.

2        Q.    So of these 10 times that the Taser was

3   deployed on July 28th of 2014, that was during the

4   training class?

5        A.    I'd assume so, yeah -- I believe so,

6   yeah.

7        Q.    How about on July 29th of 2014 where the

8   Taser was deployed for a five-second cycle?

9        A.    I don't know then -- I don't know.  I

10  would just be assuming, but I would imagine that

11  it's -- you know, I had just learned about it, and

12  I learned about spark testing it to make sure it's

13  effective and that it works, and it looks like, you

14  know, just the one time that may have been just a

15  spark test.

16       Q.    After July 28th of 2014 and leading up

17  to October 27th of 2014, is it your testimony that

18  the only time that you deployed your Taser was for

19  a spark test?

20       A.    Yes, ma'am.

21       Q.    Okay.  Now turning you to page 6 of this

22  document regarding the October 27th deployments, do

23  you see that at the bottom of page 6 into page 7?

24       A.    Yes, ma'am.

25       Q.    And how many times does this document

1    that you deployed your Taser on that date?

2         A.   Nine times.

3         Q.   Were any of those times spark test?

4         A.   No, ma'am.

5         Q.   Did you spark test your Taser on

6    October 27th?

7         A.   It doesn't look like it, no.

8         Q.   Do you have any reason to believe that

9    your Taser was malfunctioning on October 27th of

10   2014?

11        A.   No, ma'am.

12        Q.   Do you know why there is a time written

13   on the left-hand column or in the left-hand column?

14        A.   It looks to be different than the one

15   that's in the download.  Maybe the time -- maybe

16   the timers were a little off.  I don't know.

17        Q.   Do you know whose handwriting that is?

18        A.   No, ma'am.

19        Q.   Now I want to go through your nine

20   deployments.

21             You just testified that during your

22   first deployment, you didn't deem it to be

23   effective and therefore you continued to deploy

24   your Taser for a full nine-second cycle; correct?

25        A.   Yes, ma'am.

1      Q.    And then at that point, who was on

2    scene?  Was it just you and Officer Ramirez?

3      A.    I believe so.  I know Officer Kerns --

4    well, actually he may have been there at that time.

5      Q.    Okay.  And what position was Daniel

6    Tyson in when you deployed your Taser for the first

7    time?

8      A.    He was just in a -- like a ground battle

9    with Officer Ramirez.  So I saw his back --

10   backside.

11     Q.    Okay.  I'm going to hand you a photo

12   stock.  It was marked as an exhibit to Officer

13   Kerns' deposition yesterday.  It is Bates-stamped

14   as Tyson 4665 through 4774.  This is a photo stack

15   that was given by the City of Hollywood crime

16   scene.

17            If you can take an opportunity, review

18   those photographs, and I believe it's either

19   photograph three or four in where there is -- yes.

20   What does that depict?

21     A.    The scene of the incident.

22     Q.    Okay.  And what's the bottom Bates stamp

23   number?

24     A.    This number here?

25     Q.    Yes.

 1        A.    04667.

 2        Q.    What does that picture depict?

 3        A.    The incident location.

 4        Q.    Does this fairly and accurately depict

 5    the courtyard where this incident occurred?

 6        A.    Yes, ma'am.

 7        Q.    Now, if you can unclip that photo stack,

 8    pull out that photo -- and if they fall out of

 9    order, don't worry.  That's why we have them

10    stamped.

11             Turn it around for the camera.  And if

12    you can show the jury where Officer Ramirez was and

13    where Daniel Tyson were when you deployed your

14    Taser for the first time.

15        A.    I would say Officer Ramirez was right

16    here, and Tyson was right in front of him, which is

17    west of him, and they were on the ground with each

18    other.

19        Q.    Okay.  So maybe that's not the greatest

20    of photographs.  I know there's a stairwell in the

21    back of the courtyard where that building is.  Are

22    you pointing towards that location?

23        A.    No.  This empty, dark area right here,

24    that's where the initial location, I believe, was.

25        Q.    And did the location eventually change

                                              Page 110

1    to a different site?  Because I see that there are

2    a lot of yellow cones.

3            A.    Right.

4            Q.    Do you know what those signify?

5            A.    Those are for our crime scene unit.

6    Those are just possible things that they would want

7    to examine -- you know, photograph or what have

8    you.

9            Q.    Okay.  Now, turning back around that

10   photograph, when you deployed your Taser for the

11   first time, what direction was Mr. Tyson's head?

12           A.    Facing east, this way.

13           Q.    East would have been the building on the

14   left?

15           A.    Yes.

16           Q.    And then where were Mr. Tyson's legs?

17           A.    So just this way, facing, or just -- so

18   he was like, you know, laying that way, fighting on

19   the ground, this -- you know, laid like this.  Head

20   here.  Feet here.

21           Q.    And where were you standing?

22           A.    I was standing just -- I guess just

23   south of them, I'd say.

24           Q.    And where was Officer Ramirez standing?

25           A.    Do you want me to still hold it up?  He

Page 111

1    wasn't standing.  He was on the ground with him.

2    He was right in front of him.

3         Q.    And where was Officer Kerns?

4         A.    He was north of all of us.

5         Q.    North is which direction?

6         A.    So he was just a little bit this way,

7    somewhere around here.

8         Q.    Okay.  You can put the photograph down.

9              So after you deployed your Taser for

10   nine seconds, what happened?

11        A.    That's when I realized that I -- to get

12   the desired outcome for the NMI, neuromuscular

13   incapacitation -- I'll just use NMI -- I took it,

14   and I drive-stunned it to his ankle.  And in doing

15   so, right away I got the desired effect.  He locked

16   up.  He stopped punching, like his whole body just

17   locked up.  And that was an opportunity for us to

18   try to detain him at the time.  When those five

19   seconds were up, he just went right back at it.  He

20   just kept fighting.  As soon as the Taser was done,

21   he just went right back at it.

