Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.:  16-2215-CIV-DIMITROULEAS


JEAN SUAREZ, individually and as
Personal Representative of the
Estate of DANIEL TYSON, deceased,

     Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida
Municipal Corporation,

     Defendant.
_____/


 VIDEOTAPED DEPOSITION OF OFFICER ALEXIS RAMIREZ


     Taken on Behalf of the Plaintiff


     DATE TAKEN:  February 14, 2018

     TIME:        10:00 a.m. to 1:30 p.m.

     PLACE:       2719 Hollywood Boulevard
                  Hollywood, Florida 33020


    Examination of the witness stenographically
                 taken before:

             Melissa A. Sohr, RPR
           Certified Court Reporter

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

BY:  Denise H. Georges, Esquire
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
(305)476-7400
denise@colson.com

ON BEHALF OF THE DEFENDANT:

BY:  Adam M. Hapner, Esquire
WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301
(954)763-4242
ahapner@wsh-law.com

ALSO PRESENT:

Matthew Taylor, the videographer

Page 3

I N D E X

WITNESS                                          PAGE


OFFICER ALEXIS RAMIREZ

Direct Examination            By Ms. Georges     4
Cross-Examination             By Mr. Hapner      186


E X H I B I T S

PLAINTIFF'S  DESCRIPTION                          PAGE

  1  Basic Recruit Certificate                    59
  2  Taser Training Certificate                   60
  3  Evaluation                                   65
  4  Photographs                                  97
  5  Photographs                                  173
  6  Photograph                                   175
  7  Photograph                                   176
  8  Photographs                                  178
  9  Photographs                                  179


Certificate of Oath.......................Page 190
Certificate of Reporter...................Page 191
Errata Sheet..............................Page 192
Read Letter...............................Page 193

Page 4

1          THE VIDEOGRAPHER:  Today's date is

2      February 14, 2018.  The time is 9:55 a.m.  We

3      are now on the record.

4          THE COURT REPORTER:  Raise your right

5      hand, please.

6  Thereupon--

7               OFFICER ALEXIS RAMIREZ

8  was duly administered the oath:  Do you solemnly

9  swear that the testimony you are about to give will

10  be the truth, the whole truth and nothing but the

11  truth, so help you God?

12          THE WITNESS:  I do.

13               DIRECT EXAMINATION

14  BY MS. GEORGES:

15      Q.   Good morning, Officer.

16      A.   Good morning.

17      Q.   Would you please introduce yourself to

18  the jury.

19      A.   Officer Alexis Ramirez.

20      Q.   Can you spell your last name, please?

21      A.   R-A-M-I-R-E-Z.

22      Q.   And who are you employed by?

23      A.   City of Hollywood.

24      Q.   And how long have you been employed by

25  the City of Hollywood?

1       A.   Four years.

2       Q.   And in what capacity are you employed by

3  the City of Hollywood?

4       A.   Patrol officer.

5       Q.   And how long have you been a patrol

6  officer?

7       A.   Four years.

8       Q.   How old are you?

9       A.   Thirty.

10       Q.   Where were you born?

11       A.   Venezuela.

12       Q.   When did you immigrate to the United

13  States?

14       A.   I was, like, four years, five years,

15  five years old.

16       Q.   In South Florida?

17       A.   Yeah.

18       Q.   Have you ever lived anywhere other than

19  Venezuela and South Florida?

20       A.   No.

21       Q.   What counties in Florida have you lived

22  in?

23       A.   Broward County, and we lived in Miami

24  for a while; but up north, maybe like Ocala.  Moved

25  a lot.

1          Q.    Okay.  Where did you attend high school?

2          A.    I went to Hollywood Christian.  I went

3    to Stranahan, and then I was home-schooled my last

4    year.

5          Q.    What year was your last year?

6          A.    I'd say '05, '06.  I don't remember.

7          Q.    Did you obtain a high school diploma or

8    a GED?

9          A.    High school diploma.

10         Q.    Did you go to college?

11         A.    I did.

12         Q.    Where did you go to college?

13         A.    Broward College.

14         Q.    What years?

15         A.    I don't remember.

16         Q.    Did you graduate from Broward College?

17         A.    Yeah.

18         Q.    What did you graduate with?

19         A.    EMT/paramedic.

20         Q.    What year was that?

21         A.    I don't remember off the top of my head.

22         Q.    Following your graduation, did you

23    receive any type of a certificate?

24         A.    I did.

25         Q.    What type of certificate?

1          A.    EMT/paramedic certificate.

2          Q.    Were you employed as an EMT?

3          A.    I was.

4          Q.    For who?

5          A.    Medics Ambulance Company.

6          Q.    Where is that located?

7          A.    It's -- I don't -- I think they moved.

8    It's here in Broward.  I don't know the exact

9    address.

10         Q.    How long were you an EMT for?

11         A.    Maybe just a little short of a year,

12   maybe.  I don't know, exactly.

13         Q.    Did you eventually leave that job as an

14   EMT?

15         A.    I did.

16         Q.    Why?

17         A.    I got hired here.

18         Q.    When did you have a desire to become a

19   police officer?

20         A.    While working as a -- on the ambulance.

21         Q.    Is there any specific reason?

22         A.    I like the job.  I got to speak with a

23   lot of officers while working on the ambulance, and

24   they encouraged me, so I went ahead and applied.

25         Q.    Okay.  When did you apply?

1     A.    I'm going to say -- I don't remember,

2  exactly, 2013, 2014.

3     Q.    Did you attend the academy?

4     A.    I did.

5     Q.    Where?

6     A.    Broward.

7     Q.    When did you attend the academy?

8     A.    Early 2014, I believe.  Yeah.

9     Q.    Okay.  So how does it work?  You get

10  hired by the City of Hollywood Police Department

11  and then you undergo an academy that is run by the

12  department?

13     A.    It's run by Broward College, I believe,

14  and it's through FDLE, so, yeah.

15     Q.    Are there other agencies that

16  participated in the academy during that same period

17  of time?

18     A.    Yes.

19     Q.    What other agencies participated in that

20  academy when you attended?

21     A.    In my class?  Several.  It was

22  Plantation, Miramar.  I mean, a handful of

23  agencies, so --

24     Q.    Were there any agencies that were

25  outside of the Broward County district?

1          A.    I don't remember.

2          Q.    Do you know if there were any Miami

3    police agencies --

4          A.    I don't think so.

5          Q.    -- that participated?

6          A.    I don't think so.

7          Q.    Were there any agencies that belong to

8    any Central Florida jurisdictions that attended

9    that academy?

10          A.    I think there was a PBSO guy that was

11    there.

12          Q.    How many people attended the academy in

13    early January 2014?

14          A.    It was a large class.  I don't remember.

15          Q.    More than 50?

16          A.    I don't think so.

17          Q.    More than 30?

18          A.    Maybe a little less than 30.

19          Q.    How many new hires from the City of

20    Hollywood attended the Police Academy in early

21    2014?

22          A.    In my class, there was four of us from

23    Hollywood.

24          Q.    And who were the four?

25          A.    Officer Pantaloukas, Officer Horta and

1   Officer Perez.

2        Q.    Prior to the academy, did you know

3   Officer Pantaloukas?

4        A.    No.

5        Q.    Did you know Officer Horta?

6        A.    No.

7        Q.    And what was the last officer's name?

8        A.    Perez.

9        Q.    Did you know Officer Perez prior to the

10  academy?

11       A.    No.

12       Q.    How long is the academy?

13       A.    I don't know, maybe, like, five months

14  or six months, something like that.

15       Q.    What do you learn at the police academy?

16       A.    Tons of stuff.  There's two books that

17  we go through.  Anywhere from legal things to

18  practical handcuffing, defense tactics.

19       Q.    Tell me what an average day would have

20  been like in the police academy back in 2014.

21       A.    A lot of classroom time with the

22  instructors.  A lot of PT, running.  Breaks in

23  between.

24       Q.    How much classroom time?

25       A.    It just varied on the day and the topic.

1          Q.    How many hours a week was the police

2    academy?

3          A.    I don't know.  It's, like, 8:00 to 5:00,

4    8:00 to 3:00, something like that.

5          Q.    So, on average, 40 hours a week?

6          A.    I guess so, yeah.

7          Q.    During the police academy, did you do

8    any ride-alongs?

9          A.    During the police academy, no.

10          Q.    Did you do any field training during the

11    police academy?

12          A.    No.

13          Q.    What type of PT would you do?

14          A.    Whatever the instructor said on that

15    day, running, calisthenics, weight-lifting.

16          Q.    Did you ever do any training at Memorial

17    Hospital?

18          A.    Not that I can recall.

19          Q.    Were you ever trained on how to deal

20    with Baker Acts during the police academy?

21          A.    With the mentally ill, yes.

22          Q.    What did you learn during the academy on

23    how to deal with the mentally ill?

24          A.    Did a lot of scenarios.  How to try to

25    deescalate the situation.  Basically, how to get

1    the individual to seek -- get him the help that he

2    needs.

3         Q.    What type of scenarios did you guys run

4    through during the academy?

5         A.    Several of them.  I can't even remember.

6    I just know we did several scenarios.

7         Q.    How are you trained on how to deescalate

8    someone who is suffering from a mental illness?

9         A.    They taught us that you have to build a

10   rapport with them, try to calm them down, kind of

11   remove the thing that's irritating them.  Try to

12   pinpoint what it is and try to remove it from the

13   equation, things like that.

14        Q.    How would you build a rapport?  How were

15   you -- strike that.

16              How were you learned during the police

17   academy on how to build a rapport with one who is

18   suffering from a mental illness?

19        A.    Try to connect with them as much as you

20   can, you know.

21        Q.    Is it fair to say that someone who is

22   decompensating as a result of a mental illness is

23   not thinking clearly?

24        A.    Sure.

25              MR. HAPNER:  Form.

1   BY MS. GEORGES:

2        Q.    Is it fair to say that someone who is

3   decompensating as a result of a mental illness may

4   not listen to commands?

5             MR. HAPNER:   Form.

6        A.    Sure.

7   BY MS. GEORGES:

8        Q.    Were you educated on why someone who is

9   decompensating as a result of a mental illness may

10  not listen or follow commands?

11       A.    I'm sorry.  Can you repeat the question?

12            MS. GEORGES:   Melissa, can you read it

13       back, please?

14            (The requested portion was read back as

15       follows:)

16            "Question:   Were you educated on why

17       someone who is decompensating as a result of

18       a mental illness may not listen or follow

19       commands?")

20            MR. HAPNER:   Form.

21       A.    Yeah.   I mean, it would just -- it could

22  be numerous reasons.  You know, we don't know

23  exactly what's going on inside their head, so --

24  BY MS. GEORGES:

25       Q.    So how would you facilitate someone who

1    is decompensating as a result of a mental illness

2    to get the help that they need?

3         A.   Well, we could only try to assist and do

4    our best.  Whatever, you know, he's throwing at us,

5    we're going to be responding to that.  It's not a

6    guarantee that our tactics are going to work.  We

7    can only attempt.

8         Q.   Okay.  And what are those tactics,

9    specifically?

10        A.   You know, try to -- like I said, try to

11   connect with the person.  Try to calm him down as

12   best as we can.  Sometimes it works, sometimes it

13   doesn't, you know.

14             At the end, the end result is to try to

15   get him to the medical facility.  A person who is

16   mentally ill might need some kind of medication or

17   something like that.  That's something that I can't

18   help him with.  But if I can take him to the

19   hospital, that's going to be the best bet.

20        Q.   Now, while you were in the police

21   academy, were you educated on what occurs at the

22   hospital in order to stabilize someone who is

23   decompensating as a result of a mental illness?

24        A.   Honestly, I don't remember.

25        Q.   How long have you been a police officer

1  for?

2          A.    Four years.

3          Q.    And in those four years, how many

4  citizens have you had to Baker Act?

5          A.    Numerous.

6          Q.    How many is "numerous"?

7          A.    I would have to check our systems.  I

8  don't know off the top of my head.

9          Q.    More than 20?

10         A.    Honestly, if I give you a number, I'd be

11  lying to you because I'd be guessing.

12         Q.    Okay.  In January of 2018, how many

13  people did you Baker Act?

14         A.    January of this year?

15         Q.    Yes.

16         A.    Again, I would have to check our

17  systems.  I don't know, exactly.  It's not

18  something that's out of the norm, especially here

19  in Hollywood.  We have those type of calls often,

20  so --

21         Q.    Okay.  How about last week?

22               Did you work, foremost?

23         A.    I worked last week.

24               Numerous calls.  I don't remember if we

25  did or not.

1    Q.   You can't recall if you had to Baker Act

2  anyone last week?

3    A.   I'd be lying to you.  Maybe we did,

4  maybe we didn't.  I don't know.

5    Q.   Have you ever stood guard at Memorial

6  Hospital for someone who has been committed for

7  purposes of Baker Act?

8    A.   I've assisted other officers in waiting

9  at the hospital, yes.

10   Q.   Okay.  Do you know what type of medical

11  treatment they receive at Memorial in order to

12  stabilize them?

13   A.   I do not.

14   Q.   Were you ever educated at the police

15  academy, or any subsequent training, on how one is

16  stabilized at Memorial Regional Hospital following

17  the commitment via Baker Act Statute?

18   A.   I don't remember if they hit that topic.

19   Q.   What happens to someone who has been

20  diagnosed with a significant mental illness and is

21  not taking their medication?

22       MR. HAPNER:  Form.

23   A.   What happens to them?

24  BY MS. GEORGES:

25   Q.   Yes.

1        A.    I don't know.

2        Q.    Have you ever come into contact with

3   someone who is off of their medication following a

4   diagnosis of a severe mental illness?

5        A.    Yeah.

6        Q.    How many times in your career?

7        A.    Sometimes we come across people that are

8   diagnosed and we don't know that.  Sometimes they

9   say they take medications, in reality, they don't.

10  I don't -- I can't tell you an exact number of who

11  was taking their mediation at what time.  That's

12  information that I don't have.

13       Q.    Okay.  Well, what kind of physical

14  manifestations or symptoms do they exhibit when

15  someone is off of their mediation?

16            MR. HAPNER:  Form.

17       A.    Somebody that's ill, that isn't taking

18  their mediation, could exhibit all kinds -- any

19  kind of -- like, there's not a specific type of

20  pattern that may or may not happen.  I don't know.

21  It just depends on the individual.

22  BY MS. GEORGES:

23       Q.    Okay.  Have you ever come across someone

24  who is suffering from a mental illness, is off of

25  their medication, and is exhibiting aggressive

1  behavior?

2          A.    Again, I don't know if this person is

3  supposed to take medication or not.  But, yes, I

4  have come across people that, you know, may or may

5  not have the history of some kind of medical

6  condition and they are aggressive.  But I'm not

7  sure if that is because of the medication or one

8  other -- it could be other factors.

9          Q.    Okay.  So let's give you a hypothetical

10  that you were dispatched out to a scene, and over

11  the dispatch they tell you that someone has been

12  diagnosed with schizophrenia.  And they were told

13  by a close family member that that person was off

14  of their medication and was exhibiting aggressive

15  behavior.

16          A.    Okay.

17          Q.    Would you accept that at face value?

18          A.    I would have to get on scene and

19  evaluate the situation.

20          Q.    And how would you evaluate that

21  situation?

22          A.    Once you get on scene, you see all the

23  circumstances surrounding the call, and then we

24  would go from there.

25          Q.    Okay.  Let's say that you get out to

1   that scene and that you meet said family member.

2   And let's say it's the sister of someone who is

3   decompensating as a result of a mental illness

4   because they are not taking their medication.  And

5   the sister tells you, "We live together.  He hasn't

6   taken his meds. for a week," would you have any

7   reason to dispute that information?

8        A.   No.

9        Q.   Would you handle the call any different

10  following you speaking to the sister and her

11  corroborating the information that went over the

12  dispatch?

13       A.   Handle it differently?  No.

14       Q.   And so how would you approach someone

15  with that same scenario?

16       A.   Same scenario?  Again, try to deescalate

17  the situation.  Probably take advantage that the

18  sister is there, see if there's any factors that

19  she can provide that might help me calm this

20  individual down and we'll take it from there.

21       Q.   So what is the policy and procedure of

22  the Hollywood Police Department in a police officer

23  dealing with that type of scenario?

24            MR. HAPNER:  Form.

25       A.   A mentally ill person --

1    BY MS. GEORGES:

2         Q.    Yes.

3         A.    -- that's being aggressive?

4               Well, safety first, right?  So we have

5    to make sure that our safety and the safety of the

6    public is okay, and that other individual is not

7    harming himself or somebody else, and do the best

8    that we can with the tools that we have provided

9    to, you know, get this person the help that he

10   needs.

11        Q.    In that same scenario, as a police

12   officer, would you go to that scene alone?

13        A.    Again, it varies on the circumstances of

14   the call.  But, yeah, it's not -- it's not often

15   that we respond to calls by ourselves.  We don't

16   drive together, so I might get there before

17   somebody else.

18        Q.    In that scenario, would you call fire

19   rescue?

20        A.    Me, personally, if I get there and I see

21   if somebody is injured or whatnot, yeah.

22              Most of the time, I think dispatch

23   already has the ball rolling on that.

24        Q.    Who is responsible for dispatching fire

25   rescue in that type of scenario, where someone is

1    decompensating as a result of a mental illness and
2    requires medical treatment?
3         A.    I don't know off the top of my head.  I
4    know that we are able to call for them on the radio
5    if need be.
6         Q.    Would you call for it in that same
7    scenario?  You go out there, you speak to the
8    sister.  She tells you her brother has been off of
9    his meds. for one week.  He's aggressive.  He's not
10   following commands.  Would you call fire rescue?
11        A.    Again, it dictates on the situation, but
12   it is possible you could call rescue for that, yes.
13        Q.    Do you know how rescue would treat
14   someone who is suffering from a mental illness and
15   off their medication?
16        A.    Once more, it depends on that person's
17   actions.  They're not going to intervene if the
18   scene is not safe for them.
19        Q.    Would you need to restrain someone prior
20   to fire rescue giving them treatment --
21        A.    It depends.
22        Q.    -- if they were aggressive?
23        A.    If they were aggressive and they are a
24   danger to themselves or somebody else, yes.
25        Q.    When did you graduate from the academy?

     1        A.    I don't know the month.  It was 2014,
     2   though.
     3        Q.    If you started in January, would it have
     4   been in May or June?
     5        A.    I don't recall.  I don't know exactly
     6   how long it was.  It was a while ago.
     7        Q.    Do you know what shift you were assigned
     8   following your graduation from the police academy?
     9        A.    After graduating, I don't remember what
    10   shift I started working first, no.
    11        Q.    Do you know if it was midnights or days
    12   or afternoons?
    13        A.    I don't remember.
    14        Q.    Do you know what zone you were assigned
    15   to following your graduation from the academy?
    16        A.    Right after the academy?  I don't
    17   remember.  They moved us a lot.
    18        Q.    Do you remember the first place you were
    19   assigned?
    20        A.    No.
    21        Q.    How about the names of the field
    22   training officers that were assigned to you
    23   following your graduation from the police academy?
    24        A.    I had numerous field training officers.
    25        Q.    What are their names?

1          A.    I had Officer Kerns.  I had Officer

2     Pitts (phonetic).  I had Officer Baierlein.  I had

3     Officer Flores, Officer Gibbons, Officer Cosme.  I

4     know there's a few more in there, but I don't -- I

5     can't remember.

6          Q.    How long did you have a field training

7     officer assigned to you?

8          A.    How long?  For whatever the probation,

9     the term is.  I don't remember what it was.

10         Q.    Was it a month?  Was it a year?

11         A.    No.  It was more -- I think it was more

12    than a month, but less than a year, for sure.

13         Q.    Do you know if it was three months?

14         A.    I can't give you an exact time frame.  I

15    don't know.

16         Q.    How about on the date of this incident,

17    October 27, 2014, did you have a field training

18    officer assigned to you?

19         A.    I did.

20         Q.    And who was your field training officer?

21         A.    Officer Kerns.

22         Q.    Do you know how long you had been

23    assigned to patrol prior to this incident?

24         A.    Again, if I gave you a date or a time,

25    I'd be guessing.  It was toward the end of my FTO

Page 24

1   period.

2          Q.    And you don't recall what your FTO

3   period was?

4          A.    I don't know the time frame.

5          Q.    Following your graduation from the

6   police academy, were you assigned to a squad with

7   Officer Pantaloukas?

8          A.    I don't know.  I don't believe so, but I

9   don't know for a fact.

10         Q.    Were you assigned to a squad with

11  Officer Horta following your graduation?

12         A.    I don't believe so.

13         Q.    How about Officer Perez, were you

14  assigned to a squad with him following your

15  graduation from the academy?

16         A.    Not that I can remember.  I know that

17  they put all the FTO guys together, but I don't

18  know if it was in the same squad.  I don't know

19  how -- I don't remember how they did things back

20  then.

21         Q.    During the police academy, did you

22  socialize personally, outside of the academy, with

23  Officer Pantaloukas?

24         A.    Yeah.

25         Q.    How often?

1        A.    Not too often.  We would all go out

2   socially.  But we were busy during that time with

3   the academy, so it didn't happen that much.

4        Q.    How about after the academy, did you

5   socialize personally with Officer Pantaloukas?

6        A.    Yes.

7        Q.    How often?

8        A.    Not too often.  Just here and there.

9        Q.    Are you still personal friends with

10  Officer Pantaloukas?

11       A.    I am.

12       Q.    Do you hang out with him outside of

13  work?

14       A.    Not as much as we used to, but yes.

15       Q.    How often, in a given month, do you

16  socialize with Officer Pantaloukas?

17       A.    Last few months, zero.

18       Q.    How about prior to the last few months?

19       A.    I went to his baby shower.  He went to

20  my daughter's birthday.  Things like that.

21       Q.    What did you do to prepare for today's

22  deposition?

23       A.    Reviewed notes, my reports.

24       Q.    What notes did you review?

25       A.    My reports, that's what I meant by --

1      Q.    Did you review your statement that you
2  provided to City of Hollywood Homicide?
3      A.    Yes.
4      Q.    Were you represented at that statement?
5      A.    I don't know.  Is that, like, our PBA
6  attorney?
7      Q.    Did you have a PBA rep.?
8      A.    I know Julio Gonzalez was there.
9      Q.    Who is Julio Gonzalez?
10     A.    He works for the PBA.  I don't know if
11 he was my rep.
12     Q.    Is he a lawyer?
13     A.    He's an attorney.
14     Q.    Do you know if Julio Gonzalez
15 represented all of the police officers during their
16 statement to the City of Hollywood Homicide?
17     A.    I don't know.
18     Q.    Other than providing a statement to
19 Detective Rillo back in January of 2014, did you
20 ever provide a statement to anyone else at the City
21 of Hollywood?
22     A.    Besides my -- the report that was sent
23 out, no.
24     Q.    Were you ever interviewed by the City of
25 Hollywood Internal Affairs department regarding the

1  death of Daniel Tyson?

