UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ,

       Plaintiff,

v.

CITY OF HOLLYWOOD,

       Defendant.

_____/

## CITY OF HOLLYWOOD'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, City of Hollywood ("the City"), by its undersigned counsel, hereby files this Motion for Summary Judgment. Pursuant to Federal Rule of Civil Procedure 56, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## FACTUAL BACKGROUND[1]

On October 27, 2014, police were called to an apartment complex in Hollywood, Florida in reference to a naked man talking to trees. *See* Facts ¶¶ 15–17. The caller, Xavier Lesmarie, reported that his tenant, Daniel Tyson, was manic depressive and "needs medication." *Id.* ¶ 16. The Broward Sherriff's Office—who, at the time, was responsible for fielding emergency and non-emergency calls for police, fire, and medical services within Broward County, including the City of Hollywood—dispatched two of the City's Police Officers, Alexis Ramirez and Andreas Pantaloukas, to respond the scene. *Id.* ¶ 17 & n.2.

When Officer Ramirez arrived on scene, he first spoke with a concerned neighbor, Leonarda Moore, to gather more information. *Id.* ¶ 19. Earlier in the day, Moore and other neighbors observed Tyson displaying aggressive, intimidating, and bizarre behavior, including

---

[1] The undisputed facts relied on in support of this Motion for Summary Judgment are more fully set forth in the City's Statement of Material Facts ("Facts"), filed concurrently with this motion pursuant to Local Rule 56.1(a). ECF No. 103.

throwing large objects from his second-story apartment balcony into the courtyard below.[2] *Id.* ¶¶ 6–9, 14. Moore testified that based upon her observations, she was concerned for the safety of Tyson and of property. *Id.* ¶ 11.

While Officer Ramirez was speaking to Moore, Tyson emerged from his apartment wearing an open robe and nothing else. *Id.* ¶ 20. Tyson appeared irate. *Id.* Officer Ramirez stayed in the courtyard, approximately twenty-five feet away. *Id.* ¶ 21. In a friendly tone, Officer Ramirez informed Tyson, "Sir, you can't be outside like that." *Id.* ¶ 22. Tyson responded, "no no, do you know who I am?" and took his robe off. *Id.* ¶ 23. Officer Ramirez tried to deescalate the situation by conversing with Tyson in a calm and polite manner. *Id.* ¶¶ 24–25. However, Tyson became even more irate. *Id.* ¶ 24.

Tyson then grabbed a metal sundial from his exterior wall and charged at Officer Ramirez while holding the sundial above his head. *Id.* ¶¶ 27, 29. After providing a verbal warning, Officer Ramirez deployed his Taser, but it did not incapacitate Tyson because one of the probes missed contact. *Id.* ¶ 28, 30. Tyson struck Officer Ramirez over the head with the sundial, shattering the sundial and causing a significant laceration to Officer Ramirez's head. *Id.* ¶ 31.

Officer Ramirez courageously attempted to subdue Tyson in the courtyard grass. *Id.* ¶ 32. At that time, Officer Ramirez was specifically concerned that he would pass out from his injuries and that Tyson would continue to harm himself or others. *Id.* ¶ 34. To make matters worse, Officer Ramirez was bleeding profusely from his head and could barely see because he had blood in his eyes. *Id.* ¶ 33.

Approximately thirty seconds after Officer Ramirez deployed his Taser, Officer Pantaloukas arrived on scene and observed his injured comrade engaged with Tyson in a fight for his life. *Id.* ¶ 35. Specifically, Officer Pantaloukas saw Tyson swinging his fists, attempting to escape, and striking Officer Ramirez while they were both on the ground. *Id.*

Officers Ramirez and Pantaloukas attempted to place handcuffs on Tyson. *See id.* ¶¶ 36–42. However, Tyson continued fighting, flailing his arms, trying to get up, and hitting Officer Ramirez. *Id.* ¶ 39. After providing a verbal warning, Officer Pantaloukas deployed his Taser to Tyson's lower back. *Id.* ¶ 38. Although both Taser probes made contact this time, the nine-

---

[2] The night prior, Tyson violently attacked his romantic partner of ten years, John Collette. Facts ¶ 4.

second Taser cycle again did not incapacitate Tyson because the probes were too close together. *Id.*

Within the next minute, Officer Pantaloukas deployed his Taser three more times in drive stun mode[3] at or near Tyson's ankles. *Id.* ¶ 40. However, whenever the five-second Taser cycles ended, and sometimes even during the Taser cycle, Tyson continued to physically resist the officers' efforts. *Id.* ¶ 61.

Due to Tyson's high level of resistance and "superhuman" strength, it was not until a third officer, Officer Brian Kerns, arrived that the three officers were able to secure Tyson in handcuffs. *Id.* ¶¶ 42, 54. But, even while in handcuffs, Tyson continued fighting, kicking, screaming odd statements at the officers, and trying to escape. *Id.* ¶ 43. After additional police officers arrived to assist, Officer Kerns returned to his vehicle to secure metal leg restraints. *Id.* ¶ 44.

When Officer Kerns returned to the struggle, it took several attempts to secure Tyson in leg restraints because Tyson kept flailing his body and kicking his legs. *Id.* ¶ 45. Further, even after Tyson was in handcuffs and leg restraints, Tyson continued to violently resist the officers. *Id.* ¶ 46. At that time, Officer Pantaloukas viewed Tyson's legs as a potentially deadly weapon because he could get knocked unconscious if struck in the head. *Id.* ¶ 63; *see also id.* ¶ 65.

Over the course of several minutes, Officer Pantaloukas deployed his Taser five more times in drive stun mode at or near Tyson's ankles. *Id.* ¶ 59. Although he could not remember the precise details of those tense moments, he candidly testified that he deployed his Taser after Tyson was in handcuffs and leg restraints, although he does not know how may times. *Id.* ¶ 63. According to Taser records, Officer Pantaloukas' final Taser deployment ended at 15:00:01, which is approximately five minutes after Tyson was placed in handcuffs. *Id.* ¶ 60.

In an effort to subdue Tyson and prevent him from escaping and harming others, the officers applied some pressure to Tyson's body while he was on his stomach in the grass. *Id.* ¶¶ 47–53. However, the officers never drew their firearms. They never punched or kicked Tyson. They never beat Tyson with their batons. And they never sprayed Tyson with pepper spray.

