**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as Personal
Representative of the Estate of DANIEL TYSON,
deceased,

        Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida Municipal
Corporation,

        Defendant.
_____/

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, JEAN SUAREZ, individually, and as Personal Representative of the Estate of DANIEL TYSON, submits this Statement of Material Facts in support of her Motion for Partial Summary Judgment in her favor and against the Defendant CITY OF HOLLYWOOD (the "City") on the City's Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Fourteenth, Fifteenth, and Seventeenth Affirmative Defenses.

### STATEMENT OF MATERIAL FACTS

**A. Multiple, Uninterrupted Tasing and continued Weight on Daniel Tyson's Prone Body Leads to Daniel's Death on October 27, 2014.**

1. On October 27, 2014, witnesses observed Daniel naked outside his apartment and seemingly talking to trees. (LesMarie Dep. 27–29, 40, 57 (Ex. 1); Auerbach Dep. 68-69 (Ex. 2); Moore Dep. 34–35, 39 (Ex. 3); LesMarie Call for Assistance, 2–3 (Ex. 9)).  City officers were placed on notice by Xavier LesMarie and Jessica Auerbach that Daniel was mentally ill and in need of medical treatment. (LesMarie Dep. 41–42, 71-72 (Ex. 1); Auerbach Dep. 88–89, 95–96 (Ex. 2); Moore Dep. 47, 63–64 (Ex. 3); Rillo Dep. 21, 22, 62-63 (Ex. 4); Taylor Dep. 76 (Ex. 5);

1

Dispatch Call, 2:5–14 (Ex. 6); City of Hollywood Closeout/In-Custody Death Review Report at TYSON RRFP-5th Supp 00006 (Ex. 7); Det. Rillo Homicide File at TYSON 00919 (Ex. 8); LesMarie Call for Assistance, 2:13–16, 4:3–5:5 (Ex. 9)). Officers were dispatched as a "Signal 20," which is used to identify a mental illness or mental crisis related call. (Dispatch Call, 2:5–14 (Ex. 6); Ramirez Dep. 71, 74–76, 81, 112–13 (Ex. 13); Pantaloukas Dep. 82-83 (Ex. 15)).

2. Officer Ramirez, the first to arrive at the scene, stated that when he arrived at Daniel's home, Daniel was standing outside naked, acting erratically, and yelling incoherently. (Ramirez Dep. 103–11 (Ex. 13)). Daniel had an object in his hand and was approaching Officer Ramirez, who then deployed his Taser on Daniel. (Ramirez Dep. 110–17 (Ex. 13)). Daniel then struck Officer Ramirez with the object in his hand. (*Id.* at 122). Officer Pantaloukas arrived shortly thereafter and also began deploying his Taser on Daniel. (Ramirez Dep. 129, 132 (Ex. 13); Pantaloukas Dep. 93–95 (Ex. 15)). Other officers also arrived thereafter. (Ramirez Dep. 132, 143, 152, 154 (Ex. 13); Pantaloukas Dep. 120–25 (Ex. 15)).

3. Following the restraint of Daniel— handcuffs and leg restraints—City officers were exclusively in contact with Daniel and proceeded to apply their full body weight with the use of their legs and arms on various positional points on Daniel's body while in he was prone position until he was discovered to be unresponsive. (Moore Dep. 42–45, 49–50, 67–72 (Ex. 3); Truntz Dep. 97–98, 107–12, 114–15, 121–22 (Ex.10); Falcon Dep. 57–60, 72–73, 82–83 (Ex. 11); Wagner Dep. 70, 73–77, 83–84, 86–88 (Ex. 12); Ramirez Dep. 140–141; 148, 152–153 (Ex. 13); Kerns Dep. 67–68, 72, 75–79,85–86, 103 (Ex. 14); Pantaloukas Dep. 98–99, 112–13, 120–22, 129, 130–31 (Ex. 15); Karl Dep. 71–72, 77–79, 81, 88, 90, 91 (Ex. 16); Taylor Dep. 121, 129–30 (Ex. 5); Det. Rillo Homicide File TYSON 00926 (Ex. 4); Millares Dep. 121 (Ex. 17)).

