# EXHIBIT 7



|  | Approved | ☐ Disapproved |
|---|---|---|
|  | ☐ Approved | ☒ Disapproved |
|  | ☐ Approved | ☐ Disapproved |
|  | ☐ Approved | ☐ Disapproved |

# CITY OF HOLLYWOOD FLORIDA
### INTEROFFICE MEMORANDUM
### POLICE DEPARTMENT

DATE:      MAY 29, 2018                          FILE:  IA2014-0011

TO:        **CHRISTOPHER O'BRIEN**
           **CHIEF OF POLICE**

FROM:      **NICOLA WILLIAMS #2901**
           **INTERNAL AFFAIRS UNIT**

SUBJECT:   **CLOSE-OUT / IN-CUSTODY DEATH REVIEW (33-1410-143555)**

---

### Incident

On October 27, 2014, Hollywood Officers were dispatched to a police service call allegedly involving a mentally ill person [Daniel Mark Tyson] at 1836 Jackson Street #12.  After officers arrived on scene, a struggle ensued between Mr. Tyson and the officers, to include Officers Alexis Ramirez and Andreas Pantaloukas.  Hollywood Fire Rescue was summoned to treat Officer Ramirez, for an alleged injury, but ultimately transported Mr. Tyson to Memorial Regional hospital where he later died.

### Synopsis of Interviews

This review/inquiry was conducted by Sergeant Nicola Williams of the Internal Affairs Unit.

This review includes a notarized written statement provided by Loenarda Moore as well as sworn recorded statements, taken by the department's Homicide Unit, from the following witnesses:

- Officer A. Ramirez
- Officer A. Pantaloukas
- Officer B. Kerns
- Officer A. Falcon
- Officer K. Karl
- Officer A. Truntz
- Officer K. Wagner
- Christine Corbo

**TYSON**
**RRFP- 5TH SUPP 00001**

- Jennifer Corbo
- Jessica Auerbach
- John Collette
- Xavier Lesmarie

## Evidence

The investigation is based on information compiled from the following:

- Criminal Investigations Division -  Incident Report – 33-1410-143555 – Detective R. Rillo
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Detective R. Rillo
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer A. Ramirez
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer A. Pantaloukas
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer B. Kerns
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer K. Karl
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer A. Falcon
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer K. Wagner
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer A. Truntz
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer M. Owens
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer J. Gibbons
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Officer J. Alvarez
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Sergeant Y. Ruiz
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Detective S. Keough
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Detective E. Langley
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Crime Scene Supervisor L. Fernandez
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Crime Scene Technician R. Combs

**TYSON**
**RRFP- 5TH SUPP 00002**

- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Crime Scene Technician L. Monetti-Vignau
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Crime Scene Technician Diane Unger
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Crime Scene Technician L. Elmhorst
- Criminal Investigations Division - Supplement Report – 33-1410-143555 – Crime Scene Technician M. Mammarelli
- Criminal Investigations Division - Crime Scene Photographs
- Criminal Investigations Division - Transcribed Statement – Officer A. Pantaloukas – January 14, 2015
- Criminal Investigations Division - Transcribed Statement – Officer A. Ramirez – January 14, 2015
- Criminal Investigations Division - Transcribed Statement – Officer K. Karl – January 15, 2015
- Criminal Investigations Division - Transcribed Statement – Officer K. Wagner – January 15, 2015
- Criminal Investigations Division - Transcribed Statement – Officer A. Falcon – January 21, 2015
- Criminal Investigations Division - Transcribed Statement – Officer B. Kerns – January 21, 2015
- Criminal Investigations Division - Transcribed Statement – Officer A. Truntz – July 15, 2015
- Criminal Investigations Division - Transcribed Statement – Witness J. Auerbach – October 27, 2014
- Criminal Investigations Division - Transcribed Statement – Witness J. Collette – October 27, 2014
- Criminal Investigations Division - Transcribed Statement – Witness C. Corbo – October 27, 2014
- Criminal Investigations Division - Transcribed Statement – Witness J. Corbo – October 27, 2014
- Criminal Investigations Division - Transcribed Statement – Witness X. LesmarieJ. Auerbach – October 29, 2014
- Criminal Investigations Division - 911 Audio Recording
- Criminal Investigations Division - 911 Dispatch Recording
- Criminal Investigations Division - Audio Tape Request Form – Broward Sheriff's Office
- Criminal Investigations Division - Fire Rescue Incident In-House Summary Sheet – Broward Sheriff's Office – FHW141027022593
- Criminal Investigations Division - Law Enforcement Incident In-House Summary Sheet – Broward Sheriff's Office
- Criminal Investigations Division - Audio Tape Request Form – Hollywood Police Department

