UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as Personal
Representative of the Estate of DANIEL TYSON,
deceased,

       Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida Municipal
Corporation,

       Defendant.
_____/

## PLAINTIFF'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF DEFENDANT'S EXPERTS GARY MICHAEL VILKE, M.D. AND CHARLES W. DRAGO

Plaintiff, JEAN SUAREZ, individually, and as Personal Representative of the Estate of DANIEL TYSON ("Plaintiff"), pursuant to Federal Rules of Evidence 104, 702, and 703, moves to exclude the opinions and proposed trial testimony of the City of Hollywood's (the "City" or "COH") identified expert witnesses, Dr. Gary Michael Vilke and Charles W. Drago.

### INTRODUCTION

On October 27, 2014, Daniel Tyson was confronted by COH police officers while standing outside of his apartment naked and seemingly talking to the air and to the trees. The first two officers to respond to Daniel's apartment were COH Officers Ramirez and Pantaloukas. Both were rookie officers still in the shadow phase of their training, where they were each assigned to a field training officer who was supposed to supervise them.

In six minutes and thirty seconds, COH police officers tased Daniel ten times, even after he was handcuffed and leg shackled while in a prone position. One of the tasings was for a

CASE NO.: 16-cv-62215-WPD

continuous nine-second period, in violation of COH policies and procedures. During this six-and-a-half-minute period, four or five police officers bore the weight of their bodies on Daniel. Police officers testified that they got off of Daniel's body when they realized he was no longer breathing and unresponsive; his lips were blue. When paramedics evaluated Daniel approximately three minutes later, they found he was pulseless, a condition that remained unchanged until he was pronounced dead about thirty minutes later.

Despite these facts, Dr. Vilke's opinion is that COH police officers did nothing to cause or contribute to Daniel's death. Rather, according to Dr. Vilke, Daniel died of a cardiac arrest that was completely unconnected to the fact that he was tased 10 times and had four or five officers bearing weight on him until he stopped breathing. It is not surprising that Dr. Vilke would come to such an incredible opinion: Dr. Vilke has consulted on 50-75 cases where someone has died in a police encounter, and only once did he ever opine that the death was the result of police force. *See* Vilke Dep. 51:3–52:13 (attached as Exhibit 1). Dr. Vilke's opinions are not supported by the facts of the case, and therefore they are unreliable an unhelpful to the jury.

Additionally, Charles Drago testifies that "there is no evidence in the materials reviewed" by him that the City failed to properly train its officers in the use of Tasers, in the proper procedure for dealing with the mentally ill, and the proper use of force. These opinions consist merely of a recitation of the evidence that is unreliable and unhelpful to the jury.

2

CASE NO.: 16-cv-62215-WPD

## LEGAL STANDARD

In determining the admissibility of expert testimony, a district court must consider whether: (1) the expert is qualified to testify competently as to the subject matter he intends to address; (2) the method employed by the expert is sufficiently reliable; and (3) the testimony assists the trier of fact to comprehend the evidence through the application of the witness's expertise. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd.*, 326 F. 3d 1333, 1340-41 (11th Cir. 2003). The second and third prongs of the Eleventh Circuit's test require the trial judge to ensure that the testimony satisfies two criteria: reliability and relevance. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"When evaluating the reliability of scientific expert opinion, the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.'" *Frazier*, 387 F.3d at 1261-62 (quoting *Daubert*, 509 U.S. at 592-93). In assessing the reliability of scientific opinion or non-scientific, experience-based testimony, a court must consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id*. at 1262. "[I]f the witness is relying solely or primarily on experience, then the witness must

CASE NO.: 16-cv-62215-WPD

explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id*. at 1261 (quoting Fed. R. Evid. 702 advisory committee note (2000)) (internal quotations omitted)).

A court must also determine whether the expert testimony will assist the jury. Expert testimony is admissible under this requirement "if it concerns matters that are beyond the understanding of the average lay person." *Id*. at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262-63.

