# EXHIBIT 1

**Atkinson-Baker Court Reporters**
**www.depo.com**

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3

4    JEAN SUAREZ, INDIVIDUALLY AND)
     AS PERSONAL REPRESENTATIVE OF)
5    THE ESTATE OF DANIEL TYSON,  )
     DECEASED,                    )
6                                 )
             Plaintiff,           )
7                                 )
        vs.                       )  No. 16-62215-CIV-
8                                 )      DIMITROULEAS
     CITY OF HOLLYWOOD, A FLORIDA )
9    MUNICIPAL CORPORATION,       )
                                  )
10           Defendant.           )
     _____)
11

12

13

14

15                  DEPOSITION OF

16              GARY MICHAEL VILKE, M.D.

17               San Diego, California

18                 April 24, 2018

19

20

21
     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     (800) 288-3376
23   www.depo.com

24   Reported by:  MARGARET KINNEY, CSR No. 11398

25   FILE NO.:  AC040D7

**Atkinson-Baker Court Reporters**
**www.depo.com**

---

**Page 2**

```
1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF FLORIDA
3
4    JEAN SUAREZ, INDIVIDUALLY AND)
     AS PERSONAL REPRESENTATIVE OF)
5    THE ESTATE OF DANIEL TYSON,  )
     DECEASED,                    )
6                                 )
          Plaintiff,    )
7                                 )
          vs.          ) No. 16-62215-CIV-
8                      )  DIMITROULEAS
     CITY OF HOLLYWOOD, A FLORIDA )
9    MUNICIPAL CORPORATION,       )
                                  )
10        Defendant.      )
11    _____)
12
13
14
15
16        Deposition of GARY MICHAEL VILKE, M.D., taken on
17   behalf of Plaintiff, at 9655 Granite Ridge Drive,
18   Suite 200, San Diego, California, commencing at 9:04 A.M.
19   and ending at 11:58 A.M., Tuesday, April 24, 2018, before
20   MARGARET KINNEY, Certified Shorthand Reporter No. 11398.
21
22
23
24
25
```

---

**Page 4**

```
1    APPEARANCES:
2
3    For Plaintiff:
4       COLSON HICKS EIDSON
        BY:  DENISE H. GEORGES
5       Attorney at Law
        255 Alhambra Circle, Penthouse
6       Coral Gables, Florida 33134
        (305) 476-7400
7
     For Defendant:
8
        WEISS, SEROTA, HELFMAN, COLE & BIERMAN, P.L.
9       BY:  ADAM M. HAPNER
        Attorney at Law
10      200 East Broward Boulevard, Suite 1900
        Fort Lauderdale, Florida 33301
11      (954) 763-4242
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1    INDEX
2    WITNESS:  GARY MICHAEL VILKE, M.D.
3
     EXAMINATION:
4
5       BY MS. GEORGES                    5
6                                  116
7       BY MR. HAPNER                    112
8
     EXHIBITS:
9
              PLAINTIFF'S
10   NUMBER        DESCRIPTION          PAGE
11      1    Expert Report              39
12      2    Notes                      42
13      3    December 2011 study        89
14      4    Injuries Associated with Police Use
             of Force report           102
15
16      5    Notice of Deposition      103
17      6    Invoice, dated 4/8/18     106
18
19   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
20
              (NONE)
21
22
23   INFORMATION TO BE SUPPLIED:
24
              (NONE)
25
```

---

**Page 5**

```
1         San Diego, California; Tuesday, April 24, 2018
2              9:04 A.M. - 11:58 A.M.
3                   -oOo-
4
5              GARY MICHAEL VILKE, M.D.,
6    having been first duly sworn, was examined and testified
7    as follows:
8
9                   EXAMINATION
10   BY MS. GEORGES:
11      Q  Good morning.
12      A  Good morning.
13      Q  Would you please introduce yourself.
14      A  My name is Gary Michael Vilke, V-i-l-k-e.
15      Q  And who are you employed by?
16      A  UCSD, University of California, San Diego.
17      Q  In what capacity?
18      A  I'm an emergency physician.
19      Q  How long have you been an emergency physician
20   for?
21      A  About 25 years or so.
22      Q  Would you please given me the benefit of your
23   educational background.
24      A  Sure.  My undergraduate degree was at
25   Cal Berkeley, a zoology major; and then I went to medical
```

---

2 (Pages 2 to 5)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 school at the University of California, San Diego,
2 finished that in 1992; and then I did one year of
3 surgical internship; and then a three-year emergency
4 medicine residency at UCSD.
5    Q  Are you board certified?
6    A  I am.
7    Q  In what field?
8    A  Emergency medicine.
9    Q  Have you ever done a fellowship in the field of
10 cardiology?
11    A  I have not.
12    Q  Have you ever done a fellowship in the field of
13 forensic pathology?
14    A  I have not.
15    Q  How long have you had your consulting business
16 for?
17    A  My first request for a review of a case was in
18 1999 or so.
19    Q  Do you have like an official name for your
20 consulting business?
21    A  No.  I don't.
22    Q  Do you advertise your services?
23    A  I don't.  No.
24    Q  When were you retained to review the facts and
25 circumstances of this case?

Page 6

1    A  Let me see if I have it here or not.  I don't
2 know the exact date.  Somewhere -- I think in February of
3 this year.
4    Q  So February of 2018?
5    A  I believe so.  Yes.
6    Q  Do you know why you were retained in this
7 matter?
8    A  I was asked to review the case -- as far as the
9 specifics.
10    Q  Yes, the specifics.
11    A  To review the case with regards to whether
12 the deceased was involved with having excited delirium,
13 whether the TASER was involved with causing the death,
14 and whether there was any restraint issues.
15    Q  Okay.  Do you know why you were retained versus
16 another doctor?
17    A  I have a lot of experience in it.  I don't know
18 why they chose me versus somebody else.
19    Q  Have you ever been retained by the law firm of
20 Weiss, Serota, other than in this case?
21    A  I don't believe so.  I had one other case in
22 Fort Lauderdale, but I don't know if it's the same law
23 firm.  So I don't know for certain.
24    Q  Who were you retained by in the other case in
25 Fort Lauderdale?

Page 7

1        And for the record, are you referring to your
2 case list?
3    A  I am, yes.
4        Summer Barranco, B-a-r-r-a-n-c-o.
5    Q  And is Summer Barranco a defense lawyer or a
6 plaintiff lawyer?
7    A  She was a defense attorney.
8    Q  Do you know who her client was?
9    A  I believe she was defending the sheriff of
10 St. Lucie.
11    Q  Now, tell me everything in your CV that
12 qualifies you as an expert in this case.  What can you
13 point me to?
14    A  First, I guess, my training as an emergency
15 physician, and my 25 years of experience in the field of
16 emergency medicine.
17    Q  Okay.
18    A  I have --
19    Q  I want to ask you a question about your
20 experience within the field of emergency medicine.  What
21 is the standard of care for an ER physician?
22    A  The definition of it is typically what a
23 reasonable majority of emergency physicians would do with
24 similar circumstances with a similar patient.  So it's
25 basically, what most physicians would do under the same

Page 8

1 circumstances given the same information at that time.
2    Q  Do you agree with me that an ER physician's role
3 is to stabilize a patient?
4    A  We often will have to do that.  Sure.
5    Q  And would you agree with me that an ER physician
6 following the stabilization of a patient would refer them
7 to an appropriate specialty?  Say, for instance, if it's
8 a cardiac patient who gets admitted to an ER physician,
9 it would be your role to stabilize that patient and then
10 refer them to a cardiologist for treatment if it's
11 necessary?
12    A  That's one of the things we can do.  Sure.
13    Q  Do you ever -- strike that.
14        In your role as an emergency physician do you
15 ever track a patient outside of the ER after they're
16 discharged?
17    A  Yes.
18    Q  How?
19    A  Different ways.  One sometimes will discharge
20 either going -- if you're referring to going home versus
21 discharging to an in-patient setting.  I'm not sure what
22 you are referring to specifically.  But the patients who
23 visit a hospital we often follow along clinically to find
24 out what happened with them.  Patients who die in the ED
25 are discharged, I guess, technically, to the morgue.  We

Page 9

3 (Pages 6 to 9)

1  would often follow up to find out what happened with
2  them.
3       Patients who are discharged home we often do
4  phone follow-up to see how they are doing and make sure
5  they've gotten the care or if they have any questions
6  about their care.
7  **Q   Okay.  So do you follow through with their care?**
8  **For instance, do you recommend any further treatment**
9  **after they're transferred to either in-patient care or**
10 **discharged with follow-up instructions?**
11 A   Sometimes when they're discharged and we call
12 them back, they have questions.  And we modify the care
13 plan, depending on how they -- you know, if their
14 clinical condition has changed in the last 24 or
15 48 hours.  But ultimately -- we typically refer them back
16 to their clinic or their primary care physician or back
17 to the emergency department if they're having problems
18 that would warrant reassessment.
19      Once they're in the hospital, no.  I don't
20 typically manage the care of the patient, but I follow
21 them along.
22 **Q   As an ER physician have you ever performed any**
23 **type of cardiac procedures, such as the placement of a**
24 **stint or bypass surgery?**
25 A   As an emergency physician I have not done bypass

Page 10

1  surgery, and I have not placed stints.
2  **Q   Have you performed any cardiac procedures on an**
3  **emergent basis?**
4  A   I have done cardiac pacemaking, transcutaneous
5  and transvenous pacemaking, cardioversion,
6  defibrillation.  I have given thrombolytics.
7  **Q   In your experience as an emergency room**
8  **physician for the last 25 years how many patients have**
9  **you treated in the emergency room as a result of some**
10 **type of force by police departments?**
11 A   In the emergency department I've probably seen,
12 I guess -- let me make sure I understand your question.
13 Patients who have come in for evaluation after the use of
14 force?
15 **Q   Yes.**
16 A   Okay.  Probably hundreds if not thousands of
17 patients.
18 **Q   How many last month?**
19 A   Last month probably 10 to 15 at the most.
20 **Q   And out of those 10 to 15 did any die?**
21 A   No.
22 **Q   How about his year?  Have you had any patients**
23 **die in the emergency room as a result of some type of**
24 **police contact and the use of force?**
25 A   I don't think I've seen any in the emergency

Page 11

1  room last year who have died as a result of police
2  force -- as a result of police use of force.  No.
3  **Q   When was the last time you had a patient**
4  **admitted to the emergency room who died as a result of**
5  **use of force by a police department?**
6  A   I'm trying to think if I can think of any that
7  have died because of the use of force.  It's rare that
8  they die even after use of force, but I can't think of
9  anybody who has died as a result of the use of force by
10 law enforcement in my emergency department -- no.  We
11 did.  We had one about three years ago.  A patient in our
12 CAT scanner broke loose and ended up getting shot by the
13 officer.  So he died because of the use of force.
14 **Q   And who shot him?**
15 A   A sheriff's department officer -- or a deputy.
16 **Q   Other than that one and since have you ever had**
17 **any patients die as a result of some police contact that**
18 **were admitted to your emergency room?**
19 A   I can't think of anybody who came in in cardiac
20 arrest and died or came in and died subsequent to a use
21 of force -- that was attributed to the use of force.  No.
22 **Q   Have you ever performed --**
23 A   If I -- I'm sorry.
24 **Q   Do you still have a further answer?**
25 A   If you're just referring to patients who came in

Page 12

1  on my shifts.  We certainly have base hospital contacts,
2  but those are people -- if they're dead, we don't
3  transport to the hospital.  So if you're just referring
4  to the ones that came into the ER.
5  **Q   Did you have any involvement in those instances?**
6  A   We certainly had a few over the years where
7  patients have been in cardiac arrest in the field and
8  police were involved.  I don't know the causation of it,
9  but we pronounce them in the field.
10 **Q   Okay.  Did you ever pronounce any in the field?**
11 A   Yes.  That's what they're calling us to do at
12 the base.
13 **Q   How many that you were involved with?**
14 A   I'm guessing a couple, but I don't know
15 specifically.  I get called for lots of pronouncements
16 because we have a low -- or a high threshold to not
17 transport people who are in cardiac arrest that are not
18 resuscitatable.  But I can think of only a couple that
19 may have law enforcement involved at some level, but I
20 don't know the details of it.
21 **Q   Okay.  Do they actually call you out to the**
22 **field, meaning wherever it happened?**
23 A   No.  They call us to the -- we were working the
24 emergency department as the medical control physician,
25 and the paramedics will call us and say we have, you

Page 13

4 (Pages 10 to 13)

**Atkinson-Baker Court Reporters**
**www.depo.com**

know, a 30-year-old patient, cardiac arrest, 20 minutes.
They go through the details of it. We like to get
physician pronouncements. So we do that.

Q Okay. And that would be done on site at the
hospital?

A Yes. I'm actually thinking about -- there's
been a few other ones that -- there's definitely a few
gun shout wounds that we've pronounce in the field
instead of transporting them if they are dead. So there
were a few force -- use-of-force cases I can think of
specifically.

Q In your 25 years of experience have you ever
treated any patients that were tased repeatedly by a
police agency and admitted to the hospital?

A I think the answer is yes. Most of our -- and
certainly, yes, I've seen may patients who have been
tased repeatedly by police officers. Unless there's
another medical condition that requires admission to the
hospital, most of them don't get admitted. But I could
think of a few that ultimately got admitted for medical
conditions that were outside of the use of the TASER.

Q And of those few admitted, what were their
conditions that necessitated an admission into the
hospital?

A Rhabdomyolysis.

Page 14

Q What is that condition?

A That's muscle breakdown from constant or excited
activity often seen in people who are overactive,
excited delirium syndrome, on methamphetamine or cocaine.
Getting very agitated and they overuse their muscles,
break them down, and then the muscle-breakdown product
can cause kidney failure. It's unrelated to the use of
force, but it's there. So you have to watch and make
sure the kidneys are improving before you release them to
the jail.

Q Okay. What other conditions?

A Trauma. Sometimes they're involved in -- they
crash a car and they have to be admitted to the trauma
service for overnight observation after the TASER was
involved at some point for an interaction. But they were
not admitted for the -- specifically for the TASER, but
for the trauma evaluation.

Q Have you treated any patients that have been
admitted to the hospital as a result of repeated use of a
TASER that have gone into cardiac arrest?

A I have not. No.

Q Have you ever performed an autopsy?

A I have not.

Q Have you ever certified a cause of death in a
death certificate for any patients that have been

Page 15

admitted?

A I have signed death certificates. Yes.

Q Of those death certificates any as a result of
some police contact or an in-custody death?

A No.

Q So is there a chief medical examiner within the
County?

A Yes.

Q Are there associate medical examiners?

A I believe there -- there are other medicals, I'm
not sure of their title, but they work with the chief
medical examiner.

Q Are they responsible for conducting all of the
autopsies of those that have died while in custody of
some police agency?

A Typically, an in-custody death would become a
medical examiner case, but I don't know if they do all of
them.

Q Now, how is it that you become an expert in
excited delirium?

A That's a great question. It's evolved over
time. I did research originally in the field of
positional restraints and the effects of restraints on
ventilation and breathing. And that evolved to further
evaluation on pepper spray in different positions,

Page 16

weights on the back of patients or subjects in different
positions, different amounts of weights, TASERs.

And then over time the concept of the
in-custody-death issues. If they weren't being caused by
a number of these other areas that we had studied, what
was causing them.

So we did more research into the area or excited
delirium syndrome to get a better understanding of the
concept that subjects have died in custody and their
varying uses of force or restraint processes or even not
much in the way of restraints being done at all and they
die and what's the common factor.

So that's when we started learning more and
studying more and researching more about excited delirium
syndrome.

Q Why is it that you became interested in this
field?

A The very, very beginning was -- as a resident
was the very first study I did. And one of my mentors
brought me on the research project. And -- so we
restrained subjects and exercised them and measured
physiologic parameters and published the paper. It was
interesting. It was a fascinating part of my career and
then we did a second study and next thing you know it's
25 years later. So --

Page 17

5 (Pages 14 to 17)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Q  So other than your role as an emergency room physician for the last 25 years, what else in your resume can you point me to that qualifies you as an expert in this field?

A  Sure.  I've done work with -- if you're specifically talking about in-custody-death evaluations, I assume the things that I'm opining on?

Q  Yes.

A  Okay.  If you go through my CV, I have probably 40 or 50 papers -- publications on the topic of restraints, restraint deaths, positional restraint tasers, reviewed papers, book chapters.  And there's probably about five or six book chapters on the topics of excited delirium.  I've written a book on in-custody deaths.  I don't know how much detail you want.  I can go through step by step.  It could take a while.  But there's probably about -- at least 50 or 60 publications in my CV that relate to this topic.

Q  Okay.  Of those 50 to 60 publications how many of them are authoritative?

A  It just depends on how one likes to define "authoritative."

Q  Well, how do you define "authoritative"?

A  I don't think there's anything completely authoritative.  I think everything is, you know,

Page 18

to the editor in response to some article that you've read?

A  Not very often.  A few times I've done it when I think that there is something that needs to be clarified in that article or doesn't follow through with what the -- that the data seems to represent -- basic clarification for further reviewers of that topic.

Q  Now, here in rendering your ultimate opinions in this matter what publications have you relied on that are authoritative?

A  So that's always a tough question.  I've reviewed literally hundreds of articles in my lifetime and I have knowledge in database that rely on from that perspective.  So I don't necessarily come back and say this article is the authoritative article.  There are certainly articles that would be more applicable in certain cases.

I certainly referred to the articles with regards to the theoretical modeling of TASER deaths in this -- in my report here since the taser was in the lower back if it says it's not electrocution-type thing.  So I referred to that paper as being good science and research to evaluate.  Again, using the term "authoritative" -- I referred to it, I used it; that's how you define "authoritative."  It's authoritative to

Page 20

reviewed.  It's important -- it's part of the process of evaluating or assessing whether it's a medical condition or a -- you know, in this case a cause of death or a physiologic response to some sort of procedure.

So as far as "authoritative" goes, I think you look at things as being peer-reviewed, being published in an appropriate setting, and having data to bring back -- sort of put together.

Is there authoritative -- people have referred to authoritative articles that are wrong and ultimately get debunked.  That's why I use the word "authoritative" carefully.  I think that's -- these are articles that are peer-reviewed, they are sound research, they are specific to what they're looking at.  And some people refer to them as being authoritative.  But again, I always hinder when I hear that word.

Q  So you qualified the word "authoritative"?

A  Yeah, I qualified "authoritative."  That is a good way of putting it.

Q  Now, those 40 to 50 publications, have many been letters to the editor?

A  There have been a couple, maybe, you know, three or four, five.  I'd have to look again, but there are a few that are letters to the editor.

Q  Do you do see that often where you write letters

Page 19

me, but I'm using it as part of many articles that all sort of say the same thing and have the same general conclusions.

Q  Are there any authoritative publications out there in this field?

A  Again, that's sort of back to how one wants to define authoritative.  There are certainly articles that are peer-reviewed, that are sound science, and that are referred to and used by others as a reference to be able to manage -- managing a patient's care or for evaluating a case.  So a number of my articles meet that definition of "authoritative."  They're referred to and they are used and they are part of the evaluation process.

Q  Okay.  Now, using the formal definition of "authoritative," are there any references out there in this field?

A  In the formal meaning that everybody accepts?

Q  Yes.

A  I don't think there is in this field.  I think you'll always find somebody who will contradict -- even if it's sound data, sound research, and not agree with it.  So if your definition is all members of the emergency medical and forensic community say this is -- this is perfect, no arguments against it, I don't think that's going to be the case because you always seem to

Page 21

6 (Pages 18 to 21)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 find someone who doesn't believe it for whatever reason,
2 even though the science defines it.
3    **Q   Okay.  Now, putting that to the side.**
4    A   Okay.
5    **Q   Back to my ultimate question.  Even though some**
6 **may have criticisms or disagree with a journal article**
7 **that has been deemed to be authoritative, is there**
8 **anything out there in this field that would be**
9 **classically defined as authoritative?**
10    A   I think there are some articles that have been
11 vetted out and would be defined as authoritative.  Yes.
12    **Q   Okay.  And who have those articles been drafted**
13 **or written by?**
14    A   I've written a number of them.  And there are
15 articles by Jeff Ho that are very sound science that have
16 been reviewed and -- peer-reviewed and accepted and the
17 science behind it would be sound, I guess.  And my
18 definition could be a third:  Authoritative as far as the
19 data behind it is stable.
20    **Q   Okay.  Now, what publications have you authored**
21 **that are deemed to be authoritative?**
22    A   I did a review for the American Academy of
23 Emergency Medicine on what to -- what the emergency
24 physician should do to evaluate a person who comes into
25 the emergency department with a TASER activation.  That

Page 22

1 was actually requested of me and my co-authors from the
2 AAEM Group, American Academy of Emergency Medicine.  And
3 it was, you know, reviewed by their clinical practice
4 committee and sort of ratified, if you want to say it a
5 better way -- or approved that we could actually publish
6 it under their -- under their title.
7        So that comes across as being authoritative from
8 emergency medicine physicians in how to clear a patient
9 who has been tasered, medically.
10       I was on the American -- or the American College
11 of Emergency Physicians, ACEP, White Paper Group, and
12 that was a consensus panel of experts in the field
13 working with regards to excited delirium syndrome and
14 defining it and offering diagnostic and treatment and
15 suggestions -- or best practices for practicing emergency
16 physicians.  And -- so it was a consensus group and it
17 was also ratified by a ACEP and then published in a
18 peer-reviewed journal.
19       And that's been referred to as sort of globally
20 accepted from the emergency medicine perspective.
21    **Q   Are those two publications referenced in your**
22 **CV?**
23    A   They are, yes.
24    **Q   Can you point to me what the numbers are?**
25    A   Yes.  I think 148 is the ACEP paper.  I think

Page 23

1 181 is the AAEM paper.  Wait.  Is that it?  Yeah, I think
2 that's it.
3    **Q   Okay.  A- --**
4    A   AEEM paper.
5        You know, maybe -- that may be a referral to it.
6 Let me look for the original article.  156 -- sorry.  I
7 apologize.  That is another excited delirium paper.  I'm
8 looking for the TASER paper that was done with me,
9 Dr. Bozeman, and Dr. Chen.  There it is; it's 146.
10    **Q   So publication articles Nos. 146 and 148 are**
11 **authoritative?**
12    A   By your definition, yeah.  They were accepted
13 and approved by two major American Emergency Medicine
14 membership groups.
15    **Q   Did you rely on these two publications in**
16 **rendering your opinion here as to the cause of death of**
17 **Daniel Tyson?**
18    A   They are all part of my knowledge and experience
19 in this field.  So I -- they're part of what I would rely
20 on in a sense.  I reviewed, I think, 140 papers in the
21 146 article.  So all those papers I reviewed to write
22 that paper and are part of my knowledge base.  The same
23 thing with the 148.  I reviewed, you know, 40, 50 papers
24 on the topic to come to this publication.  And -- so when
25 you're reviewing them, you're reading papers.  You're

Page 24

1 creating more knowledge on the topic.  And -- so I use
2 these papers, but I also use the knowledge I gained in
3 creating these papers to have all that in the background
4 to be able to make an opinion.
5    **Q   Did you perform any studies or testing as it**
6 **relates to your opinion as to the cause of death of**
7 **Daniel Tyson?**
8    A   If you're referring to anything specific for
9 this case, I've done no studies or evaluations
10 specifically for this.  No.
11    **Q   Were you asked to perform any studies or any**
12 **testing as it relates to these immediate facts?**
13    A   I was not.  No.
14    **Q   Now, your consulting business since 1999.**
15 **How -- what would you say would be the percentage that**
16 **you've been retained by a plaintiff lawyer versus a**
17 **defense lawyer?**
18    A   And just to make things easier and get -- give
19 you the answer you are looking for in a sense, are you
20 referring to in-custody death cases or all legal
21 consulting?
22    **Q   Well, let's talk about your legal consulting.**
23 **Other than in-custody deaths, what other consulting work**
24 **do you do?**
25    A   I do some med/mal cases for emergency

Page 25

7 (Pages 22 to 25)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

1  physicians, and I do some medical-care cases for jails
2  and prisons.
3      **Q   What kind of work for jails and prisons?**
4      A   Evaluating medical care, claims of either
5  inappropriate care or just deaths in a custodian
6  situation.
7      **Q   And in those claims you would be reviewing work**
8  **on behalf of that jail or prison?**
9      A   When I was working for the defense, yes.
10     **Q   Have you ever worked for the plaintiff?**
11     A   I have, yes.
12     **Q   In what type of cases?**
13     A   I've done -- I've reviewed cases for med/mal --
14  emergency medicine med/mal, I've reviewed plaintiff cases
15  for jail medical care, and I've reviewed cases for
16  in-custody deaths for plaintiffs.
17     **Q   Okay.  What is your percentage of consulting**
18  **business as it relates to plaintiff work for in-custody**
19  **deaths?**
20     A   The majority of people approach me for -- my
21  evaluations tend to be defense.  And -- so probably more
22  than 95 percent are defense cases.
23     **Q   And that's for in-custody deaths?**
24     A   Correct.
25     **Q   How about for medical negligence cases?  What is**

Page 26

1  plaintiffs?
2      A   Yeah.  Maybe -- yeah.  It's probably in the
3  range there.
4      **Q   And how about testifying in a hearing or in a**
5  **trial on behalf of a plaintiff?  How many times would you**
6  **approximate since 1999?**
7      A   I've only done a trial a few times.  It's
8  usually depositions.  So I guess about five, maybe.
9      **Q   When was the last time you were retained as an**
10  **expert by a plaintiff for any type of case?**
11     A   I'm involved in cases right now with -- med/mal
12  cases that are plaintiff based.
13     **Q   How many?**
14     A   I think there's probably two or three that are
15  at different levels of -- you know, they take a long
16  time.  So there are two or three that are probably
17  sitting on the shelf that are probably at various stages
18  of evaluation.
19     **Q   Are you currently retained as an expert for a**
20  **plaintiff for any in-custody death?**
21     A   I am not.  I don't think I am.  I have not been
22  retained.  No.
23     **Q   How many cases are you currently retained on as**
24  **an expert?**
25     A   That are sort of active at any level of, you

Page 28

1  the percentage of plaintiff versus defense?
2      A   Probably at this point because it's evolved over
3  time I was approached more by plaintiffs' lawyers when I
4  was first consulting, and then defense lawyers I started
5  working with.  So it went from probably 30/70 defense to
6  50/50.  Now it's probably more 70/30, the majority being
7  defense cases at this point.
8      **Q   And how about cases on behalf of jails or**
9  **prisons?  What is the plaintiff versus defense**
10  **percentage?**
11     A   Probably closer to 90-plus percent are defense.
12     **Q   Have you ever testified in a formal proceeding**
13  **for a plaintiff?**
14     A   Yes.
15     **Q   On a medical negligence case, jail or prison or**
16  **an in-custody death?**
17     A   Yes.
18     **Q   How many?**
19     A   And you're referring to deposition or trial or
20  both?
21     **Q   Let's start with deposition.**
22     A   Probably -- this is more of a guess than I'd
23  like to make.  It's probably at least 10 to 20 times over
24  a period of time.
25     **Q   And this is depositions on behalf of the**

Page 27

1  know --
2      **Q   Litigation?**
3      A   Yeah.  And sometimes they last three years when
4  they're doing appeals and all that.  But it's probably --
5  probably somewhere around -- close to 20 or so.
6      **Q   And of those 20 cases that you are currently**
7  **retained on, how many of them are plaintiff versus**
8  **defense?**
9      A   I think that's -- you know, the two or three
10  that I was saying that I think are plaintiff out there.
11  I think that's about it.  The rest I think are defense.
12     **Q   And out of the remaining 18 or 17 cases on**
13  **behalf of the defense, how many of them are on behalf of**
14  **the jail, prison, or an in-custody death?**
15     A   Probably about half of them -- half of my work
16  is on that level, and the other half is med/mal.
17     **Q   What's the percentage of your income as it**
18  **relates to your role as an emergency room physician and**
19  **your consulting business?**
20     A   It's roughly about 20 percent.
21     **Q   20 percent for your consulting business?**
22     A   Right.
23     **Q   And since 1999 has it always been approximately**
24  **20 percent of your income?**
25     A   It's grown over the years.

