UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ,

    Plaintiff,

v.

CITY OF HOLLYWOOD,

    Defendant.
_____/

**CITY OF HOLLYWOOD'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS**

    Defendant, City of Hollywood ("the City"), by its undersigned counsel, and in accordance with Local Rule 56.1, hereby files this Response to Plaintiff's Statement of Facts. ECF No. 102.

1. Admitted in part and denied in part. The City specifically denies that its "officers" (who are not identified by Plaintiff) were "on notice" that Daniel Tyson was "mentally ill and in need of medical treatment." As the City's police officers explained, Signal 20 calls are often misreported. *See, e.g.*, ECF No. 103-16 at 41; ECF No. 103-11 at 83; ECF No. 103-21 at 52. Additionally, many of the officers testified that they were unaware of Tyson's alleged mental illness or need for medication because they responded to a call reporting an officer in distress, rather than a Signal 20. ECF No. 103-21 at 99–100; ECF No. 103-22 at 91–93; ECF No. 103-23 at 60, 65–66; ECF No. 103-24 at 61–62. When Tyson's property owner, Xavier Lesmarie, called the police, he told the Broward Sherriff's Office (BSO) dispatcher that Tyson was manic depressive and "needs medication." ECF No. 103-9 at 41, 72–73. Lesmarie claims to have learned this information from John Collette, Tyson's romantic partner. *Id.* at 16, 41–42. However, Collette testified that he doesn't think he told Lesmarie that Tyson needed medication because that is something Collette did not know. ECF No. 103-5 at 23–24, 29, 44. Although Tyson's friend, Jessica Auerbach, also called the police, the information she reported was not relayed by BSO dispatch to the City's police officers. *See* ECF No. 103-12. When Auerbach called the police, the police officers were already on scene dealing with a violent,

uncooperative Tyson. ECF No. 103-4 at 94–95. Tyson, in fact, was not diagnosed as "manic depressive" at the time of the incident. *See infra* ¶ 46.

2. Admitted in part and denied in part. The City specifically denies that Tyson was standing outside when Officer Ramirez arrived at his apartment. Officer Ramirez testified that when he arrived on scene, Tyson was not outside and Officer Ramirez began speaking with a lady. ECF No. 103-16 at 91–92; *see also* ECF No. 103 ¶¶ 19–26. That lady, Leonarda Moore, corroborated his testimony. *See* ECF No. 103-7 at 36–39. Additionally, the City denies that Tyson was holding an object when Officer Ramirez arrived. After Officer Ramirez arrived, Tyson attempted to rip a shutter off the wall. *Id.* at 39. When that failed, Tyson grabbed a black metal sundial and smashed it into pieces over Officer Ramirez's head. *Id.* at 39–40.

3. Admitted in part and denied in part. The City specifically denies that its police officers "were exclusively in contact with" Tyson after he was placed in restraints. City paramedics and Memorial Regional Hospital staff were also in contact with Tyson after he was placed in restraints. *See* ECF No. 103-34 at 3. The City also denies that the officers applied "their full body weight" to Tyson if Plaintiff is suggesting that the entire body weight of each officer was on Tyson uninterrupted "until he was discovered to be unresponsive." This would be physically impossible unless each officer was standing on Tyson, for which there is no evidence. Moreover, the event was dynamic; both Tyson and the officers were constantly moving and adjusting their positions. *See* ECF No. 103 ¶¶ 43–46, 55, 67–68, 73–74, 78, 80; ECF No. 103-24 at 82–83.

4. Admitted. *See also* ECF No. 103 ¶ 47.

5. Admitted. *See also id.* ¶ 52.

6. Admitted. Officer Truntz also testified that at two points during the dynamic event, he stopped applying any pressure to Tyson's body. *Id.* ¶ 51.

