UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as Personal
Representative of the Estate of DANIEL TYSON,
deceased,

        Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida Municipal
Corporation,

        Defendant.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT CITY OF HOLLYWOOD'S
MOTION TO PRECLUDE EXPERT WITNESS TESTIMONY**

    Plaintiff, JEAN SUAREZ, individually, and as Personal Representative of the Estate of DANIEL TYSON ("Plaintiff"), files this response in opposition to Defendant City of Hollywood's (the "City" or "COH") motion to preclude the expert witness testimony of Roy Taylor, M.S., Mark Shuman, M.D., M.S., and Daniel Wohlgelernter, M.D., F.A.C.C.

### INTRODUCTION

    On October 27, 2014, Daniel Tyson was confronted by COH police officers while standing outside of his apartment naked and seemingly talking to the air and to the trees. In six minutes and thirty seconds, COH police officers tased Daniel ten times, even after he was handcuffed and leg shackled while in a prone position. One of the tasings was for a continuous nine-second period, in violation of COH policies and procedures. During this six-and-a-half-minute period, four or five police officers bore the weight of their bodies on Daniel. Police officers testified that they got off of Daniel's body when they realized he was no longer

breathing and unresponsive; his lips were blue. When paramedics evaluated Daniel approximately three minutes later, they found he was pulseless, a condition that remained unchanged until he was pronounced dead about thirty minutes later.

The City seeks to exclude the testimonies of Roy Taylor, M.S., Mark Shuman, M.D., M.S., and Daniel Wohlgelernter, M.D. The City does not set forth any serious disagreements with the methodologies applied by these experts. Rather, the City disagrees with the expert's conclusions. Perceived weaknesses in the underpinnings of an expert's opinion, however, go to its weight, not its admissibility.

## LEGAL STANDARD

In determining the admissibility of expert testimony, a district court must consider whether: (1) the expert is qualified to testify competently as to the subject matter he intends to address; (2) the method employed by the expert is sufficiently reliable; and (3) the testimony assists the trier of fact to comprehend the evidence through the application of the witness's expertise. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd.*, 326 F. 3d 1333, 1340-41 (11th Cir. 2003).

"When evaluating the reliability of scientific expert opinion, the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.'" *Frazier*, 387 F.3d at 1261-62 (quoting *Daubert*, 509 U.S. at 592-93). In assessing the reliability of scientific opinion or non-scientific, experience-based testimony, a court must consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id*.

2

at 1262. "[I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id*. at 1261 (quoting Fed. R. Evid. 702 advisory committee note (2000)) (internal quotations omitted)).

A court must also determine whether the expert testimony will assist the jury. Expert testimony is admissible under this requirement "if it concerns matters that are beyond the understanding of the average lay person." *Id*. at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262-63.

### A. Roy Taylor Should Be Permitted to Testify on Police Policies, Training, and Use of Force.

#### 1. Mr. Taylor is Qualified.

The City contends—without providing any further support—that Mr. Taylor "is *arguably* not qualified to offer an expert opinion regarding the City's policing policies and procedures." Mot. at 7 (emphasis added).[1] A motion filed in federal court should apprise the opposing party of what the movant's arguments actually are, not what they could be. *See W. Sur. Co. v. Steuerwald*, 16-61815-WPD, 2017 WL 5248499, at *2 (S.D. Fla. Jan. 17, 2017) ("It is axiomatic that arguments not supported and properly developed are deemed waived."); *SSH2 Acquisitions, Inc. v. Howard*, 10-61703-RNS, 2012 WL 668042, at *3 (S.D. Fla. Feb. 29, 2012). It is unclear whether the City is in fact arguing—or not—that Mr. Taylor is unqualified.

---

[1] The City contends that Mr. Taylor is not qualified to testify that the use of a Taser caused Daniel's death. Mr. Taylor was not offered to provide—and will not provide at trial—an opinion on the cause of Daniel's death. Thus, the City's arguments on that point are either irrelevant or moot.

