UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO. : 16-62215-cv-WPD

| | |
|---|---|
| JEAN SUAREZ, individually and as a Personal Representative of the Estate of DANIEL TYSON, deceased<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF HOLLYWOOD, a Florida Municipal Corporation, CHIEF OF POLICE TOMAS SANCHEZ, in his official capacity, TASER INTERNATIONAL, INC., and JOHN DOES 1 – 20, individually,<br><br>    Defendant. | |

### Retention

My name is Roy G. Taylor and I was retained by the Plaintiff in this case to review the police use of force and other procedures utilized by the Defendants on October 27, 2014 which may have resulted in Plaintiff, Daniel Tyson's death and to render my expert opinion as to whether the Defendants acted in accordance with established law enforcement standards.

### General Qualifications

1

I currently serve as the Chief of Police for Capitol Special Police and have been in this position since 2002 as well as the Chief of Police for Blue Ridge Public Safety since 2014. During my thirty-eight-year law enforcement career, I served as a Chief of Police in three North Carolina cities, the State's psychiatric hospital, as well as the National Geo-Spatial Intelligence Agency (NGA) in the National Capitol Region.  I also served on the FBI Joint Terrorism Task Force for three years conducting investigations.

I recently served, for two years, as a National Guard MP Officer assigned as Provost Marshal for Joint Task Force Civil-Support.  In this role, I was the Chief Law Enforcement Officer for any military operations which take place in the continental United States in the event of an enemy attack involving chemical, biological, or nuclear devices.  Presently, I am a Lt. Colonel assigned to the 346th Military Police Detachment in Nashville, Tennessee.  One of my primary duties is overseeing the humane treatment of enemy prisoners of war and civilian internees in accordance with the Geneva Conventions for the US Army.

I served as an adjunct faculty member in the criminal justice program at Wake Technical College located in Raleigh, North Carolina; and South-Eastern Community College located in Whiteville, North Carolina.

I hold several law enforcement certificates, including the Advanced Certificate from the State of North Carolina and General Certificates from Virginia, Maryland and Ohio. I am currently certified by the North Carolina Criminal Justice Training and Standards Commission as a General Law Enforcement and Firearms Instructor.  I am also certified as a TASER Instructor and have been since 2005.  Between 1990 and 2004 I instructed in over one hundred Basic Law Enforcement Training Academies across the State of North Carolina specializing in use of force, high risk traffic stops, officer survival, physical fitness, hazardous materials and first responder courses.

I completed my bachelor's degree at Mount Olive College, Mt. Olive, North Carolina and my master's degree at East Carolina University, Greenville, North Carolina.  I am currently enrolled as a Ph.D candidate in the Criminal Justice and Public Policy program at Walden University.

### Specific Qualifications to Provide Opinions on This Case

During my thirty-eight-year law enforcement career and my twenty-two years as a law enforcement executive and trainer, I have reviewed more than one hundred police misconduct cases.

I have trained hundreds of law enforcement officers on the legal and professional standards regulating law enforcement operations and investigations.

I have also trained, certified and recertified over 100 officers in the proper use of Electronic Control Devices, O.C. Spray, and Expandable Batons.  My complete CV is attached as Appendix A to this report.

### Objectivity

During the past four years my expert witness services has been approximately 85% plaintiffs and 15% defendants. A list of this experience is attached as Appendix B to this report.

**Fees**

My fee for the analysis in this case was $5,000.00, to prepare a report of opinions and testify at trial.

**Items Reviewed and Relied Upon in Development of Preliminary Opinions**

Before developing my preliminary opinions in this case, I reviewed the materials listed in Appendix C attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of police-involved incidents and provided me with enough relevant data to develop my preliminary opinions to a reasonable degree of professional certainty.

