**EXHIBIT 2**

**DR. MARK SHUMAN**

**Expert Report**

**CV**

**Litigation Disclosure**



# Mark J. Shuman, MD, MS

March 8, 2018

Denise H. Georges
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

Re: Estate of Daniel Tyson vs. City of Hollywood
    Case No.: 16-2215-CIV-DIMITROULEAS

Dear Ms. Georges:

I have reviewed the following materials that you provided:

1. Jean Suarez vs. City of Hollywood, et al. – Complaint
2. Table of Taser Discharges by Officers Ramirez and Pantaloukas
3. Hollywood Fire/Rescue & Beach Safety Department, Ambulance Record – October 27, 2014
4. Broward County Medical Examiner (BME2014-2848)
5. 76 autopsy photographs, including Lodox radiographs
6. Cardiac Pathology Report – Dr. Michael Bell
7. Neuropathology Report – Dr. Kenneth Hutchins
8. Transcripts of Sworn Statements of:
    a. Officer Andreas Pantaloukas
    b. Officer Alexis Ramirez
    c. Officer Brian Kerns
    d. Officer Alejandro Falcon
    e. Officer Kyle Karl
    f. Officer Kyle Wagner
    g. Officer Anthony Truntz
    h. Jennifer Corbo
    i. Christine Corbo
    j. Xavier Lesmarie
9. Notarized Statement of Leonarda Moore
10. Deposition Transcripts of:
    a. Officer Alejandro Falcon
    b. Officer Anthony Truntz
    c. Officer Kyle Wagner

1



# Mark J. Shuman, MD, MS

**Summary of Circumstances**

Daniel Tyson was a 30 year old male who had a history of bipolar disorder. On October 27, 2014, his neighbor observed him in an agitated state, and eventually speaking loudly with a woman who was visiting his apartment. A few minutes later, he was seen naked on his balcony and talking to the air and a tree. The neighbor called their landlord, and the landlord reported the incidence to the police. The first responding officer, Officer Ramirez, arrived 5 to 10 minutes later and found Mr. Tyson on his balcony and wearing a robe, which was open in the front and exposing his body. Officer Ramirez told Mr. Tyson that he could not be naked in public. Mr. Tyson was mumbling random words, went inside and brought out a bucket with marbles or metal balls and started throwing them off the balcony. Officer Ramirez instructed him to stop throwing things. Mr. Tyson then removed his robe, grabbed a sundial off the wall, and quickly descended the stairs. Officer Ramirez told him to stop or he would utilize his Taser. Mr. Tyson continued to approach and Officer Ramirez discharged the Taser, but it did not incapacitate him and he continued to approach and struck Officer Ramirez in the head with the sundial. Officer Ramirez then "hip-flipped" him onto the ground and wrestled with Mr. Tyson to try to gain control. The second responding officer, Officer Pantaloukas, found Officer Ramirez wrestling with Mr. Tyson who was prone on the ground and continuing to fight. Officer Pantaloukas tried to use verbal commands, but Mr. Tyson did not comply. Officer Pantaloukas tried to physically restrain Mr. Tyson's legs, and then utilized a Taser. The Taser barbs struck Mr. Tyson's back, but the Taser discharge was ineffective. Officer Pantaloukas then drive stunned Mr. Tyson's ankle several times and each time Mr. Tyson continued to fight after the discharge ended.[1] They were able to handcuff him behind his back after one of the discharges. Other officers arrived and shackles were applied to Mr. Tyson's legs. He remained face down and continued to fight with four police officers trying to control him. Several minutes later, Mr. Tyson became calm and it was noted that his face was turning blue and he wasn't breathing. The officers turned him over and noticed that he was limp. The handcuffs and leg shackles were removed and resuscitation was initiated by the officers and paramedics.

