May 18, 2018

Denise H. Georges, Esq.
Law Firm of Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134


Re: Jean Suarez as Personal Representative of the Estate of Daniel Tyson v. City of Hollywood
Case No.: 16-2215-CIV-Dimitrouleas


# EXPERT REPORT OF DANIEL WOHLGELERNTER, M.D., F.A.C.C.

## Materials Reviewed:

- Plaintiff's Second Amended Complaint
- Hollywood Fire Rescue Report of Daniel Tyson
- Autopsy Report of Daniel Tyson including Cardiopathology, Neuropathology and Toxicology report
- Hollywood Police Department Police Reports
- Statements of City of Hollywood Police Officers Ramirez, Pantaloukas, Kerns, Kyle, Truntz, Falcon and Wagner
- Statement of Leonarda Moore
- Tasing Chart produced by Hollywood Police Department
- Memorial Regional Hospital Records of Daniel Tyson from October 27, 2014
- Expert Report of Gary Vilke, M.D.

## Summary of Facts and Circumstances:

On October 27, 2014, Daniel Tyson, age 30, was observed by neighbors in an agitated state, speaking loudly and later talking to the air and trees. Following a call to City of Hollywood, police officers were dispatched to Mr. Tyson's residence. Upon arrival, Officer Alexis Ramirez observed Mr. Tyson whom was standing naked on the balcony of his second-floor apartment behaving in an unusual manner. As relayed to police dispatch, Mr. Tyson had a diagnosed mental illness and was not on his medication.

Mr. Tyson picked up a sundial, descended the stairs and approached Officer Ramirez. In turn, Mr. Tyson was tased in his chest and abdominal area. Additionally, the Officer was struck in the head with the sundial. Officer Ramirez then "hip-flipped" Mr. Tyson to the ground, landing on his stomach.

Officers Brian Kerns and Andreas Pantaloukas arrived shortly thereafter and Officer Pantaloukas deployed his Taser in Mr. Tyson's lower left back for nine seconds. The Officers placed Mr. Tyson in handcuffs and held various positional points by applying pressure to maintain

1

Mr. Tyson in a prone position. Following the placement of handcuffs, Officers Karl, Truntz and Falcon arrived on scene. Officer Karl proceeded to apply his body weight on Mr. Tyson's upper right arm and upper rear thigh. Officer Truntz applied pressure to Mr. Tyson's left arm. Officer Falcon relieved Officer Ramirez and applied his right knee on Mr. Tyson's left shoulder blade. During this entire encounter, Officer Pantaloukas was holding a positional point at Mr. Tyson's legs where he was using the taser on Mr. Tyson's ankle to achieve neuromuscular incapacitation. Leg restraints were then placed on Mr. Tyson's legs. Officers Pantaloukas, Karl, Truntz and Falcon maintained their positions after leg restraints were applied. Of significance, Officer Falcon testified in his statement (1/21/15, pg. 7-8) to:

> "Um, the leg restraints got placed on, and then, uh, at that point, I already had my right hand on his, on his left shoulder blade; he remained, he was still on his shoulder blade. And at some random point, Im not sure, it was after the leg restraints; I'm not sure if it's a result of the l--leg restraints; he went calm. So at that point, I started releasing some of the weight from my right hand; he was still calm. I patted him a little bit. Um, and then I relaxed the weight on my, on my knee, but I still maintained pressure just in case he decided to flip out. Um, so at that point, I thought he was calm, he was gonna be good. And someone, at that point, brought up the fact that they didn't think he was breathing, and when we rolled him, we, we found out he was, uh, completely unresponsive."

While the sequence of tasings relative to the type of restraint applied is unclear, the materials suggest that Mr. Tyson was tased a few times prior to the placement of handcuffs, a few times prior to the placement of leg restraints and at least two times after the leg restraints were applied for a total of ten (10) tasings for fifty-four (54) seconds over a six minute, thirty second period. The materials suggest the last tasing took place at 14:59:56 for five seconds ending at 15:00:01 hours. Mr. Tyson then fell unresponsive and his lips were blue.

Following this discovery, Mr. Tyson was turned over and Fire Rescue personnel began treatment after handcuffs were removed. Hollywood Fire Rescue records reflect that initial patient assessment was conducted at 15:03 and Mr. Tyson was pulseless, apneic and cyanotic. At 15:05, an EKG was performed and Mr. Tyson's cardiac rhythm reflected pulseless electrical activity (PEA) which remained throughout patient contact. CPR was initiated and Mr. Tyson was transported to Memorial Regional Hospital. Upon arrival at 15:24, Mr. Tyson's condition remained unchanged and ACLS was continued until his pronouncement at 15:37.