22        Q.    When you say he went right back at it,

23   what do you mean?

24        A.    Striking Officer Ramirez, trying to,

25   again, get on top of him, kicking, just flailing

1  limbs and just still fighting with us.

2        Q.   Were you able to place handcuffs on

3  Mr. Tyson after that second cycle?

4        A.   I don't recall which cycle it was, but

5  ultimately we were.  I believe I remember, you

6  know, when we were putting his hands behind his

7  back, Officer Kerns feeling a little bit of a spark

8  because of where it was.  So, you know, if the

9  prongs are here and the drive-stun is on the ankle,

10 so you're going to feel something in between that

11 entire area.  So when we handcuff -- pull the hands

12 to the back.  That's right in that area that you

13 would feel it.  I remember him -- I think I

14 remember him feeling, you know, a shock from it.

15 But I know ultimately we were able to put handcuffs

16 on him.  I don't know which cycle it was, but...

17       Q.   What ankle were you drive-stunning?

18       A.   I would just be guessing.  I don't know.

19 I would just assume his right, because I was on the

20 south side of the lawn or the south side of them.

21       Q.   So what happens after your second cycle?

22       A.   He just continues to fight with us.

23 Once it stops, he just kept going, just

24 screaming -- you know, without making any sense.

25 He was just yelling -- like, like -- the only way

1    to describe it is like the Tasmanian devil, just
2    like -- it doesn't make any sense.  Just yelling
3    and, you know...
4           Q.   Do you know if Mr. Tyson was
5    experiencing chest pain?
6           A.   I don't know.  I don't believe so,
7    though.
8           Q.   Was he able to communicate anything
9    effectively?
10          A.   Nothing.  Just -- just screaming.  Just
11   yelling at us:  Rah rah rah, like that.  That was
12   the extent of it.
13          Q.   It's fair to say that being tased is
14   painful; right?
15          A.   Yeah, but this wasn't -- he wasn't
16   screaming during the -- during the cycles.  It was
17   once they stopped -- you know, we were giving
18   verbal commands during the cycles.  Listen to me.
19   Stop resisting.  We're here to help -- whatever I
20   said.  And as soon as it was over, just went right
21   back at it, and that's when he would start
22   screaming.  Well, when you're getting that NMI, you
23   can't scream.  It's just -- you know, it's -- it
24   just locks you up.  You lock up.
25          Q.   When you were tased back in July of

Page 114

1  2014, after that cycle was complete, how did you

2  feel?

3          A.    Like nothing happened.

4          Q.    Were you in pain?

5          A.    No.

6          Q.    Did you feel any type of agitation?

7          A.    No.  During those five seconds,

8  absolutely, but after --

9          Q.    But not after?

10         A.    No.

11         Q.    You were able to just bounce back like

12 nothing happened?

13         A.    Yes, ma'am.

14         Q.    You didn't feel any type of effect?

15         A.    No.  No.  No.

16         Q.    Do you know if there are other officers

17 that have felt differently after the cycle was

18 complete?

19             MR. HAPNER:  Form.

20         A.    I don't know.

21 BY MS. GEORGES:

22         Q.    Do you know if it's possible to feel

23 pain after being tased for nine seconds?

24         A.    I don't know.  I didn't feel anything,

25 but I'm just one person.

Page 115

1      Q.   So you can't tell this jury what

2  Mr. Tyson was feeling exactly after those two

3  cycles?

4      A.   No.

5      Q.   You can't tell this jury that he was not

6  in pain?

7      A.   If -- I mean -- I don't know.  He just

8  kept fighting with us.  If it hurt and I was in

9  pain, I wouldn't be resisting at the moment.  I

10  would just comply and, you know, do our job.

11      Q.   It's fair to say that Mr. Tyson wasn't

12  thinking rationally; correct?

13           MR. HAPNER:  Form.

14      A.   Yes.  I can't tell you what he's

15  thinking.

16  BY MS. GEORGES:

17      Q.   Was he following commands?

18      A.   After -- I don't know after what cycle,

19  but after -- like I said, I don't know what cycle,

20  but after a cycle, he would sometimes -- or a few

21  times he would say:  Okay, okay, okay.  Okay, okay,

22  okay.  Like that.  And then all of a sudden he

23  would just pop right back and just start -- you

24  know, maybe he thought we were putting our guard

25  down or something, but he would just start going at

1    it again.  And if after the cycle was done, then he

2    would just be calm for a second or a couple

3    seconds, and then jump right back into kicking me,

4    you know -- I don't know -- trying to gain ground

5    on Ramirez, trying to -- trying to stand up.  I

6    don't know what -- what his intentions were or what

7    he was trying to do.

8         Q.    Well, were you ever able to establish

9    any type of a dialogue --

10        A.    No.

11        Q.    -- with Mr. Tyson?

12        A.    No.

13        Q.    Were you ever able to find out what he

14   was suffering from?

15        A.    No.

16        Q.    Was he ever able to communicate to you

17   that his chest was hurting?

18        A.    No.

19        Q.    Was he ever able to communicate to you

20   that he was off of his medication?

21        A.    Was he ever able to?  He didn't, but I

22   mean, once my cycle was over, that would be a

23   perfect time to tell me something was up, if

24   something was going on.

25        Q.    My question is after the cycle, any of

1    the cycles, all nine of the cycles, did he ever

2    tell you, "Officer, I'm off of my medication" --

3         A.    No.

4         Q.    -- "I need help."

5         A.    No.

6         Q.    Was he ever able to tell you, "My chest

7    hurts, Officer"?