2        A.   I know I spoke with IA, but I don't

3  remember, exactly, the questions that they asked,

4  things like that, I don't know.  I don't remember

5  the procedure for that.

6        Q.   Do you know who you spoke to at

7  Hollywood IA regarding the death of Daniel Tyson?

8        A.   I don't remember, exactly.

9        Q.   Do you know how many times you spoke to

10  IA regarding this death investigation?

11        A.   No.

12        Q.   Do you know whether IA was investigating

13  you, personally, regarding this death

14  investigation?

15        A.   I know there was an investigation.  I

16  don't know exactly what it was for, though, if it

17  was for the death or whatnot.

18        Q.   Do you know whether or not that

19  investigation has concluded, as you sit here today?

20        A.   I don't know.

21        Q.   Were you cleared by Internal Affairs?

22        A.   I believe so.  I'm not a hundred percent

23  sure.  You've got to forgive me, I'm not exactly

24  sure how that process works, so --

25        Q.   Okay.  During your four-year career as a

1    police officer, have you ever been investigated by

2    Internal Affairs?

3         A.   Yes.

4         Q.   Okay.  Walk me through the process of

5    how Internal Affairs investigates a police officer.

6         A.   I don't know.  You would have to check

7    their procedures and whatnot.  So I don't know

8    exactly the steps that they take.

9         Q.   Okay.  Based on your experience, how

10   does IA investigate you?

11        A.   Like I said, there was a lot going on.

12   The only time that I remember being investigated by

13   IA was for this incident.  And there was a lot

14   going on, so I don't -- like, I had a lot of people

15   visit me at the house for IA stuff or whatever, so

16   I don't know exactly what was what.

17        Q.   Did you receive either an e-mail or a

18   letter or any type of correspondence that put you

19   on notice that IA was investigating you regarding

20   this investigation?

21        A.   I believe so, yeah.

22        Q.   Do you know what that correspondence

23   looked like or what it told you?

24        A.   No.  It was a while ago.  I'm sorry.

25        Q.   Okay.  And at some point did you receive

1    any follow-up correspondence regarding the status

2    of the IA investigation?

3         A.   I don't think so, no.

4         Q.   Do you know, as you sit here today,

5    whether you are still under investigation for this

6    death by Internal Affairs?

7         A.   I don't believe so, but I can't give you

8    yes or no.

9         Q.   Are you curious to know whether or not

10   you're still under investigation by IA?

11        A.   Now that you bring it up, yes.

12        Q.   Following the death of Daniel Tyson on

13   October 27, 2014, were you relieved of duty?

14        A.   I know I was taken off the road for a

15   little bit, yeah.

16        Q.   How long were you taken off the road?

17        A.   I want to say a few months, but I don't

18   remember, exactly.  I was working the desk for a

19   little bit, so I don't know how long.

20        Q.   Where were you working the desk?

21        A.   At the station.

22        Q.   Which station?

23        A.   Hollywood police station.

24        Q.   Do you know if this was more than a

25   month?

1        A.    I believe so.

2        Q.    Do you know if it was more than two

3   months?

4        A.    I don't.  As far as -- I don't remember.

5        Q.    So two months would have taken you to

6   Christmas of 2014.  Do you know whether, during

7   Christmastime, you were still working the desk at

8   the station?

9        A.    I don't remember.

10        Q.    Do you know whether or not, in the

11   beginning of the new year, in 2015, you were still

12   working the desk?

13        A.    I don't remember.

14        Q.    Were you told why you were working the

15   desk?

16        A.    I think I was on light-duty because of

17   the injuries on my head.

18        Q.    And what were the injuries to your head?

19        A.    I had staples in my head.

20        Q.    How many staples?

21        A.    I don't recall the number.  Six or seven

22   staples.

23        Q.    How long did those take to heal?

24        A.    I don't know an exact time frame.  A

25   little bit.

1      Q.    Did that injury affect you cognitively?

2      A.    As far as, like?

3      Q.    Your mental capacity.

4      A.    Not that I can recall, no.

5      Q.    Did it affect your ability to walk?

6      A.    After the fact, no.

7      Q.    Did it affect your ability to talk?

8      A.    No.

9      Q.    Did it affect your ability to think

10  clearly?

11      A.    After the fact, no.

12      Q.    When you say, "after the fact," are you

13  talking the day after?  Are you talking two days

14  after?

15      A.    The day of the incident.

16      Q.    Were you in pain as a result of your

17  injuries?

18      A.    I was.

19      Q.    How long were you in pain for?

20      A.    I can't tell you an exact time frame,

21  but a few days.

22      Q.    Do you know if Officer Pantaloukas was

23  ever delegated or assigned to a desk following the

24  death of Daniel Tyson?

25      A.    I don't know.  You would have to ask him

1   for that.

2        Q.   Do you know if anyone, besides yourself,

3   was assigned to the desk at the station following

4   the death of Daniel Tyson?

5        A.   I don't have that information.

6        Q.   Did you ever speak to Officer

7   Pantaloukas following the death of Daniel Tyson?

8        A.   I did.

9        Q.   Did you know whether or not he was out

10  on the road versus working the desk?

11       A.   No, because we weren't working together

12  at that time.

13       Q.   On the date of the incident, what zone

14  were you working in?

15       A.   Seven.

16       Q.   And what is Zone 7?  Or where, I should

17  say, is Zone 7?

18       A.   Seven, it's the east side of the city.

19  I believe the boundaries are Pembroke to -- I want

20  to say Hollywood Boulevard and Federal Highway to

21  21st.

22       Q.   Was Officer Pantaloukas working Zone 7

23  on October 27, 2014?

24       A.   I don't know what zone he was working

25  that day.

1     Q.   Were you working in the same squad on

2  October 27th?

3     A.   Again --

4          MR. HAPNER:  Form.

5     A.   -- I don't know if we were on the same

6  FTO squad or not.  I don't know what squad he was.

7  BY MS. GEORGES:

8     Q.   After working the desk for a few months

9  following this incident, were you transferred into

10 a squad?

11    A.   When I went back on duty, yes.

12    Q.   And what squad was that?

13    A.   I don't remember.

14    Q.   Do you remember who you were working

15 with?

16    A.   No.  It was a while back.

17    Q.   Did you have an FTO during that time

18 period?

19    A.   When the incident happened I was still

20 on FTO, so I think I needed a few days to finish my

21 FTO period.  I believe, I'm not a hundred percent

22 sure, but I think I did have an FTO afterwards.

23    Q.   Do you know who your FTO was following

24 this incident?

25    A.   Following the incident, no.

1          Q.    Were you working with Officer
2     Pantaloukas?
3          A.    After the incident?  I don't remember.
4          Q.    As you sit here today, are you working
5     with Officer Pantaloukas?
6          A.    I am.
7          Q.    Where are you assigned now?
8          A.    I'm central west patrol.
9          Q.    Where is that located?
10         A.    That's on the west side of the city.
11         Q.    Which shift are you working now?
12         A.    Mornings.
13         Q.    And back on October 27th, what shift
14    were you working?
15         A.    Afternoons.
16         Q.    What hours did that consist of?
17         A.    Afternoons?  I haven't worked it for a
18    while.  I think it's -- I want to say 2:00 to 11:00
19    or something like that, 2:00 to 10:00.
20         Q.    Did you work four a week and then three
21    days off back then?
22         A.    Back then, yes.
23         Q.    Is that how it currently works?
24         A.    For me, no -- or mornings is different.
25         Q.    So five days a week?

1          A.    (Witness nods head.)

2          Q.    Is that a "yes"?

3          A.    That's a "yes."  Sorry.

4          Q.    And what are your days off currently?

5          A.    Currently, Friday, Saturday.

6          Q.    And back then, what were your days off?

7          A.    I don't remember.

8          Q.    What day of the week was this incident?

9          A.    I don't remember.

10         Q.    Were you ever interviewed by a member of

11   the Florida Department of Law Enforcement

12   pertaining to the death of Daniel Tyson?

13         A.    Honestly, I don't know.

14         Q.    Were you ever interviewed by a member of

15   the Broward State Attorney's Office as it pertains

16   to the death of Daniel Tyson?

17         A.    I don't remember.

18         Q.    Did you testify in the grand jury

19   proceedings this past fall?

20         A.    I did.

21         Q.    Were you subpoenaed to that grand jury?

22         A.    What's that?  Like, was I forced to go?

23   Is that what the question is?  Or --

24         Q.    For instance, for your deposition here

25   today --

1          A.    Right.

2          Q.    -- there was a subpoena that went to

3    you, correct?

4          A.    I know I was -- it was -- I voluntarily

5    went.

6          Q.    Okay.  Why did you voluntarily go and

7    testify in front of the grand jury?

8          A.    Help out as much as I can.

9          Q.    Help out with what?

10         A.    With the whole -- I guess, the jury and

11   whatever they needed, if they had any questions or

12   anything like that.

13         Q.    Do you know what the grand jury

14   responded with, or what verdict they rendered

15   following all of the testimony?

16         A.    Yeah.  They gave them a No True Bill.

17         Q.    And who was the No True Bill directed

18   towards?

19         A.    I guess myself and Officer Pantaloukas.

20         Q.    How about any of the other officers?

21         A.    I don't know.

22         Q.    So when you say that you were trying to

23   help out as much as you can, you were trying to

24   protect yourself as much as you could, correct?

25              MR. HAPNER:  Form.

1         A.    I was willing to answer whatever

2    questions they had for me.

3    BY MS. GEORGES:

4         Q.    And you understood that you were under

5    investigation for the death of Daniel Tyson?

6         A.    Yes.

7         Q.    What did you tell the grand jury?

8         A.    They asked me what happened, and I

9    basically gave them a story format of what occurred

10   that day.

11        Q.    When you say "they," who?

12        A.    The grand jury.

13        Q.    The grand jurors themselves?

14        A.    All of the people that were standing

15   right in front of me.

16        Q.    And how long did you testify in front of

17   the grand jury for?

18        A.    I don't know, exactly, the time frame.

19   I want to say maybe 20, 30 minutes.

20        Q.    And how did you prepare for the grand

21   jury?

22        A.    Just read my reports.

23        Q.    Did you speak to the state attorney

24   prior to your testimony?

25        A.    I don't believe so.

1    Q.   Did you speak to Shari Tate at any point

2 prior to testifying in front of the grand jury?

3    A.   No.  I think the first time I met her

4 was that day.

5    Q.   Did Ms. Tate ever come down to the

6 Hollywood Police Department prior to the grand jury

7 proceedings?

8    A.   I don't know.

9    Q.   Did you ever speak to Officer Kerns

10 prior to testifying in front of the grand jury?

11    A.   Yes.

12    Q.   Did you speak to Officer Kerns regarding

13 the death investigation of Daniel Tyson prior to

14 testifying in front of the grand jury?

15    A.   No.

16    Q.   Did you speak to Officer Pantaloukas

17 prior to your testimony at the grand jury?

18    A.   Yes.

19    Q.   What did you speak of?

20    A.   How nervous we were.  Just wanted to get

21 the whole incident behind us.

22    Q.   Prior to you coming and testifying

23 today, have you spoken to Officer Pantaloukas about

24 this deposition?

25    A.   Make him -- we're on the same squad, so

1  just make him aware that I was going to the depo.

2      Q.    Do you know if Officer Pantaloukas has

3  been deposed in this case?

4      A.    I don't know.

5      Q.    Other than your lawyer, Mr. Hapner, and

6  also Officer Pantaloukas, have you spoken to any

7  other police officer prior to coming to testify

8  today about this investigation?

9      A.    No.

10      Q.    Have you reviewed the autopsy report?

11      A.    No.

12      Q.    Do you know what Mr. Tyson's cause of

13  death was?

14      A.    No.

15      Q.    Were you at all curious about his cause

16  of death?

17      A.    Yes.

18      Q.    Have you reviewed his toxicology report?

19      A.    No.

20      Q.    Why not?

21      A.    It was never presented to me.

22            Honestly, I don't know how to get a hold

23  of that.

24      Q.    Did you suspect that Mr. Tyson was on

25  some form of narcotics on October 27, 2014?

1        A.    I didn't know what any of that was that
2   day.  I mean, I was curious about the toxicology,
3   to see what came back.  But as far as I knew, I
4   didn't know if he was on something or if he was
5   not.
6        Q.    My question is, did you suspect that
7   Mr. Tyson was on something on October 27, 2014?
8        A.    I didn't know if he was or not.  I
9   didn't know what to expect, you know, new officer.
10  I'm just dealing with the situation in front of me.
11             The thoughts of it, yeah, probably it
12  could possibly have been somebody on narcotics or
13  whatnot.
14        Q.    Now, other than your experience as a
15  police officer, in your personal life, have you
16  ever dealt with someone who is decompensating as a
17  result of a mental illness?
18        A.    No.
19        Q.    Any friends who suffer from a mental
20  illness, that you know?
21        A.    Not that I know.
22        Q.    Any family members suffering from a
23  mental illness, that you know?
24        A.    No.
25        Q.    What's a signal 20?

1          A.    It means a -- it's a call sign for a

2     mentally ill person.

3          Q.    Are there other call signs for mentally

4     ill people?

5          A.    Not that I'm aware of, no.

6          Q.    How about a Baker Act?

7          A.    There's not a specific signal for that.

8          Q.    It just comes out as Baker Act?

9          A.    Baker Act is -- we'll determine if it

10    meets the criteria after the fact for a signal 20

11    or not.  There's not a specific signal for, you're

12    going to a Baker Act.

13         Q.    Okay.  So when you receive a signal 20

14    call, what does that signify to you?

15         A.    It could be numerous things.  It could

16    be somebody not acting right.  It could possibly be

17    a mentally ill person.  Could be somebody on

18    narcotics or something like that.

19         Q.    Anything else?

20         A.    No.

21         Q.    Now, as you are dressed today, what do

22    you have on your equipment belt?

23         A.    Today?

24         Q.    Yes.

25         A.    I have -- on my belt I have my gun, my

Page 42

1   handcuffs, my Taser and a flashlight.

2        Q.   Do you have an ASP?

3        A.   I don't carry one.

4        Q.   Did you carry one back on October 27th?

5        A.   I don't remember if I did or not.

6        Q.   Do you know how you were dressed on

7   October 27th?

8             MR. HAPNER:  Of 2014.

9   BY MS. GEORGES:

10       Q.   Of 2014.  I'm sorry.  Anytime I refer to

11  October 27th, it's going to be --

12       A.   Okay.

13       Q.   -- regarding 2014.  Okay?

14       A.   Got you.

15            Not like I am today.  This is new.  But

16  with just whatever was required of me that day, the

17  mandatory things.

18       Q.   How new is this uniform?

19       A.   I don't know, maybe six months.

20       Q.   Are all of the patrol officers wearing

21  the same uniform?

22       A.   Not the same exact vest, no.

23       Q.   What is that vest?

24       A.   It's an outer carrier.

25            THE COURT REPORTER:  I'm sorry?

1      A.    Outer carrier.  Some people have the

2   older model.  This is just a new one.

3   BY MS. GEORGES:

4      Q.    Okay.  You're not assigned to, like, a

5   Crime Suppression Team or --

6      A.    No.

7      Q.    -- any type of a specialized unit?

8      A.    No.

9      Q.    Have you ever applied to any type of a

10  specialized unit?

11     A.    S.W.A.T.  And I am on the S.W.A.T. team.

12     Q.    When did you undergo S.W.A.T. training?

13     A.    S.W.A.T. training, I went to S.W.A.T

14  school last year.

15     Q.    What months?

16     A.    January.

17     Q.    And where, exactly?

18     A.    Fort Lauderdale.

19     Q.    What other agencies participated in

20  S.W.A.T. school?

21     A.    Numerous.  Pines, North Miami, I believe

22  was there.  Hollywood was there.  I forget who

23  else.

24     Q.    So how does it work?  If you're a member

25  of S.W.A.T., do you just work on an on-call basis?

1          A.    For Hollywood, yes, we're on call.

2          Q.    So you could be called out 24 hours a

3    day and on the weekends, as well?

4          A.    Yes.

5          Q.    And what type of calls does S.W.A.T.

6    respond to?

7          A.    S.W.A.T. typically handles calls that

8    have gotten out of hand that patrol can't handle;

9    barricaded subjects, kidnappings, things like that.

10         Q.    Okay.  How about those that are

11   suffering from a mental illness and are attempting

12   suicide by cop, does S.W.A.T. respond to those?

13         A.    Depends on the circumstances of the

14   call.  If they're barricaded inside with a weapon

15   and they don't want to come out and a sergeant

16   determines that it's necessary for us to come out,

17   then they call us out.

18         Q.    Back in October 27, 2014, did you have a

19   team that you were working with?

20         A.    A team?  No.

21         Q.    Did you have a squad you were working

22   with?

23         A.    Yes.

24         Q.    Who was on your squad?

25         A.    I don't remember.

1        Q.    Do you know how many people were on your

2   squad?

3        A.    Uh-uh.  No.

4        Q.    You were working afternoons.  So

5   typically how many people within that zone would

6   have been working on that day?

7        A.    For that specific zone?

8        Q.    Yes.

9        A.    If I was working 7 Zone, who else was

10  working 7 Zone with me?

11       Q.    Yes.  And how many?

12       A.    I don't remember that day, but it varies

13  on staffing.  Typically, we don't work two per

14  zone, but if staff permits, then they'll pick what

15  zone they want people to double-up with.

16       Q.    How many zones are there in the city of

17  Hollywood?

18       A.    I want to say 20.

19       Q.    Do you know how many people total would

20  have been working in the city of Hollywood during

21  the afternoon shift on October 27, 2014, on the

22  patrol level?

23       A.    No, I can't tell you.  It varies.

24       Q.    Is it a minimum of one person per zone

25  during a shift?

1      A.   I don't know exactly how they do it, but

2  there's minimum staffing, and then they work it --

3  command staff works it however they fit.

4      Q.   Do you know anyone else working in

5  Zone 7 during the afternoon shift on

6  October 27, 2014?

7      A.   I don't recall, no.

8      Q.   Do you recall which zone Officer

9  Pantaloukas was working on October 27, 2014?

10     A.   I do not.

11     Q.   Do you know what shift Officer Wagner

12  was working on October 27, 2014?

13     A.   No clue.

14     Q.   How about Officer Truntz, do you know

15  what zone he was working?

16     A.   I do not.

17     Q.   And since Officer Kerns was assigned as

18  your FTO on October 27th, was he also working in

19  Zone 7?

20     A.   I know he was my FTO.  He was shadowing

21  me.  I don't know what zone he was, if he was just

22  designated to me or working a zone.  I don't know.

23     Q.   Okay.  What does it mean to shadow you?

24     A.   So after -- during our FTO period

25  there's a shadow phase, which is basically we're on

1  our own.  We're not driving with our FTO.  I'm

2  driving in a car by myself, handling calls as they

3  come.  My FTO basically just keeps an eye on me,

4  making sure that, you know, I'm doing everything

5  okay, but from a distance, and basically shadowing

6  me as I go.

7        Q.   Was there ever a point, once you became

8  a police officer on patrol, that your FTO was

9  actually riding two-man with you?

10       A.   During FTO, yes.

11       Q.   At what period?

12       A.   Early stages.

13       Q.   Okay.  During this time period, being on

14 October 27, 2014, were you riding two-man with

15 Officer Kerns?

16       A.   No.

17       Q.   How about any time during that month,

18 were you riding two-man with Officer Kerns?

19       A.   I don't remember.

20       Q.   Do you know how many months or how many

21 weeks you rode two-man with Officer Kerns or any

22 other FTO?

23       A.   Like I said, it was during the early

24 stages of FTO, and I don't remember what that time

25 frame was, how long FTO was.

1    Q.   Okay.  So if you were in the academy in

2  January, and you said that approximately took five

3  months, did you hit the road in June?  Did you hit

4  the road in July of 2014?

5    A.   Possibly.  I don't know exactly the

6  month or day that I hit the road.

7    Q.   Now, once you were assigned to the

8  road -- and, hold on.  Strike that.

9        Immediately upon graduation from the

10 academy, do you immediately hit the road or do you

11 go somewhere else?

12   A.   No.  You go to the station for in-house.

13   Q.   Okay.  Tell me about in-house training.

14   A.   In-house, a lot of PT again, get

15 familiar with the city, learning codes.  Just the

16 basic stuff.

17   Q.   How long is in-house training?

18   A.   I don't know.  I can't give you an exact

19 time frame.

20   Q.   Is it a month?

21   A.   I don't know.

22   Q.   Is it a week?

23   A.   I don't know.

24   Q.   You can't give me any type of an

25 approximation?

 1        A.    I would be guessing.  Is that -- would

 2   it be okay for me to guess?

 3        Q.    No, I don't want you to guess.

 4        A.    Okay.  Then, no.

 5        Q.    So you can't tell me if it was a week or

 6   a month?

 7        A.    It was a while ago.  I'm sorry.  I don't

 8   keep up with that.

 9        Q.    Okay.  Were you equipped with your Taser

10   prior to hitting patrol?

11        A.    Prior to hitting patrol?  Yeah, they

12   assigned us our tools.  So before going on the road

13   they gave us our things.

14        Q.    Did you have to undergo training --

15        A.    Yes.

16        Q.    -- prior to being issued a Taser?

17        A.    Uh-huh.  Yes.

18        Q.    And what type of training did you

19   receive in order to be equipped with a Taser?

20        A.    It's a classroom format, so there's a

21   PowerPoint that we went through; went through all

22   the details and whatnot.  Got to discharge the

23   Taser.  And we also got administered the Taser.

24        Q.    Okay.  Did that all happen in one day?

25        A.    I don't believe so.  Actually, I don't

1   know for a fact.  Maybe.  I don't know.

2        Q.   Do you recall who else took this Taser

3   training class with you?

4        A.   The other officers that I mentioned,

5   they were in the academy with me.

6        Q.   So Pantaloukas, Horta and Perez were in

7   the same class as you?

8        A.   Yes.

9        Q.   And who was the instructor?

10       A.   At that time, in-house was done by

11  Officer --

12       Q.   Does Julio Alvarez --

13       A.   Julio Alvarez and Beckford (phonetic).

14       Q.   Okay.  Who is Beckford?

15       A.   He's a sergeant now, but he was in the

16  training department.

17       Q.   Okay.  And who is Julio Alvarez?

18       A.   He used to be in the training, as well,

19  training officer.

20       Q.   Is he still in the training office?

21       A.   No.

22       Q.   Do you remember what this PowerPoint

23  was?

24       A.   I don't remember, no.

25       Q.   Do you remember if you received any

Page 51

1  materials at this Taser training class?

2      A.   Possibly.  They gave us a lot of

3  handouts, so --

4      Q.   Do -- have you ever referred to those

5  handouts since your training back in 2014?