---

[3] In drive stun mode, the front of the Taser is physically pressed against the target. Facts ¶ 41. When a drive stun is applied with the probes still attached, electrical impulses are transmitted through two fixed electrodes on the sides of the cartridge that held the probes. *Id.*

Several neighbors witnessed Tyson's violent altercation with police.[4] Moore, who observed the entire struggle from inside her apartment, testified that after Tyson was in handcuffs and leg restraints, he was "still being combative," was not calm, was moving around, and refused to comply with the officers' commands. *Id.* ¶ 67–68. Christine Corbo testified that throughout the encounter, Tyson was "just crazed" and his "power was just phenomenal." *Id.* ¶ 73. She stated that the officers tried to calm Tyson down, but "he was just attacking and attacking and attacking." *Id.* Additionally, Jennifer Corbo testified that the police officers were talking to Tyson "very rationally, tryin' to reason with him to get him to calm down and, you know, just remain calm and stay still and he was fighting them and fighting them and, and screaming I am Daniel, I am Daniel and they said sir please, I mean they pleaded with him." *Id.* ¶ 74. According to her, the officers "couldn't have been more professional and, you know, tryin' to put him at ease." *Id.* Moore and Jennifer Corbo also noted that Tyson was very strong and that he was able to move the officers who were attempting to subdue him. *Id.* ¶¶ 68, 75.

At 3:01, Fire Rescue personnel arrived on scene and observed that Tyson was still "combative." *Id.* ¶ 77. At that time, Tyson did not exhibit any physical injuries that required emergency medical assistance. *Id.* ¶ 79. Nor was there an opportunity to safely provide any medical care due to Tyson's ongoing violent behavior. *See id.* ¶ 78. Once on scene, paramedics began to treat Officer Ramirez's head wound, approximately ten to fifteen feet away in the courtyard. *Id.* ¶ 77. During this time, the Patrol Supervisor, Sergeant Yasmanny Ruiz, arrived on scene. *Id.* ¶ 80.

At 3:03, Tyson suddenly became unresponsive, and Sergeant Ruiz immediately ordered Fire Rescue personnel to respond to Tyson. *Id.* ¶ 80. Paramedics immediately began medical treatment on Tyson, but to no avail. *Id.* ¶ 81–82. A subsequent autopsy revealed that Tyson had multiple very serious heart conditions, which, independent of one another, could lead to sudden cardiac death. *Id.* ¶ 85. Both Plaintiff's expert and the City's expert agree that these preexisting heart conditions, as well as Tyson's Excited Delirium Syndrome (ExDS), which was the source of his grandiose behavior and superior strength, were the actual and proximate causes of Tyson's death. *Id.* ¶ 87; *see also Hoyt v. Cooks*, 672 F.3d 972, 979 n.7 (11th Cir. 2012) (noting that the

---

[4] Earlier in the encounter, when there were only two or three officers on scene, Robert Brown observed from twenty seconds to less than one minute of the struggle. Facts ¶¶ 70–71. According to Brown, "[Tyson] was clearly resisting, but he was -- he really was -- they really had him pretty well under control at that point that I saw." *Id.*

symptoms of ExDS "include imperviousness to pain, great strength, bizarre behavior, aggression, and hallucinations").

**PROCEDURAL HISTORY**

On September 16, 2016, Plaintiff, Jean Suarez, as the Personal Representative of Tyson's Estate, filed this lawsuit against the City.[5] ECF No. 1. On April 18, 2018, after significant discovery had taken place, Plaintiff filed the operative Second Amended Complaint. The Second Amended Complaint ("Complaint") raises four claims against the City. ECF No. 76.

Count I is a Florida state-law claim for wrongful death. Counts II and III allege violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act, respectively. Count IV alleges the City violated 42 U.S.C. § 1983. The specific basis for each claim will be discussed in more detail below.

**ARGUMENT**

**I.    The City is entitled to summary judgment as to Count I because the police officers' conduct was authorized and/or did not cause Tyson's death.**

For Plaintiff to prevail on her wrongful death claim, she must, at a minimum, prove that the death of Tyson more likely than not resulted from the City's allegedly wrongful conduct. *See Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). In her Complaint, Plaintiff specifically alleges that Tyson "ultimately died as a direct and proximate result of being tased repeatedly while multiple officers applied physical pressure and force to Mr. Tyson's body." ECF No. 76 ¶¶ 37, 38, 41.

As explained below, Plaintiff cannot establish that the actions of the City's police officers were unreasonable, unauthorized, or caused Tyson's death. The undisputed evidence shows that every Taser deployment was justified under the circumstances and that no Taser deployment contributed to Tyson's death. Additionally, to the extent Plaintiff has properly alleged that the application of physical pressure to Tyson's body contributed to his death, which the City does not concede, this type of force was similarly reasonable and justified under the circumstances.

**A.    The use of a Taser did not contribute to Tyson's death.**

Plaintiff unquestionably pleaded this case as a Taser-death case, even going so far as to sue the manufacturer. However, the undisputed material facts show that the use of a Taser did not contribute to Tyson's death.

---

[5] The complaint also named Axon, formerly known as Taser, as a defendant. However, Plaintiff voluntarily dismissed Axon as a party.

5

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

"In cases where a plaintiff asserts harm caused by a device, the plaintiff bears the burden of proving 'both general causation—that the device in question can cause harm of the type [alleged]—and proof of specific causation—that the device in fact did cause [the alleged] injury.'" *Oliver v. City of Orlando*, 6:06-CV-1671-ORL-28, 2011 WL 2174010, at *9 (M.D. Fla. May 31, 2011), *aff'd sub nom. Oliver v. Orange County, Fla.*, 456 Fed. Appx. 815 (11th Cir. 2012). "To meet this burden requires the use of expert testimony." *Id.*

Here, Dr. Gary Vilke, the City's medical causation expert, and Dr. Daniel Wohlgelernter, Plaintiff's rebuttal expert witness, both agree that the use of a Taser did <u>not</u> contribute to Tyson's death. ECF No. 101-8 at 10–13; ECF No. 101-18 at 40–41.

Dr. Mark Shuman, Plaintiff's initial medical expert, is the only witness who did not definitively rule out the possibility that Tyson "ultimately died as a direct and proximate result of being tased repeatedly." ECF No. 76 ¶ 37. In his report, Dr. Shuman opined that "the use of a Taser conductive energy device <u>may</u> have contributed to his death as the result of additional stress caused by pain, <u>but only if</u> there was a temporal association with the cardiopulmonary arrest and the last discharge." ECF No. 101-4 at 5 (emphasis added). During his deposition, Dr. Shuman clarified that the cardiac arrest must occur within seconds from the last Taser discharge because any stress or pain caused by a Taser would immediately dissipate at the conclusion of the discharge. *See* ECF No. 101-11 at 43–44, 47.