4. Officer Wagner testified that upon his arrival to the scene, he observed Officer

Ramirez applying his body weight with his knee to hold Daniel down. (Wagner Dep. 73–75 (Ex. 12)).

5. Officer Karl testified that he applied his body weight to Daniel's right arm, upper right buttocks and leg area. (Karl Dep. 89–90 (Ex. 16)).

6. Officer Truntz testified that he applied medium pressure to Daniel's left elbow; following the realization that Daniel went "calm" and his lips were blue, told the other officers to get off of Daniel. (Truntz Dep. 107–08, 131, 140 (Ex. 10)).

7. Officer Falcon testified that upon arrival, multiple officers were holding Daniel down and he proceeded to tap and relieve Officer Ramirez who was holding Daniel's upper back down. (Falcon Dep. 56–57 (Ex. 11)). Officer Falcon further testified that he placed his right knee on Daniel's right shoulder blade and placed his right hand on Daniel's left shoulder. (Falcon Dep. 58–59 (Ex. 11)). Officer Falcon maintained pressure until someone realized that Daniel was not breathing. (Falcon Dep. 73 (Ex. 11)).

8. Officer Pantaloukas maintained point and control of Daniel's legs throughout this entire event. (Pantaloukas Dep. 121–22 (Ex. 15); Karl Dep. 88 (Ex. 16)). Officer Pantaloukas also activated his Taser nine (9) times which included activation prior to handcuffs being applied, after handcuffs being applied and after leg restraints being applied. (Pantaloukas Dep. 106–107 (Ex. 15), Dep. Ex. 7, TYSON 01145–51 (Ex.18)). Officer Pantaloukas testified in deposition that with the exception of the first application, neuromuscular incapacitation was achieved. (Pantaloukas Dep. 99, 111, 130–31 (Ex. 15)). Officer Pantaloukas testified that he was holding down either one or both of Daniel's legs with the use of his legs and at least one of his hands. (Pantaloukas Dep. 122 (Ex. 15)).

9. Also, the Officers testified that at the time of Daniel's death, they weighed the following:

- Falcon: 185 – 190 pounds.  Falcon Dep. 13 (Ex. 11);
- Karl: 210 pounds. Karl Dep. 24 (Ex. 16);
- Pantaloukas: 185 – 190 pounds. Pantaloukas Dep. 71 (Ex. 15);
- Ramirez: 145 – 150 pounds. Ramirez Dep. 123 (Ex. 13);
- Truntz: 160 pounds. Truntz Dep. 42 (Ex. 10).

10. Daniel was Tased a total of ten times in around 6 minutes and thirty seconds. (City of Hollywood Closeout/In-Custody Death Review Report at TYSON RRFP-5th Supp 00006–07 (Ex. 7); Homicide File of Det. Rillo, TYSON 00918 (Ex. 8); Millares Dep. 117–119 (Ex. 17); Rillo Dep. 91, 92–93 (Ex. 4)).  In one of the Tasings, Daniel was Tased continuously for 9 seconds, in violation of SOP 201.  (*See* Pantaloukas Dep. Ex. 7, TYSON 01145–51 (Ex. 18); Homicide File of Det. Rillo TYSON 00918, TYSON 00930; Exhibit B, TYSON 00934 (Ex. 8); TYSON RRFP-5th Supp 00007 (Ex. 7); Millares Dep. 117–18 (Ex. 17); Rillo Dep. 92 (Ex. 4); Taylor Dep. 95 (Ex. 5); SOP 201 (Ex. 19)).