**TYSON**
**RRFP- 5TH SUPP 00003**

- Criminal Investigations Division - Email – CAD Abbreviations – Broward Sheriff's Office – Lori Henry
- Criminal Investigations Division - Charlie Shift Line-Up – October 27, 2014
- Criminal Investigations Division - Hollywood Police Department – Major Case Canvass Data Sheet
- Criminal Investigations Division – Consent to Search Form – Xavier Lesmarie
- Criminal Investigations Division - Hollywood Police Department – State Attorney Checklist
- Criminal Investigations Division - Taser Certified End User Certificate – Officer A. Pantaloukas  – July 17, 2014
- Criminal Investigations Division - Taser User Certification Test – Officer A. Pantaloukas  – July 17, 2014
- Criminal Investigations Division - Taser X26 Certification Test – Officer A. Pantaloukas  – July 17, 2014
- Criminal Investigations Division - Taser CEW User Certification Form – Officer A. Pantaloukas  – July 17, 2014
- Criminal Investigations Division - Taser Report – Officer A. Pantaloukas – October 28, 2014
- Criminal Investigations Division - Taser Certified End User Certificate – Officer A. Ramirez – July 17, 2014
- Criminal Investigations Division - Taser User Certification Test – Officer A. Ramirez – July 17, 2014
- Criminal Investigations Division - Taser X26 Certification Test – Officer A. Ramirez – July 17, 2014
- Criminal Investigations Division - Taser CEW User Certification Form – Officer A. Ramirez – July 17, 2014
- Criminal Investigations Division - Taser Information Log – Officer A. Ramirez – October 28, 2014
- Criminal Investigations Division – Exhibit A – (Department Issued Taser - Officer A. Ramirez / Officer A. Ramirez)
- Criminal Investigations Division -  Exhibit B (Taser Deployment Times)
- Criminal Investigations Division – Exhibit C (Text Messages Among Xavier Lesmarie, Leonarda Moore, and Patrick McConnell)
- Criminal Investigations Division – Exhibit D (In Custody Death Approximate Timeline)
- Criminal Investigations Division - Fire Rescue Run Report – Hollywood Fire Rescue
- Criminal Investigations Division - Medical Examiners Cause of Death Report – Broward County Medical Examiner
- Criminal Investigations Division - Medical Examiners Examination Report – Broward County Medical Examiner
- Criminal Investigations Division - Cellular Forensics Report – Xavier Lesmarie