Finally, a court may exclude expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. *Id.* at 1263; *see* Fed. R. Evid. 403. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a court "must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

**A. Dr. Vilke's Opinion That The Restraining Process Did Not Cause Daniel's Death Is Unreliable and Should Be Excluded.**

In his first opinion, Dr. Vilke concludes that the "restraining process did not cause the sudden cardiac arrest and death in Mr. Tyson." Vilke Report at 5 (attached as Exhibit 2). In other words, he concludes that Daniel's cardiac arrest was not due to positional asphyxiation as a result of police officers bearing down on his body while he was face down, handcuffed, and leg shackled.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

CASE NO.:  16-cv-62215-WPD

Dr. Vilke fails to employ any reliable methodology to render this opinion.  Essentially, he expects this Court to simply take his word for it.  *See Frazier*, 387 F.3d at 1261 ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'") (quoting Fed. R. Evid. 702 advisory committee note (2000)) (internal quotations omitted)).  Moreover, his opinion is unreliable, unhelpful, and confusing and misleading to the jury, because it is incomplete and directly contradicted by the evidence in this case, i.e., it is not based on "good grounds." *Id*. ("[I]t remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known.") (quoting *Daubert*, 509 U.S. at 590).

In his deposition, Dr. Vilke identifies the following clinical presentations that are taken into account when determining whether a person is ventilating properly:

> There's a number of things, what they're doing at the time, whether there's a person yelling or screaming, are they vocalizing, are they -- ***you want to look at how much weight is being placed; the locations the weights are being placed***; is it constant weight or is it shifting weight; is there a change in position; is the person changing position; are they moving up and down and able to increase ventilatory aspects because it takes a long time for somebody to asphyxiate, to build enough carbon dioxide levels and drop oxygen levels.

Vilke Dep. 33:13-22 (Ex. 1) (emphasis added).  When asked how much weight a person could sustain before being asphyxiated, Dr. Vilke explained:

> There's not a formula for a single number to give you, and the reason being people are different. ***It depends where the weight is, how much weight it is***, how focused it is, are you moving and wiggling, are you bridging up. So that's the challenge of it.
> . . .
> . . . ***But there's no calculation that can say 200 pounds is safe, 300 pounds is not safe for you.*** Because if you're breathing and talking and moving, it's probably going to be safe for a period of time.

5

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

CASE NO.: 16-cv-62215-WPD

> And then the other piece is the dynamics. The weight -- if it's 500 pounds, it will probably have some negative impact, and then it will take some time to asphyxiate. I mean, to kill somebody does take time to do that. So there is not a calculation saying for a 125-pound versus a 200-pound person this much weight is safe to put on for "X" amount of time.

Vilke Dep. 35:10–36:13 (Ex. 1) (emphasis added). Dr. Vilke could not point to any studies on positional asphyxiation where weight greater than 50-100 pounds was placed on a person who was handcuffed, leg shackled, and in a prone position; the single study that he thought <u>might</u> include those variables did not consider persons with pre-existing cardiac conditions. *See* Vilke Dep. 62:18–64:12, 93:9-21 (Ex. 1). Despite the lack of any calculation that can rule out positional asphyxiation with certainty, and despite the lack of any studies that would likewise rule out positional asphyxiation in the case of a person who is facedown, handcuffed, leg shackled and with a heart condition, Dr. Vilke opined that positional asphyxiation was not the cause of Daniel's death.

More importantly, even accepting Dr. Vilke's methodology to rule out positional asphyxiation, Dr. Vilke did not reliably employ that methodology to render his opinion. Although the amount of weight placed on a person is a clinical presentation that must be considered when determining if the person's death was caused by positional asphyxiation, *see* Vilke Dep. 33, 35–36, ***in rendering his opinion in this case, Dr. Vilke never took into account the height and weight of any of the officers who placed pressure on Daniel's body.*** Vilke Dep. 68:1-21 (Ex. 1).

Dr. Vilke's explanation for this gaping hole in his analysis highlights his failure to follow his own methodology and the resulting complete lack of reliability of his opinion. In his

6

CASE NO.:  16-cv-62215-WPD

deposition, he explained that "the height and weight was not going to impact the evaluation of this case" because:

> That when the case was going on, the officers had shifted positions after the handcuffing. And then when they got the restraints on, there was -- basically, ***he was still struggling at that point with only one officer, really, holding him in position***. And -- so there was not a significant amount of weight that needed to be determined at the point of -- when he went into cardiac arrest.
>
> ***Had there been multiple officers on top of him at the time he was in cardiac arrest, then I would have looked at materials to see how much they weighed and -- to try to determine how much weight was being placed in positions of ventilatory -- potential compromise.*** But based on the -- based on the information here, the weights were minimal at the very end, one person just holding him in mild position to keep him from moving.