Page 29

8 (Pages 26 to 29)

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    Q   Other than your consulting business and, also,
2  your role as an emergency room physician, do you have any
3  other sources of income?  For instance, are you a
4  lecturer?  Are you an educator?
5    A   I'm a lecturer and I'm an educator.  Most of
6  that is rolled into my work at the university.  I do my
7  clinical work, which I get paid for, but I get a salary
8  from the University for administrative work.  So I do
9  work with management.  I get a stipend for that; it's
10  rolled into my UCSD paycheck.  I do work for --
11  consulting for the Carlsbad Fire Department as a medical
12  director, but they contract with the University for my
13  services.  And -- so that's rolled into my paycheck.
14      So when I have a UCSD paycheck, it's not just
15  for working in the ER, it's for my education, my
16  training, my quality review, my consulting -- that
17  perspective of it.  It's all rolled into one paycheck.
18    Q   Have you ever been paid by TASER International,
19  which is now known as Axon, to perform any type of a
20  lecture or any type of educational training?
21    A   I have not.  No.
22    Q   How about police departments?  Have you ever
23  been compensated by any police department to give some
24  type of in-house training?
25    A   I have received travel and hotel to come out and

Page 30

1  give a talk for a police department, but I don't get pay
2  or a big stipend for it.  No.
3    Q   And what police department?
4    A   Miami Dade had me come out to give a talk in a
5  symposium that they had.  That's about it -- oh, there's
6  the Southern California Sheriffs' Association.  It's not
7  really a department.  They paid for me to come out
8  and stay the night and give a talk the next day.
9    Q   Okay.  And what was that talk on?
10    A   That was on excited delirium syndrome.
11    Q   How about Miami Dade Police Department, that
12  symposium?  When did that take place?
13    A   A year or so ago.
14    Q   Who were you retained by?
15    A   There is -- it's a contact in Miami Dade.  I
16  don't remember the name.  But it's somebody who
17  coordinated the -- when to be there and where to stay and
18  those types of things.
19    Q   And what was that subject matter?
20    A   It was talking about restraints and restraint
21  physiology.
22    Q   Do you know how many people were in attendance?
23    A   Probably -- at least 100, maybe more.
24    Q   And were those police officers in attendance?
25    A   They were police officers there.  Yes.

Page 31

1    Q   Did you provide them with any materials?
2    A   I think they got a copy of the materials that
3  were provided for the conference.
4    Q   But did you specifically author a PowerPoint or
5  any type of other literature that was distributed?
6    A   I used a PowerPoint.  I don't recall if it was
7  actually distributed or not.  I didn't give it out as
8  a -- I don't remember if there were any handouts that
9  went out to everybody that would have the PowerPoints in
10  them.
11    Q   And what did you generally speak on?
12    A   The history of restraint physiology, the old
13  work that was inaccurate and it was debunked and the
14  current process of evaluating a case:  What does weight
15  do to one's physiology, ventilation, asphyxia, and those
16  types of things -- defining it and trying to help educate
17  on the topic of, you know, what is potentially dangerous,
18  what isn't dangerous, and why you look out for certain
19  things.
20    Q   What does weight do to one's physiology?
21    A   It depends where it's at, how much is there, how
22  long it's there -- individual -- individual aspects of
23  the person being restrained with weight on them.  So it
24  varies.
25    Q   Okay.  Did you specifically educate them on

Page 32

1  weight on one's back for a prolonged period of time?
2    A   We certainly covered that topic.  Yes.  We
3  covered the -- two parts, one is what weight can do to
4  you once it's put on you; and two, what to evaluate if
5  you're trying to look to see if the weight had an impact
6  on ventilation.  Or if there's a question about asphyxia,
7  what physiologic parameters you want to look at, what
8  clinical presentations you want to look at to see if it
9  may or may not have been involved.
10    Q   And what clinical presentations should a police
11  officer look at to see whether or not one is ventilated
12  properly?
13    A   There's a number of things, what they're doing
14  at the time, whether there's a person yelling or
15  screaming, are they vocalizing, are they -- you want to
16  look at how much weight is being placed; the locations
17  the weights are being placed; is it constant weight or is
18  it shifting weight; is there a change in position; is the
19  person changing position; are they moving up and down and
20  able to increase ventilatory aspects because it takes a
21  long time for somebody to asphyxiate, to build enough
22  carbon dioxide levels and drop oxygen levels.
23      So that takes a prolonged period of --
24  essentially, almost no ventilation.  So if you're seeing
25  ventilation happening, breathing, yelling, screaming,

Page 33

9 (Pages 30 to 33)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  changing positions -- those are the types of things we're
2  trying to teach them to look for in these cases.  When
3  you're evaluating the investigation, what was going on at
4  the time.  These are things to look for and document, if
5  they were or weren't there.
6     **Q  Do you educate these police officers on certain**
7  **locations on one's body not to place weight?  Are there**
8  **no-nos, for instance?**
9     A  There are no no-nos -- no no-nos?  As far as
10  that goes, it's a matter of what's going on.  If you have
11  a lot of weight in a position that might be impacting
12  one's ventilation and the person is not -- you know, was
13  screaming, no longer screaming, and doesn't seem to me
14  moving any air in, then you want to evaluate what you're
15  doing there.
16     But in a dynamic situation, typically, there's
17  not a lot of weight placed in those positions that heavy
18  that tend to be left there, but give precautions.  Sure.
19     **Q  Did you provide during this symposium any type**
20  **of hypothetical scenarios or any type of case studies?**
21     A  I've given so many lectures on the topic.  And
22  it evolved depending on the -- I don't remember
23  specifically whether we did case studies in this talk or
24  not.
25     **Q  Was there a certain equation out there as to if**

Page 34

1  procedure, that's not typical scenarios.
2     I assume you would be talking about what you --
3  yourself as an example.  But there's no calculation that
4  can say 200 pounds is safe, 300 pounds is not safe for
5  you.  Because if you're breathing and talking and moving,
6  it's probably going to be safe for a period of time.
7     And then the other piece is the dynamics.  The
8  weight -- if it's 500 pounds, it will probably have some
9  negative impact, and then it will take some time to
10  asphyxiate.  I mean, to kill somebody does take time to
11  do that.  So there is not a calculation saying for a
12  125-pound versus a 200-pound person this much weight is
13  safe to put on for "X" amount of time.
14     **Q  Okay.  Do you know how many emergency room**
15  **physicians there are in south Florida?**
16     A  I do not know.
17     **Q  Do you know how many emergency room physicians**
18  **there are in the state of Florida?**
19     A  I do not.
20     **Q  Okay.  Why you?  Of all the emergency room**
21  **physicians in Florida why were you retained on this case**
22  **versus one of -- I would generalize as thousands of**
23  **emergency room physicians in the state of Florida.**
24     A  I would assume it's because I've had -- I have
25  had more publications in this topic and have done more

Page 36

1  **someone weighs a certain amount of pounds, how much**
2  **weight can actually be placed on their body to prevent**
3  **asphyxia?**
4     A  Or to cause asphyxia?
5     **Q  Let's go prevent.  Okay.  I weigh 125 pounds.**
6     A  Okay.
7     **Q  And that's on the record.**
8     **So how much weight could I sustain prior to**
9  **being asphyxiated?**
10     A  There's not a formula for a single number to
11  give you, and the reason being people are different.  It
12  depends where the weight is, how much weight it is, how
13  focused it is, are you moving and wiggling, are you
14  bridging up.  So that's the challenge of it.
15     There have been studies -- or at least one study
16  that tried to look at how much static weight you place on
17  somebody, you leave it there, and, you know, do nothing
18  else.  And that's in the order of hundreds and hundreds
19  of pounds -- you know, 400, 500 pounds.
20     Back in the old days of -- basically, killing
21  people or punishing people in the old, I think, English
22  court system placing weights on them until they either
23  confessed or died.  And -- so they have lots of
24  documented -- how much weight to put on those people.
25  That's static weight.  That's not a wiggling-dynamic

Page 35

1  work in research in the topic of in-custody deaths than
2  every one of them.
3     **Q  Do you know how Mr. Hapner found you or his law**
4  **firm?**
5     A  I don't.  I -- I really don't.  Maybe it was
6  mentioned at some point, you know, when he called me or
7  whenever he said I was referred by somebody, but I
8  don't recall off the top of my head how he heard of me.
9     **Q  Other than this case, have you ever been**
10  **retained by the law firm of Weiss, Serota on any other**
11  **matter?**
12     A  I think I answered that earlier.  I'm not sure.
13  I gave you the one case that possibly could be that was
14  out of Fort Lauderdale, but I don't know if it's the same
15  firm or not.
16     **Q  Did you request any materials?**
17     A  There's usually a conversation about materials
18  to be sent to me.  If they send me everything I need,
19  then I don't request materials.  If there are things that
20  I would like to have that weren't sent to me or were gone
21  through on a conversation on the phone, then I -- I do
22  usually have a list of things I'd like to see.
23     **Q  Okay.  Do you remember how that conversation**
24  **went on this case?**
25     A  I do not.

Page 37

10 (Pages 34 to 37)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    Q   So do you have any communications, either via
2    E-mail or letters, that could refresh your recollection?
3        A   I think it was all done telephonically as far as
4    the discussion in the needs for the review.
5        Q   And when was the first telephone conversation
6    that you had with any member of Weiss, Serota for this
7    case?
8        A   I think it was in February because I started my
9    work March 1st.  So usually I start within some period of
10   time after receiving the materials.
11       Q   When did you receive the materials?
12       A   It must have been in February.  Again, I
13   apologize.  I don't remember exactly when it was, but I
14   started reviewing the materials the 1st of -- the 1st of
15   March I think it was.
16       Q   Did you provide any type of opinions to counsel
17   prior to reviewing any materials?
18       A   Opinions on the specifics of the case, no.  If
19   they asked me questions about evaluations of cases as a
20   generalization, it's possible.  But I wouldn't have given
21   an opinion on the specifics of this case until I had a
22   chance to review the materials.
23       Q   Do you know when you reviewed the materials on
24   this case?
25       A   In March mainly and a little bit in April.

Page 38

1    Q   Did you receive all of the materials in one shot
2    or was this over multiple dates?
3        A   I think I received two large binders at one
4    time, and then some additional things came in as they
5    arrived, basically.
6        Q   Now, all of the materials that you were
7    provided -- did you document that in your expert report?
8        A   I tried to.  Yes.
9        Q   What do you mean you tried to?
10       A   Well, all materials -- I went through each one
11   and documented it.  I believe they're all listed in
12   there.  And sometimes they're -- you know, the way the
13   pages are defined, it may look like one thing verus
14   something else.  They're all reflected in that report.
15       Q   Okay.  And the report that we speak of is before
16   you?
17       A   Yes.
18       Q   And this is your expert report dated April 4th
19   of 2018?
20       A   Yes.
21       MS. GEORGES:  Okay.  I'm going to have this
22   marked as Plaintiff's Exhibit 1.
23       (Plaintiff's Exhibit 1 was marked for
24       identification by the court reporter.)
25   ///

Page 39

1    BY MS. GEORGES:
2        Q   And I believe it's 118-page document?
3        A   Yes.
4        Q   And all your appearances are contained within
5    this report?
6        A   Yes.
7        Q   Have any of your opinions changed since you
8    authored this report on April 4th of 2018?
9        A   They have not.
10       Q   Have there been any addendums to your opinions
11   since April 4th of 2018?
12       A   No.
13       Q   Have you received any additional materials since
14   April 4th of 2018?
15       A   Yes.
16       Q   What materials have you received since
17   April 4th?
18       A   I received a deposition from Pierre Pean,
19   P-e-a-n, and then I believe there was the notice for my
20   deposition today.
21       Q   Okay.  Now, other than the materials that are
22   listed on Page 2 of your report, are there any other
23   materials that you requested of Mr. Hapner that you did
24   not receive?
25       A   No.

Page 40

1    Q   Is there any information that Mr. Hapner
2    provided to you verbally that you used and incorporated
3    into your opinion?
4        A   No.
5        Q   Did Mr. Hapner provide you any information prior
6    to the receipt of the materials as it pertains to the
7    facts and circumstances of this case?
8        A   That was in the conversation on the telephone,
9    and I don't really remember the specifics of it.  So he
10   may have said we have, you know, a 30-year-old subject --
11   gave some details of it, but I don't recall specifically
12   if there was a -- usually, there's some sort of overview
13   of the case just so I know what I'm being asked to -- if
14   I'm interested in reviewing it.  So I assume there's
15   something in there, but I don't remember the specifics of
16   it.
17       Q   Now, all of the materials that you've reviewed
18   and incorporated into your opinions, did you bring them
19   here with you today?
20       A   Yes.
21       Q   Do any of these materials have any notes on
22   them?
23       A   These are for you.  I brought a consolidated
24   note list so you don't have to go through 5,000 pages.
25       Q   And what is the consolidated note list?

Page 41

11 (Pages 38 to 41)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    A  It will probably be Exhibit No. 2.  And what
2  this is, basically -- I guess, while I'm reviewing cases
3  I -- instead of highlighting and having to refer back, I
4  tend to write notes down or keep notes electronically and
5  of the facts that come in here and use that for a
6  refresher whenever I do things.
7        MS. GEORGES:  And just for the record, you just
8  handed me a six-page document, which I've marked as
9  Plaintiff's Exhibit 2 to your deposition.
10        (Plaintiff's Exhibit 2 was marked for
11        identification by the court reporter.)
12  BY MS. GEORGES:
13    Q  And this is the entirety of your notes?
14    A  Yes.
15    Q  So you went through all of the material.  You
16  wrote notes in the margins of these materials?
17    A  To answer the question, yes, it is, except
18  for -- one exception, the deposition of Pierre Pean I
19  reviewed and highlighted, but I haven't actually
20  transcribe onto my notes here.  Everything else would
21  be -- there would be nothing in the margins.  I don't
22  write notes in the margins, and there would be nothing
23  that would be highlighted that wasn't reflected here.
24    Q  So all the information contained in Exhibit 2
25  are your notes?

Page 42

1    A  And one other exception, the EMS record here.  I
2  didn't put all the details of the EMS records.  I did
3  highlight onto these notes as well.  It's just a couple
4  lines of the EMS record.
5    Q  Did you have any working jobs to your report?
6    A  No.
7    Q  Did your impressions ever change?
8    A  No.
9    Q  Were you provided a retainer for your consulting
10  work here?
11    A  I don't think so.  I was not.
12    Q  Do you have an hourly rate for your consulting
13  business?
14    A  I do.
15    Q  And what is your hourly rate?
16    A  It's $500 per hour.
17    Q  Do you have a minimum?
18    A  I do not.
19    Q  Okay.  And your fee schedule is Page 118 of your
20  expert report?
21    A  Yes.
22    Q  Does this document your fee schedule?
23    A  It does.
24    Q  Now, in Paragraph 1 there's a line that states a
25  retainer for three hours of $1,500 may be requested in

Page 43

1  advance?
2    A  Correct.
3    Q  Under what circumstances do you require a
4  retainer?
5    A  More often than not if it's a -- if it's
6  somebody that may have difficulty paying me.  You know,
7  municipalities tend to pay.  So it's usually not a
8  problem.  I don't tend to request from them.  But if it's
9  a private law firm, whether it's defense or a plaintiff,
10  I tend to get a retainer just to make sure -- in case
11  they're not happy with my opinions.  I've had trouble
12  getting paid in the past.
13    Q  Did you receive a retainer from the law firm of
14  Weiss, Serota in this matter?
15    A  I did not.
16    Q  Why not?
17    A  It was a municipality.  And -- so I felt good
18  and I felt comfortable that they would pay.
19    Q  So you trusted their dollar?
20    A  I did.
21    Q  How many hours have you billed Weiss, Serota in
22  reviewing this case?
23    A  I've billed 19 hours so far.
24    Q  Does that include preparing for this deposition?
25    A  It does not.

Page 44

1    Q  How many hours did you spend preparing for this
2  depo?
3    A  I have another three hours of depo prep time.
4    Q  How much have you been paid thus far?
5    A  Zero.
6    Q  So the 19 hours that you have reviewed materials
7  on this case -- you have not been paid for those
8  19 hours?
9    A  Right.  It's bill that's pending -- pending
10  payment.
11    Q  And how much are you charging me for your
12  deposition here today?
13    A  I'm charging you $1,000 an hour.
14    Q  And why does the rate double from $500 to $1,000
15  an hour?
16    A  A couple of reasons, and it's for deposition or
17  trial time.  So it's either -- if I go to trial, I charge
18  them $1,000 an hour.  It's just because of -- what I
19  traditionally have to do, block out periods of time from
20  my work schedule to be available.  I used to have a
21  half-day minimum, four hours, because I can't work during
22  that time.  So I'm blocking out for this.
23        That was the same rate, $500 an hour, and
24  attorneys did not want to pay me for hours they didn't
25  use.  So they worked me on a deposition for two hours and

Page 45

12 (Pages 42 to 45)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  paid me for two hours.  So to try to compensate for the
2  fact that I'd block out four hours, I ended up doubling
3  my -- my rate.
4      Q  Okay.  Now, in your role as an emergency room
5  physician do you get paid by the hour or do you get
6  salary rates?
7      A  I get salary.
8      Q  On your fee schedule do you have travel
9  requirements?
10     A  If I have to travel, there are -- there are
11 preclusions -- or comments about what I would have to be
12 paid.
13     Q  Okay.  What are your travel requirements?
14     A  In general, if you're reading my -- reading my
15 form here, it says business class airline tickets to and
16 from be paid for the requesting firm or agency, hotel
17 accommodations to be paid for by the requesting firm or
18 agency, and transportation to and from the airport in the
19 host city to be paid for by the requesting firm or
20 agency.  And I will bill the standard rate up to four
21 hours each direction for travel time.
22     Q  Now, do you have certain restrictions as it
23 pertains to hotel accommodations?  For instance do you
24 need three star hotel?  Four star hotel?  Five star
25 hotel?

Page 46

1      Q  Of the ten cases this year how many are
2  in-custody deaths?
3      A  In general about half my workload is either jail
4  or in-custody deaths type stuff, but it may be a little
5  less.  It may be 30 to 40 percent for that population
6  versus medical malpractice.
7      Q  Have you ever testified against a police agency
8  on behalf of the plaintiff?
9      A  A long time ago I did a case.  Yes.
10     Q  What case was that?
11     A  I don't remember the name of it.
12     Q  Do you know where?
13     A  It was in Connecticut.
14     Q  Do you know the circumstances?
15     A  It was a person who was being restrained by
16 police officers.  There was a lot of weight being placed
17 on him, a big pile-on, and he was peppered-sprayed after
18 he had already gone into cardiac arrest and then they
19 wouldn't allow the EMTs to come and evaluate him for a
20 significant amount of time.  And -- so it delayed -- the
21 basis was the delay in allowing them to take care of this
22 person.
23     Q  And were you asked to opine on the cause of
24 death?
25     A  Partially on cause of death and partially on

Page 48

1      A  I do not.  I typically fly Southwest.  So I
2  don't really have a class representation.
3      Q  I don't know if that's safe nowadays.  Actually,
4  Southwest might be the safest airline to be on right now.
5      A  That's correct.
6      Q  And what type of transportation do you require?
7  For instance, do you require a limo to pick you up?  Or
8  is an Uber okay?
9      A  UberX is fine.  Yes.  I just want to get there.
10     Q  Have you ever had an instance where a law firm
11 or a municipality has paid a retainer and you have looked
12 at the materials and you've provided a refund?  For
13 instance, like I can't help you out.  I know you paid for
14 "X" amount of hours, but based on my preliminary review I
15 can't give you an opinion that's going to support your
16 case.  Here's the rest of your money back?
17     A  I haven't done that.  No.
18     Q  Now, are your rates any different for a
19 plaintiff versus a defense law firm?
20     A  No.
21     Q  How many cases were you retained on last year?
22     A  I'm guessing maybe 15 or so.
23     Q  How many cases have you been retained on this
24 year?
25     A  Like maybe ten or so.

Page 47

1  what could have happened had the EMTs had the chance to
2  evaluate.
3      Q  Okay.  What was your opinion?
4      A  That there was a delay in recognition by the
5  officers of the cardiac arrest and a delay in allowing
6  them to have EMS evaluate.  And along the lines of that,
7  that decreased the chance of his recovery or survival.
8      Q  And when you say that there was a lot of weight,
9  how many police officers were involved in this pile-on?
10     A  A good question.  I don't remember the details
11 of the case.  It was a long time ago.  But it was -- it
12 was impressive from what I see with law enforcement.  I
13 mean, they were trying to hold him down.  And there
14 was -- usually they're being -- they try to get a hand
15 out to cuff him, and this is more of a pile-on to hold
16 him in position.
17         And -- so that was -- but it was a lot more
18 weight than cases that I've seen where it's usually it's
19 either -- the knee to try to pull a hand out or a lower
20 back trying to get the hands behind their back type of
21 cases.  So that's -- I don't remember the details
22 specifically, though.
23     Q  Did you opine on the cause of death in this
24 case?
25     A  I don't recall if I actually opined on the cause

Page 49

13 (Pages 46 to 49)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  of death or it just was with regards to the ability to
2  allow for response.
3      Q   In your experience have you ever found the cause
4  of death of any individual to be as a result of excessive
5  force by a police department?
6      A   I gave an opinion to a defense attorney about a
7  case in which a wool blanket was held over the face of an
8  inmate for a period of time that probably ended up
9  causing asphyxiation.  That's not really use of force
10 necessarily if you consider a wool blanket a use of
11 force, but they were retraining him and holding him.  And
12 then -- that was a concern I had with regards to the
13 case.
14          And so that's -- that was most of the
15 involvement I had.  I wasn't retained for the defense in
16 that case.
17      Q   And when did you provide that opinion?  What
18 year?
19      A   It was 10, 12, 15 years ago; something like
20 that.
21      Q   Other than that instance, are there any other
22 cases that you've been asked to consult on?
23      A   That I thought the use of force caused or
24 contributed to death?
25      Q   Yes.

*Page 50*

1      A   I don't think -- I don't think I've come to that
2  conclusion, other than what I've talked about.
3      Q   How many cases since 1999 have you consulted on
4  where someone has died due to some form of police
5  contact?
6      A   During police contact?
7      Q   Yes.
8      A   That's a good question.  I guess over that time
9  period maybe 50 to -- 50 to 75.  I'm just guessing,
10 really, now.  A significant number, but I don't remember
11 exactly how many there are.
12      Q   And of those approximately 50 to 75 death cases
13 as a result of some type of police contact, how many have
14 you attributed to be as a result of some form of force
15 that was used by a police agency?
16      MR. HAPNER:  Form.
17      THE WITNESS:  I think, basically, what we talked
18 about, a couple of cases where I felt that there was
19 causation -- caused by the enforcement agency.  But most
20 of these cases involved drug use, bad hearts, excited
21 delirium.  And my opinions are that the -- that in
22 general those are the causes of death, you know, with the
23 exertion and the resistance that they're doing.  So I --
24 I don't think any of that -- you know, as I said, that
25 the law enforcement agency caused or contributed to

*Page 51*

1  death, outside of what we talked about here -- at least
2  nothing that I've testified in.
3  BY MS. GEORGES:
4      Q   Of those approximately 50 to 75 death cases, how
5  many of them have involved the use of a TASER?
6      A   Maybe half, maybe a little bit more.
7      Q   And of the approximately half or a little bit
8  more, how many have you attributed the use of a TASER as
9  a contribution to one's death?
10     A   I don't think any that I recall.
11     Q   Have you found the use of a TASER to cause any
12 of those deaths?
13     A   No.
14     Q   Why not?
15     A   Based on my evaluation of the case and the
16 specifics of the case where the TASER was used, location,
17 the circumstances, is there a reason why the person would
18 have had a cardiac arrest and died.  Each case
19 individually -- you need to look at each case
20 individually, but the overall as to why is because the
21 circumstances in these cases didn't support that the
22 TASER caused or contributed to the death.
23     Q   And you have found cause of death to be a bad
24 heart or drug use?
25     A   In some cases yes.

*Page 52*

1      Q   Any other causes for those TASER related deaths?
2      A   Excited delirium syndrome, which can be caused
3  by either untreated or undertreated psychiatric disorders
4  or stimulant drugs.  There's TASER cases there was a
5  gunshot wound after a TASER that killed them.  That makes
6  sense.  I think that's the main thing, you know, some
7  serious coronary disease -- oh, hyperkalemia, too.  Renal
8  failure and hyperkalemia.
9      Q   Can you define that?
10     A   Sure.  Life-threatening elevated potassium
11 levels.  Some people who use drugs don't manage
12 themselves over the days they are using the drugs, get
13 dehydrated, go into kidney failure.  And that's a
14 predisposition for elevating your potassium levels, and
15 people die of hyperkalemia, not frequently.  But
16 that's -- it's a common cause of death in people who are
17 hyperkalemic, people with kidney failure, dialysis
18 patients who miss dialysis.
19          A number of cases in which patients showed up to
20 the emergency department with severely elevated potassium
21 levels and had a cardiac arrest related to that.
22     Q   So of your TASER related deaths -- I'm talking
23 just about the circumstance you're opining -- there's
24 about 25 to maybe 35 cases?  Somewhere in that range?
25     A   Again, we're really ballpark-ing this without

*Page 53*

14 (Pages 50 to 53)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 having good data to back it up for me, but I'm guessing
2 it's about right.  My best estimate.
3     Q  Okay.  Of the TASER related cases that have
4 resulted in death that you've consulted on, how many have
5 you determined the cause of death to be excited delirium?
6     A  It depends on the specifics of the case.  Maybe
7 25 to 30 percent.  Again, there's another reason for the
8 deaths, gunshot wounds, hyperkalemia.  If they didn't
9 have signs and symptoms of excited delirium consistent
10 with the definition but had significant drug use and, you
11 know, cardiac disease or cardiomyopathies, then, you
12 know, those would be a more likely cause of death than --
13 if excited delirium wasn't there.  Or the TASER if it was
14 in a circumstance remote to the event.
15     Q  Can you explain to me what excited delirium is?
16     A  Sure.  It's a diagnosis that's sort of made
17 based on clinical symptoms and signs.  So I'm liking it
18 to, well, flu-like illness.  People with flu have
19 sometimes fevers, sometimes chills, sometimes aches,
20 sometimes sore throat, sometime ear pain, sometimes nasal
21 sinus discharge, sometimes sinus pressure.
22         You can define somebody as having a viral-like
23 or influenza-like illness by having a handful of those
24 symptoms.  You don't have to have all of them, and
25 everybody is going to be a little bit different, but you

Page 54

1 broken arm.  You should be sensing pain and stop doing
2 this.  You're against overwhelming odds.  You shouldn't
3 be doing that, fighting, stressing.  The heart keeps
4 beating faster and just keeps revving up.
5         And that's the symptoms -- that's the process in
6 which excited delirium revs up, which presents them,
7 basically, as sweating.  People often take their clothes
8 off because they feel this internal heat that's going on,
9 you know, sort of the generator is revving up.  The
10 agitation, the delusions, the superhuman strength, the
11 fighting against all odds, the resistance against painful
12 stimuli.
13         That's sort of the clinical diagnosis of that.
14 So that is, in a nutshell, what the excited delirium is
15 from the pathophysiology to how you sort of come to a
16 diagnosis and -- so basic clinical diagnosis from that.
17     Q  Okay.  Are you of the opinion that Daniel Tyson
18 was exhibiting signs and symptoms that were consistent
19 with excited delirium on October 27, 2014?
20     A  I am.  Yes.
21     Q  Do you have an opinion as to the cause of his
22 excited delirium on October 27th of 2014?
23     A  I do.  Yes.
24     Q  And what is that opinion?
25     A  Undertreated psychiatric disorder.