7. Admitted. *See also id.* ¶ 48.

8. Admitted. *See also id.* ¶ 49.

9. Admitted. Additionally, Tyson was 5'7", 220 pounds, "large build," with super human strength. *Id.* ¶¶ 32, 54–55.

10. Denied. Officer Ramirez deployed his Taser in probe mode one time as Tyson was charging at him while wielding the sundial in a threatening manner. *Id.* ¶¶ 27–30. However, this Taser deployment was ineffective because one of the prongs missed contact. *Id.* ¶ 30. Officer

Pantaloukas also deployed his Taser one time for nine seconds in probe mode. *Id.* ¶ 38. However, this deployment was ineffective because the prongs were too close together. *Id.* SOP 201 does not prohibit the deployment of a Taser for nine seconds. *See* Ex. 1 at 116, 121, 126–27; ECF No. 103-38 at 654–65. Officer Pantaloukas deployed his Taser eight more times in drive stun mode. ECF No. 103 ¶¶ 40, 59. Although each drive-stun deployment was for five seconds, it is impossible to know for certain whether Tyson "was Tased" for that entire duration because the front of the Taser must maintain physical contact to have an effect. *See* ECF No. 103-20 ¶¶ 8(2), 15. It is highly unlikely that the Taser maintained full contact to Tyson's leg for the entirety of the five-second deployments considering Tyson was violently resisting arrest by constantly flailing around and kicking during the encounter. *See* Ex. 1 at 98–99, 109, 117, 123; ECF No. 103 ¶¶ 43–46, 55, 67–68, 73–74, 78, 80.

11. Denied. Plaintiff cites no evidence to support her statement that "officers did not stop and evaluate the situation before each deployment of the Taser on Daniel." Officer Pantaloukas specifically testified that he considered Tyson's mental illness as a situational factor. ECF No. 103-11 at 51. Additionally, there is no evidence that Officers Ramirez and Pantaloukas inflicted any injury to Tyson "by continuing to Tase him" *See* ECF No. 104 at 5–7. There is also no evidence that Tyson was in pain or that he could not breath due to the application of pressure to Tyson's back. *See* ECF No. 103 ¶ 57. Finally, although the officers' actions were fully consistent with SOP 200 and 201, this is not an issue before the Court. Ex. 1 at 126–27.

12. Denied. *See supra* ¶ 3. Further, Plaintiff cites to no evidence to establish that the officers' application of physical pressure prevented Tyson from breathing. In fact, the officers testified that there was no indication that Tyson could not breath during the incident. ECF No. 103 ¶ 57. Following the incident, three medical doctors separately analyzed Tyson's cause of death, and none of them found evidence that Tyson could not breath. *See* ECF No. 101-11 at 32–33; ECF No. 103-36 at 7–10; ECF No. 103-17 at 1–6.

13. Denied. Officer Karl testified that Tyson was on his side at some points during the encounter. ECF No. 103-24 at 72. Additionally, Tyson was constantly flailing around, rolling, and moving until he became unresponsive. *See* ECF No. 103 ¶¶ 43–46, 55, 67–68, 73–74, 78, 80. Due to his violent resistance and clear intent to harm others, the officers did not have the opportunity to sit Tyson up. ECF No. 103-23 at 81; ECF No. 103-22 at 168–69. They did not "fail" to do so.

14. Admitted. *See also* ECF No. 103 ¶¶ 70–72.

15. Admitted in part and denied in part. Moore did not testify that the officers were "using their entire bodies and knees." Moore stated that she "saw five or six -- five or six that were just trying to contain him." ECF No. 103-7 at 69.

16. Admitted in part and denied in part. Tyson was "able to" stand and escape, despite being placed in leg restraints. ECF No. 103-11 at 122–23; ECF No. 103-14 at 88. However, the City does not allege that Tyson did, in fact, stand or escape.

17. Admitted.

18. Admitted in part and denied in part. Plaintiff mischaracterizes Dr. Michael Bell's testimony. When Dr. Bell was asked whether exercise alone can cause abnormal changes in heart rhythm or the heart's electrical activity for a patient with severe coronary heart disease, such as Tyson, Dr. Bell testified, "that would be one of the complications when oxygen demand exceeds oxygen supply because of the narrowing of the coronary arteries." ECF No. 101-2 at 39. When asked whether he would expect to see pulseless electrical activity (PEA), he stated, "Not so much." *Id.* at 40. However, he did not testify that it is medically impossible, as Plaintiff suggests. Indeed, three other doctors, including Plaintiff's medical expert and an independent coroner, concluded that Tyson's severe coronary atherosclerosis contributed to his death, notwithstanding the known presence of PEA. ECF No. 103-17 at 6; ECF No. 103-36 at 13–17; ECF No. 103-37 at 5. There is also evidence (again, from Plaintiff's own medical expert) that Tyson's sickled red blood cells may have contributed to Tyson's death. ECF No. 103-37 at 4.