In any event, Mr. Taylor is qualified to testify regarding the City's police policies and procedures. Mr. Taylor has had a 38-year law enforcement career. Taylor Report at 2 & App'x A (attached as Exhibit 1). He served as Chief of Police in three North Carolina cities and a state psychiatric hospital. *Id*. He served on the FBI Joint Terrorism Task Force for three years conducting investigations. *Id*. He served as a National Guard MP Officer assigned as a Provost Marshal for Joint Task Force Civil-Support, acting as Chief Law Enforcement Officer for military operations in the continental United States. *Id*. He currently serves as a Commander of an Army Reserve unit in Nashville, Tennessee. Taylor Dep. 7:7-17 (attached as Exhibit 2). He also serves as the head of two private security firms. Taylor Report at 2 & App. A (Ex. 1).

Mr. Taylor has extensive experience training officers and reviewing police misconduct cases. He has been a certified Taser instructor for over ten years and holds multiple law enforcement certificates. *See id*. He has reviewed more than one hundred police misconduct cases in his career, he has trained hundreds of law enforcement officers and private security officers on legal and professional standards, as well as on different non-lethal use-of-force techniques. *See id*., Taylor Dep. 17:22–18:1 (Ex. 2).

Finally, Mr. Taylor has taught criminal justice courses at Wake Technical College and South-Eastern Community college, and he is current a Ph.D. candidate in the Criminal Justice and Public Policy program at Walden University. *See* Taylor Report at 2 & App'x A (Ex. 1). He is also a member of the Internal Chiefs of Police Association, the Police Executive Research Forum, and the International Association of Law Enforcement Educators and Trainers. *Id*.; Taylor Dep. 104:8-15 (Ex. 2).

4

### 2. Mr. Taylor's Opinions City's Policies, Training, and Supervision Are Sufficient and Reliable.

The City states that Mr. Taylor "should be preclude from testifying that the City's policies, training, and supervision are inadequate because those opinions are unreliable and not included within his report." Mot. at 7. His opinions, however, are sufficient and reliable.

Mr. Taylor disclosed in his report that he was retained for two purposes: (1) "to review the police use of force and other procedures," and (2) to determine "whether the Defendants acted in accordance with established law enforcement standards." Taylor Report at 1 (Ex. 1). His opinion is then laid out over four pages in a section titled "Opinion" in which he opines, among other things: (1) what is an appropriate use of force; (2) instructions and training that law enforcement officers should receive during basic law enforcement training and use-of-force training programs; and (3) when the use of a Taser is appropriate or recommended. *See* Taylor Report at 4–7 (Ex. 1). He also concludes that the actions of the City's police officers were inconsistent with the City's policies and procedures. *See id.* at 7.

Mr. Taylor properly relies on his experience in police practices and procedure, as detailed in his report, to evaluate the City's policies and procedures, and to evaluate the officers' actions. *See Bussey-Morice v. Kennedy*, 6:11-CV-970-ORL-36GJ, 2012 WL 7992419, at *3 (M.D. Fla. Dec. 28, 2012) (police-practices expert properly applied his experience to evaluate facts in the case). This is an appropriate methodology for an expert testifying about police policies and practices. *See id.*; *Knight v. Miami-Dade Cty.*, 09-23462-CIV, 2014 WL 11813876, at *8 (S.D. Fla. May 14, 2014) (finding police-practices expert who relied on his experience to evaluate facts of the case employed reliable methodology).

To render his opinion, Mr. Taylor considered the City's policies and procedures, the officers' statements and depositions, witness statements, Taser records, and Medical Examiner

5

records. *See* Taylor Report App'x C (Ex. 1). Using his experience, he explained why the City's policies were inadequate. For example, he explained what courses his officers are required to take on dealing with the mentally ill and why such courses are important. *See* Taylor Dep. 33:13–35:3, 41:22–42:25, 44:10-44:25 (Ex. 2). He explained that based on his experience with the shadow phase of training and as a police chief, a field training officer "needed to be on duty and available anytime that their training is out on the street answering calls" especially when the call involves a person experiencing a psychotic episode. *See* Taylor Dep. 47:7–49:2 (Ex. 2). Contrary to the City's contention, Mr. Taylor concluded that the presence of a field training officer may have resulted in a different outcome for Daniel's encounter with police, including that, had Officer Ramirez waited for backup, "they would have been more likely to take [Daniel] into custody quicker." *See* Taylor Dep. 77:17–78:10, 80:3-8 (Ex. 2).