**Methodology Utilized in Developing Opinions**

I have reviewed the U.S. Supreme Court decisions *Daubert v. Merrill Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and in *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147 119 S. Ct. 1167 (1999) which established the standards for scientific, non-scientific, technical and specialized knowledge expert witnesses. It is my understanding that a non-scientific expert must be qualified to offer expert testimony by knowledge, skill, experience, training, or education. I have provided in this report both my general and specific qualifications I believe prove my qualifications to provide expert testimony in this case.

It is also my understanding an expert's testimony must be relevant to the specific facts of an incident under consideration and be of such a specialized nature that it would be beyond the knowledge of a typical juror. An expert's testimony must also be of assistance to the jury in understanding the evidence and issues presented to them.  I believe my testimony regarding how officers are trained, professional standards for police response and the protocols for police use of electronic control weapons and other practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident are all areas of testimony which would assist the jury in understanding the evidence presented to them and is testimony relevant to the facts of this case.

Specifically, I possess knowledge regarding the procedures recognized in the law enforcement profession in 2012 on the proper use of less than lethal weapons.

I am familiar with the proper methods used to train police officers in legal standards on the use of force and the recognized standards needed for their continuous training requirement.

I am familiar with how officers are taught to deploy electronic control devices to overcome resistance to affect a lawful arrest.

These subjects are all matters beyond the knowledge of a typical juror and sufficiently tied to the facts of this case to be relevant and of assistance to the jury in understanding the evidence and resolving factual disputes.

The methodology used and conclusions reached by an expert must also be reliable. To ensure my methodology was reliable, I did not assign credibility to any witness, reviewed sufficient data to

reach conclusions to a reasonable degree of professional certainty, developed a set of material and relevant facts only after a review of all materials provided, and assumed those facts to be true solely for the purpose of analysis. I then analyzed those facts against a backdrop of the professional standards for police practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident.

The methodology I used in this case is the same which I have utilized for several years and has been accepted by presiding judges in previous cases in which I have testified. The methodology is consistent with the methodology utilized by other experts in the field of law enforcement when conducting an analysis of police procedures.

### Summary of Relevant and Material Facts Assumed to Be True for Purposes of Analysis

The facts I assumed to be true for purposes of analysis in this case are outlined in Appendix D attached to this report. If asked to consider a different set of facts, I will analyze those facts and render opinions to the best of my ability.

### Opinion

The basis and reasons for my opinions are premised upon my experience as a law enforcement officer; my education and training in law enforcement; my knowledge of law enforcement standards; my knowledge of law enforcement training and protocols for conducting criminal investigations; my knowledge of law enforcement training and protocols on the use of electronic control devices; analysis and study in the field through consulting professional literature, and the facts of this case as determined by a comprehensive review of the materials listed in Appendix C.

My opinions are based upon a synthesis of the above. I hold the following preliminary opinions to a reasonable degree of professional certainty.

On October 27, 2014 Mr. Daniel Mark Tyson of 1836 Jackson St. Apartment 12 Hollywood, FL was experiencing a psychotic episode. His neighbors observed him talking to the air, a tree, and a wall. Ms. Leonarda Moore had observed other unusual behavior, such as Mr. Tyson ranting and raving about injustice to women and standing on his balcony in the nude. She called her landlord, Xavier, to notify him of the situation. They discussed calling the police department to get help for Mr. Tyson.

Xavier called the Hollywood Police Department's non-emergency number and informed the dispatcher of what was occurring. The dispatcher notified Officer Alexis Ramirez and Officer Andreas Pantaloukas to respond to 1836 Jackson St. for a potential psychological emergency. Each of these Officers were in the final phase of their Field Training and were under the supervision of a Field Training Officer, who were driving separate vehicles, to allow the new Officers an opportunity to operate solo.