Paramedics were dispatched at 2:56 p.m. and upon arrival began treating Officer Ramirez's injury, but then were summoned to Mr. Tyson. They had contact with Mr. Tyson at 3:01 p.m. One note indicates that he was initially combative, but then became unresponsive, pulseless, and apneic, but other notes indicate that he was unresponsive, apneic, and pulseless on their initial evaluation. They noted that he received a Taser discharge approximately 5 minutes prior to their arrival. He was cyanotic, had and fixed and dilated pupils, and two barbs from a Taser were in his upper back. His blood glucose was 81 mg/dL by finger stick, and his cardiac rhythm was PEA. T He was transported to Memorial Regional Hospital with no change in his status.

Mr. Tyson arrived in the emergency department of Memorial Regional Hospital at 3:24 p.m. He was unresponsive, and ACLS was continued for 12 minutes. A cardiac ultrasound revealed

---

[1] Mr. Tyson received a total of 10 Taser shocks in a period of 10 minutes; all except one was for 5 seconds, and it was 9 seconds.

2


**Mark J. Shuman, MD, MS**

no cardiac activity and he was pronounced dead at 3:37 p.m. A chest x-ray revealed increased pulmonary markings suggestive of congestion. A pelvic x-ray revealed no fractures, but the exam was limited because of overlying medical intervention. A urine drug screen was positive for opiates, amphetamine, and cannabinoids. Serum ethanol was 31 mg/dL. His body temperature was not recorded by EMS or in the hospital.

**Postmortem Examination**

The autopsy revealed a well-developed, "large build" male who had a small abrasion with a punctate defect in the left side of the chest; small abrasions of the epigastric region, right upper quadrant of the abdomen, right knee, left forearm, and left leg; two metal barbs were in the left side of the lower back; severe coronary atherosclerosis; fibromuscular dysplasia of the cardiac conduction system; pulmonary congestion and edema; and hepatomegaly. Toxicology testing revealed delta-9 carboxy THC (7 ng/mL) and ethanol (0.03%) in peripheral blood. No amphetamine/methamphetamine, opiates, bath salts or designer stimulants were detected in peripheral blood.

Examination of the heart by a cardiac pathologist revealed severe coronary atherosclerosis, fibromuscular dysplasia of the SA and AV nodal arteries, focal mononuclear cell infiltrate of the right atrial myocardium and SA node, dilated TV and PV annuli, and sickled red blood cells.

Examination of the brain by a neuropathologist revealed a normal brain with cerebral edema.

Toxicology testing revealed ethanol (0.03%) in ocular fluid, and delta-9 carboxy THC (7 ng/mL) in peripheral blood. No ethanol, amphetamine/methamphetamine, delta-9 THC, opiates, bath salts/designer stimulants were detected in peripheral blood.

The cause and manner of death were certified as "undetermined."

**Opinions and Discussion**

Mr. Tyson's behavior on October 27, 2014, was consistent with the Excited Delirium Syndrome. Excited Delirium Syndrome is a state of delirium, an acute, transient disturbance in consciousness and cognition, with associated combative and/or violent behavior a state, which is often characterized by agitation, excitability, paranoia, aggression, great strength, and numbness to pain. It is similar to acute exhaustive mania, acute psychosis, serotonin syndrome, and neuroleptic malignant syndrome, which are disorders of altered brain chemistry that can result in death as the result of a dysregulation in the autonomic nervous system. It often the result of recreational drug use, but can also be secondary to underlying psychiatric disorders, including bipolar disorder. While excited delirium syndrome can be independently fatal, individuals in this state often die during encounters with law enforcement personnel or others who are attempting to restrain them for their protection and others.

3



## Mark J. Shuman, MD, MS

Sudden death during prone restraint has been recognized for many years. The mechanism by which the sudden death occurs is unknown, but theories include the restriction of pulmonary function, and thus oxygenation, by the restraint position, and increased cardiac susceptibility to arrhythmia because of increases in catecholamines during the struggle. The deaths usually occur during prone restraint within five minutes. The victim struggles vigorously during the restraint and then is suddenly silent and found to be unresponsive. Factors that have been most often found in these cases include forceful struggle, stimulant drug use, chronic natural disease, and obesity.