**Autopsy of Daniel Tyson**

The autopsy documented Mr. Tyson weighing 220 pounds with a height of 5 feet, 8 inches. An external examination revealed abrasions to the left side of the chest, epigastric area of the abdomen, right upper quadrant of the abdomen, right knee, left forearm and left leg. Also, two metal barbs from a conducted electrical device were implanted in the left side of the lower back. Additionally, cardiovascular pathology was performed which found severe coronary atherosclerosis, fibromuscular dysplasia of the cardiac conduction system, dilated TV and PV annuli and sickled red blood cells. Toxicology revealed delta-9 carboxy THC (7 ng/mL) in peripheral blood and ethanol 0.03 in ocular fluid. No amphetamine/methamphetamine, opiates, bath salts or designer stimulants were detected in peripheral blood.

**Opinion**

It is my opinion, with a reasonable degree of medical certainty, that Mr. Daniel Tyson's death was due to restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA cardiac arrest.

Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not.  The records indicate that the last tasing took place at 14:59:56 for five seconds ending at 15:00:01 hours. Mr. Tyson then fell unresponsive and his lips were blue.

Following this discovery, Mr. Tyson was turned over and Fire Rescue personnel began treatment after handcuffs were removed. Hollywood Fire Rescue records reflect that initial patient assessment was conducted at 15:03 and Mr. Tyson was pulseless, apneic and cyanotic. At 15:05, an EKG was performed and Mr. Tyson's cardiac rhythm reflected pulseless electrical activity (PEA) which remained throughout patient contact. CPR was initiated and Mr. Tyson was transported to Memorial Regional Hospital.

The following medical literature is informative regarding PEA cardiac arrest:

> 2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest". Circulation. 112 (24 Suppl): IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

As is documented in the cardiology literature, PEA may be caused by many conditions, but its most frequent causes are hypovolemia and hypoxemia.

> "Hypoxia secondary to respiratory failure is probably the most common cause of PEA, with respiratory insufficiency accompanying 40-50% of PEA cases." emedicine.medscape.com/article/161080-overview#a6- updated 11/20/17

The possible causes of PEA are remembered as the 6 Hs and the 6 Ts.

- Hypovolemia
- Hypoxia
- Hydrogen ion (acidosis)
- Hypokalemia/ hyperkalemia
- Hypoglycemia
- Hypothermia
- Toxins
- Cardiac tamponade
- Tension pneumothorax
- Thrombosis (coronary or pulmonary)
- Trauma

3

In reviewing the literature and as confirmed by my extensive experience as a cardiologist, the only plausible and possible cause of PEA cardiac arrest in Mr. Tyson was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia.  None of the other possible causes listed above are plausible or relevant in the case of Mr. Tyson.

I totally reject the contention that the cause of the sudden cardiac arrest and death in Mr. Tyson was Excited Delirium Syndrome (ExDS), as suggested by Dr. Vilke. The literature suggesting that victims of ExDS may die from cardiopulmonary arrest link this sudden cardiac death to a generalized sympathetic storm within the autonomic nervous system causing lethal ventricular arrhythmias, such as ventricular tachycardia (VT) or ventricular fibrillation (VF). In the case of Mr. Tyson, the undeniable fact that the cardiac rhythm at the time of cardiac arrest was PEA is incompatible with the theory that ExDS was the culprit.  The hypothesis that ExDS caused the cardiac arrest would only be plausible if the EKG at the time of the cardiac arrest showed VT or VF.  ExDS does NOT cause PEA.  The only acceptable pathophysiologic explanation of the PEA in this case is hypoxia/hypoxemia due to asphyxia.

Dr. Vilke places great emphasis on the finding of a low end-tidal $CO_2$ at the time of Mr. Tyson's resuscitation process: "Finally, the end-tidal $CO_2$ noted by paramedics when they arrived was low at 22 mm Hg. If Mr. Tyson had been asphyxiated by the restricting of chest wall movement due to weight and compression, he would not have been able to ventilate and breathe out carbon dioxide ($CO_2$). Over the time of asphyxiation, he would have built up high levels of $CO_2$, the earliest clinical indicator of asphyxiation. This would have led to a buildup of $CO_2$ in the lungs and when the paramedics started ventilating him with the breathing tube, the end tidal $CO_2$ that they measured would have been extremely high. In the case of Mr. Tyson, the end tidal $CO_2$ levels were low, which is not consistent with asphyxiation. The low $CO_2$ levels at the time of initiating ventilations are consistent with a cardiac arrest not related to ventilatory failure, but rather cardiac arrest, the heart stopping." Dr. Vilke is correct insofar as studies have demonstrated that the partial pressure of end-tidal $CO_2$ ($petCO_2$) is significantly higher in patients with asphyxia cardiac arrest in comparison to patients with primary (cardiogenic) cardiac arrest.  However, elevated levels of $petCO_2$ in asphyxia cardiac arrest are only noted in the first minute after cardiac arrest.   The following article provides important information and documentation on this topic:

> Difference in end-tidal $CO_2$ between asphyxia cardiac arrest and ventricular fibrillation/pulseless ventricular tachycardia cardiac arrest in the prehospital setting
>
> Authors:  Štefek Grmec, Katja Lah and Ksenija Tušek-Bunc
>
> *Critical Care* 2003, 7:R139-R144 (DOI 10.1186/cc2369)

From the Discussion section of this article: "In the present study we confirmed that the $PetCO_2$ was markedly elevated during the first minute of CPR in asphyxia cardiac arrest. This study therefore confirmed the results of the studies that used animal models in which cardiopulmonary arrest was induced by asphyxia. In the present study the $PetCO_2$ values during CPR were initially high, then decreased to subnormal levels."

4

The paramedics/EMS records related to the CPR are as follows:

| Date | Time | Action | By | Notes |
|---|---|---|---|---|
| 10-27-2014 | 15:03 | Assessment | RF | Pt was combative during initial pt contact and then became unresponsive, apniec and pulseless. CPR was then Initiated. * |
| 10-27-2014 | 15:03 | Spinal Motion Restriction | MD | |
| 10-27-2014 | 15:03 | CPR | AS | |
| 10-27-2014 | 15:05 | EKG | RF | Pt Rhythm of PEA did not change throughout treatment. A Other ekg was obtained by Fuentes, Rafael. PEA. |
| 10-27-2014 | 15:06 | Oxygen | ML | Via BVM and OPA. 15.00 LPM via Other/miscellaneous per On-Line. The Patient's condition was Unchanged. |
| 10-27-2014 | 15:06 | Vitals | | BP 0/0 Automated Cuff, Pulse 0, Respirations 0, SPO2 0% on O2 |
| 10-27-2014 | 15:07 | IV/IO | AS | A 15g IV was attempted in the Lower Extremity-Left by Sharpe, Adam with success. NS 1000cc Bag run at Bolus with a 10 gtt. Total Volume Infused 250.0. Blood was not drawn. |
| 10-27-2014 | 15:08 | Advanced Airway | RF | 5.0 i-gel Supraglottic Airway was established by Fuentes, Rafael. It was secured nullby Tape. It was confirmed by Auscultation of Bilateral Breath Sounds, Digital CO2 Confirmation, Visualization of the Chest Rising with ventilation. |

As is noted, the CO2 level was not measured until 5 minutes after CPR was initiated, at which time one would no longer expect an elevated petCO2 in asphyxia cardiac arrest. Accordingly, Dr. Vilke's arguments based on PetCO2 values in Mr. Tyson are erroneous.

Table 3 from the Grmec article illustrates the pattern of PetC02 values in asphyxia cardiac arrest and for VF/VT arrest.

## Table 3

The mean values for all patients of the initial, final, average and after 1 min of cardiopulmonary resuscitation (CPR) partial pressures of end-tidal carbon dioxide (PetCO2) for arrest due to asphyxia and for ventricular fibrillation/pulseless ventricular tachycardia (VF/VT) cardiac arrest

| | Initial PetCO2 | PetCO2 after 1 min | Final PetCO2 |
|---|---|---|---|
| Asphyxial cardiac arrest | 66.4±17.3 | 29.1±4.9 | 27.3±9.2 |
| VT/VF cardiac arrest | 16.5±9.2 | 24.2±5.1 | 24.4±10.3 |

These data confirm that the low PetCO2 measured in Mr. Tyson 5 minutes after CPR was initiated is entirely consistent with asphyxia cardiac arrest.

In summary, it is my opinion that the findings at the time of the cardiac arrest were PEA, which is entirely consistent with restraint asphyxia and hypoxia, and entirely inconsistent with Excited Delirium Syndrome (ExDS), as suggested by Dr. Vilke.

I note the pathology findings of severe coronary arteriosclerosis. There is no evidence that this disease process contributed to Mr. Tyson's death. There was no evidence of acute myocardial infarction, and the findings of PEA are entirely consistent with asphyxia cardiac arrest, unrelated to coronary artery disease.

Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties and review other materials as they become available in the case and provide additional opinions as appropriate.

Sincerely yours,

*[signature: Daniel Wohlgelernter]*

DANIEL WOHLGELERNTER, MD, FACC