8         A.    He never said that, no.

9         Q.    He was never able to communicate

10   anything; correct?

11              MR. HAPNER:   Form.

12        A.    He's able to communicate.  When I got

13   tased, when it's over it's over.  There's nothing

14   going on.  There's not a pain that sticks around.

15   It ends and then it ends and that's it.  There was

16   plenty of chances between those cycles for him, if

17   something was going on, to let us know, but he did

18   not.

19   BY MS. GEORGES:

20        Q.    Officer, do you suffer from

21   schizophrenia?

22        A.    Nope.  No, I do not.

23        Q.    Do you suffer from depression?

24        A.    No, ma'am.

25        Q.    So do you know what it's like to suffer

1  from schizophrenia and depression and be off of

2  your medication?

3        A.   I don't.

4        Q.   Do you know what it's like to

5  decompensate as a result of being off of your

6  medication?

7        A.   I do not.

8        Q.   So your experience is much different

9  than others who are decompensating as a result of a

10  mental illness and have been tased nine times?

11             MR. HAPNER:   Form.

12        A.   I don't know.

13  BY MS. GEORGES:

14        Q.   Have you ever been tased nine times?

15        A.   No.

16        Q.   So you don't know what it's like to be

17  tased for nine times?

18        A.   I would assume it's like the first time,

19  but just longer which...

20        Q.   54 seconds in sum; correct?

21        A.   Sure.

22        Q.   That's how long Mr. Tyson was tased for?

23        A.   If that's what it says.  If that's what

24  the nine cycles were.

25             It was just us two officers trying to

1   control this man; so he didn't get up and hurt

2   someone else for I don't know how long.  But we

3   were alone for a very long time.  So I know 54

4   seconds sounds like a long time, but that's the

5   only time we were able to get a breather and be in

6   control and not have him try to attack us or get up

7   and possibly attack someone else.  There's an

8   elementary school half a block away from the

9   location of incident.  It was early afternoon when

10  probably and most likely there are kids outside.

11          Now, if he gets up and gets away, I

12  can't let him hurt someone else or even hurt

13  himself.  If he ran out into Federal Highway and

14  gets hit by a car running away from us, now what?

15  Now he's really hurt.  So I know 54 seconds seems

16  excessive, but it wasn't.  It's -- each time he was

17  fighting with us, it was the only time we were able

18  to have control of him and try to control him until

19  backup arrived, more officers arrived.

20      Q.   Weren't other officers present during

21  some of these tasing cycles?

22      A.   I don't -- I don't believe so.  I

23  believe it was just when it was just the three of

24  us, but -- it was just the two of us, but...

25      Q.   So all nine of these cycles were prior

Page 120

1   to other officers arriving on scene, such as

2   Officer Karl, Officer Truntz, and Officer Falcon?

3        A.   I don't recall if I tased them while

4   they were there.  I don't recall.

5        Q.   How many times did you tase him prior to

6   the handcuffs being placed on?

7        A.   I answered that earlier, but I don't

8   recall.  It was either after the second, third, or

9   fourth cycle.  I don't know.

10        Q.   After the handcuffs were placed on,

11   other officers arrived on the scene?

12        A.   They arrived well after -- after even

13   the shackles were on him.  There was a point where

14   Officer Kerns ran to his truck and got shackles,

15   because he was kicking at this point.

16        Q.   How many times was Mr. Tyson tased prior

17   to the leg shackles being placed on?

18        A.   I don't recall.

19        Q.   Do you know if it was six times?

20        A.   I don't know what number of times it

21   was.

22        Q.   Were leg shackles placed on?

23        A.   They were.

24        Q.   After leg shackles were placed on, did

25   you tase him?

1      A.    Yes, ma'am.

2      Q.    How many times?

3      A.    I don't recall how many times.

4      Q.    Were other officers on scene?

5      A.    After the shackles were on?

6      Q.    Yes.

7      A.    Yes, ma'am.

8      Q.    Were other officers holding down

9  Mr. Tyson after handcuffs and leg shackles have

10 been placed on?

11     A.    Ultimately when the other officers

12 arrived on scene, they helped in detaining -- you

13 know, holding him down, yes.

14     Q.    Do you know what part of Daniel Tyson

15 Officer Truntz was holding down?

16     A.    I don't recall.

17     Q.    Do you know what part of Mr. Tyson's

18 body Officer Falcon was holding down?

19     A.    I don't recall that either.

20     Q.    Do you know what part of Mr. Tyson's

21 body Officer Karl was holding down?

22     A.    I do not.  I don't recall that either.

23     Q.    After the leg shackles had been placed

24 on, were you also holding Mr. Tyson down?

25     A.    I believe so.

1        Q.    What part of his body were you holding

2  down?

3        A.    Either one or both of his legs.  I don't

4  recall if I was trying to hold both down.

5        Q.    What were you using to hold down either

6  one or both of his legs?

7        A.    My legs and my hands, and I still

8  have -- I believe I still had the Taser in my

9  hands.  So I'm maybe using one of my hands and my

10 legs.  I don't know.

11       Q.    Were you crouched down or were you

12 standing?

13       A.    I believe I was crouched down.

14       Q.    And how about Officer Truntz?  Do you

15 know what part of his body he was using in order to

16 hold down Mr. Tyson?

17       A.    No, I don't know that.

18       Q.    How about Officer Kerns, do you know

19 what part of his body he was using to hold down

20 Mr. Tyson?

21       A.    I'd just be assuming.  I don't know.

22       Q.    And why was everyone holding down

23 Mr. Tyson after he was handcuffed and leg shackled?

24       A.    He's still flailing his legs.  There's a

25 lot of slack between leg shackles.  They're not

Page 123

1    like handcuffs.