6      A.   Since the training?  No.

7      Q.   Do you know whether or not they are

8  uploaded anywhere digitally in the event that you

9  had any question about your Taser and how to refer

10 back to it?

11     A.   Possibly, yes.

12     Q.   Was there a practical portion of this

13 Taser training class?

14     A.   There was.

15     Q.   And what was the practical portion?

16     A.   Discharging the cartridge and also

17 getting tased.

18     Q.   Do you recall what model was being used

19 back in 2014?

20     A.   What do you mean by "model"?  Model of

21 the Taser?

22     Q.   The model of the Taser.

23     A.   Not this one.  Not the -- the X2 or X --

24 I don't know.  It was a little bit ago.

25     Q.   Do you recall if it was the X26?

1        A.    Possibly.  Sounds about right.

2        Q.    Were you tased back during this training

3   class?

4        A.    I was.

5        Q.    How were you tased?

6        A.    They put the prongs -- they put a prong

7   on my foot and a prong on my hip and charged it.

8        Q.    Do they tape the prongs to you or are

9   they actually deployed and inserted into your body?

10       A.    They weren't deployed.  They were

11  placed.  I don't remember if it was taped or not,

12  but placed.

13       Q.    And how long were you tased for?

14       A.    I went the full cycle.

15       Q.    And the full cycle being five seconds?

16       A.    I believe so, yeah.

17       Q.    How did it feel?

18       A.    Not pleasant.

19       Q.    When you say, "not pleasant," were you

20  incapacitated?

21       A.    Yes.

22       Q.    Were you standing up while you received

23  the five-second cycle?

24       A.    I was.

25       Q.    Did you fall to the ground?

1      A.    I did.

2      Q.    Did you have a mat or some type of

3  protective padding under you?

4      A.    I don't remember.  I did have somebody

5  on my side, though.

6      Q.    Have you ever had a Taser actually

7  deployed inside of your body, meaning the probes

8  actually were inserted into your body and then you

9  received a five-second cycle?

10     A.    Like, shot at me?

11     Q.    Yes.

12     A.    No.

13     Q.    Do you know if it feels any different

14  than what you experienced?

15     A.    I don't know.

16     Q.    Have you ever been drive-stunned?

17     A.    No.

18     Q.    Your four years as a police officer,

19  excluding this incident, how many times have you

20  used your Taser on a citizen?

21     A.    Never.

22     Q.    Never?

23     A.    No.  That was the only time.

24     Q.    So in 2017, you never deployed your

25  Taser?

1        A.    Not that I can recall, no.

2        Q.    In 2016, you never deployed your Taser?

3        A.    Not that I can recall, no.

4        Q.    Back in 2014, what were you wearing on

5  your equipment belt?

6        A.    Whatever the minimum standard was for me

7  to go on the road.  I don't remember exactly what

8  that was.

9        Q.    Did you carry Mace?

10        A.    Possibly.  I don't remember, honestly.

11        Q.    Did you carry a baton?

12        A.    Possibly.

13        Q.    Is there a specific reason why you don't

14  carry a baton today?

15        A.    It's not my preference.

16        Q.    Is it mandated by the City of Hollywood

17  to actually have a baton on your equipment belt?

18        A.    It is not.

19        Q.    What is mandated to wear, back in 2014,

20  on a patrol officer's equipment belt by the City of

21  Hollywood?

22        A.    I would have to review the policy back

23  in that time.  I don't know what that would be.

24        Q.    What does the mandate say today about

25  what a police officer has to wear on his equipment

1  belt for the City of Hollywood?

2       A.   At least one less lethal, I believe.

3  I've got to review it, but one less lethal and

4  then, obviously, your gun.  And I believe that's

5  it.

6       Q.   Well, what does -- "one less lethal"?

7       A.   You know, our baton, our Taser, our

8  Mace, that's all considered less lethal.  So you

9  have to carry something like that on your person.

10       Q.   As you sit here today, your nonlethal

11  weapon is your Taser?

12       A.   Correct.

13       Q.   When you were tased during this training

14  class back in the summer of 2014, are you of the

15  opinion that it was effective on you?

16       A.   Yes.

17       Q.   And can you define what effectiveness

18  means as it pertains to the use of a Taser?

19       A.   Effective, it stopped me in my tracks.

20  I mean, there's no fighting it.  There's just --

21  basically, you can't move.

22       Q.   So you were incapacitated?

23       A.   I was.

24       Q.   Have you ever been out on a scene where

25  a police officer has tased a citizen -- not being

1   you, but another police officer -- and it has not

2   been effective?

3        A.   Not that I can recall, no.

4        Q.   Have you ever had any discussions with

5   any police officers where they have told you that

6   they tased someone and it was not effective?

7        A.   Not that I can recall, no.

8        Q.   Were you present when Officer

9   Pantaloukas was tased during his training class?

10       A.   I was.

11       Q.   Was it effective on him?

12       A.   Yes.

13       Q.   How about Officer Horta, when he was

14  tased during this training class, was it effective

15  on him?

16       A.   I can't tell you what they experienced,

17  but it did look like it was taking effect.  It

18  looked very similar to what I looked, so, yeah.

19       Q.   Okay.  How about Officer Perez, was the

20  Taser effective on him during this training class?

21       A.   I believe so, yes.

22       Q.   Other than yourself, Officer

23  Pantaloukas, Officer Horta and Officer Perez, was

24  anyone else tased during this training class in

25  2014?

1      A.   I don't remember.  I know that there was

2  two other officers in there that were taking the

3  class with us, but I don't remember if they got

4  tased that day or not.

5      Q.   Since 2014, have you received a

6  refresher class --

7      A.   Yes --

8      Q.   -- for Taser training?

9      A.   -- we do.

10      Q.   Do you know when?

11      A.   I don't know exactly when it was, but I

12  know we always have in-house training

13  department-wide for the refresher.

14      Q.   Do you know how often you need to

15  receive a refresher class in order to maintain your

16  use of the Taser?

17      A.   I don't know off the top of my head, no.

18      Q.   Now, other than the two training

19  officers employed by the City of Hollywood, has

20  anyone from Taser International, or now Axon, come

21  to the City of Hollywood and trained you directly

22  on the use of their Tasers?

23      A.   Me directly, no.

24      Q.   Do you know of anyone else?

25      A.   I don't know.

1      Q.    Now, prior to becoming a patrol officer

2  actually out on the street, did you have to undergo

3  a firearms training?

4      A.    Yes.

5      Q.    What other trainings or certifications

6  were necessary prior to you hitting the streets as

7  a patrol officer?

8      A.    I don't know off the top of my head.

9      Q.    Did you have to complete a computer

10 course in order to access CJIS?

11     A.    Is that, like, "David" and stuff?

12     Q.    No.  C-J-I-S, which is your computer

13 system, so you could access and you could run

14 people and also --

15     A.    Yeah.

16     Q.    -- case numbers?

17     A.    Yeah.  We took classes on that.

18     Q.    Now, I've seen in your employment file

19 that you've been certified by FEMA on two different

20 instances, back in 2000 and again in 2014.  Do you

21 recall that training or the certificate?

22     A.    I don't remember.  I had a lot of

23 certificates, so --

24     Q.    Did you ever do a FEMA emergency

25 training class?

Page 59

1      A.     Probably.

2             MS. GEORGES:  Let me have this marked as

3      an exhibit.  I'll show it to you first.  I'm

4      sorry.  I kind of walked out without the

5      copies last night.

6             MR. HAPNER:  This is from his personnel

7      file?

8             MS. GEORGES:  Yes.  This we have Bates

9      stamped as Tyson 3458, and I'm going to have

10     it marked as Plaintiff's Exhibit 1 to your

11     deposition.

12            (A document was marked as Plaintiff's

13     Exhibit No. 1 for Identification.)

14 BY MS. GEORGES:

15     Q.     Officer, do you recognize that document?

16     A.     Yes.

17     Q.     What do you recognize this document to

18 be?

19     A.     I mean, I guess the completion for the

20 State of Florida, this Basic Recruit Certificate,

21 Law Enforcement.

22            THE COURT REPORTER:  I'm sorry, the what

23     certificate?

24     A.     Basic Recruit Certificate.

25 BY MS. GEORGES:

1      Q.    And what does that mean?  What type of

2   training is this?

3      A.    I believe it's for the FDLE standards, I

4   think.  I'm not a hundred percent sure.

5      Q.    And what is the date of that

6   certificate?

7      A.    August 26, 2014.

8      Q.    Does this refresh your recollection as

9   to when you completed your training prior to

10  becoming a patrol officer with the City of

11  Hollywood?

12     A.    I guess, per this date, August.

13     Q.    Is it fair to say that you would have

14  likely hit the streets after August 26, 2014?

15     A.    Yes.

16          MS. GEORGES:  I'm going to have this

17       marked as Exhibit 2, which is also in your

18       employment file.  I'll hand it to your

19       attorney first.

20          (A document was marked as Plaintiff's

21       Exhibit No. 2 for Identification.)

22  BY MS. GEORGES:

23     Q.    Officer Ramirez, do you recognize

24  Plaintiff's Exhibit 2?

25     A.    Yes.

1          Q.    What do you recognize it to be?

2          A.    The certificate they gave us for the

3     Taser.

4          Q.    And how is it dated?

5          A.    7/17/2014.

6          Q.    So is it fair to say that you received

7     your Taser training on or about July 17, 2014?

8          A.    This certificate, yes.

9          Q.    Do you know whether or not you received

10    that certificate on the same date of your training?

11         A.    I don't know.

12         Q.    Now, as it pertains to Plaintiff's

13    Exhibit 1, does this certify that you completed 720

14    hours?

15         A.    This?  Yes.

16         Q.    Is it fair to say that that 720 hours

17    was completed between January of 2014 and August of

18    2014?

19         A.    Yes.

20              MS. GEORGES:  I think this is a good

21         time to take a break.

22              THE VIDEOGRAPHER:  The time is

23         10:52 a.m.  We're now going off the record.

24              (A recess was had from 10:52 a.m. to

25         10:59 a.m.)

1          THE VIDEOGRAPHER:  The time is

2      10:59 a.m.  We're now back on the record.

3   BY MS. GEORGES:

4          Q.   Officer, how long were you on probation

5   for?

6          A.   Probation is a year.

7          Q.   So during your probationary period, are

8   you evaluated?

9          A.   Yes.

10         Q.   Who are you evaluated by?

11         A.   At the end there's a chief meeting, so

12   we meet with the chief and command staff.

13         Q.   When you say "the end," are you talking

14   about the end of your probationary period?

15         A.   Correct.

16         Q.   Are you evaluated on a monthly basis

17   during your probationary period?

18         A.   I don't remember.  I know the sergeants

19   do their thing, but I don't know if that's

20   quarterly or whatnot.  But there are, some sort of

21   a written evaluation.

22         Q.   Who was your sergeant back on

23   October 27, 2014?

24         A.   That was the training sergeant.  I don't

25   remember who that was.

1    Q.   Do you know if the training sergeant was

2    also assigned to the other people who you had

3    graduated from the academy with?

4        A.   Should have been, yes.

5        Q.   Do you know why you would have been

6    assigned to a training sergeant versus a sergeant

7    within a particular squad or zone?

8        A.   The FTO program falls under that

9    sergeant, so he is the one dealing with all that,

10   so that's who they would place us with.

11       Q.   Do you know how many sergeants were

12   there in the training bureau back in October of

13   2014?

14       A.   I don't know.

15       Q.   Did you receive monthly evaluations

16   during your probationary period?

17       A.   The probationary year or the FTO

18   portion?

19       Q.   Well, I think one encompasses the other.

20   But during your one-year probationary period, did

21   you receive evaluations?

22       A.   I don't remember.  Like I said, the

23   sergeants do their notes and the quarterly.  I

24   think it's quarterly or something like that.  But I

25   don't recall specifically just for that.

1      Q.    Do you know who Sergeant Gerber is?

2      A.    Yes.

3      Q.    Who is he?

4      A.    A sergeant in the department.

5      Q.    A sergeant of what department?

6      A.    In the department.  Currently he's

7  working the beach.  I don't --

8      Q.    Do you know where he was assigned back

9  in late 2014?

10     A.    Back -- no, I don't.

11     Q.    Do you know whether he ever evaluated

12 you during your probationary period?

13     A.    He was my sergeant at one time when they

14 put me on midnights for a little bit.  And he was

15 my sergeant during that midnight -- but I don't

16 remember when throughout the year that was.

17     Q.    Who is Sergeant Joe Siple?

18     A.    Siple?

19     Q.    S-I-P-L-E.

20     A.    Siple, he used to be my sergeant.

21     Q.    Do you know when he was your sergeant?

22     A.    I don't know the time frame, but I had

23 him throughout my probationary year.

24     Q.    Do you know whether you were evaluated

25 in the month of September 2014 by any sergeant?

1      A.    I don't know.

2      Q.    Do you know whether you were evaluated

3   in the month of October of 2014 by any sergeant?

4      A.    I don't remember, honestly.

5      Q.    Would you receive your evaluations in a

6   mailbox or via e-mail?

7      A.    If we do, when the sergeants do their

8   evaluations, or the forms that they do, we have to

9   sign them.  So, yeah, they have to give us a copy

10  for us to sign.

11     Q.    In response to discovery in this case I

12  did receive your employment file and it includes

13  some of your evaluations.

14     A.    Okay.

15     Q.    And I'm just going to pick out a random

16  month here.  And this is going to be from

17  February 1, 2015, to February 28th.  And I'm going

18  to have this marked as Plaintiff's Exhibit 3.

19          (A document was marked as Plaintiff's

20      Exhibit No. 3 for Identification.)

21          MS. GEORGES:  I will show it to your

22      counsel, as well.

23  BY MS. GEORGES:

24     Q.    Officer, just take an opportunity to

25  review that document and let me know if you

1  recognize it.

2           MR. HAPNER:  Do you want to move these

3      off to the side so they don't get messed up?

4           MS. GEORGES:  Yeah.  That's fine.

5      A.   You want me to read through it?  I mean,

6  I recognize it, yeah.

7  BY MS. GEORGES:

8      Q.   Do you recognize it?

9      A.   Yeah.

10      Q.   So do you know if you received these

11  monthly evaluations during the entire length of

12  your probationary period?

13      A.   I don't know if they do these monthly.

14  I really -- I don't know.  But whenever they did do

15  them, I would sign them, yeah.

16      Q.   Did you save them anywhere?

17      A.   I don't think I have copies of them, no.

18      Q.   Do you know if they were e-mailed to

19  you?

20      A.   No, not that I can remember.

21      Q.   If you ever wanted to request a copy of

22  your performance evaluations, what would you have

23  to do to receive those documents?

24      A.   I don't know what the process is, but I

25  would speak with my sergeant.

Page 67

1      Q.   Do you know if you received an

2  evaluation report in October of 2014 following this

3  incident?

4      A.   I don't know.  I could have.

5      Q.   And you don't recall if you received an

6  evaluation report at the conclusion of December of

7  2014?

8      A.   I don't recall.

9      Q.   Have you ever been disciplined by the

10  City of Hollywood?

11      A.   Disciplined?  I don't think so, no.

12      Q.   Have you ever been suspended by the City

13  of Hollywood?

14      A.   No.

15      Q.   Other than being assigned to desk duty

16  following this incident for a couple of months,

17  were you ever delegated to the desk on any other

18  instance?

19      A.   Not that I can remember, no.

20      Q.   Do you have any intentions on becoming

21  an FTO?

22      A.   No.

23      Q.   Do you know if there's any type of

24  specialized training or specialized school in order

25  to become an FTO?

1          A.    I don't know.

2          Q.    Is an FTO a sergeant?

3          A.    No.

4          Q.    Do you have any aspirations to take the

5     sergeant's exam?

6          A.    Yeah, later on in my career.

7          Q.    Do you have any aspirations in order to

8     join the Detective Bureau?

9          A.    Yes.

10         Q.    Are there any specialized units that you

11    aspire to join or apply to?

12         A.    Not at the moment.

13         Q.    Back at Broward College, did you ever

14    obtain, like, a bachelor of arts or a bachelor of

15    science?

16         A.    No, I don't have a bachelor's degree.

17         Q.    Did you obtain an associate's?

18         A.    No, just certificates.

19         Q.    During your four years as a police

20    officer, have you ever had to use your training and

21    experience as an EMT on any citizens?

22         A.    Yes.

23         Q.    Have you ever administered CPR while

24    you've been out on a scene?

25         A.    Yes.

1       Q.    Have you ever performed chest

2   compressions while you were out on a scene as a

3   police officer?

4       A.    Yes.

5       Q.    What other forms of aid have you given

6   while you've been a police officer?

7       A.    Just pretty much those two.

8       Q.    Just the chest compressions and CPR?

9       A.    Correct.

10      Q.    Have you ever responded to a homicide

11  scene?

12      A.    Yes.

13      Q.    Have you ever responded to a scene where

14  someone has been violently assaulted?

15      A.    Yes.

16      Q.    It's fair to say that, as a patrol

17  officer, you're generally the first on scene?

18      A.    Yes.

19      Q.    And then following assessing a scene,

20  you're able to either call for backup or call for a

21  specialized unit to also respond to a scene?

22      A.    Correct.

23      Q.    I want to take you to October 27, 2014.

24  Were you working that day?

25      A.    Yes.  That's the date of the incident,

Page 70

1    yes.

2           Q.    What shift were you working on that day?

3           A.    Afternoon.

4           Q.    And afternoon, you said, starts after

5    2:00 p.m.?

6           A.    I believe so.  2:00 p.m., or right

7    around there.

8           Q.    Or thereabouts?

9           A.    Yes.

10          Q.    Do you know if you worked the night

11   before or the day before?

12          A.    I don't remember, no.

13                MR. HAPNER:  Try to speak up just a

14          little bit, make sure we're getting it.

15                THE WITNESS:  Okay.

16   BY MS. GEORGES:

17          Q.    I think I asked you this before, but did

18   you know what day of the week October 27th was?

19          A.    I don't remember.

20          Q.    Do you know if the days leading up to

21   October 27th were particularly stressful?

22          A.    I don't remember.

23          Q.    Do you know whether you had worked any

24   overtime hours leading up to October 27th?

25          A.    I don't remember.

1      Q.   How long had you been on shift when you

2   received this specific signal 20?

3      A.   Not long.  I don't know the exact time

4   frame, but I know it was either the first or second

5   call of the shift, as far as I remember.

6      Q.   Okay.  So when you arrive on shift, do

7   you go to the station?

8      A.   We do.

9      Q.   And this is headquarters?

10     A.   Yes.

11     Q.   Just down here on Hollywood Boulevard?

12     A.   Correct.

13     Q.   Do you go to roll call?

14     A.   Yes.

15     Q.   Do you know how many people were in roll

16  call on October 27th?

17     A.   I don't know the number, no.

18     Q.   Was Officer Pantaloukas in roll call on

19  October 27th?

20     A.   I believe so.  He was working with us.

21  I don't remember, though.

22     Q.   Who performs roll call?

23     A.   The shift lieutenant.

24     Q.   Do you know who the shift lieutenant was

25  on October 27th?

Page 72

1        A.    I do not.

2        Q.    Do you know if Officer Kerns was in roll

3   call?

4        A.    Again, I'm assuming, because he was my

5   shadow, but I don't -- I don't remember who was

6   actually there, no.

7        Q.    How about Officer Karl, was he in roll

8   call on October 27th?

9        A.    I don't know.

10        Q.    Do you know if Officer Karl was working

11   the same shift as you?

12        A.    I don't remember.

13        Q.    How about Officer Truntz, was he in roll

14   call?

15        A.    I don't remember.

16        Q.    Do you know if Officer Truntz was

17   working the same shift as you?

18        A.    I don't know.

19        Q.    How about Officer Falcon, was he in roll

20   call with you on October 27th?

21        A.    I don't remember.

22        Q.    Do you know if Officer Falcon was

23   working the same shift as you?

24        A.    I don't know.

25        Q.    How about Officer Wagner, was he in roll

1  call with you?

2      A.   The same, I don't know.

3      Q.   Now, of all the names that I just called

4  out, were any working in the same zone as you on

5  October 27, 2014?

6      A.   Not that I can remember.

7      Q.   Were you riding just one man on

8  October 27th?

9      A.   Correct.

10     Q.   Do you remember what your first call of

11 the day was?

12     A.   I don't remember if that was my first or

13 second call of the day.

14     Q.   Do you recall what your first call

15 pertained to?

16     A.   I don't.

17     Q.   I see that you're wearing a radio today.

18     A.   Yes.

19     Q.   Is that the same radio you were wearing

20 on October 27, 2014?

21     A.   I believe so.

22     Q.   Is this a two-piece radio?

23     A.   It is.

24     Q.   So do you speak in the piece that is

25 closest to your left shoulder?

1       A.    I do.

2       Q.    And then the other piece is on your

3  waistband?

4       A.    The other piece is up here (indicating).

5       Q.    I'm sorry.  In the middle of your

6  abdomen, on the left-hand side?

7       A.    Yes.

8       Q.    And did you wear it in the same position

9  back on October 27th?

10      A.    No.

11      Q.    Where was it placed back in October?

12      A.    Back then, I believe it was on my belt.

13 I'm not a hundred percent sure, but I think it was

14 on my belt.

15      Q.    Is your radio off today?

16      A.    It's off, yes.

17      Q.    Does it have a -- either a switch or

18 some type of device that controls the volume?

19      A.    It does.

20      Q.    And on October 27, 2014, were you in

21 your car when you received the signal 20 regarding

22 Daniel Tyson?

23      A.    I don't know where I was.  Inside my car

24 or outside my car, I don't remember.

25      Q.    Okay.  So tell me how you received the

1  dispatch.

2      A.   I don't remember exactly where I was at

3  that time.  But, typically, if I were to receive a

4  call right now, I receive it over the radio.

5      Q.   Is there a radio device actually within

6  your patrol unit?

7      A.   No.

8      Q.   Do you remember what you were riding on

9  October 27, 2014?

10     A.   As far as?

11     Q.   As far as your patrol car, make, model

12  unit number.

13     A.   I don't remember the make -- I mean, I

14  know it was a Crown Vic.  I don't know the patrol

15  number or anything like that.

16     Q.   Is this a marked patrol car?

17     A.   It is.

18     Q.   Prior to October 27, 2014, was that

19  patrol car assigned to you?

20     A.   That vehicle, yeah, that's the one the

21  station gave me.

22     Q.   Is that a take-home vehicle?

23     A.   I don't remember.  I don't believe so.

24     Q.   What do you recall about the dispatch?

25     A.   The call that was placed?

1        Q.    About Daniel Tyson, what do you recall?

2        A.    The manner that it was dispatched?  It

3   was just any regular call.  They raised me over the

4   radio.  I replied.  They sent me in reference to a

5   possible signal 20, white male, naked, talking to

6   trees, in 7 Zone.