Dr. Shuman's opinion is not sufficient to create a genuine issue of fact regarding causation for multiple reasons. First, as explained in the City's *Daubert* motion, Dr. Shuman's opinion regarding the physiological response caused by a Taser under the relevant circumstances is unreliable. ECF No. 101 at 12–13. Second, even if Dr. Shuman's opinion was reliable, it is insufficient. The fact that the Taser "may" have exacerbated Tyson's ExDS, which was self-induced by Tyson's poor decision to stop taking his medication, does not indicate that the Taser itself caused Tyson's death. *See Oliver*, 2011 WL 2174010, at *10; *see also Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1304 (11th Cir. 2009) ("Dr. Gowitt did opine that the use of the Taser probably made the situation worse, but that simply falls short of the requirements of law."). Third, there is no expert testimony that Tyson would have survived <u>but for</u> use of the Taser. *See Mann*, 588 F.3d at 1304. Finally, as the coroner noted, the undisputed material evidence shows that there was not a sufficient temporal association between Tyson's cardiac arrest and the last Taser deployment. Facts ¶ 86. Officer Pantaloukas' final Taser deployment

ended at 3:00:01. *Id.* ¶ 60. However, Tyson did not become unresponsive until 3:03, at least three minutes later. *Id.* ¶ 81.

### B.   The use of a Taser was reasonably necessary under the circumstances.

Even if Plaintiff could prove that the officers' use of force contributed to Tyson's death, she cannot prove that the use of force was excessive or unreasonable. "Traditionally, a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." *Id.* "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Id.*

Under Florida law, police officers "are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" *Id.* (quoting § 776.05, Fla. Stat.). Under federal and Florida law, police officers may not use force that is objectively unreasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397 (1989); Fla. Const. Art. I, § 12 ("This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."). This Court may, based on undisputed facts, conclude that the force used was not excessive or unreasonable as a matter of law. *See Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000); *Cottrell v. Caldwell*, 85 F.3d 1480, 1492 (11th Cir. 1996); *Bolander v. Taser Intern., Inc.*, 07-CV-80789, 2009 WL 2004379, at *12 (S.D. Fla. July 9, 2009); *Furtado v. Yun Chung Law*, 51 So. 3d 1269, 1275–77 (Fla. 4th DCA 2011). "When determining whether force was excessive and unreasonable, [the Court will] look to several factors, including the severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect actively resisted arrest." *Hoyt*, 672 F.3d at 978.

Additionally, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Therefore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The critical inquiries for summary judgment purposes

are what the involved officers knew, what they observed, and what they had reason to believe." *Magee v. City of Daphne*, 05-0633 WSM, 2006 WL 3791971, at *1 n.6 (S.D. Ala. Dec. 20, 2006).

To the extent Plaintiff believes that a Taser deployment, or even multiple Taser deployments, is per se unreasonable when an officer knows or suspects that the detainee is suffering from a mental illness, she is mistaken. *See, e.g.*, *Bussey-Morice v. Gomez*, 587 Fed. Appx. 621, 629 (11th Cir. 2014); *Mann*, 588 F.3d at 1306; *Hoyt,* 672 F.3d at 975–76; *Bolander*, 2009 WL 2004379, at *9–*10. Individuals decompensating from a mental illness often present a unique safety risk due to their unstable and sometimes violent behavior. *See Fernandez v. City of Cooper City*, 207 F. Supp. 2d 1371, 1378 (S.D. Fla. 2002) (stating that "[mental instability] presents a heightened possibility of threat to the officers and others"). Moreover, and unsurprisingly, individuals who meet the criteria for involuntary examination do not always cooperate with officers who are trying to help them. In Baker Act or criminal detainments where there is active physical resistance, police officers have limited options to overcome that resistance, and the use of a Taser has been proven to be a permissible, safe, and effective tool for gaining compliance.[6] *See Buckley v. Haddock*, 292 Fed. Appx. 791, 799 (11th Cir. 2008) (upholding repeated use of a Taser to move plaintiff to his patrol car for misdemeanor arrest); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (upholding use of Taser to overcome "hostile, belligerent, and uncooperative" behavior, but no physical resistance); *see also Hoyt*, 672 F.3d at 980 ("Other alternatives, e.g. brute physical force, also presented dangers both to Allen and the officers.").

In the instant case, all three factors—the severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect actively resisted arrest—weigh heavily in favor of the City's police officers. When Tyson struck Officer Ramirez over the head with a metal sundial, causing him great bodily harm and permanent disfigurement, the potentially routine Baker Act call transformed into a criminal encounter and a life-threatening emergency. In Florida, aggravated battery against a law enforcement officer is a first-degree felony with a minimum sentence of five years. *See* § 784.07(2)(d), Fla. Stat. From that point forward, the officers were permitted to use significant force to detain Tyson to protect themselves and the public. *See Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)

---

[6] For specific examples from the City of Hollywood, see Part IV.C., *infra*.

("Generally, more force is appropriate for a more serious offense and less force is appropriate for a less serious one.").

Due to his violent and erratic behavior, Tyson posed an immediate threat to the safety of the public, including the officers and himself. *See* Facts ¶¶ 46, 54. Both Officers Ramirez and Pantaloukas testified that throughout the encounter, they were seriously concerned for their own safety, as well as the neighbors within the apartment complex, not to mention the children who had recently been let out of a nearby school. *Id.* ¶¶ 34, 64. Officer Pantaloukas also stated that he was concerned that Tyson may run out into the street and get hit by a car. *Id.* ¶ 64.

Importantly, there is no evidence that Officer Pantaloukas deployed his Taser "beyond [Tyson's] complete physical capitulation." *See Manners v. Cannella*, 891 F.3d 959, 975 (11th Cir. 2018). Even after Tyson was secured in handcuffs and leg restraints, the evidence shows that he continued to violently resist the officers' attempts to control him. Facts ¶¶ 46, 68, 74–75, 78–80. Utilizing his superhuman strength, he was even able to lift the officers and kick at the officers after he was restrained. *See id.* ¶ 54–55. In fact, according to nine sworn law enforcement officers, one paramedic, and three independent eyewitnesses, Tyson continued assaulting the officers and trying to escape until the moment he suddenly became unresponsive. *See id.* ¶¶ 46, 54–55, 68, 74–75, 78–80. Due to Tyson's incessant violent, dangerous, and uncontrollable behavior, an official in Officer Pantaloukas' situation could reasonably believe the use of a Taser was necessary to defend himself or another from bodily harm. *See* § 776.05, Fla. Stat.; *Garrett v. Athens-Clarke County*, Ga., 378 F.3d 1274, 1280 (11th Cir. 2004) ("The uncontroverted evidence in the record shows that legs can still be used to kick, even when the ankles are bound together."). Additionally, the use of a Taser—even after handcuffs and leg restraints—was reasonably proportionate to the need for force under those tense circumstances.