11. Also, in violation of SOP 200 and SOP 201, officers did not stop and evaluate the situation before each deployment of the Taser on Daniel. (*See* SOP 200 (Ex. 20); SOP 201 (Ex. 19)). Even after Daniel was restrained in handcuffs and leg shackles, officers continued to inflict injury upon Daniel by continuing to Tase him and by continuing to exert pressure on top of his body, which prevented him from breathing.  (*See* Wohlgelernter Dep. 45 (Ex.21); Moore Dep. 42–45, 49–50, 67–72 (Ex. 3); Truntz Dep. 97–98, 107–12, 114–15, 121–22 (Ex. 10); Falcon Dep. 57, 58-59, 60, 72–73, 82–83 (Ex. 11); Wagner Dep. 70, 73–75, 76–77, 83–84, 86–88 (Ex. 12); Ramirez Dep. 140–141, 148, 152–53 (Ex. 13); Kerns Dep. 67–68, 72, 75–79,85, 86, 103 (Ex. 14); Pantaloukas Dep. 98–99, 112–13, 120–22, 129, 130–131 (Ex. 15); Karl Dep. 71–72, 77–79, 81, 88, 90, 91 (Ex. 16); Taylor Dep. 83, 95, 121, 129–30 (Ex. 5); Millares Dep. 119, 121 (Ex. 17)). These actions were also in violation of SOP 200 and 201. (Taylor Dep. 116 (Ex. 5); SOP 200 (Ex. 20); SOP 201 (Ex. 19)).

12. Four to six City officers bore down on Daniel's body after he was placed in handcuffs and leg shackles, preventing him from breathing; no one else came into contact with Daniel other than City officers. (Taylor Dep. 129, 147–48 (Ex. 5); Det. Rillo Homicide File TYSON 00927 (Ex. 8); Moore Dep. 67–71 (Ex. 3); Truntz Dep. 107–15, 118–19, 121, 125 (Ex. 10); Falcon Dep. 57–61, 72–73, 82–83 (Ex. 11); Wagner Dep. 70, 74, 75–78, 81, 83–84, 86–88 (Ex. 12); Pantaloukas Dep. 122, 124 (Ex. 15); Karl Dep. 89–90, 95, 98 (Ex. 16).

13. Officers failed to place Daniel on his side or sitting up to prevent him from asphyxiating. (Taylor Dep. 147–48, 149–50 (Ex. 5); Truntz Dep. 125–26 (Ex. 10); Falcon Dep. 60 (Ex. 11); Wagner Dep. 81 (Ex. 12); Ramirez Dep. 152–153 (Ex. 13); Kerns Dep. 79 (Ex. 14), Pantaloukas Dep. 124 (Ex. 15).

14. Robert Brown, a neighbor of Daniel's witnessed a period of this encounter and testified in deposition that Daniel was subdued, (Brown Dep. 16, 18, 19 (Ex. 22)), not moving his body at all, (Brown Dep. 18, 32 (Ex. 22)), while City Officers were yelling at Daniel to shut up. (Brown Dep. 19 (Ex. 22)). Mr. Brown characterized the officers' actions as "sitting on top of him." (Brown Dep. 18, 33–34 (Ex. 22)). Mr. Brown explained that the officers were using their arms and legs to apply their full body weight to Daniel while he was in a prone position. (Brown Dep. 17, 20 (Ex. 22)). Mr. Brown testified that at no point did he see Daniel move his body, (Brown Dep. 20, 24 (Ex. 22)), and testified that he could not move based on the officers applying their weight "almost everywhere." (Brown Dep. 20, 32 (Ex. 22)).

15. Leonarda Moore, another of Daniel's neighbors, also witnessed the encounter and testified in deposition that she "saw five or six officers on [Daniel]," using their entire bodies and knees to put pressure on him to keep his body down - and that was only what she could see of Daniel's body "from the elbows down." (Moore Dep. 14, 68–69 (Ex. 3)). Ms. Moore explained

5

that Daniel was handcuffed and leg shackled while the officers were on him. (Moore Dep. 69 (Ex. 3)). Ms. Moore further testified that Daniel "was still face down and restrained at the wrist and ankles with officers still on him" while the officers proceeded to Tase him. (Moore Dep. 70 (Ex. 3)).