**TYSON**
**RRFP- 5TH SUPP 00004**

- Internal Affairs - Summary of Investigation
- Closeout Memorandum
- Supervisor's Response to Resistance Report/Supplement Report
- Property Form – Officer A. Ramirez – October 27, 2014
- Administrative Leave with Pay Form – Officer A. Ramirez  – October 27, 2014
- Traumatic Event Psychological Debriefing Appointment – Officer A. Ramirez – October 28, 2014
- Debriefing Confirmation Letter – Officer A. Ramirez - October 29, 2014
- Relieved/Reassignment Letter – Officer A. Ramirez – November 12, 2014
- Training Record – Officer A. Ramirez
- Property Form – Officer A. Pantaloukas – October 27, 2014
- Administrative Leave with Pay Form – Officer A. Pantaloukas  – October 27, 2014
- Traumatic Event Psychological Debriefing Appointment – Officer A. Pantaloukas – October 28, 2014
- Debriefing Confirmation Letter – Officer A. Pantaloukas - October 29, 2014
- Relieved/Reassignment Letter – Officer A. Pantaloukas – November 12, 2014
- Training Record – Officer A. Pantaloukas
- Bravo Shift Line-Up – October 27, 2014
- Shift Commander Daily Log – October 27, 2014
- Written Statement – Witness L. Moore – November 3, 2014
- Dispatch Incidents with Comments – Hollywood Police Department – 33-1410-143555
- Taser Information Log – Officer K. Karl – October 28, 2014
- Taser Information Log – Officer K. Wagner – October 28, 2014
- Taser Information Log – Officer A. Falcon – October 28, 2014
- Taser Information Log – Officer B. Kerns – October 28, 2014
- Taser Information Log – Officer A. Truntz – October 28, 2014
- Taser Information Log – Sergeant Y. Ruiz – October 28, 2014
- SOP# 200 – Use of Force
- SOP# 201 – Use of Force:  Special Impact Weapons & Chemical Agents
- Sun Sentinel Article – October 29, 2014
- Training Unit Recommendation – December 2, 2014
- Broward State Attorney's Office Investigation Initiation Letter – Received August 24, 2015
- Broward State Attorney's Office – No True Bill – November 6, 2017
- Email – Use of Force – 1836 Jackson Street -  Lieutenant Astacio
- Email – Reassignment – Ramirez/Pantaloukas – Major T. Basler
- Email – Critical Incident Stress Debrief – Lieutenant B. Millares
- Email – Suarez(Tyson) v. City of Hollywood, N. 16-62215-CIV – No True Bill
- Email – Taser Analysis – Sergeant L. Bien
- X26P_CEW_Manual

TYSON
RRFP- 5TH SUPP 00005

## Summary

On October 27, 2014, at about 1444 hours, Broward County Regional Communications received a call for service from complainant Xavier Lesmarie advising, his tenant, Daniel Tyson, was "very agitated", "screaming", "naked", "with his boots on" and "talking to trees" at 1836 Jackson Street #12.  According to the complainant, Mr. Tyson suffers from mental illness "…and does not have his meds".  Mr. Lesmarie claimed Mr. Tyson needs medication, and said "the situation is getting out of hand".   Lesmarie relayed Tyson lived on the second floor of the "back house."

Officer Alexis Ramirez (33C7) and Officer Andreas Pantaloukas (33C5), both of whom were in the final phase of their road patrol officer training, were dispatched to the call (33-1410-143555) at about 1445 hours.  Officer Ramirez was dispatched as the primary officer and Pantaloukas as the back-up.  The dispatcher informed both officers of the information provided by Mr. Lesmarie.

Officer Ramirez arrived on scene first and made contact with Mrs. Leonarda Moore. Mrs. Moore briefed Officer Ramirez on Mr. Tyson's erratic behavior.  It is unclear exactly when, but Mrs. Moore then left Officer Ramirez alone to deal with Mr. Tyson.  It is believed after Officer Ramirez observed Mr. Tyson, and because of what had just been reported to him, he contacted Officer Pantaloukas by phone attempting to determine how long it was going to take Pantaloukas to arrive on scene.  Shortly thereafter, it is believed Mr. Tyson exited his second floor apartment wearing little to no clothing. Officer Ramirez attempted to engage Mr. Tyson in dialogue.  For an unknown reason, Mr. Tyson became further upset, grabbed a sun-dial type clock off of the wall and rushed down the east exterior stairs, of his residence, in the direction of Officer Ramirez.  Mr. Tyson subsequently charged at Officer Ramirez, with the sun-dial type clock in his hands, who was dressed in a clear and identifiable police uniform.  In response to Mr. Tyson's aggression, at about 14:53:26 hours, Officer Ramirez deployed his department issued Taser.  (One (1) one-time deployment consisting of a five (5) second duration.)  It is believed the two Taser prongs deployed struck Mr. Tyson in the left chest area and on the upper right side of his navel.  It is unclear exactly why, but this Taser deployment was ineffective because Tyson continued charging at Ramirez. When Tyson reached Officer Ramirez, he struck Officer Ramirez on the top left portion of his head with the sun-dial type clock.  This caused an approximate one and three quarter (1 ¾) inch laceration to Officer Ramirez's head.   Officer Ramirez started to bleed.   Both Ramirez and Tyson end up on the ground struggling.  A Taser prong located in the grass, at the scene, is believed to have been deployed from Officer Ramirez's Taser but was possibly dislodged during the struggle.