Vilke Dep. 69:1-17 (Ex.1).  Dr. Vilke thus did not perform any weight calculation, but concluded that:

> Given that Mr. Tyson was alive and resisting before, during, and after the restraining, and that the cardiac arrest occurred suddenly later in time, the effort to restrain and handcuff him did not cause or contribute to Mr. Tyson's death.

Vilke Report at 9 (Ex. 2); *see* Vilke Dep. 74-75 (Ex. 1).  This opinion also rested on Dr. Vilke's assumption that Daniel died several minutes after the struggle with police had ended.  Vilke Dep. 76:24-3 (Ex. 1) ("Q. So are you under the belief that there was the struggle with police officers for 6 ½ minutes, and then several minutes went by prior to Mr. Tyson becoming unresponsive?  A. Approximately, yes."); *see also* Vilke Report at 7–8 (Ex. 2) ("The total estimated time of struggle was 6 minutes and 30 seconds. ***Several minutes later*** Mr. Tyson became calm and quiet and then the officers realized that Mr. Tyson was unresponsive and not breathing.") (emphasis added).

7

CASE NO.: 16-cv-62215-WPD

First, Dr. Vilke's explanation about why calculating weight was unnecessary to sound scientific methods directly contradicts Dr. Vilke's earlier identification of the clinical presentations that must be considered to determine whether a person was ventilating (i.e., "you want to look at how much weight is being placed; the locations the weights are being placed"). *See supra*. Second, it defies common sense: how can one determine whether a person was asphyxiated as a result of weight being placed on their body without calculating the amount of weight being placed on the person's body? Dr. Vilke's report states that "[r]esearch up to 220 lbs of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight." Vilke Report at 8 (Ex. 2). But even if there was only one officer on top of Daniel, how could Dr. Vilke render his opinion that Daniel did not die of positional asphyxiation when he did not know whether that single officer weighed 180 pounds or 300 pounds?

Third, Dr. Vilke's explanation about why calculating weight was unnecessary to sound scientific methods reveals a fundamental error in his assumptions and data. Dr. Vilke stated that if the evidence showed there had been multiple officers on top of Daniel at the time he was in cardiac arrest, Dr. Vilke's own methodology required him to determine how much weight was being placed on Daniel in order to render a reliable opinion. *See supra.* And the undisputed evidence is that there were multiple officers on top of Daniel when he stopped yelling, stopped breathing, became unresponsive, and his lips turned blue. Daniel did not become "calm and quiet" several minutes after the struggle with police officers; his cardiac arrest occurred while

8

CASE NO.: 16-cv-62215-WPD

four or five police officers bore their weight on him and while he was face down, handcuffed, and leg shackled.

Officer Truntz was the first officer who realized that Daniel was no longer responsive. Truntz Dep. 129:10-12 (relevant excerpts attached as Exhibit 3). Officer Truntz testified that thirty seconds to one minute lapsed between the time when Daniel stopped yelling and the time Officer Truntz realized Daniel's lips were blue and he was not responding. Truntz Dep. 138:10-18 (Ex. 3). All that time, until Officer Truntz realized Daniel's lips were blue and he was not breathing, four or five officers were "holding down" Daniel. Truntz Dep. 129-130 (Ex. 3); Falcon Dep. 72:12-19 (deposition excerpts attached as Exhibit 4). Officer Falcon testified that there were three officers "on his upper torso area." Falcon Dep. 62:5-14 (Ex. 4). Officer Truntz explained: "Everybody let go of Mr. Tyson when I told them to get away from him due to the fact that I observed his lips turning blue." Truntz Dep. 140:2-4 (Ex. 3). Officer Truntz then called out to paramedics; he testified: "I just told them to get over here, I think he's not breathing." Truntz Dep. 18-21 (Ex. 3). Officers then removed Daniel's handcuffs and leg shackles. Truntz Dep. 139-141 (Ex. 3). Daniel was unresponsive. *Id*. Paramedics found him to be pulseless. *See* Hollywood Fire Rescue Report (attached as Exhibit 7).