Page 56

1 get the same diagnosis at the end because it's clinical.
2         Excited delirium syndrome is similar in the
3 sense that you have a series of symptoms and signs that
4 tend to present and you have to have an ideology for it,
5 a cause for it.  So it's typically causative --
6 ideologies tend to be either stimulant drug use,
7 sympathomimetic, and they look like methamphetamines,
8 PCP, cocaine.  And the other option -- or the other
9 common finding is untreated psychiatric disorders,
10 particularly schizophrenia, bipolar.
11         And -- so there are changes that occur within
12 the brain in these individuals over time.  The receptor
13 uptake changes and sort of -- molecularly based science
14 with receptors and -- there are transmitters that at some
15 point they -- the person sort of -- the triggers change
16 and they use cocaine every day and then one they snap.
17 It's a big change.
18         Or the psychiatric patient starts revving up and
19 acting more and more psychotic and then there is a
20 snapping point.  And the theory behind is what's truly
21 happening is there is a regulatory mismatch in the brain,
22 things that normally slow you down, put the braking
23 systems on -- say that your temperature is too high,
24 we're going to, you know, slow things down.  You're
25 working too hard.  You're fighting too much.  You have a

Page 55

1     Q  And is that within a reasonable degree of
2 medical probability?
3     A  Yes.
4     Q  You previously testified that you have not
5 performed any specific testing as it pertains to this
6 case.  But in your experience -- I know that I read
7 somewhere that you have been tased?
8     A  I have, yes.
9     Q  How many times?
10     A  Once in probe mode and about five times in
11 drive-stun.
12     Q  What year were you tased in probe mode?
13     A  The year before I put out one of my papers that
14 I was trying to get police officers to join me in.  It
15 was probably about ten years ago.
16     Q  In the ten occasions that you were
17 drive-stunned, were they all different dates or were they
18 consecutive stuns?
19     A  Just five.  I was not stunned ten, and they were
20 on different dates.
21     Q  When was the last time you were drive-stunned?
22     A  It was probably about four, five years ago.
23     Q  Have you ever been exposed to repeated tasing
24 cycles?
25     A  I have not.

Page 57

15 (Pages 54 to 57)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  Q  Why not?
2  A  Because it hurts enough that you stop doing
3  whatever you're doing and don't ask for a second one.
4  It's a painful stimuli.
5  Q  The one time that you were tased in probe mode
6  what were the circumstances?
7  A  And I should call -- probe mode meaning spread.
8  We didn't actually shoot the probes.  It was alligator
9  clipped on, but it was the effect of a probe mode.  So I
10  need to clarify that.
11  Q  What were the circumstances of that instance?
12  A  We were at a training site trying to recruit
13  police officers to a study.  They were allowed to do a
14  voluntary TASER activation to understand what the TASER
15  physiologic effects are, and we were doing cardiac
16  tracings on those who had volunteered to do it.  We put a
17  cardiac monitor on them.
18      And we were trying to recruit additional police
19  officers.  And someone said, "Well, if the doctor gets
20  it, will anybody else step up?"  And the doctor got it,
21  and nobody else stepped up.  But I got the experience.
22  Q  Was this your 2011 study?
23  A  This was one of the first ones, the cardiac
24  monitoring study.  So I'd have to look at the dates to be
25  specific, but I think it's actually before that.  It's

Page 58

1  one of the ones with, I think, Saul Levine -- Dr. Levine.
2  Q  Where did that take place?
3  A  That was at the San Diego Police Department
4  Training Center.
5  Q  And the five instances where you were
6  drive-stunned -- what were the circumstances of those
7  five dates?
8  A  Those were more -- just testing devices and
9  showing people how it works and being involved, not
10  really study-type things.  So those were more -- not
11  formal training, but working with residents and working
12  with other aspects of the TASER education stuff.
13  Q  Are there any emergency room physician that you
14  work with currently that have also exposed themselves to
15  a TASER?
16  A  There are.
17  Q  How many?
18  A  At least two.  I don't remember if Dr. Chan ever
19  got tasered, but at least two that I know of.
20  Q  And they're also researchers in this field?
21  A  One is a researcher and one was a study
22  participant in a -- we were doing a sham TASER for, and
23  he was disappointed he didn't get tasered.  So we gave
24  him the opportunity to get tasered.
25  Q  Have you ever participated in any studies where

Page 59

1  an individual has been handcuffed and has been in the
2  prone position and been tased?
3  A  No.
4  Q  Have you ever participated in a study where one
5  has been in a prone position, handcuffed and ramshackled
6  and tased?
7  A  No.
8  Q  Have you ever used a surrogate to recreate this
9  type of a scenario?
10  A  Our TASER research was done at the very
11  beginning with TASER being tested for safety.  So we were
12  just looking at the physiologic effects without putting
13  in other dynamics, other than exercise.  So we used the
14  physiologic effects of exertion on, I think, evaluating
15  the TASER effects physiologically, but not position or
16  restraint.
17  Q  So the answer is no?
18  A  I think I forgot your original question.  If
19  it's a restraint question, then the answer is no.  If
20  it's mimicking other physiologic things that happened in
21  the field, then it would be yes with regard to exertion.
22  Q  But my question is have you ever used a
23  surrogate to recreate a scenario where someone is in the
24  prone position, handcuffed, leg shackled, and tased
25  repeatedly?

Page 60

1  A  No.
2  Q  Have you ever participated in any study and used
3  a surrogate to recreate a scenario where someone has been
4  tased ten times while in a prone position?
5  A  No.
6  Q  Have you ever been handcuffed?
7  A  Yes.
8  Q  In what circumstance?
9  A  Nothing that had to do with law enforcement
10  proceedings.  But as part of our studies we handcuffed
11  and hogtied and hobbled each other to either participate
12  in studies or to prepare for a study that's coming up.
13  Q  Have you ever been handcuffed and tased?
14  A  I have not.
15  Q  Have you ever been handcuffed, shackled, and
16  tased?
17  A  The answer to that also is no.
18  Q  Have you ever been leg-shackled?
19  A  I have, yes.
20  Q  Have you ever been handcuffed and leg-shackled
21  at the same time while in the prone position?
22  A  Yes.
23  Q  How many times?
24  A  Probably about half a dozen times.
25  Q  And of the times that you have been handcuffed,

Page 61

16 (Pages 58 to 61)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  leg-shackled in the prone position has any force been
2  applied or weight to your back?
3      A  I've had weight placed on me.  Yes.
4      Q  How much weight?
5      A  I've had up to 225 pounds -- actually, no.  I
6  take that back.  No.  I was not shackled at that time.
7  I've had about 50 pounds put on me with shackles and
8  handcuffs.
9      Q  And the 50 pounds is this a plate?
10     A  Sandbags, I believe, at the time.
11     Q  Did it affect your breathing in any type of
12  manner?
13     A  Not that I can discern.  No.
14     Q  And what was the premise behind this study?
15     A  It was an evaluation of low amounts of weight on
16  individuals in a prone position.  So we were preparing
17  for that study.
18     Q  Was anyone during this evaluation, who was
19  handcuffed and leg-shackled, applied weight in excess of
20  50 pounds?
21     A  Not in this particular study.  No.
22     Q  In any study that you participated in?
23     A  Yes.
24     Q  What study was that?
25     A  I'm pretty sure.

Page 62

1  afterwards to find out if they had a prescribed disease
2  or other cardiac conditions.  As far as we knew they were
3  relatively healthy individuals.
4      Q  Was there a type of screening procedure to
5  determine whether anyone had a cardiac condition?
6      A  In this study I don't think so.
7      Q  Do you know if there are any studies out there
8  where individuals who have a preexisting cardiac
9  condition have been handcuffed, leg-shackled, placed in a
10 prone position, tased approximately ten times with weight
11 applied to their back?
12     A  Not with those specific requirements.  No.
13     Q  Do you know why there aren't any studies?
14     A  It's a very specific protocol as far as that
15 goes.  So it would be very difficult to recruit patients
16 for that, but that's not typically how a study would be
17 performed.  You look for a specific population of
18 individuals who would sample your population.  Probably
19 the first part -- you have to build up to that study also
20 as well through a process of evaluations.
21     Q  Do you agree with me that Daniel Tyson had a
22 preexisting cardiac condition at the age of 30?
23     A  Based on the autopsy.  Yes.
24     Q  And what did the autopsy reveal as to his
25 cardiac condition?

Page 64

1      It was -- I think they were handcuffed and
2  shackled.  I have to double-check that.  It was up to
3  100 pounds, and it was the Savaser Study looking at
4  cardiac activity in the prone, restrained position with
5  the weight on them.
6      Q  While someone was handcuffed and leg-shackled?
7      A  I'm 99 percent sure they had both those on there
8  with the weights on them.
9      Q  How much weight was applied?
10     A  I believe it was 50 and 100 pounds.
11     Q  And what were your findings?
12     A  That there were no cardiac changes with regards
13 to cardiac output.  There was no clinically significant
14 changes in the hemodynamic monitoring measures in the
15 restraint position with or without the weight on.
16     Q  In this particular study how many people
17 participated?
18     A  I think it's 20 or 25, but I have to
19 double-check specifically.
20     Q  And out of the 20 to 25 -- did any have any type
21 of a preexisting cardiac condition?
22     A  Not that was known.
23     Q  Why not?
24     A  Because we didn't do evaluations in everybody if
25 they -- we didn't do a cardiac evaluation on everybody

Page 63

1      A  He had two major findings, one is multivessel
2  significant -- or severe atherosclerotic heart disease.
3  He also, I think, had a conduction issue as well in his
4  cardiac conduction system.
5      If there is a good point at some point, maybe I
6  can use the --
7      Q  Yes.  This is a great time to take a bathroom
8  break.
9      A  All right.
10     (Recess.)
11 BY MS. GEORGES:
12     Q  I want to go to Page 2 of your report.  And you
13 list all of the materials that you've received in this
14 case?
15     A  Yes.
16     Q  And I'm also going to include the recent
17 deposition that you received of Dr. Pierre Pean.
18     A  Yes.
19     Q  P-e-a-n.
20     Did you receive the deposition of
21 Officer Alexis Ramirez?
22     A  I did not.
23     Q  Did you request it?
24     A  I did not.
25     Q  Is there a reason why you did not request the

Page 65

17 (Pages 62 to 65)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

---

deposition of Officer Alexis Ramirez?

    A   I did not know it was done.

    Q   Did you receive the deposition of
Officer Anthony Truntz?

    A   I did not.

    Q   Do you know who Officer Anthony Truntz is?

    A   He was one of the officers that arrived at the
scene after the initial handcuffing.

    Q   Do you know why you didn't receive his
deposition?

    A   I do not.

    Q   You've listed Item 23 as the videotape
deposition of Officer Andreas Pantaloukas?

    A   Yes.

    Q   Did you receive any other depositions, other
than his, as it pertains to the involved police officers?

    A   I did not.

    Q   Did you receive the deposition of
Officer Bryan Kerns?

    A   No.

    Q   Did you receive the deposition of
Officer Kyle Karl?

    A   No.

    Q   Did you receive the deposition of
Officer Alejandro Falcon?

Page 66

---

    Q   Do you know the height and weight of
Officer Andreas Pantaloukas on October 27th of 2014?

    A   I do not.

    Q   Do you know the height and weight of
Officer Alexis Ramirez on October 27th of 2014?

    A   I do not.

    Q   Do you know the height and weight of
Officer Alejandro Falcon on October 27th of 2014?

    A   I do not.

    Q   Do you know the height and weight of
Officer Kyle Karl on October 27th of 2014?

    A   I do not.

    Q   Do you know the height and weight of
Officer Bryan Kerns on October 27th, 2014?

    A   I do not.

    Q   Do you know the height and weight of
Officer Anthony Truntz on October 27th of 2014?

    A   I do not.

    Q   Did you ever request the height and weight of
these police officers?

    A   I did not.

    Q   Why not?

    A   Based on the review of the material, the height
and weight was not going to impact the evaluation of the
case.

Page 68

---

    A   No.

    Q   Did you receive the deposition of civilian
Leonardo Moore?

    A   No.

    Q   Did you receive the deposition of
Xavier Lesmarie?

    A   No.

    Q   Did you request these depositions?

    A   I did not.

    Q   Do you know who Leonardo Moore is?

    A   Leonardo Moore?  I would have to go back to my
notes.  I don't remember specifically.

    Q   Did you ever receive a statement that was
written by Leonardo Moore?

    A   I don't recall.

    Q   If you did, would you have documented that here
in the case specific materials?

    A   If it came as a separate statement, then yes, I
typically would.  If it came as a group of things in part
of an exhibit or report, then it may get lumped into
that.

    Q   Okay.  Well, do you know if Leonardo Moore's
statement was lumped into any other materials that you
received?

    A   I'm not sure.

Page 67

---

    Q   And what is the basis of that opinion?

    A   That when the case was going on, the officers
had shifted positions after the handcuffing.  And then
when they got the restraints on, there was -- basically,
he was still struggling at that point with only one
officer, really, holding him in position.  And -- so
there was not a significant amount of weight that needed
to be determined at the point of -- when he went into
cardiac arrest.

        Had there been multiple officers on top of him
at the time he was in cardiac arrest, then I would have
looked at materials to see how much they weighed and --
to try to determine how much weight was being placed in
positions of ventilatory -- potential compromise.  But
based on the -- based on the information here, the
weights were minimal at the very end, one person just
holding him in mild position to keep him from moving.

    Q   And what is the source of the information and
you making the determination or having the opinion that
only one police officer was holding Mr. Tyson at the time
he went into cardiac arrest?

    A   In holding him in position where it might impact
ventilatory -- ventilatory aspects of the case, not of,
say, legs or buttocks.  It was based on my review of the
incident reports and the interviews.

Page 69

---

18 (Pages 66 to 69)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Q   Okay.  But you haven't been privy to the depositions of the involved police officers that occurred in these past two months?

A   I have not reviewed the depositions, other than the one I received.

Q   So can you sit here definitively today and tell this jury that only one police officer was holding down Mr. Tyson at the time he went into cardiac arrest?

MR. HAPNER:  Form.

THE WITNESS:  Based on the reports and the materials I have, there was only one officer that was holding him in a position that might impact ventilation. That's without having reviewed the depositions.

BY MS. GEORGES:

Q   And who was that one police officer?

A   I believe it was -- Truntz was putting pressure on the left side, and that's after the leg shackles were being placed.

Q   Left side of what?

A   I believe of his torso -- his torso.

Q   Are you aware that at the same time that Officer Truntz was applying pressure to Mr. Tyson's left torso after the leg shackles were placed on, that Officer Falcon was also applying pressure to the right side of Mr. Tyson's torso?

Page 70

A   I know he was putting pressure as they were trying to put the leg shackles on.  I was not aware that he was doing it afterwards.

Q   Were you aware that Mr. Tyson was tased a minimum of two times after the leg shackles had been applied?

A   I have heard that he was tased after the leg shackles were applied.

Q   Where did you hear this from?

A   I read that.  I believe it was in Officer Pantaloukas' deposition.

Q   Were you aware that Officers Truntz, Karl, Falcon, and Pantaloukas were applying pressure to Mr. Tyson's body prior to him falling limp and unresponsive?

A   There were people putting weights and pressure on various parts of the body at various times.  Those officer did note that, yes, prior to -- in general, prior to the application of the leg shackles.

Q   Are you under the belief that there was some type of gap in between when the police officers were applying pressure to Mr. Tyson to when it was discovered that he was unresponsive?

A   There was always somebody in contact with Mr. Tyson.  So I don't think there was a gap, but it was

Page 71

a change in the amount and location of the pressure being placed.

Q   I'm going to ask you some questions about your analysis.  It's on Page 7 of your report.  Now, Doctor, are you aware that Mr. Tyson was tased at a minimum of two times prior to handcuffs being placed on?

A   Prior to handcuffs being placed on?  I believe it was used at least two times.  Yes.

Q   Are you also aware that Mr. Tyson was tased after handcuffs were applied, but prior to leg shackles being applied?

A   I believe there were some TASER activation. They were trying to get the legs in the shackle position.

Q   Okay.  And you're aware that between Officer Ramirez and Officer Pantaloukas Mr. Tyson was tased a total times -- of ten different cycles for a total of 54 seconds?

A   There were ten trigger-pulls documented for 54 seconds.

Q   Okay.  Now, in Paragraph 1 of Page 7 you write, "Even after these restraints were placed, Mr. Tyson continued to fight and struggle."  Can you explain to me what you mean by "fight and struggle"?

A   That after the restraints were placed, he continued to try to get up.  That's why the officer was

Page 72

holding him in position, so he wouldn't get up.  So he was still trying to, I guess, wiggle and get away type of thing.  That's the best way to describe it, even though he was restrained.

Q   Based on everything that you have reviewed and everything that you have learned, are you aware of any instance where Mr. Tyson was able to get up on his feet?

A   On his feet I don't believe.  I think he kept bridging up and lifting him up him that way, but not to his feet.

Q   Are you aware of any instance where Mr. Tyson was able to run away after he was handcuffed and leg-shackled?

A   No.

Q   So your definition of "fight and struggle" is the fact that he was jostling from side to side and able to move his body up off of the either payment or grass?

MR. HAPNER:  Form.

THE WITNESS:  Yeah.  Basically, he was not just laying there passively or resting or whatever, he was continuing to try to pull away, even though he was restrained.

BY MS. GEORGES:

Q   Doctor, did you ever take into consideration that the reason why Mr. Tyson was struggling was because

Page 73

19 (Pages 70 to 73)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  he was having trouble breathing?
2      A   Did I take that into consideration?  I always
3  take that as part of my evaluation, sure.  But in this --
4  in this case -- the specifics of this point here no.  I
5  didn't.  There was no evidence he was having difficulty
6  breathing.
7      Q   And what is that evidence?
8      A   That he was still making sounds.  He was not in
9  a position that should impact his ventilation.  If he was
10 having difficulty breathing, it was not from an external
11 force or a position.  It could be from a heart attack,
12 which would be very different, but it wouldn't be from an
13 external force or position that that was being placed on
14 him at that time.
15     Q   What type of external force can affect one's
16 ventilation?
17     A   It would have to be -- well, generally, we talk
18 about weights being placed on somebody.  I mean, that's a
19 very broad question.  But as far as from the perspective
20 of what we're talking about, it's weight placed on
21 positions that impact ability to move air in and out of
22 the lungs.
23     Q   And here, just so we're clear, you're on --
24 strike that.
25         And just so we're clear, you're unaware of what

Page 74

1  the involved police officers' weights were on
2  October 27th of 2014?
3      A   Correct.  I do not know the specific weights.
4      Q   And you're of the opinion that nothing that the
5  police officers did on October 27th affected Mr. Tyson's
6  ability to breathe?
7      A   I -- I opined that he did not become asphyxiated
8  by their actions.  There is always going to be some -- if
9  you want to measure ventilatory changes, there can always
10 be some change associated with some weight being placed
11 at the time he was being handcuffed.  But once that
12 weight was removed after he was handcuffed, that would
13 have, basically, negated out any ventilatory effects that
14 get self-corrected.
15         But at the time that the sudden cardiac arrest
16 occurred there was not weight in a position and enough of
17 that would have caused him to have ventilatory compromise
18 to the point of cardiac arrest.
19     Q   What type of weight was being applied to
20 Mr. Tyson while he went into cardiac arrest?
21     A   As I understood, it was weight being placed by
22 one officer on one side of his body to help hold him in
23 place, of his torso.  And it was just enough to keep him
24 in position, but not with any intent to try to push him
25 down and hold him down, just to keep him in position.

Page 75

1      Q   And this is while Mr. Tyson was handcuffed and
2  leg-shackled?
3      A   Yes.
4      Q   Do you know how long Mr. Tyson was in that prone
5  position?
6      A   After being shackled?
7      Q   Yes.
8      A   It wasn't very long, less than a couple of
9  minutes.
10     Q   Less than a couple of minutes prior to him going
11 unresponsive?
12     A   Correct.
13     Q   Okay.  Also in Paragraph 1 of Page 7 of your
14 report you write, "The total estimated time of struggle
15 was 6 minutes and 30 seconds.  Several minutes later
16 Mr. Tyson became calm and quiet and then the officers
17 realized that Mr. Tyson was unresponsive and not
18 breathing."  What is the source of your information for
19 "several minutes later"?
20     A   That was based on the reports that I reviewed
21 and the fact that the paramedics had arrived.  And,
22 also -- and there was a time gap between them evaluating
23 Mr. Ramirez and being called back to evaluate Mr. Tyson.
24     Q   So are you under the belief that there was the
25 struggle with police officers for 6 1/2 minutes, and then

Page 76

1  several minutes went by prior to Mr. Tyson becoming
2  unresponsive?
3      A   Approximately, yes.
4      Q   Do you know how many minutes?
5      A   Again, a number of minutes.  I don't know
6  exactly because it's difficult to go through the CAD and
7  find specifics.  But the paramedics had arrived, they had
8  seen him still struggling and fighting, went over to see
9  Officer Ramirez, and then a couple of minutes later got
10 pulled back to see him and found him in cardiac arrest.
11 So it's a sudden event from being struggling and fighting
12 to being in cardiac arrest.
13     Q   Now, where would I look to in order to find
14 evidence of several minutes went by following the
15 struggle with police prior to Mr. Tyson becoming
16 unresponsive?
17     A   I believe I got that through the police
18 interviews and reports, as well as the notation of the
19 paramedic arrival through their time stamps when they get
20 there.
21     Q   It's fair to say that you did not incorporate
22 the depositions that were taken of the involved parties
23 into your opinion that several minutes went by prior to
24 Mr. Tyson becoming unresponsive?
25     A   The only deposition I reviewed was

Page 77

20 (Pages 74 to 77)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1   Officer Pantaloukas' deposition.
2       **Q   Doctor, have you ever found that repeated TASER**
3   **exposure has caused or contributed to anyone's death?**
4       A   I have not.
5       **Q   Do you disagree that being tased repeatedly can**
6   **cause stress on one's cardiac system?**
7       A   I don't think it has ever been shown that it can
8   cause stress in the cardiac system in somebody who is
9   already severely agitated and, basically, in a state
10   where they can't really -- they're already, I guess,
11   sympathomimetically or adrenaline level -- already
12   excited from other reasons.
13       If you measure it in a person who's just sitting
14   still, you can see the heart rate go up.  But as far as
15   people who are already exerted or exercised, you don't
16   see any physiologic changes associated with a TASER
17   activation.
18       **Q   Have any of the opinions that you've rendered in**
19   **your consulting work since 1999 been contradictory to the**
20   **forensic pathologist who has performed the autopsy?**
21       A   Have any of my -- can you ask me a different
22   question again?  I --
23       **Q   Have any of your opinions while you've been**
24   **doing consulting work since 1999 been contradictory to**
25   **the forensic pathologist who has performed an autopsy?**

Page 78

1       A   Yes.
2       **Q   How many times?  And when I say "how many**
3   **times," I'm specifically asking about in-custody deaths**
4   **or prison-related deaths.**
5       A   I can't give you a specific number.  Usually
6   there's an overlap, but oftentimes there is a difference
7   in opinion on either contributing factors -- but
8   sometimes there's a complete disagreement based on
9   records that I got from the hospital that the medical
10   examiner did not have access to.
11       **Q   Okay.  Do you know what the percentage is of the**
12   **cases that you've reviewed or you had a difference of**
13   **opinion or you've added a contributing factor that was**
14   **not in a forensic pathologist's autopsy report?**
15       A   Maybe 25, 30 percent of the time.
16       **Q   In the cases that you've been retained on how**
17   **many have you agreed with the medical examiner's findings**
18   **as it relates to in-custody deaths?**
19       A   Well, "findings," you're referring to the -- the
20   anatomic findings or their conclusions?
21       **Q   The conclusion as to the cause of death.**
22       A   I think I agree more than I don't.  I think I
23   said about 25 percent of the time I may disagree with
24   them or have a -- an added contributing factor or
25   disagree with one of the contributing factors they may

Page 79

1   have put down saying may contribute, and I would say I
2   don't believe contributed.  That's different, but it's
3   not necessarily contradictory.  But I think the majority
4   of the time I probably do agree with the findings that
5   they do have in these cases.
6       **Q   Okay.  Now, this case when you were retained,**
7   **were you specifically asked to opine as to the cause of**
8   **death of Daniel Tyson?**
9       A   If I was able to opine and that they asked me
10   to, yes.
11       **Q   And were you able to?**
12       A   Yes.
13       **Q   Why you and not a forensic pathologist?**
14       A   As far as why -- I assume that a forensic
15   pathologist is already involved.  But I mean, as far
16   as -- they asked like if -- I can because of my expertise
17   in this field in evaluating these cases.  I evaluate
18   causes of death on a regular basis in the emergency
19   department and try to reverse those.  So I'm comfortable
20   in that topic.  If I can't come to an opinion, I tell
21   them I can't come to an opinion.  But I think it's
22   reasonable to ask me that.
23       **Q   Have you ever performed a cardiac pathology**
24   **report on a deceased person?**
25       A   I have not.