19. Admitted. However, Dr. Wohlgelernter's opinion is unreliable and should be stricken. *See* ECF No. 101 at 13–18.

20. Admitted in part and denied in part. *See* ECF No. 103 ¶¶ 112–28. As Officer Pantaloukas testified, "we're not here to go hide in our cars if something isn't right . . . . [I]f I was sitting in my car, who am I going to help or who am I going to call for help? But a lot of times we have to deal with people or situations that are scary, and that's just what we signed up to do." ECF No. 103-11 at 86–87; *see also* Ex. 1 at 130–31. In this case, there is no evidence that Officers Ramirez or Pantaloukas, who had already undergone extensive training, had time or ability to wait for their field-training officers (FTO) without putting themselves or others at risk. When Tyson emerged on his balcony, he was already irate and presented a risk of safety to himself, his neighbors, and others. ECF No. 103 ¶¶ 19–26. Officer Ramirez apparently made a prudent

decision to remain in the courtyard a safe distance from Tyson until his back up officer arrived. *See id.*; ECF No. 103-16 at 110. However, prior to his back up arriving, Officer Ramirez was inexplicably and violently attacked by Tyson. *Id.* at 115; ECF No. 103 ¶¶ 27–35.

21. Denied. *See Supra* ¶ 11. Officer Kerns immediately responded to the scene as an FTO for Officer Ramirez. ECF No. 103-14 at 48–49. Officer Kerns was not present when Officer Ramirez deployed his Taser, *see id.* at 51, and there is no evidence that Officer Kerns knew that Officer Pantaloukas deployed his Taser for nine seconds or could prevent him from doing so. Further, each Taser deployment while Officer Kerns was on scene was entirely justified due to Tyson's violent physical resistance. *See* ECF No. 103 ¶¶ 43–65, 67–68, 73–74; Ex. 1 at 126–27.

22. Denied. *See supra* ¶ 13.

23. Denied. *See supra* ¶¶ 21–22.

24. Denied. Plaintiff did not plead an inadequate investigation and discipline claim against the City. In any event, the City adequately trains, supervises, and disciplines its employees on the appropriate and reasonable use of force, particularly the use of a Taser, on the mentally ill. *See* ECF No 103 ¶¶ 93–128.

25. The City admits that the Gruber report includes the quoted language, but denies the content of that language and Plaintiff's interpretation or extension of that language. The City further denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.

26. The City admits that the Gruber report includes the quoted language, but denies the content of that language and Plaintiff's interpretation or extension of that language. The City further denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.

27. Denied. *See also supra* ¶ 25.

28. Denied. *See also supra* ¶ 25.

29. The City admits that the Gruber report includes the quoted language, but denies the content of that language and Plaintiff's interpretation or extension of that language. The City further denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.