The City's criticisms of Mr. Taylor's opinion focus on the assumptions he made and perceived weaknesses in his opinion. For example, the City complains that certain insufficiencies Mr. Taylor identifies in the City's policies and procedures may also exist Mr. Taylor's own company policies. Mot. at 7. Interestingly, the City also complains that Mr. Taylor "admitted he could not determine from the use-of-force reports alone whether the force used in the past was excessive." Mot. at 7. This particular complaint is ironic (and telling), considering an independent audit of the Hollywood Police Department concluded that the police department "fail[e]d to meet even the most essential elements of the generally accepted police practices in internal affairs operations," police records failed to properly identify alleged police misconduct, and internal investigations "did not properly probe into the allegations of police misconduct and the reviews did not memorialize the issues." Gruber Report at 4,5, 9–10 (attached as Exhibit 3). In any event, the "perceived errors or shortcomings" in Mr. Taylor's opinions regarding the

6

assumptions he makes and the facts he relies are properly attacked by "vigorous cross-examination" and "presentation of contrary evidence" at trial, not the exclusion of the witness. *See Coquina Investments v. Rothstein*, 10-60786-CIV, 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011); *Knight*, 2014 WL 11813876, at *4 ("Any flaws or inaccuracies in [the expert's] analysis and opinions must be weighed and considered by the jury at trial.").

To the extent Mr. Taylor stated that he reserved the right to supplement the report if he was provided with additional information, the City is correct that no further report was provided, and Plaintiff submits that Mr. Taylor will testify in accordance with the opinions set forth in his report dated March 8, 2018 and detailed further in his deposition. *See Acosta v. Electrolux N. Am.*, 08-60213, 2008 WL 5246160, at *8 (S.D. Fla. Dec. 16, 2008) (declining to strike expert testimony). The City cites to a slew of case law to support its contention that courts "routinely" preclude expert witness testimony on opinions that were not memorialized in a report "prior to the close of discovery." These cases are inapplicable.[2] Mr. Taylor's report was timely disclosed, and his deposition was taken two months before the close of discovery. Certainly, at Mr. Taylor's deposition the City had the opportunity to delve deeply into all of his opinions. The City does not provide any explanation as to why it was supposedly unable to do so; Mr. Taylor answered all questions posed regarding his opinion on the City's policies, training, and

---

[2] The cases cited are distinguishable on their facts. *See, e.g.*, *Campbell v. Moon Palace, Inc.*, 11-60274-CIV, 2012 WL 399218, at *4 (S.D. Fla. Feb. 7, 2012) (plaintiff disclosed expert on "the eve of trial" and his report lacked a resume, a list of cases in which he testified in the past, or his qualifications); *Carreno v. Home Transp, Inc.*, 308-CV-1206-J-32JRK, 2010 WL 2293391, at *2 (M.D. Fla. June 7, 2010) (excluding expert testimony where "Plaintiffs did not have an opportunity to depose [the expert] on his opinion and were not given sufficient notice such that they could cross-examine him on this subject during his May 11 *trial* deposition" (emphasis added)); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 616 F. Supp. 2d 1250, 1256 (M.D. Fla. 2009) (striking new opinions disclosed for the first time in declarations submitted in response to motion for summary judgment).

supervision.[3]  *Cf. In In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 256 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016) (declining plaintiff's request to exclude case-in-chief experts that were disclosed on the deadline for disclosing rebuttal experts where "plaintiffs have had a full and fair opportunity to depose both [experts] and therefore will not be sandbagged at trial").

Finally, Mr. Taylor's deposition was a discovery deposition, not a trial deposition, and the City is well versed on its own policies and procedures and can attack Mr. Taylor's opinions in cross examination.  *See Colman v. Home Depot USA, Inc.*, 705 F. App'x 949, 952 (11th Cir. 2017) (failure to timely disclose expert's supplemental report was not prejudicial where supplemental report disclosed new studies that expert relied upon); *Lakeman v. Otis Elevator Co.*, 930 F.2d 1547, 1554 (11th Cir. 1991) (district court did not abuse its discretion in allowing experts to testify at trial on previously undisclosed opinion where "counsel was well versed in the labeling of toxic chemicals and was capable of cross-examining both [experts] effectively").

### 3. Mr. Taylor's Opinion that Officers' Use of Force was Unreasonable, Excessive, and Violated Departmental Policies is Helpful to the Jury.