Officer Ramirez was the first to arrive on scene and began searching for Mr. Tyson. Ms. Moore approached Officer Ramirez and informed him of what she had observed. At this point Mr. Tyson came out of his second floor apartment and stood on his balcony. He was only wearing an open bath robe. Officer Ramirez told Mr. Tyson he could not be outside dressed as he was. Mr. Tyson

4

replied "no, no, do you know who I am?" He then took his robe off and proceeded to take a decorative sun dial off the wall of the building. Mr. Tyson then quickly came down the stairs approaching Officer Ramirez. Mr. Tyson had the sun dial raised above his head and started toward Officer Ramirez. Officer Ramirez instructed him to not come any closer or he would tase him. Mr. Tyson continued at a fast pace toward the Officer who then discharged his TASER X26. The TASER did not appear to be effective and Mr. Tyson continued toward Officer Ramirez. Mr. Tyson then struck Officer Ramirez in the head with the sun dial which resulted in a laceration to his scalp.

Just prior to this contact with Mr. Tyson, Officer Ramirez had telephoned his back up Officer, Officer Pantaloukas to inquire as to his estimated time of arrival, due to being concerned about a confrontation with Mr. Tyson.

Officer Ramirez began grappling with Mr. Tyson. Both were rolling around on the ground and at times up on their knees fighting. Officer Ramirez's head wound was bleeding and he could see blood getting on himself and Mr. Tyson.

Officer Pantaloukas arrived and moved toward Mr. Tyson's feet to try and keep them from thrashing around. Officer Pantaloukas then decided to use his TASER to immobilize Mr. Tyson. However, Officer Pantaloukas fired the TASER very close to Mr. Tyson's lower back which resulted in a minimal spread of the TASER projectiles, thereby reducing its effectiveness.

Officer Pantaloukas positioned himself again by Mr. Tyson's feet and performed a "drive stun" to his ankle. This technique is used to compensate for a minimal projectile spread or when one of the projectiles fails to connect with the subject's body. By doing this it completes the electrical circuit or increases the affected portion of the body. In this case, by moving to the extreme lower end of the body the electrical circuit is spread from the lower back to the ankle, which will override all of the motor nerves and muscles located in this region.

Officer Pantaloukas delivered at least two drive stuns to Mr. Tyson in an attempt to cause him to stop resisting their efforts to handcuff him. Officer Kern arrived and immediately radioed the dispatcher to request additional Officers and an ambulance to treat Officer Ramirez's injury.

Officer Kern then grabbed Mr. Tyson's left arm and began to move it behind his back for handcuffing. This allowed Officer Ramirez to gain control of the right arm and handcuff it.

Reportedly, Mr. Tyson was thrashing around on the ground and would not lye still. Officer Pantaloukas administered several more drive stuns to Mr. Tyson's lower leg. Officer Kern went to his patrol car and retrieved a set of leg irons which were placed on Mr. Tyson's ankles.

Mr. Tyson, now fully restrained was still thrashing about on the ground. Officer Pantaloukas continued to administer TASER drive stuns to Mr. Tyson even though he was not capable of escaping, harming himself or anyone else. Several minutes later one of the Officers noticed Mr. Tyson was not moving and appeared not to be breathing. The emergency medical personnel were summoned and began life saving procedures which were not successful.

5

The TASER is a Conducted Energy Weapon (CEW) designed to deliver an electrical pulse to override the human body's sensory and motor nervous systems. When it is deployed in the "probe mode" it fires two (2) sharp projectiles designed to penetrate outer clothing and skin of the intended target. Each of the projectiles are connected to the TASER by a thin conducting wire. The top projectile is designed to strike the target where the laser beam is pointed. The second projectile is angled down at 8 degrees to create a spread between it and the top projectile. The farther the distance between the TASER and the target the wider the spread between the two (2) projectiles, which will result in greater neuro muscular incapacitation (NMI) of the target[i].

Both probes need to contact the subject to achieve NMI. If one probe strikes the subject and the other probe misses but lands on a conductive surface, the circuit might be completed, but NMI is unlikely due to the resistance.

Force is defined as the exercise of strength, energy or power to impose one's will. The use of force is either appropriate or inappropriate. The most common definition of appropriate force is that which is reasonably necessary to affect an arrest or overcome resistance. It is important to understand that appropriate force does not require the least amount of force but rather only a reasonable amount. Accordingly, there is also no requirement to begin with lesser force and gravitate to higher levels.