Mr. Tyson had several chronic natural diseases that must be considered. Mr. Tyson had a large build and a body mass index within the range of obesity, but he did not have a protuberant abdomen, which would increase his susceptibility to prone restraint. He had severe coronary atherosclerosis and fibromuscular dysplasia of the SA and AV nodal arteries, which can independently result in sudden cardiac death, especially in relation to strenuous activity. Examination of the heart revealed sickled red blood cells, which were not mentioned in the histology of the other organs. I did not review the histology and hemoglobin electrophoresis was not performed, but if Mr. Tyson had sickle cell trait, the violent struggle with police could have precipitated a sickle cell crisis.

Taser conducted energy devices were used in an attempt to subdue Mr. Tyson on several occasions. The first discharge by Officer Ramirez was aimed at the front of his torso, but it was ineffective. The autopsy examination revealed a Taser probe impact site in the left lower chest. An "abrasion" above the umbilicus and a "linear abrasion" in the right upper quadrant of the abdomen may have represented marks from the second probe. This attempt at neuromuscular incapacitation was ineffective either as the result of the probes being too close, one or both probes being dislodged, or one probe missing his body. A second Taser device was deployed by Officer Pantaloukas while Officer Ramirez was struggling to subdue Mr. Tyson in a prone position. Both probes embedded in the lower left aspect of Mr. Tyson's back and remained in his back. This discharge also did not result in neuromuscular incapacitation likely because the probes were too close to each other. Officer Pantaloukas then used the Taser in drive stun mode with the cartridge in the device several times and was able to achieve neuromuscular incapacitation.

Whether a conducted energy device can cause death is contentious, and though they are unlikely to cause sudden cardiac arrhythmia and death, it is apparent that it is a rare event that can occur under certain circumstances. Studies in pigs have demonstrated that in order for the CED to capture the heart rhythm, the electrical stimulation must occur across the cardiac axis and one of the probes must be near the heart. Therefore, in order for a conducted energy device to cause sudden death by cardiac arrhythmia, the probes must strike the anterior chest, the heart must be between the probes, and one of the probes must be close to the heart. In addition, the effect of electrical induction of cardiac arrhythmia will have an effect within seconds, and therefore, the subject must lose consciousness and have no signs of life within seconds of the discharge of the conducted energy device, and an electrocardiogram taken immediately after the discharge should reveal ventricular fibrillation. Neither of the Taser probe

4

 **Mark J. Shuman, MD, MS**

strikes in Mr. Tyson were across the cardiac access, therefore, his death was not the result of the direct electrical effect on his heart.  If the Taser discharge had any role in his death, it was as an additional stressor from pain of the discharge and would be a factor only if there was a temporal association with the cardiopulmonary arrest and the last conductive energy device discharge.  The records indicate that the last discharge ended at 3:01 p.m., which was the same time as the initial patient contact by EMS, but it is unknown of these times are synchronized and the witness statements and EMS report indicate that there was a time lapse between the last discharge and Mr. Tyson becoming unconscious.

**Conclusion**

Mr. Tyson was in a state of excited delirium and when confronted by police engaged with them in a violent struggle in which he was subjected to several discharges of Taser conductive energy devices and eventually restrained in a prone position by four police officers before he suddenly became unresponsive and was found to be in cardiopulmonary arrest.  The Broward County Medical Examiner concluded that the cause and manner of death could not be determined, because of Mr. Tyson's underlying natural diseases that could have resulted in sudden cardiac death and it could not be discerned "to what degree, if any, the struggle with the police and subsequent from the EDD [electromuscular disruptive device]" affected his underlying natural disease. When determining the cause of death, it is not necessary to know precisely what role external factors played in the death when it is known that those factors will exacerbate the underlying conditions.  Therefore, the cause of his death was a result of a combination of all of the factors.

The cause of his death was cardiopulmonary arrest following a violent struggle and prone restraint while in a state of excited delirium associated with bipolar disorder.  Coronary atherosclerosis and fibromuscular dysplasia of the SA and AV nodal arteries contributed to his death.  The use of a Taser conductive energy device may have contributed to his death as the result of additional stress caused by pain, but only if there was a temporal association with the cardiopulmonary arrest and the last discharge.