2         Q.    Could he get up and run?

3         A.    Yes.

4         Q.    At some point, Officer Wagner arrived on

5    scene after Mr. Tyson had been handcuffed and leg

6    shackled?

7         A.    I don't even remember him on scene, to

8    be honest with you.

9         Q.    Do you have any reason to dispute his

10   testimony that he arrived on scene?

11        A.    No, ma'am.  There was a lot going on.

12        Q.    So if Officer Wagner had been on scene,

13   that would be a total of seven police officers

14   after Mr. Tyson was handcuffed and leg shackled;

15   would that be correct?

16        A.    I remember when the officers first

17   responded that they whisked Ramirez away because of

18   his head injury.

19        Q.    Was Officer Ramirez removed from the

20   scene prior to Mr. Tyson being removed?

21        A.    He was just -- like on the side just

22   north of the incident where everyone is getting

23   treated for his head wound, I believe.

24        Q.    Okay.  So that would bring us down to

25   six officers:  Yourself, Officer Kerns, Officer

1    Karl, Officer Truntz, Officer Falcon, and Officer

2    Wagner?

3          A.    Correct.

4          Q.    So that would have been six officers

5    that were holding Mr. Tyson down?

6          A.    Correct.

7          Q.    So if Mr. Tyson would have gotten up

8    after being handcuffed and leg shackled and hobbled

9    away, there would have been six officers there to

10   stop him; correct.

11         A.    Mm-hmm.

12         Q.    Is that a yes?

13         A.    Yes.

14         Q.    But Mr. Tyson never got up; correct?

15         A.    Correct.

16         Q.    And as there's approximately six police

17   officers standing around him and on him, he loses

18   consciousness, doesn't he?

19              MR. HAPNER:    Form.

20         A.    I don't recall that.  I was the next one

21   to get whisked away.  I was so out of breath from

22   struggling with him for so long.  They saw how

23   tired I was, and I stepped to the side just west of

24   the -- west of the location.

25

1    BY MS. GEORGES:

2          Q.    At what point?

3          A.    Once those officers got there.  I don't

4    know who it was.  But somebody said, just go over

5    there or, you know, we'll hold him for now or -- I

6    don't know what was said, but -- and at that point,

7    I just walked away, just completely gassed.

8          Q.    So then who was left holding Mr. Tyson

9    down when they discovered that he was unresponsive?

10         A.    I don't know who was there, but I don't

11   know -- those officers that arrived on scene, I

12   don't know exactly who was around him or holding

13   him down or what.  I don't know.

14         Q.    Did you ever hear someone yell out, "Get

15   off of him, get off of him"?

16         A.    No.

17         Q.    So if you're gassed and you're to the

18   side, Officer Ramirez is getting treatment from

19   fire rescue.  How do you learn that Mr. Tyson is

20   unresponsive?

21         A.    I remember someone saying something to

22   the effect, Hey, somebody needs to check him out.

23   He's not breathing or something like that.  I don't

24   recall exactly what.  And then I mean, the fire

25   rescue guys were standing 5-, 8 feet away from him

1  and just went over there.  And I remember them

2  pumping his chest to try to get a pulse, working on

3  him at that point.

4          Q.    Did you look over?

5          A.    At that them working on him?

6          Q.    Yes.

7          A.    Yes, ma'am.

8          Q.    Did you ever approach Mr. Tyson?

9          A.    No.

10         Q.    What could you see?

11         A.    I saw fire rescue -- I guess their

12  officers -- fire personnel.  They were pumping his

13  chest like really hard.  I guess that's what --

14  there was like four guys working on him at that

15  point trying to get a pulse on him.

16         Q.    Do you know if they were able to get a

17  pulse?

18         A.    I don't recall.  I just remember them

19  loading him up really quickly and driving him away.

20         Q.    Did someone take the restraints off of

21  Mr. Tyson?

22         A.    I don't know.  I don't think I did.  I

23  don't believe it was me.  If somebody, I don't

24  know --

25         Q.    How about when fire rescue was doing

1   chest compressions, was he still handcuffed and leg

2   shackled?

3            A.    I don't know.

4            Q.    When did you learn that Mr. Tyson died?

5            A.    Later that day.

6            Q.    How much later?

7            A.    Three or four hours later.

8            Q.    How did you learn?

9            A.    I don't recall.  I don't recall who

10  notified me.  I think maybe my FTO or maybe -- I

11  don't know.  I really don't know.  I would just be

12  guessing.

13           Q.    When did you learn that this was a death

14  investigation and that both you and Ramirez were

15  being investigated for this death?

16           A.    Well, I guess -- I guess probably early

17  on.  I was sitting in my -- well, when they whisked

18  him away, they thought that was possibly -- I was

19  put into one of the -- my FTO's Tahoe, and I was

20  just sitting there, and then I remember -- I don't

21  know who told me.  I think he told me somebody

22  related to him that I had to go down to the network

23  center and have my Taser downloaded or something --

24  or taken from me.  I don't know.  I would say it

25  was pretty early on, but I didn't know if he was

1  dead or if that was just precautionary in the event

2  that he does die from the incident.

3       Q.   Do you know if Mr. Tyson was pronounced

4  as soon as he was transported to Memorial?

5       A.   I would just be guessing, but I think

6  so.

7       Q.   Did you provide a statement to law

8  enforcement after this incident on that night?

9       A.   I don't believe so.

10       Q.   Do you know why?

11       A.   No.

12       Q.   Did you make contact with your PBA rep

13  on that day?

14       A.   I believe -- I think one responded to --

15  oh, we have reps, yes, in the department.  I

16  remember a rep coming on scene and talking to me.

17       Q.   Were you ever transported to Memorial

18  for medical treatment?