7        Q.    Do you recall anything else coming out

8   over that call?

9        A.    Not off the top of my head, no.

10       Q.    So you just heard, "Possible signal 20,

11  white man, naked, talking to trees"?

12       A.    That's what I can recall, yes.

13       Q.    And do you remember who the dispatcher

14  was?

15       A.    No.

16       Q.    Now, were you specifically assigned to

17  respond to this call or did you enter it into the

18  system?  How do you specifically get assigned?

19       A.    I don't remember exactly the way it went

20  out that day, but, generally, she would either

21  dispatch -- if it was in my zone, she would

22  dispatch me with the partner.  I don't know if I

23  was dispatched first or second, but I know I was

24  dispatched the call.

25       Q.    Okay.  And you were in Zone 7 on that

1   day?

2        A.    Correct.

3        Q.    And do you know where Officer Kerns

4   was --

5        A.    No.

6        Q.    -- when you got the call?

7        A.    (Witness shakes head.)

8        Q.    Now, this dispatch over the radio, is

9   every officer in the City of Hollywood able to hear

10  those same facts or same scenario?

11       A.    Yes.  The only reason why I hesitate on

12  saying that is because our city is split east and

13  west.  Not all on the same channel.  There was a

14  transition.  I'm not sure if it was during that

15  time or not, so --

16       Q.    What channel were you on?

17       A.    Again, it was -- I don't know if that

18  transition had already gone through.  There was a

19  point that it was citywide, one radio, and then we

20  switched over to two channels.  So I don't know,

21  during that time, if the transition had already

22  happened or not.

23       Q.    Okay.  What channel is west?

24       A.    West, Area 2.  Now, when it splits, Area

25  2, Channel 2.

1      Q.    Okay.  And east?

2      A.    One.

3      Q.    And this was east?

4      A.    That's the east side of the city.

5      Q.    This was east?

6      A.    Yeah.

7      Q.    So either back then it was

8  department-wide or it would have been --

9      A.    Split.

10     Q.    -- relayed on Channel 1?

11     A.    It would have been split, how it is now.

12     Q.    Now, other than this information being

13  relayed verbally via radio, is it also entered into

14  a system?

15     A.    Yes.

16     Q.    Did you have a laptop back on

17  October 27, 2014?

18     A.    I did.

19     Q.    Did all of the police officers who were

20  riding patrol for the City of Hollywood equipped

21  with a laptop back on October 27, 2014?

22     A.    I can't speak for them.  I don't know if

23  they did or not.

24     Q.    Okay.  Now, who enters the information

25  that gets inputted into the system?

1        A.    No idea.  I don't know who enters that.

2        Q.    Now, other than receiving this call

3    verbally over the radio, did you also see it in

4    your laptop?

5        A.    Excuse me.  Yeah.

6        Q.    So it would have given you those same

7    facts?

8        A.    The notes that the dispatcher has.

9        Q.    Which is, "White man, naked, talking to

10   trees"?

11       A.    Yeah.  Whatever information dispatch

12   gives us over the radio, generally, what she's

13   reading out, we have in our computer.

14       Q.    And can everyone access that same

15   information if it's inputted into the system?

16       A.    I believe so.  I don't know exactly how

17   they would manage to do that if they weren't sent

18   the call, but I think there must have been a way to

19   access that information, yeah.

20       Q.    Okay.  So how do you respond that you're

21   accepting the call?

22       A.    Acknowledge through the radio.

23       Q.    How do you acknowledge?

24       A.    10-4, 51, en route.

25       Q.    What does 51 mean?

1     A.    En route.

2     Q.    Would you call out a specific unit

3  number for them to know that you're going out

4  versus someone else?

5     A.    Possibly, yeah.  It just -- it's just a

6  manner of speaking.  I mean, you get to know your

7  dispatchers, the dispatchers get to know you.  The

8  way I use my radio now is not the same way I would

9  use it back then.  Maybe I was -- Bravo 7, I'm 51

10  from whatever.  It just depends.

11     Q.    How would you use your radio back then

12  versus how you use it now?

13     A.    I don't know what difference I did.  You

14  just feel more comfortable on the radio and you cut

15  verbiage here and there.

16     Q.    Okay.  And is it fair to say that

17  dispatchers have come to know your voice?

18     A.    I believe so.

19     Q.    Now, after you were dispatched that

20  there was a white man, naked, talking to trees, and

21  you responded that you were en route, how long did

22  it take you to get to the location?

23     A.    I don't know.  I don't recall.

24     Q.    Do you know where the location was?

25     A.    Do I know where it was?  Yeah, I know

1   where it was.  Yes.

2        Q.   And what's the location?

3        A.   I don't know the exact numerical, but

4   it's the 1800 block of Jackson Street.

5        Q.   Now, prior to October 27, 2014, had you

6   ever been dispatched to that location before?

7        A.   I don't remember.

8        Q.   Prior to October 27, 2014, did you know

9   Daniel Tyson?

10       A.   No.

11       Q.   Did you ever have any encounters with

12  Daniel Tyson prior to October 27, 2014?

13       A.   Not to my recollection, no.

14       Q.   Now, after you received this call about

15  the possible signal 20, what were you thinking?

16       A.   You know, generally, as officers, you

17  try to get a game plan in your head.  So you're

18  going through different scenarios and whatnot of

19  ways that you need to assess the situation once you

20  get there.  So you're just playing that in your

21  head, where are you going to park, how are you

22  going to approach, all of these things.

23       Q.   Okay.  And what was your game plan

24  following the receipt of this dispatch on

25  October 27, 2014?

1        A.    I can tell you how I would do it now.    I

2    can't tell you my mindset back then.    I was new and

3    whatnot, so I don't know exactly what was going

4    through my head at that time.    But, obviously, they

5    always drill officer safety, officer safety,

6    community safety, community safety, so I know that

7    was in my head for sure.

8        Q.    How would you handle the call

9    differently today, based on your four years of

10   experience as a patrol officer?

11       A.    I don't think I would have handled it

12   any differently.

13       Q.    Do you have any regrets about what

14   happened on October 27, 2014?

15       A.    Regrets?    No.    I mean, it's unfortunate.

16   But as far as regrets, I mean, I don't know what I

17   could have done any differently.

18       Q.    Prior to arriving on scene, did you

19   request backup?

20       A.    Prior to arriving on scene, I don't

21   recall.    I don't think so.

22       Q.    Did you call Officer Pantaloukas?

23       A.    Prior to arriving on scene?

24       Q.    Yes.

25       A.    I don't believe so.

1          Q.    Did you call Officer Pantaloukas on his

2    cell phone?

3          A.    Yes.

4          Q.    When did you call Officer Pantaloukas on

5    his cell phone?

6          A.    While on scene.

7          Q.    At what point when you were on scene?

8          A.    I had already exited my vehicle.  I was

9    inside the courtyard and had seen the individual up

10   on the balcony.

11         Q.    Okay.  What was he doing on the balcony?

12         A.    He was naked and he was aggressive and

13   just talking, mumbling to himself.

14         Q.    What was he aggressive about?

15         A.    Just his demeanor.  He was -- you could

16   tell in his face that he was irritated.  He had

17   something in his hands.  He was shaking.  He was

18   just screaming.

19         Q.    How long had you been on scene prior to

20   calling Officer Pantaloukas?

21         A.    I don't -- I don't recall.  It couldn't

22   have been too long.

23         Q.    Was it more than five minutes?

24         A.    I don't remember.  Again, I would have

25   to guess if I gave you a time frame.

1        Q.    Do you know if it was more than ten

2    minutes?

3        A.    I don't know.

4        Q.    Where did you park when you arrived on

5    scene?

6        A.    I parked on Jackson Street.  It's going

7    to be just west of the residence.

8        Q.    What kind of a day was it, as far as

9    weather was concerned, when you arrived on scene?

10       A.    I don't remember, exactly.  But it was a

11   regular day, I think.

12       Q.    Okay.  What's "regular"?

13       A.    Just -- it wasn't raining or anything

14   like that, as far as I remember.

15       Q.    Just remember, our version of regular is

16   a lot different than other areas of the country.

17       A.    I got you.  Yeah.  It wasn't raining,

18   not stormy or anything like that.

19       Q.    I'm going to ask you this off of the

20   record, as far as your cell phone number, and then

21   also your carrier for that day.  Okay?

22            Why did you call Officer Pantaloukas on

23   his cell phone versus using the radio?

24       A.    I don't know.  It was just a decision

25   that I made that day.  There was no -- I guess I

Page 85

1  didn't want to tie up the radio.  I don't know what

2  my train of thought was.  But I figured it would be

3  more direct to call him on his cell.

4       Q.   Do you know how long you spoke for?

5       A.   I don't know.  I don't remember.

6       Q.   Do you know where Officer Pantaloukas

7  was?

8       A.   I don't know.

9       Q.   Did you call anyone prior to calling

10  Pantaloukas?

11       A.   I don't believe so.  I don't remember,

12  though.

13       Q.   Did you call Officer Kerns prior to

14  Pantaloukas?

15       A.   I don't think so.  I don't remember.

16       Q.   Why did you call Pantaloukas versus

17  someone else?

18       A.   He was my backup officer.

19       Q.   If Officer Pantaloukas had been tied up

20  on another call and unable to respond, who would

21  you have called?

22       A.   Whoever was responding with me.  The

23  only reason I called Officer Pantaloukas was

24  because he was my backup.

25       Q.   How was he assigned as your backup?

1          A.    I'm sorry.  What do you mean?

2          Q.    You're saying Officer Pantaloukas was

3    your backup officer on that day.  Was that assigned

4    by someone?

5          A.    Yes.

6          Q.    Who?

7          A.    We were both assigned the call.

8          Q.    Who assigned Pantaloukas?

9          A.    The dispatcher.  She dispatched me and

10   must have dispatched him, as well.

11         Q.    Okay.  How is it that you learned he was

12   your backup officer?

13         A.    Again, I don't know how I knew back

14   then, but today, you can listen to the radio, so

15   today I'm Bravo 12.  "32 Bravo 12, 32 Bravo 13,

16   respond to this call," I know that 13 is my

17   partner, so I know 13 is going with me.

18         Q.    Okay.  Was 13 a number to signify

19   Officer Pantaloukas?

20         A.    I don't know what zone he was working.

21   So whatever zone he was -- I was 7 Zone, so I was

22   Bravo 7 that day.  Whatever zone he was, he was

23   Charlie something -- I'm sorry, that's afternoons.

24   So Bravo is mornings.  Charlie 7, Charlie whatever,

25   you know.

1      Q.   Now, prior to October 27, 2014, how

2   often had you worked with Officer Pantaloukas?

3      A.   I don't remember.  We were on FTO, but I

4   can't tell you the time frame how long we worked

5   together.

6      Q.   Do you know how many scenes you had

7   worked with Officer Pantaloukas?

8      A.   Not off the top of my head, I can't.

9      Q.   Prior to October 27, 2014?

10     A.   No.

11     Q.   Do you know if the radio was

12  particularly busy on October 27, 2014?

13     A.   Gees, I don't remember.  That was a

14  while ago.

15     Q.   Okay.  So after you got on scene, you

16  park, you go into the courtyard, you see Mr. Tyson

17  on his balcony, correct?

18     A.   Correct.

19     Q.   You call Officer Pantaloukas?

20     A.   Uh-huh.

21     Q.   What do you tell him?

22     A.   I tell them that this guy is a little

23  out of control and asking him where he's at, how

24  far away it's going to take him -- how long it's

25  going to take him for him to get to the scene.

Page 88

1      Q.   Now, prior to you calling him, had

2   Officer Pantaloukas gone on the radio and

3   acknowledged the fact that he was the backup and

4   that he was en route?

5      A.   I would guess so.  I don't remember.

6      Q.   What I want to know is, did the dispatch

7   trigger him to be the backup or did your phone call

8   via cell phone trigger Officer Pantaloukas to be

9   the backup?

10      A.   I knew he was my backup before I called

11   him.  They'll send two units or however -- units

12   they see necessary.  And I knew -- I can't tell you

13   how I knew, maybe I heard it on the radio, but I

14   knew that Pantaloukas was my backup.

15      Q.   When you made that phone call, do you

16   know where Officer Kerns was?

17      A.   No.

18      Q.   After your phone call with Officer

19   Pantaloukas, how long did it take for him to get on

20   scene?

21      A.   I don't know the time frame.

22      Q.   Do you know if this was before you were

23   injured or after you were injured?

24      A.   It was after.

25      Q.   At what point was Officer Kerns either

Page 89

1  dispatched or requested to come to the scene?

2      A.   I don't know the answer to either of

3  those.  I don't know if they ever dispatched him

4  the call or not.  I don't remember.

5      Q.   Now, when you were in the courtyard and

6  you got on scene, you -- it's fair to say that

7  you're a new police officer on the streets,

8  correct?

9      A.   Correct.

10      Q.   Why didn't you call Officer Kerns after

11  you called Officer Pantaloukas?

12      A.   Why did I?

13      Q.   Why didn't you?

14      A.   I don't know.  I was just calling my

15  backup.  Officer Kerns wasn't my backup.

16      Q.   Is it fair to say that you felt nervous?

17      A.   I don't know what I was feeling at that

18  time.  I know I was concerned.  That's why I called

19  Officer Pantaloukas to see where he was at.

20      Q.   Prior to October 27, 2014, had you ever

21  responded to a call with a similar instance where

22  someone was naked, talking to trees, and was making

23  unintelligible comments?

24      A.   I don't remember the calls prior to

25  that.  I honestly wouldn't be able to tell you.

1      Q.    Okay.  So prior to October 27, 2014, had

2  you ever responded to any calls where someone was

3  decompensating as a result of a mental illness?

4      A.    Again, I would have to guess.  My guess

5  would be, yes, because it's not uncommon in the

6  city of Hollywood for us to have these calls.  I

7  just -- I was on shadow, so I don't know the time

8  frame if, prior to that, we did or not, but I would

9  assume so.

10      Q.    Do you have an independent recollection

11  of all of the events that took place involving

12  Daniel Tyson on October 27, 2014?

13      A.    Yes.

14      Q.    Why do you have an independent

15  recollection?

16      A.    What do you mean by "independent"?  I'm

17  sorry.  Like, are you asking me if I remember what

18  happened?

19      Q.    Yes.

20      A.    Yes, I remember what happened.

21      Q.    Is there a reason why this matter stands

22  out in your mind versus other encounters that

23  you've had with people who are decompensating as a

24  result of a mental illness?

25      A.    Yes.  Because this whole -- the trial

1  and everything else, you know, it's just something

2  that I can't forget it.  You know, it's an ongoing

3  investigation and whatnot.  It's just always there.

4      Q.   Are you involved in any other matters

5  where there is litigation that is ensuing?

6      A.   I don't believe so, no.

7      Q.   Have you ever been sued?

8      A.   Not to my knowledge.

9      Q.   Has anyone ever filed a complaint

10 against you as a police officer?

11     A.   I'm sure there's a couple of complaints.

12 I'm not sure how many, though.  I don't know.

13     Q.   Were you aware, prior to arriving on

14 scene, that Mr. Tyson had been diagnosed with

15 depression?

16     A.   I don't -- I don't know.  I don't know

17 what information was given to us.

18     Q.   Were you aware, prior to arriving on

19 scene, that Mr. Tyson was off of his psychotropic

20 medication?

21     A.   I didn't know, no.

22     Q.   All right.  So you get on scene.  Was

23 anyone outside?

24     A.   Initially, when I get there, no, there's

25 nobody outside.

1      Q.    What do you do?

2      A.    I start walking the property, try to

3   find this individual that we're being called for.

4   Walked through the courtyard.  There's a gate.  And

5   I'm approached by, I guess, a neighbor, a female

6   neighbor, lady, that was there.  And I don't

7   remember exactly the words, it was a while back,

8   but she said something along the lines of, oh, are

9   you looking for this individual, whatever, somebody

10  naked or whatever?  And I said, yeah.  And when I'm

11  speaking with her, I see the subject come out on

12  the balcony.

13     Q.    Okay.  So this female, what did she look

14  like?

15     A.    I don't remember, honestly.

16     Q.    Do you know her name?

17     A.    No.

18     Q.    Do you know whether or not she was white

19  or black?

20     A.    I don't remember.  It's a blur.  No.

21     Q.    Other than her telling you, are you

22  looking for the naked man, did she tell you

23  anything else?

24     A.    No.

25     Q.    Did you ask her anything else?

1    A.   I possibly did.  I tried to get

2  information from her, but I don't recall what I

3  asked.

4    Q.   Now, if you had received any information

5  from her, would you have documented that somewhere?

6    A.   Maybe mental notes or something like

7  that.  I mean, there's no time for me to write

8  anything down.  Everything just happened so quick.

9    Q.   How about subsequent to this incident,

10  have you had an opportunity to document all of the

11  events that occurred?

12    A.   I sent my report out, yes.

13    Q.   Okay.  And anywhere in your report, did

14  you document what this female told you upon

15  arrival?

16    A.   I documented exactly what I remembered

17  as best as I could, and that's what's on there.

18    Q.   Do you know what questions you asked

19  this female --

20    A.   I don't.

21    Q.   -- upon arrival?

22    A.   I don't.

23    Q.   Did you ask this female whether

24  Mr. Tyson was off of his medication?

25    A.   I don't remember what I asked her.

1      Q.   Did you ask this female whether

2   Mr. Tyson was suffering from a mental illness?

3      A.   Again, I don't remember what I asked.

4      Q.   Did you ask this female whether

5   Mr. Tyson was on narcotics?

6      A.   I don't remember what I asked her.

7      Q.   Did you ask this female for Mr. Tyson's

8   family members?

9      A.   Again, no, I don't remember.

10      Q.   How long did you speak to this female

11   for?

12      A.   It wasn't too long.  Again, I can't give

13   you a time frame, but a short period.

14      Q.   Okay.  So after the short period, what

15   do you do?

16      A.   What do I do?  While I'm speaking with

17   her and subject comes out -- again, I explained how

18   he seemed irate.

19           At one point, I asked the female to go

20   back inside, for her safety.  I didn't know what

21   his intentions were.  And then I proceeded to

22   handle the incident as dictated.

23      Q.   Okay.  When you say "subject," what does

24   "subject" mean?

25      A.   Mr. Tyson.

1      Q.    Okay.  Is there a specific reason why

2   you use "subject" versus citizen?

3      A.    The person.

4      Q.    Is that just how you're trained in the

5   academy, to refer to citizens as subjects?

6      A.    It's a person.  I mean, we just -- we

7   switch on and off, back and forth.  There's no

8   negative connotation to that.  It's just the

9   individual.

10     Q.    Okay.  When you get there on scene,

11  like, do you know if there's probable cause to

12  arrest Mr. Tyson for anything?

13     A.    I don't have any probable cause, no.

14     Q.    Okay.  So how do you deal with the

15  incident?

16     A.    I try applying the techniques that they

17  taught us and try to deescalate, because, honestly,

18  you can -- immediately, you can tell that he was

19  irate.  So I'm trying to calm him down for his

20  safety and my safety, anybody else's safety.

21          So I introduced myself, Officer Ramirez.

22  You know, I don't remember exactly what I told him,

23  but something along the lines, hey, how are you,

24  what's going on, you know, you're naked.  You can't

25  be out here naked and whatnot.  And then went from

Page 96

1    there.

2        Q.    Okay.   Where were you when you spoke to

3    Mr. Tyson?

4        A.    I was downstairs in the courtyard.

5        Q.    How far away were you from Mr. Tyson?

6        A.    Maybe 25 feet.   Maybe.   I don't know

7    exactly the distance.

8        Q.    And so when you say that he was on a

9    balcony, how high was the balcony?

10       A.    He was on the second floor.   I think,

11   I'm not a hundred percent sure, but I think it's

12   just a two-story building.

13       Q.    Okay.   So are you standing and you're

14   looking up at him?

15       A.    Yeah.

16       Q.    And then what's behind you?

17       A.    Behind me is Jackson Street.

18       Q.    Okay.   I'm going to show you some

19   photographs, and I'm hoping that you can find some

20   photographs that are going to assist with your

21   testimony today.

22            And I left the three copies of these 800

23   photos in my office, so my apologies.   So I'm down

24   to one copy.   But we're going to make this work.

25            MR. HAPNER:   I hope you're not expecting

 1          him to go through all 800 right now.

 2                  MS. GEORGES:  No, I have a few tabs.

 3                  And I am going to mark this as a

 4          composite No. 4.

 5                  (Documents were marked as Plaintiff's

 6          Exhibit No. 4 for Identification.)

 7                  MS. GEORGES:  And they're Bates stamped.

 8          And I'm going to give you a copy tomorrow of

 9          all of these.

10   BY MS. GEORGES:

11          Q.   These are all photographs that were

12   taken by crime scene investigator Unger, U-N-G-E-R.

13                  So I have some tabs towards the back of

14   this stack.  And you can have an opportunity to

15   review them with your lawyer.

16                  I will tell you that I have never been

17   to the scene, and we received 800 photographs in

18   this case, and we have not received a crime scene

19   report.

20                  And let me know whether there is a

21   photograph in that scene that depicts where you

22   were standing versus where Mr. Tyson was on the

23   balcony when you had this initial encounter.

24          A.   I think the best one that I can show you

25   is -- you want me to give you the number down here?

1          Q.    Yes.  The Bates No., please.

2          A.    04492.

3          Q.    Are there any other photographs?

4          A.    That's going to be the best one.

5          Q.    Okay.  Can you remove 4492 from that

6     stack?  You can just remove it from the clip, and

7     if you could just turn it around.

8                I don't know how I'm going to maneuver

9     this, but I'm going to try.

10         A.    Do you want me to hold it?

11         Q.    Can you please hold it so Matthew can at

12    least zoom in on it?

13         A.    (Witness complies.)

14         Q.    Okay.  So using this photograph, I see

15    that there is a fence and some crime scene tape.

16    Do you see that in this photograph?

17         A.    I do.

18         Q.    What's right behind that fence?

19         A.    Behind that fence, that's the alley.

20    That's going to be the south alley of Jackson.

21         Q.    Okay.  So when you approach and entered

22    into this courtyard, is it fair to say that you're

23    entering from the front of this photograph where

24    there are some pots?

25         A.    Correct.  It's from over here

1   (indicating).

2          Q.    Okay.  Now, using that photograph, can

3   you point to the jury where Mr. Tyson was standing

4   on a balcony?

5          A.    Right up here.  That ledge area

6   (indicating).

7          Q.    What is the material surrounding that

8   balcony?

9          A.    I don't know.

10         Q.    And where were you standing when you

11  initially spoke to Mr. Tyson?

12         A.    I don't remember, exactly, but I was in

13  this general area right here (indicating).