### C. The application of physical pressure to Tyson's body was reasonably necessary under the circumstances.

Finally, to the extent Plaintiff challenges the officers' application of physical pressure to Tyson's body as excessive or unreasonable, "it is unclear as to what reasonable alternatives the officers had in dealing with [Tyson]." *See Fernandez*, 207 F. Supp. 2d at 1379. "The prone restraint, pressure on the upper torso (presumably from one of the officer's knees being pressed to [Tyson's] back), handcuffing, and struggle were all the result of [Tyson's] illegal, physical, and prolonged resistance." *Id.* "It was of course an unfortunate occurrence, but sympathy for a plaintiff does not transform law enforcement officials' objectively reasonable responses to a

volatile situation into a constitutional violation." *Id.*; *see also Lillo v. Bruhn*, 306CV247/MCR/EMT, 2009 WL 2928774, at *6 (N.D. Fla. Sept. 9, 2009), *adopted*, 306CV247 MCR/EMT, 2009 WL 3177584 (N.D. Fla. Sept. 28, 2009), *aff'd sub nom. Lillo ex rel. Estate of Lillo v. Bruhn*, 413 Fed. Appx. 161 (11th Cir. 2011) ("Although the officers fettered Lillo and pinned him to the ground, on his side, they did so only because he continued to resist.").

 "In the Eleventh Circuit, [the Court] recognize[s] that the typical arrest involves some force and injury." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002). Moreover, the Court has repeatedly held that "the application of de minimis force, without more, will not support a claim for excessive force." *Nolin*, 207 F.3d at 1257. "In analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story." *Garrett*, 378 F.3d at 1280.

In the instant case, "we have a man [Tyson] who for a considerable time has consistently put his life and the lives of others in danger and who has shown that he has every intention of fighting and forcibly escaping arrest if possible." *Id.* at 1281. The application of physical pressure to effectuate Tyson's arrest was necessary and de minimis, relative to Tyson's tremendous strength and prolonged violent physical resistance. Importantly, there is no evidence, and Plaintiff does not allege, that the officers applied any gratuitous force, such as by punching or kicking Tyson while he was compliant. *See Young v. City of Tampa*, 8:15-CV-226-T-35MAP, 2017 WL 5239473, at *10 (M.D. Fla. Mar. 6, 2017), *aff'd*, 713 Fed. Appx. 986 (11th Cir. 2018). Indeed, he was <u>never</u> compliant.

In the end, Plaintiff may question the police officers' actions that day. However, this Court should not look at the officers' actions with hindsight. *See Garrett*, 378 F.3d at 1281; *Cottrell*, 85 F.3d at 1492. In those tense and dynamic moments, a reasonable officer certainly could have concluded that releasing Tyson from his prone position was not a good idea at the time. The application of physical pressure to Tyson's body was, in fact, necessary to defend the officers and others from additional bodily harm.[7]

---

[7] To the extent we succumb to using hindsight, it turns out that the application of physical pressure to Tyson's body was actually the most beneficial to his acute medical state. During the incident, the officers could never be sure of the source of Tyson's bizarre behavior, and no one knew about Tyson's severe preexisting heart conditions. However, we now know that Tyson's violent and erratic behavior was the result of his self-induced ExDS. Because "ExDS places the individual at increased risk for sudden death syndrome . . . caused by the increased stress and

**II.     The City is entitled to summary judgment as to Count I because Tyson died during the commission or attempted commission of a forcible felony.**

The City is also entitled to summary judgment as to Count I because Tyson died during the commission or attempted commission of a forcible felony. Under Florida law, "It shall be a defense to any action for damages for personal injury or wrongful death, or for injury to property, that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony." § 776.085(1), Fla. Stat. (2014). Here, it is undisputed that Tyson committed and attempted to commit many forcible felonies immediately prior to his death, including, but not limited to, assault and battery on multiple law enforcement officers and resisting arrest with violence. *See* Facts ¶¶ 31, 35, 37, 39, 43–46, 54–55, 65, 67–80. Therefore, Plaintiff is barred from seeking state-law damages as a result of his death. *See Fernandez*, 207 F. Supp. 2d at 1381–82; *see also O'Brien v. City of Pembroke Pines*, No. 05-61366, ECF No. 180 at 3, 26–28 (S.D. Fla. Aug. 1, 2006).

**III.     The City is entitled to summary judgment as to Counts II and III because the City did not violate the ADA or the Rehabilitation Act.**

"Title II of the ADA and § 504 of the Rehabilitation Act forbid discrimination on the basis of disability in the provision of public services." *J.S., III by & through J.S. Jr. v. Houston County Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). The substantive standards for determining liability under Title II of the ADA and the Rehabilitation Act are the same. *Id.* Additionally, it "is appropriate to look to Title IX case law for guidance in examining discriminatory intent under § 504." *Id.* at 987.

To prove a violation of the ADA or the Rehabilitation Act, Plaintiff must show that Tyson: (1) is a qualified individual with a disability; (2) was either excluded from participation in or denied the benefits of the City's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See id.* at 985; 42 U.S.C. § 12132. Additionally, to obtain money damages for herself, Plaintiff must prove that the statutory violation actually caused Tyson's death.[8]

---

work on the heart by the excited, over-stimulated, agitated physical state," it was actually medically beneficial for the officers to limit Tyson's physical mobility. *See* ECF No. 101-8 at 14.

[8] Like 42 U.S.C. § 1983, the ADA and the Rehabilitation Act do not expressly permit wrongful death claims. *See Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1045 (11th Cir. 2011); *Moore v. Chilton County Bd. of Educ.*, 936 F. Supp. 2d 1300, 1315 (M.D. Ala. 2013). Rather, for Plaintiff's discrimination claims to survive, this Court must look to 42 U.S.C.

11

### A. The City did not deny Tyson law enforcement services because of his disability.

In this case, Plaintiff claims that "Tyson is qualified to receive the same law enforcement services that the City of Hollywood provides to other non-disabled individuals." ECF No. 76 ¶¶ 50, 62. The City does not dispute this legal truism. However, there is no evidence that Tyson was denied any law enforcement services that are provided to other non-disabled individuals. In fact, it is undisputed that the City's police officers immediately responded to the scene upon dispatch. Facts ¶ 17–19.

To be sure, Plaintiff also claims that the City failed to reasonably accommodate Tyson's disability "in handling him." ECF No. 76 ¶¶ 54–55, 66–67. Plaintiff states, "In particular, Mr. Tyson is entitled to the benefit of a lawful exercise of police powers, including the right not to be subjected to an unlawful and excessive use of force against him." *Id.* 76 ¶¶ 51, 63. While true, this right was provided by the Fourth and Fourteenth Amendments—not the ADA or the Rehabilitation Act.