16. The officers consistently testified that Daniel was never placed in a seated position following the restraint at his arms and legs nor was Daniel ever able to stand or otherwise be released from that prone position. (Truntz Dep. 125–26 (Ex. 10); Falcon Dep. 60 (Ex. 11); Wagner Dep. 81 (Ex. 12); Ramirez Dep. 152–53 (Ex. 13); Kerns Dep. 79 (Ex. 14), Pantaloukas Dep. 124 (Ex. 15)).

17. Upon realization that Daniel was unresponsive, Fire Rescue assessed Daniel and found pulseless electrical activity (PEA). (Fire Rescue Record TYSON 04010, TYSON 04012 (Ex. 23); Wohlgelernter Dep. 69 (Ex. 21)). CPR was initiated however resuscitation attempts were unsuccessful. (Fire Rescue Record TYSON 04010, TYSON 04012 (Ex. 23); Plaintiff's October 27, 2014 Hospital Records TYSON 00027 (Ex. 24); Shuman Dep. 53 (Ex. 25). Wohlgelernter Dep. 69 (Ex. 21)). Daniel was transported to Memorial Regional Hospital where he was pronounced dead following further resuscitation attempts. (Fire Rescue Record TYSON 04010, TYSON 04012 (Ex. 23); Plaintiff's October 27, 2014 Hospital Records TYSON 00027–28 (Ex. 24); City of Hollywood Closeout/In-Custody Death Review Report TYSON RRFP-5th Supp 00008 (Ex. 7)).

18. Dr. Michael Bell performed the cardiac pathology of Daniel's heart and found no evidence of myocardial infarction which rules out a heart attack. (Bell Dep. 55–56, 33, 56 (Ex. 26)). Additionally, Dr. Bell opined in deposition that PEA would not be seen if Daniel had gone into sudden cardiac arrest as a result of coronary atherosclerosis or fibromuscular dysplasia. (Bell

6

Dep. 40, 45 (Ex. 26)). There is no evidence that Daniel's post-mortem cardiac pathology findings of severe coronary arteriosclerosis, fibromuscular dysplasia, mononuclear cell infiltration, dilated tricuspid and pulmonic valve annuli and sickled red blood cells contributed to Daniel's death. (Bell Dep. 26–41, 45–47 (Ex. 26); Wohlgelernter Dep. 73–74 (Ex. 21)).

19. Dr. Daniel Wohlgelernter, an experienced cardiologist, opined within a reasonable degree of medical certainty that Daniel's death was due to restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA cardiac arrest. (*See* Wohlgelernter Dep. 45 (Ex. 21)).

### B. City of Hollywood Failed to Supervise Rookie Officers Still in Training

20. During the shadow phase of new employment, the City allows rookie officers still in training to: respond to calls involving a mentally ill person without checking in with, or waiting for, their assigned field training officers; engage with a mentally person without waiting for their assigned field training officer, even when the circumstance is such that the rookie officer has time and ability to wait for the field training officer without putting himself or others at risk; deploy a Taser without waiting for their assigned field training officer, even when the circumstance is such that the rookie officer has time and ability to wait for the field training officer before initiating an encounter with the person without putting himself or others at risk. (Basler Dep. 113 (Ex. 27); Millares Dep. 130–32 (Ex. 17); Kerns Dep. 65 (Ex. 14); Pantaloukas Dep. 17–19 (Ex. 15)).

21. Additionally, although a supervisor—Officer Kerns—was present at the scene, he failed to supervise officers in the proper use of a Taser (e.g., deploying a Taser for no more than 5 continuous seconds, stopping to evaluate the situation before deploying the Taser again, and using alternatives if the deployment of the Taser was not effective). (Pantaloukas Dep. 110–12 (Ex. 15); Kerns Dep. 51, 67–68 (Ex. 14); Truntz Depo. 45 (Ex. 10); Taylor Dep. 146 (Ex. 5); Karl Dep. 72 (Ex. 16); SOP 201, pg. 7 (Ex. 19)).