At or about this time, Officer Pantaloukas arrived on scene and observed Officer Ramirez struggling with Mr. Tyson, on the ground, with Tyson on top of Ramirez. Officer Ramirez could be seen clearly bleeding from his head injury.  At about 14:53:55 hours, Officer Pantaloukas deployed his Taser, striking Mr. Tyson in the lower left

**TYSON
RRFP- 5TH SUPP 00006**

portion of his back. It is believed this Taser deployment had little to no effect on Tyson because the prongs were relatively close to each other, so Pantaloukas held the Taser trigger and drive-stunned Tyson's lower extremities in order to cause the connection leading to neuromuscular incapacitation (NMI). (The Taser deployment lasted about nine (9) seconds due to a continued trigger pull.)

Officer Pantaloukas then released the Taser's trigger disengaging the drive stun, as officers continued to struggle with Mr. Tyson, ordering him to stop resisting and instructing him to put his hands behind his back. With no electrical connection to impede his efforts, Mr. Tyson continued struggling with the officers. It is unclear exactly where on Tyson's body, but at 14:54:05 hours, it is believed Officer Pantaloukas again drive-stunned Mr. Tyson, for no more than five (5) seconds, while the original probes were still attached to Tyson's back. As the struggle continued, eighteen (18) seconds later at 14:54:23 hours, Officer Pantaloukas drive-stuns Mr. Tyson again, for about another five (5) seconds. It is again unclear where on Mr. Tyson's body this drive stun was conducted either.

Although the time cannot be clearly determined, it is believed Officer Kerns then arrived on scene. He, Pantaloukas and Ramirez were subsequently able to handcuff Mr. Tyson, but Tyson continued to struggle. At 14:54:56 hours, Pantaloukas drive-stuns Mr. Tyson again for no more than five (5) seconds. It is unclear where, on Tyson's body, the Taser was depressed.

Now with his hands secured, it is believed Tyson continuously kicked at the officers. Officers continued to order Mr. Tyson to stop fighting them but he refused. At 14:56:15 hours, Officer Pantaloukas drive stun's Mr. Tyson a fifth time, for no more than five (5) seconds.

Although it is unclear exactly when, it is believed that somewhere during this timeframe, shortly thereafter Officers K. Karl, A. Falcon and A. Truntz arrived on scene. With the additional officers now helping hold Mr. Tyson down, it is believed Officer Kerns responds to his police vehicle to retrieve leg restraints. After leg restraints were able to be placed on Mr. Tyson, it is believed he continued to struggle with the officers who were still unable to physically restrain him. At or about this point, Officer Ramirez separates himself from the struggle and awaits medical attention.

Mr. Tyson continued to scream, yell and struggle with the officers. It is unclear if the Taser had been used to drive-stun Mr. Tyson again, but at 14:58:23 hours, Officer Pantaloukas' Taser recorded it had been cycled for another five seconds. This was followed by three more five (5) second cycles, from 14:59:03 to 14:59:56. It is believed that during this timeframe Officer I. Pitts (33C83), who is believed to be on scene, is trying to communicate, via his police radio. A subject, believed to be Mr. Tyson, can be heard in the background. According to Ms. Moore, Mr. Tyson continued to struggle with officers even after he had been handcuffed and had his legs restrained. Moore claimed she could hear the "taser going off again." Based on her statement, it is reasonable to

**TYSON**
**RRFP- 5TH SUPP 00007**

believe the Taser did not have a good connection, and therefore was emitting a clearly audible sound.