Indeed, in light of the actual, undisputed evidence in this case, Dr. Vilke's own supposed methodology would support a finding of positional asphyxiation. He explains that:

> If the weight force by the officers impacted Mr. Tyson's ability to ventilate to the point of causing a cardiac arrest and sudden death by asphyxiation, the ventilations would have had to be restricted long enough to where blood oxygen levels would drop because there was not enough oxygen getting into Mr. Tyson's lungs. When this occurs, the low blood oxygen levels will cause the heart to become irritable and eventually slow and then stop and the subject goes into

9

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

CASE NO.: 16-cv-62215-WPD

> cardiac arrest. ***This would be evident at the time the weight was removed if the position and weight force was responsible for asphyxiation – he would be lifeless at this time.***

Vilke Report at 8–9 (Ex. 2) (emphasis added).  And, in fact, the evidence is that at the time the weight was removed from Daniel's body, he was no longer responsive, he was no longer breathing, and his lips were blue; when paramedics checked him less than 3 minutes later, they found him to be pulseless. Based on the clinical presentations Dr. Vilke states are relevant, Daniel died as a result of asphyxiation caused by police officers.[1]

Because the evidence reflects that there were multiple officers on Daniel at the time he stopped breathing, Dr. Vilke—by his own admission—should have calculated their weight to determine how much weight was being placed on Daniel when he became unresponsive.  He did not do so, and his failure to do so is fatal to the reliability of his opinion.

Further, because Dr. Vilke's opinion is based on assumptions that directly contradict the undisputed evidence, it is unreliable and unhelpful to the jury, and would serve only to mislead and confuse the jury.  *See* Fed. R. Evid. 403.  "Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion."  *United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997). "Opinions derived from

---

[1] Dr. Vilke considers one additional factor in ruling out positional asphyxiation.  He remarks that Daniel's end-tidal carbon dioxide levels noted by paramedics was low when they initiated ventilation.  Vilke Report at 9 (Ex. 2).  He states that, had Daniel asphyxiated, the levels of $CO_2$ should have been high due to build up of $CO_2$.  *Id.*  However, studies show that high levels of $CO_2$ are only noted in the first minute after cardiac arrest. *See* Wohlgelernter Report at 4 (attached as Exhibit 8).  Dr. Vilke's discussion of end-tidal $CO_2$ would be relevant if Daniel had indeed become unresponsive only "several minutes" after police officers stopped restraining him.  But, as discussed above, he became unresponsive while being restrained and Hollywood Fire Rescue only began its assessment of Daniel three minutes after he became unresponsive.  *See* Hollywood Fire Rescue Report (Ex. 7).  Again, Dr. Vilke's fundamental misunderstanding of the timeline of the events renders his opinion unreliable and would serve only to mislead and confuse the jury.

10

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

CASE NO.: 16-cv-62215-WPD

erroneous data are appropriately excluded." *Id*.; *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 1000 (5th Cir. 1976) ("[A]n expert's testimony should be cleansed of unsupportable assumptions or clear errors which have less than the minimum of probative value.").

Here, Dr. Vilke's opinion is derived solely from erroneous data. His opinion is based on the incorrect assumptions that (1) there was only one officer on Daniel when he became unresponsive (the undisputed evidence is that there were three or four); and (2) Daniel only became unresponsive "several minutes" after a struggle with police (the undisputed evidence is that Officer Truntz realized Daniel was unresponsive and his lips were blue while three or four officers were still restraining him). *See* Vilke Report at 9 (Ex. 2). Allowing him to testify as to an opinion that has no factual support in the record would mislead and confuse jurors. His testimony should be excluded for this reason alone. *See Martinez v. Rabbit Tanaka Corp. Ltd.*, 04-61504-CIV, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) ("As a result of [the expert's] reliance on a number of unsupported and unverified assumptions, his ultimate opinion on damages amounts to nothing more than his own *ipse dixit*."); *City of Miami*, 115 F.3d at 874 (holding trial court erred in accepting expert testimony where expert's opinion "was premised on erroneous data").