Page 80

1       **Q   Have you ever performed a neuropathology on a**
2   **deceased person?**
3       A   An examination of -- in either of those or both,
4   no.
5       **Q   So it's fair to say that your opinion in this**
6   **case is that neither the restraining process, nor the**
7   **repeated exposure of the TASER caused or contributed to**
8   **the death of Daniel Tyson?**
9       A   Correct.
10       **Q   And you completely rule out the contributions**
11   **associated with the police contact as a cause of death of**
12   **Daniel Tyson?**
13       A   He was resisting and fighting, but he was
14   already showing evidence of his agitation prior to that.
15   The police were trying to maintain him.  He was trying to
16   resist.  So his resistance contributed.  But as far as
17   the police contact -- they were there when he was
18   resisting, but it was his resistance that actually
19   increased his level of agitation and his acidosis and his
20   other components of things, but with his predisposed
21   excited delirium presentation.
22       **Q   You believe in a cause and then an effect,**
23   **correct?**
24       A   Causes can have effects, sure.
25       **Q   Okay.  What's the cause of Daniel Tyson's death?**

Page 81

21 (Pages 78 to 81)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 82

1   Give me all of the causes.
2       A   So he had severe cardiac disease, which can
3   cause sudden cardiac arrest without anything happening to
4   him.  Then he was undertreated with his psychiatric
5   disorder, which caused him to start ramping up his mania
6   and developed signs and symptoms consistent with excited
7   delirium.
8       Excited delirium itself will create agitation,
9   exertion, acidosis, and put one, basically, in a position
10   where they end up having to be brought into position
11   where they can be treated.  This doesn't go away if you
12   let them go.  So they have to be contained so that
13   medical therapy can be initiated.
14       His excited delirium syndrome and his exertion,
15   basically, stressed his severely diseased heart.  It was
16   ultimately like taking a cardiac stress test, and he went
17   into cardiac arrest because of that.
18       Q   How do you define exertion as it pertains to
19   these facts and circumstances?
20       A   Basically, exertion was everything from the part
21   of going down and attacking the officer to when the
22   officers were trying to restrain him and handcuff him.
23   His pulling away, his resisting, his fighting, his
24   bridging up -- all that was creating muscle contractions
25   and exerting himself.  The -- those types of activities

Page 83

1   can contribute to an acidosis.  Although excited delirium
2   itself is usually a significant acidosis, already it's
3   part of the phenomenon.
4       Q   Do you contribute being tased ten times to a
5   stressor on Daniel Tyson's heart?
6       A   So the tasing compared to exertion and excited
7   delirium wouldn't have any significant impact on acidosis
8   as far as changing his physiology that would stress his
9   heart.  So no.
10       Q   So you rule that out within a reasonable degree
11   of medical probability, that the repeated use of a TASER
12   did not cause stress on Mr. Tyson's heart on October 27th
13   of 2014?
14       A   Based on his physiologic condition at the time,
15   correct.
16       Q   Do you attribute Mr. Tyson being handcuffed,
17   being leg-shackled while in a prone position a stressor?
18       A   That's actually -- for his physiology it is
19   actually protective of him.  The large muscle groups
20   fighting, arms and legs flexing and contracting create
21   more acidosis that could be added onto the system.  And
22   restraining somebody with handcuffs and putting them in
23   shackles actually hinders and limits the flexion and
24   contraction of the large muscle groups.
25       So essentially, that is more physiologic

Page 84

1   protective than the stressors associated with just being
2   restrained.
3       Q   So it's your opinion within a reasonable degree
4   of medical probability that Mr. Tyson being handcuffed,
5   leg-shackled in a prone position for approximately ten
6   minutes did not cause stress on his heart?
7       A   Correct.
8       MR. HAPNER:   Form.
9       THE WITNESS:   Correct.
10   BY MS. GEORGES:
11       Q   And that is your opinion within a reasonable
12   degree of medical probability?
13       A   Yes.
14       Q   And you have ruled that out as a contribution to
15   his death?
16       A   Correct.
17       Q   And you have also ruled out as a contribution to
18   his death the fact that approximately five police
19   officers weighing between 180 and 210 pounds were
20   applying pressure to him while he was in that prone
21   position?
22       A   There were different weights in different
23   locations.  So yes, there were five officers and the
24   weights as you defined them, but they were not on him at
25   one time.  So based on my evaluation of the materials I

Page 85

1   was provided I have ruled that out as a cause of --
2   stressor on his heart to cause his cardiac arrest.
3       Q   And that is your opinion within a reasonable
4   degree of medical probability?
5       A   Correct.
6       Q   And you are making this opinion without the
7   benefit of the depositions that were recently taken of
8   the involved police officers?
9       A   My opinions are based on the materials I had at
10   the time.  Yes.
11       Q   Which exclude the depositions of the involved
12   police officers and independent civilian witnesses?
13       A   I didn't exclude.  I did not include because I
14   was not provided them.
15       Q   And you failed to attribute any effect due to
16   the stress and physical infliction from the encounter
17   with the City of Hollywood police officers?
18       A   Based on the physiologic presentation at that
19   time, that is correct.
20       Q   You can completely rule out within a reasonable
21   degree of medical probability the chance of Mr. Tyson
22   being asphyxiated during this police interaction with the
23   City of Hollywood?
24       A   Correct.
25       Q   Can we agree, Doctor, that Daniel Tyson was not

22 (Pages 82 to 85)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 86

1  on any synthetic drugs?
2      A  "Synthetic," like a -- sympathomimetic?
3      Q  Was he on any drugs?
4      A  I believe he had THC in his system.
5      Q  Do you know how much THC?
6      A  I do not know how much THC off the top of my
7  head.  No.
8      Q  Is 7 nanograms per milliliter a trace amount of
9  marijuana?
10     A  It's a positive marijuana test.  I don't really
11  put levels into it.
12     Q  And how long does marijuana last in one's body?
13     A  I'm probably not the best person to opine on
14  that at this point because I haven't read the date on
15  that perspective.
16     Q  You're not a toxicologist, are you?
17     A  That is correct.
18     Q  You've never held yourself out to be a
19  toxicologist?
20     A  Not a board certified toxicologist.  No.
21     Q  But we can agree that Mr. Tyson was not on
22  bath salts of any type of a stimulant?
23     A  Based on the autopsy report, yes.
24     Q  There's no detection of LSD, for instance, or
25  cocaine?

Page 87

1      A  Correct.
2      Q  Can you agree that Mr. Tyson's behavior on
3  October 27 was consistent with one who was decompensating
4  as a result of a mental illness?
5      A  Yes.
6      Q  And, Doctor, you're not here providing an
7  opinion as to the reasonableness of the use of force
8  employed by the City of Hollywood police officers,
9  correct?
10     A  Correct.
11     Q  And we can agree that this was not an electrical
12  death as a result of the repeated exposure of this TASER?
13     A  Correct.
14     Q  Are you aware of any studies that measure the
15  effect of repeated exposure of a TASER on someone who has
16  a preexisting heart condition, such as Mr. Tyson's, that
17  was tased ten times within 6 1/2 minutes?
18     A  I am not aware of any studies that have those
19  exact parameters.  No.
20     Q  Are you aware of any studies that measure the
21  repeated exposure of a TASER on someone who is
22  decompensating as a result of a mental illness?
23     A  No.
24     Q  Doctor, would your opinion differ in any manner
25  if Mr. Tyson was tased 100 times versus 10 times?

Page 88

1      A  I would have to look at the evaluation of the
2  case from the specifics because, obviously, 100 times is
3  going to be a longer time period, and other things
4  may be going on with his restraint and physiology at this
5  point.  So I would have to review it as a specific case
6  independently.
7      Q  Would your opinions differ if Mr. Tyson was
8  tased 20 times versus 10 times?
9      A  The same thing, I would have to review the
10  specifics of the case.
11     Q  Have you ever found that the prolonged and
12  repeated use of a TASER has contributed to anyone's
13  death?
14     A  I don't believe so.
15     Q  Doctor, do you agree that someone being tased
16  10 times for a total of 54 seconds within a short period
17  of time can cause physical pain on one's body?
18     A  In someone who can sense pain, yes.
19     Q  Can it cause stress on someone's body?
20     A  The same answer.  In someone who can sense the
21  stress and the discomfort they can.  Sure.
22     Q  Doctor, is there any literature out there that I
23  can look to which speaks on the repeated tasing of
24  someone who suffers from severe arterial sclerosis?
25     A  Not that I'm aware of.

Page 89

1      Q  And all the studies that you have conducted have
2  been on those that do not have preexisting cardiac
3  conditions?
4      A  Not that it necessarily had been evaluated for
5  specifically.  We used sheriff's officers that could have
6  had some disease in them, but we didn't know either
7  before or after if they did.
8      Q  How about your 2011 study where you had
9  approximately 42 subjects who were screened for this
10  study and that were then given one cycle of a five-second
11  tasing?  Do you recall that 2011 study?
12     A  I'm going to make sure I've got the right one --
13  the same page as you.
14         MS. GEORGES:  And I'll have it marked here as
15  Exhibit 3.  This was a December 2011 study that is titled
16  The Effect of TASER on Cardiac, Respiratory, and
17  Metabolic Physiology in Human Subjects.
18         (Plaintiff's Exhibit 3 was marked for
19         identification by the court reporter.)
20         THE WITNESS:  Yes.  This is the NAJ report that
21  incorporates two of my publications.  That's why I was
22  trying to sort this out.  So this is the report from the
23  funding that took care of phase one and phase two of our
24  TASER research.  So one phase was no exercise and the
25  second phase was with exercise.

23 (Pages 86 to 89)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

BY MS. GEORGES:

Q   How many people participated in this study?

A   I think you said 42.  But I will have to look if it was --

Q   It's my understanding that there were initially 42, and then there was a screening process.  And those that had revealed any type of a cardiac condition were excluded from participation?

A   Correct.  We did a questionnaire to look for physiologic parameters that are in human subjects that we did not want to do studies on.  So it looks like there are two phases with regards to the numbers of patients.  That's why I'm trying to answer your question there whether it was 42.  42 officers volunteered to participate.  32 included 27 men and 5 women.

Q   Why were those that revealed a cardiac condition excluded from participating in the 2011 study?

A   Because this was the first study of its type, meaning that up to this point nobody had studied the physiologic effects of a TASER.  And -- so for a -- for the first time I'm doing this the Human Subjects Committee required that we do a part-two evaluation for looking for people who may not have exercised or have other risks that would impact the way the TASER operated.  And -- so they wanted to screen those out for the first

Page 90

time to make sure it was the TASER only being evaluated.

Q   Okay.  Since that study have you performed one that's been similar where you have included those that have revealed a preexisting cardiac condition?

A   I have not.  No.

Q   Why not?

A   Because I have not gotten subsequent funding for that type of a study.  The NAJ was doing this first study, and that's all they really wanted to look at.

Q   Now, Doctor, your opinion within a reasonable degree of medical probability is that the repeated exposure of a TASER on someone with a preexisting heart condition does not contribute to the inducement of cardiac arrest?

A   That is a -- that's not specific to this case.  That a person with a predisposition cardiac disease with severe excited delirium syndrome and agitation associated with it, the TASER will not be additive to that and cause or contribute to the death.

Q   And just to be clear, here in this circumstance you have ruled out within a reasonable degree of medical probability that the repeated exposure of this TASER contributed to the death of Daniel Tyson?

A   Correct.

Q   You've also ruled out that it did not cause any

Page 91

type of stress or any type of effect on Mr. Tyson's cardiac system?

A   Nothing that he would be able to sense based on the physiology that he was experiencing at the time.  It would not have contributed to any changes in that.

Q   And what was that?

A   He was in a state of excited delirium syndrome.  He was, basically, fully -- for a lack of better term, amped up.  He was very agitated, very -- struggling, very resistive.  He has the acidosis and all the physiologic effects that occur with excited delirium syndrome.  And on top of that he was struggling and resisting against the officers trying to get him handcuffed, which would be, if anything, contributory.  The excited delirium syndrome itself creates a significant acidosis.

Sometimes one can opine that the resistance will make a little additional acidosis.  But when you compare the acidosis that a TASER can do to somebody who is not resisting his arrest, compared to somebody who is exerting himself, the TASER does not have any additional or a -- any additional impact to the resisting type of physiologic changes.

Q   So it's your opinion that Mr. Tyson didn't even feel the tasings?

A   It didn't have any effect on his physiology.

Page 92

Q   How do we measure that?

A   Well, it's been measured in labs looking at lactate levels and looking at other physiologic markers of stress when you compare exertion and struggle compared -- or and other type of physiologic stress compared to the stress of a TASER activation.  The TASER activation does not impact the changes you see physiologically from the exertion of stress.

Q   Are you aware of any studies of individuals who have been handcuffed, leg-shackled with a 250-pound weight on their back as it relates to their ability to breathe and ventilate?

A   250 pounds, not that I'm aware of.

Q   Have you ever attempted to demonstrates that scenario?

A   We've demonstrated 220 pounds in a prone position.

Q   Prone position with handcuffs and leg shackles?

A   No.  We weren't able to get the handcuffs back there because of the amount of weight you put on somebody.

Q   Why not?

A   When you put their hands back, there's not enough space to put 225 pounds of weight onto their back.  So when you get the hands back there, you can't stack the

Page 93

24 (Pages 90 to 93)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1  weight up safely on somebody.  It's too much weight to | 1  they're getting air in and getting air out. |
| 2  put in a small place, which is why it doesn't happen very | 2      Sometimes they get anxious, sometimes they get |
| 3  often, because it's not a whole lot of back space when | 3  nervous, sometimes they just try not to move and try to |
| 4  someone is handcuffed. | 4  just hold still to try to minimize their exertion to try |
| 5      **Q   Have you ever attempted to stagger weight** | 5  to decrease the cardiac demand.  So everybody is a little |
| 6  **totaling 250 pounds on someone who's handcuffed,** | 6  bit different in how they would respond to a heart |
| 7  **leg-shackled in a prone position?** | 7  attack. |
| 8      A   Stagger -- | 8      **Q   Would you agree in that scenario that it could** |
| 9      **Q   As in redistribute some weight to one's left** | 9  **be a terrifying feeling?** |
| 10  **shoulder, one's right shoulder, one's lower back, one's** | 10      A   To have -- if you're able to sense -- if you're |
| 11  **lower right back.** | 11  talking about this scenario versus a generic heart attack |
| 12      A   No.  The way we did it -- in our studies it was | 12  and a person not -- off their psych meds in the state of |
| 13  done over the maximal ventilatory area.  So between the | 13  excited delirium, it certainly can be a scary feeling. |
| 14  shoulder blades and the upper back -- mid back. | 14      **Q   Okay.  Well, let's take out the excited delirium** |
| 15      **Q   Are you aware of any studies where individuals** | 15  **or the decompensation and let's just talk about someone** |
| 16  **have been tested that had been handcuffed, leg-shackled** | 16  **who is unable to breathe as a result of going into** |
| 17  **in a prone position with 250 pounds between their upper** | 17  **cardiac arrest.  Would you agree with me that it could be** |
| 18  **and mid back?** | 18  **a terrifying feeling?** |
| 19      A   No. | 19      A   Okay.  Let me clarify your question.  Now we're |
| 20      **Q   Why aren't there any studies that are that** | 20  going into cardiac arrest.  If we're going into cardiac |
| 21  **specific?** | 21  arrest, they would be unconscious.  So they won't be in |
| 22      A   There are a lot of studies with weight on the | 22  terrifying feeling there.  We were talking about heart |
| 23  back.  This is a big -- 225 versus 250.  That's -- I | 23  attacks earlier. |
| 24  guess you can say, you know, why not 275 or 300.  There's | 24      **Q   So those are different?** |
| 25  different questions that could be answered based on lots | 25      A   Yes. |
| Page 94 | Page 96 |

| | |
|---|---|
| 1  of studies.  Studies are not easy and cheap to do.  So | 1      **Q   This is why I didn't go to med school.** |
| 2  you do what -- these are reasonable studies. | 2      **Okay.  Scenario:  Someone is unable to breathe** |
| 3      So you can come up with a hundred scenarios | 3  **as a result of a heart attack, would you agree with me** |
| 4  right now, not all of them are going to be done because | 4  **that it could be a terrifying feeling?** |
| 5  we just don't have the time or the energy or the monies | 5      A   And I'll clarify.  It's usually not you can't |
| 6  to do it.  But I can't tell you why nobody has tried a | 6  breathe, it just feels you're not getting air in because |
| 7  250 study like you just suggested.  I would be happy to | 7  your heart is not getting enough blood flow to it because |
| 8  try it some day if you want to fund me, but that's just | 8  the blockages of your heart.  So your heart demands more |
| 9  the challenge of research. | 9  oxygen.  It doesn't feel like it's getting it.  So people |
| 10      **Q   How does the human body respond in a prone** | 10  who have cardiac ischemia feel like an elephant on their |
| 11  **position when they're unable to breathe?** | 11  chest.  Obviously, it's not -- they're moving air in and |
| 12      A   If you're -- if any position you can't breathe, | 12  out just fine, they're breathing just fine, they're |
| 13  you respond by trying to breathe faster, but it depends | 13  ventilating just fine -- all the parameters are normal. |
| 14  on what's the reason why you can't breathe, if they're | 14  Their sensation is that they need to get -- they can't |
| 15  having a heart attack versus a blood clot, versus | 15  breathe. |
| 16  pneumonia, versus -- there's lots of reasons why somebody | 16      So there's a difference between not being able |
| 17  can't breathe.  The response might be a little bit | 17  to breathe and the sensation of -- that can go along with |
| 18  different depending on what that is -- the reason for not | 18  a heart attack of not feeling you can breathe. |
| 19  breathing is. | 19      **Q   And that sensation can be terrifying?** |
| 20      **Q   Okay.  How about if the reason is a heart** | 20      A   It can be.  True. |
| 21  **attack?** | 21      **Q   And that sensation can cause stress to one's** |
| 22      A   So somebody having a heart attack often feels | 22  **body, correct?** |
| 23  like they have -- you know, the elephant sitting on their | 23      A   Being anxious about something, sure, it can |
| 24  chest is the classic presentation.  They feel like they | 24  cause some physiologic stress. |
| 25  can't breathe, even though they're ventilating just fine, | 25      MR. HAPNER:  Off the record. |
| Page 95 | Page 97 |

25 (Pages 94 to 97)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    (Recess.)
2  BY MS. GEORGES:
3     **Q   Now, did you review any medical records which**
4  **indicated that Mr. Tyson was receiving any type of**
5  **cardiac treatment for his preexisting condition?**
6     A   I did not see any.  No.
7     **Q   Would it surprise you if he was unaware of his**
8  **preexisting condition?**
9     A   It would not surprise me.  No.
10    **Q   Why wouldn't it surprise you?**
11    A   A young guy -- you don't expect to see that kind
12 of severe disease in a young person.  And if he wasn't
13 having symptoms or not sensing symptoms, he might not get
14 medical care.  Sometimes people with mental illness are
15 even less likely to get mental care --- or medical care.
16    **Q   You did review Mr. Tyson's psychiatric records,**
17 **though?**
18    A   Yes.
19    **Q   And he was receiving continued psychiatric care**
20 **for approximately ten years prior to his death; isn't**
21 **that correct?**
22    A   He was receiving psychiatric care.
23    **Q   And you also reviewed the deposition of**
24 **Dr. Pean?**
25    A   Yes.

Page 98

1     **Q   Who testified that Mr. Tyson was a model**
2  **patient?**
3     A   I don't know if I remember that he used the word
4  "model," but he certainly was fairly compliant with
5  showing up to his appointments.  He occasionally missed
6  some things here and there, but he was relatively
7  compliant.
8     **Q   Now, can we agree that Mr. Tyson didn't merely**
9  **go for a run or for a walk and drop dead as a result of**
10 **his preexisting cardiac condition?**
11    MR. HAPNER:  Form.
12    THE WITNESS:  Yeah.  His cardiac arrest occurred
13 during an exertional component, basically, rather than
14 going for a run.
15 BY MS. GEORGES:
16    **Q   And this exertional component involved the**
17 **members of the City of Hollywood Police Department?**
18    A   He was struggling against them.  Yes.
19    **Q   So Mr. Tyson wasn't just having a psychotic**
20 **episode in his courtyard and just struggling with**
21 **himself, correct?**
22    MR. HAPNER:  Form.
23    THE WITNESS:  When he had his cardiac arrest,
24 no.  He was having a -- he was having a psychological
25 event, having some internal struggling, but not a

Page 99

1  physical struggle if that's what you're referring to.
2  BY MS. GEORGES:
3     **Q   And during this exertional component Mr. Tyson**
4  **was handcuffed?**
5     A   During the struggle, yes, he was.
6     **Q   And he was also leg-shackled?**
7     A   Yes, he was.
8     **Q   And he was tased a period of ten times during**
9  **the course of this exertional component?**
10    A   There were ten TASER trigger pulls recorded.
11 Yes.
12    **Q   And there were also six police officers applying**
13 **pressure to Mr. Tyson in some form or fashion before he**
14 **was unresponsive?**
15    A   There were six officers, I believe, present at
16 different times assisting with the handcuffing and the
17 shackling.  But were they all in contact with him at the
18 same time?  That did not happen.
19    **Q   Doctor, do you have any law enforcement officers**
20 **in your family or amongst your friends' group?**
21    A   Not my family.  No.  I play softball on a league
22 that some people are in law enforcement, but they are not
23 my close friends that I hang out with.
24    **Q   Are you a member of the police benevolent**
25 **association or provided any contributions to the PDA?**

Page 100

1     A   I have not.  No.
2     **Q   How about the Fraternal Order of Police?**
3     A   I'm not a member.  I can be a member, and I have
4  not contributed.  No.
5     **Q   Have you ever served on the board of any police**
6  **department?**
7     A   I have not served on any boards.  I've worked
8  with jail medical care, not from a board perspective, but
9  just from looking at protocol procedures at a sheriff
10 department when I was the director for it, but nothing
11 with regards to law enforcement use of force or anything
12 like that.
13    **Q   Have you ever undergone any type of training at**
14 **TASER International?**
15    A   I have not.
16    **Q   I'm going to go through a few things, and I**
17 **think we've already covered it.  All of your opinions are**
18 **contained within your report?**
19    A   Yes.
20    **Q   And if you are called to testify, would you**
21 **testify consistently with your expert report that is**
22 **dated April 4th, 2018?**
23    A   Yes.
24    **Q   Do you have any additional opinions that are not**
25 **contained within your report that you would like to share**

Page 101

26 (Pages 98 to 101)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1   during this deposition? | 1   easier? |
| 2     A  I do not. | 2     Q  Yes. |
| 3     Q  Have you ever provided any type of an advisory | 3     A  My notes.  We've already noted my list of my |
| 4   opinion to any member of the City of Hollywood Police | 4   deposition trial testimony. |
| 5   Department? | 5     Q  And your deposition testimony I believe is |
| 6     A  I have not. | 6   included within your report? |
| 7     Q  In your case specific material documented on | 7     A  Correct. |
| 8   Page 2 of your report, Item No. 22, you referenced a "Use | 8     Q  Okay.  So let's go through Items 1 through 13 to |
| 9   of Force & Injury Article"? | 9   ensure compliance.  Did you bring all of the documents |
| 10     A  Yes. | 10   referenced in Item No. 1? |
| 11     Q  What is that? | 11     A  I don't -- I don't bring copies of every book |
| 12     A  It was an article provided to me.  Bill Bozeman | 12   and chapter and everything I've written and reviewed.  So |
| 13   and other coauthors from the "Journal of Trauma and Acute | 13   no.  I couldn't bring all that material.  This is |
| 14   Care Surgery" entitled "Injuries Associated With Police | 14   20 years of knowledge that I used for my opinions. |
| 15   Use of Force." | 15   And -- so I didn't make copies of everything.  No. |
| 16     MS. MORRISON:  Okay.  I'm going to have that | 16     Q  Okay.  Why not? |
| 17   marked as Exhibit 4 to this deposition. | 17     A  Because I don't have all the copies of |
| 18     (Plaintiff's Exhibit 4 was marked for | 18   everything sitting on a pile to bring in.  They're |
| 19     identification by the court reporter.) | 19   hundred of papers I've reviewed over my career that are |
| 20   BY MS. GEORGES: | 20   part of my knowledge base that I use to create opinions. |
| 21     Q  And did you rely on this in forming your | 21     Q  Okay.  Where can I obtain all of these documents |
| 22   opinion? | 22   that you relied on in forming your opinion?  Since you |
| 23     A  Not particularly.  No. | 23   didn't bring them here with you where can I find them? |
| 24     Q  Why did you reference it in the case specific | 24     A  Basically, everything in my CV -- every |
| 25   materials? | 25   reference and every article in my CV would be something |
| Page 102 | Page 104 |

| | |
|---|---|
| 1     A  It was provided to me.  So I just kept my file | 1   that's part of it.  It's probably hundreds, if not |
| 2   complete. | 2   thousands, of articles.  So those could be -- they're |
| 3     Q  And who provided it to you? | 3   usually available on medline.  They could be obtained |
| 4     A  Counsel. | 4   that way. |
| 5     Q  Did you speak to any of the involved police | 5     Q  Okay.  Item No. 2, written reports prepared by |
| 6   officers? | 6   you in this case. |
| 7     A  I did not.  No. | 7     A  You have a copy of it, Exhibit No. 1. |
| 8     Q  I believe I sent you a notice, which we were | 8     Q  And it's only the April 4, 2018, report? |
| 9   having trouble serving you. | 9     A  Correct. |
| 10     A  Yes. | 10     Q  Did you bring with you all communications that |
| 11     MS. MORRISON:  And I believe I attached a | 11   relate to compensation for your study or testimony? |
| 12   schedule to the notice of taking your deposition.  I'm | 12     A  That was the fee schedule on Page 118 of |
| 13   going to have the notice marked as Exhibit 5 to this | 13   Exhibit 1.  And then I -- as far as the compensation |
| 14   deposition. | 14   portion of things, yeah. |
| 15     (Plaintiff's Exhibit 5 was marked for | 15     Q  No.  But do you have any correspondence and |
| 16     identification by the court reporter.) | 16   communications with counsel as it relates to your |
| 17   BY MS. GEORGES: | 17   compensation? |
| 18     Q  Have you had an opportunity to review the items | 18     A  Other than a -- other than invoices I sent them, |
| 19   listed on Pages 4 and 5? | 19   if that's what you're referring to. |
| 20     A  I have, yes. | 20     Q  Yes. |
| 21     Q  And have you brought with you all of the | 21     A  For the depos as well.  But I'm not sure that -- |
| 22   documents that are listed on Pages 4 and 5? | 22   the invoice that I sent for my first billing. |
| 23     A  To the best of my reasonable abilities. | 23     Q  Okay.  And this billing is for 19 hours for a |
| 24     Q  Okay.  What have you brought? | 24   total of $9,500, correct? |
| 25     A  You want me to just pull it out?  Would that be | 25     A  Correct. |
| Page 103 | Page 105 |

27 (Pages 102 to 105)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
www.depo.com

1    MS. GEORGES:  I'm going to mark that as
2  Exhibit 6.
3         (Plaintiff's Exhibit 6 was marked for
4         identification by the court reporter.)
5  BY MS. GEORGES:
6    **Q   Did you bring with you all communications**
7  **between yourself and counsel that identifies facts or**
8  **data that was provided to you and considered in forming**
9  **your opinions?**
10   A  All the data or facts were based in the binders,
11 and I brought those along.  Yes.
12   **Q   Are there any additional E-mails or letters**
13 **between yourself and counsel identifying any facts or**
14 **data?**
15   A  No.  They're just E-mails -- or, actually,
16 letters -- cover letters that would say here's the
17 materials.  Please call when you review or somewhere
18 along those lines.  Nothing of substance.
19   **Q   And do you have those letters?**
20   A  Not with me.  No.
21   **Q   Did you retain those letters?**
22   A  They're probably somewhere at home.
23   **Q   Do you have any communications that identify**
24 **assumptions that Defense counsel provided you and that**
25 **you relied on in forming your opinions?**

Page 106

1    A  Basically, I think we talked about that earlier.
2  There were hundreds of articles, if not thousands, in
3  this area that I've reviewed over my career.
4    **Q   Do you have any presentations to provide?**
5    A  I've given lots of presentations, but same the
6  type of thing, I don't keep copies of them to easily
7  distribute.
8    **Q   I believe we have Item No. 8 covered with the**
9  **list of the cases that you've testified in these past**
10 **four years?**
11   A  Correct.
12   **Q   Did you bring with you any items that are**
13 **responsive to No. 9, which are transcripts of any**
14 **testimony in court or in deposition for the past four**
15 **years?**
16   A  Yeah.  I don't keep those.  No.
17   **Q   Why don't you keep those?**
18   A  Because I have to present them when people ask
19 for them.
20   **Q   Are you generally given a copy of your**
21 **deposition after it's been taken?**
22   A  Generally, I get a copy to review and I sign it
23 and send it back.  And if it's going to go to trial, I
24 request a copy for trial.  And then when the case is
25 settled, I dispose of everything.