30. The City admits that the Gruber report includes the quoted language, but denies the content of that language and Plaintiff's interpretation or extension of that language. The City further denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.
31. Admitted.
32. Admitted in part and denied in part. There is no evidence of record that "[t]he City concluded that in every single incident in 2013, the officers acted within City policy and no officer was disciplined." To support her statement, Plaintiff cites to 546 pages of use-of-force reports in general. However, in the preceding paragraph, Plaintiff stated that these types of "[r]eports do not indicate whether any of these incidents resulted in any discipline." ECF No. 105 ¶ 31. Additionally, Plaintiff's statement regarding fact-finding investigations is highly misleading and inaccurate. A fact-finding investigation is "[a]n initial investigation conducted by the Internal Affairs Unit to determine if the complaint is an allegation of misconduct or a misunderstanding of law, departmental written directive and/or procedure." ECF No. 103-38 at 140. In 2013, "there were 115 Fact Finding Investigations that revealed there was no violation of the law, departmental written directive and/or procedure." ECF No. 105-32 at 3. These "[i]nvestigations were classified as Non Complaints, Withdrawn or No Return Contact from Complaint." *Id*. If warranted, a fact-finding investigation will be elevated to a more formal review. *See* Ex. 1 at 20–22. The Annual Report Plaintiff cites to did not state that there was no discipline for every incident in 2013.
33. Denied. There is no record evidence to support Plaintiff's assertions, and the City specifically objects to this Court considering materials outside of the Court record.
34. Denied. A fact-finding investigation is "[a]n initial investigation conducted by the Internal Affairs Unit to determine if the complaint is an allegation of misconduct or a misunderstanding of law, departmental written directive and/or procedure." ECF No. 103-38 at 140. In 2014, "there were 267 Fact Finding Investigations that revealed there was no violation of the law, departmental written directive and/or procedure." ECF No. 105-34 at 3. These "[i]nvestigations were classified as Non Complaints, Withdrawn or No Return Contact from Complaint." *Id.* If warranted, a fact-finding investigation will be elevated to a more formal review. *See* Ex. 1 at 20–22. The Annual Report Plaintiff cites to did not state that there was no discipline for every incident in 2014.

35. Denied. *See also supra* ¶ 25.
36. Admitted. However, the City denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.
37. Denied. *See also supra* ¶ 25.
38. Denied. *See also supra* ¶ 25.
39. The City admits that the Gruber report includes the quoted language, but denies the content of that language and Plaintiff's interpretation or extension of that language. The City further denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.
40. The City admits that the Gruber report includes the quoted language, but denies the content of that language and Plaintiff's interpretation or extension of that language. The City further denies that the Gruber report is admissible as evidence, that its content could be rendered into admissible form, and that it has any relevance to this case.
41. Admitted.
42. Admitted.
43. Admitted.
44. Admitted.
45. Admitted.
46. Admitted in part and denied in part. At the time of his death, Tyson was only diagnosed with schizoaffective disorder, bipolar type. ECF No. 103-3 at 16. Dr. Pierre Pean, Tyson's treating psychiatrist, specifically denied that Tyson was formally diagnosed with any other mental disorders. *Id.* at 20.
47. Admitted.
48. Admitted.
49. Admitted in part and denied in part. Dr. Pean testified that poor compliance of medication would cause Tyson to decompensate from his mental illness, which could result in a manic state. *Id.* at 22, 42.
50. Admitted. Tyson's behavior was also consistent with Excited Delirium Syndrome (ExDS), a severe manic state that is associated with patients who have psychological disorders and fail to take their medication. ECF No. 103-36 at 13–17; ECF No. 103-37 at 3, 5.

51. Admitted in part and denied in part. The City specifically denies that Tyson was "out of touch with reality." Tyson knew exactly what he was doing when he physically attacked and violently resisted the officers because he did not want to be Baker Acted. *See infra* ¶¶ 55, 60–65, 70, 74. Although Tyson screamed unintelligible, incoherent speech at some points during the encounter, he also was able to walk home by himself, recognize others, and communicate with others. *See infra* ¶¶ 60, 63–65, 70, 74.

52. Admitted. However, Officer Kern's "suspicions" are immaterial and based upon information learned after the incident.

53. Denied. A urine drug screen following Tyson's death was positive for opiates, amphetamine, and cannabinoids. ECF No. 103-37 at 3. Moore also observed Tyson drinking alcohol the morning of his death. ECF No. 103-7 at 22.

## ADDITIONAL FACTS

54. Tyson had a history of being Baker Acted for his mental illness. ECF No. 103-4 at 19–20, 28; ECF No. 103-5 at 41.

55. As a result of his past Baker Act experience(s), Tyson "hated the hospital" and was afraid of relapsing. ECF No. 103-4 at 21; ECF No. 103-5 at 64.

56. Tyson was a self-proclaimed "magic practitioner" and psychic. ECF No. 103-4 at 25, 32. Approximately six weeks prior to his death, Tyson suggested that he was tired of living and predicted that he would not live past thirty years of age. *Id.* at 97.