The City's last point of contention is that Mr. Taylor's opinion that the officers' use of force was excessive, unreasonable or violated departmental policy is unhelpful to the jury.  The City contends that this opinion offers nothing more than what the parties can argue at closing arguments.

To support this argument, the City appears to argue that Mr. Taylor's opinion is unreliable.  But, as discussed above, Mr. Taylor may testify based on his 38-year experience as a law enforcement officer and his review of the facts of the case.  *See supra*, Part A.1.  Mr.

---

[3] And, in any event, the City never asked Plaintiff to continue Mr. Taylor's deposition for another day or re-depose him.

8

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

Taylor's opinion is largely based on officer and witness deposition testimony about what happened during Daniel's encounter with police. *See* Taylor Dep. 81–98 (Ex. 2). For example, the City states that Mr. Taylor "can only speculate as to when handcuffs were actually applied." Mot. at 10. In fact, Mr. Taylor relied on officer testimony. *See, e.g.*, Taylor Dep. 83:13–84:1 ("Officer Pantaloukas testified in his deposition that he did continue to drive stun [Daniel] after the handcuffs were placed on and he continued at least twice after the leg irons were placed on his legs."). The City contends Mr. Taylor could not assume that Daniel was under control after he was handcuffed and leg shackled, but Mr. Taylor explains how his experience and eyewitness testimony allowed him to render that opinion. *See* Taylor Dep. 87:17–88:20, 97:23–98:10, 103:24–105:1 (Ex. 2). The City also takes issue with Mr. Taylor's opinion that the officers violated City policies and procedures by overusing their Tasers. Again, Mr. Taylor explains how his experience and review of the policies at issue allowed him to render that opinion. *See* Taylor Dep. 61:3–62:20, 103:24–111:11 (Ex. 2). Any perceived weaknesses in Mr. Taylor's assumptions or opinions should be tested through cross examination, not through exclusion of the witness's testimony. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) ("[T]he weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility.").

Finally, Mr. Taylor's opinion will help a jury determine whether police officers' use of force was reasonable in light of accepted police practices.[4] *See, e.g.*, Tayler Dep. 98:11–103:6 (Ex. 2). Indeed, the Eleventh Circuit has previously held that a police-practices expert's opinion on whether police violated policies and used reasonable force is helpful to the jury. *See Knight v.*

---

[4] To be sure, Mr. Taylor will not testify that the police officers violated the Fourth Amendment or otherwise violated Daniel's civil rights, which are ultimate questions for the jury. *See* Taylor Dep. 102:11–103:6 (Ex. 2).

9

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

*Miami-Dade County*, 856 F.3d 795, 809–10 (11th Cir. 2017) (court did not err in allowing testimony of police-practices expert to testify that officers had reasonable basis to use deadly force). The Eleventh Circuit has stated that "[t]estimony by such experts is generally admissible as long as the jury is properly informed that the expert is testifying only regarding prevailing standards in the field of law enforcement." *Ayers v. Harrison*, 650 F. App'x 709, 719 (11th Cir. 2016) (internal quotation marks omitted); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (expert testimony that officer's tactics violated standard police practices may be relevant to whether force was reasonable). Thus, the City's contention that the jury will be confused what they need to find liability is similarly misplaced—the jury will receive proper jury instructions on the law.

### B. Dr. Shuman Should Be Permitted to Testify That the Use of a Taser Contributed to Daniel's Death.

The City seeks to preclude Dr. Shuman from testifying that the use of a Taser on Daniel contributed to his death. The City (correctly) does not challenge Dr. Shuman's premise that pain can be an additional stressor that contributes to cardiac arrest in circumstances like Daniel's death. Rather, the City contends that Dr. Shuman's opinion is "not reliable or sound" because he is unable to measure the amount of pain Daniel was in when he was tased, and therefore he has no basis for his opinion that the use of the Taser was an additional stressor that contributed to Daniel's death. The City's motion is based on a mischaracterization of Dr. Shuman's testimony.

Dr. Shuman is a medical doctor. Shuman Report at 8 (attached as Exhibit 4). He did a fellowship in forensic pathology at the Miami-Dade County's Medical Examiner Department, he served as a Deputy Medical Examiner for San Diego County, California, and for the last seventeen years he has served as Associate Medical Examiner at the Miami-Dade County's Medical Examiner Department. *Id*.