Inappropriate force generally falls into two distinct categories: excessive force and unreasonable force. Excessive force is that which is deemed to be more severe than necessary in either kind or duration. Excessive force by kind inflicts more pain, suffering or injury than is deemed proper to accomplish the law enforcement objective. This almost always entails choosing the wrong weapon. Excessive force by duration is when force is applied longer than is reasonable. Hitting a suspect with a baton may be necessary and reasonable, for example, but would be excessive when applied longer than is required to achieve the objective. Unreasonable force is the use of any force when it is unjustified. The most common mistake associated with complaints of unnecessary force is lack of urgency. In such cases the situation simply did not merit the use of force at the time it was applied, even when it might have been called for eventually. While these distinctions may seem subtle failure to fully understand their nuances can lead to civil rights violations.

Law enforcement officers are instructed in their basic law enforcement training on the use of force and that the U.S. Supreme Court ruled "All claims that law enforcement officers have used force – deadly or not – during an arrest, investigatory stop, or other seizure…will be analyzed under the Fourth Amendment reasonableness standard." [ii]

Since 1989 the standard established by the United States Supreme Court is *Graham v. Connor*, which has been used in basic law enforcement training programs to instruct officers on the use of force since that time. Officers are taught the Supreme Court stated, "the test of reasonableness requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Further, officers are instructed in use of force training programs that the Court stated "the question

6

is…. whether the totality of the circumstances justifies a particular sort of seizure."

Law enforcement officers are also taught when an officer's action is questioned following a use of force, that an assessment be made as to (1) whether the subject had an apparent ability/capability to carry out a threat; (2) whether the subject was able to use that ability/capability to carry out the threat; and (3) whether the subject, by words or deeds, demonstrated an intent to carry out the threat.

While there are circumstances under which multiple TASER cycles may be appropriate and reasonable, officers should consider an attempt to move in and control the subject while the TASER CEW is cycling and it is practical and reasonably safe to do so[iii]. The International Association of Police Chief's as well as the Police Executive Research Forum both recommend that no more than three, five second TASER cycles be used unless deadly force would be authorized under the existing circumstances.

Remember, as with any application of force, each CEW (5-second) cycle, deployment, or trigger pull must be legally justified[iv].

The TASER is generally authorized to be used in circumstances where grounds to arrest or detain are present and the subject's actions cause a reasonable officer to believe that physical force will be used by the subject to resist the arrest or detention[v]. Such active resistance may include but is not limited to:

   a. use of force against the officer or another person
   b. violent, threatening, or potentially violent behavior
   c. flight in order to avoid arrest or detention, in circumstances where officers would pursue on foot and physically effect the arrest or detention
   d. self-destructive behavior

In summary, the nine applications of the TASER by Officer Pantaloukas to Mr. Tyson was an excessive use of force. In addition, it was inconsistent with the policies and procedures used in law enforcement in 2014 and a violation of Hollywood Police Department's Use of Force: Special Impact Weapons & Chemical Agents Standard Operating Procedure #201, dated: 11/01/2001. This policy states the TASER will be prohibited from use when (4e) "The subject is handcuffed, unless they are exhibiting aggressive physical resistance, actively attempting to escape from custody, or trying to harm themselves or others." These circumstances were not present on October 27, 2014. Therefore, the continued use of the TASER was not authorized and ultimately was a proximal cause of death to Mr. Tyson.

Respectfully Submitted,

*Roy G. Taylor*

Roy G. Taylor, MS

3/8/2018

---

[i] TASER Operating Manual Revision 8 Page 5
[ii] *Graham v. Connor*, 490 U.S. 386 (1989)
[iii] TASER V20 Annual CEW User Update, January 2016
[iv] TASER V20 Annual CEW User Update, January 2016
[v] IACP Model Policy: Electronic Control Weapons