Please contact me if you have any questions.

Sincerely,

Mark J. Shuman, MD, MS

5



# Mark J. Shuman, MD, MS

**References:**

Chan, Theodore C., Gary M. Vilke, Tom Neuman and Jack L. Clausen.  "Restraint Position and Positional Asphyxia."  *Annals of Emergency Medicine*, 30(5):578-586, 1997.

Chan, Theodore C., Gary M. Vilke and Tom Neuman.  "Reexamination of Custody Restraint Position and Positional Asphyxia" *The American Journal of Forensic Medicine and Pathology*, 19(3):201-205, 1998.

Dennis, A., Valentino, D., & Walter, R. (2007). Acute effects of TASER X26 discharges in a swine model. *The Journal of Trauma*, *63*(3), 581–590.

Di Maio, T. G., & Di Maio, V. J. (2006). *Excited Delirium Syndrome: Cause of Death and Prevention*. Boca Raton: CRC Press.

Kim, P. J., & Franklin, W. H. (2005). Ventricular Fibrillation after Stun-Gun Discharge. *New England Journal of Medicine*, *353*(9), 958–959.

Nanthakumar, K., Billingsley, I. M., Masse, S., Dorian, P., Cameron, D., Chauhan, V. S., … Sevaptsidis, E. (2006). Cardiac electrophysiological consequences of neuromuscular incapacitating device discharges. *Journal of the American College of Cardiology*, *48*(4), 798–804.

Naunheim, R. S., Treaster, M., & Aubin, C. (2010). Ventricular fibrillation in a man shot with a Taser. *Emergency Medicine Journal : EMJ*, *27*(8), 645–6.

O'Halloran, Ronald L. and Janice G. Frank.  "Asphyxial Death During Prone Restraint Revisited." *The American Journal of Forensic Medicine and Pathology*, 21(1):39-52, 2000.

O'Halloran, Ronald L. and Larry V. Lewman.  "Restraint Asphyxiation in Excited Delirium" *The American Journal of Forensic Medicine and Pathology*, 14(4):289-295, 1993.

Parkes, John.  "Sudden Death During Restraint: A Study to Measure the Effect of Restraint Positions on the Rate of Recovery From Exercise."  *Medicine, Science and the Law*, 40(1):39-43, 2000.

Pollanen, Michael S., David A. Chiasson, James T. Cairns, and James G. Young.  "Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community."  *Canadian Medical Association Journal*, 158(12):1603-1607, 1998.

Ross, Darrell L.  "Factors Associated with Excited Delirium Deaths in Police Custody." *Modern Pathology*, 11(11):1127-1137, 1998.

6



**Mark J. Shuman, MD, MS**

Stratton, Samuel J, Christopher Rogers, Karen Brickett and Ginger Gruzinski. "Factors Associated with Sudden Death of Individuals Requiring Restraint for Excited Delirium." *American Journal of Emergency Medicine*, 19(3):187-191, 2001.

Walter, R. J., Dennis, A. J., Valentino, D. J., Margeta, B., Nagy, K. K., Bokhari, F., … Roberts, R. R. (2008). TASER X26 discharges in swine produce potentially fatal ventricular arrhythmias. *Academic emergency medicine: official journal of the Society for Academic Emergency Medicine*, *15*(1), 66–73.

Webster, J., Will, J., Wu, J., Sun, H., O'Rourke, A., Huebner, S., & Rahko, P. (2006). Can TASERS directly cause ventricular fibrillation. *2006 Experimental Biology Meeting*, 3307–3310. Retrieved from http://charlydmiller.com/LIB08/2006CanTasersCauseVFib.pdf

Zipes, D. P. (2012). Sudden cardiac arrest and death following application of shocks from a TASER electronic control device. *Circulation*, *125*(20), 2417–22.

.