19       A.   No, ma'am.

20       Q.   Were you just treated on scene?

21       A.   I really didn't have any injuries.  I

22  was just --

23       Q.   Well, you said that you were gassed

24  earlier.  So did someone give you any oxygen?

25       A.   No.

1       Q.    As you sit here today, did you tase

2  Mr. Tyson after the leg shackles had been applied?

3       A.    Yes.

4       Q.    How many times?

5       A.    I don't recall that.

6       Q.    Is there a possibility that you tased

7  him more than one time?

8       A.    Yes.

9       Q.    Is there a possibility that you tased

10 him more than two times after the leg shackles had

11 been applied?

12      A.    I guess it's a possibility, but I really

13 don't know.  At that point, he's still swinging his

14 legs, and now he has a weapon on his ankles that

15 could knock me out.  And the only other officer --

16 my partner, who I was backing up, I don't know how

17 long he's going to last in this struggle.  He's

18 going to pass out any second.  He already can't

19 see, so...

20      Q.    How about when the other officers

21 arrived on scene, didn't they tap out Officer

22 Ramirez so he can go get medical treatment and they

23 held his position?

24      A.    Yes, I believe so.

25      Q.    Did you ever go on the radio and ask for

Page 130

1   additional units?

2          A.   I don't think I ever keyed up on the

3   radio.

4          Q.   Did you ever go on the radio and ask for

5   an additional fire rescue unit?

6          A.   I don't believe so.

7          Q.   After the leg shackles were placed on,

8   were the other officers applying pressure to

9   Mr. Tyson's body?

10         A.   Yes, I believe so.

11         Q.   And was that to prevent him from kicking

12  and getting up off the ground?

13         A.   Yes.

14         Q.   Other than the first cycle, did you

15  reach NMI on the second through ninth cycle?

16         A.   All of them reached NMI.

17         Q.   It was only after the cycle had been

18  completed that then he became uncooperative

19  again --

20         A.   Correct.

21         Q.   -- like kicking --

22         A.   Once they ended, he just began kicking,

23  trying to get up.

24         Q.   Did the Taser have its desired effect?

25         A.   It did.

Page 131

1       Q.    And what was that effect?

2       A.    Neuromuscular incapacitation to lock him

3   up and gave us a chance to handcuff him and place

4   the leg shackles on him.

5       Q.    After Mr. Tyson was handcuffed and leg

6   shackled, why wasn't he transported to one of your

7   units?

8       A.    I don't know.  Honestly, I don't think

9   he would fit in one of our units, but at that point

10  we already have fire rescue en route.  And what we

11  do with larger individuals who are resisting like

12  that is we, you know -- we have rescue come, and

13  they can strap them to a bed, and they can apply

14  straps so he can't resist or can't fight them on

15  the way.  But I mean, I don't think putting him in

16  my vehicle was an option, but it would have been

17  very tough to do.

18      Q.    When you say large, how big was

19  Mr. Tyson?

20      A.    He was pretty heavyset.  I would say

21  240, and I mean, he was on the ground the whole

22  time, so I don't know how tall he was.

23      Q.    Do you have any reason to dispute that

24  he was 5'7"?

25      A.    I don't know how tall he was.  I don't

1  know.

2      Q.    Do you have any reason to dispute that

3  he was 5'6" and that actually dispatch had relayed

4  that information over the radio?

5      A.    I don't remember that.

6      Q.    So you're telling me that someone who's

7  5'6" and 250 pounds cannot fit in the back of your

8  patrol unit?

9      A.    Possibly.  But when they're fighting,

10 it's very tough to put someone back there,

11 especially if -- I mean, I don't even know if my

12 car -- that was a single cage or a full cage, but

13 if it's a single cage, it wouldn't happen.

14     Q.    So what was the purpose of everyone

15 holding down Mr. Tyson as he was handcuffed and leg

16 shackled?

17     A.    To have control of him until fire rescue

18 was able to come on scene and transport him.

19     Q.    And then what was fire rescue supposed

20 to do?

21     A.    And then strap him to one of their beds

22 and put him in the back of the truck, and we would

23 follow them over either with an officer in the back

24 of the truck or an officer in the back of the truck

25 and another one following the rescue truck and take

1  him to Memorial Regional.

2      Q.    Could fire rescue sedate him on the

3  scene?

4      A.    I don't know.  I guess.  I'm not sure if

5  they have that equipment on their trucks.

6      Q.    Now, was it your intention had he not

7  fallen unresponsive and then died, were you going

8  to Baker Act him?

9      A.    I was.

10      Q.    Had you ever seen fire rescue provide a

11  sedative to anyone while you've been a police

12  officer?

13      A.    No.  I've seen them wake people up, but

14  never anything to calm people down, I don't think.

15      Q.    Have you ever responded to a car

16  accident with catastrophic injuries where someone

17  was awake and they were severely injured?

18      A.    I don't think so.

19      Q.    Have you ever heard of an instance where

20  someone who is severely injured needs to be

21  sedated?

22      A.    Sure.

23      Q.    Do you know if fire rescue carries

24  certain medication that could sedate someone?

25      A.    I don't know what they carry.

1      Q.   How long was fire rescue on the scene

2   prior to Mr. Tyson being unresponsive?

3      A.   A couple of minutes.

4      Q.   And it was one truck?

5      A.   I don't recall.

6      Q.   It was four officers or four fire rescue

7   personnel?

8      A.   I don't recall how many were there.

9      Q.   And how many were treating Officer

10  Ramirez?

11     A.   I don't recall that either.

12     Q.   Do you know if a second unit arrived on

13  scene?

14     A.   I don't recall.

15     Q.   Who were the fire rescue personnel that

16  worked on Mr. Tyson?

17     A.   I don't even remember faces.  So even if

18  you were to show me pictures, I wouldn't know.  I

19  don't know.