14         Q.    Now, I see that there is some blue tape

15  and some other material on the grass area.  Do you

16  see that in the photograph?

17         A.    This right here (indicating)?

18         Q.    Yes.

19         A.    Yeah.

20         Q.    What does that pertain to?

21         A.    That looks like things that rescue would

22  use, fire rescue.

23         Q.    Okay.  So when you're speaking to

24  Mr. Tyson up on that balcony, you have your back to

25  Jackson Street?

1        A.    Correct.

2        Q.    And so would Mr. Tyson have been in

3   front of you and to your right?

4        A.    Correct.

5        Q.    And was there anyone else out in the

6   courtyard when you had that initial approach?

7        A.    That lady I was speaking with.

8        Q.    Do you know where she was standing?

9        A.    I don't remember.  I know she came out

10  of one of the units, but I don't remember exactly

11  which one.

12       Q.    And do you know what was directly behind

13  you other than the street?

14       A.    No.

15       Q.    Is that a fenced-in area?

16       A.    Yes, there's a fence.

17       Q.    And is this a free-standing building

18  that Mr. Tyson was standing on the balcony of?

19       A.    Uh-huh.

20       Q.    Is that a "yes"?

21       A.    Yes.

22       Q.    Is there a unit up top and also a unit

23  downstairs?

24       A.    I don't know the layout.  I don't know

25  if it's two separate units or one.

1      Q.    Is there a stairway that leads to that

2   balcony?

3      A.    Yeah.  This stairway right there

4   (indicating).

5      Q.    Okay.  Is it a dual stairway or is it

6   just one single entrance?

7      A.    What do you mean by "dual"?  There's

8   stairs here and stairs right there (indicating).

9      Q.    How about in this back, is there a

10  stairwell there (indicating)?

11     A.    I don't know.

12     Q.    Okay.  You can put the photograph down.

13           So you're standing about 25 feet away.

14  And can you just tell the jury the exact

15  conversation that you had with Mr. Tyson?

16     A.    I introduced myself as Officer Ramirez.

17  I tried to ask him questions.  You know, obviously,

18  he's naked, so I'm kind of informing him he's

19  naked, he can't be out here naked.  Just trying to

20  build that rapport that I spoke to you about

21  earlier, and he's not having it.

22     Q.    Okay.  What kind of tone were you using

23  when you introduced yourself and you told him that

24  he can't be naked?

25     A.    As much as a friendly tone that I can

1    give.  You know, our goal, again, was to try to

2    deescalate the situation.  I'm not going to be

3    screaming at him, trying to get him even more irate

4    and whatnot.  So just a calm -- as calm as I could

5    be.

6          Q.   Okay.  Well, how did it make you feel,

7    just, as a police officer, that there is a naked

8    man outside?

9          A.   Obviously, concerned.

10         Q.   Okay.  And when you say that Mr. Tyson

11   wasn't having it, what do you mean by that?

12         A.   I mean that when I would speak with him,

13   I felt as if me trying to communicate with him just

14   angered him even more.  So he was not -- it wasn't

15   a back-and-forth communication.  It was me

16   basically trying to talk with him and him just

17   screaming and mumbling.

18         Q.   Okay.  When you say "screaming," what

19   was Mr. Tyson screaming?

20         A.   Just, he's making noises.  He's saying

21   words that I couldn't understand.  The only word I

22   remember hearing him saying a few times was a

23   kingdom.  He kept talking about his kingdom.  But

24   besides that, I don't -- there's no -- I don't

25   recall him having any other words or anything else

1  like that towards me.

2       Q.   During this initial encounter, was there

3  anything that Mr. Tyson said that made sense to

4  you?

5       A.   Like I said, the only thing that I

6  could -- word that I could make sense of was

7  "kingdom."  And I can't tell you what it was

8  attached to.  I can't tell you what the sentence

9  referred to or, like -- there was no meaning -- at

10  least to me there was no meaning behind what he was

11  saying.

12       Q.   Is it fair to say that Mr. Tyson was

13  incoherent?

14       A.   Yes.

15       Q.   Is it fair to say that Mr. Tyson was not

16  thinking clearly?

17       A.   I don't know his state of mind.  I

18  didn't know what he was -- his current state of

19  mind was.

20       Q.   Did you have an opinion as to his state

21  of mind following this initial encounter?

22       A.   I had my own personal opinions, yeah.

23  He was incoherent.  I don't know what his state of

24  mind was, but that -- I don't think that's neither

25  here nor there.

1      Q.    Well, what was your opinion of him,

2   though?  You're trying to assess the situation.

3   You're trying to deescalate this situation.  So

4   you, as a police officer, what is your opinion as

5   to his state of mind?

6      A.    My opinion is that we need to try to

7   control him as best as possible for his safety and

8   the safety of anybody else, because he's definitely

9   irate.  Things could have escalated very quickly.

10     Q.    So what did you do to control the

11  situation?

12     A.    Initially, I was by myself, so I was

13  using verbal, just verbal, trying to talk to him.

14  But like I said, he wasn't having it.  That's the

15  best that I could do at that time was, obviously,

16  ask the lady that was there to go back inside and

17  try to contain the situation as best as I can, try

18  to keep him up there as long as I could, waiting

19  for my backup to get there.

20     Q.    Okay.  Now, did you call Officer

21  Pantaloukas following this initial conversation

22  with Mr. Tyson?

23     A.    I don't remember exactly when the time

24  period was, but, yeah, I had a -- obviously, I saw

25  Mr. Tyson, so I kind of did a quick assessment,

1  realized that I needed somebody there, so I asked

2  him how far away he was.

3        Q.    Okay.  And then following the

4  conversation with Officer Pantaloukas, did you

5  reengage Mr. Tyson?

6        A.    Yeah.

7        Q.    Why didn't you wait until Officer

8  Pantaloukas arrived on scene?

9        A.    Because I could see that his level of

10  intense was rising.  So instead of me sitting there

11  not doing anything, try to do anything about it,

12  try to, you know, keep working at it, see if I

13  could get some kind of results from it.

14        Q.    Did you go back to your patrol car at

15  all?

16        A.    No, I don't believe so.

17        Q.    Did you call for Officer Kerns?

18        A.    I don't think so, no.

19        Q.    So what happens after you reengage?

20        A.    So he sees me -- he hears me talking to

21  him, and he's mumbling, screaming.  And he goes

22  back inside for a quick second.  That alerted me a

23  little more.  I wasn't sure what he was going back

24  for.  He wasn't there long, a few seconds.  He

25  comes back outside, and this time that's when he

1  had that can I told you about.  He had -- to this

2  day, I don't know what was inside.  It looked like

3  marbles to me.  He dumps the stuff down, down the

4  stairs, over the balcony.

5         Q.   What can?  I'm sorry, you didn't --

6         A.   I didn't mention it?  I'm sorry.

7         Q.   No.

8         A.   It's a tin can, you know, like what they

9  put cookies in and whatnot.  That's what it was.

10  But there weren't cookies inside, there was other

11  things.  I don't -- it looked like marbles to me.

12  And he was just dumping them over, over the

13  balcony.

14         Q.   Okay.  Within the photo stack that I

15  handed you as Plaintiff's Exhibit 4, are there any

16  photographs that depict that tin or the marbles

17  that were dumped by Mr. Tyson?

18         A.   Through the last four -- those slides, I

19  don't think so.  Would you like me to look through

20  it again?

21         Q.   Please.

22         A.   Can I remove this?

23         Q.   Luckily they're all numbered, so we can

24  kind of put them back together later on.

25         A.   Okay.  Perfect.

1              No.  No can.

2        Q.    Okay.  So when Mr. Tyson is dumping this

3   can with the marbles in it, were there any other

4   neighbors or any people out in the courtyard?

5        A.    I don't think so.  I already had asked

6   that lady to go back inside.

7        Q.    Did she go back inside?

8        A.    She did.

9        Q.    Do you know where she went back inside?

10       A.    I don't know.

11       Q.    Do you know if she had a view of the

12   courtyard from inside?

13       A.    I don't know.

14       Q.    Did that woman ever reappear?

15       A.    I don't have any recollections of me

16   seeing her again.  But like I said, it was so

17   quick.  I don't know what happened.  I don't

18   remember seeing her.

19       Q.    Okay.  So you were waiting on Officer

20   Pantaloukas.  You reengage.  He goes inside.  He

21   gets the can.  He dumps out the marbles.  He's

22   yelling and screaming again.  Can you actually make

23   sense of anything that's coming out of his mouth?

24       A.    No.

25       Q.    Was it just incoherent talk?

1      A.    Yes.

2      Q.    Okay.  So after you witness this

3  behavior, what do you do?

4      A.    I'm still trying to talk to him.

5      Q.    What are you saying to him?

6      A.    Same things.  I mean, just whatever I

7  can to try to connect with him.  I think I called

8  him buddy at one time.  "Hey, Buddy, what's going

9  on?  Why are you out here?  Man, you know you're

10  naked.  You can't be out here naked."  Things like

11  that.  Just trying to connect with him as best I

12  could.

13      Q.    And did your conversation appear to be

14  effective?

15      A.    No.

16      Q.    Do you know why it was ineffective?

17      A.    I don't know.

18      Q.    At that point, did you think that

19  Mr. Tyson was decompensating as a result of a

20  mental illness?

21      A.    I knew he was getting more irate.  I

22  don't -- you know, as far as decompensation, I

23  don't know.

24      Q.    Did you ever call into the radio and

25  ask, like, "Hey, what else do you know on this

Page 109

1    guy," or ask someone to try to get any more

2    information?

3          A.    No.

4          Q.    Do you know if dispatch had his name?

5          A.    I don't remember.  I don't know.

6          Q.    Do you know who called City of

7    Hollywood?

8          A.    To this day, I don't know.

9          Q.    Do you know whether this came in to the

10   non-emergency hotline?

11         A.    No idea.

12         Q.    If you needed that information, for

13   instance, if this came in through the non-emergency

14   hotline, or the person's name, could you have

15   called dispatch and asked them?

16         A.    To find out who called it?

17         Q.    Yes.

18         A.    We could have, yeah.

19         Q.    Did you?

20         A.    No.  That's -- honestly, there's a guy

21   who is irate, talking to trees.  I don't know what

22   he could do to anybody else, so my main concern was

23   try to get there first to try to assess the

24   situation.

25         Q.    Okay.  So during your initial encounter

Page 110

1    and then your subsequent reengaging of Mr. Tyson,

2    was he standing on the balcony the entire time?

3         A.    He was.

4         Q.    Was anyone else up on that balcony?

5         A.    Not that I can recall.

6         Q.    And you were still standing 25 feet when

7    you reengaged?

8         A.    Approximately, yes.

9         Q.    If you wanted to, could you go back to

10   your patrol car and wait for other officers to

11   arrive on scene?

12        A.    I could have.

13        Q.    Did you?

14        A.    No.

15        Q.    Did you ever leave that courtyard after

16   you arrived?

17        A.    I don't believe I did.

18        Q.    Did you ever retreat after you arrived?

19        A.    I don't believe I did, no.

20        Q.    So what happens?  After he dumps the

21   marbles from the can, what do you do?

22        A.    Again, still talking to him.  It's not

23   having any effect.  He starts escalating,

24   escalating, escalated.  And he just -- he's staring

25   me -- he's staring at me.  He turns away, faces the

Page 111

1    wall, and just grabs this blunt object off the

2    wall, and that's when he starts making his way

3    down.

4         Q.    What type of object?

5         A.    I know what it is now, but at the time I

6    didn't know what it was.  At that time, it was just

7    this big round object.  I didn't know what it was.

8         Q.    Do you know what Mr. Tyson was saying?

9         A.    No.  Just incoherent.  Just mumbling and

10   screaming.

11        Q.    Now, prior to Mr. Tyson rushing down

12   those stairs, did you believe that he was

13   decompensating as a result of a mental illness?

14        A.    Again, I wasn't sure what I was dealing

15   with.  The only thing that was noticeable to me and

16   obviously visible was his level of irritation.  He

17   was just angry.

18        Q.    Prior to Mr. Tyson coming down those

19   stairs, did you understand the source of the

20   irritation or the anger?

21        A.    I didn't know what I was dealing with.

22        Q.    Did it ever come across your mind that

23   the source of the irritation and the anger was

24   because Mr. Tyson was off of his medication and he

25   was suffering from a mental illness?

1    A.    It could have been a possibility.

2    Q.    But my question is, were you thinking

3  that Mr. Tyson was off of his medication and

4  decompensating as a result of his mental illness

5  and that was the source of his irritation and

6  anger?

7    A.    I mean, you have those options, right,

8  those options are on the table.  It could be this

9  or it could be that.  I didn't have the luxury of

10  guessing or assuming what it was.  I'm just dealing

11  with the situation that's in front of me.

12    So, I mean, I don't know if that answers

13  your question.

14    Q.    Mr. Tyson was rushing down those stairs.

15  Did you believe he had a mental illness?

16    A.    I knew that it wasn't normal, how he was

17  acting.  I didn't know the cause of it.

18    Q.    Did you believe it was drugs?

19    A.    It could have been.  Again, that's one

20  of the options that was on the table.

21    Q.    Okay.  What options were on the table?

22    A.    Numerous.  Could be off his meds.  He

23  could be on drugs.  He could be whatever it is.

24    Q.    What were you thinking in that moment?

25  Give me your top five.

1      A.   I don't know.  I mean, obviously, the

2  signal came out as a signal 20.  Could have been a

3  mental guy, not all there.  Could have been drugs.

4  At least, for me, it could have been either/or.

5  That's what I was thinking in my head.

6      Q.   So as Mr. Tyson is rushing down the

7  stairs, what do you do?

8      A.   So he's coming down at a quick pace.

9  He's got that object in his hands.  My Taser comes

10  out.  I take out my Taser.  And I'm giving him

11  commands to stop before he even comes down.  I was

12  saying, "Stop.  Stop.  Stop.  Don't come down.

13  Stop.  Stop."  Not having it.

14      Q.   Okay.  When you say, "not having it,"

15  what does that mean?

16      A.   Not complying.  Not complying.

17      Q.   So he was not complying with your

18  commands?

19      A.   Correct.

20      Q.   Do you know why?

21      A.   I don't know why.

22      Q.   Do you know whether he was appreciating

23  and understanding your commands?

24      A.   I don't know what his train of thought

25  was.

1     Q.   Do you know the reasons why he -- strike

2  that.

3          So he comes down with something in his

4  hand.  You pull out your Taser.  You tell him,

5  "Stop.  Stop."  What does he do?

6     A.   He reaches the bottom of the stairs and

7  he pauses for a quick second.  He's looking at me,

8  mean mugging me, yelling, and he's got this object

9  over his head.

10     Q.   Are you getting closer to him?

11     A.   I'm not getting closer to him, no.

12     Q.   So where are you standing in that

13  photograph that's Bates stamped as 4492?

14     A.   I'm standing --

15     Q.   Can you turn it around?

16     A.   I don't know exactly where I was at that

17  time.  I don't know if I was on the grass.  I don't

18  know exactly where I was.

19     Q.   And where was Mr. Tyson when he stopped

20  and then he was looking at you, mean mugging?

21     A.   He was right here (indicating).

22     Q.   Is that in front of the door?

23     A.   No.  The front of the door would be

24  right there.  He's right around here (indicating).

25     Q.   And where are you standing?

```
 1        A.   I'm in this general area right here
 2   (indicating).
 3        Q.   And where is Officer Pantaloukas, at
 4   this point?
 5        A.   Not on scene.
 6        Q.   Is any officer on scene?
 7        A.   Nobody is on scene, just me.
 8        Q.   At this point, do you raise on your
 9   radio for additional officers?
10        A.   No.
11        Q.   Why not?
12        A.   I didn't have the time.  I had my Taser
13   in my hand, and I'm giving him verbal commands.
14   And like I said, that pause, that pause wasn't
15   long.  He was there for a second, if that, two
16   seconds, and then he just started charging at me.
17        Q.   So what would you have to do to dispatch
18   police officers?  Is there, like, an emergency
19   button you can hit?
20        A.   There is.
21        Q.   Did you hit it?
22        A.   No.
23        Q.   Why not?
24        A.   I don't know exactly why.  I don't know
25   if I didn't have the time.  My hands were obviously
```

1   tied up when he came at me.  I don't know, exactly.

2          Q.    How do you hit the emergency button?

3          A.    It's a little orange button that we

4   would have to -- it's actually pretty tough to get

5   to.  You would have to actually physically push

6   that button down.

7          Q.    And it's on your radio here today?

8          A.    It is.

9          MS. GEORGES:  Can you zoom in on that?

10         THE VIDEOGRAPHER:  It's the little red

11      one?

12         THE WITNESS:  It is.

13         THE VIDEOGRAPHER:  Okay.  Got it.

14      Thanks.

15   BY MS. GEORGES:

16         Q.    And is this the same radio you had back

17   in October of 2014?

18         A.    I believe so.

19         Q.    So you deploy your -- strike that.

20                You pull out your Taser.  You tell

21   Mr. Tyson, "Stop.  Stop."  And then what happens?

22         A.    He just charges at me.

23         Q.    How does he charge at you?

24         A.    He's basically, like, bull-rushing me,

25   and he's got this thing over his head and he's just

Page 117

1    running, a quick pace, like, super fast.

2         Q.    And then what happens?

3         A.    I deploy my Taser and it doesn't phase

4    him.  It has no effect.

5         Q.    Where do you deploy your Taser?

6         A.    We're taught to aim, you know, cant it,

7    dart to heart and whatnot.  I deployed.  I can tell

8    you where I was aiming.  I don't know where it hit.

9         Q.    Is that the first time that you had

10   deployed your Taser on anyone?

11        A.    On an individual, yes.

12        Q.    During your Taser training, did you have

13   the benefit of deploying your Taser into another

14   individual?

15        A.    No.

16        Q.    Why not?

17        A.    It wasn't part of our training.  We had,

18   like, a paper manikin or something.  It's a special

19   thing that Taser has.

20        Q.    So as far as during your training, you

21   get tased, but you don't tase anyone else?

22        A.    Right.

23        Q.    Why wouldn't you tase another officer

24   who was also undergoing the training?

25        A.    I don't make the rules.  You would have

1  to ask the department.  I don't know.

2       Q.    Do they train you on how to use the

3  Taser on an actual human being so it's effective?

4       A.    How to deploy it, yes.

5       Q.    But using paper manikins?

6       A.    Correct.

7       Q.    How is the Taser effective?

8       A.    How should it work?

9       Q.    How should it work in order to be

10 effective?

11      A.    You deploy the prongs, make contact, and

12 it just stops the person dead in their tracks.

13 And, just, your whole body contracts and you can't

14 move, basically.

15      Q.    Where is the most effective place on

16 one's body to be tased in order to be

17 incapacitating?

18      A.    The most effective?  I mean, we're

19 taught numerous places, but if you can hit them on

20 their back, I mean, it's going to be a good -- a

21 lot of back muscles and stuff like that.  That's

22 what they teach us, but that's if it's an option.

23      Q.    Okay.  How about the two probes, is

24 there supposed to be a close spread, a wide spread?

25 Is there a certain amount of distance that should

Page 119

1    be in-between them in order to be the most

2    effective?

3          A.   The longer the spread -- you know, we're

4    taught, the longer the spread, the better, because

5    there's more muscles in-between.  The closer the

6    two prongs are together, you're going to get less

7    area of contact, so it's not going to be as

8    effective, but you're still going to get at least

9    pain compliance.

10         Q.   Okay.  What's the difference between

11   pain compliance and incapacitation?

12         A.   Incapacitation, you can't move.  So your

13   body is just contracting, right.  All of your

14   muscles are, like, being forced to contract and you

15   can't move.

16              Pain compliance is just that, pain.  So

17   you feel pain, you tell somebody to stop, hopefully

18   they comply because of the pain.  They don't like

19   that feeling.

20         Q.   Okay.  So when you deployed your Taser,

21   do you know where the probes went?

22         A.   I don't know.

23         Q.   Do you know whether it was in

24   Mr. Tyson's front versus back?

25         A.   I was aiming for the front; obviously, I

1   didn't have his back.

2          Q.    Do you know whether probes entered
3   Mr. Tyson's body?

4          A.    I don't know.

5          Q.    Why don't you know?

6          A.    The time was too fast.  By the time I
7   deployed, it didn't work, he was already on top of
8   me.

9          Q.    Okay.  Well, how about after you
10  deployed your Taser and you said he was on top of
11  you, do you know where the probes were?

12         A.    I don't know where the probes were, no.

13         Q.    Do you know where your Taser was?

14         A.    I dropped my Taser.

15         Q.    Where did you drop it?

16         A.    I don't know, exactly.  Somewhere
17  in-between that area.

18         Q.    Did you ever have an ability to pick
19  back up your Taser after you dropped it?

20         A.    No.

21         Q.    Now, how long did you tase Mr. Tyson
22  for?

23         A.    I squeezed the trigger once, and I
24  didn't have time to try to reengage or anything
25  like that.

Page 121

1          Q.    Do you know how many seconds Mr. Tyson

2    was tased for that first time?

3          A.    Like I said, I squeezed the trigger.

4    The cycle went off.  I am assuming at least one

5    cycle.  But like I said, no effect.

6          Q.    How many seconds are in one cycle?

7          A.    Five, I believe.

8          Q.    Now, is there an ability to tase someone

9    for three seconds versus five seconds?

10         A.    If you shut it off.  If you deploy the

11   Taser, it's going off, you can -- I believe you

12   can -- it's the old model, so I'm not exactly sure,

13   but I think you can just flip it off.

14         Q.    Can you tase someone for more than five

15   seconds?

16         A.    You can re-administer the cycle, yeah.

17         Q.    How about for a straight nine seconds?

18         A.    I don't remember what the thing was for

19   that Taser.  I would have to look at the manual.

20         Q.    Have you ever tased anyone for more than

21   five seconds?

22         A.    I haven't used my Taser since.

23         Q.    Okay.  So when you say that the Taser

24   was not effective, what do you mean?

25         A.    No pain compliance that I could tell,

Page 122

1   and no muscle constriction.  He was still coming at

2   me at the same speed.  There was no stop, no pause.

3           Q.   Okay.  So after Mr. Tyson was tased,

4   what happened to the object in his hand?

5           A.   He had it over his head and he hit me on

6   the head with it.

7           Q.   At what point?

8           A.   As soon as he could reach me.  So he was

9   running, he got to me, he struck me.

10          Q.   So when he struck you was he being

11  tased?

12          A.   By that time I had already deployed my

13  Taser, no effect.

14          Q.   Well, during that five seconds, that

15  five-second cycle, had you been hit?

16          A.   I'm assuming it was between five

17  seconds.  I don't know if it was during the cycle

18  or not, but he did close that distance.

19          Q.   Okay.  And so when he closed the

20  distance, what happened?