To the extent that Plaintiff has stated a valid discrimination claim for the way Tyson was "handled" by the City's police officers, the "handling" did not violate the ADA or the RA. There is currently a circuit split as to whether Title II even applies to a police officer's on-the-street responses to reported disturbances or other similar incidents prior to the officer securing the scene and ensuring that there is no threat to human life. *See City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1772; *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083–85 (11th Cir. 2007). In *Bircoll*, the Eleventh Circuit declined to address this issue and instead framed the appropriate inquiry as "whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety." *Id.*

---

§ 1988. Under § 1988, state statutory law "provides the principal reference point in determining survival of civil rights actions, subject to the important proviso that state law may not be applied when it is 'inconsistent with the Constitution and laws of the United States.'" *Robertson v. Wegmann*, 436 U.S. 584, 589–90 (1978). Florida's Wrongful Death Act fills the survival gap in the ADA, the Rehabilitation Act, and § 1983, and is consistent with federal law, because "it hold[s] wrongdoers liable when their actions result in death." *See Sharbaugh v. Beaudry*, 267 F. Supp. 3d 1326, 1335 (N.D. Fla. 2017); *see also Carringer v. Rodgers*, 331 F.3d 844, 850 n.9 (11th Cir. 2003) ("[W]e are bound by *Brazier*'s decision that under § 1988 Georgia's wrongful death statute is incorporated into § 1983."); *Starling v. R.J. Reynolds Tobacco Co.*, 845 F. Supp. 2d 1215, 1218–19 (M.D. Fla. 2011) ("Certainly, it is true that the elements of a personal injury claim where the death is alleged or proven to have resulted from the complained of tortious conduct are subsumed in the statutory cause of action created by the Wrongful Death Act.").

at 1085. The Court stated that "[t]he exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." *Id.* "The reasonable-modification inquiry in Title II–ADA cases is 'a highly fact-specific inquiry.'" *Id.*

Here, there is literally nothing that the police could have done differently to accommodate Tyson's mental illness prior to him becoming unresponsive. When Officer Ramirez first arrived on scene, he spoke to a concerned neighbor in an attempt to obtain as much information as possible about the situation. Facts ¶ 19. During this time, Tyson emerged from his balcony naked and irate. *Id.* ¶ 20. Nevertheless, Officer Ramirez was "very nice" and professional towards Tyson. *Id.* ¶ 22, 25. He maintained a non-threatening distance away from Tyson. *Id.* ¶ 21. And he did not raise his voice or speak to Tyson in an aggressive tone. *Id.* ¶ 25.

For no apparent reason, Tyson then violently attacked Officer Ramirez. *Id.* ¶¶ 27–31. At that time, regardless of Tyson's mental disability, the officers had a duty to detain Tyson and were permitted to use force in doing so. Neither the ADA nor the Rehabilitation Act required the officers to release Tyson so he could continue to inflict harm on himself or others.

**B. Tyson was not "qualified" to receive medical services while being combative, and Tyson received appropriate medical care as soon as he was not combative.**

Plaintiff also claims that the City failed to reasonably accommodate Tyson's disability by not "providing proper medical care to him." ECF No. 76 ¶¶ 54–55, 66–67. However, Tyson was not qualified to receive medical services while being combative, and he received appropriate medical care as soon as he was not combative.

Title II of the ADA requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). "Qualified individuals" are defined as persons with disabilities who, "with or without reasonable modifications to rules, policies, or practices, . . . mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). Importantly, however, the ADA "does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 139(a) (2014). Moreover, the Supreme Court has held that a public entity "may rely on the

reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements.'" *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999).

In the instant case, Plaintiff fails to explain what medical care should have been provided to accommodate Tyson's mental disability, but was not. *See Young*, 2017 WL 5239473, at *15 ("[T]he allegation that a defendant failed to adequately attend to the medical needs of a disabled individual in its custody is insufficient to support that an ADA or RA violation occurred."). Police are not doctors or pharmacists. Even when they are told that an individual is off his medication (and assume that information is true), they have no ability or obligation to seek out the medication, provide it to the individual, or force the individual to take it.[9] *Cf.* 28 C.F.R. § 35.130(e)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.").

Instead, the police officers' actions are constrained by Florida law. Pursuant to section 394.462(1), Florida Statutes, depending on whether Tyson was going to be charged with a felony, the officers could have either processed Tyson in the same manner as any other criminal suspect <u>or</u> taken him directly to Memorial Regional Hospital, the designated receiving facility for individuals who meet the statutory guidelines for involuntary examination. § 394.462(1)(h)–(i), Fla. Stat.; *cf. Mann*, 588 F.3d at 1308 ("The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol."). Although Plaintiff's treating psychiatrist was located a couple blocks away from the incident, the officers were not permitted to take him there, and Tyson would not have been accepted even if they did. Facts ¶ 84.

For whatever its worth, many of the involved officers testified that their ultimate intent was to transport Tyson to Memorial Regional Hospital for an examination. However, they simply never had the opportunity due to Tyson's hostile and violent behavior up until the moment he suddenly became unresponsive. *See Hoyt*, 672 F.3d at 980 ("Allen could not be safely transported until he was restrained."). Prior to that time, there was no indication that Tyson required immediate medical assistance, rather than a routine examination by a mental health practitioner. Facts ¶ 78–79.

---

[9] Here, the officers also had no knowledge of what medication Tyson was prescribed.

Additionally, there is no dispute that as soon as Tyson became unresponsive, he received immediate medical treatment from Fire Rescue personnel, who were already on scene. *Id.* ¶ 81–82. Prior to that time, the City's paramedics had no duty to provide Tyson any medical care until he calmed down and stopped attempting to physically harm others. Neither the ADA nor the Rehabilitation Act require medical care providers to put themselves in harm's way for the benefit of the violent. *See* 28 C.F.R. § 139(a) (2014).

Although Plaintiff alleges that Tyson "no longer posed a threat to human safety" after he was secured in handcuffs and leg restraints, ECF No. 76 ¶ 54, the evidence does not support her allegation and no reasonable jury could find that to be true. When the paramedics arrived on scene, the scene had not been declared safe by police, and Tyson was still being combative by physically resisting the officers. Facts ¶ 78, 80. Accordingly, a reasonable public offical could have concluded that Tyson posed a direct threat to the health or safety of others. This is in fact what happened here, and this Court should defer to the reasonable assessments of the City's own professionals who were actually on scene. *See Olmstead*, 527 U.S. at 602; *J.S.*, 877 F.3d at 987.