22. Officer Kerns also failed to supervise officers in properly placing Daniel on his side or sitting up to prevent him from asphyxiating. (Kerns Dep. 78–80 (Ex. 14); Taylor Dep. 146–48, 149–50 (Ex. 5); Truntz Dep. 125-126; 130 (Ex. 10); Falcon Dep. 60, 72–73 (Ex. 11); Wagner Dep. 76, 81 (Ex. 12); Ramirez Dep. 152-153 (Ex. 13); Pantaloukas Dep. 123–24 (Ex. 15)).

23. As a result of this failure of supervision, the situation with Daniel was not properly deescalated, Daniel was Tased ten times, once for a continuous 9-second period, officers failed to stop and assess the situation between Tasings, Daniel was Tased even after being placed in handcuffs and leg shackles, Daniel was smothered by officers and could not breathe, and Daniel ultimately died. (Shuman Dep. 11–13, 54–57 (Ex. 25); Wohlgelernter Dep. 45 (Ex. 21)).

**C. City of Hollywood Had a Custom, Policy or Practice of Failing to Adequately Investigate and Discipline Employees, Agents and Officers in the Appropriate and Reasonable Use of Force and Use of Taser on the Mentally Ill**

24. The City has or had a custom, policy, or practice whereby it failed to adequately investigate and discipline its employees, agents, and officers in the appropriate and reasonable use of force and use of Taser on the mentally ill. (Taylor Dep. 50–51: (Ex. 5)).

25. An independent audit of the Hollywood Police Department's ("HPD") internal affairs department conducted by Charles Gruber found, "HPD failing to meet even the most essential elements of the generally accepted police practices in internal affairs operations." (TYSON-COH Resp. to 2nd RFP GRUBER 01393 (Ex. 28)).

26. The Audit concluded that there is "a distinct lack of formal reporting of [complaints] that met any minimal police investigative standard. There was little to no management review of the cases." (TYSON-COH Resp. to 2nd RFP GRUBER 01393–94 (Ex. 28)).

27. Despite HPD policy and a national standard requiring all citizen complaints to be entered into IAPro, the internal record keeping and tracking system for complaints, HPD has developed a practice of failing to do so. (TYSON-COH Resp. to 2nd RFP GRUBER 01393–94 (Ex. 28)).

28. As a result, each of these complaints "were lost opportunities for management accountability including early intervention of effected personnel, counseling, and possible discipline." (TYSON-COH Resp. to 2nd RFP GRUBER 01394 (Ex. 28)).

29. The Audit further conclude that a review of 2012 and 2013 IA incidents "indicated a lack of investigative follow up, probing of the alleged complaint, proper identification of the alleged misconduct and appropriate/fair discipline when officer misconduct was or should have been identified." (TYSON-COH Resp. to 2nd RFP GRUBER 01394 (Ex. 28)).

30. The Audit emphasized HPD's lack of any management accountability process as a critical element. *Id.* "Simply stated, HPD's leadership failed to provide adequate or appropriate oversight in IA complaint process including intake, investigation, and failure to report publicly (sic) about the activities and cases within the Internal Affairs process." *Id.*

31. According to City records, in 2012, lethal and non-lethal force was used in 88 incidents, 15 of which involved a Baker Act or Marchman Act situation. (*See* TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00001–185 (Ex. 29); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00001-02 (Ex. 30)). Tasers were used in 49 of the 88 incidents. (TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00001–185 (Ex. 29); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00002 (Ex. 30)). Reports do not indicate whether any of these incidents resulted in any discipline. (TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00001–185 (Ex. 29)*;* TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00001–03 (Ex. 30))*.*

32. According to City records, in 2013, lethal and non-lethal force was used in 82 incidents, 9 of which involved a Baker Act or Marchman Act situation. (*See* TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00186–780 (Ex. 31); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00006-07 (Ex. 32)). Tasers were used in 27 of the 82 incidents. (TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00186–780 (Ex. 31); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00007 (Ex. 32)). The City concluded that in every single incident in 2013, the officers acted within City policy and no officer was disciplined. (TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00186–780 (Ex. 31); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00011 (Ex. 32)). Additionally, in 2013, there were 115 fact-finding investigations based on internal complaints, and in every instance, all police officers were cleared. (TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00005 (Ex. 32)).