At 1500 hours, Officer M. Owens (33C9) arrived on scene, followed shortly thereafter by Sergeant Y. Ruiz and Hollywood Fire Rescue.  Hollywood Fire Rescue originally responded to treat Officer Ramirez, for his head injury, but tended to Mr. Tyson once they were notified Mr. Tyson had become unresponsive.

Both Mr. Tyson and Officer Ramirez were then transported to Memorial Regional hospital for further medical care.  A crime scene was established and required department notifications were made.

At about 1538 hours, Mr. Tyson was declared deceased.  It is unclear exactly when, but sometime thereafter Officer Ramirez was treated for his head wound, receiving six (6) medical staples.

## Conclusion

According to Mr. Lesmarie, Mr. Patrick McConnell, who lives in apartment 14 below Mr. Tyson, called him at about 1000 hours on the above date claiming; "there's a lot of noise in the apartment, lots of banging.  He's [Mr. Tyson] going crazy".  A couple of hours later, at 1300, Mrs. Moore contacted Mr. Lesmarie concerned about Mr. Tyson's behavior.  Lesmarie forwarded her text message to McConnell who called Lesmarie and allegedly said; "there's still noise in the apartment.  He's [Mr. Tyson] agitated".

According to Mr. Tyson's friend, John Collette, Tyson was "manic depressive and attends Henderson Behavioral Health".  (According to their website, they were "Established in 1953, Henderson Behavioral Health (HBH or Henderson) provides healthcare, housing, and hope for over 30,000 persons of all ages with behavioral health conditions in Florida each year. Through care, supported employment, advocacy, and housing, Henderson assists and inspires people with mental illnesses and substance use disorders to reclaim their lives.")  According to Detective Rillo, Mr. Collette said he himself had been attacked by Tyson, the day prior, October 26, 2014 at his apartment.  Collette said Tyson yelled at him, cornered him in the kitchen, grabbed him by the hair and threw him to the ground.  Collette claimed he had been injured. Collette added Tyson then grabbed a bottle out of the refrigerator, struck him on the shoulder and also grabbed a kitchen knife, stabbing a chair.  Collette alleged Mr. Tyson later threw the same bottle through Collette's rear vehicle window, causing damage.

According to Mr. Lesmarie, on the date of the incident he asked Collette to go to Tyson's apartment because he was going to call the police, but Collette refused.  Even though Mr. Collette ultimately refused to provide investigators a sworn recorded statement it is clear from Lesmarie, Mr. Collette was afraid of Mr. Tyson.

According to Jessica Auerbach, a friend of Mr. Tyson for many years, she had seen Tyson the day before and he wasn't doing well.  When she called to check up on him,

In-Custody Death Tyson_2014_Closeout        Page 8 of 11

**TYSON**
**RRFP- 5TH SUPP 00008**

she said Tyson became very upset and she could not understand what he was saying. Ms. Auerbach added Mr. Tyson was getting "progressively worse", erratic and starting to slip into a schizophrenic kind of state. After staying up with Tyson all night, she found him walking around her home having conversations with people which were not actually there. Auerbach confirmed when she went to check on him on October 27, 2014, she found him naked only wearing one boot. She said his apartment was in disarray with broken items scattered throughout.

Ms. Christine Corbo said Tyson was "just crazed and the power was just phenomenal". Ms. Corbo said, "They [officers] talked to him, they [officers] tried to calm him down, they [officers] did everything they [officers] could and he [Tyson] was just attacking and attacking and attacking the officers".

Mr. Lesmarie said Mrs. Moore told him, Mr. Tyson was "...very agitated" and "very strong." Lesmarie said Moore relayed; "...he [Tyson] was able to move out three guys out of him."

Based on several witness statements, it is clear Mr. Tyson suffered from some type of mental illness. It is evident Mr. Tyson was not acting rationally and his behavior was becoming increasingly aggressive, concerning those who knew him. Without intervention, it is clear Mr. Tyson would have brought further harm to himself and/or potentially others. Based on this alone, officers had a duty to act. Florida State Statute and department policy allows officers to use reasonable force to take a person into custody for an involuntary Baker Act.