**B. Dr Vilke's Opinion That the Use of the Taser on Daniel Did Not Cause or Contribute to His Death Is Not Based on Any Accepted Methodology.**

It is undisputed that, at the time of his death, Daniel was suffering from schizophrenia and bipolar disorder and had severe arteriosclerosis. Vilke Report at 7, 16 (Ex. 2). During his

11

CASE NO.: 16-cv-62215-WPD

encounter with the City's police officers, Daniel was tased ten times, once for a continuous nine-second cycle, for a total of 54 seconds over a six-minute, thirty-second period of time. *Id.* at 11.

Dr. Vilke opines that the police officers' ten Taser discharges on Daniel "did not cause or contribute to his cardiac arrest or death." *Id.* at 10. Dr. Vilke's opinion is unsupported by scientific studies or evidence. It should therefore be excluded.

Dr. Vilke purports to support his opinion on studies of the use of Tasers on healthy human beings or animals. His opinion is not supported by any studies that measure the effect of the prolonged and continuous use of a Taser on a person who already has severe arteriosclerosis or who has a mental illness, much less both. *See* Vilke Dep. 87:14-23, 88:22–89:7 (Ex. 1) ("Q. Doctor, is there any literature out there that I can look to which speaks on the repeated tasings of someone who suffers from severe arterial sclerosis? A. Not that I'm aware of."). In fact, Dr. Vilke has never conducted any study that has included participants who revealed any pre-existing cardiac condition. *See* Vilke Dep. 89:8–91:5 (Ex. 1).

In short, Dr. Vilke cannot reliably rule out that the use of a Taser on a person with severe arteriosclerosis would cause or contribute to his cardiac arrest. He has never tested it. Thus, Dr. Vilke's opinion that ten deployments of a Taser on a mentally ill man suffering of pre-existing severe arteriosclerosis did not cause or even contribute his cardiac arrest is simply not reliable and should be excluded. *See Joiner*, 522 U.S. at 144–46 (district court did not abuse its discretion in rejecting expert's opinion based on studies that were too dissimilar to the facts presented in the litigation).

12

CASE NO.: 16-cv-62215-WPD

### C. Dr. Vilke's Opinion That Excited Delirium Is the Cause of Daniel's Death is Unreliable.

Dr. Vilke provides a final opinion that "cardiac arrest was caused by Excited Delirium Syndrome resulting from his untreated psychiatric disorder and exacerbated by a severely diseased heart combined with his continued exertional resistance." Vilke Report at 13 (Ex. 2). But, for the reasons already provided above, Dr. Vilke fails to reliably rule out two other potential causes or contributors of his death: positional asphyxiation or the prolonged use of a Taser.

"Although a reliable differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010). "[A]n expert must provide a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury. *Id.* (internal quotation marks omitted). Dr. Vilke has failed to rule out the prolonged use of a Taser or positional asphyxiation as causes of Daniel's death. As a result, his opinion Daniel's cardiac arrest was caused by Excited Delirium Syndrome is unreliable.

### D. Mr. Drago's Opinions That There is No Evidence That the City Failed to Train Its Officers Are Unreliable and Not Helpful to the Jury.

Mr. Drago provides three opinions in this case. First, he opines that "[t]here is no evidence in the materials reviewed that the Hollywood Police Department failed to properly train their police officers in the proper use of the Taser CED." Drago Report at 4 (attached as Exhibit 5). Second, he opines that "[t]here is no evidence in the materials reviewed that the Hollywood

13

CASE NO.: 16-cv-62215-WPD

Police Department failed to properly train their police officers in the proper procedures for dealing with the mentally ill." *Id*. at 7. Third, he opines that "[t]here is also no evidence in the materials reviewed that the Hollywood Police Department failed to properly train or supervise their police officers in the proper Use of Force."[2] *Id*. at 11. These opinions should be excluded because they are unreliable and they are not helpful to the jury; Mr. Drago merely recites the evidence in the case.

Mr. Drago did not conduct any independent investigation to determine whether the City <u>actually properly trained</u> its officers. *See* Drago Dep. 22:5-10, 38:5-7, 91:23–92:16 (attached as Exhibit 6). In rendering his opinions, all he did was review certain training materials, sign-off sheets, and tests. *See, e.g*., Drago Dep. 22:5-10, 40:6–41:13, 49:8-23, 54:4–55:3, 66:3-7 (Ex. 6); Drago Report at 4-15 (Ex. 5). To be clear: the opinions challenged in this motion are not whether the City's written training materials or policies and procedures are sufficient, but whether the officers were <u>actually properly</u> trained.