Page 108

1    A  No, I don't.
2    **Q   Are there any?**
3    A  No, there aren't.
4    **Q   How about Item No. 4, "All studies,**
5  **examinations, tests conducted by you or at your**
6  **discretion in this case"?  Are there any to provide?**
7    A  No, there are none.
8    **Q   And Item No. 5 as it pertains to your retainer**
9  **agreement, time and billing records as accounted for in**
10 **Exhibit 6 and, also, your fee schedule.**
11   A  Correct.  And just the -- I have a handwritten
12 version of it, but it's all been transcribed on the
13 invoice.
14   **Q   And how about Item No. 6?  Do you have any**
15 **documents to produce?**
16   A  I do not.
17   **Q   Why not?**
18   A  The same thing.  Everything that I've written
19 myself or in my CV -- and we talked earlier -- there are
20 lots of articles that may pertain to this at some level
21 that involve in-custody deaths, restraints, TASERS, and
22 excited delirium, but I don't have a printed-out copy to
23 bring to you.  And -- so it would take me a long time to
24 sort them all out and bring them to you for this.
25   **Q   Okay.  Item No. 7; is your response the same?**

Page 107

1    **Q   Do you have some type of a retention policy as**
2  **to how long you keep your depositions?**
3    A  Personally, no.  Just basically, if there's a
4  case that's going to trial, I will request it and review
5  it, obviously, for the trial.  But then once the trial is
6  over, I tend to dispose of them -- the pile of -- box or
7  binder of things.
8    **Q   What's your retention policy in regards to**
9  **records?**
10   A  Medical records?  Or --
11   **Q   For instance, any records that you're provided**
12 **by counsel, such as these?**
13   A  I retain them as long as I'm working on the
14 case.  And once the case is over and counsel says I can
15 get rid of them, so to speak -- there's not going to be a
16 secondary trial or an appeal or something like that, then
17 I dispose of them through shredding them, basically.
18   **Q   Do you have any items that are responsive to**
19 **Item No. 10 regarding any reports that you've prepared in**
20 **litigation in the past four years?**
21   A  I don't have any to bring to you.  No.
22   **Q   Why don't you have any?**
23   A  Because they're not something that I keep a
24 simple backup for those.
25   **Q   So you can't go back in your computer and pull**

Page 109

28 (Pages 106 to 109)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

| | |
|---|---|
| 1   the report that you generated in a 2017 case? | 1      MS. GEORGES: Let's just make sure I have |
| 2      A   Typically, I back-file those somewhere. I guess | 2   everything. |
| 3   if someone wants to pay for my time, I can go back and | 3      MR. HAPNER: So just to clarify, we need to |
| 4   look for them, but I don't keep them easily accessible. | 4   respond to 19, and then also confirm whether my firm |
| 5   I would have to look, though. | 5   hired him in the one previous case? But I do not believe |
| 6      Q   Do you only keep hard copies? | 6   that we did. |
| 7      A   Well, typically, I keep the case, and I dispose | 7      MS. GEORGES: Yes. |
| 8   the case after I'm done. I don't keep electronic copies | 8      And also follow up if there are active |
| 9   after the case is over. | 9   cases that Dr. Vilke is currently listed as an expert and |
| 10      Q   So as you sit here today you don't have any | 10   has a copy of the deposition that has not been destroyed |
| 11   electronic copies of any reports prepared as part of | 11   to furnish that to you as well. |
| 12   litigation in the past four years? | 12      Q   Doctor, have you ever rendered an opinion that |
| 13      A   I think I would have to look. I may have some | 13   is inconsistent with the opinions contained within your |
| 14   on my computer there. As far as that goes, I would be | 14   April 4th report or your testimony here today? |
| 15   happy to look for it. | 15      A   Not to my knowledge. No. |
| 16      Q   Well, in order to comply with Schedule A of your | 16      Q   You're sure? |
| 17   notice, can you please look and see if you have any | 17      A   That's my best answer. Yes. |
| 18   reports that have been generated in the past four years. | 18      MS. GEORGES: Doctor, thank you so much for your |
| 19   And if so, forward them to Mr. Hapner. | 19   time. |
| 20      A   Sure. | 20      THE WITNESS: Thank you. |
| 21      MR. HAPNER: No. 10? | 21      MR. HAPNER: Just a few follow-up questions. |
| 22      MS. GEORGES: No. 10. | 22 |
| 23      Q   And as to Item No. 11, I believe that you | 23      EXAMINATION |
| 24   testified that the percentage of income earned from legal | 24   BY MR. HAPNER: |
| 25   consulting work in the past four years has been | 25      Q   Doctor, in preparing your report from April 4th, |
| Page 110 | Page 112 |
| 1   approximately 20 percent? | 1   2018, did you review the officers' sworn statements that |
| 2      A   Yes. | 2   were provided to Detective Rillo? |
| 3      Q   And then items responsive to No. 12 are included | 3      A   Yes. |
| 4   in your expert report? | 4      Q   Does that include the sworn statement of |
| 5      A   Well, 12 you asked me earlier. And I think | 5   Officer Truntz? |
| 6   that -- again, I wasn't sure if I had one case or not, | 6      A   Yes. |
| 7   and I gave you the name of the attorney to check. | 7      Q   Officer Falcon? |
| 8      Q   But this a list of all cases? | 8      A   Yes. |
| 9      A   That this -- | 9      Q   Officer Wagner? |
| 10      Q   This firm. | 10      A   Yes. |
| 11      A   Exactly. Yes. | 11      Q   Officer Karl? |
| 12      Q   Maybe one? | 12      A   Yes. |
| 13      A   Maybe one. | 13      Q   Officer Kern? |
| 14      Q   And then Item No. 13 as to the total amount of | 14      A   Yes. |
| 15   income earned by you as a result of consulting work | 15      Q   Did you also review the sworn statements of |
| 16   performed by you at the request of the Defendant and/or | 16   Officers Pantaloukas and Ramirez? |
| 17   the Defendant's attorney in the last four years. | 17      A   Yes. |
| 18      A   Well, if the one case is involved and there's | 18      Q   And did you actually review the deposition of |
| 19   some moneys involved. And if it is not, then zero to | 19   Officer Pantaloukas? |
| 20   this point. | 20      A   Yes. |
| 21      Q   Other than the $9,500 that has been billed in | 21      Q   Following the submission of your April 4th, |
| 22   this case and the $1,000 an hour that I will pay you for | 22   2018, report did you also review the deposition |
| 23   your deposition here today? | 23   transcript the Dr. Pean? |
| 24      A   Yes. And a couple of hours of preparation for | 24      A   Yes. |
| 25   the deposition. | 25      Q   Does reviewing that deposition transcript change |
| Page 111 | Page 113 |

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  your opinion in any way?
2      A  It doesn't change it.  No.
3      **Q  Is there anything you'd like to add or**
4  **supplement?**
5      A  It just goes on to support the ideology of
6  excited delirium syndrome, that there was already some
7  ramping up at that point of his hypomania being out of --
8  you know, at the time he was being evaluated.  And -- so
9  that goes along with the witness' statements, and then
10  his initial presentation on the date that the officers
11  found him.
12      **Q  Would you say it corroborates your opinion?**
13      MS. GEORGES:  Form.
14      THE WITNESS:  It corroborates and maybe even
15  strengths it.
16  BY MR. HAPNER:
17      **Q  On Page 7 of your report opposing counsel asked**
18  **you about the wording of one of your phrases, and I'd**
19  **just like to get some clarification on that.  At the**
20  **top -- at the top paragraph where it says, "Several**
21  **minutes later Mr. Tyson became calm and quiet."  Several**
22  **minutes after what?**
23      A  After being restrained with the -- after the
24  struggle, basically.  After he was being restrained and
25  the struggle.

Page 114

1      **Q  Okay.  But he was -- is it your understanding**
2  **from reviewing the materials that he was still struggling**
3  **at that time?**
4      MS. GEORGES:  Form.
5      THE WITNESS:  He was struggling after he was
6  restrained and then he continued to struggle and then he
7  became quiet a few minutes later.
8  BY MR. HAPNER:
9      **Q  Okay.  Can prolonged or repeated TASER usage**
10  **cause someone's death?**
11      A  I have not seen any data to support that as far
12  as research or research studies to support that.  No.
13      **Q  What are the -- in the scientific and the**
14  **medical community has anyone formed the conclusion that**
15  **it can?**
16      A  Can a TASER cause death?  There are theoretical
17  modeling that a TASER activation can cause a cardiac
18  arrest and death.  Yes.
19      **Q  And what would be required according to those**
20  **models?**
21      MS. GEORGES:  Form.
22      THE WITNESS:  The modeling is, basically, a
23  cardiac -- transcardiac TASER probe deployments of,
24  basically, over the heart, thin-walled individual, deep
25  penetration of the darts to get close enough to the heart

Page 115

1  to cause an electrical cardiac arrest.  Usually the
2  person standing and leaning forward to get the heart
3  closer to the surface of the chest wall.  And -- so those
4  things have to be in play.
5      And the initial rhythm has to be ventricular
6  fibrillation, basically, an electrocution type of
7  activity.  And it has to happen at the time that
8  electricity is being passed through the TASER darts, not
9  in a delayed fashion.
10  BY MR. HAPNER:
11      **Q  Are any of those circumstances present in this**
12  **case?**
13      MS. GEORGES:  Form.
14      THE WITNESS:  They are not.
15      MR. HAPNER:  Okay.  That's all I have.
16
17          FURTHER EXAMINATION
18  BY MS. GEORGES:
19      **Q  Doctor, very quickly.  You testified that you**
20  **reviewed the deposition of Dr. Pean?**
21      A  Yes.
22      **Q  And Dr. Pean testified that he saw Mr. Tyson in**
23  **September of 2014; do you recall reading that?**
24      A  I believe I recall that.  Yes.
25      **Q  Do you recall reading that during the**

Page 116

1  **September 2014 visit that Mr. Tyson was stable?**
2      A  I recall that he was showing signs of hypomania.
3  I don't know if -- "stable" is sort of a very loose term.
4      **Q  And I believe it is September 6 of 2014.  Can**
5  **you show me where?**
6      A  I have a note from September 2, 2014, that says
7  he's got rapid speech, tangential thought process,
8  tangential association, fair recent and remote memory,
9  poor attention and concentration listed out as part of
10  his mental status examination and present in his -- he's
11  got chronic hypomania.
12      **Q  Did you identify the source?**
13      A  Of the hypomania?
14      **Q  Yes.**
15      A  I think that's his mental illness.  He has
16  schizoaffective disorder with some bipolar components to
17  it.  And that in itself -- if it's undertreated, it can
18  certainly create this type of mental status presentation.
19      **Q  Well, did the doctor believe that Mr. Tyson was**
20  **being undertreated, and that's what caused his signs or**
21  **behavior on September 2nd of 2014?**
22      MR. HAPNER:  Form.
23      THE WITNESS:  Yeah.  He felt that he's got
24  chronic hypomania.  So he has a degree of decompensation
25  at baseline.  So some of this stuff could be his

Page 117

30 (Pages 114 to 117)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

1 baseline, some of it could be a change, and that's
2 difficult to tell when you have somebody like that.
3 BY MS. GEORGES:
4     **Q   Based upon your review of all of the records,**
5 **are you aware of what medications Mr. Tyson was**
6 **prescribed in order to treat his mental illness?**
7     A   Yeah.  He was on a medication I haven't seen
8 much of, but most recent he was on Wellbutrin.
9     **Q   Doctor, based on the materials that you**
10 **reviewed, do you know if Mr. Tyson was off his**
11 **Wellbutrin --**
12     A   Based on --
13     **Q   -- leading up to October 27th of 2014?**
14     A   Based on one of his friends, he was -- he had
15 reported he was off his medications.
16     MS. GEORGES:  Thank you, Doctor, for your time.
17     THE COURT REPORTER:  Mr. Hapner, would you like
18 to order a copy of the transcript?
19     MR. HAPNER:  Yes.
20     Do you want to read it, Doctor?
21     THE WITNESS:  I do.
22     MS. GEORGES:  Off the record.
23     (TIME NOTED:  11:58 A.M.)
24
25

Page 118

1     STATE OF CALIFORNIA  )
                : ss
2 COUNTY OF SAN DIEGO  )
3
4     I, the undersigned, a Certified Shorthand
5 Reporter of the State of California, do hereby certify:
6     That the foregoing proceedings were taken before
7 me at the time and place herein set forth; that any
8 witnesses in the foregoing proceedings, prior to
9 testifying, were placed under oath; that a verbatim
10 record of the proceedings was made by me using machine
11 shorthand which was thereafter transcribed under my
12 direction; reading and signing was requested; further,
13 that the foregoing is an accurate transcription thereof.
14     I further certify that I am neither financially
15 interested in the action nor a relative or employee of
16 any attorney of any of the parties.
17     IN WITNESS WHEREOF, I have this date subscribed
18 my name.
19
20 Dated:  April 25, 2018
21
22
23                               
    MARGARET KINNEY
24     CSR No. 11398
25

Page 120

1
2
3
4
5
6
7
8     I, GARY MICHAEL VILKE, M.D., do hereby declare
9 under penalty of perjury that I have read the foregoing
10 transcript of my deposition; that I have made such
11 corrections as noted herein, in ink, initialed by me, or
12 attached hereto; that my testimony as contained herein,
13 as corrected, is true and correct.
14     EXECUTED this _____ day of _____,
15 20____, at _____, _____.
            (City)        (State)
16
17
18     GARY MICHAEL VILKE, M.D.
19
20
21
22
23
24
25

Page 119

31 (Pages 118 to 120)

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 1

**A**

A- 24:3
A.M 2:18,19 5:2,2 118:23
AAEM 23:2 24:1
abilities 103:23
ability 50:1 74:21 75:6 93:11
able 21:9 25:4 33:20 73:7,12,16 80:9,11 92:3 93:19 96:10 97:16
AC040D7 1:25
Academy 22:22 23:2
accepted 22:16 23:20 24:12
accepts 21:17
access 79:10
accessible 110:4
accommodations 46:17 46:23
accounted 107:9
accurate 120:13
ACEP 23:11,17,25
aches 54:19
acidosis 81:19 82:9 83:1 83:2,7,21 92:10,15,17 92:18
acting 55:19
action 120:15
actions 75:8
activation 22:25 58:14 72:12 78:17 93:6,7 115:17
active 28:25 112:8
activities 82:25
activity 15:3 63:4 116:7
Acute 102:13
ADAM 4:9
add 114:3
added 79:13,24 83:21
addendums 40:10
additional 39:4 40:13 58:18 92:17,20,21 101:24 106:12
additive 91:18
administrative 30:8
admission 14:18,23
admitted 9:8 12:4,18 14:14,19,20,22 15:13 15:16,19 16:1
adrenaline 78:11
advance 44:1
advertise 6:22
advisory 102:3
AEEM 24:4
affect 62:11 74:15
age 64:22
agency 14:14 16:15 46:16,18,20 48:7 51:15,19,25
agitated 15:5 78:9 92:9
agitation 56:10 81:14,19 82:8 91:17
ago 12:11 31:13 48:9 49:11 50:19 57:15,22
agree 9:2,5 21:21 64:21 79:22 80:4 85:25 86:21 87:2,11 88:15

96:8,17 97:3 99:8
agreed 79:17
agreement 107:9
air 34:14 74:21 96:1,1 97:6,11
airline 46:15 47:4
airport 46:18
Alejandro 66:25 68:8
Alexis 65:21 66:1 68:5
Alhambra 4:5
alligator 58:8
allow 48:19 50:2
allowed 58:13
allowing 48:21 49:5
American 22:22 23:2,10 23:10 24:13
amount 35:1 36:13 47:14 48:20 69:7 72:1 86:8 93:20 111:14
amounts 17:2 62:15
amped 92:9
analysis 72:4
anatomic 79:20
and/or 111:16
Andreas 66:13 68:2
answer 3:19 12:24 14:15 25:19 42:17 60:17,19 61:17 88:20 90:13 112:17
answered 37:12 94:25
Anthony 66:4,6 68:17
anxious 96:2 97:23
anybody 12:9,19 58:20
anyone's 78:3 88:12
apologize 24:7 38:13
appeal 109:16
appeals 29:4
appearances 4:1 40:4
applicable 20:16
application 71:19
applied 62:2,19 63:9 64:11 71:6,8 72:10,11 75:19
applying 70:22,24 71:13 71:22 84:20 100:12
appointments 99:5
approach 26:20
approached 27:3
appropriate 9:7 19:7
approved 23:5 24:13
approximate 28:6
approximately 29:23 51:12 52:4,7 64:10 77:3 84:5,18 89:9 98:20 111:1
April 1:18 2:19 5:1 38:25 39:18 40:8,11,14,17 101:22 105:8 112:14 112:25 113:21 120:20
area 17:7 94:13 108:3
areas 17:5
arguments 21:24
arm 56:1
arms 83:20
arrest 12:20 13:7,17 14:1 15:20 48:18 49:5 52:18 53:21 69:9,11 69:21 70:8 75:15,18

75:20 77:10,12 82:3 82:17 85:2 91:14 92:19 96:17,20,21 99:12,23 115:18 116:1
arrival 77:19
arrived 35:9 66:7 76:21 77:7
arterial 88:24
article 20:1,5,15,15 22:6 24:6,21 102:9,12 104:25
articles 19:10,12 20:12 20:16,18 21:1,7,11 22:10,12,15 24:10 105:2 107:20 108:2
asked 7:8 25:11 38:19 41:13 48:23 50:22 80:7,9,16 111:5 114:17
asking 79:3
aspects 32:22 33:20 59:12 69:23
asphyxia 32:15 33:6 35:3,4
asphyxiate 33:21 36:10
asphyxiated 35:9 75:7 85:22
asphyxiation 50:9
assessing 19:2
assisting 100:16
associate 16:9
associated 3:14 75:10 78:16 81:11 84:1 91:17 102:14
association 31:6 100:25 117:8
assume 18:7 36:2,24 41:14 80:14
assumptions 106:24
atherosclerotic 65:2
ATKINSON-BAKER 1:21
attached 103:11 119:12
attack 74:11 95:15,21,22 96:7,11 97:3,18
attacking 82:21
attacks 96:23
attempted 93:14 94:5
attendance 31:22,24
attention 117:9
attorney 4:5,9 87:7 50:6 111:7,17 120:16
attorneys 45:24
attribute 83:16 85:15
attributed 12:21 51:14 52:8
author 32:4
authored 22:20 40:8
authoritative 18:20,22 18:23,25 19:5,9,10,11 19:15,17,18 20:10,15 20:24,25,25 21:4,7,12 21:15 22:7,9,11,18,21 23:7 24:11
autopsies 16:14
autopsy 15:22 64:23,24 78:20,25 79:14 86:23
available 45:20 105:3
aware 70:21 71:2,4,12

72:5,9,14 73:6,11 87:14,18,20 88:25 93:9,13 94:15 118:5
Axon 30:19

**B**

B-a-r-r-a-n-c-o 8:4
back 10:12,15,16 17:1 19:7 20:14,21 21:6 22:5 33:1 35:20 42:3 47:16 49:20,20 54:1 62:2,6 64:11 67:11 76:23 77:10 93:11,19 93:23,24,25 94:3,10 94:11,14,14,18,23 108:23 109:25 110:3
back-file 110:2
background 5:23 25:3
backup 109:24
bad 51:20 52:23
ballpark-ing 53:25
Barranco 8:4,5
base 13:1,12 24:22 104:20
based 28:12 47:14 52:15 54:17 55:13 64:23 68:23 69:15,15,24 70:10 73:5 76:20 79:8 83:14 84:25 85:9,18 86:23 92:3 94:25 106:10 118:4,9,12,14
baseline 117:25 118:1
basic 20:6 56:16
basically 8:25 35:20 39:5 42:2 51:17 56:7 69:4 73:19 75:13 78:9 82:9,15,20 92:8 99:13 104:24 108:1 109:3,17 114:24 115:22,24 116:6
basis 11:3 48:21 69:1 80:18
bath 86:22
bathroom 65:7
beating 56:4
becoming 77:1,15,24
beginning 17:18 60:11
behalf 2:17 26:8 27:8,25 28:5 29:13,13 48:8
behavior 87:2 117:21
belief 71:20 76:24
believe 7:5,21 8:9 16:10 22:1 39:11 40:2,19 62:10 63:10 70:16,20 71:10 72:7,12 73:8 77:17 80:2 81:22 86:4 88:14 100:15 103:8,11 104:5 108:8 110:23 112:5 116:24 117:4,19
benefit 5:22 85:7
benevolent 100:24
Berkeley 5:25
best 23:15 54:2 73:3 86:13 103:23 112:17
better 17:8 23:5 92:8
BIERMAN 4:8
big 31:2 48:17 55:17 94:23

bill 45:9 46:20 102:12
billed 44:21,23 111:21
billing 105:22,23 107:9
binder 109:7
binders 39:3 106:10
bipolar 55:10 117:16
bit 38:25 52:6,7 54:25 95:17 96:6
blades 94:14
blanket 50:7,10
block 45:19 46:2
blockages 97:8
blocking 45:22
blood 95:15 97:7
board 6:5 86:20 101:5,8
boards 101:7
body 34:7 35:2 71:14,17 73:17 75:22 86:12 88:17,19 95:10 97:22
book 18:12,13,14 104:11
Boulevard 4:10
box 109:6
Bozeman 24:9 102:12
brain 55:12,21
braking 55:22
break 75:6 93:12
breakdown 15:2
breathe 75:6 93:12 95:11,12,13,14,17,25 96:16 97:2,6,15,17,18
breathing 16:24 33:25 36:5 62:11 74:1,6,10 76:18 95:19 97:12
bridging 35:14 73:9 82:24
bring 19:7 41:18 104:9 104:11,13,18,23 105:10 106:6 107:23 107:24 108:12 109:21
broad 74:19
broke 12:12
broken 56:1
brought 17:20 41:23 82:10 103:21,24 106:11
Broward 4:10
Bryan 66:19 68:14
build 33:21 64:19
business 6:15,20 25:14 26:18 29:19,21 30:1 43:13 46:15
buttocks 69:24
bypass 10:24,25

**C**

CAD 77:6
Cal 5:25
calculation 36:3,11
California 1:17 2:18 5:1 5:16 6:1 31:6 120:1,5
call 10:11 13:21,23,25 58:7 106:17
called 13:15 37:6 76:23 101:20
calling 13:11
calm 76:16 114:21
capacity 5:17
car 15:13

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 2

carbon 33:22
cardiac 9:8 10:23 11:2,4
  12:19 13:7,17 14:1
  15:20 48:18 49:5
  52:18 53:21 54:11
  58:15,17,23 63:4,12
  63:13,21,25 64:2,5,8
  64:22,25 65:4 69:9,11
  69:21 70:8 75:15,18
  75:20 77:10,12 78:6,8
  80:23 82:2,3,16,17
  85:2 89:2,16 90:7,16
  91:4,14,16 92:2 96:5
  96:17,20,20 97:10
  98:5 99:10,12,23
  115:17,23 116:1
cardiologist 9:10
cardiology 6:10
cardiomyopathies 54:11
cardioversion 11:5
care 8:21 10:5,6,7,9,12
  10:16,20 21:10 26:4,5
  26:15 48:21 89:23
  98:14,15,15,19,22
  101:8 102:14
career 17:23 104:19
  108:3
carefully 19:12
Carlsbad 30:11
case 6:17,25 7:8,11,20
  7:21,24 8:2,12 16:17
  19:3 21:11,25 25:9
  27:15 28:10 32:14
  34:20,23 36:21 37:9
  37:13,24 38:7,18,21
  38:24 41:7,13 44:10
  44:22 45:7 47:16 48:9
  48:10 49:11,24 50:7
  50:13,16 52:15,16,18
  52:19 54:6 57:6 65:14
  67:17 68:25 69:2,23
  74:4 80:6 81:6 88:2,5
  88:10 91:15 102:7,24
  105:6 107:6 108:24
  109:4,14,14 110:1,7,8
  110:9 111:6,18,22
  112:5 116:12
cases 14:10 20:17 25:20
  25:25 26:1,12,13,14
  26:15,22,25 27:7,8
  28:11,12,23 29:6,12
  34:2 38:19 42:2 47:21
  47:23 48:1 49:18,21
  50:22 51:3,12,18,20
  52:4,21,25 53:4,19,24
  54:3 79:12,16 80:5,17
  108:9 111:8 112:9
CAT 12:12
causation 13:8 51:19
causative 55:5
cause 15:7,24 19:3
  24:16 25:6 35:4 48:23
  48:25 49:23,25 50:3
  52:11,23 53:16 54:5
  54:12 55:5 56:21 78:6
  78:8 79:21 80:7 81:11
  81:22,25 82:3 83:12
  84:6 85:1,2 88:17,19