57. In the weeks and days leading up to his death, Tyson began to exude symptoms of his mental illness, such as by acting more "erratically" and talking more about magic and other "fantastic things." *Id.* at 29. However, he still made sense, especially if you knew him. *Id.* at 61.

58. The night before his death, Tyson violently attacked his romantic partner of ten years, John Collette, because he was upset at Collette. *Id.* at 57; ECF No. 103-5 at 31.

59. Later that night, Tyson stayed at his friend, Jessica Auerbach's house, where she observed him get progressively worse. ECF No. 103-4 at 51.

60. Auerbach knew that Tyson would resist going to see a doctor, so she tried to get Tyson to sleep through it, as he had done in the past. *See id.* at 47, 51–52, 62–63, 65. Auerbach even told Tyson that if he did not get some rest, then she was going to have to take him to the hospital. *Id.* at 59–60. Tyson responded, "I'm not going to . . . . Please, I'll be fine. I'm not going to the hospital." *Id.* at 60.

61. Auerbach was Tyson's best friend. *Id.* at 12. All the years she knew him "[Tyson] would tell [her] about his past and the one thing that he made so clear to [her] was that he never ever was to go back to the mental hospital no matter what, because it was just a nightmare for him." *Id.* at 60.

62. That night, Tyson communicated to Auerbach that he had stopped taking his medication and was "aware that he would have to go somewhere." *Id.* at 59, 71. Further, Plaintiff admitted that at the time of his death, Tyson had not been taking his medication, as prescribed. Ex. 2 ¶ 15–16.

63. In the morning of October 27, 2014, despite her concerns, Auerbach let Tyson walk home by himself, which he did. ECF No. 103-4 at 65–67.

64. In the early afternoon of October 27, 2014, Auerbach went to check on Tyson at his apartment. *Id.* at 68. The apartment was "trashed" from broken objects, and Tyson was naked except for one boot. *Id.* At that time, Tyson had enough self-awareness that when he and Auerbach made eye contact, they both just laughed. *Id.* at 69.

65. Although Auerbach believed that Tyson was not thinking "rationally," she knew that Tyson recognized her. *Id.* at 74–75. She expressly told him, "You're running out of time to not get the hospital involved." *Id.* at 70. But then she left Tyson alone his apartment and returned home to call Tyson's mom. *Id.* at 73–74.

66. Prior to calling the police, Lesmarie told Collette what was happening with Tyson and requested assistance; however, Collette expressly declined to help. ECF No. 103-9 at 31.

67. Several concerned neighbors finally requested police assistance due to Tyson's disturbing behavior. ECF No. 103 ¶¶ 6, 10, 15–16.

68. While Officer Ramirez was on scene speaking to a neighbor, Tyson appeared on his balcony naked and already irate. *Id.* ¶ 20.

69. With the exception of the word "kingdom," Tyson was screaming and mumbling words that Officer Ramirez could not understand. ECF No. 103-16 at 102.

70. Officer Ramirez tried to deescalate the situation by speaking with Tyson from a safe distance away. ECF No. 103 ¶ 21. Officer Ramirez calmly informed Tyson that he should not be outside naked. *Id.* ¶ 22. However, Tyson responded, "no, no, do you know who I am?" *Id.* ¶ 23.

71. Although Officer Ramirez remained very polite and professional, Tyson charged at Officer Ramirez and struck him over the head with a blunt metal object. *Id.* ¶¶ 25–31. As a result,

Officer Ramirez received a significant laceration to his head, which required six staples to close and left him in pain for multiple days. ECF No. 114 (sealed photographs); ECF No. 103-15 at 34; ECF No. 103-16 at 30–31, 181. Following the attack, Officer Ramirez had to see a doctor several times due to headaches. ECF No. 103-15 at 35. Officer Ramirez now has a noticeable permanent scar on his head. *Id.*

72. After Officer Ramirez was violently attacked by Tyson, he and several other officers attempted to subdue Tyson in the courtyard grass. ECF No. 103 ¶¶ 32–75. Each officer was on duty and wearing a police uniform. ECF No. 103-16 at 42; ECF No. 103-18 at 2; ECF No. 103-19 at 2; ECF No. 103-21 at 24; ECF No. 103-22 at 13; ECF No. 103-23 at 49; ECF No. 103-24 at 45.