10

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Dr. Shuman testified that studies have shown that Tasers can cause death. *See* Shuman Dep. 37:4-17 (attached as Exhibit 5). In fact, Taser's user manual warns that "[f]ailure to comply with the product instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the user, force recipient, and others." *See* Taser x26E ECD User Manual, at 4 (excerpt attached as Exhibit 10). Taser's training materials state that "[t]he application of the [Taser] is a physically stressful event" and warn that "[s]everal law enforcement groups have set out 15 seconds (multiple applications or continuous) of [Taser] exposure as a significant safety point." *See* Taser Annual CEW User Update PowerPoint Presentation, at 19, 32 (v. 19, April 2013) (excerpts attached as Exhibit 11). It is undisputed that officers deployed a Taser on Daniel ten times for a total 54 seconds. Taser training materials also state that, where an individual may have a pre-existing condition (as Daniel did), "[a]ny physiologic or metabolic change may cause or contribute to death or serious injury." *See* Taser User Certification Course PowerPoint Presentation, at 26 (v.18, July 2011) (excerpts attached as Exhibit 12).

Dr. Shuman testified that, although it is impossible to know whether Daniel's brain was processing pain as a normal person would, "[t]he pain receptors are there, the pain receptors are going to send the pain signal to the brain." Shuman Dep. 41:1-14 (Ex. 5). He further explained that the Taser "is causing pain. I just don't know - - causing pain meaning it's causing pain receptors to fire and send signal to the brain this is painful. It's what the brain does with it after that, I don't know. And whether or not that results in you know - - the fact that they're not acting like they're in pain doesn't mean that they're not having the same physiologic response to the pain such as an increase in blood pressure and heart rate and all that." *Id*. 41:22–42:9. That physiological response will have a role in a cardiac event, regardless of whether Daniel's brain

11

processed the pain as "ouch, that hurts." *Id*. 44:22–45:15. As a result, he could not *rule out* the use of a Taser as a cardiac stressor. *Id*. 56:23–57:2. Dr. Shuman clarified:

> I think that you can you know, when you have this situation, which is not an unusual situation, the cause of death is everything you have. I mean it's not – you can't pick and choose one thing or the other you know. It's the whole thing. And that's why if it were my case, I would have had a descriptive as I did in my report. There would have been a descriptive cause of death, not just one line of you know, heart attack or you know coronary disease or something like that. But it would be descriptive, trying to take into all parts that was going on at the time of his death.

*Id*. 56:5-22.

Dr. Shuman's testimony is based on his knowledge as a medical doctor and his almost twenty years of experience working as an Associate Medical Examiner, as well as evidence in the record. The City discusses at length how its expert reached a different conclusion. Merely disagreeing with an expert's statements, however, is not sufficient to exclude him. *S. States Co-op., Inc. v. Melick Aquafeeds, Inc.*, 476 F. App'x 185, 189 (11th Cir. 2012).

### C. Dr. Wohlegelernter's Rebuttal Opinion is Proper and Reliable.

#### 1. Dr. Wohlgelernter is a Proper Rebuttal Expert Witness.

Dr. Vilke proposes to offer expert testimony that the restraining process by City police officers did not cause the sudden cardiac arrest and death in Daniel and his death was in fact caused <u>solely</u> by Excited Delirium Syndrome "resulting from his untreated psychiatric disorder and exacerbated by a severely diseased heart combined with his continued exertional resistance." Vilke Report at 7 and 13 (attached as Exhibit 6). In rebuttal, Dr. Wohlegelernter examines Dr. Vilke's assumptions and data, and opines that the restraining process did cause Daniel's sudden cardiac arrest; his cardiac arrest was not due to Excited Delirium Syndrome. Wohlegelernter Report, at 3 (attached as Exhibit 7).

12

A rebuttal expert may "present evidence that is intended to contradict or rebut evidence on the same subject matter identified by an initial expert witness." *Lebron v. Royal Caribbean Cruises, Ltd.*, 16-24687-CIV, 2018 WL 3583002, at *2 (S.D. Fla. July 26, 2018). Moreover, "[a] rebuttal expert can testify as to the flaws that she believed are inherent in another expert's report that implicitly assumes or ignores certain facts." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 09-61490-CIV, 2011 WL 2295269, at *5 (S.D. Fla. June 8, 2011). A rebuttal expert is also "free to support his opinions with evidence not cited in an opposing expert's reports so long as he rebuts the same 'subject matter' identified in those reports" *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d at 257 (quoting *SEC v. Badian*, No. 06–cv–2621 (LTS)(DFE), 2009 WL 5178537 (S.D.N.Y. Dec. 23, 2009)) (internal quotation marks omitted).