# Curriculum Vitae
# Mark J. Shuman, MD, MS

## EDUCATION & WORK EXPERIENCE

2001 – Present   Miami-Dade County                               Miami, FL
                 Medical Examiner Department
*Associate Medical Examiner*


2000 – 2001    County of San Diego                               San Diego, CA
               Medical Examiner's Office
*Deputy Medical Examiner*


1999 - 2000    Miami-Dade County                                 Miami, FL
               Medical Examiner Department
*Fellow, Forensic Pathology*


1997 - 2000    Nova Southeastern University                      Fort Lauderdale, FL
*Masters of Science in Computer Information Systems*


1995 - 1999    Jackson Memorial Hospital                         Miami, FL
*Resident, Pathology*


1994 - 1995    Department of Pathology                           Pittsburgh, PA
               University of Pittsburgh School of Medicine.
*Research Fellow*
- Studied prostate cell biology using an *in vitro* system of prostate cell culture.


1993 - 1994    Washington Hospital Center                        Washington, DC
*Resident, General Surgery*


1989 - 1993    University of Pittsburgh School of Medicine   Pittsburgh, PA
*Medical Doctor*


1985 - 1989    Kenyon College                                    Gambier, OH
*Bachelor of Arts*
- *Summa Cum Laude*
- High Honors in Chemistry

# Curriculum Vitae
# Mark J. Shuman, MD, MS

## PUBLICATIONS AND ABSTRACTS

"Severe Retinal Hemorrhages With Retinoschisis Are Not Pathognomonic for Abusive Head Trauma." Shuman M and Hutchins K. Abstract presented at AAFS 68th Annual Scientific Meeting, 2016; Las Vegas, NV.

"Fatal wounds sustained from "falling bullets": maintaining a high index of suspicion in a forensic setting." Rapkiewicz AV, Shuman MJ, and Hutchins KD. Journal of Forensic Sciences 59(1):268-70, 2014 January

"Retinal and Optic Nerve Sheath Hemorrhages Associated With Non-Traumatic Subarachnoid Hemorrhage in Young Children." Thomas K, Shuman M, and Hutchins K. Abstract presented at AAFS 64th Annual Scientific Meeting, 2012; Atlanta, GA.

"Sickle cell trait-associated deaths: a case series with a review of the literature." Thogmartin JR, Wilson CI, Palma NA, Ignacio SS, Shuman MJ, and Flannagan LM. Journal of Forensic Sciences 56(5):1352-60, 2011 September.

"Retinal and Optic Nerve Sheath Hemorrhages Are Not Pathognomonic of Abusive Head Injury." Matshes E. SM, Shuman M, and Lew E. Abstract presented at: AAFS 62nd Annual Scientific Meeting, 2010; Seattle, WA.

"Apparent Natural Deaths in Older Individuals" Burt, M and Shuman, MJ. Abstract presented at the 2002 annual meeting of the National Association of Medical Examiners.

"Evaluation of Clinician Accuracy in Describing Gunshot Wound Injuries" Shuman M. and R. K. Wright. Journal of Forensic Sciences 44(2):339-342, 1999 March

"A Simple Method for the Isolation and Culture of Epithelial and Stromal Cells from Benign and Neoplastic Prostates" Krill D., Shuman M., Thompson MT., Becich MJ., and Strom SC. Urology 49(6):981-8, 1997 Jun.

"Replication of Human Prostate Epithelial Cells, In Vitro." S.C. Strom, M. Shuman, R. Bahnson, and M. Becich. (Abstract)

"Lessons Learned from Tissue Banking Prostates from Organ Donors and Prostatectomy Specimens: What is Normal?" A. Hakam, J.T. Gau, M. Shuman, S. Strom, D. Cooper, R.R. Bahnson, T. Hakala, B. Brosnick and M.J. Becich. (Abstract)

"The Cellular Distribution of CD44 and c-met in Relation to the Secretion of PSA in Human Prostate Cell Lines." J.T. Gau, S. Hsu, M.G. Grove, M. Shuman, A. Hakam, B.A. Evans, T.A. Howard, S. Strom, R.R. Bahnson, D. Cooper, and M.J. Becich. (Abstract)

# Curriculum Vitae
# Mark J. Shuman, MD, MS

**PRESENTATIONS**

"Electrocution" at the Miami-Dade County Medical Examiner Department Police Medicolegal Investigation of Death conference – presented three times per year.