20     Q.   Well, was it an instance where those

21  fire rescue personnel were working on Officer

22  Ramirez and then were alerted to the fact that you

23  had a lifeless man and then they walked over and

24  they started treating Mr. Tyson?

25     A.   That's what occurred, yeah.

1      Q.   Do you know how many approached

2   Mr. Tyson?

3      A.   I don't.

4      Q.   Do you know how many were doing chest

5   compressions?

6      A.   I don't.  I would just be assuming.

7      Q.   When fire rescue arrived on scene, why

8   didn't you direct them to transport Mr. Tyson?

9      A.   He seemed fine at the time they arrived

10  on scene, and we had an officer bleeding from the

11  head; so I think they, you know, put injuries -- I

12  guess they would decide what injuries need to be

13  treated first.

14     Q.   When you say "fine," what do you mean?

15     A.   He was -- when I got whisked away, he

16  was -- he was just whispering to himself and just

17  laying there, and he was doing that for a little

18  while afterwards, and then he just -- then

19  somebody -- I don't know who.  Somebody said hey --

20  somebody check on him.  He's not breathing.  They

21  went over there.

22     Q.   So when he was whispering to himself,

23  were the officers still around him?

24     A.   I believe so.

25     Q.   At the point that you stepped away

Page 136

1   because you were gassed, did you feel that

2   Mr. Tyson was no longer a threat to yourself?

3        A.   I did.   Other officers were there to

4   control him if he decided to fight and get up

5   again.

6        Q.   Did he ever fight and get up again?

7        A.   No, ma'am.

8        Q.   Is there a policy and procedure at the

9   Hollywood Police Department for responding to calls

10  of people with a mental illness or other

11  disabilities?

12       A.   I believe so.

13       Q.   And what is that policy or procedure?

14       A.   Have two officers go deescalate the

15  situation, explain to them that you're there to

16  help them.  I'm just guessing on what it says, but

17  that's what I believe it covers.

18       Q.   Prior to your arrival, was Officer

19  Ramirez ever able to deescalate the situation?

20       A.   I don't believe so.

21       Q.   Upon your arrival, were you ever able to

22  deescalate the situation?

23       A.   Like I said earlier, after -- or while

24  being tased, he wasn't fighting with us; so that

25  was, you know, bringing him down.  And then I don't

1  know after which tases.  But after some tases, he

2  would say:  All right, all right, all right.  All

3  right, all right.  And then he would seem calm, and

4  then he would just start right back up again.  So

5  it did have -- I guess we did -- he did deescalate

6  for a short period of time.

7          Q.    He only deescalated when he was actually

8  being tased?

9          A.    Like I said, after the Taser ended, he

10  would start saying:  Okay, okay, okay.  Okay.

11  Okay.  Okay.  And then he would just start up

12  again.

13          Q.    Okay.  When he would say:  Okay, okay,

14  was that between the second and third tasing or was

15  that between the seventh and eighth tasing?

16          A.    I don't recall.

17          Q.    Can you articulate with more detail?

18          A.    I don't recall which tasing it was, but

19  it was multiple times.

20          Q.    Why didn't you use your ASP to hold down

21  Mr. Tyson's legs instead of the leg shackles?

22          A.    I've never been trained to use the ASP

23  in that way to hold someone's legs down.

24          Q.    How were you trained to use the ASP?

25          A.    You strike people in meaty areas like

Page 138

1    the legs or the butt or even as just -- that's

2    about it -- or if the situation needed, you can

3    strike someone in say the head -- you know, that

4    would be considered like deadly force or...

5          Q.    An ASP is deadly force?

6          A.    If struck in the head, it could lead to

7    the death of somebody.

8          Q.    How about the use of an ASP on someone's

9    legs, is that deadly force?

10          A.    No.

11          Q.    How about the use of an ASP in someone's

12    lower back, is that deadly force?

13          A.    No.

14          Q.    Was it available to you?

15          A.    Sure.

16          Q.    Did you ever use it?

17          A.    No, ma'am.

18          Q.    Strictly use the Taser; correct?

19          A.    Yes, ma'am.

20          Q.    And you deem that to be nonlethal force?

21          A.    Correct.

22          Q.    Do you know how many people have died in

23    custody of the City of Hollywood as a result of a

24    Taser?

25                MR. HAPNER:   Form.

Page 139

1          A.    No.

2    BY MS. GEORGES:

3          Q.    Do you know how many people have died

4    while in custody of the City of Hollywood?

5          A.    No.

6          Q.    How about since you've been a police

7    officer, do you know of anyone who's died while

8    they were in custody of City of Hollywood?

9          A.    I don't believe so.

10          Q.    How often is your Taser downloaded?

11          A.    I think it's after you use it.  I could

12    be wrong.

13          Q.    Well, have you ever had your sergeant

14    come to you every three or six months and say:

15    Hey, hand over your Tasers.  We're just going to

16    download them for quality control?

17          A.    No.  Sometimes when there's a time

18    change, they have us download them, so they can

19    update the time on them, so they're more accurate

20    after the time change; but they never just run

21    them.  They come up to you and have it downloaded.

22          Q.    Have you ever received any training on

23    how to comply with the American Disabilities Act?