21          A.   He hit me on my head.

22          Q.   Was the five-second cycle done?

23          A.   I don't know.

24          Q.   Okay.  Where did he hit you on the head?

25          A.   My left side.

1          Q.    What happened?

2          A.    So he hits me on my head.  I remember

3    dropping my Taser.  And it was basically, you know,

4    you're stunned.  You see stars.  And it's just

5    basically try to hold on to him.  Try to avoid any

6    further injuries.  Just trying to hold on to him.

7    Make sure he doesn't leave anywhere, hurt anybody

8    else.  It was just basically a struggle to try to

9    control him and kind of defend myself, too.

10          Q.    Okay.  How tall are you?

11          A.    I'm 5' 7".

12          Q.    And how much do you weigh?

13          A.    I weigh, right now, 165.

14          Q.    What did you weigh back in October of

15    2014?

16          A.    I'm going to say, 145, 150.

17          Q.    And so on October 27, 2014, you would

18    have been 145, 150?

19          A.    I believe so, yeah.

20          Q.    And Mr. Tyson, do you know how much he

21    weighed?

22          A.    I don't know.

23          Q.    Do you know how tall he was?

24          A.    I don't know.

25          Q.    Now, other than doing PT in the academy,

Page 124

1   for instance, running, weight-lifting, did you

2   receive any other defensive training?

3        A.    From the station, yeah.  I did some

4   boxing at the PAL.

5             THE COURT REPORTER:  I'm sorry, "boxing"

6        what?

7        A.    At the Police Athletic League.

8             You know, just -- we did scenarios with

9   our instructors, how to try to do hand techniques

10  and come-alongs and stuff like that.

11  BY MS. GEORGES:

12       Q.    Okay.  I'm going to volunteer your

13  attorney, because he's a male.

14            Now, if you encountered Mr. Hapner on

15  the street somewhere, okay, or someone of his

16  similar body weight and size, and you did not have

17  your Taser or your gun and you needed to take

18  Mr. Hapner down, how are you trained to do so?

19       A.    You could do takedowns and stuff like

20  that, decap -- I mean, not decapitation,

21  incapacitation, pain compliance, things like that.

22       Q.    How would you take him down?

23       A.    Probably try to do some distractionary,

24  and then -- distractionary blows, and then just try

25  to grab him by his neck or something and just try

1    to bring him down, like a leg-sweep or something

2    like that.

3               MR. HAPNER:  Please don't, by the way.

4               MS. GEORGES:  I'm not asking for any

5         demonstrations.

6    BY MS. GEORGES:

7         Q.   How do you do a leg-sweep?

8         A.   It's basically that.  Just sweep the

9    person's feet right from under them.

10        Q.   Okay.  So on October 27, 2014, after you

11   lost your Taser, what measures did you take, or

12   what takedown techniques did you employ?

13        A.   I don't even remember.  I know that it

14   was just -- he struck me.  I know I was hurt.  And

15   I just remember grabbing him.  I know we ended up

16   on the ground, but I can't tell you how we got

17   there.

18        Q.   Do you know if Mr. Tyson had shoes on?

19        A.   I don't remember.

20        Q.   Do you remember if he had socks on?

21        A.   I don't recall.

22        Q.   Do you remember if he had a robe on on

23   top?

24        A.   I don't remember.

25        Q.   Okay.  So what happens then?

1        A.    So I'm basically holding on to him as

2   best I can, try to control him.  The thoughts of

3   him trying to hit me again and me passing out.  My

4   gun is exposed, he could get that.  There's people

5   in their houses.  I don't know if there's anybody

6   else in the area.  There's a school down the

7   street.  So all of these thoughts are running

8   through my head.  I'm just trying to hold on to him

9   as best I can -- struggling to hold on to him as

10  best I can.

11       Q.    Okay.  Now, while you're struggling to

12  hold on to him, do you ever hit the emergency

13  button?

14       A.    No.

15       Q.    Why not?

16       A.    I'm struggling as it is, trying to hold

17  him, and if I take my hand out, I'm scared that I'm

18  going to lose whatever little control I have of

19  him.

20       Q.    Now, do you know where this object

21  was --

22       A.    No.

23       Q.    -- that you had been hit with?

24       A.    No, I didn't know.

25       Q.    Did you see it in Mr. Tyson's hand

1  during this struggle?

2          A.    I couldn't see anything.

3          Q.    Why couldn't you see anything?

4          A.    I had blood in my eyes.  I had him close

5  to my body.  I didn't know where my Taser was.  I

6  didn't know where that object was.

7          Q.    Now, were you guys on the grass or that

8  sidewalk area that's in that photograph, 4492?

9          A.    I don't remember, exactly.  I'm assuming

10  we're on the grass.  I don't recall.

11          Q.    Okay.  So tell me what your position --

12  strike that.

13          Tell me what position Mr. Tyson was in

14  at this point and what position you were in.

15          A.    Mr. Tyson -- we went back and forth.  I

16  remember him being on top for a little bit and I

17  was able to kind of push my way up.  And just --

18  and we were on our knees for a little -- he was on

19  his knees, I was on my knees, just grabbing.  I

20  was, like, parallel to him, trying to grab him

21  while he was just fighting.  It just went back and

22  forth.  We weren't steady in one position.  It was

23  just -- it was like a wrestling match.

24          Q.    Okay.  How long did you go back and

25  forth for?

Page 128

1          A.    I don't know.  It felt like forever.  I
2    couldn't tell you a time frame.
3          Q.    At some point, did this back-and-forth
4    end?
5          A.    No.  It was constant, constant fight.
6    It was constant.  There was no pause.  Just was
7    back and forth.
8          Q.    Was it five minutes?
9          A.    I don't --
10         Q.    Was it ten minutes?
11         A.    Like I said, it felt like an eternity,
12    but I don't know.
13         Q.    Okay.  So what happens during this
14    back-and-forth?
15         A.    There's blood everywhere, so
16    I'm slippery.  He's slippery.  I can't grab him.  I
17    managed to -- we were on our knees for a little
18    bit.  I managed to get him down as best as I could.
19    I was just trying to put my weight on him while
20    still trying to wrap him up.  And after a while I
21    see Officer Pantaloukas come into the courtyard.
22         Q.    Where does he come in from?
23         A.    Same direction where I entered, so
24    Jackson Street.
25         Q.    Is there a photograph in that stack that

1    depicts the entrance --

2         A.    The entrance of this --

3         Q.    -- of the courtyard?

4         A.    Yeah, 04487.

5         Q.    Can you turn that around, please, and

6    show it for the camera?

7         A.    (Witness complies.)

8         Q.    How far back is Mr. Tyson's balcony from

9    the street?

10        A.    There's -- I mean, I don't remember

11   exactly the layout, but I know Jackson Street is --

12   I don't think -- I don't think it's right here.  I

13   think there's more grass from here.  So there's

14   grass, and then Jackson Street is right over here.

15   His balcony is up there (indicating).

16        Q.    Okay.  And where was this struggle

17   taking place?

18        A.    I don't remember.  Inside this little

19   courtyard, somewhere in there.  I can't tell you.

20        Q.    How close to that stairwell?

21        A.    To the stairwell?  I don't know.  Like I

22   said, I don't remember where we ended up.

23        Q.    Okay.  So when Officer Pantaloukas

24   arrives on scene, what happens?

25        A.    I see him running towards me.  And I

Page 130

1    don't know what happened to Pantaloukas.  He looks

2    at me, I guess he freaks out.

3            And I tell him, "Help me.  He hit me.

4    He hit me" -- or "he cut me" or "he hit me."  I

5    don't remember exactly what I told him.

6            And, at that point, he engages and tries

7    to take control of Tyson's feet, his legs.

8        Q.   Okay.  So when you say that he freaked

9    out, what do you mean by that?

10       A.   That's my -- that's what I'm assuming.

11   He just paused.  He looked at me.  He was just

12   looking at me.

13       Q.   Okay.  So how did he try to gain control

14   of Mr. Tyson's feet?

15       A.   I saw him try to grab his feet with his

16   hands.

17       Q.   Was he successful?

18       A.   No.

19       Q.   So what did he do?

20       A.   I saw Tyson kicking him, kicking him.

21            And then I heard Pantaloukas give

22   commands for his Taser, like, a warning.  Usually

23   you just say, "Taser, Taser, Taser."  And then I

24   heard his -- I heard him deploy his Taser.

25       Q.   Where were you when he gave the

1  commands, "Taser, Taser, Taser"?

2          A.   I was by his torso area.  I was higher

3  up on his body, trying to hold on to him still.

4  Hold on to his arm, trying to bring his arm back,

5  tried to put handcuffs on him.

6          Q.   Okay.  And was Mr. Tyson down on his

7  stomach?

8          A.   He was back and forth, trying to get to

9  his knees and whatnot.  But, yeah, he was -- I was

10 trying to pin him down to the ground, yeah.

11         Q.   Okay.  And where did Officer Pantaloukas

12 deploy his Taser?

13         A.   I don't know where he deployed his

14 Taser.

15         Q.   Do you know whether that was in the

16 front side of Mr. Tyson's body or whether it was in

17 his back?

18         A.   I could only give you assumptions, you

19 know, because I didn't see exactly where the probes

20 hit, but he was face down.

21         Q.   Now, upon Officer Pantaloukas' arrival,

22 did you hit your emergency button?

23         A.   No.

24         Q.   Did you go back over the radio?

25         A.   I don't know if it was during when

1    Pantaloukas was there or later on, but at one time

2    I did get on my radio.

3         Q.   At what point?

4         A.   I don't remember, exactly.  I don't

5    know.

6         Q.   Now, when Officer Pantaloukas had

7    arrived on scene, where was Officer Kerns?

8         A.   Not on scene.

9         Q.   Had anyone called Officer Kerns, at this

10   point?

11        A.   I don't know.  I know I didn't.

12        Q.   Now, if you wanted to communicate over

13   the radio, would you just hit a button and just

14   speak into it?

15        A.   You have to hold it down and speak into

16   it, yes.  It's not just, hold it, let it go and

17   speak.  You have to continue holding it.

18        Q.   Okay.  Now, if you wanted to just call

19   out for backup, could you literally just say

20   "backup" over the radio?

21        A.   You can say whatever you want on the

22   radio, yeah.

23        Q.   Could you yell out, "Officer injured,"

24   and you would hope that the dispatch would --

25        A.   You could, yeah.

Page 133

1      Q.    But you didn't do that?

2      A.    At one point I did get on my radio.  I

3   just don't remember if it was when it was just me

4   and Pantaloukas by ourselves or after Officer Kerns

5   got there, but I -- whenever I got the chance to do

6   so, I did so.

7      Q.    So while you're holding Mr. Tyson's

8   upper torso, trying to gain control, and Officer

9   Pantaloukas deploys his Taser, do you still have

10  hands on Mr. Tyson?

11     A.    I have hands on Mr. Tyson at all times,

12  as much as I can.  I can't -- I couldn't afford not

13  to have my hands on him.

14     Q.    Even while he's being tased?

15     A.    Yeah.

16     Q.    Is there any risk that you could be --

17     A.    Yes.

18     Q.    Let me finish my question.

19           Is there a risk that you can also feel

20  the effects of the Taser if your hands are also on

21  Mr. Tyson?

22     A.    Yes.

23     Q.    Did you ever feel the effects of the

24  Taser?

25     A.    I don't remember.  I remember, at one

Page 134

1   point, I felt something, I backed up and I

2   grabbed -- I re-grabbed him.  But it was just -- it

3   was so fast that -- I mean, it wasn't something

4   that you're going to get stuck there.  But I did

5   remember feeling a little bit of a shock, but I

6   just had to fight through that.

7          Q.    Now, I know that this struggle is

8   ongoing.  Do you and Pantaloukas ever have a

9   conversation about what happened?

10         A.    During that, no.

11         Q.    Does he say, like, "What happened"?

12         A.    No.

13         Q.    Do you ever have a conversation that

14  Mr. Tyson is suffering from a mental illness?

15         A.    At that time, no.  There's no time for

16  that.

17         Q.    Okay.  So Mr. Tyson gets tased, correct?

18         A.    Yeah.  I hear Pantaloukas give the

19  commands and I hear his Taser go off.

20         Q.    How many times do you hear it go off?

21         A.    At least once.  I don't know -- I

22  remember hearing the cycling, because --

23              THE COURT REPORTER:  "I" -- I'm sorry?

24         A.    I remember hearing the cycling of the

25  Taser.  It's very loud.  You can hear it, the

1  electricity.  The electricity is just going

2  through, so you can hear it.  I don't know -- I

3  don't recall how many times he squeezed that

4  trigger.

5  BY MS. GEORGES:

6      Q.   Okay.  Well, after you hear the sound,

7  what happens to Mr. Tyson?

8      A.    Nothing.  Nothing.  It's just -- it's

9  ongoing.  It's just him flailing his arms, trying

10  to get back up to his knees.  It's just that

11  constant fight.

12      Q.   Okay.  Is it fair to say that the Taser

13  is ineffective?

14      A.   At least to me.  I mean, to me, that's

15  what it felt like, like it wasn't any good.

16      Q.   Well, how about to Officer Pantaloukas,

17  who was actually using the Taser, was it effective?

18          MR. HAPNER:  Form.

19      A.   You would have to speak to Officer

20  Pantaloukas.  I don't know what his judgment was on

21  that.

22  BY MS. GEORGES:

23      Q.   Okay.  So when he uses the Taser and it

24  doesn't work, do you have any type of a

25  conversation about, like, the Taser is not working?

Page 136

1          A.    I didn't know if the Taser was working

2     or not.  My main concern was controlling the

3     portion of his body that I was holding already.

4     Like I said, there was no time for a conversation.

5     It was just -- it was a struggle.  I couldn't have

6     a conversation with somebody during that.

7          Q.    Isn't it fair to say that you knew the

8     Taser wasn't working because it did not make

9     Mr. Tyson incapacitated or comply with commands?

10               MR. HAPNER:  Form.

11         A.    I don't -- I can't give you an answer.

12    I don't know if the Taser worked or not.  Like I

13    said, I just heard -- I heard the Taser going off

14    and there was still a battle on the ground.

15    BY MS. GEORGES:

16         Q.    Did Mr. Tyson stop struggling after he

17    was tased?

18         A.    Did he stop struggling after he was

19    tased?  No.  It was a fight.  It was non-stop.

20         Q.    So is it fair to say that the Taser did

21    not incapacitate Mr. Tyson?

22         A.    I didn't know the -- like I said, I

23    didn't deploy the Taser.  I wasn't watching him.  I

24    was just holding on to him as best as I could.

25         Q.    But while you were holding on to him,

1   you would be able to acknowledge whether or not the

2   Taser had incapacitated him.

3        A.   The only thing I could tell you is that

4   he kept fighting.  Even when I heard the

5   (indicating) from the Taser, I -- he was just

6   moving, moving, moving, moving, moving.  And I'm

7   not even concerned about the Taser at that time.

8   I'm just concerned about his hands.

9        Q.   But my specific question is, did the

10  Taser, at any point, incapacitate Mr. Tyson?

11       A.   My answer would be, I don't know.  I

12  don't know.

13       Q.   Why don't you know?

14       A.   Because I didn't see -- I mean, I

15  couldn't tell.  The only answer I can give you is,

16  he was fighting us during that time when I could

17  hear the Taser.  I don't know if the Taser worked

18  or not.  I don't know.  You would have to ask

19  Officer Pantaloukas what he observed.

20       Q.   So as you have your hands on him,

21  Mr. Tyson, and as he's struggling, you hear the

22  tasing sound.  At any point, does Mr. Tyson just go

23  completely limp?

24       A.   Not when I'm with him, no.

25            And then the other thing is, I couldn't

1   even see.  I had my own blood in my eyes.  I was

2   having a hard time seeing.  But at no time did he

3   ever stop fighting.

4        Q.   And, therefore, the Taser was not

5   effective for purposes of incapacitation?

6            MR. HAPNER:  Form.

7        A.   I don't know the answer to that

8   question.

9   BY MS. GEORGES:

10       Q.   Who will know the answer to that

11  question?

12       A.   You could try Officer Pantaloukas.

13       Q.   Did you ever take your hands off of

14  Mr. Tyson?

15       A.   I tried not to, no.  I don't recall if I

16  did, at one point, but I tried maintaining constant

17  contact with him.

18       Q.   Why?

19       A.   If I didn't have contact with him he

20  would be able to get up and run or fight us or -- I

21  don't know what he could have done.

22       Q.   Now, were you ever trained, during your

23  Taser training back in July of 2014, or at any

24  point during the academy, on what to do if a Taser

25  is ineffective in incapacitating someone?

1      A.   Just, the mentality behind that is what

2   the circumstances are.  If -- you know, if you're

3   using a Taser to subdue an individual that is just

4   being -- resisting and there's no violence to it,

5   then, I mean, you can try to go hands-on or

6   whatnot.  You are going to do different things

7   depending on the scenario that you have in front of

8   you.

9      Q.   Do you know if there's a policy and

10  procedure at the City of Hollywood for an officer

11  using his Taser?

12     A.   Uh-huh.

13     Q.   Is that a "yes"?

14     A.   Yes.

15     Q.   And what is the policy and procedure of

16  the City of Hollywood for a police officer

17  deploying his Taser?

18     A.   I would have to review it, but back

19  then, we would -- excuse me -- we would go through

20  the use of force continuum which is provided by

21  FDLE.  There's different stages of, you know,

22  aggression and whatnot; level four, that's when

23  you're able to use a baton or a nonlethal such as a

24  Taser.  That's the one, I believe, when an

25  individual is actively resisting, and that's when

 1   you're allowed to use it.

 2        Q.   Okay.  How did you use the policy and

 3   procedure as it pertains to the use of force on

 4   October 27, 2014?

 5        A.   Excuse me?

 6        Q.   How did you utilize the policy and

 7   procedure for the use of force continuum?

 8        A.   How did I utilize it?  I mean, he was

 9   actively resisting my commands.  He was coming at

10   me.  He was actually higher than a level four,

11   which is what we're entitled to use.  He was coming

12   at me with an object with the intent to cause great

13   bodily harm.  So instead of going to my lethal, I

14   decided to use my nonlethal and use my Taser.

15   That's the thought process behind my actions for

16   using the Taser.

17        Q.   Okay.  So, at some point, do you get

18   Mr. Tyson into handcuffs?

19        A.   Yes.

20        Q.   At what point?

21        A.   It's a bit -- it's me and Officer

22   Pantaloukas going back and forth with him.  Officer

23   Kerns shows up on scene.  And that's when Officer

24   Kerns, I don't know -- I think, I'm not a hundred

25   percent sure, I think he grabbed his left side,

Page 141

1  because I had his right arm, and between him and I,

2  we were able to put cuffs on him.

3          Q.    How did Officer Kerns get dispatched?

4          A.    I don't know.  You would have to ask

5  him.

6          Q.    Did you ever call him?

7          A.    I don't remember.  I don't think so.

8          Q.    Do you know if Officer Pantaloukas

9  called him?

10         A.    I don't know.

11         Q.    Now, prior to Officer Kerns arriving on

12  scene, had you requested additional units?

13         A.    I don't remember.  That was -- remember,

14  I told you I know I got on the radio, but I wasn't

15  sure exactly who was on scene, who was not on

16  scene.  At one point I did ask for -- I said,

17  "Additional 94," which is a backup unit.

18         Q.    Did you provide any other information

19  other than, "Additional 94"?

20         A.    I don't remember.  I was screaming

21  something on the radio.  I don't remember what it

22  was.

23         Q.    When you say "screaming," what does that

24  mean?

25         A.    I was in a panic, so I just got on my

Page 142

1  radio really quick.

2        Q.    What else did you say on the radio in a

3  panic?

4        A.    I don't recall.  You would have to run

5  those tapes.  I haven't heard it since.  I haven't

6  heard the radio recordings, so I don't know -- I

7  don't remember what I said.

8        Q.    Now, would the CAD dispatch as it

9  pertains to this case contain all of the

10  communications that you had with dispatch on

11  October 27, 2014?

12        A.    I don't know what dispatch's policy is

13  on that.  I don't know what they do or what they

14  don't.

15        Q.    You don't know what they record?

16        A.    No, I don't.

17        Q.    Have you had an opportunity to review

18  the dispatch in this case?

19        A.    I have not.

20        Q.    How long did it take to get Mr. Tyson in

21  handcuffs?

22        A.    I don't know an exact time frame, but it

23  took a little bit, between me and Officer Kerns, to

24  get him there.  I don't know.  I would have to

25  guess again, give you a guesstimation.

1    Q.   How long did it take for Officer Kerns

2    to arrive on scene following Officer Pantaloukas?

3          A.   I don't know.

4          Q.   Do you know if it was five minutes?  Do

5    you know if it was an hour?

6          A.   I don't know the time frame.  I can't

7    tell you.

8          Q.   And during this time where Officer

9    Pantaloukas is there and also Officer Kerns, does

10   Mr. Tyson say anything that you can make sense of?

11         A.   I can tell -- honestly tell you that I

12   never heard anything make sense from what

13   Officer -- what Mr. Tyson was saying.  It was just,

14   the only thing -- to this day, the only thing I

15   remember is "kingdom."  That's the only word that I

16   heard that was somewhat recognizable.  He was

17   screaming, mumbling.  I couldn't -- I was never

18   able to make sense of what he was saying.

19         Q.   Okay.  So as this situation continued to

20   escalate, at any point are you thinking, "What's

21   wrong with this guy"?

22         A.   Yes.

23         Q.   Were you able to answer that at any

24   point?

25         A.   No.

Page 144

1      Q.    Why not?

2      A.    I'm occupied with what's in front of me.

3            It's human nature.  Like, what's going

4  on?  What's going on with this guy?  I'm not a

5  doctor.  I can't diagnose.  I don't know if he's on

6  something.  I'm just, it's in front of me.  That's

7  what I'm dealing with.  What's wrong with this guy?

8  What's wrong?  He's not complying.  You know,

9  that's -- I mean, I'm just dealing with what's in

10  front of me.

11      Q.    Would you agree that you would need to

12  know the source in order to solve the problem?

13      A.    The problem that was presented at that

14  time was he was resisting and we needed to get him

15  under control.  There's different ways.  We're

16  basically reacting to what he's giving us, what

17  he's offering us.

18            Yeah, I mean, it would have been great

19  to take him to the hospital calmly, voluntarily.

20  That wasn't an option.  He didn't give us that

21  option.  So the way for us to handle that situation

22  was try to go hands-on and try to do our best, try

23  to control him as best as possible.

24      Q.    Now, prior to placing handcuffs on

25  Mr. Tyson, had you dispatched fire rescue?

Page 145

1    A.    Me, personally?  I don't think so, no.

2    Q.    How about Officer Pantaloukas?

3    A.    I don't know.  I don't remember.

4         MS. GEORGES:  Okay.  We're going to take

5    a break now so he can change the tape.