### C.  The City did not act with deliberate indifference.

To establish discriminatory intent by the City, Plaintiff proceeds under a theory of deliberate indifference.[10] The Supreme Court has never decided whether a municipality can be vicariously liable under Title II for money damages for the deliberately indifferent conduct of its police officers. *See Sheehan*, 135 S. Ct. at 1773–74. "For an organization to be liable for Title IX purposes, *Gebser* requires the deliberate indifference of 'an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has *actual knowledge* of discrimination in the [organization's] programs and fails adequately to respond.'" *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012) (alterations and emphasis in original) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). "Deliberate indifference is an exacting standard; [public officials] will only be deemed deliberately indifferent if their response . . . or lack thereof is clearly unreasonable in light of the known circumstances." *J.S.*, 877 F.3d at 987 (quoting *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1259 (11th Cir. 2010)). This Court "may, on a

---

[10]  This Court previously found that Plaintiff failed to sufficiently allege an intentional discrimination claim. ECF No. 17 at 9. In that regard, the operative Complaint remains unchanged.

motion for summary judgment, determine that a response was not 'clearly unreasonable' as a matter of law." *Id.* (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)).

In *Liese*, the Eleventh Circuit concluded that "an official is someone who enjoys *substantial* supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese*, 701 F.3d at 350 (emphasis added). This "requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization." *Id.* In this case—at the very least—that person was Sergeant Yasmanny Ruiz, the Patrol Supervisor for the district in which the incident occurred. Facts ¶¶ 80, 105–06. The City's patrol officers, including Field Training Officers, do not have any supervisory authority under the department's formal chain of command. *Id.* ¶ 104.

Sergeant Ruiz responded to the scene in response to an officer in distress. *Id.* ¶ 80. When he arrived (near the end of the struggle), Tyson was still actively resisting detainment, and there was no indication that Tyson required immediate medical assistance. *Id.* However, when Tyson suddenly became unresponsive, Sergeant Ruiz ordered Fire Rescue personnel to respond to Tyson, which they did. *Id.* ¶ 81. This response was not "clearly unreasonable" under the circumstances. *J.S.*, 877 F.3d at 987.

### D.  The City's alleged discrimination did not cause Tyson's death.

Finally, even if Plaintiff could prove a statutory violation of the ADA or Rehabilitation Act for conduct that is fairly attributable to the City, she cannot prove that the alleged discrimination, whatever that may be, actually caused Tyson's death. In fact, there is no evidence from expert testimony or otherwise that any particular medical care or law enforcement services would have made any difference whatsoever.

### IV.    The City is entitled to summary judgment as to Count IV because the City did not violate 42 U.S.C. § 1983.

The City may not be held liable under § 1983 based on the doctrine of respondeat superior. *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). To establish a § 1983 claim against the City, the Plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). To establish a sufficient causal connection in the absence of an express policy, the evidence must show a custom or practice "so pervasive and well-settled that it

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

assumes the force of law." *Doe v. Sch. Bd. of Broward County, Fla.*, 604 F.3d 1248, 1263 (11th Cir. 2010).

"In addition to identifying conduct attributable to the municipality, a plaintiff alleging municipal liability under § 1983 must show that the 'the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences.'" *Id.* (quoting *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375–76 (11th Cir. 2000)). To establish deliberate indifference, Plaintiff must provide proof "of other incidents involving factual situations that are substantially similar to the case at hand." *Mercado v. City of Orlando*, 407 F.3d 1152, 1161–62 (11th Cir. 2005) (emphasis added). Importantly, not only must these incidents be factually similar, these incidents must also have been actual constitutional violations and must have occurred with such temporal frequency and quantity that the City should be on notice of a problem. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. 2004); *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987); *Asia v. City of Miami Gardens*, 1420117CIVCOOKETORRE, 2016 WL 739656, at *8 (S.D. Fla. Feb. 25, 2016); *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015); *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1373 (S.D. Fla. 2013).

In her Complaint, Plaintiff articulates two theories to support her § 1983 claim. First, Plaintiff claims, the City "had a custom, policy, or practice whereby its police officers used excessive force when attempting to detain individuals, including individuals with mental illness like Mr. Tyson, by overusing their department-issued Tasers." ECF No. 76 ¶ 70. However, Plaintiff fails to identify any unconstitutional policy. Rather, this theory is solely predicated on a "widespread unofficial custom or practice in the City." *See id.* ¶ 71 (emphasis added).

Second, Plaintiff claims, "the City of Hollywood also had a custom, policy, or practice whereby it failed to adequately supervise, discipline, or train its employees, agents, and officers in the appropriate and reasonable use of force and use of Tasers on the mentally ill." *Id.* ¶ 73. However, again, Plaintiff fails to identify any unconstitutional policy. Additionally, she does not identify a custom or practice pertaining to supervision or discipline. Rather, this theory is solely predicated on a lack of training. *See id.* ¶¶ 74–75.

**A. There was no underlying constitutional violation.**

As an initial matter, the City is entitled to summary judgment as to Count IV because there was no underlying constitutional violation. *See Supra* Part I.B.–C. This alone is dispositive. *See Fernandez*, 207 F. Supp. 2d at 1381. Additionally, Count IV must be dismissed for each of the reasons discussed below.

**B. The City's policies met or exceeded national standards.**

To the extent Plaintiff has sufficiently pleaded a claim pertaining to the City's policies, the City has sufficiently addressed mental illness, compliance with the ADA, and use of force on individuals suffering from a disability in its Standard Operating Procedures (SOP). Facts ¶ 93. For example, after defining "ADA," SOP 120 provides a contact person for reporting ADA harassment or discrimination complaints. *Id.* ¶ 94. SOP 200 provides that mental illness is a "situational factor" to consider in determining whether to use force in general. *Id.* ¶ 95. SOP 203 instructs officers that "[c]are should be taken when restraining disabled, sick, injured, intoxicated, drug impaired, and mentally disturbed persons so as not to complicate or compound their condition." *Id.* ¶ 96. SOP 212 establishes guidelines and procedures for the handling, care and transportation of individuals who meet the criteria of Florida's Baker Act. *Id.* ¶ 97. SOP 216 requires accommodations to person with hearing disabilities. *Id.* ¶ 98. SOP 218 allows service animals in the department. *Id.* ¶ 99. And SOP 227 prohibits the use of a canine "[t]o apprehend a known mentally ill person, unless the subjects actions pose a physical threat to the general public." *Id.* ¶ 100.

In short, the City's policies on use of Taser, dealing with the mentally ill, and use of force met or exceeded state and nationally accepted standards. *Id.* ¶ 103. Moreover, at the time of the incident, the Hollywood Police Department was an accredited agency, which means that its policies and procedures were approved by the State. *Id.* ¶ 102. Thus, if the City's policies and procedures are found to be deficient, then nearly every accredited agency in the state will have deficient policies and procedures.