33. According to City records, in 2014, lethal and non-lethal force was used in 89 incidents, 15 of which involved a Baker Act or Marchman Act situation. (*See* TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00781–1767 (Ex. 33); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00015–16 (Ex. 34)). Tasers were used in 25 of the 89 incidents. (TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00781–1767 (Ex. 33); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00016 (Ex. 34)). The City concluded that in every single incident in 2014, the officers acted within City policy and no officer was disciplined. (TYSON-COH Resp. to Sec. RFP 4th Supp. Resp. 00781–1767 (Ex. 33); TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00014, 00020, 00027 (Ex. 34)).

34. Additionally, in 2014, there were 267 fact-finding investigations based on internal complaints, and in every instance, all police officers were cleared. (TYSON-COH Resp. to 2nd RFP 3rd Supp. Resp. 00014 (Ex. 34)).

35. The City customarily fails to adequately discipline its employees, agents, and officers because it "lacks a formal, structured, and consistent investigative process. […] Because HPD does not direct HPD investigators with such precision it fails to provide thorough investigations, which is contrary to generally accepted police practice." (TYSON-COH Resp. to 2nd RFP GRUBER 01399–400 (Ex. 28)).

36. The Audit determined that many internal investigations were conducted over the phone. (TYSON-COH Resp. to 2nd RFP GRUBER 01400 (Ex. 28)).

37. In very few cases did the investigator bother to meet with the complainants, collect any evidence, document any investigation or meetings through notes or summaries of discussions, create a statement of work done, or create any other documentation regularly done and expected in an internal affairs file. *Id.*

38. Moreover, "many of the complaints alleged by the complainant were not addressed in the investigative file or concluded in the final outcome of the case. *Id.*

39. Since some of the alleged misconduct was not addressed from the complainant's initial complaint, incomplete cases were found throughout the review process." *Id.* Even worse, the Audit determined that some reports revealed "the investigation completely ignored the misconduct asserted by the complainant." *Id.*

40. As stated in the Audit, any reasons for a deliberate failure to include all of the allegations in the investigation should be properly documented in the IA file. *Id.* However, the Auditors found none. *Id.* The Audit concluded that the "investigations did not properly probe into the allegations of police misconduct and the reviews did not memorialize the issues." *Id.*

**D. Daniel's Death Caused Plaintiff Severe Emotional Suffering which resulted in Intense Migraines and a Mini-Stroke.**

41. Plaintiff is Daniel's mother and he is her first-born son. She raised Daniel in Miami,

taking him to the beach, trick-or-treating on Halloween, celebrating holidays such as Christmas and Thanksgiving, throwing birthday parties with family and family-friends, and supporting Daniel's singing, piano, Boy Scouts activities and lifestyle. Plaintiff would visit with Daniel at least once a week in the year preceding his death. In addition to having a mother-son relationship, Plaintiff was very close with Daniel and considered him a "friend, confidante, … adviser." (Suarez Dep. 9-29, 32, 40–41, 54 (Ex. 35)).

42. Although Plaintiff had previously been diagnosed with depression and anxiety, her distress was exacerbated by Daniel's death. (Suarez Dep. 12, 41, 69–71 (Ex. 35)).