It is clear from the information and evidence available, Mr. Tyson violently charged at and committed an Aggravated Battery upon Officer Ramirez. It would have been reasonable for Officer Ramirez to believe he was about to face great bodily harm as Mr. Tyson charged at him with a blunt object. It is known that because of Mr. Tyson's actions, Officer Ramirez suffered a strike to his head, causing a significant laceration, which may have rendered him unconscious. Based on the incident scene and what Officer Ramirez was faced with, it is reasonable to believe Officer Ramirez would have been authorized to use deadly force but it is clear he chose not to. It is evident he opted for a lesser alternative when he deployed his Taser, which ended up being ineffective.

The inquiry confirmed Officers Ramirez and Pantaloukas deployed their department issued Tasers ten (10) times during the incident. With regards to the first six Taser deployments/drive stuns, it is clear Mr. Tyson was displaying Level 5 (Aggressive Physical Resistance) and Level 6 (Aggravated Physical Resistance) towards the officers when the Tasers were employed. Mr. Tyson attacked Officer Ramirez with a weapon (sun-dial cock) with the intent and apparent ability to cause death, great bodily harm or incapacitation. In addition, he continued by making overt, hostile, attacking movements that could have caused further injury, but were not likely to cause death or great bodily harm, when he continued to fight and kick at the officers, even after being handcuffed and shackled. For these clear reasons the officers were authorized to utilize their department issued Tasers. The force used was reasonable under the circumstances

TYSON
RRFP- 5TH SUPP 00009

faced by the officers.

With regards to the remaining four Taser cycles, it is unclear if they were actually employed or produced any significant NMI. It is known two prongs were connected to Mr. Tyson's lower back but what is not known is if an actual electrical connection was being made. Loud audible Taser deployment sounds lead one to believe there was no actual electrical connection. It is clear Officer Pantaloukas' Taser trigger was pressed four more times but it cannot be clearly determined if any of those cycles were either employed as drive stuns, actually making contact with Mr. Tyson or that they had any significant neuromuscular effect on him. It would be reasonable to believe, if Officer Pantaloukas drive stunned Mr. Tyson by pressing down on Mr. Tyson's skin, to establish an electrical connection as many times as the Taser reported, evidence would have supported that. On the contrary, the available evidence suggests otherwise. It is believed several of the Taser deployments did not produce the effect that was expected by the officers.

By all accounts Mr. Tyson continued to struggle with the officers throughout the entire incident even after he had been handcuffed and leg restraints had been placed on him. Department Policy #201 states as follows:

> IV. Authorized Lethal Weapons, Less Lethal Weapons and Chemical Agents
>
> > E. Taser
> >
> > > 4. Members will be Prohibited from using the Taser when:
> > >
> > > > e. The subject is handcuffed, <u>unless</u> they are exhibiting aggressive physical resistance, actively attempting to escape from custody or trying to harm themselves or others.

The policy recognizes that even though a subject is handcuffed they can still be aggressive and cause harm to others. As a witness described, Mr. Tyson appeared to be "crazed and the power was just phenomenal." The officers continued use of the Taser was reasonable to ensure Mr. Tyson would stop attempting to further harm himself or the officers.

Both Officers Ramirez and Pantaloukas received training in their department issued Taser on July 17, 2014 and completed a refresher course on October 8, 2014.

The Internal Affairs review has determined the involved officers followed department policy, with regards to their response to Mr. Tyson's resistance.

The Criminal Investigations Division conducted a proper investigation ensuring State Attorney Review.

**TYSON**
**RRFP- 5TH SUPP 00010**

After a thorough review of the entire incident, this inquiry only found a minor policy violation to have taken place when two of the officers involved failed to follow Department Policy #101, Appearance Standards when they were observed to be wearing black sneakers.

No further investigation is warranted.

## RECOMMENDATION:

For your approval.

For action memoranda only

☑ Approved          ☐ Disapproved

By: _____
                              Signature

TYSON
RRFP- 5TH SUPP 00011