But Mr. Drago's report reveals that he did not do any independent investigative work to determine whether the actual training (in person, online, etc.) received by COH police officers was proper. For example, his Report does not indicate that he attended any of the City's or FDLE's classes or sat in on a ride-along with an officer during the shadow phase of training to determine whether rookie officers are being properly trained and supervised. He simply reviewed paperwork and recited that paperwork in his report.

---

[2] Mr. Drago's third opinion has two parts. The first is that "[t]he Hollywood Police Department policies on Use of Force meet or exceeds accepted standards." Drago Rep. at 11. This part of Opinion C is not a subject of this Motion.

14

CASE NO.: 16-cv-62215-WPD

And even Mr. Drago's review of the records was incomplete. Mr. Drago admitted, for example, that he never reviewed the depositions of several of the officers involved in Daniel's death, including Officer Ramirez, the rookie officer who was the first on the scene and the first to tase Daniel. *See* Drago Dep. 37:7-20 (Ex. 6). These officers were asked in their depositions about the training they actually received, but Mr. Drago did not consider that information. Mr. Drago also admitted he did not review the City's Field Training Officer program, and he did not review the specific FDLE training materials that Officers Ramirez and Pantaloukas received. Drago Dep. 46:14–47:13, 48:14–49:7 (Ex. 6).

In short, Mr. Drago's opinion that the City properly trained its officers is based on nothing more than his word. Thus, the "analytical gap between the data and the opinion proffered" by Mr. Drago is simply too great. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). His opinions that the City properly trained its officers should be excluded.

Moreover, Mr. Drago's opinions consist of really nothing more than a recitation of the written training materials and a conclusion that "there is no evidence in the materials reviewed" that the City failed to train its officers. Expert testimony 'is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 07-61542-CIV, 2010 WL 6363027, at *3 (S.D. Fla. Sept. 9, 2010). The jury is able to read and understand training materials themselves without the help

15

CASE NO.: 16-cv-62215-WPD

of an expert. *See Coquina Investments v. Rothstein*, 10-60786-CIV, 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011) ("Jurors are able to read and understand witness testimony, e-mails, or other documentary evidence without assistance of an expert."); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6363027, at *3 (excluding testimony that merely "rehashe[d] information" contained in e-mails and public filings). Mr. Drago's opinions may be excluded on this ground alone.

## CONCLUSION

For the reasons provided, Plaintiff Jean Suarez, individually, and as Personal Representative of the Estate of Daniel Tyson, respectfully requests that the Court enter an order excluding the opinions and proposed trial testimony of the City of Hollywood's identified expert witnesses, Dr. Gary Michael Vilke and Charles W. Drago.

16

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

CASE NO.: 16-cv-62215-WPD

### CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), the undersigned certify that they conferred with counsel for Defendant City of Hollywood, who represented that they oppose the relief sought in this motion.

Respectfully submitted,

*s/JOSEPH J. KALBAC, JR*.
JOSEPH J. KALBAC, JR.
Florida Bar No. 628270
jkalbac@colson.com
STEPHANIE A. CASEY
Florida Bar. No. 97483
scasey@colson.com
DENISE H. GEORGES
Florida Bar No. 55861
denise@colson.com
COLSON HICKS EIDSON
Attorneys for the Plaintiff
255 Alhambra Circle, Penthouse
Coral Gables, Florida  33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
E-mail: eservice@colson.com;
nicky@colson.com; mabel@colson.com

17

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

CASE NO.: 16-cv-62215-WPD

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, this 30th day of July, 2018, and a true and correct copy of the foregoing was served either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner of those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing, on: Daniel L. Abbott, Esq., Adam M. Hapner, Esq., Email: dabbott@wsh-law.com; pgrotto@wsh-law.com; ahapner@wsh-law.com; Weiss Serota Helfman Cole & Bierman, P.L., Attorneys for Defendant, City of Hollywood, 200 E. Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301.

*s/JOSEPH J. KALBAC, JR*.
JOSEPH J. KALBAC, JR.
Florida Bar No. 628270