91:18,25 97:21,24
  115:10,16,17 116:1
caused 17:4 50:23 51:19
  51:25 52:22 53:2
  75:17 78:3 81:7 82:5
  117:20
causes 51:22 53:1 80:18
  81:24 82:1
causing 7:13 17:6 50:9
Center 59:4
certain 7:23 20:17 32:18
  34:6,25 35:1 46:22
certainly 13:1,6 14:16
  20:16,18 21:7 33:2
  96:13 99:4 117:18
certificate 15:25
certificates 16:2,3
certified 2:20 6:5 15:24
  86:20 120:4
certify 120:5,14
challenge 35:14 95:9
Chan 59:18
chance 38:22 49:1,7
  85:21
change 33:18 43:7 55:15
  55:17 72:1 75:10
  113:25 114:2 118:1
changed 10:14 40:7
changes 55:11,13 63:12
  63:14 75:9 78:16 92:5
  92:22 93:7
changing 33:19 34:1
  83:8
chapter 104:12
chapters 18:12,13
charge 45:17
charging 45:11,13
cheap 95:1
check 111:7
Chen 24:9
chest 95:24 97:11 116:3
chief 16:6,11
chills 54:19
chose 7:18
chronic 117:11,24
Circle 4:5
circumstance 53:23
  54:14 61:8 91:20
circumstances 6:25
  8:24 9:1 41:7 44:3
  48:14 52:17,21 58:6
  58:11 59:6 82:19
  116:11
city 1:8 2:8 46:19 85:17
  85:23 87:8 99:17
  102:4 119:15
civilian 67:2 85:12
claims 26:4,7
clarification 20:7 114:19
clarified 20:4
clarify 58:10 96:19 97:5
  112:3
class 46:15 47:2
classic 95:24
classically 22:9
clear 23:8 74:23,25
  91:20
client 8:8

clinic 10:16
clinical 10:14 23:3 30:7
  33:8,10 54:17 55:1
  56:13,16
clinically 9:23 63:13
clipped 58:9
close 29:5 100:23
  115:25
closer 27:11 116:3
clot 95:15
clothes 56:7
co-authors 87:13
coauthors 102:13
cocaine 15:4 55:8,16
  86:25
COLE 4:8
College 23:10
COLSON 4:4
come 11:13 20:14 24:24
  30:25 31:4,7 42:5
  48:19 51:1 56:15
  80:20,21 95:3
comes 22:24 23:7
comfortable 44:18 80:19
coming 61:12
commencing 2:18
comments 46:11
committee 23:4 90:22
common 17:12 53:16
  55:9
communications 38:1
  105:10,16 106:6,23
community 21:23
  115:14
compare 92:17 93:4
compared 83:6 92:19
  93:5,6
compensate 46:1
compensated 30:23
compensation 105:11
  105:13,17
complete 79:8 103:2
completely 18:24 81:10
  85:20
compliance 104:9
compliant 99:4,7
comply 110:16
component 99:13,16
  100:3,9
components 81:20
  117:16
compromise 69:14
  75:17
computer 109:25 110:14
concentration 117:9
concept 17:3,9
concern 50:12
conclusion 51:2 79:21
  115:14
conclusions 21:3 79:20
condition 10:14 14:18
  15:1 19:2 63:21 64:5,9
  64:22,25 83:14 87:16
  90:7,16 91:4,13 98:5,8
  99:10
conditions 14:21,23
  15:11 64:2 89:3
conducted 89:1 107:5

conducting 16:13
conduction 65:3,4
conference 32:3
confessed 35:23
confirm 112:4
Connecticut 48:13
consecutive 57:18
consensus 23:12,16
consider 50:10
consideration 73:24
  74:2
considered 106:8
consistent 54:9 56:18
  82:6 87:3
consistently 101:21
consolidated 41:23,25
constant 15:2 33:17
consult 50:22
consulted 51:3 54:4
consulting 6:15,20
  25:14,21,22,23 26:17
  27:4 29:19,21 30:1,11
  30:16 43:9,12 78:19
  78:24 110:25 111:15
contact 11:24 12:17 16:4
  31:15 51:5,6,13 71:24
  81:11,17 100:17
contacts 13:1
contained 40:4 42:24
  82:12 101:18,25
  112:13 119:12
continued 72:22,25
  98:19 115:6
continuing 73:21
contract 30:12
contracting 83:24
contraction 83:24
contractions 82:24
contradict 21:20
contradictory 78:19,24
  80:3
contribute 80:1 83:1,4
  91:13,19
contributed 50:24 51:25
  52:22 78:3 80:2 81:7
  81:16 88:12 91:23
  92:5 101:4
contributing 79:7,13,24
  79:25
contribution 52:9 84:14
  84:17
contributions 81:10
  100:25
contributory 92:14
control 13:24
conversation 37:17,21
  37:23 38:5 41:8
coordinated 31:17
copies 104:11,15,17
  108:6 110:6,8,11
copy 32:12 105:7 107:22
  108:20,22,24 112:10
  118:18
Coral 4:6
coronary 53:7
CORPORATION 1:9 2:9
correct 26:24 44:2 47:5
  75:3 76:12 81:9,23

83:15 84:7,9,16 85:5
  85:19,24 86:17 87:1,9
  87:10,13 90:9 91:24
  97:22 98:21 99:21
  104:7 105:9,24,25
  107:11 108:11 119:13
corrected 119:13
corrections 119:11
correspondence 105:15
corroborates 114:12,14
counsel 38:16 103:4
  105:16 106:7,13,24
  109:12,14 114:17
County 16:7 120:2
couple 13:14,18 19:22
  43:3 45:16 51:18 76:8
  76:10 77:9 111:24
course 100:9
court 1:1,22 2:1 35:22
  39:24 42:11 89:19
  102:19 103:16 106:4
  108:14 118:17
courtyard 99:20
cover 106:16
covered 33:2,3 101:17
  108:8
crash 15:13
create 82:8 83:20 104:20
  117:18
creates 92:15
creating 25:1,3 82:24
criticisms 22:6
CSR 1:24 120:24
cuff 49:15
current 32:14
currently 28:19,23 29:6
  59:14 112:9
custodian 26:5
custody 16:14 17:9
CV 8:11 18:9,18 23:22
  104:24,25 107:19
cycle 89:10
cycles 57:24 72:16

---
**D**
---
Dade 31:4,11,15
dangerous 32:17,18
Daniel 1:5 2:5 24:17 25:7
  56:17 64:21 80:8 81:8
  81:12,25 83:5 85:25
  91:23
darts 115:25 116:8
data 19:7 20:6 21:21
  22:19 54:1 106:8,10
  106:14 115:11
database 20:13
date 7:2 86:14 114:10
  120:17
dated 3:16 39:18 101:22
  120:20
dates 39:2 57:17,20
  58:24 59:7
day 31:8 55:16 95:8
  119:14
days 35:20 53:12
dead 13:2 14:9 99:9
death 7:13 15:24,25 16:2
  16:3,4,16 19:3 24:16

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 3

25:6,20 27:16 28:20
29:14 48:24,25 49:23
50:1,4,24 51:12,22
52:1,4,9,22,23 53:16
54:4,5,12 78:3 79:21
80:8,18 81:8,11,25
84:15,18 87:12 88:13
91:19,23 98:20 115:10
115:16,18
**deaths** 18:11,15 20:19
25:23 26:5,16,19,23
37:1 48:2,4 52:12 53:1
53:22 54:8 79:3,4,18
107:21
**debunked** 19:11 32:13
**deceased** 1:5 2:5 7:12
80:24 81:2
**December** 3:13 89:15
**declare** 119:8
**decompensating** 87:3
87:22
**decompensation** 96:15
117:24
**decrease** 96:5
**decreased** 49:7
**deemed** 22:7,21
**deep** 115:24
**Defendant** 1:10 2:10 4:7
111:16
**Defendant's** 111:17
**defending** 8:9
**defense** 8:5,7 25:17 26:9
26:21,22 27:1,4,5,7,9
27:11 29:8,11,13 44:9
47:19 50:6,15 106:24
**defibrillation** 11:6
**define** 18:21,23 20:25
21:7 53:9 54:22 82:18
**defined** 22:9,11 39:13
84:24
**defines** 22:2
**defining** 23:14 32:16
**definitely** 14:7
**definition** 8:22 21:11,14
21:22 22:18 24:12
54:10 73:15
**definitively** 70:6
**degree** 5:24 57:1 83:10
84:3,12 85:4,21 91:11
91:21 117:24
**dehydrated** 53:13
**delay** 48:21 49:4,5
**delayed** 48:20 116:9
**delirium** 7:12 15:4 16:20
17:8,14 18:14 23:13
24:7 31:10 51:21 53:2
54:5,9,13,15 55:2 56:6
56:14,19,22 81:21
82:7,8,14 83:1,7 91:17
92:7,11,14 96:13,14
107:22 114:6
**delusions** 56:10
**demand** 96:5
**demands** 97:8
**demonstrated** 93:16
**demonstrates** 93:14
**DENISE** 4:4
**department** 10:17 11:11

12:5,10,15 13:24
22:25 30:11,23 31:1,3
31:7,11 50:5 53:20
59:3 80:19 99:17
101:6,10 102:5
**departments** 11:10
30:22
**depending** 10:13 34:22
95:18
**depends** 18:21 32:21
35:12 54:6 95:13
**deployments** 115:23
**depo** 45:2,3
**depos** 105:21
**deposition** 1:15 2:16
3:15 27:19,21 40:18
40:20 42:9,18 44:24
45:12,16,25 65:17,20
66:1,3,10,13,18,21,24
67:2,5 71:11 77:25
78:1 98:23 102:1,17
103:12,14 104:4,5
108:14,21 111:23,25
112:10 113:18,22,25
116:20 119:10
**depositions** 27:25 28:8
66:15 67:8 70:2,4,13
77:22 85:7,11 109:2
**deputy** 12:15
**describe** 73:3
**DESCRIPTION** 3:10
**destroyed** 112:10
**detail** 18:15
**details** 13:20 14:2 41:11
43:2 49:10,21
**detection** 86:24
**Detective** 113:2
**determination** 69:19
**determine** 64:5 69:13
**determined** 54:5 69:8
**developed** 82:6
**devices** 59:8
**diagnosis** 54:16 55:1
56:13,16,16
**diagnostic** 23:14
**dialysis** 53:17,18
**die** 9:24 11:20,23 12:8
12:17 17:12 53:15
**died** 12:1,4,7,9,13,20,20
16:14 17:9 35:23 51:4
52:18
**Diego** 1:17 2:18 5:1,16
6:1 59:3 120:2
**differ** 87:24 88:7
**difference** 79:6,12 97:16
**different** 9:19 16:25 17:1
17:2 28:15 35:11
47:18 54:25 57:17,20
72:16 74:12 78:21
80:2 84:22,22 94:25
95:18 96:6,24 100:16
**difficult** 64:15 77:6
118:2
**difficulty** 44:6 74:5,10
**DIMITROULEAS** 1:8 2:8
**dioxide** 33:22
**direction** 46:21 120:12
**director** 30:12 101:10

**disagree** 22:6 78:5 79:23
79:25
**disagreement** 79:8
**disappointed** 59:23
**discern** 62:13
**discharge** 9:19 54:21
**discharged** 9:16,25 10:3
10:10,11
**discharging** 9:21
**discomfort** 88:21
**discovered** 71:22
**discretion** 107:6
**discussion** 38:4
**disease** 53:7 54:11 64:1
65:2 82:2 89:6 91:16
98:12
**diseased** 82:15
**disorder** 56:25 82:5
117:16
**disorders** 53:3 55:9
**dispose** 108:25 109:6,17
110:7
**distribute** 108:7
**distributed** 32:5,7
**DISTRICT** 1:1,2 2:1,2
**doctor** 7:16 58:19,20
72:4 73:24 78:2 85:25
87:6,24 88:15,22
91:10 100:19 112:12
112:18,25 116:19
117:19 118:9,16,20
**document** 34:4 39:7
40:2 42:8 43:22
**documented** 35:24
39:11 67:16 72:18
102:7
**documents** 103:22
104:9,21 107:15
**doing** 10:4 29:4 33:13
34:15 51:23 56:1,3
58:2,3,15 59:22 71:3
78:24 90:21 91:8
**dollar** 44:19
**double** 45:14
**double-check** 63:2,19
**doubling** 46:2
**dozen** 61:24
**Dr** 24:9,9 59:1,18 65:17
98:24 112:9 113:23
116:20,22
**drafted** 22:12
**Drive** 2:17
**drive-stun** 61:4
**drive-stunned** 57:17,21
59:6
**drop** 33:22 99:9
**drug** 51:20 52:24 54:10
55:6
**drugs** 53:4,11,12 86:1,3
**due** 51:4 85:15
**duly** 5:6
**dynamic** 34:16
**dynamics** 36:7 60:13

**E**

**E-mail** 38:2
**E-mails** 106:12,15
**ear** 54:20

**earlier** 37:12 96:23
107:19 108:1 111:5
**earned** 110:24 111:15
**easier** 25:18 104:1
**easily** 108:6 110:4
**East** 4:10
**easy** 95:1
**ED** 9:24
**editor** 19:21,24 20:1
**educate** 32:16,25 34:6
**education** 30:15 59:12
**educational** 5:23 30:20
**educator** 30:4,5
**effect** 58:9 81:22 85:15
87:15 89:16 92:1,25
**effects** 16:23 58:15
60:12,14,15 75:13
81:24 90:20 92:11
**EIDSON** 4:4
**either** 9:20 10:9 26:4
35:22 38:1 45:17 48:3
49:19 53:3 55:6 61:11
73:17 79:7 81:3 89:6
**electrical** 87:11 116:1
**electricity** 116:8
**electrocution** 116:6
**electrocution-type**
20:21
**electronic** 110:8,11
**electronically** 42:4
**elephant** 95:23 97:10
**elevated** 53:10,20
**elevating** 53:14
**emergency** 5:18,19 6:3,8
8:14,16,20,23 9:14
10:17,25 11:7,9,11,23
11:25 12:4,10,18
13:24 18:1 21:23
22:23,23,25 23:2,8,11
23:15,20 24:13 25:25
26:14 29:18 30:2
36:14,17,20,23 46:4
53:20 59:13 80:18
**emergent** 11:3
**employed** 5:15 87:8
**employee** 120:15
**EMS** 43:1,2,4 49:6
**EMTs** 48:19 49:1
**encounter** 85:16
**ended** 12:12 46:2 50:8
**energy** 95:5
**enforcement** 12:10
13:19 49:12 51:19,25
61:9 100:19,22 101:11
**English** 35:21
**ensure** 104:9
**entirety** 42:13
**entitled** 102:14
**episode** 99:20
**equation** 34:25
**ER** 8:21 9:2,5,8,15 10:22
13:4 30:15
**essentially** 23:24 83:25
**ESTATE** 1:5 2:5
**estimate** 54:2
**estimated** 76:14
**evaluate** 20:23 22:24
33:4 34:14 48:19 49:2

49:6 76:23 80:17
**evaluated** 89:4 91:1
114:8
**evaluating** 19:2 21:10
26:4 32:14 34:3 60:14
76:22 80:17
**evaluation** 11:13 15:17
16:25 21:13 28:18
52:15 62:15,18 63:25
68:24 74:3 84:25 88:1
90:22
**evaluations** 18:6 25:9
26:21 38:19 63:24
64:20
**event** 54:14 77:11 99:25
**everybody** 21:17 32:9
54:25 63:24,25 96:5
**evidence** 74:5,7 77:14
81:14
**evolved** 16:21,24 27:2
34:22
**exact** 7:2 87:19
**exactly** 38:13 51:11 77:6
111:11
**examination** 3:3 5:9
81:3 112:23 116:17
117:10
**examinations** 107:5
**examined** 5:6
**examiner** 16:6,12,17
79:10
**examiner's** 79:17
**examiners** 16:9
**example** 36:3
**exception** 42:18 43:1
**excess** 62:19
**excessive** 50:4
**excited** 7:12 15:2,4
16:20 17:7,14 18:14
23:13 24:7 31:10
51:20 53:2 54:5,9,13
54:15 55:2 56:6,14,19
56:22 78:12 81:21
82:6,8,14 83:1,6 91:17
92:7,11,14 96:13,14
107:22 114:6
**exclude** 85:11,13
**excluded** 90:8,17
**EXECUTED** 119:14
**exercise** 60:13 89:24,25
**exercised** 17:21 78:15
90:23
**exerted** 78:15
**exerting** 82:25 92:20
**exertion** 51:23 60:14,21
82:9,14,18,20 83:6
93:4,8 96:4
**exertional** 99:13,16
100:3,9
**exhibit** 39:22,23 42:1,9
42:10,24 67:20 89:15
89:18 102:17,18
103:13,15 105:7,13
106:2,3 107:10
**exhibiting** 56:18
**EXHIBITS** 3:8
**expect** 98:11
**experience** 7:17 8:15,20

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

11:7 14:12 24:18 50:3
57:6 58:21
**experiencing** 92:4
**expert** 3:11 8:12 16:19
18:3 28:10,19,24 39:7
39:18 43:20 101:21
111:4 112:9
**expertise** 80:16
**experts** 23:12
**explain** 54:15 72:22
**exposed** 57:23 59:14
**exposure** 78:3 81:7
87:12,15,21 91:12,22
**external** 74:10,13,15

**F**

**face** 50:7
**fact** 46:2 73:16 76:21
84:18
**factor** 17:12 79:13,24
**factors** 79:7,25
**facts** 6:24 25:12 41:7
42:5 82:19 106:7,10
106:13
**failed** 85:15
**failure** 15:7 53:8,13,17
**fair** 77:21 81:5 117:8
**fairly** 99:4
**Falcon** 66:25 68:8 70:24
71:13 113:7
**falling** 71:14
**family** 100:20,21
**far** 7:8 19:5 22:18 34:9
38:3 44:23 45:4 64:2
64:14 74:19 78:14
80:14,15 81:16 83:8
105:13 110:14 115:11
**fascinating** 112:9
**fashion** 100:13 116:9
**faster** 56:4 95:13
**February** 7:2,4 38:8,12
**fee** 43:19,22 46:8 105:12
107:10
**feel** 56:8 92:24 95:24
97:9,10
**feeling** 96:9,13,18,22
97:4,18
**feels** 95:22 97:6
**feet** 73:7,8,10
**fellowship** 6:9,12
**felt** 44:17,18 51:18
117:23
**fevers** 54:19
**fibrillation** 116:6
**field** 6:7,9,12 8:15,20
13:7,9,10,22 14:8
16:22 17:17 18:4 21:5
21:16,19 22:8 23:12
24:19 59:20 60:21
80:17
**fight** 72:22,23 73:15
**fighting** 55:25 56:3,11
77:8,11 81:13 82:23
83:20
**file** 1:25 103:1
**financially** 120:14
**find** 9:23 10:1 21:20 22:1
64:1 77:7,13 104:23

**finding** 55:9
**findings** 63:11 65:1
79:17,19,20 80:4
**fine** 47:9 95:25 97:12,12
97:13
**finished** 6:2
**Fire** 30:11
**firm** 7:19,23 37:4,10,15
44:9,13 46:16,17,19
47:10,19 111:10 112:4
**first** 5:6 6:17 8:14 17:19
27:4 38:5 58:23 64:19
90:18,21,25 91:8
105:22
**five** 18:13 19:23 28:8
46:24 57:10,19,22
59:5,7 84:18,23
**five-second** 89:10
**flexing** 83:20
**flexion** 83:23
**Florida** 1:2,8 2:2,8 4:6
4:10 36:15,18,21,23
**flow** 97:7
**flu** 54:18
**flu-like** 54:18
**fly** 47:1
**focused** 35:13
**follow** 9:23 10:1,7,20
20:5 112:8
**follow-up** 10:4,10
112:21
**following** 9:6 77:14
113:21
**follows** 5:7
**force** 3:14 11:10,14,24
12:2,2,5,7,8,9,13,21
12:21 14:10 15:8
17:10 50:5,9,11,23
51:14 62:1 74:11,13
74:15 87:7 101:11
102:9,15
**foregoing** 119:9 120:6,8
120:13
**forensic** 6:13 21:23
78:20,25 79:14 80:13
80:14
**forgot** 60:18
**form** 46:15 51:4,14,16
70:9 73:18 84:8 99:11
99:22 100:13 114:13
115:4,21 116:13
117:22
**formal** 21:14,17 27:12
59:11
**formed** 115:14
**forming** 102:21 104:22
106:8,25
**formula** 35:10
**Fort** 4:10 7:22,25 37:14
**forth** 120:7
**forward** 110:19 116:2
**found** 37:3 50:3 52:11
52:23 77:10 78:2
88:11 114:11
**four** 19:23 45:21 46:2,20
46:24 57:22 108:10,14
109:20 110:12,18,25
111:17

**Fraternal** 101:2
**frequently** 53:15
**friends** 100:23 118:14
**friends'** 100:20
**fully** 92:8
**fund** 95:8
**funding** 89:23 91:7
**furnish** 112:11
**further** 10:8 12:24 16:24
20:7 116:17 120:12,14

**G**

**Gables** 4:6
**gained** 25:2
**gap** 71:21,25 76:22
**Gary** 1:16 2:16 3:2 5:5
5:14 119:8,18
**general** 21:2 46:14 48:3
51:22 71:18
**generalization** 38:20
**generalize** 36:22
**generally** 32:11 74:17
108:20,22
**generated** 110:1,18
**generator** 56:9
**generic** 96:11
**GEORGES** 3:5 4:4 5:10
39:21 40:1 42:7,12
52:3 65:11 70:14
73:23 84:10 89:14
90:1 98:2 99:15 100:2
102:20 103:17 106:1,5
110:22 112:1,7,18
114:13 115:4,21
116:13,18 118:3,16,22
**getting** 12:12 15:5 44:12
96:1,1 97:6,7,9
**give** 25:18 30:23 31:1,4
31:8 32:7 34:18 35:11
47:15 79:5 82:1
**given** 5:22 9:1 11:6
34:21 38:20 89:10
108:5,20
**globally** 23:19
**go** 14:2 18:9,15 35:5
41:24 45:17 53:13
65:12 67:11 77:6
78:14 82:11,12 97:1
97:17 99:9 101:16
104:8 108:23 109:25
110:3
**goes** 19:5 34:10 64:15
110:14 114:5,9
**going** 9:20,20 21:25 34:3
34:10 36:6 39:21
47:15 54:25 55:24
56:8 65:16 68:24 69:2
72:3 75:8 76:10 82:21
88:3,4 89:12 95:4
96:16,20,20 99:14
101:16 102:16 103:13
106:1 108:23 109:4,15
**good** 5:11,12 19:19
20:22 44:17 49:10
51:8 54:1 65:5
**gotten** 10:5 91:7
**Granite** 2:17
**grass** 73:17

**great** 16:21 65:7
**group** 23:2,11,16 67:19
100:20
**groups** 24:14 83:19,24
**grown** 29:25
**guess** 8:14 9:25 11:12
22:17 27:22 28:8 42:2
51:8 73:2 78:10 94:24
110:2
**guessing** 13:14 47:22
51:9 54:1
**gun** 14:8
**gunshot** 53:5 54:8
**guy** 98:11

**H**

**H** 4:4
**half** 39:15,15,16 48:3
52:6,7 61:24
**half-day** 45:21
**hand** 49:14,19
**handcuff** 82:22
**handcuffed** 60:1,5,24
61:6,10,13,15,20,25
62:19 63:1,6 64:9
73:12 75:11,12 76:1
83:16 84:4 92:13
93:10 94:4,6,16 100:4
**handcuffing** 66:8 69:3
100:16
**handcuffs** 62:8 72:6,7
72:10 83:22 93:18,19
**handed** 42:8
**handful** 54:23
**handouts** 32:8
**hands** 49:20 93:23,25
**handwritten** 107:11
**hang** 100:23
**Hapner** 3:7 4:9 37:3
40:23 41:1,5 51:16
70:9 73:18 84:8 97:25
99:11,22 110:19,21
112:3,21,24 114:16
115:8 116:10,15
117:22 118:17,19
**happen** 94:2 100:18
116:7
**happened** 9:24 10:1
13:22 49:1 60:20
**happening** 33:25 55:21
82:3
**happy** 44:11 95:7 110:15
**hard** 55:25 110:6
**head** 37:8 86:7
**healthy** 64:3
**hear** 19:16 71:9
**heard** 37:8 71:7
**hearing** 28:4
**heart** 52:24 56:3 65:2
74:11 78:14 82:15
83:5,9,12 84:6 85:2
87:16 91:12 95:15,20
95:22 96:6,11,22 97:3
97:7,8,8,18 115:24,25
116:2
**hearts** 51:20
**heat** 56:8
**heavy** 34:17

**height** 68:1,4,7,10,13,16
68:19,23
**held** 50:7 86:18
**HELFMAN** 4:8
**help** 32:16 47:13 75:22
**hemodynamic** 63:14
**hereto** 119:12
**HICKS** 4:4
**high** 13:16 55:23
**highlight** 43:3
**highlighted** 42:19,23
**highlighting** 42:3
**hinder** 19:15
**hinders** 83:23
**hired** 112:5
**history** 32:12
**Ho** 22:15
**hobbled** 61:11
**hogtied** 61:11
**hold** 49:13,15 75:22,25
96:4
**holding** 50:11 69:6,17
69:20,22 70:7,12 73:1
**Hollywood** 1:8 2:8 85:17
85:23 87:8 99:17
102:4
**home** 9:20 10:3 106:22
**hospital** 9:23 10:19 13:1
13:3 14:5,14,19,24
15:19 79:9
**host** 46:19
**hotel** 30:25 31:7 46:16
46:23,24,24,25
**hour** 43:16 45:13,15,18
45:23 46:5 111:22
**hourly** 43:12,15
**hours** 10:15 43:25 44:21
44:23 45:1,3,6,8,21,24
45:25 46:1,2,21 47:14
105:23 111:24
**human** 89:17 90:10,21
95:10
**hundred** 95:3 104:19
**hundreds** 11:16 20:12
35:18,18 105:1 108:2
**hurts** 58:2
**hyperkalemia** 53:7,8,15
54:8
**hyperkalemic** 53:17
**hypomania** 114:7 117:2
117:11,13,24
**hypothetical** 34:20

**I**

**identification** 39:24
42:11 89:19 102:19
103:16 106:4
**identifies** 106:7
**identify** 106:23 117:12
**identifying** 106:13
**ideologies** 55:6
**ideology** 55:4 114:5
**illness** 54:18,23 87:4,22
98:14 117:15 118:6
**immediate** 25:12
**impact** 33:5 36:9 68:24
69:22 70:12 74:9,21
83:7 90:24 92:21 93:7

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 5

impacting 34:11
important 19:1
impressions 43:7
impressive 49:12
improving 15:9
in-custody 16:4,16
  18:14 25:20,23 26:16
  26:18,23 27:16 28:20
  29:14 37:1 48:2,4 79:3
  79:18 107:21
in-custody-death 17:4
  18:6
in-house 30:24
in-patient 9:21 10:9
inaccurate 32:13
inappropriate 26:5
incident 69:25
include 44:24 65:16
  85:13 113:4
included 90:15 91:3
  104:6 111:3
income 29:17,24 30:3
  110:24 111:15
inconsistent 112:13
incorporate 77:21
incorporated 41:2,18
incorporates 89:21
increase 33:20
increased 81:19
independent 85:12
independently 88:6
INDEX 3:1
indicated 98:4
individual 32:22,22 50:4
  60:1 115:24
individually 1:4 2:4
  52:19,20
individuals 55:12 62:16
  64:3,8,18 93:9 94:15
inducement 91:13
infliction 85:16
influenza-like 54:23
information 3:22 9:1
  41:1,5 42:24 69:15,18
  76:18
initial 66:8 114:10 116:5
initialed 119:11
initially 90:5
initiated 82:13
Injuries 3:14 102:14
Injury 102:9
ink 119:11
inmate 50:8
instance 9:7 10:8 30:3
  34:8 46:23 47:7,10,13
  50:21 58:11 73:7,11
  86:24 109:11
instances 13:5 59:5
INSTRUCTED 3:19
instructions 10:10
intent 75:24
interaction 15:15 85:22
interested 17:16 41:14
  120:15
interesting 17:23
internal 56:8 99:25
International 30:18
  101:14

internship 6:3
interviews 69:25 77:18
introduce 5:13
investigation 34:3
invoice 3:16 105:22
  107:13
invoices 105:18
involve 107:21
involved 7:12,13 13:8,13
  13:19 15:12,15 28:11
  33:9 49:9 51:20 52:5
  59:9 66:16 70:2 75:1
  77:22 80:15 85:8,11
  99:16 103:5 111:18,19
involvement 13:5 50:15
ischemia 97:10
issue 65:3
issues 7:14 17:4
Item 66:12 102:8 104:10
  105:5 107:4,8,14,25
  108:8 109:19 110:23
  111:14
items 103:18 104:8
  108:12 109:18 111:3