73. Over the next ten minutes, Tyson repeatedly attempted to physically harm the officers and continuously resisted their efforts to control him with violence. *See* ECF No. 103 ¶¶ 32–81. Although the officers pleaded with Tyson to calm down and stop resisting, Tyson repeatedly punched the officers, kicked the officers, spat at the officers, and attempted to escape until the moment Tyson suddenly became unresponsive due to cardiac arrest. *See id.*

74. During the encounter, Tyson was able to communicate. ECF No. 103-11 at 117. For example, a few times after Officer Pantaloukas deployed his Taser, Tyson stated, "okay, okay," as if he was willing to stop resisting. *Id.* at 115. Tyson did not appear in pain; only agitated, angry, and willing to inflict harm to anybody. ECF No. 103-14 at 74; ECF No. 103-23 at 82; ECF No. 103-24 at 96–97.

75. Despite immediate medical attention from paramedics who were already on scene, Tyson ultimately died at the age of thirty. ECF No. 103 ¶¶ 81–83; ECF No. 103-17 at 2.

76. A subsequent autopsy revealed that Tyson had multiple very severe heart conditions, which, independent of one another, could lead to sudden cardiac arrest. *Id.* ¶ 85.

77. Both Plaintiff's and the City's medical experts also agree that Tyson was suffering from ExDS, which can also lead to sudden cardiac arrest by itself and, in fact, did contribute to Tyson's death. *Id.* ¶ 87.

78. Tyson's ExDS was caused by medication mismanagement of his psychological disorder. *Id.* ¶ 89.

79. Dr. Pean thought Tyson was complying with his medication regimen. ECF No. 103-3 at 33–34. Dr. Pean did not instruct or approve Tyson to stop taking his medication. *See id.* at 27 ("I would not definitely stop something because if I knew stopping would create an issue.").

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail on August 2, 2018 on all counsel of record on the attached Service List.

        Respectfully submitted,

        WEISS SEROTA HELFMAN
        COLE & BIERMAN, P.L.
        *Counsel for Defendant City of Hollywood*
        200 East Broward Boulevard, Suite 1900
        Fort Lauderdale, FL  33301
        Telephone:  (954) 763-4242
        Telecopier:  (954) 764-7770

        By: */s/ Adam M. Hapner*
            DANIEL L. ABBOTT
            Florida Bar No. 767115
            Primary email: dabbott@wsh-law.com
            Secondary email: pgrotto@wsh-law.com
            ADAM M. HAPNER
            Florida Bar No. 112006
            Primary email: ahapner@wsh-law.com
            Secondary email: mboschini@wsh-law.com

## SERVICE LIST

CASE NO.: 0:16-CIV-62215-DIMITROULEAS/SNOW

| | |
|---|---|
| **Joseph J. Kalbac, Jr., Esq.**<br>**Stephanie A. Casey, Esq.**<br>**Denise H. Georges, Esq.**<br>**Lindsey Lazopoulos Friedman, Esq.**<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, Penthouse<br>Coral Gables, Florida 33134<br>Telephone: 305-476-7400<br>Facsimile: 305 476-7444<br>Email:eservice@colson.com;<br>nicky@colson.com; mabel@colson.com;<br>denise@colson.com; scasey@colson.com;<br>jkalbac@colson.com;<br>lindsey@colson.com<br><br>*Attorneys for Plaintiff* | **Daniel L. Abbott, Esq.**<br>**Adam M. Hapner, Esq.**<br>WEISS SEROTA HELFMAN<br>COLE & BIERMAN, P.L.<br>200 E. Broward Blvd., Suite 1900<br>Fort Lauderdale, FL 33301<br>Telephone: (954) 763-4242<br>dabbott@wsh-law.com<br>ahapner@wsh-law.com<br><br>*Attorneys for Defendant City of Hollywood* |