Dr. Wohlegelernter provides classic rebuttal testimony. He identifies facts and assumptions that Dr. Vilke either ignored or did not properly factor into his analysis.[5] To render his opinion, Dr. Wohlegelernter considered the critical timeline of events that Dr. Vilke ignored or misapplied regarding when Daniel became unresponsive, including the fact that Daniel had pulseless electrical activity ("PEA") three minutes after Daniel's last tasing (which Dr. Vilke ignored), and criticized the undue emphasis that Dr. Vilke placed on end-tidal CO2. Dr. Vilke's opinion was based on the incorrect assumption that Daniel only became unresponsive "several minutes" after a struggle with police (the undisputed evidence is that Officer Truntz realized Daniel was unresponsive and his lips were blue while three or four officers were still restraining him). *See* Vilke Report at 9 (Ex. 6); *see also* Plaintiff's Motion to Exclude Defendant's Experts, ECF No. 110. This fact is critical, as it informs the importance of the paramedic's findings when the evaluated Daniel approximately three minutes after Daniel was last tased. Notably, Dr.

---

[5] Plaintiff has moved to exclude the testimony of Dr. Vilke because it is unreliable. *See* ECF No. 110.

13

Wohlgelernter does not introduce any new cause of death that was not considered and ruled out by Dr. Vilke. Dr. Wohlgelernter simply rebuts the facts and assumptions Dr. Vilke used to rule out positional asphyxiation and rebuts the facts and assumptions Dr. Vilke used to conclude that the sole cause of Daniel's death was Excited Delirium Syndrome. This is exactly the function of a rebuttal expert. *See Lebron v. Royal Caribbean Cruises, Ltd.*, 16-24687-CIV, 2018 WL 3583002, at *4 (S.D. Fla. July 26, 2018) (defendant's rebuttal expert never mentioned the plaintiff's expert's opinions at all, but was proper rebuttal testimony because the defendant's expert's "opinions are, in reality, merely the inverse of the opinions of the Plaintiff's expert's opinions. In other words, it is not that [the defendant's expert] is presenting any new theories that haven't already been explored by the Parties, but deal with the very things that Plaintiff's expert puts forth as the cause of plaintiff's fall").

To support its motion, the City relies heavily on *Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1290 (M.D. Fla. 2016). There, the plaintiff attempted to use expert testimony from a previously undisclosed expert to respond to a motion to dismiss his amended complaint. The court struck the expert's opinions "for purposes of ruling on the Motion to Dismiss," leaving open whether the expert could be admissible "at some future juncture of the case." *Id*. at 1292. In fact, the court subsequently granted the plaintiff's motion to extend expert deadlines, effectively allowing the timely disclosure of the previously stricken expert. *See Timber Pines Plaza, LLC*, No. 15-01821, ECF. Nos. 46, 59 (M.D. Fla.).

The City's contention that the opinion of Dr. Wohlgelernter is prejudicial because it introduces new theories of the case is unsupported by the record. The theory that positional asphyxiation caused Daniel's death is not a new one. Nor is Plaintiff's theory that Excited Delirium was not the sole cause of Daniel's death. Dr. Shuman opined that Excited Delirium

14

Syndrome was not the sole cause of Daniel's death; and positional asphyxiation was a contributing factor to Daniel's death. Shuman Report at 5 (Ex. 4) (stating that Daniel's death "was a result of a combination of all of the factors. The cause of his death was cardiopulmonary arrest following a violent struggle *and prone restraint* while in a state of excited delirium associated with bipolar disorder." (emphasis added)). In those critical aspects, Dr. Wohlgelernter is in line with Dr. Shuman's opinion. To the extent the opinions may be cumulative, the Court can address that issue at trial.