"Head Injuries in Infants and Young Children" at the Illinois Institute for Continuing Legal Education (IICLE), Defending Illinois Death Penalty Cases conference in Springfield, IL (November 18, 2008) and in Chicago, IL (March 27, 2009)

"Pediatric Head Injury and the Shaken Baby Syndrome: Myths and Facts" at the Miami-Dade County Medical Examiner Department (October 20, 2008) and at the FORENSIC SCIENCE: NOW AND THE FUTURE conference the Nova Southeastern University (November 14, 2008).

"Imaging for the Forensic Pathologist" in the Workshop So You Think You Know Digital Imaging? SWGIT Advice to All AAFS Disciplines at the 61st Annual Meeting of the American Academy of Forensic Sciences (AAFS) in Denver, CO.

"Physician's Death Certification & Death Reporting Responsibilities" at Doctor's Hospital, Miami, FL (April 11, 2008)

"Capturing Still Images in the Field and Laboratory" in the Workshop SWGIT Presents: Guidelines for Acquiring, Processing, Analyzing, and Archiving Video and Image Data at the 57th and 59th Annual Meetings of the American Academy of Forensic Sciences (AAFS) in New Orleans, LA and San Antonio, TX, respectively.

"Bodies in Water" at the Forensic Science Conference of the Caribbean Forensic Network in St. Croix, U.S. Virgin Islands

"Practical Digital Photography" Workshop presented at the 54th Annual Conference of the American Academy of Forensic Sciences in Atlanta, Georgia.

"Digital Photography: It's Not Just for Vacations Anymore" Workshop presented at the 53rd Annual Conference of the American Academy of Forensic Sciences in Seattle, Washington.

"Cyber Solutions for Forensic Science: Practical Cost Effective and Efficient." Workshop presented at the 52nd Annual Conference of the American Academy of Forensic Sciences in Reno, Nevada.

"Lightning Injury and Death." Presented in the workshop "Electrical Injury and Death" at the 52nd Annual Conference of the American Academy of Forensic Sciences in Reno, Nevada.

# Curriculum Vitae
# Mark J. Shuman, MD, MS

"Information Technology Solutions for Forensic Pathology: Practical, Cost Effective and Efficient."  Presented at the Fourth Annual Conference for Advancing Pathology Informatics, Imaging and the Internet in Pittsburgh, Pennsylvania.

"Information Systems for Medical Examiners and Coroners." Presented in the workshop "Beyond Record Keeping: Maximizing the Use of Forensic Data: Implications for SNOMED® and the Forensic Pathologist" at the 1999 ASCP/CAP Fall Meeting in New Orleans, Louisiana.

## PROFESSIONAL MEMBERSHIPS

American Academy of Forensic Sciences

National Association of Medical Examiners

Florida Association of Medical Examiners

FBI/DOJ Scientific Working Group on Imaging Technologies

## AWARDS AND ACHIEVEMENTS

Chief Resident, Clinical Pathology, Jackson Memorial Hospital 1998-1999
Phi Beta Kappa, Kenyon College (1989)
Carl Djerassi Award in Chemistry (1989)
Sigma Xi (Honor Society for Science Majors, 1989)
Lubrizol Fund Award (1988 and 1989)

## CERTIFICATION AND LICENSURE

Diplomate of The American Board of Pathology in Anatomic, Clinical and Forensic Pathology

Florida State Medical License #ME78012

Cayman Islands Medical Doctor Registration Number MDC/PL/MED/223

Nevada State Medical License #14953

Virgin Islands Certificate of Registration as a Medical Practitioner (Forensic Pathologist) No: MS447/0114