24          A.    I don't recall.

25          Q.    Is there a policy and procedure at the

Page 140

1    City of Hollywood for compliance with the American
2    Disabilities Act?
3            A.    I don't recall.
4            Q.    Are you aware of any incidents at the
5    City of Hollywood where excessive force has been
6    found?
7            A.    No.
8            Q.    Have you ever heard of someone being
9    fired because they used excessive force?
10           A.    I don't believe so.
11           Q.    Who investigates your use of force?
12           A.    Our immediate supervisors, which is our
13   sergeants, and then internal affairs.
14           Q.    It's all in-house at the City of
15   Hollywood; correct?
16           A.    Correct.
17           Q.    There is no other police agency that
18   comes in and evaluates your use of force?
19           A.    I don't know -- I don't know about that.
20           Q.    Officer, would you agree with me that
21   someone who is decompensating as a result of a
22   mental illness requires medical treatment and
23   stabilization?
24           A.    Sure, I'd agree with that.
25           Q.    Since this incident, have you ever

Page 141

1  encountered anything similar?

2       A.   Yes.

3       Q.   When?

4       A.   There's been plenty of times where I've

5  Baker Acted people who have been showing signs of,

6  you know, being off their meds and, you know, going

7  through whatever they're going through, and

8  those -- those times, and what I do is I just

9  deescalate the situation, tell them I'm going to

10 transport them to the hospital and take them to the

11 hospital.

12      Q.   Is it fair to say that you're better

13 equipped to handle Baker Acts now than you were on

14 October 27 of 2014?

15      A.   It was fresh in my mind at the time from

16 learning about it in training, but, you know, I've

17 Baker Acted I would say over 50 people.  So, sure,

18 I would say I'm better at it now.  That's fair to

19 say.

20      Q.   Back on October 27th of 2014, did you

21 have any real world or real life experiences in

22 Baker Acting citizens?

23      A.   I Baker Acted somebody prior to that on

24 FTL, yeah.

25      Q.   How many?

1        A.    I don't recall, but I can recall one

2   that was fairly, you know, aggressive or resistant

3   to us transporting him.

4        Q.    And that one time prior to this

5   incident, it was with your FTO?

6        A.    Yes, ma'am.

7        Q.    It wasn't by yourself?

8        A.    No, ma'am.

9        Q.    Have you ever had to use your Taser on a

10   mentally ill person?

11        A.    No.

12        Q.    Was this the only incident?

13        A.    On a mentally ill person, yes.

14        Q.    Have you ever had to restrain a mentally

15   ill person prior to Baker Acting them without using

16   your Taser?

17        A.    Yes.

18        Q.    How many times?

19        A.    I'd say 10, 15 times.

20        Q.    And how would you restrain them of those

21   10 to 15 times?

22        A.    Just gain control, handcuff them and get

23   them into a car as soon as possible.

24        Q.    Have you ever had to use force?

25        A.    No, ma'am.

1      Q.    Have you ever had to use your ASP at all

2   in your four years as a police officer?

3      A.    I just use it to knock on doors, but

4   that's about it.  I don't even carry it on my belt

5   anymore.

6      Q.    And when did you stop carrying it on

7   your belt?

8      A.    Two -- two, three years ago.  I don't...

9      Q.    Back on October 27th of 2014, what

10  equipment did you have on your belt?

11     A.    Everything I have now.  I also have a

12  gun -- handcuffs, an ASP, extra magazines, a radio

13  and a Taser.

14     Q.    Was your radio working on that day?

15     A.    Yes, ma'am.

16     Q.    Just give me a moment.

17           Have you ever done any details at

18  Memorial Regional for those that are in the mental

19  health ward?

20     A.    No, ma'am.  I rarely work details.

21     Q.    Do you know if there is a unit at

22  Memorial for those that have been Baker Acted?

23     A.    There's around the clock an officer

24  working an off-duty detail at the hospital, but

25  they're not strictly and solely there in the mental

1  health facilities or areas of the hospital.

2       Q.   Have you ever spent any time working a

3  detail in any type of a mental health facility?

4       A.   No, ma'am.

5       Q.   Have you listened to the dispatch audio

6  as it pertains to this case?

7       A.   No, ma'am.

8       Q.   Do you ever announce your arrival?

9       A.   Yes, I believe so.

10      Q.   Other than announcing your arrival, did

11 you ever go out on the air and communicate any

12 information?

13      A.   No, ma'am.  No.

14      Q.   How did you feel as a friend when you

15 saw Officer Ramirez injured?

16      A.   I didn't think anything other -- I

17 didn't feel anything just because he's a friend of

18 mine.  I just saw an officer injured, and I wanted

19 to take care of -- help the situation or control

20 the situation or gain control of the situation as

21 best I could.

22      Q.   How about as a fellow police officer,

23 how did you feel about Officer Ramirez being

24 injured and having blood running down his face?

25      A.   I was worried for his well-being, you

Page 145

1  know.  He's married.  He was trying for kids at the

2  time.

3       Q.   Were you upset?

4       A.   No.  I was just more scared.  If he was

5  to pass out at any moment because of his head

6  injury, then it would have been only me, and the

7  decedent was -- had like this supernatural strength

8  I've never seen before.  So it would have been

9  very, very tough for me to control him and contain

10 him on my own.  That's for sure.

11      Q.   Did he have supernatural strength when

12 you were tasing him for those nine cycles?

13      A.   While I was getting the desired NMI, no,

14 he did not.

15      Q.   It was only after?

16      A.   Correct.  And before.

17      Q.   Are there specific policies and

18 procedures that have been reduced to writing by the

19 City of Hollywood for the use of your Taser?

20      A.   I'm sorry.  Can you ask that one more

21 time?

22      Q.   Are there policies and procedures in

23 place by the City of Hollywood Police Department

24 that have been reduced to writing as to the use of

25 your Taser while on duty?

1       A.    I'm not sure.

2       Q.    Have you ever been given SOPs as it

3   pertains to the use of a Taser specifically by the

4   City of Hollywood?

5       A.    I believe so.

6       Q.    Do you know the number of that SOP?

7       A.    I do not.

8       Q.    Does it differ than the use of force

9   SOP?

10      A.    I believe it's the same one.  I would

11  just be guessing.