6         THE VIDEOGRAPHER:  The time is

7    12:26 p.m.  We are now going off the record.

8         (A recess was had from 12:26 p.m. to

9    12:36 p.m.)

10        THE VIDEOGRAPHER:  The time is

11   12:36 p.m.  We're now back on the record.

12   BY MS. GEORGES:

13   Q.    Would you agree with me, Officer

14   Ramirez, that prior to Mr. Tyson coming down the

15   stairs, you were unable to establish a rapport with

16   him?

17   A.    Yes.

18   Q.    Is it fair to say that, prior to

19   Mr. Tyson coming down the stairs, that you were

20   unable to deescalate the situation?

21        MR. HAPNER:  Form.

22   A.    Yes.

23   BY MS. GEORGES:

24   Q.    Is it fair to say that, based on your

25   initial encounter and also during your reengagement

Page 146

1   of that encounter, that the situation only

2   escalated?

3         A.   Yes.

4         Q.   And that the situation only became more

5   irritable for Mr. Tyson?

6              MR. HAPNER:   Form.

7         A.   I don't know if it was irritable for

8   him.  I don't know what he was processing.  But I

9   could tell that he was more aggressive, irate,

10  himself.

11  BY MS. GEORGES:

12        Q.   Is it fair to say that, prior to

13  Mr. Tyson coming down the stairs, that the entire

14  situation was getting worse?

15        A.   Worse by him coming down the stairs,

16  yes.

17        Q.   Do you know if anyone was inside

18  Mr. Tyson's apartment on that day?

19        A.   I don't know.

20        Q.   Did anyone ever appear?

21        A.   I don't know.

22        Q.   Did you ever get any calls on the radio

23  that gave you any further information after you

24  arrived on scene?

25        A.   I don't remember.  I don't know if we

Page 147

1    did or not.

2         Q.   Do you know how many times Mr. Tyson was

3    tased by Officer Pantaloukas prior to handcuffs

4    being placed?

5         A.   I do not.

6         Q.   Do you know if it was more than one

7    time?

8         A.   I do not know.

9         Q.   Do you know if it was more than two

10   times?

11        A.   I don't know.

12        Q.   Do you know if it was more than three

13   times?

14        A.   I don't know.

15        Q.   Why don't you know?

16        A.   I just don't.  I mean, I was occupied

17   with my task at hand and that was kind of the least

18   of my worries.  I wasn't keeping track.

19        Q.   Why was it the least of your worries if

20   your task, I suppose, was to get Mr. Tyson into

21   handcuffs?

22        A.   Because I was -- my main task at that

23   time was trying to control him, so I'm not going to

24   try to hold his -- grab his arm, try to keep --

25   maintain control of him and at the same time be

1  concerned of how many times Officer Pantaloukas is

2  pulling that Taser.

3        Q.   How many times did you hear the Taser go

4  off prior to the handcuffs being placed on?

5        A.   I don't remember.  At least once,

6  because I know I heard the cycling of the Taser.

7        Q.   Do you know if the Taser helped in

8  getting the handcuffs on?

9        A.   Not to my recollection.  Like I said, it

10 was a constant fight.

11       Q.   What eventually led to Mr. Tyson

12 actually being placed in handcuffs?

13       A.   What helped was the fact that Officer

14 Kerns was there, so there was extra hands for us to

15 actually bring his hands back.

16       Q.   Is it fair to say that it took three

17 police officers in order to place Mr. Tyson into

18 handcuffs?

19       A.   Yes.

20       Q.   And is it fair to say that it was more

21 effective by using three police officers to

22 handcuff Mr. Tyson than using the Taser?

23            MR. HAPNER:  Form.

24       A.   I would say that having Officer Kerns

25 there did help us, the third officer, because I

Page 149

1    don't know -- like I said, I don't know if

2    Pantaloukas was still messing with the feet at the

3    same time or not.  But at least having that extra

4    hand with the left side of Mr. Tyson, just to bring

5    him back, that definitely helped, for sure.  I

6    wouldn't have been able to do it without Officer

7    Kerns.

8    BY MS. GEORGES:

9        Q.    And it's fair to say that, after that

10   one tasing, that you can at least testify here

11   today that you were not able to place Mr. Tyson

12   into handcuffs?

13       A.    I was unable to, yes.

14       Q.    And that was when it was just you and

15   Officer Pantaloukas?

16       A.    Yes.

17       Q.    So the Taser didn't assist you with

18   handcuffing Mr. Tyson, correct?

19       A.    I don't know if at that time, Kerns --

20   if the Taser was working or not, but like I said,

21   we were able to put him in cuffs at that time.

22       Q.    I'm talking about the specific instance

23   where it was just you and Pantaloukas, and Officer

24   Pantaloukas deployed his Taser --

25       A.    Uh-huh.

1    Q.    -- were you able to place Mr. Tyson --

2    A.    I was not.

3    Q.    -- into handcuffs?

4    A.    No.

5    Q.    So it's fair to say that the Taser did

6  not assist with placing handcuffs on Mr. Tyson?

7    A.    I didn't place handcuffs, so, no.

8    Q.    Who placed the handcuffs on?

9    A.    I mean, I was unable to at that time.

10 So, no, we weren't able to -- it wasn't working.

11 We were just fighting.  He was resisting.  We were

12 fighting.  And between Pantaloukas and I, I wasn't

13 able to put handcuffs on Tyson at that time, no.

14   Q.    Whose handcuffs were used?

15   A.    I don't remember.  I don't know if it

16 was mine or not.

17   Q.    Do you know if it was Officer Kerns'?

18   A.    I don't know.

19   Q.    So, at some point, are the handcuffs on?

20   A.    Yes.

21   Q.    And as you sit here today, are you

22 unaware of how many times Officer Pantaloukas

23 deployed his Taser prior to the handcuffs being

24 placed?

25   A.    Well, there's rumors and whatnot that

1    you hear, but I don't know the exact number that

2    was recorded.

3         Q.   Okay.  So I wasn't there.  Mr. Hapner

4    wasn't there.  You were there.

5         A.   Right.

6         Q.   And the jury was not there.  Can you

7    tell this jury how many times Mr. Tyson was tased

8    prior to the handcuffs being placed?

9         A.   I'm unable to.  I don't recall from that

10   incident.  No.

11        Q.   So what happens after the handcuffs are

12   placed on?

13        A.   After the cuffs were placed, he's still

14   trying to get up, still trying to get to his knees.

15   By no means was the fight done.

16             Thankfully, more officers got to -- got

17   on scene.  And shortly after the cuffs went on I

18   was relieved by another officer.  I don't know who

19   it was.  He basically pushed me aside and said, "Go

20   get help."  They took me to the paramedics that

21   were already on scene, as well.

22        Q.   Do you know who called those paramedics?

23        A.   I don't know.

24        Q.   Was it you?

25        A.   Not me.  I don't think so.

Page 152

1      Q.   Who arrived immediately following

2  Officer Kerns?

3      A.   I don't know.

4      Q.   Do you remember seeing Officer Karl on

5  the scene?

6      A.   I do not.

7      Q.   Do you remember seeing Officer Truntz on

8  the scene?

9      A.   No.

10      Q.   Do you remember seeing Officer Falcon on

11  the scene?

12      A.   No.

13      Q.   Do you remember seeing Officer Wagner on

14  the scene?

15      A.   No.

16      Q.   So as you sit here today, you only

17  recall yourself, Officer Pantaloukas and Officer

18  Kerns; is that correct?

19      A.   That I can recall, yes.

20      Q.   Have you ever spoken to Officer Karl or

21  Officer Truntz or Officer Falcon regarding their

22  involvement?

23      A.   No.

24      Q.   After the handcuffs are placed, are you

25  holding Mr. Tyson down?

Page 153

1        A.    Yes.

2        Q.    What are you holding?

3        A.    His upper torso.  I guess his back area.

4        Q.    What are you using?

5        A.    I'm using my hands.  At one time, I'm

6   worn out, so I have to use my stomach.  I put my

7   knee on his shoulder blade, as well, at one time.

8        Q.    And where is Officer Pantaloukas

9   standing?

10       A.    I don't -- I can't give you an exact

11  location.  I don't know what he was doing.  I'm

12  assuming he was by the feet still.

13       Q.    Why do you assume he was by the feet?

14       A.    Because that's where he was when he

15  first -- when he initially got there, he was trying

16  to control his feet.  But after that, I don't

17  remember if he moved to the other side or not.  I

18  don't -- I don't recall.

19       Q.    And where was Officer Kerns?

20       A.    As far as I can recall, he was on the

21  left side of Mr. Tyson.

22       Q.    And what was Officer Kerns doing after

23  the handcuffs were placed on him?

24       A.    I don't know.

25       Q.    Do you know if he was holding Mr. Tyson

Page 154

 1  down?

 2       A.   I don't know.

 3       Q.   Now, these other officers who arrived on

 4  scene, do you know what they did upon arrival?

 5       A.   I don't know.

 6       Q.   Do you know if they were holding down a

 7  certain body part of Mr. Tyson?

 8       A.   I don't know.

 9       Q.   Why don't you know?

10       A.   I was -- I couldn't see, first of all.

11  I had blood all over my eyes and I had been moved

12  away to the side.

13       Q.   How long was it before you were moved

14  away?

15       A.   From when?

16       Q.   From when Mr. Tyson was handcuffed --

17       A.   Okay.

18       Q.   -- to when someone tapped you out, how

19  many minutes had gone by?

20       A.   I don't know.  I don't think it was that

21  long.  I can't give you a time frame, but it didn't

22  seem like it was too long.

23       Q.   So after Mr. Tyson was handcuffed, was

24  he tased again?

25       A.   I don't know.

1        Q.    Why don't you know?

2        A.    Because I don't know.  I didn't -- not

3    to my knowledge.

4        Q.    Do you recall hearing the Taser after

5    Mr. Tyson was handcuffed?

6        A.    I don't recall, no.

7        Q.    So as you sit here today, you're telling

8    this jury that you tased Mr. Tyson one time,

9    correct?

10       A.    I deployed my Taser once, yes.

11       Q.    And you're also telling this jury that,

12   during this encounter, you recall Officer

13   Pantaloukas deploying his Taser one time?

14       A.    I know he deployed his Taser and I heard

15   the cycling, so, minimum, once.  I mean, that's the

16   best I can give you.

17       Q.    Can you provide this jury with a maximum

18   number amount of times?

19       A.    I can't.

20       Q.    Why not?

21       A.    Because I don't know.

22       Q.    Why don't you know?

23       A.    I'm just telling you, you're asking me a

24   question that I don't know the answer to.

25       Q.    Well, I just want the jury to understand

1   why you can recall certain facts and then you are

2   unable to recall other facts, such as the number of

3   times that Officer Pantaloukas tased Mr. Tyson.

4           MR. HAPNER:  Form.

5       A.   You would have to ask somebody who

6   understands the human mind and how it works,

7   because I wouldn't be able to answer that for you.

8   I don't know why I can remember some things and

9   some I can't.

10          I could tell you why I couldn't see,

11  because my eyes, clearly covered in blood.  That's

12  why I couldn't see what was going on in front of

13  me.  As far as all of the other stuff, I can't give

14  you an answer for those.

15  BY MS. GEORGES:

16      Q.   It's fair to say that you can hear a

17  Taser when it's being deployed?

18      A.   Yes.

19      Q.   And you're telling this jury that you

20  heard the Taser one time?

21      A.   Minimum once, yes.

22      Q.   Can you provide this jury with a maximum

23  number of times you heard that Taser?

24          MR. HAPNER:  Asked and answered.

25      A.   I cannot.

1   BY MS. GEORGES:

2         Q.    At some point, are leg shackles placed

3   on Mr. Tyson?

4         A.    I don't know.

5         Q.    Did you participate in the placing of

6   leg shackles on Mr. Tyson?

7         A.    Not that I can recall, no.

8         Q.    Did anyone ever tell you that they were

9   going to get leg shackles?

10        A.    I don't remember that, no.

11        Q.    Do you know whether anyone ever told you

12  that Mr. Tyson had been placed in leg shackles?

13        A.    Not that I can recall.

14        Q.    Do you know whether Mr. Tyson was tased

15  after leg shackles were placed on?

16        A.    I don't know.

17        Q.    So after you got tapped-out by some

18  other police officer, what did you do?

19        A.    I was escorted by somebody to the side

20  of the building where fire rescue came and started

21  wiping all of this blood from my face.

22        Q.    How far away were you from Mr. Tyson

23  when fire rescue was wiping all the blood off your

24  face?

25        A.    I don't know.  It was in the courtyard

Page 158

1  still.

2          I don't know if you want to use this

3  picture here (indicating).

4      Q.   Well, if you can see an area depicted in

5  any of those photographs where fire rescue was

6  treating you, please look through and if you can

7  identify where.

8      A.   I know for a fact that I was moved to

9  this side of the building here (indicating).  But I

10  don't know where we ended up -- where we ended up

11  cuffing Mr. Tyson.

12      Q.   Now, using photograph ending in 92, does

13  that depict the area in which Mr. Tyson was

14  handcuffed?

15      A.   This?  I mean, we can see the stuff that

16  rescue used, but I don't know if that's exactly --

17  if we moved him, if he rolled, or if, through

18  the -- you know, the constant wrestling, if we

19  moved the area.  I can't tell you if that was

20  exactly where we cuffed him or not.

21      Q.   Now, do you know the area in which you

22  had that initial struggle with Mr. Tyson prior to

23  Officer Pantaloukas arriving on scene?

24      A.   I can't -- I wouldn't be able to tell

25  you.  It had to have been somewhere in the middle

1  of the courtyard, but I can't tell you a specific

2  spot.

3         Q.   Do you know whether or not that area

4  differed from where Mr. Tyson was actually placed

5  in handcuffs and leg shackles?

6         A.   Again, I can't answer that because I

7  don't know where, what area we put the handcuffs

8  on.

9         Q.   Okay.  So while you were receiving

10  treatment from fire rescue, what are the other

11  officers doing?

12         A.   I don't know.  I just -- I know that

13  they're -- they're -- over here, there's a group of

14  guys standing over there, and I'm against the wall

15  over here being treated (indicating).  I don't -- I

16  don't know what they're doing.

17         Q.   What are you hearing?

18         A.   I'm hearing -- I'm basically hearing

19  fire rescue trying to tell me what to do or put

20  pressure on this, or what happened.  That's -- my

21  attention is no longer on Mr. Tyson and the other

22  officers.  My attention was on myself at this time.

23         Q.   Okay.  At some point, when you're

24  receiving treatment from fire rescue, do you hear

25  anything else out on the radio as it pertains to

1    this specific call?

2          A.    On the radio, no.

3          Q.    Does your cell phone ever ring while

4    you're being treated by fire rescue?

5          A.    Not that I can remember.  I don't think

6    so.

7          Q.    How about at any point during this

8    encounter with Mr. Tyson, does your cell phone ever

9    ring?

10         A.    I can't remember that.  No, I don't

11   think so.

12         Q.    Do you know whether you called your

13   sergeant?

14         A.    I don't know.  I really don't.

15         Q.    Before I forget, and since I'm going to

16   do this off the record, if you could write down the

17   cell phone that you used on October 27, 2014, and

18   also your carrier back then.  And if you had more

19   than one cell phone, please include that, as well.

20         A.    (Witness complies.)

21               The carrier, I think it was T-Mobile.

22   I'm not a hundred percent sure.

23         Q.    Who is your current carrier?

24         A.    Sprint.

25         Q.    Do you know how long you've been with

Page 161

1   Sprint?

2        A.   Actually, I had T-Mobile, then I went to

3   Sprint, now I'm back with T-Mobile.  So it's either

4   Sprint or T-Mobile, one of the two.

5        Q.   How many people were treating you from

6   fire rescue?

7        A.   I don't know.  At least a couple of guys

8   were there with me.

9        Q.   Okay.  And while you were being treated

10  by fire rescue, does anything else happen?

11       A.   The rescue guys were -- they're

12  attending to me, trying to wipe the stuff.  And

13  then they shift their focus from me back to

14  Mr. Tyson and the group of guys that were there.

15       Q.   Why?

16       A.   I don't know -- well, obviously, I know

17  after the fact, but at that time I didn't know.

18       Q.   Are they treating you and then all of a

19  sudden, like, they just all rush, or what happens?

20       A.   Yeah, basically.  They just -- so they

21  cleaned me up as best they can and then they just

22  turned and head to Mr. Tyson.

23       Q.   What happens then?

24       A.   At that time I was already escorted off

25  the property, so I don't know what happened

Page 162

1  afterwards.

2      Q.   Did you hear anything?

3      A.   No.  I was put in a rescue, and then

4  they made me get out of the rescue truck and then

5  they put me in a patrol car.

6      Q.   Why?

7      A.   I don't know.

8      Q.   Do you know who went in the back of the

9  fire rescue in your place?

10     A.   I saw them load Mr. Tyson in the

11 ambulance.

12     Q.   Okay.  What did you see?

13     A.   Just, he was on a backboard and they

14 were putting him in the ambulance.

15     Q.   Was he awake?

16     A.   I couldn't tell from where I was.

17     Q.   Was he conscious?

18     A.   I couldn't tell.

19     Q.   Could you make any observations about

20 his -- the color of his lips?

21     A.   I couldn't.  No, I was too far.

22     Q.   Could you make any observations as to

23 whether or not he was breathing?

24     A.   I couldn't.

25     Q.   Now, while you were being treated by

Page 163

1   fire rescue, do you ever hear another officer say,

2   "He's not breathing"?

3           A.    Again, after the fact, yes.  But I don't

4   remember exactly if I did or not during that time.

5           Q.    Did anyone tell you after the fact,

6   like, he turned blue and he stopped moving?

7           A.    Not specifically like that.  They just

8   said that they had to take him to the hospital,

9   rush him to the hospital.

10          Q.    Now, while you're being treated with

11  fire rescue, is Officer Pantaloukas still with

12  Mr. Tyson?

13          A.    I don't know where Pantaloukas is at

14  that time, no.

15          Q.    Do you know where Officer Kerns was at

16  that time?

17          A.    I do not know.

18          Q.    Do you know the location of any of the

19  officers who arrived --

20          A.    No.

21          Q.    -- on scene while you're being treated

22  by fire rescue?

23          A.    No.

24          Q.    Now, while you were looking through

25  those photographs before you, did you see your

Page 164

1    Taser in the grass?

2         A.    No, I don't think I did.  No.

3         Q.    Did you observe any of the wires from

4    your Taser?

5         A.    No.

6         Q.    Do you know what happened to your Taser

7    after this?

8         A.    I'm assuming it was collected by crime

9    scene, but I didn't take it back.  I don't think I

10   did.

11        Q.    Do you know if your Taser was

12   downloaded?

13        A.    I don't know.  I believe so.

14        Q.    Do you know if you were issued another

15   Taser?

16        A.    I don't know.  I don't remember.

17        Q.    Were you educated, during your Taser

18   training back in July of 2014, on how a Taser

19   affects someone who is decompensating as a result

20   of a mental illness?

21        A.    I don't remember that, no.

22        Q.    How about during your refresher course,

23   were you ever trained on the effect a Taser has on

24   someone who is decompensating as a result of a

25   mental illness?

1        A.   It's been a bit, so I don't remember if

2   it's on their notes or not.  I don't remember that

3   being a topic on it.  It could be.  I would have to

4   refresh those handouts.

5        Q.   Okay.  As you sit here today, are you

6   aware of how a Taser can affect someone that is

7   decompensating as a result of a mental illness?

8        A.   I would have to research it.

9        Q.   So is your answer, no?

10       A.   Yes.

11       Q.   Can I have that stack of photos, please?

12       A.   Sure.

13       Q.   Were you transported to Memorial

14   Regional?

15       A.   I was.

16       Q.   Did you have a police escort?

17       A.   I don't remember.  I went in the

18   ambulance.  I don't know.

19            THE COURT REPORTER:  I'm sorry?

20       A.   I went in the ambulance, but I don't

21   know if our guys followed me or not.

22   BY MS. GEORGES:

23       Q.   I was going to ask you a question about

24   these two photographs, and they are Tyson 4335 and

25   36.  If you could just review those.

1        A.    Okay.

2        Q.    And so is this just like an apartment

3   complex that just has multiple units on the same

4   property?

5        A.    I don't know if -- I'm assuming.  So I

6   don't know if it's a complex or whatnot, a duplex.

7   I don't even know if the back units belong to the

8   front units.  I don't know.

9        Q.    Now, does this depict a front gate in

10  photograph 4436?

11       A.    Thirty-six?  There's a gate to this unit

12  over here, but that's not -- that's not where we

13  entered.

14       Q.    Is that -- is there a number that's

15  affixed on top of that gate?

16       A.    It's kind of blurry.  I can't make it

17  out.  1830 or 1836.  I don't know.

18       Q.    So where did you enter?

19       A.    I entered just west of that, between the

20  two buildings.

21       Q.    Is that where there is, I believe, a

22  gray Honda parked?

23       A.    Yes.

24       Q.    And so you would have entered right here

25  (indicating)?

1      A.   Correct.

2      Q.   Do you know why you would have entered

3  there versus somewhere else?

4      A.   I don't recall at the moment.  I don't

5  know.  Maybe the information that was given to us

6  or --

7      Q.   Do you know if someone directed you to

8  enter?

9      A.   I don't think so, no.  I mean, I wasn't

10  greeted by anybody.  I just walked through.

11      Q.   How about that woman that you initially

12  encountered when you arrived on scene, do you

13  recall where she was standing?

14      A.   She was -- I don't remember exactly what

15  unit, but she was further down.

16      Q.   Further down within the courtyard?

17      A.   Yeah.

18      Q.   And I'm sorry if I asked you this, but

19  did your sergeant ever arrive on scene?

20      A.   I don't remember, no.

21      Q.   How about at Memorial, did your sergeant

22  respond to that location and talk to you?

23      A.   I was seen by a lot of people.  I don't

24  remember.  Honestly, I can't even think of who my

25  sergeant was that day, so I don't know if he did

Page 168

1    respond or not.

2         Q.    Do you know if a lieutenant responded to

3    Memorial Regional?

4         A.    I don't know.

5         Q.    Do you know if your PBA rep. arrived at

6    Memorial and spoke to you?

7         A.    I don't remember, no.

8         Q.    Did you learn of Mr. Tyson's death on

9    October 27, 2014?

10         A.    I don't remember if it was that same

11    date or afterwards.  I don't know.

12         Q.    When did you learn that this was a death

13    investigation?

14         A.    I can't give an exact date.  I don't

15    know.

16         Q.    This photograph that's Bates stamped as

17    Tyson 4360, do you know what's on that sidewalk

18    where the cone is located?

19         A.    A tree stump.

20         Q.    No, in the middle of the sidewalk.

21         A.    No, I don't know what that is.  I don't

22    actually see anything there.