**C. There was no widespread custom or practice in the City of "overusing" Tasers when attempting to detain individuals with a mental illness.**

In her Complaint, Plaintiff alleges that the City has an unofficial custom or practice of its police officers "overusing" their Tasers on individuals with a mental illness. ECF No. 76 ¶¶ 70–71. "For example," Plaintiff alleges, "in 2012, of nineteen Baker Act'ed persons who were taken into custody by Hollywood police officers, six were tased three or more times and four were

tased even after being handcuffed; and in 2013, of seven Baker Act'ed persons who were taken into custody by Hollywood police officers, three were tased three or more times and one was tased even after being handcuffed." *Id.* (footnote omitted). "In 2014," Plaintiff alleges, "of the seven Baker Act'ed persons who were taken into custody by Hollywood police officers, one was tased six times by two police officers." *Id.* However, these allegations are completely false.

In 2012, there were actually a total of 1,200 reported incidents in which a City of Hollywood police officer took an individual into custody after determining that the individual met the criteria for involuntary examination and/or institutionalization. Facts ¶ 90. According to Plaintiff, only six (6) of them involved the excessive use of a Taser. ECF No. 76 ¶ 72. That is 0.50% of the total reported incidents in 2012.

In 2013, there were actually a total of 1,144 reported incidents in which a City of Hollywood police officer took an individual into custody after determining that the individual met the criteria for involuntary examination and/or institutionalization. Facts ¶ 91. According to Plaintiff, only three (3) of them involved the excessive use of a Taser. ECF No. 76 ¶ 72. That is 0.26% of the total reported incidents in 2013.

In 2014, there were actually a total of 1,375 reported incidents in which a City of Hollywood police officer took an individual into custody after determining that the individual met the criteria for involuntary examination and/or institutionalization. Facts ¶ 92. According to Plaintiff, only one (1) of them (apart from this incident) involved the excessive use of a Taser. ECF No. 76 ¶ 72. That is 0.07% of the total reported incidents in 2014.

The reason Plaintiff's numbers are flawed is because she relies solely on the City's Response to Resistance Reports, also known as use-of-force reports, to identify past incidents in which an individual was Baker Acted. *See* ECF No. 76-1. Pursuant to departmental policy, a use-of-force report must be completed by a supervisor (usually a Sergeant) whenever an officer uses force in response to a subject's resistance and the subject is charged with resisting with violence, the use of force resulted in injury, or the use of force involved a weapon, *inter alia*. Facts ¶ 107. In each report, the supervisor will provide a brief narrative of the relevant events, as explained by the involved officers and witnesses. *Id.* ¶ 108. Upon its completion, the report is submitted within 24 hours to a supervising Lieutenant and then the Division Major, who each separately review the incident. *Id.* ¶ 109. After his or her review, the Division Major can recommend that the report be forwarded for filing, that there be an administrative review, or that there be a

separate internal affairs investigation. *Id.* ¶ 110. Each year, the City's Internal Affairs department also reviews and analyzes each report. *Id.* ¶ 111.

Because these reports only refer to past incidents in which force was used and reviewed, they do not provide a complete picture of the total incidents. As indicated above, there are many other incidents (over 99%) that did not involve <u>any</u> use of force, let alone excessive use of force, because the individual being detained cooperated and was taken into custody without incident— unlike Tyson. Thus, even if this Court were to assume that each incident identified by Plaintiff involved excessive use of force, there is certainly not "a widespread unofficial custom or practice . . . that is so permanent and well settled as to constitute a custom or usage with force of law," as Plaintiff alleges. ECF No. 76 ¶ 71.

Additionally, these reports are inadmissible for Plaintiff's intended purpose. While the reports themselves may be public records that meet an exception, the facts within the narrative section are prepared by a supervisor based upon hearsay from third parties. Facts ¶ 108. The officer who used force does not prepare the reports. *See id.* Therefore, the narrative section of each report is hearsay within hearsay that cannot be considered on summary judgment. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280 (11th Cir. 2009); *Shehada*, 965 F. Supp. 2d at 1374.

Additionally, even if these reports were admissible, Plaintiff cannot prove that any of the prior incidents actually involved a known constitutional violation. While Plaintiff's document dump may have been sufficient to get past the motion to dismiss stage, it is insufficient to create a genuine issue of material fact for purposes of precluding summary judgment. *See Shehada*, 965 F. Supp. 2d at 1374 (S.D. Fla. 2013) (quoting *Ott v. City of Mobile*, 169 F.Supp.2d 1301, 1313 (S.D. Ala. 2001)); *see also Buckler v. Israel*, 680 Fed. Appx. 831, 835 (11th Cir. 2017) ("We first note that the sheer number of use of force incidents, without more, does not establish a widespread custom of acquiescence to the use of excessive force.").

The reports that Plaintiff relies on actually support the City's position that <u>none</u> of these incidents involved excessive use of force, even when the facts are construed in the light most favorable to Plaintiff.[11] In nearly every incident, as explained in the narrative section of the report, the use of a Taser was necessary and often helpful to overcome active physical resistance.

---

[11] This Court must take each report at face value because Plaintiff failed to conduct any substantive discovery on these incidents.

*See, e.g.*, ECF No. 76-1 at 15 ("Irving complied and dropped the knife as he fell to the ground. Once on the ground, Officers placed Irving into protective custody and transported him to Hollywood Memorial-Regional without further incident."); *id.* at 21 ("The [suicidal] subject [who was covered in blood and carrying scissors] complied with this order and Officer Moxley placed the subject into hand restraints without further incident."); *id*. at 29 ("Officer Andrews activated his Taser a third time, finally gaining compliance from Sutherland."). In other cases, there was a serious safety concern to the public, the officers, or the subject, and the use a Taser eliminated that threat. *See, e.g.*, *id.* at 23 ("Fearing the subject would attempt to jump off the balcony, Officer Scheel deployed his department issued X-26 Taser. The subject fell to the ground."); *id.* at 42 (subject wielding skateboard in an aggressive and threatening manner); *id.* at 72 (juvenile armed with knife at school).  In every incident, the report alone does not establish a constitutional violation as a matter of law.

### D. The City provided adequate training, supervision, and discipline to its officers concerning the appropriate use of force on the mentally ill.