43. Since Daniel's death, Plaintiff has experienced depression, frequent and severe migraines with dizziness and vision loss, heart palpitations, sleeping issues and has suffered a Trans Ischemic Attack ("TIA"). (Suarez Dep. 69–73 (Ex. 35)). A TIA is essentially a mini-stroke. *Id.*

44. As a result, Plaintiff sought treatment with a cardiologist who performed a full cardiac work-up and prescribed medication. *Id.* Additionally, the Plaintiff sought treatment which is ongoing with her primary care physician, psychiatrist and a neurologist for her remaining symptoms. *Id.*

**E. Daniel Tyson suffered from schizoaffective disorder, bipolar type and was decompensating as result of non-compliance with medication on the date of his death.**

45. Daniel was a patient of the Henderson Behavioral Clinic from July 1997 through the date of his death. (Pean Dep. 10, 12 (Ex. 36)).

46. Daniel was diagnosed with schizoaffective disorder, bipolar type and manic depression. (Pean 16, 18–19 (Ex. 36)).

47. Behavior consistent with schizophrenia are hallucinations, delusions, agitation, and poor sleeping. (Pean Dep. 18 (Ex. 36)).

48. Behavior consistent with a manic episode are yelling, screaming, agitating, mood swings and most often, require hospitalization for stabilization. (Pean Dep. 19, 44, 49 (Ex. 36)).

49. Failing to take medication would cause Daniel to decompensate resulting in a manic episode and behavioral manifestations of his mental illness. (Pean Dep. 22, 42–43 (Ex. 36)).

50. On October 26, 2014, Daniel began exhibiting behavior consistent with a manic episode and made statements implying that he was not taking his prescribed Wellbutrin. (Auerbach Dep. 45–49, 51–52, 57–59, 60–61, 78, 84 (Ex. 2)).

51. On the date of Daniel's death—October 27, 2014—Daniel decompensated further and was out of touch with reality. From the period which lead to the City's police officers being dispatched through his death, Daniel was screaming unintelligible, incoherent speech. (Auerbach Dep. 64, 68–70, 74 (Ex. 2); Moore Dep. 26, 28, 34-35 (Ex. 3); Brown Dep. 21, 29, 31, 34 (Ex. 22); Ramirez Dep. 83, 102–03, 107–08, 110–11, 143 (Ex. 13); Pantaloukas Dep. 98, 112–13, (Ex. 15); Kerns Dep. 53–54 (Ex. 14); Karl Dep. 73 (Ex. 16); Falcon Dep. 57, 98, 100 (Ex. 11)).

52. Field Training Officer Kerns suspected that Daniel was screaming "because he was in some type of state of mind, suffering from the mental illness or the narcotics, and he was having some type of manic episode." (Kerns 81 (Ex. 14)).

53. Post-mortem toxicology revealed that narcotics did not contribute to Daniel's death or behavior. (Autopsy Report & Records at TYSON 4021–24 (Ex. 37), Shuman Dep. 48–49 (Ex. 25)).

Dated July 19, 2018                                    Respectfully submitted,

*s/JOSEPH J. KALBAC, JR*.
JOSEPH J. KALBAC, JR.
Florida Bar No. 628270
jkalbac@colson.com
STEPHANIE A. CASEY
Florida Bar. No. 97483
scasey@colson.com
DENISE H. GEORGES
Florida Bar No. 55861
denise@colson.com
COLSON HICKS EIDSON
Attorneys for the Plaintiff
255 Alhambra Circle, Penthouse
Coral Gables, Florida  33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
E-mail: eservice@colson.com;
nicky@colson.com; mabel@colson.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, this 19th day of July, 2018, and a true and correct copy of the foregoing was served either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner of those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing, on: Daniel L. Abbott, Esq., Adam M. Hapner, Esq., Email: dabbott@wsh-law.com;   pgrotto@wsh-law.com; ahapner@wsh-law.com; Weiss

Serota Helfman Cole & Bierman, P.L., Attorneys for Defendant, City of Hollywood, 200 E. Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301.

<u>*s/JOSEPH J. KALBAC, JR*</u>.  
JOSEPH J. KALBAC, JR.  
Florida Bar No. 628270