J
jail 15:10 26:8,15 27:15
  29:14 48:3 101:8
jails 26:1,3 27:8
JEAN 1:4 2:4
Jeff 22:15
jobs 43:5
join 57:14
jostling 73:16
journal 22:6 23:18
  102:13
jury 70:7

K
Karl 66:22 68:11 71:13
  113:11
keep 42:4 69:17 75:23
  75:25 108:6,16,17
  109:2,23 110:4,6,7,8
keeps 56:3,4
kept 73:8 103:1
Kern 113:13
Kerns 66:19 68:14
kidney 15:7 53:13,17
kidneys 15:9
kill 36:10
killed 53:5
killing 35:20
kind 26:3 98:11
KINNEY 1:24 2:20
  120:23
knee 49:19
knew 64:2
know 7:2,6,15,17,22,23
  8:8 10:13 13:8,14,20
  14:1 16:17 17:24
  18:15,25 19:3,22 23:3
  24:5,23 28:15 29:1,9
  31:22 32:17 34:12
  35:17,19 36:14,16,17
  37:3,6,14 38:23 39:12
  41:10,13 44:6 47:3,13
  48:12,14 51:22,24

53:6 54:11,12 55:24
  56:9 57:6 59:19 64:7
  64:13 66:2,6,9 67:10
  67:22 68:1,4,7,10,13
  68:16 71:1 75:3 76:4
  77:4,5 79:11 86:5,6
  89:6 94:24 95:23 99:3
  114:8 117:3 118:10
knowledge 20:13 24:18
  24:22 25:1,2 104:14
  104:20 112:15
known 30:19 63:22
Kyle 66:22 68:11

L
labs 93:2
lack 92:8
lactate 93:3
large 39:3 83:19,24
Lauderdale 4:10 7:22,25
  37:14
law 25:4,9 7:19,22 12:10
  13:19 37:3,10 44:9,13
  47:10,19 49:12 51:25
  61:9 100:19,22 101:11
lawyer 8:5,6 25:16,17
lawyers 27:3,4
laying 73:20
leading 118:13
league 100:11
leaning 116:2
learned 73:6
learning 17:13
leave 35:17
lecture 30:20
lecturer 30:4,5
lectures 34:21
left 34:18 70:17,19,22
  94:9
leg 60:24 70:17,23 71:2
  71:5,7,19 72:10 93:18
leg-shackled 61:18,20
  62:1,19 63:6 64:9
  73:13 76:2 83:17 84:5
  93:10 94:7,16 100:6
legal 25:20,22 110:24
legs 69:24 72:13 83:20
Leonardo 67:3,10,11,14
  67:22
Lesmarie 67:6
let's 25:22 27:21 35:5
  96:14,15 104:8 112:1
letters 19:21,24,25 38:2
  106:12,16,16,19,21
level 13:19 28:25 29:16
  78:11 81:19 107:20
levels 28:15 33:22,22
  53:11,14,21 86:11
  93:3
Levine 59:1,1
Life-threatening 53:10
lifetime 20:12
lifting 73:9
likes 18:21
liking 54:17
limits 83:23
limo 47:7
limp 71:14

line 43:24
lines 43:4 49:6 106:18
list 8:2 37:22 41:24,25
  65:13 104:3 108:9
  111:8
listed 39:11 40:22 66:12
  103:19,22 112:9 117:9
literally 20:12
literature 32:5 88:22
litigation 29:2 109:20
  110:12
little 38:25 48:4 52:6,7
  54:25 92:17 95:17
  96:5
location 52:16 72:1
locations 33:16 34:7
  84:23
long 5:19 6:15 28:15
  32:22 33:21 48:9
  49:11 76:4,8 86:12
  107:23 109:2,13
longer 34:13 88:3
look 19:6,23 24:6 32:18
  33:5,7,8,11,16 34:2,4
  35:16 39:13 52:19
  55:7 58:24 64:17
  77:13 88:1,23 90:3,9
  91:9 110:4,5,13,15,17
looked 47:11 69:12
looking 19:14 24:8 25:19
  60:12 63:3 90:23 93:2
  93:3 101:9
looks 90:11
loose 12:12 117:3
lot 7:17 34:11,17 48:16
  49:8,17 88:3 94:3,22
lots 13:16 35:23 94:25
  95:16 107:20 108:5
low 13:16 62:15
lower 20:21 49:19 94:10
  94:11
LSD 86:24
Lucie 8:10
lumped 67:20,23
lungs 74:22

M
M 4:9
M.D 1:16 2:16 3:2 5:5
  119:8,18
machine 120:10
main 53:6
maintain 81:15
major 5:25 24:13 65:1
majority 8:23 26:20 27:6
  80:3
making 69:19 74:8 85:6
malpractice 48:6
manage 10:20 21:10
  53:11
management 30:9
managing 21:10
mania 82:5
manner 62:12 87:24
March 38:9,15,25
MARGARET 1:24 2:20
  120:23
margins 42:16,21,22

marijuana 86:9,10,12
mark 106:1
marked 39:22,23 42:8,10
  89:14,18 102:17,18
  103:13,15 106:3
markers 93:3
material 42:15 68:23
  102:7 104:13
materials 32:1,2 37:16
  37:17,19 38:10,11,14
  38:17,22,23 39:1,6,10
  40:13,16,21,23 41:6
  41:17,21 42:16 45:6
  47:12 65:13 67:17,23
  69:12 70:11 84:25
  85:9 102:25 106:17
  115:2 118:9
matter 7:7 20:9 31:19
  34:10 37:11 44:14
maximal 94:13
mean 36:10 39:9 49:13
  72:23 74:18 80:15
meaning 13:22 21:17
  58:7 90:19
measure 75:9 78:13
  87:14,20 93:1
measured 17:21 93:2
measures 63:14
med 97:1
med/mal 25:25 26:13,14
  28:11 29:16
medical 5:25 13:24
  14:18,20 16:6,9,12,17
  19:2 21:23 26:4,15,25
  27:15 30:11 48:6 57:2
  79:9,17 82:13 83:11
  84:4,12 85:4,21 91:11
  91:21 98:3,14,15
  101:8 109:10 115:14
medical-care 26:1
medically 23:9
medicals 16:10
medication 118:7
medications 118:5,15
medicine 6:4,8 8:16,20
  22:23 23:2,8,20 24:13
  26:14
medline 105:3
meds 96:12
meet 21:11
member 38:6 100:24
  101:3,3 102:4
members 21:22 99:17
membership 24:14
memory 117:8
men 90:15
mental 87:4,22 98:14,15
  117:10,15,18 118:6
mentioned 37:6
mentors 17:19
merely 99:8
Metabolic 89:17
methamphetamine 15:4
methamphetamines
  55:7
Miami 31:4,11,15
Michael 1:16 2:16 3:2
  5:5,14 119:8,18

**Gary Michael Vilke, M.D.**
**April 24, 2018**

mid 94:14,18
mild 69:17
milliliter 86:8
mimicking 60:20
minimal 69:16
minimize 96:4
minimum 43:17 45:21
 71:5 72:5
minutes 14:1 76:9,10,15
 76:15,19,25 77:1,4,5,9
 77:14,23 84:6 87:17
 114:21,22 115:7
mismatch 55:21
missed 99:5
mode 57:10,12 58:5,7,9
model 99:1,4
modeling 20:19 115:17
 115:22
models 115:20
modify 10:12
molecularly 55:13
money 47:16
moneys 111:19
monies 95:5
monitor 58:17
monitoring 58:24 63:14
month 11:18,19
months 70:3
Moore 67:3,10,11,14
Moore's 67:22
morgue 9:25
morning 5:11,12
MORRISON 102:16
 103:11
move 73:17 74:21 96:3
moving 33:19 34:14
 35:13 36:5 69:17
 97:11
multiple 39:2 69:10
multivessel 65:1
MUNICIPAL 1:9 2:9
municipalities 44:7
municipality 44:17 47:11
muscle 15:2 82:24 83:19
 83:24
muscle-breakdown 15:6
muscles 15:5

**N**

NAJ 89:20 91:8
name 5:14 6:19 31:16
 48:11 111:7 120:18
nanograms 86:8
nasal 54:20
necessarily 20:14 50:10
 80:3 89:4
necessary 9:11
necessitated 14:23
need 37:18 46:24 52:19
 58:10 97:14 112:3
needed 69:7
needs 20:4 38:4
negated 75:13
negative 36:9
negligence 26:25 27:15
neither 81:6 120:14
nervous 96:3
neuropathology 81:1

never 86:18
night 31:8
no-nos 34:8,9,9
normal 97:13
normally 55:22
Nos 24:10
notation 77:18
note 41:24,25 71:18
 117:6
noted 104:3 118:23
 119:11
notes 3:12 41:21 42:4,4
 42:13,16,20,22,25
 43:3 67:12 104:3
notice 3:15 40:19 103:8
 103:12,13 110:17
nowadays 47:3
number 3:10 17:5 21:11
 22:14 33:13 35:10
 51:10 53:19 77:5 79:5
numbers 23:24 90:12
nutshell 56:14

**O**

oath 120:9
observation 15:14
obtain 104:21
obtained 105:3
obviously 88:2 97:11
 109:5
occasionally 99:5
occasions 57:16
occur 55:11 92:11
occurred 70:2 75:16
 99:12
October 56:19,22 68:2,5
 68:8,11,14,17 75:2,5
 83:12 87:3 118:13
odds 56:2,11
offering 23:14
officer 12:13,15 33:11
 65:21 66:1,4,6,13,19
 66:22,25 68:2,5,8,11
 68:14,17 69:6,20 70:7
 70:11,15,22,24 71:11
 71:18 72:15,15,25
 75:22 77:9 78:1 82:21
 113:5,7,9,11,13,19
officers 14:17 31:24,25
 34:6 48:16 49:5,9
 57:14 58:13,19 66:7
 66:16 68:20 69:2,10
 70:2 71:12,21 75:5
 76:16,25 82:22 84:19
 84:23 85:8,12,17 87:8
 89:5 90:14 92:13
 100:12,15,19 103:6
 113:16 114:10
officers' 75:1 113:1
official 6:19
oftentimes 79:6
oh 31:5 53:7
okay 7:15 8:17 10:7
 11:16 13:10,21 14:4
 15:11 18:9,19 21:14
 22:3,4,12,20 24:3
 26:17 31:9 32:25 35:5
 35:6 36:14,20 37:23

39:15,21 40:21 43:19
 46:4,13 47:8 49:3 54:3
 56:17 67:22 70:1
 72:14,20 76:13 79:11
 80:6 81:25 91:2 95:20
 96:14,19 97:2 102:16
 103:24 104:8,16,21
 105:5,23 107:25 115:1
 115:9 116:15
old 32:12 35:20,21
once 10:19 33:4 57:10
 75:11 109:5,14
one's 32:15,20 33:1 34:7
 34:12 52:9 74:15 78:6
 86:12 88:17 94:9,10
 94:10,10 97:21
ones 13:4 14:7 58:23
 59:1
oOo- 5:3
operated 90:24
opine 48:23 49:23 80:7,9
 86:13 92:16
opined 49:25 75:7
opining 18:7 53:23
opinion 24:16 25:4,6
 38:21 41:3 47:15 49:3
 50:6,17 56:17,21,24
 69:1,19 75:4 77:23
 79:7,13 80:20,21 81:5
 84:3,11 85:3,6 87:7,24
 91:10 92:23 102:4,22
 104:22 112:12 114:1
 114:12
opinions 20:8 38:16,18
 40:7,10 41:18 44:11
 51:21 78:18,23 85:9
 88:7 101:17,24 104:14
 104:20 106:9,25
 112:13
opportunity 59:24
 103:18
opposing 114:17
option 55:8
order 35:18 77:13 101:2
 110:16 118:6,18
original 24:6 60:18
originally 16:22
output 63:13
outside 9:15 14:21 52:1
overactive 15:3
overall 52:20
overlap 79:6
overnight 15:14
overuse 15:5
overview 41:12
overwhelming 56:2
oxygen 33:22 97:9

**P**

P-e-a-n 40:19 65:19
P.L 4:8
pacemaking 11:4,5
page 3:10 40:22 43:19
 65:12 72:4,20 76:13
 89:13 102:8 105:12
 114:17
pages 39:13 41:24
 103:19,22

paid 30:7,18 31:7 44:12
 45:4,7 46:1,5,12,16,17
 46:19 47:11,13
pain 54:20 56:1 88:17,18
painful 56:11 58:4
panel 23:12
Pantaloukas 66:13 68:2
 71:13 72:15 113:16,19
Pantaloukas' 71:11 78:1
paper 17:22 20:22 23:11
 23:25 24:1,4,7,8,22
papers 18:10,12 24:20
 24:21,23,25 25:2,3
 57:13 104:19
paragraph 43:24 72:20
 76:13 114:20
paramedic 77:19
paramedics 13:25 76:21
 77:7
parameters 17:22 33:7
 87:19 90:10 97:13
part 17:23 19:1 21:1,13
 24:18,19,22 61:10
 64:19 67:19 74:3
 82:20 83:3 104:20
 105:1 110:11 117:9
part-two 90:22
partially 18:25,25
participant 59:22
participate 61:11 90:15
participated 59:25 60:4
 61:2 62:22 63:17 90:2
participating 90:17
participation 90:8
particular 62:21 63:16
particularly 55:10
 102:23
parties 77:22 120:16
parts 33:3 71:17
passed 116:8
passively 73:20
pathologist 78:20,25
 80:13,15
pathologist's 79:14
pathology 6:13 80:23
pathophysiology 56:15
patient 8:24 9:3,6,8,9,15
 10:20 12:3,11 14:1
 23:8 55:18 99:2
patient's 21:10
patients 9:22,24 10:3
 11:8,13,17,22 12:17
 12:25 13:7 14:13,16
 15:18,25 17:1 53:18
 53:19 64:15 90:12
pay 31:1 44:7,18 45:24
 110:3 111:22
paycheck 30:10,13,14
 30:17
paying 44:6
payment 45:10 73:17
PCP 55:8
PDA 100:25
Pean 40:18 42:18 65:17
 98:24 113:23 116:20
 116:22
peer-reviewed 19:6,13
 21:8 22:16 23:18

penalty 119:9
pending 45:9,9
penetration 115:25
Penthouse 4:5
people 13:2,17 15:3 19:9
 19:14 26:20 31:22
 35:11,21,21,24 53:11
 53:15,16,17 54:18
 56:7 59:9 63:16 71:16
 73:9 78:15 90:2,23
 97:9 98:14 100:22
 108:18
pepper 16:25
peppered-sprayed
 48:17
percent 26:22 27:11
 29:20,21,24 48:5 54:7
 63:7 79:15,23 111:1
percentage 25:15 26:17
 27:1,10 29:17 79:11
 110:24
perfect 21:24
perform 25:5,11 30:19
performed 10:22 11:2
 12:22 15:22 57:5
 64:17 78:20,25 80:23
 81:1 91:2 111:16
period 27:24 33:1,23
 36:6 38:9 50:8 51:9
 88:3,16 100:8
periods 45:19
perjury 119:9
person 22:24 32:23
 33:14,19 34:12 36:12
 48:15,22 52:17 55:15
 69:16 78:13 80:24
 81:2 86:13 91:16
 96:12 98:12 116:2
PERSONAL 1:4 2:4
Personally 109:3
perspective 20:14 23:20
 30:17 74:19 86:15
 101:8
pertain 107:20
pertains 41:6 46:23 57:5
 66:16 82:18 107:8
phase 89:23,23,24,25
phases 90:12
phenomenon 83:3
phone 10:4 37:21
phrases 114:18
physical 85:16 88:17
 100:1
physician 5:18,19 8:15
 8:21 9:5,8,14 10:16,22
 10:25 11:8 13:24 14:3
 18:2 22:24 29:18 30:2
 46:5 59:13
physician's 9:2
physicians 8:23,25 23:8
 23:11,16 26:1 36:15
 36:17,21,23
physiologic 17:22 19:4
 33:7 58:15 60:12,14
 60:20 78:16 83:14,25
 85:18 90:10,20 92:10
 92:22 93:3,5 97:24
physiologically 60:15

93:8
**physiology** 31:21 32:12 32:15,20 83:8,18 88:4 89:17 92:4,25
**pick** 47:7
**piece** 36:7
**Pierre** 40:18 42:18 65:17
**pile** 104:18 109:6
**pile-on** 48:17 49:9,15
**place** 31:12 34:7 35:16 59:2 75:23 94:2 120:7
**placed** 11:1 33:16,17 34:17 35:2 48:16 62:3 64:9 69:13 70:18,23 72:2,6,7,21,24 74:13 74:18,20 75:10,21 120:9
**placement** 10:23
**placing** 35:22
**plaintiff** 1:6 2:6,17 4:3 8:6 25:16 26:10,14,18 27:1,9,13 28:5,10,12 28:20 29:7,10 44:9 47:19 48:8
**Plaintiff's** 3:9 39:22,23 42:9,10 89:18 102:18 103:15 106:3
**plaintiffs** 26:16 28:1
**plaintiffs'** 27:3
**plan** 10:13
**plate** 62:9
**play** 100:21 116:4
**please** 5:13,22 106:17 110:17
**pneumonia** 95:16
**point** 8:13 15:15 18:3 23:24 27:2,7 37:6 55:15,20 65:5,5 69:5,8 74:4 75:18 86:14 88:5 90:19 111:20 114:7
**police** 3:14 11:10,24 12:1,2,5,17 13:8 14:14 14:17 16:4,15 30:22 30:23 31:1,3,11,24,25 33:10 34:6 48:7,16 49:9 50:5 51:4,6,13,15 57:14 58:13,18 59:3 66:16 68:20 69:20 70:2,7,15 71:21 75:1,5 76:25 77:15,17 81:11 81:15,17 84:18 85:8 85:12,17,22 87:8 99:17 100:12,24 101:2 101:5 102:4,14 103:5
**policy** 109:1,8
**poor** 117:9
**population** 48:5 64:17 64:18
**portion** 105:14
**position** 33:18,19 34:11 49:16 60:2,5,15,24 61:4,21 62:1,16 63:4 63:15 64:10 69:6,17 69:22 70:12 72:13 73:1 74:9,11,13 75:16 75:24,25 76:5 82:9,10 83:17 84:5,21 93:17 93:18 94:7,17 95:11

95:12
**positional** 16:23 18:11
**positions** 16:25 17:2 34:1,17 69:3,14 74:21
**positive** 86:10
**possible** 38:20
**possibly** 37:13
**potassium** 53:10,14,20
**potential** 69:14
**potentially** 32:17
**pounds** 35:1,5,19,19 36:4,4,8 62:5,7,9,20 63:3,10 84:19 93:13 93:16,24 94:6,17
**PowerPoint** 32:4,6
**PowerPoints** 32:9
**practice** 23:3
**practices** 23:15
**practicing** 23:15
**precautions** 34:18
**preclusions** 46:11
**predisposed** 81:20
**predisposition** 53:14 91:16
**preexisting** 63:21 64:8 64:22 87:16 89:2 91:4 91:12 98:5,8 99:10
**preliminary** 47:14
**premise** 62:14
**prep** 45:3
**preparation** 111:24
**prepare** 61:12
**prepared** 105:5 109:19 110:11
**preparing** 44:24 45:1 62:16 112:25
**prescribed** 64:1 118:6
**present** 55:4 100:15 108:18 116:11 117:10
**presentation** 81:21 85:18 95:24 114:10 117:18
**presentations** 33:8,10 108:4,5
**presents** 56:6
**pressure** 54:21 70:16,22 70:24 71:1,13,16,22 72:1 84:20 100:13
**pretty** 62:25
**prevent** 35:2,5
**previous** 112:5
**previously** 57:4
**primary** 10:16
**printed-out** 107:22
**prior** 35:8 38:17 41:5 71:14,18,18 72:6,7,10 76:10 77:1,15,23 81:14 98:20 120:8
**prison** 26:8 27:15 29:14
**prison-related** 79:4
**prisons** 26:2,3 27:9
**private** 44:9
**privy** 70:1
**probability** 57:2 83:11 84:4,12 85:4,21 91:11 91:22

27:5,6,11,22,23 28:2 28:14,16,17 29:4,5,15 31:23 36:6,8 42:1 50:8 57:15,22 61:24 64:18 80:4 86:13 105:1 106:22
**probe** 57:10,12 58:5,7,9 115:23
**probes** 58:8
**problem** 44:8
**problems** 10:17
**procedure** 19:4 36:1 64:4
**procedures** 10:23 11:2 101:9
**proceeding** 27:12
**proceedings** 61:10 120:6,8,10
**process** 19:1 21:13 32:14 56:5 64:20 81:6 90:6 117:7
**processes** 17:10
**produce** 107:15
**product** 15:6
**project** 17:20
**prolonged** 33:1,23 88:11 115:9
**prone** 60:2,5,24 61:4,21 62:1,16 63:4 64:10 76:4 83:17 84:5,20 93:16,18 94:7,17 95:10
**pronounce** 13:9,10 14:8
**pronouncements** 13:15 14:3
**properly** 33:12
**protective** 83:19 84:1
**protocol** 64:14 101:9
**provide** 32:1 34:19 38:16 41:5 50:17 107:6 108:4
**provided** 32:3 39:7 41:2 43:9 47:12 85:1,14 100:25 102:3,12 103:1 103:3 106:8,24 109:11 113:2
**providing** 87:6
**psych** 96:12
**psychiatric** 53:3 55:9,18 56:25 82:4 98:16,19 98:22
**psychological** 99:24
**psychotic** 55:19 99:19
**publication** 24:10,24
**publications** 18:10,17 18:19 19:20 20:9 21:4 22:20 23:21 24:15 36:25 89:21
**publish** 23:5
**published** 17:22 19:6 23:17
**pull** 49:19 73:21 103:25 109:25
**pulled** 77:10
**pulling** 82:23
**pulls** 100:10
**punishing** 35:21
**push** 75:24

**put** 19:8 33:4 35:24 36:13 43:2 55:22 57:13 58:16 62:7 71:2 80:1 82:9 86:11 93:20 93:23,24 94:2
**putting** 19:19 22:3 60:12 70:16 71:1,16 83:22

---
**Q**
---
**qualified** 19:17,18
**qualifies** 8:12 18:3
**quality** 30:16
**question** 8:19 11:12 16:21 20:11 22:5 33:6 42:17 49:10 51:8 60:18,19,22 74:19 78:22 90:13 96:19
**questionnaire** 90:9
**questions** 3:19 10:5,12 38:19 72:3 94:25 112:21
**quickly** 116:19
**quiet** 76:16 114:21 115:7

---
**R**
---
**Ramirez** 65:21 66:1 68:5 72:15 76:23 77:9 113:16
**ramping** 82:5 114:7
**ramshackled** 60:5
**range** 28:3 53:24
**rapid** 117:7
**rare** 12:7
**rate** 43:12,15 45:14,23 46:3,20 78:14
**rates** 46:6 47:18
**ratified** 23:4,17
**read** 20:7 52:6 71:10 86:14 118:20 119:9
**reading** 24:25 46:14,14 116:23,25 120:12
**realized** 76:17
**really** 31:7 37:5 41:9 47:2 50:9 51:10 53:25 59:10 69:6 78:10 86:10 91:9
**reason** 22:1 35:11 52:17 54:7 65:25 73:25 95:14,18,20
**reasonable** 8:23 57:1 80:22 83:10 84:3,11 85:3,20 91:10,21 95:2 103:23
**reasonableness** 87:7
**reasons** 45:16 78:12 95:16
**reassessment** 10:18
**recall** 32:6 37:8 41:11 49:25 52:10 67:15 89:11 116:23,24,25 117:2
**receipt** 41:6
**receive** 38:11 39:1 40:24 44:13 65:20 66:3,9,15 66:18,21,24 67:2,5,13
**received** 30:25 39:3 40:13,16,18 65:13,17 67:24 70:5

**receiving** 38:10 98:4,19 98:22
**receptor** 55:12
**receptors** 55:14
**Recess** 65:10 98:1
**recognition** 49:4
**recollection** 38:2
**recommend** 10:8
**record** 8:1 35:7 42:7 43:1,4 97:25 118:22 120:10
**recorded** 100:10
**records** 43:2 79:9 98:3 98:16 107:9 109:9,10 109:11 118:4
**recovery** 49:7
**recreate** 60:8,23 61:3
**recruit** 58:12,18 64:15
**redistribute** 94:9
**refer** 9:6,10 10:15 19:14 42:3
**reference** 21:9 102:24 104:25
**referenced** 23:21 102:8 104:10
**references** 21:15
**referral** 24:5
**referred** 19:9 20:18,22 20:24 21:9,12 23:19 37:7
**referring** 8:1 9:20,22 12:25 13:3 25:8,20 27:19 79:19 100:1 105:19
**reflected** 39:14 42:23
**refresh** 38:2
**refresher** 42:6
**refund** 47:12
**regard** 60:21
**regarding** 109:19
**regards** 7:11 20:19 23:13 50:1,12 63:12 90:12 101:11 109:8
**regular** 80:18
**regulatory** 55:21
**relate** 18:18 105:11
**related** 53:1,21,22 54:3
**relates** 25:6,12 26:18 29:18 79:18 93:11 105:16
**relative** 120:15
**relatively** 64:3 99:6
**release** 15:9
**relied** 20:9 104:22 106:25
**rely** 20:13 24:15,19 102:21
**remaining** 29:12
**remember** 31:16 32:8 34:22 37:23 38:13 41:9,15 48:11 49:10 49:21 51:10 59:18 67:12 99:3
**remote** 54:14 117:8
**removed** 75:12
**Renal** 53:7
**rendered** 78:18 112:12
**rendering** 20:8 24:16

**Atkinson-Baker Court Reporters**
**www.depo.com**

repeated 15:19 57:23 78:2 81:7 83:11 87:12 87:15,21 88:12,23 91:11,22 115:9
repeatedly 14:13,17 60:25 78:5
report 3:11,14 20:20 39:7,14,15,18 40:5,8 40:22 43:5,20 65:12 67:20 72:4 76:14 79:14 80:24 86:23 89:20,22 101:18,21,25 102:8 104:6 105:8 110:1 111:4 112:14,25 113:22 114:17
reported 1:24 118:15
reporter 2:20 39:24 42:11 89:19 102:19 103:16 106:4 118:17 120:5
REPORTERS 1:22
reports 69:25 70:10 76:20 77:18 105:5 109:19 110:11,18
represent 20:6
representation 47:2
REPRESENTATIVE 1:4 2:4
request 6:17 37:16,19 44:8 65:23,25 67:8 68:19 108:24 109:4 111:16
requested 23:1 40:23 43:25 120:12
requesting 46:16,17,19
require 44:3 47:6,7
required 90:22 115:19
requirements 46:9,13 64:12
requires 14:18
research 16:22 17:7,20 19:13 20:23 21:21 37:1 60:10 89:24 95:9 115:12,12
researcher 59:21
researchers 59:20
researching 17:14
residency 6:4
resident 17:18
residents 59:11
resist 81:16
resistance 51:23 56:11 81:16,18 92:16
resisting 81:13,18 82:23 92:12,19,21
resistive 92:10
Respiratory 89:16
respond 95:10,13 96:6 112:4
response 19:4 20:1 50:2 95:17 107:25
responsible 16:13
responsive 108:13 109:18 111:3
rest 29:11 47:16
resting 73:20
restrain 82:22
restrained 17:21 32:23