### 2. The Disclosure of Plaintiff's Rebuttal Expert Was Timely.

The City's suggestion that Plaintiff's disclosure of Dr. Wohlgelernter was untimely or "last minute" is wrong. As the City acknowledges, the parties' agreed-upon deadline to serve expert rebuttal witness disclosures was May 16, 2018. The parties subsequently agreed to extend the deadline to serve rebuttal witness disclosures to May 18, 2018. *See* E-mail exchange (attached as Exhibit 8). Plaintiff served the rebuttal witness disclosure on May 18, 2018. Also on May 18, 2018, Plaintiff offered June 5, June 7, and June 12 for the City to take Dr. Wohlgelernter's deposition. *See* E-mail exchange, attached as Exhibit 13. On May 22, 2018, Plaintiff also added May 31 as an available deposition date. *See id.* Of those available dates, the City chose June 12 to take Dr. Wohlgelernter's deposition. *See id.*

The City was on notice of the substance of Dr. Wohlgelernter's opinions since May 18. The City then was able to confirm those opinions on June 12. The City now states that, had it known the substance of Dr. Wohlgelernter's supposed "new theory" of the case, it would have retained a better expert than Dr. Vilke, and it is therefore prejudiced. Yet, for two months the City has done nothing to re-open discovery or designate this other expert. Moreover, the City's only argument is that this new, better expert would consider the very same facts that were

15

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

previously available and ignored or discounted by Dr. Vilke. If the Court were to allow the parties to go back and forth retaining new experts each time a rebuttal expert identified a flaw in the initial expert's opinion, litigation would devolve into an endless expert ping pong of disclosures. Dr. Vilke set forth an opinion. Dr. Wohlgelernter identified flaws in Dr. Vilke's assumptions and opinions. That is not the kind of prejudice that would support the exclusion of a rebuttal witness or allow the City the opportunity to retain another expert to rebut the rebuttal. Rather, the City is free to attack Dr. Wohlgelernter's opinions in cross-examination.

Finally, any supposed late disclosure of Dr. Wohlgelernter is harmless, as the City has had an opportunity to depose him and will have the opportunity to cross-examine him at trial. *See Leaks v. Target Corp.*, CV414-106, 2015 WL 4092450, at *4 (S.D. Ga. July 6, 2015) (finding plaintiff's expert was not proper rebuttal expert because it did not "discuss [defendant's expert's] report or address his examination findings" but declining to exclude him because the defendant "received notice that [the expert] would be called and took his deposition on the penultimate day of discovery"); *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d at 256 (declining to exclude defendant's "case-in-chief" experts that were disclosed on the rebuttal expert deadline because "[h]aving deposed [the experts], plaintiffs will not be sandbagged at trial"). In fact, further undermining the City's contention that it will be prejudiced, the City provides the declaration of Dr. Vilke that goes into detail why Dr. Vilke thinks Dr. Wohlgelernter is incorrect. Thus, it is clear that Dr. Vilke is prepared and able to address Dr. Wohlgelernter's anticipated testimony at trial.

### 3. Dr. Wohlgelernter Is Qualified and His Opinion Is Reliable.

The City contends that Dr. Wohlgelernter is unqualified to give his opinion that Daniel's death was due to positional asphyxiation because, according to Dr. Vilke's self-serving

16

declaration, Dr. Wohlgelernter is "unlikely to [have] specific experience" in that area "from daily activities and patient care." Vilke Decl. 6, ECF No. 101-19. As he is not a cardiologist himself, it is unclear what is the basis (if any) of Dr. Vilke's apparent knowledge of the day-to-day experiences of a cardiologist, much less of Dr. Wohlgelernter in particular. Dr. Vilke does not say. Dr. Vilke also takes issue with the fact that Dr. Wohlgelernter has not participated in research or published in this topic.

Dr. Wohlgelernter received his medical degree from Yale University School of Medicine with highest honors in 1977. Wohlgelernter Report at 7 (Ex. 7). Following a fellowship in cardiology, he served as a cardiologist at several hospitals and was a professor of medicine at Yale and UCLA. *Id*. at 7–8. He has served in leadership positions at several hospitals in California, and he is currently the Cardiology Section Chief at St. John's Hospital in Santa Monica, California. *Id*. He writes extensively on issues related to cardiology. *Id*. at 8–12. To render his opinions in this case he also relied on papers and studies of other researchers and doctors. *See, e.g.*, Wohlgelernter Dep. 6–12, 16–17, 22–23 (attached as Exhibit 9). He also reviewed Daniel's medical records, autopsy records, officer and witness statements, the deposition testimonies of Dr. Vilke and Dr. Bell. *See* Wohlgelernter Report at 1 (Ex. 7); Wohlgelernter Dep. 20–24 (Ex. 9).