Mark J. Shuman, MD, MS
1865 NE 214th Terrace
Miami, FL  33179
Phone: (305) 527-9535
Fax: (305) 437-8121

Civil Cases: Total = 186; Defense = 124 (67%); Plaintiff = 58 (31%); Unknown = 1
Insurance Disability Review = 3

**Civil Depositions/Trial Testimony**

| Case Title / Decedent | Law Firm | Plaintiff/Defendant | Depo | Court |
|---|---|---|---|---|
| Pandrea v. Rosenberg, MD, et. al. | Krupnick & Campbell | Plaintiff | Yes | Yes |
| Lazaro Romero v. Efrain Camera, MD, et. al. | Raul R. Lopez, PA | Plaintiff | Yes | No |
| Jenkins v. Sunrise | Cole, Scott, & Kissane, PA | Defendant | Yes | Yes* |
| Witcher v. Barin | Adams & Adams | Defendant | Yes | No |
| Vital v. Palm Beach Gardens Community Hospital, et. al. | Krupnick & Campbell, et. al. | Plaintiff | Yes | No |
| Valencia Abrams v. Anthony A. Hood, MD, et. al. | Sandy Martin, MD | Plaintiff | Yes | No |
| Spencer v. Resources for Human Development, Inc. | Marshal & Dennehey, et. al. | Defendant | No | Yes |
| Lyons v. Friedman, et. al. | Winston & Clark, PA | Plaintiff | Yes | No |
| Sussman v. Boca Raton Community Hospital, et al. | Ratzan & Alters | Plaintiff | Yes | Yes |
| Zikas v. LA Fitness | Cole, Scott & Kissane, PA | Defendant | Yes | No |
| Cardoso v. SCI Funeral Services | Stabinski and Funt, P.A. | Plaintiff | Yes | No |
| McInnis v. Seltzer | Adams, Coogler, Watson et al. | Plaintiff | Yes | No |
| Warrick v. R.J. Reynolds Tobacco Company, et al | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | Yes |
| Levy v. Palms West Hospital | Greenspoon Marder, P.A. | Plaintiff | Yes | No |
| Gee, Mildton vs. Lakeside Nursing & Rehabilitation Center | Wicker, Smith, O'Hara, McCoy & Ford, P.A. | Defendant | Yes | No |
| Cohen v. R.J. Reynolds Tobacco Company, et al | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | No |
| Odum v. R.J. Reynolds Tobacco Company, et al | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | No |
| Bryant v. R.J. Reynolds Tobacco Company, et al | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | Yes* |
| McMannis v. R.J. Reynolds Tobacco Company, et al | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | No |
| Eimers v. Key West | Lewis Legal Group, P.A. | Plaintiff | Yes | No |
| Estate of Robert Gaglioti vs. Dr. Michael J. Mallis, D.O., All-Star Recruiting Locums, et al | Cole, Scott & Kissane, PA | Defendant | Yes | No |
| Pucci v. Carnival | Foreman, Friedman, P.A. | Defendant | Yes | No |
| Curtin v. Oasis | Kelly Uustal Trial Attorneys | Plaintiff | Yes | No |
| Coursey/Fredenhagen v. R. J. Reynolds Tobacco Company, et al. | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | No |

| | | | | |
|---|---|---|---|---|
| Harper v. Embassy Suites, et al. | Balkan & Patterson, LLP | Plaintiff | Yes | No |
| Ferris v. City of Cadillac, et al. | Sommers Schwartz, P.C. | Plaintiff | Yes | No |
| Adamson v. R.J. Reynolds Tobacco Company, et al. | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | No |
| Leon v. R. J. Reynolds Tobacco Company, et al. | Womble, Carlyle, Sandridge & Rice, PLLC | Defendant | Yes | No |
| Sansone v. Gordon D. Burtch, MD and Surgical Specialists of Southwest Florida, P.A. | Florin Roebig, P.A. | Plaintiff | Yes | No |

\* by video recording

Consulting in Criminal Cases – 174 (172 Defense, 2 State)
      Testified in Deposition or Court – 44