12      Q.    So do you know if there's a specific

13  policy and procedure as it pertains to using your

14  Taser while on duty?

15      A.    I don't know.

16          MS. GEORGES:  I don't have anything

17      else.

18                 CROSS-EXAMINATION

19  BY MR. HAPNER:

20      Q.    Officer, after Mr. Tyson was placed in

21  leg shackles but while you were still involved, did

22  Mr. Tyson ever stop physically resisting?

23          MS. GEORGES:  Form.

24      A.    There were a few seconds where he would

25  say, "okay, okay, okay" after the cycle was ended,

1    and he would stop, and then it would just start

2    right back up again, kicking and flailing and

3    trying to stand up and...

4    BY MR. HAPNER:

5         Q.    Did he still physically resist after leg

6    shackles were placed on him?

7         A.    Yes, sir.

8         Q.    Did you ever deploy your Taser when he

9    was not physically resisting?

10        A.    No.

11              MS. GEORGES:   Form.

12   BY MR. HAPNER:

13        Q.    What was your ultimate goal that day?

14              MS. GEORGES:   Form.

15        A.    To just control him and just hold him

16   there until we were able to get other additional

17   units to either put him in the -- well, the rescue

18   truck or just to get him to the hospital.

19   BY MR. HAPNER:

20        Q.    You said you had an ASP on you on that

21   day?

22        A.    I believe so, yes.

23        Q.    Why did you use your Taser as opposed to

24   the ASP?

25        A.    I mean, with the level of resistance he

Page 148

1    was showing.  You know, to get him to stop, I would

2    have to hit him in the head with it, and that would

3    cause either serious brain damage or permanent

4    disfigurement, and that's the last thing I wanted

5    to do.  I wasn't there to hurt the guy.  I was

6    there just to gain control of him and take him to

7    the hospital and get him the help he needed.

8              MR. HAPNER:  That's all I have.

9              MS. GEORGES:  No redirect.

10             THE VIDEOGRAPHER:  Okay.  That concludes

11        today's deposition.  The time is 12:21 p.m.

12        We're now going off the record.

13             (The reading and signing of this

14        deposition was not waived.)

15             (This deposition was concluded at

16        12:21 p.m.)

17

18

19

20

21

22

23

24

25

Page 149

1

2                       CERTIFICATE OF OATH

3

4   STATE OF FLORIDA       :

5                              :SS.

6   COUNTY OF MIAMI-DADE  :

7

8            I, Lance W. Steinbeisser, Registered

9       Professional Reporter, Notary Public, State

10      of Florida, certify that OFFICER ANDREAS

11      PANTALOUKAS personally appeared before me on

12      the 27th of February, 2018.

13

14           Signed this 3rd day of March, 2018.

15

16

17

18

19   _____

20   LANCE W. STEINBEISSER
     Notary Public, State of Florida at Large
21   My Commission Number:  GG064258
     Expires:  May 4, 2021

22

23

24

25

Page 150

1                REPORTER'S DEPOSITION CERTIFICATE

2

3             I, Lance W. Steinbeisser, Registered

4      Professional Reporter, do hereby certify that

5      I was authorized to and did stenographically

6      report the deposition of OFFICER ANDREAS

7      PANTALOUKAS; that a review of the transcript

8      was requested; and that the transcript, pages

9      1 through 148, is a true record of my

10     stenographic notes.

11            I FURTHER CERTIFY that I am not a

12     relative, employee, attorney, or counsel of

13     any of the parties, nor am I a relative or

14     employee of any of the parties' attorney or

15     counsel connected with the action, nor am I

16     financially interested in the action.

17

18            Dated this 3rd day of March, 2018, at

19     Miami, Florida.

20

21

22

23     _____

24     LANCE W. STEINBEISSER, RPR CSR FPR

25

Page 151

1                          ERRATA SHEET

2          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

3    RE        :      TYSON VS. CITY OF HOLLYWOOD
     DEPONENT  :      OFFICER ANDREAS PANTALOUKAS
4    TAKEN     :      FEBRUARY 27, 2018

5    Page #      Line #            Change          Reason

6    _____    _____

7    _____    _____

8    _____    _____

9    _____    _____

10   _____    _____

11   _____    _____

12   _____    _____

13   _____    _____

14   _____    _____

15   _____    _____

16   _____    _____

17   _____    _____

18   _____    _____

19   _____    _____

20   _____    _____

21

     Under penalties of perjury, I declare that I have
22   read the foregoing document, and that the facts
     stated in it are true.
23

               _____    _____
24                   Signature                   Date

25

Page 152

1   March 3, 2018

2   Officer Andreas Pantaloukas
    c/o Adam M. Hapner, Esquire
3   Weiss Serota Helfman
    200 East Broward Boulevard, Suite 1900
4   Fort Lauderdale, Florida 33301

5   In Re:  TYSON VS. CITY OF HOLLYWOOD

6   Dear Sir/Madam:

7        This letter is to advise that the transcript
    for the above-referenced deposition has been
8   completed and is available for review.  Please
    contact our office at (305)632-4464 to make
9   arrangements for read and sign, or sign below to
    waive review of this transcript.

10

11       It is suggested that the review of this
    transcript be completed within 30 days of your
    receipt of this letter.

12

13       The original of this transcript has been
    forwarded to the ordering party, and your errata,
    once received, will be forwarded to all ordering
14  parties for the inclusion in the transcript.

15                    Sincerely,

16                    Lance W. Steinbeisser, RPR FPR CSR
                      Steinotype, Inc.
17
    cc:  Denise H. Georges, Esq.
18

19  Waiver:

20  I, _____, hereby waive the
    reading and signing of my deposition transcript.

21


22


23  _____    _____
    Deponent Signature                  Date

24


25