23         Q.    Did you ever speak to any witnesses,

24    other than the woman when you initially arrived?

25         A.    No.

1      Q.   Did you ever hear any neighbors during

2  this entire encounter?

3      A.   No.

4      Q.   Were there ever any citizens who

5  assisted you all during this encounter with

6  Mr. Tyson?

7      A.   Not that I can recall.

8      Q.   This patrol car that's depicted in Tyson

9  4384, that is number 2770, was that your unit?

10     A.   I don't know.  Possibly.  I don't

11 remember what number I was driving at that time.

12     Q.   Would that information be contained

13 within the CAD dispatch?

14     A.   I don't think so.

15     Q.   Do you know what type of vehicle Officer

16 Kerns was driving on October 27, 2014?

17     A.   I don't recall, no.

18     Q.   Do you know what type of car Officer

19 Pantaloukas was driving on October 27, 2014?

20     A.   I would assume, a Crown Vic.  That's

21 what all the new guys got.  But I don't know for a

22 fact.

23     Q.   Who would have been driving a City of

24 Hollywood SUV?

25     A.   There's numerous people that drive SUVs,

1  anywhere from command staff, to the FTOs, to NTL,

2  neighborhood team leaders.  It just depends who

3  they want to give them to.

4        Q.    Officer Pantaloukas (sic.), this

5  photograph that's Bates stamped as Tyson 4488, does

6  that photograph assist in any way in depicting the

7  area of your initial struggle with Mr. Tyson and

8  your subsequent struggle?

9        A.    I mean, I recognize it as the general

10  area, but it doesn't clarify anything for me, no.

11        Q.    To this day, do you know what you were

12  struck with?

13        A.    Yeah.  I learned after the fact what it

14  was.

15        Q.    What did you learn?

16        A.    It was like a metal sundial clock or

17  something like that.

18        Q.    Now, there's portions of a clock in

19  Tyson 4498.  Do you recognize that?

20        A.    I recognize that as a clock, yeah, but I

21  couldn't tell you that that was -- you know, I

22  didn't know what it was at the time.

23        Q.    Do you know if that's what you were

24  struck with?

25        A.    That's what I was told I was struck

1    with, yeah.

2          Q.    Did you have gloves on at any point

3    during this struggle?

4          A.    I don't remember.

5          Q.    Do you know if any of the other officers

6    wore gloves?

7          A.    I don't know.

8          Q.    Almost done.

9                Prior to getting into the fire rescue

10   truck, was your equipment belt taken from you --

11         A.    I don't --

12         Q.    -- or removed?

13         A.    I don't remember.

14         Q.    Do you remember taking your equipment

15   belt with you to Memorial?

16         A.    I don't remember if I had it on me or

17   not, no.

18         Q.    Was your Taser functioning on that day?

19         A.    I'm assuming so, yeah.

20         Q.    I mean, like, when you hit the trigger,

21   did it actually work, or was there no electricity

22   that went through the wires?

23         A.    I don't remember.  I don't know.

24         Q.    Do you have any reason to believe that

25   your Taser was malfunctioning on that day?

Page 172

1     A.    I wouldn't have any reason to believe
2     so, no.
3          Q.    Officer Pantaloukas ever tell you that
4     his Taser was malfunctioning on October 27, 2014?
5          A.    I don't remember having that
6     conversation with him, no.
7          Q.    Do you recall having any conversation
8     with any police officer, while on the scene, of the
9     reason for Mr. Tyson's behavior?
10         A.    No.
11         Q.    Do you know if your Taser was recovered?
12         A.    I believe it was taken by crime scene,
13    but I'm not a hundred percent sure.
14         Q.    Do you know where it was taken from?
15         A.    No.
16         Q.    Was it on your equipment belt?
17         A.    Is it on my current?
18         Q.    Was it on your equipment belt when it
19    was taken from you?
20         A.    No, I don't think so.
21         Q.    Was it somewhere in that courtyard area?
22         A.    I believe so, yes.
23         Q.    Did you ever regain control of your
24    Taser device after you deployed it?
25         A.    During that incident, no.

1          MS. GEORGES:  Since we're going to be

2     using these in all of these depositions, I'm

3     going to have this marked as Exhibit 5, as a

4     composite.

5          MR. HAPNER:  I think the photographs are

6     already marked as 4.

7          MS. GEORGES:  No, this is another stack.

8          MR. HAPNER:  Oh, it is?

9          MS. GEORGES:  Yes.

10          MR. HAPNER:  Okay.

11          MS. GEORGES:  And, Adam, I'll have a

12     copy for you tomorrow.  Three copies,

13     actually.

14          (Documents were marked as Plaintiff's

15     Exhibit No. 5 for Identification.)

16  BY MS. GEORGES:

17     Q.   These are Bates stamped as Tyson 4665

18  through 4774.  I'm directing you specifically to

19  photograph 4752.  Do you recognize that photograph?

20     A.   I recognize the building, yes.

21     Q.   What do you recognize this to be?

22     A.   It's the balcony where Mr. Tyson came

23  out of.

24     Q.   Is that a fair and accurate depiction of

25  the building and also the balcony in which

Page 174

1    Mr. Tyson came out of?

2         A.    Yes.

3         Q.    Now, does that photograph also depict

4    where you stood upon your initial encounter?

5         A.    I don't know exactly where I was

6    standing.  I don't -- I don't recall if it was on

7    here.  I believe it was further back to the other

8    building, but I don't know for a fact.

9         Q.    Do you know what those two markers in

10   that photograph, 4752, correspond to?

11        A.    I do not.

12        Q.    Okay.  You can put the photo down.

13             Is it fair to say that crime scene

14   investigators went out to the scene?

15        A.    I believe so.

16        Q.    They processed the scene?

17        A.    To my knowledge, yes.

18        Q.    They took the photographs that are

19   before you?

20        A.    I believe so.

21        Q.    And they preserved any and all evidence?

22        A.    I believe so.

23        Q.    The Taser that you used on

24   October 27, 2014, was it ever given back to you?

25        A.    I don't know if it was the same Taser or

1    not, but a Taser was given back to me.

2           Q.    Do you know if it was the same Taser?

3           A.    I do not know.

4           Q.    Now, you testified earlier that you

5    tased Mr. Tyson in the front of his body.  Do you

6    know where in the front of his body?

7           A.    I don't.

8           MS. GEORGES:  I'm going to mark this as

9           Plaintiff's Exhibit 6.

10          (A document was marked as Plaintiff's

11          Exhibit No. 6 for Identification.)

12   BY MS. GEORGES:

13          Q.    You can have an opportunity to review

14   this.  It's also Bates stamped as Tyson 4091.

15          Do you recognize this photo?

16          A.    I don't recognize it now.

17          Q.    Have you ever seen the autopsy photos --

18          A.    I have not.

19          Q.    -- of Mr. Tyson?

20          A.    No.

21          Q.    Do you see that there is a laceration of

22   sorts under the left chest area?

23          A.    Would you mind pointing it out?

24          Q.    This (indicating).

25          A.    That?  Yeah, I can see that.

Page 176

1      Q.   Do you know whether that is the area in

2  which you tased Mr. Tyson?

3      A.   Like I said, I aimed for the chest.  I

4  don't know if that's where my prongs made contact.

5  I never got to see that.

6      Q.   Okay.  And how about, in the center of

7  the chest here above the belly button is another

8  laceration.  Do you see that?

9      A.   I see it.

10      Q.   Do you know whether one of the probes

11  had entered into that area of Mr. Tyson's abdomen?

12      A.   I don't recall.

13      Q.   Does this fairly and accurately depict

14  Mr. Tyson's body habitus?

15      A.   I mean, yeah, that's -- that's what he

16  looked like.

17      Q.   And he was naked, right?

18      A.   Yeah.

19      Q.   So you were able to see his chest area?

20      A.   Yeah.  Like I said, it was so quick

21  and -- I mean, I didn't get a chance to glance at

22  him, but if you're telling me that's him, then --

23           MS. GEORGES:  I'll have this marked as

24      Exhibit 7.

25           (A document was marked as Plaintiff's

1      Exhibit No. 7 for Identification.)

2  BY MS. GEORGES:

3      Q.   You can take an opportunity to review

4  that photograph.

5           Do you recognize this photograph?

6      A.   I assume that's Mr. Tyson.  I don't

7  recognize it, no.

8      Q.   Do you know whose Taser probes are

9  inserted into Mr. Tyson's back as depicted in the

10  medical examiner photographs?

11     A.   I don't know whose -- I can assume, but

12  I don't know for a fact.

13     Q.   Were they yours?

14     A.   No.  I don't think so, no, because I

15  didn't aim for his back.

16     Q.   Were they Officer Pantaloukas'?

17          MR. HAPNER:  Form.

18     A.   Could possibly be.  I don't know.

19  BY MS. GEORGES:

20     Q.   Do you know if any other officer, other

21  than yourself and Pantaloukas, deployed their Taser

22  on Mr. Tyson on October 27, 2014?

23     A.   Not to my knowledge.

24     Q.   Let me show you a photograph.  I'm going

25  to mark it as Plaintiff's Exhibit 8.  Review it

Page 178

1  with your counsel.

2           I'm actually going to have it marked as

3  a composite with three other photographs.  So the

4  sequence will be Tyson 4303 through 06.

5           (Documents were marked as Plaintiff's

6      Exhibit No. 8 for Identification.)

7  BY MS. GEORGES:

8      Q.   Please let me know if you recognize the

9  Taser that's depicted in that vehicle with that

10  serial number.

11      A.   I recognize that to be one of our old

12  Tasers, one that I could possibly have used, but I

13  don't know if that's exactly the one that I had or

14  not.  I don't know if it's mine or somebody else's.

15      Q.   My question to you is, do you know if

16  that's your Taser?

17      A.   I don't know.

18      Q.   Do you know if those are your handcuffs?

19      A.   I don't know.

20      Q.   Do you know how that came about that it

21  was placed in that vehicle?

22      A.   I do not know.

23      Q.   Or photographed in that vehicle?

24      A.   I don't know.

25      Q.   Paperclip that, please.

Page 179

1          A.    Yes.

2          Q.    Officer Ramirez, if you could review

3     these photographs.

4               MS. GEORGES:  And I'm going to have it

5          marked as a composite, as Plaintiff's

6          Exhibit 9, consisting of four photographs

7          that are Bates stamped as Tyson 4920 through

8          23.

9               (Documents were marked as Plaintiff's

10          Exhibit No. 9 for Identification.)

11    BY MS. GEORGES:

12          Q.    Do you recognize those photographs?

13          A.    Sure.

14          Q.    What do you recognize those photographs

15     to be?

16          A.    Me standing next to the hospital bed.

17               MR. HAPNER:  For the record, I would

18          object to these photographs being published

19          because they are depicting the officer and

20          exempt under Florida Statute.

21               MS. GEORGES:  We will agree.

22    BY MS. GEORGES:

23          Q.    Officer, do those photographs fairly and

24     accurately depict your injuries?

25          A.    They do.

1          Q.    Now, I know the second photograph, there

2    seems to be a series of either ripple lines or

3    there's additional blood on your forehead.  Do you

4    see that?

5          A.    I do.

6          Q.    Is that just a matter of the blood not

7    being cleaned up?

8          A.    I don't know.

9          Q.    Did you have any other lacerations other

10   than the one that's depicted in the third and

11   fourth photograph of that composite?

12         A.    I did.  Yes, I did.

13         Q.    Where were the other injuries?

14         A.    I had some on my hands, back of my head,

15   behind my ear, scratches.

16         Q.    How about to the front of your face?

17         A.    I don't remember.  I don't know.

18         Q.    Maybe these are better photographs that

19   I will add to that composite, that are Bates

20   stamped as Tyson 4930, 4931, 4932.

21               I just want to direct you to the front

22   of your forehead.

23         A.    Uh-huh.

24         Q.    Are those lacerations?

25         A.    I wouldn't be able to tell you.  I don't

1    know.  I don't know if those are scratches.  I

2    can't tell from the picture.  I believe so.

3          Q.   Did you have to be stitched in any other

4    area?

5          A.   Besides that, no.

6          Q.   And so, otherwise, you just received

7    some lacerations to your hand --

8          A.   Yes.

9          Q.   -- and behind your ear, correct?

10         A.   Correct.

11         Q.   How many staples did you receive that

12   day?

13         A.   I don't recall off the top of my head.

14   It was somewhere between six or seven.

15         Q.   Do you know -- or strike that.

16              Did you have to receive any other

17   treatment at Memorial on October 27, 2014?

18         A.   No, not that I can remember.

19         Q.   Did they ever have to run a CAT scan?

20         A.   I'm not sure if they did or not.  I

21   don't remember.  They ran a lot of tests and stuff,

22   so I don't know.

23         Q.   Now, Officer Ramirez, after Mr. Tyson

24   was placed into handcuffs and you were being

25   treated by fire rescue, it's fair to say that you

1  are not there to observe what the other police

2  officers were doing during that period of time?

3       A.    Right.

4       Q.    And it's fair to say that you did not

5  observe them put on leg shackles?

6       A.    Right.

7       Q.    And it's fair to say that you weren't

8  present if Mr. Tyson was tased additionally?

9       A.    Correct.

10      Q.    Had Mr. Tyson not been transported to

11 Memorial and not died, were you going to arrest him

12 for battery on a law enforcement officer?

13      A.    I don't know.  Typically, you know, when

14 there's a battery on a Leo, we would.  I don't know

15 if the circumstances, as far as whatever additional

16 information, whether if he was mentally ill, I

17 don't know if the state attorneys would actually go

18 ahead and press charges for that.

19      Q.    Have you had instances where people have

20 been mentally ill, committed crimes and have been

21 arrested?

22      A.    Me, personally, no.

23      Q.    You've never arrested someone who is

24 suffering from a mental illness?

25      A.    No, I haven't had that chance yet -- I

Page 183

1   mean, or I haven't been to a call like that.

2   Normally, when somebody -- it is, you know, they

3   meet our criteria for a Baker Act, then, you know,

4   they get transported.  But as far as somebody

5   mentally ill committing a crime, at least me, I

6   haven't responded to a call like that, as of now,

7   that I can recollect.

8          Q.   So while you were trying to get

9   Mr. Tyson into custody, what is your intention to

10  do with him?

11         A.   Control him.

12         Q.   For what?

13         A.   For the purpose of avoiding any other

14  injuries, either to himself or me, and get him the

15  help -- get him to whatever help he needs.

16         Q.   So your intention, to Baker Act him?

17              MR. HAPNER:  Form.

18         A.   If that's what was needed, yeah.  Yeah.

19              I mean, my intentions, I can't tell you

20  what I was thinking, my future plans, because I

21  hadn't gotten there yet.  My intentions at that

22  time was just to control the scene.  I didn't

23  have -- I didn't get that chance, to think that far

24  ahead.

25  BY MS. GEORGES:

1      Q.   Now, when you say "control the scene,"

2   you wanted to control Mr. Tyson?

3      A.   Correct.

4      Q.   But what was it -- what was your

5   intention, though?  What were you controlling him

6   for?

7      A.   To prevent him from continuing to hurt

8   me, injure me, himself or somebody else.

9      Q.   And then did you intend on Baker Acting

10   him or taking him to Broward County Jail?

11      A.   We hadn't gotten to that step yet.  You

12   know, you've got to crawl before you can walk, and

13   there's steps that you've got to take.  And the

14   first step was to control the scene and then see

15   what we had; evaluate, reassess, you know, is there

16   a crime that was committed, is he mentally

17   challenged, is there something else?  Just continue

18   to reassess.

19      Q.   Had you ever had a conversation with any

20   of the police officers who arrived on scene about

21   what you guys were going to do with Mr. Tyson?

22      A.   No.

23      Q.   Other than on October 27, 2014, have you

24   ever had to use force during any type of a citizen

25   encounter?

1      A.    Prior to that, I don't remember.

2      Q.    After?

3      A.    After?  Yes.

4      Q.    How many times?

5      A.    I'm not sure how many uses of force I've

6  had.  Not much.  Maybe three or four.  I don't

7  know.  I would have to check.

8      Q.    Do you know what a spark test is?

9      A.    Yes.

10      Q.    How often would you spark test?

11      A.    I would typically spark test every

12  morning.

13      Q.    Did you spark test on October 27, 2014?

14      A.    I don't recall if I did or not.

15      Q.    And for the jury's benefit, when we talk

16  "spark test," we're talking about your Taser?

17      A.    Yes.

18      Q.    Do you know if any of the other officers

19  were injured during this encounter?

20      A.    I do not know.

21      Q.    Did you ever ask them?

22      A.    No.

23      Q.    Did you have leg shackles in your car?

24      A.    I don't remember.

25      Q.    Do you know if any of the other officers

Page 186

1    had a baton clipped to their belt?

2          A.   I don't know.

3          Q.   Do you know if a baton was ever used

4    during this encounter?

5          A.   Not to my knowledge.

6          Q.   At any point during this encounter, did

7    any citizen approach any of the officers?

8          A.   I don't know.  You would have to ask

9    them.

10         Q.   How about you, do you recall that same

11   woman you initially spoke to approaching you and

12   the other officers?

13         A.   No, I don't recall.

14              MS. GEORGES:  Just one more minute.

15              I don't have anything further.

16                    CROSS-EXAMINATION

17   BY MR. HAPNER:

18         Q.   Officer, when dispatch first contacted

19   you, did they inform you they received a 911 call

20   in reference to a naked man who was talking to

21   trees?

22              MS. GEORGES:  Object to the form.

23         A.   Yes.

24   BY MR. HAPNER:

25         Q.   Did you later learn that the subject of

Page 187

1   that call was Daniel Tyson?

2          A.    Yes.

3          Q.    Is that why you refer to Mr. Tyson now

4   as "the subject"?

5          A.    Yes.

6          Q.    When you received that dispatch call and

7   then later arrived at the scene, were you under the

8   impression that dispatch had already sent another

9   officer to respond to the same incident?

10         A.    Yes.

11         Q.    And who was that officer?

12         A.    Officer Pantaloukas.

13         Q.    Is that why you referred to him as your

14  backup officer?

15         A.    Yes.

16         Q.    Once you responded to the scene and

17  began to interact with Mr. Tyson to figure out what

18  was going on, why didn't you leave the courtyard?

19         A.    My main concern was that he could -- I

20  mean, he's obviously not in the right state, he

21  could potentially get out.  I didn't know what his

22  intentions were, so I wanted to basically contain

23  him to that area.  My presence being there would

24  hopefully do that.

25         Q.    Opposing Counsel asked you about your

Page 188

1   definition of what is an effective use of a Taser.

2   Do you remember that?

3          A.    Yes.

4          Q.    You mentioned incapacitation?

5          A.    Correct.

6          Q.    Is that your definition for a Taser

7   being fully effective?

8                MS. GEORGES:  Object to the form.

9          A.    Yes.

10  BY MR. HAPNER:

11         Q.    Is it possible for a Taser to have some

12  effect even if it doesn't totally incapacitate

13  somebody?

14               MS. GEORGES:  Form.

15         A.    It just depends on the manner that it's

16  being used.

17  BY MR. HAPNER:

18         Q.    Do you think a Taser can be effective

19  even though it doesn't totally incapacitate

20  somebody?

21               MS. GEORGES:  Form.

22         A.    No.

23  BY MR. HAPNER:

24         Q.    When fire rescue was treating you, can

25  you give a general approximation about how far you

Page 189

1  were from Mr. Tyson?

2       A.   The space between the building isn't

3  that big, so maybe, I would say, eight feet,

4  something like that.

5            MR. HAPNER:  Okay.  No further

6       questions.

7            MS. GEORGES:  I don't have any Redirect.

8            THE VIDEOGRAPHER:  That concludes

9       today's deposition.  The time is 1:29 p.m.

10      We're now going off the record.

11           THE COURT REPORTER:  Read?

12           MR. HAPNER:  Yes.

13           (The reading and signing of this

14      deposition was not waived.)

15           (This deposition was concluded at

16      1:29 p.m.)

17

18

19

20

21

22

23

24

25

Page 190

1          CERTIFICATE OF OATH

2  .

3  STATE OF FLORIDA        :

4                          :SS.

5  COUNTY OF MIAMI-DADE :

6

7          I, the undersigned authority, certify

8     that Officer Alexis Ramirez personally

9     appeared before me and was duly sworn.

10

11          WITNESS my hand and official seal this

12     20th day of February, 2018.

13

14

15

16  _____

17  MELISSA A. SOHR, RPR
    Notary Public, State of Florida at Large
    My Commission Number:  FF 897226
18  Expires:  November 4, 2019

19

20

21

22

23

24

25

1          REPORTER'S DEPOSITION CERTIFICATE

2

3          I, MELISSA A. SOHR, Registered

4     Professional Reporter, certify that I was

5     authorized to and did stenographically report

6     the deposition of Officer Alexis Ramirez;

7     that a review of the transcript was

8     requested; and that the transcript is a true

9     and complete record of my stenographic notes.

10         I further certify that I am not a

11    relative, employee, attorney or counsel of

12    any of the parties, nor am I a relative or

13    employee of any of the parties' attorney or

14    counsel connected with the action, nor am I

15    financially interested in the action.

16

17         DATED this 20th day of February, 2018.

18

19

20              _Melissa A. Sohr_

21    _____
      MELISSA A. SOHR, RPR
22    Certified Court Reporter

23

24

25

Page 192

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

RE:        Suarez vs. City of Hollywood
CASE NO.:  16-62215-CIV-DIMITROULEAS
DEPO OF:   Officer Alexis Ramirez
TAKEN:     February 14, 2018

Page #        Line #            Change            Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document, and that the facts
stated in it are true.

_____        _____
        Signature                   Date

Page 193

1                        February 20, 2018

2    Officer Alexis Ramirez
     c/o:  Adam M. Hapner, Esq.
3    Weiss Serota Helfman Cole & Bierman, P.L.
     200 East Broward Boulevard, Suite 1900
4    Fort Lauderdale, Florida 33301
     (954)763-4242
5    ahapner@wsh-law.com

6    In Re:  Suarez vs. City of Hollywood

7    Dear Sir/Madam:

8         This letter is to advise that the transcript
     for the above-referenced deposition has been
9    completed and is available for review.  Please
     contact our office at (305)632-4464 to make
10   arrangements to read and sign, or sign below to
     waive review of this transcript.

11

12        It is suggested that the review of this
     transcript be completed within 30 days of your
     receipt of this letter.

13

14        The original of this transcript has been
     forwarded to the ordering party, and your errata,
     once received, will be forwarded to all ordering
15   parties for the inclusion in the transcript.

16   Sincerely,

17

18   Melissa A. Sohr, RPR
     Steinotype, Inc.

19

     cc:  Denise H. Georges, Esq.
20

     Waiver:
21

     I, _____, hereby waive the
22   reading and signing of my deposition transcript.

23   _____    _____
     Deponent Signature                         Date
24

25