Plaintiff further alleges that "the City of Hollywood also had a custom, policy, or practice whereby it failed to adequately supervise, discipline, or train its employees, agents, and officers in the appropriate and reasonable use of force and use of Tasers on the mentally ill." ECF No. 76 ¶ 73. "For any attempt to impose Section 1983 liability on either a municipality or a supervisor for the act of an employee, be it failure to discipline or failure to train, a plaintiff must demonstrate: (1) a violation of a constitutional right, (2) a custom or policy constituting deliberate indifference to that constitutional right, and (3) a causal link between the policy or custom and the violation." *Bergin v. City of Treasure Island*, 8:09CV00286-T-17MAP, 2009 WL 1606477, at *2 (M.D. Fla. June 8, 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). It does not suffice merely "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton*, 489 U.S. at 390; *see also Gold*, 151 F.3d at 1350.

Here, Plaintiff again relies on the City's use-of-force reports to establish a custom or practice constituting deliberate indifference towards the use of a Taser on individuals suffering from a mental illness. Based on these reports, Plaintiff appears to claim that the City was on notice of a problem and should have taken some abstract action in regard to training, supervision, or discipline. However, Plaintiff fails to explain what training, supervision, or discipline should

have been required, but was not. More importantly, as explained above, these reports do not support Plaintiff's theory that there was ever a "problem" at all. *See Supra* Part IV.C.

If anything, these reports show that the City takes use of force in general, and the use of a Taser in particular, very seriously. Every time a Taser is deployed, the incident is separately reviewed by a Sergeant, a Lieutenant, and then a Major. Facts ¶ 107–10. If necessary, the incident may also be reviewed by Internal Affairs. *Id.* ¶ 110. However, in each of the incidents identified by Plaintiff, there was no need to use limited City resources to conduct an <u>additional</u> investigation because the use of force was clearly justified based upon all of the information available at the time, some of which may not be included in the report. There is also no evidence that any of these incidents led to a complaint that warranted further investigation.

In regard to training, Plaintiff alleges that "the City of Hollywood provides <u>no</u> training to its officers on the appropriate and reasonable use of force and use of Tasers on the mentally ill." ECF No. 76 ¶ 74 (emphasis added). Elsewhere, Plaintiff claims that the City failed to train or supervise its officers in properly complying with Title II of the ADA and the Rehabilitation Act. *Id*. ¶¶ 53, 65. But, again, these allegations could not be further from the truth.

As a condition of employment, every City police officer must attend the police academy, which is a six-month training and education seminar provided by Broward College. Facts ¶ 113. During the academy, cadets receive standardized educational materials and practical training in accordance with Florida Department of Law Enforcement standards. *Id.* ¶ 113–14. The cadets are specifically educated and trained on how to respond to a crisis situation involving a person with a disability, including mental illness, as well as use of force on individuals suffering from a disability, including a mental illness. *Id.* ¶ 115. Officers Ramirez and Pantaloukas received this specific training on February 21, 2014, and February 24, 2014. *Id.* ¶ 116. Officers Ramirez and Pantaloukas subsequently passed the State certification exam, evidencing their knowledge and understanding of what was taught in the academy. *Id.* ¶ 118.

After the academy, the City's police officers undergo additional in-house training over a period of four to five weeks. *Id.* ¶ 119. During in-house training, the officers receive additional materials and training on Baker Act procedures, use of force, and use of a Taser, specifically.[12] *Id.* ¶ 120. Additionally, the officers are provided with the department's policies and procedures.

---

[12] The Taser materials are provided by the manufacturer. The Taser materials address mental illness and excited delirium.

*Id.* Prior to the incident, all of the involved officers acknowledged their receipt and understanding of the City's policies. *Id.* ¶ 101. In July 2014, Officer Ramirez and Pantaloukas obtained their Taser certification. *Id.* ¶ 122.

After in-house training, the officers then participate in the City's Field Training Program, where they receive hands-on training and supervision from a Field Training Officer over the course of twelve to fifteen weeks. *Id.* ¶ 123. At the time of the incident, both Officers Ramirez and Pantaloukas were in the final phase of the Field Training Program, which means they had already undergone significant training and were still being "shadowed" by a Field Training Officer. *Id.* ¶ 124.

After the Field Training Program, the City's officers are required to undergo in-service refresher trainings on a regular basis. *Id.* ¶ 125. For example, the officers must take additional Taser and use of force courses once a year and additional mental illness training every three years. *Id.* The City also offers Crisis Intervention Team (CIT) training, which is a program specifically geared towards teaching officers about mental illness and de-escalation tactics. *Id.* ¶ 127. Although Officers Ramirez and Pantaloukas did not have the opportunity to benefit from that program prior to the incident, they both received supplemental Taser training that same month. *Id.* ¶ 126.

In short, the City's training on use of force, use of a Taser, and mental illness met or exceeded the state and national standards. *Id.* ¶ 128.

### E.  The City's alleged customs and practices did not cause Tyson's death.

Finally, even if Plaintiff could establish a custom or practice involving the use of Tasers on the mentally ill, whether by lack of training or supervision or otherwise, Plaintiff cannot prove that the alleged custom or practice caused Tyson's death. To meet the "substantially similar" requirement, all of Plaintiff's alleged customs and practices are predicated on the use of a Taser on an individual suffering from a mental illness. But, again, it is incontrovertible that the use of a Taser did <u>not</u> contribute to Tyson's death. *See Supra* Part I.A.

### <u>CONCLUSION</u>

Accordingly, the City respectfully requests that summary judgment be entered in its favor as to all claims.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail on July 19, 2018 on all counsel of record on the attached Service List.

Respectfully submitted,

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Counsel for Defendant City of Hollywood*
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, FL 33301
Telephone: (954) 763-4242
Telecopier: (954) 764-7770

By: */s/ Adam M. Hapner*
    DANIEL L. ABBOTT
    Florida Bar No. 767115
    Primary email: dabbott@wsh-law.com
    Secondary email: pgrotto@wsh-law.com
    ADAM M. HAPNER
    Florida Bar No. 112006
    Primary email: ahapner@wsh-law.com
    Secondary email: mboschini@wsh-law.com

## SERVICE LIST

CASE NO.:  0:16-CIV-62215-DIMITROULEAS/SNOW

**Joseph J. Kalbac, Jr., Esq.**
**Stephanie A. Casey, Esq.**
**Denise H. Georges, Esq.**
**Lindsey Lazopoulos Friedman, Esq.**
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: 305-476-7400
Facsimile: 305 476-7444
Email:eservice@colson.com;
nicky@colson.com; mabel@colson.com;
denise@colson.com; scasey@colson.com;
jkalbac@colson.com;
lindsey@colson.com

*Attorneys for Plaintiff*

**Daniel L. Abbott, Esq.**
**Adam M. Hapner, Esq.**
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
200 E. Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
Telephone: (954) 763-4242
dabbott@wsh-law.com
ahapner@wsh-law.com

*Attorneys for Defendant City of Hollywood*