48:15 63:4 73:4,22 84:2 114:23,24 115:6
restraining 81:6 83:22
restraint 7:14 17:10 18:11,11 31:20 32:12 60:16,19 63:15 88:4
restraints 16:23,23 17:11 18:11 31:20 69:4 72:21,24 107:21
restrictions 46:22
result 11:9,23 12:1,2,4,9 12:17 15:19 16:3 50:4 51:13,14 87:4,12,22 96:16 97:3 99:9 111:15
resulted 54:4
resume 18:2
resuscitatable 13:18
retain 106:21 109:13
retained 6:24 7:6,15,19 7:24 25:16 28:9,19,22 28:23 29:7 31:14 36:21 37:10 47:21,23 50:15 79:16 80:6
retainer 43:9,25 44:4,10 44:13 47:11 107:8
retention 109:1,8
retraining 50:11
reveal 64:24
revealed 90:7,16 91:4
reverse 80:19
review 6:17,24 7:8,11 22:22 30:16 38:4,22 47:14 68:23 69:24 88:5,9 98:3,16 103:18 106:17 108:22 109:4 113:1,15,18,22 118:4
reviewed 18:12 19:1 20:12 22:16 23:3 24:20,21,23 26:13,14 26:15 38:23 41:17 42:19 45:6 70:4,13 73:5 76:20 77:25 79:12 98:23 104:12,19 108:3 116:20 118:10
reviewers 20:7
reviewing 24:25 26:7 38:14,17 41:14 42:2 44:22 113:25 115:2
revs 56:6
revving 55:18 56:4,9
Rhabdomyolysis 14:25
rhythm 116:5
rid 109:15
Ridge 2:17
right 28:11 29:22 45:9 47:4 54:2 65:9 70:24 89:12 94:10,11 95:4
Rillo 113:2
risks 90:24
role 9:2,9,14 18:1 29:18 30:2 46:4
rolled 30:6,10,13,17
room 11:7,9,23 12:1,4 12:18 18:1 29:18 30:2 36:14,17,20,23 46:4 59:13
roughly 29:20

rule 81:10 83:10 85:20
ruled 84:14,17 85:1 91:21,25
run 73:12 99:9,14

**S**

safe 36:4,4,6,13 47:3
safely 94:1
safest 47:4
safety 60:11
salary 30:7 46:6,7
salts 86:22
sample 64:18
San 1:17 2:18 5:1,16 6:1 59:3 120:2
Sandbags 62:10
Saul 59:1
Savaser 63:3
saw 116:22
saying 29:10 36:11 80:1
says 20:21 46:15 109:14 114:20 117:6
scanner 12:12
scary 96:13
scenario 60:9,23 61:3 93:15 96:8,11 97:2
scenarios 34:20 36:1 95:3
scene 66:8
schedule 43:19,22 45:20 46:8 103:12 105:12 107:10 110:16
schizoaffective 117:16
schizophrenia 55:10
school 6:1 97:1
science 20:22 21:8 22:2 22:15,17 55:13
scientific 115:13
sclerosis 88:24
screaming 33:15,25 34:13,13
screen 90:25
screened 89:9
screening 64:4 90:6
second 17:24 58:3 89:25
secondary 109:16
seconds 72:17,19 76:15 88:16
see 7:1 10:4 19:25 33:5 33:8,11 37:22 49:12 69:12 77:8,10 78:14 78:16 93:7 98:6,11 110:17
seeing 33:24
seen 11:11,25 14:16 15:3 49:18 77:8 115:11 118:7
self-corrected 75:14
send 37:18 108:23
sensation 97:14,17,19 97:21
sense 24:20 25:19 53:6 55:3 88:18,20 92:3 96:10
sensing 56:1 98:13
sent 37:18,20 103:8 105:18,22
separate 67:18

September 116:23 117:1 117:4,6,21
series 55:3
serious 53:7
Serota 4:8 7:20 37:10 38:6 44:14,21
served 101:5,7
service 15:14
services 6:22 30:13
serving 103:9
set 120:7
setting 9:21 19:7
settled 108:25
severe 65:2 82:2 88:24 91:17 98:12
severely 53:20 78:9 82:15
shackle 72:13
shackled 60:24 61:15 62:6 63:2 76:6
shackles 62:7 70:17,23 71:2,5,8,19 72:10 83:23 93:18
shackling 100:17
sham 59:22
share 101:25
shelf 28:17
sheriff 8:9 101:9
sheriff's 12:15 89:5
Sheriffs' 31:6
shifted 69:3
shifting 33:18
shifts 13:1
shoot 58:8
short 88:16
shorthand 2:20 120:4,11
shot 12:12,14 39:1
shoulder 94:10,10,14
shout 14:8
show 117:5
showed 53:19
showing 59:9 81:14 99:5 117:2
shown 78:7
shredding 109:17
side 22:3 70:17,19,25 73:16,16 75:22
sign 108:22
signed 16:2
significant 48:20 51:10 54:10 63:13 65:2 69:7 83:2,7 92:15
signing 120:12
signs 54:9,17 55:3 56:18 82:6 117:2,20
similar 8:24,24 55:2 91:3
simple 109:24
single 35:10
sinus 54:21,21
sit 70:6 110:10
site 14:4 58:12
sitting 28:17 78:13 95:23 104:18
situation 26:6 34:16
six 18:13 100:12,15
six-page 42:8
slow 55:22,24
small 94:2

snap 55:16
snapping 55:20
softball 100:21
somebody 7:18 21:20 31:16 33:21 35:17 36:10 37:7 44:6 54:22 71:24 74:18 78:8 83:22 92:18,19 93:21 94:1 95:16,22 118:2
someone's 88:19 115:10
sore 54:20
sorry 12:23 24:6
sort 19:4,8 21:2,6 23:4 23:19 28:25 41:12 54:16 55:13,15 56:9 56:13,15 89:22 107:24 117:3
sound 19:13 21:8,21,21 22:15,17
sounds 74:8
source 69:18 76:18 117:12
sources 30:3
south 36:15
Southern 1:2 2:2 31:6
Southwest 47:1,4
space 93:24 94:3
speak 32:11 39:15 103:5 109:15
speaks 88:23
specialty 9:7
specific 19:13 25:8 57:5 58:25 64:12,14,17 67:17 75:3 79:5 88:5 91:15 94:21 102:7,24
specifically 9:22 13:15 14:11 15:16 18:6 25:10 32:4,25 34:23 41:11 49:22 63:19 67:12 79:3 80:7 89:5
specifics 7:9,10 38:18 38:21 41:9,15 52:16 54:6 74:4 77:7 88:2,10
speech 117:7
spend 45:1
spray 16:25
spread 58:7
ss 120:1
St 8:10
stabilization 9:6
stabilize 9:3,9
stable 22:19 117:1,3
stack 93:25
stages 28:17
stagger 94:5,8
stamps 77:19
standard 8:21 46:20
standing 116:2
star 46:24,24,24
start 27:21 38:9 82:5
started 17:13 27:4 38:8 38:14
starts 55:18
state 36:18,23 78:9 92:7 96:12 119:15 120:1,5
statement 67:13,18,23 113:4
statements 113:1,15

**Atkinson-Baker Court Reporters**
**www.depo.com**

Page 9

114:9

states 1:1 2:1 43:24
static 35:16,25
status 117:10,18
stay 31:8,17
step 18:16,16 58:20
stepped 58:21
stimulant 53:4 55:6
86:22
stimuli 56:12 58:4
stint 10:24
stints 11:1
stipend 30:9 31:2
stop 56:1 58:2
strength 56:10
strengths 114:15
stress 78:6,8 82:16 83:8
83:12 84:6 85:16
88:19,21 92:1 93:4,5,6
93:8 97:21,24
stressed 82:15
stressing 56:3
stressor 83:5,17 85:2
stressors 84:1
strike 9:13 74:24
struggle 72:22,23 73:15
76:14,25 77:15 93:4
100:1,5 114:24,25
115:6
struggling 69:5 73:25
77:8,11 92:9,12 99:18
99:20,25 115:2,5
studied 17:5 90:19
studies 25:5,9,11 34:20
34:23 35:15 59:25
61:10,12 64:7,13
87:14,18,20 89:1
90:11 93:9 94:12,15
94:20,22 95:1,1,2
107:4 115:12
study 3:13 17:19,24
35:15 58:13,22,24
59:21 60:4 61:2,12
62:14,17,21,22,24
63:3,16 64:6,16,19
89:8,10,11,15 90:2,17
90:18 91:2,8,9 95:7
105:11
study-type 59:10
studying 17:14
stuff 48:4 59:12 117:25
stunned 57:19
stuns 57:18
SUAREZ 1:4 2:4
subject 31:19 41:10
subjects 17:1,9,21 89:9
89:17 90:10,21
submission 113:21
subscribed 120:17
subsequent 12:20 91:7
substance 106:18
sudden 75:15 77:11 82:3
suffers 88:24
suggested 95:7
suggestions 23:15
Suite 2:18 4:10
Summer 8:4,5
superhuman 56:10

supplement 114:4
SUPPLIED 3:22
support 47:15 52:21
114:5 115:11,12
sure 5:24 9:4,12,21 10:4
11:12 15:9 16:11 18:5
34:18 37:12 44:10
53:10 54:16 62:25
63:7 67:25 74:3 81:24
88:21 89:12 91:1
97:23 105:21 110:20
111:6 112:1,16
surface 116:3
surgery 10:24 11:1
102:14
surgical 6:3
surprise 98:7,9,10
surrogate 60:8,23 61:3
survival 49:7
sustain 35:8
sweating 56:7
sworn 5:6 113:1,4,15
sympathomimetic 55:7
86:2
sympathomimetically
78:11
symposium 31:5,12
34:19
symptoms 54:9,17,24
55:3 56:5,18 82:6
98:13,13
syndrome 15:4 17:8,15
23:13 31:10 53:2 55:2
82:14 91:17 92:7,11
92:15 114:6
synthetic 86:1,2
system 35:22 65:4 78:6
78:8 83:21 86:4 92:2
systems 55:23

---

**T**

take 18:16 28:15 31:12
36:9,10 48:21 56:7
59:2 62:6 65:7 73:24
74:2,3 96:14 107:23
taken 2:16 77:22 85:7
108:21 120:6
takes 33:20,23
talk 25:22 31:1,4,8,9
34:23 74:17 96:15
talked 51:2,17 52:1
107:19 108:1
talking 18:6 31:20 36:2,5
53:22 74:20 96:11,22
tangential 117:7,8
tased 14:13,17 57:7,12
58:5 60:2,6,24 61:4,13
61:16 64:10 71:4,7
72:5,9,16 78:5 83:4
87:17,25 88:8,15
100:8
taser 7:13 14:21 15:14
15:16,20 20:19,20
22:25 24:8 30:18 52:5
52:8,11,16,22 53:1,4,5
53:22 54:3,13 58:14
58:14 59:12,15,22
60:10,11,15 72:12

78:2,16 81:7 83:11
87:12,15,21 88:12
89:16,24 90:20,24
91:1,12,18,22 92:18
92:20 93:6,6 100:10
101:14 115:9,16,17,23
116:8
tasered 23:9 59:19,23,24
tasers 17:2 18:12 107:21
tasing 57:23 83:6 88:23
89:11
tasings 92:24
teach 34:2
technically 9:25
telephone 38:5 41:8
telephonically 38:3
tell 8:11 70:6 80:20 95:6
118:2
temperature 55:23
ten 47:25 48:1 57:15,16
57:19 61:4 64:10
72:16,18 83:4 84:5
87:17 98:20 100:8,10
tend 26:21 34:18 42:4
44:7,8,10 55:4,6 109:6
term 20:23 92:8 117:3
terrifying 96:9,18,22
97:4,19
test 82:16 86:10
tested 60:11 94:16
testified 5:6 27:12 48:7
52:2 57:4 99:1 108:9
110:24 116:19,22
testify 101:20,21
testifying 28:4 120:9
testimony 104:4,5
105:11 108:14 112:14
119:12
testing 25:5,12 57:5 59:8
tests 107:5
thank 112:18,20 118:16
THC 86:4,5,6
theoretical 20:19 115:16
theory 55:20
therapy 82:13
thereof 120:13
thin-walled 115:24
thing 17:24 20:21 21:2
24:23 39:13 53:6 73:3
88:9 107:18 108:6
things 9:12 18:7 19:6
25:18 31:18 32:16,19
33:13 34:1,4 37:19,22
39:4 42:6 55:22,24
59:10 60:20 67:19
81:20 88:3 99:6
101:16 105:14 109:7
116:4
think 7:2 11:25 12:6,6,8
12:19 13:18 14:10,15
14:20 18:24,25 19:5
19:12 20:4 21:19,19
21:24 22:10 23:25,25
24:1,20 28:14,21 29:9
29:10,11,11 32:2
35:21 37:12 38:3,8,15
39:3 43:11 51:1,1,17
51:24 52:10 53:6

58:25 59:1 60:14,18
63:1,18 64:6 65:3
71:25 73:8 78:7 79:22
79:22 80:3,21 90:3
101:17 108:1 110:13
111:5 117:15
thinking 14:6
third 22:18
thought 50:23 117:7
thousands 11:16 36:22
105:2 108:2
three 12:11 19:22 28:14
28:16 29:3,9 43:25
45:3 46:24
three-year 6:3
threshold 13:16
throat 54:20
thrombolytics 11:6
tickets 46:15
time 9:1 12:3 16:22 17:3
27:3,24 28:9,16 33:1
33:14,21 34:4 36:6,9
36:10,13 38:10 39:4
45:3,17,19,22 46:21
48:9,20 49:11 50:8
51:8 55:12 57:21 58:5
61:21 62:6,10 65:7
69:11,20 70:8,21
74:14 75:11,15 76:14
76:22 77:19 79:15,23
80:4 83:14 84:25
85:10,19 88:3,17
90:21 91:1 92:4 95:5
100:18 107:9,23 110:3
112:19 114:8 115:3
116:7 118:16,23 120:7
times 20:3 27:23 28:5,7
57:9,10 61:4,23,24,25
64:10 71:5,17 72:6,8
72:16 79:2,3 83:4
87:17,25,25 88:2,8,8
88:16 100:8,16
title 16:11 23:6
titled 89:15
today 40:20 41:19 45:12
70:6 110:10 111:23
112:14
top 37:8 69:10 86:6
92:12 114:20,20
topic 18:10,18 20:7
24:24 25:1 32:17 33:2
34:21 36:25 37:1
80:20
topics 18:13
torso 70:20,20,23,25
75:23
total 72:16,17 76:14
88:16 105:24 111:14
totaling 94:6
tough 20:11
toxicologist 86:16,19,20
trace 86:8
tracings 58:16
track 9:15
traditionally 45:19
training 8:14 30:16,20
30:24 58:12 59:4,11
101:13

transcardiac 115:23
transcribe 42:20
transcribed 107:12
120:11
transcript 113:23,25
118:18 119:10
transcription 120:13
transcripts 108:13
transcutaneous 11:4
transferred 10:9
transmitters 55:14
transport 13:3,17
transportation 46:18
47:6
transporting 14:9
transvenous 11:5
trauma 15:12,13,17
102:13
travel 30:25 46:8,10,13
46:21
treat 118:6
treated 11:9 14:13 15:18
82:11
treatment 9:10 10:8
23:14 98:5
trial 27:19 28:5,7 45:17
45:17 104:4 108:23,24
109:4,5,5,16
tried 35:16 39:8,9 95:6
trigger 100:10
trigger-pulls 72:18
triggers 55:15
trouble 44:11 74:1 103:9
true 97:20 119:13
truly 55:20
Truntz 66:4,6 68:17
70:16,22 71:12 113:5
trusted 44:19
try 46:1 49:14,19 69:13
72:25 73:21 75:24
80:19 95:8 96:3,3,4,4
trying 12:6 32:16 33:5
34:2 49:13,20 57:14
58:12,18 71:2 72:13
73:2 81:15,15 82:22
89:22 90:13 92:13
95:13
Tuesday 2:19 5:1
two 23:21 24:13,15
28:14,16 29:9 33:3,4
39:3 45:25 46:1 59:18
59:19 65:1 70:3 71:5
72:6,8 89:21,23 90:12
type 10:23 11:10,23
26:12 28:10 30:19,20
30:24 32:5 34:19,20
38:16 47:6 48:4 49:20
51:13 60:9 62:11
63:20 64:4 71:21 73:2
74:15 75:19 86:22
90:7,18 91:8 92:1,1,21
93:5 98:4 101:13
102:3 108:6 109:1
116:6 117:18
types 31:18 32:16 34:1
82:25
typical 36:1
typically 8:22 10:15,20

**Atkinson-Baker Court Reporters**
**www.depo.com**

16:16 34:16 47:1 55:5 64:16 67:19 110:2,7
**Tyson** 1:5 2:5 24:17 25:7 56:17 64:21 69:20 70:8 71:4,22,25 72:5,9 72:15,21 73:7,11,25 75:20 76:1,4,16,17,23 77:1,15,24 80:8 81:8 81:12 83:16 84:4 85:21,25 86:21 87:25 88:7 91:23 92:23 98:4 99:1,8,19 100:3,13 114:21 116:22 117:1 117:19 118:5,16
**Tyson's** 70:22,25 71:14 75:5 81:25 83:5,12 87:2,16 92:1 98:16

**U**

**Uber** 47:8
**UberX** 47:9
**UCSD** 5:16 6:4 30:10,14
**ultimate** 20:8 22:5
**ultimately** 10:15 14:20 19:10 82:16
**unable** 95:11 96:16 97:2
**unaware** 74:25 98:7
**unconscious** 96:21
**undergone** 101:13
**undergraduate** 5:24
**undersigned** 120:4
**understand** 11:12 58:14
**understanding** 17:8 90:5 115:1
**understood** 75:21
**undertreated** 53:3 56:25 82:4 117:17,20
**UNITED** 1:1 2:1
**university** 5:16 6:1 30:6 30:8,12
**unrelated** 15:7
**unresponsive** 71:15,23 76:11,17 77:2,16,24 100:14
**untreated** 53:3 55:9
**upper** 94:14,17
**uptake** 55:13
**usage** 115:9
**use** 3:14 11:13,24 12:2,5 12:7,8,9,13,20,21 14:21 15:7,19 19:11 25:1,2 42:5 45:25 50:9 50:10,23 51:20 52:5,8 52:11,24 53:11 54:10 55:6,16 65:6 83:11 87:7 88:12 101:11 102:8,15 104:20
**use-of-force** 14:10
**uses** 17:10
**usually** 28:8 37:17,22 38:9 41:12 44:7 49:14 49:18 79:5 83:2 97:5 105:3 116:1

**V**

**V-i-l-k-e** 5:14
**varies** 32:24

**various** 28:17 71:17,17
**varying** 17:10
**ventilate** 93:12
**ventilated** 33:11
**ventilating** 95:25 97:13
**ventilation** 16:24 32:15 33:6,24,25 34:12 70:12 74:9,16
**ventilatory** 33:20 69:14 69:23,23 75:9,13,17 94:13
**ventricular** 116:5
**verbally** 41:2
**verbatim** 120:9
**version** 107:12
**versus** 7:15,18 9:20 25:16 27:1,9 29:7 36:12,22 47:19 48:6 87:25 88:8 94:23 95:15,15,16 96:11
**verus** 39:13
**vetted** 22:11
**videotape** 66:12
**Vilke** 1:16 2:16 3:2 5:5 5:14 112:9 119:8,18
**viral-like** 54:22
**visit** 9:23 117:1
**vocalizing** 33:15
**voluntary** 58:14
**volunteered** 58:16 90:14
**vs** 1:7 2:7

**W**

**Wagner** 113:9
**Wait** 24:1
**walk** 99:9
**wall** 116:3
**want** 8:19 18:15 23:4 33:7,8,15 34:14 45:24 47:9 65:12 75:9 90:11 95:8 103:25 118:20
**wanted** 90:25 91:9
**wants** 21:6 110:3
**warrant** 10:18
**wasn't** 42:23 50:15 54:13 76:8 98:12 99:19 111:6
**watch** 15:8
**way** 17:11 19:19 23:5 39:12 73:3,9 90:24 94:12 105:4 114:1
**ways** 9:19
**we're** 34:1 53:25 55:24 74:20,23,25 96:19,20
**we've** 14:8 93:16 101:17 104:3
**weigh** 35:5
**weighed** 69:12
**weighing** 84:19
**weighs** 35:1
**weight** 32:14,20,23 33:1 33:3,5,16,17,18 34:7 34:11,17 35:2,8,12,12 35:16,24,25 36:6,13 48:16 49:8,18 62:2,3,4 62:15,19 63:5,9,15 64:10 68:1,4,7,10,13 68:16,19,24 69:7,13

74:20 75:10,12,16,19 75:21 93:11,20,24 94:1,1,5,9,22
**weights** 17:1,2 33:17 35:22 63:8 69:16 71:16 74:18 75:1,3 84:22,24
**Weiss** 4:8 7:20 37:10 38:6 44:14,21
**Wellbutrin** 118:8,11
**went** 5:25 27:5 32:9 37:24 39:10 42:15 69:8,21 70:8 75:20 77:1,8,14,23 82:16
**weren't** 17:4 34:5 37:20 93:19
**WHEREOF** 120:17
**White** 23:11
**wiggle** 73:2
**wiggling** 35:13
**wiggling-dynamic** 35:25
**WITNESS** 3:2,19 51:17 70:10 73:19 84:9 89:20 99:12,23 112:20 114:14 115:5,22 116:14 117:23 118:21 120:17
**witness'** 114:9
**witnesses** 85:12 120:8
**women** 90:15
**wool** 50:7,10
**word** 11:9,16,17 99:3
**wording** 114:18
**work** 16:11 18:5 25:23 26:3,7,18 29:15 30:6,7 30:8,9,10 32:13 37:1 38:9 43:10 45:20,21 59:14 78:19,24 110:25 111:15
**worked** 26:10 45:25 101:7
**working** 13:23 23:13 26:9 27:5 30:15 43:5 55:25 59:11,11 109:13
**workload** 48:3
**works** 59:9
**wouldn't** 38:20 48:19 73:1 74:12 83:7 98:10
**wound** 53:5
**wounds** 14:8 54:8
**write** 19:25 24:21 42:4 42:22 72:20 76:14
**written** 18:14 22:13,14 67:14 104:12 105:5 107:18
**wrong** 19:10
**wrote** 42:16
**www.depo.com** 1:23

**X**

**X** 36:13 47:14
**Xavier** 67:6

**Y**

**yeah** 19:18 24:1,12 28:2 28:2 29:3 73:19 99:12 105:14 108:16 117:23 118:7

**year** 6:2 7:3 11:22 12:1 31:13 47:21,24 48:1 50:18 57:12,13
**years** 5:21 8:15 11:8 12:11 13:6 14:12 17:25 18:2 29:3,25 50:19 57:15,22 98:20 104:14 108:10,15 109:20 110:12,18,25 111:17
**yelling** 33:14,25
**young** 98:11,12

**Z**

**zero** 45:5 111:19
**zoology** 5:25

**0**

**1**

**1** 3:11 39:22,23 43:24 72:20 76:13 104:8,10 105:7,13
**1,000** 45:13,14,18 111:22
**1,500** 43:25
**1/2** 76:25 87:17
**10** 11:19,20 27:23 50:19 87:25 88:8,16 109:19 110:21,22
**100** 31:23 63:3,10 87:25 88:2
**102** 3:14
**103** 3:15
**106** 3:16
**11** 110:23
**11:58** 2:19 5:2 118:23
**112** 3:7
**11398** 1:24 2:20 120:24
**116** 3:6
**118** 43:19 105:12
**118-page** 40:2
**12** 50:19 111:3,5
**125** 35:5
**125-pound** 36:12
**13** 104:8 111:14
**140** 24:20
**146** 24:9,10,21
**148** 23:25 24:10,23
**15** 11:19,20 47:22 50:19
**156** 24:6
**16-62215-CIV-** 1:7 2:7
**17** 29:12
**18** 29:12
**180** 84:19
**181** 24:1
**19** 44:23 45:6,8 105:23 112:4
**1900** 4:10
**1992** 6:2
**1999** 6:18 25:14 28:6 29:23 51:3 78:19,24
**1st** 38:9,14,14

**2**

**2** 3:12 40:22 42:1,9,10 42:24 65:12 102:8

105:5 117:6
**20** 14:1 27:23 29:5,6,20 29:21,24 63:18,20 88:8 104:14 111:1 119:15
**200** 2:18 4:10 36:4
**200-pound** 36:12
**2011** 3:13 58:22 89:8,11 89:15 90:17
**2014** 56:14,19,22 68:2,5,8 68:11,14,17 75:2 83:13 116:23 117:1,4 117:6,21 118:13
**2017** 110:1
**2018** 1:18 2:19 5:1 7:4 39:19 40:8,11,14 101:22 105:8 113:1,22 120:20
**210** 84:19
**22** 102:8
**220** 93:16
**225** 62:5 93:24 94:23
**23** 66:12
**24** 1:18 2:19 5:1 10:14
**25** 5:21 8:15 11:8 14:12 17:25 18:2 53:24 54:7 63:18,20 79:15,23 120:20
**250** 93:13 94:6,17,23 95:7
**250-pound** 93:10
**255** 4:5
**27** 56:19 87:3 90:15
**275** 94:24
**27th** 56:22 68:2,5,8,11 68:14,17 75:2,5 83:12 118:13
**288-3376** 1:22
**2nd** 117:21

**3**

**3** 3:13 89:15,18
**30** 48:5 54:7 64:22 76:15 79:15
**30-year-old** 14:1 41:10
**30/70** 27:5
**300** 36:4 94:24
**305** 4:6
**32** 90:15
**33134** 4:6
**33301** 4:10
**35** 53:24
**39** 3:11

**4**

**4** 3:14 102:17,18 103:19 103:22 105:8 107:4
**4/8/18** 3:16
**40** 18:10 19:20 24:23 48:15
**400** 35:19
**42** 3:12 89:9 90:3,6,14 90:14
**476-7400** 4:6
**48** 10:15
**4th** 39:18 40:8,11,14,17 101:22 112:14,25 113:21

**Gary Michael Vilke, M.D.**
**April 24, 2018**

**Atkinson-Baker Court Reporters**
**www.depo.com**

**5**

**5** 3:5,15 90:15 103:13,15
  103:19,22 107:8
**5,000** 41:24
**50** 18:10,17,19 19:20
  24:23 51:9,9,12 52:4
  62:7,9,20 63:10
**50/50** 27:6
**500** 35:19 36:8 43:16
  45:14,23
**54** 72:17,19 88:16

**6**

**6** 3:16 76:15,25 87:17
  106:2,3 107:10,14
  117:4
**60** 18:17,19

**7**

**7** 72:4,20 76:13 86:8
  107:25 114:17
**70/30** 27:6
**75** 51:9,12 52:4
**763-4242** 4:11

**8**

**8** 108:8
**800** 1:22
**89** 3:13

**9**

**9** 108:13
**9,500** 105:24 111:21
**9:04** 2:18 5:2
**90-plus** 27:11
**95** 26:22
**954** 4:11
**9655** 2:17
**99** 63:7

**Gary Michael Vilke, M.D.**
**April 24, 2018**