The City does not criticize Dr. Wohlgelernter's methodology; it criticizes his assumptions and facts. Dr. Wohlgelernter supports his opinion by considering Daniel's medical records. In particular, he considered that Daniel exhibited PEA approximately three minutes after Daniel became unresponsive and the facts leading up to his death, including the police officer's restraints on him. Wohlgelernter Report at 3 (Ex. 7); Wohlgelernter Dep. 48-59 (Ex. 9). He then undertook a differential diagnosis to rule out the possible causes of PEA. Wohlgelernter Report

17

at 3 (Ex. 7).  In so doing, he considered, among other things, that hypoxia (oxygen deficiency) secondary to respiratory failure is the most common cause of PEA. *Id*. Dr. Wohlgelernter also explained the diagnostic criteria that a cardiologist considers to make the diagnosis that an individual has suffered from restraint/compressive asphyxia; he applied those factors to the facts of this case. Wohlgelernter Dep. 50:20–52:8 (Ex. 9). Having ruled out the other possible causes of PEA cardiac arrest, and based on his extensive experience as a cardiologist and review of the evidence in this case, he concluded that the only plausible and possible cause of a PEA cardiac arrest was hypoxia/hypoxemia due to asphyxia.  *Id*. at 4; Wohlgelernter Dep. 52 (Ex. 9). Finally, Dr. Wohlgelernter's exclusion of acidosis caused by Excited Delirium Syndrome as a cause of PEA is supported by the work of Dr. Mash, as the City itself concedes.[6] *See id*. 61–63; Mot. at 18.  In contrast, Dr. Vilke assumption that Daniel was suffering from metabolic acidosis is not based on any data, tests or evidence in the record.

It is clear that Dr. Wohlgelernter applied sound methodology—differential diagnosis and analysis of diagnostic criteria—to render his opinion.  His opinion is supported by research and studies.  To the extent the City disagrees with Dr. Wohlgelernter's conclusions, the appropriate method to challenge his assumptions is with cross examination. *See Daubert*, 509 U.S. at 596; *S. States Co-op., Inc.*, 476 F. App'x at 189.

## CONCLUSION

For the reasons provided, Plaintiff Jean Suarez, individually, and as Personal Representative of the Estate of Daniel Tyson, respectfully requests that the Court deny

---

[6] The City then resorts to criticizing the work of Dr. Mash to support the exclusion of Dr. Wohlgelernter. *See* Mot. at 18. This criticism goes not to the admissibility of the witness, but to the weight of his testimony.

18

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

Defendant City of Hollywood's motion to preclude the expert witness testimony of Roy Taylor, M.S., Mark Shuman, M.D., and Daniel Wohlgelernter, M.D.

              Respectfully submitted,

              *s/JOSEPH J. KALBAC, JR*.
              JOSEPH J. KALBAC, JR.
              Florida Bar No. 628270
              jkalbac@colson.com
              STEPHANIE A. CASEY
              Florida Bar. No. 97483
              scasey@colson.com
              DENISE H. GEORGES
              Florida Bar No. 55861
              denise@colson.com
              COLSON HICKS EIDSON
              Attorneys for the Plaintiff
              255 Alhambra Circle, Penthouse
              Coral Gables, Florida  33134
              Telephone: (305) 476-7400
              Facsimile: (305) 476-7444
              E-mail: eservice@colson.com;
              nicky@colson.com; mabel@colson.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, this 9th day of August, 2018, and a true and correct copy of the foregoing was served either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner of those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing, on: Daniel L. Abbott, Esq., Adam M. Hapner, Esq., Email: dabbott@wsh-law.com;  pgrotto@wsh-law.com; ahapner@wsh-law.com; Weiss Serota Helfman Cole & Bierman, P.L., Attorneys for Defendant, City of Hollywood, 200 E. Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301.

*s/JOSEPH J. KALBAC, JR*.
JOSEPH J. KALBAC, JR.
Florida Bar No. 628270

20

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**