# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as Personal
Representative of the Estate of DANIEL TYSON,
deceased,

        Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida Municipal
Corporation,

        Defendants.
_____/

# PLAINTIFF'S STATEMENT OF MATERIAL FACTS
# IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO
# CITY OF HOLLYWOOD'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, JEAN SUAREZ, individually, and as Personal Representative of the Estate of DANIEL TYSON ("Plaintiff"), Responds to Defendant City of Hollywood's ("the City" or "COH") Statement of Undisputed Facts in Support of its Motion for Summary Judgment and provides an additional concise statement of material facts, as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.

### RESPONSE TO CITY OF HOLLYWOOD'S STATEMENT OF UNDISPUTED FACTS

1. Undisputed.

2. Undisputed. Pean Dep. 16, 18–19, attached as Ex. 1. Behaviors consistent with schizophrenia include hallucinations, delusions, and agitation, while a manic episode include yelling, agitation, and most often require hospitalization for stabilization. *Id*. at 18, 19, 44, 49.

3. It is undisputed that sometime before October 27, 2014, Daniel told Jessica Auerbach that he had stopped taking his Wellbutrin medication. Auerbach Dep. at 45–49, 51–52, 57–59, 60–61, 78, 84, attached as Ex. 2. Additionally, the day before he died, Daniel exhibited behavior consistent with a manic episode. Ex. 1 at 22, 42–43.

4. It is undisputed that an altercation took place between Daniel and Mr. Collette on October 26, 2014. However, this fact is irrelevant and prejudicial. COH police officers were entirely unaware of this incident when responding to the call at Daniel's apartment because Mr. Collette did not report the incident to the police. Collette Dep. 38-39, attached as Ex. 3.

5. It is undisputed that Daniel hardly slept and his mental condition got progressively worse the night of October 26, 2014. Daniel did not go to a hospital because "it was just a nightmare for him." Ex. 2 at 59-60, 63.

6. Defendant's characterization of Daniel's behavior as "aggressive, intimidating, and bizarre" is disputed. *See infra*, ¶¶ 7-9, 14.

7. It is undisputed that around 10:00 A.M., Robert Brown testified that Daniel knocked on his door to ask for a cigarette or a bucket. Brown Dep. 6, 12, attached as Ex. 4. Brown testified he asked Daniel to leave his apartment because he did not want Daniel around his two minor children "at that moment." *Id.* Brown described Daniel's behavior as "*a little* intimidating" or "*a little* aggressive," then clarified that "maybe that's not even quite the word." *Id.* at 6-7 (emphasis added). Brown also testified that Daniel was "not physically aggressive, but somewhat imposing maybe" and "maybe not making as much sense." *Id.* at 7, 28.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

8. Undisputed that this reflects Moore's testimony.

9. Undisputed.

10. Undisputed.

11. Undisputed.  Additionally, Moore testified that she was not concerned for her own safety or the safety of anyone else, including their neighbor, Samantha, and her children.  Moore Dep. 28, 30-31, attached as Ex. 5.

12. Undisputed.

13. It is undisputed that Auerbach was worried that Tyson might hurt or even kill himself. However, Auerbach testified that she left Tyson's apartment to retrieve a cell phone charger that would charge Tyson's cell phone, which was dead at the time. Ex. 2 at 72-74.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Disputed. At 2:45 P.M., the Broward Sherriff's Office (BSO) dispatched two rookie Hollywood Police Officers, Alexis Ramirez and Andreas Pantaloukas, who were in week 2, day 1 of the shadow phase of their field training program, to respond to the scene.  *See* Hollywood Police Department CAD Report, attached as Ex. 6; Ramirez Dep. at 46-47, attached as Ex. 7.; Pantaloukas Dep. at 17-18, attached as Ex. 8.

18. Undisputed. It is also undisputed that Officers were dispatched as a "Signal 20," which is used to identify a mental illness or crisis-related call.  Ex. 8 at 82-83; Ex. 7 at 71, 74-76, 81, 112-13; Dispatch call at 2, attached as Ex. 9.  The City broadcast over the air and through written communication that Daniel suffered from mental illness; this information was available to all officers, including Ramirez and Pantaloukas.  Ex. 9 at 2; Kerns Dep. at 48, attached as Ex. 10.

19. Undisputed.  It is also undisputed that Ramirez was the first to arrive at the scene. According to Ramirez, when he arrived at Daniel's home, Daniel was standing outside naked, acting erratically, and mumbling and yelling incoherently. Ex. 7 at 103-11. Additionally, Ramirez testified that when he approached Daniel, he observed unusual behavior and in turn called Pantaloukas on his cellular telephone (instead of using the police radio) to ask when he would arrive because he was "concerned." *Id.* at 82-84.  Ramirez testified that he "could have" gone back to his patrol car and wait for other officers to arrive on scene, but he decided not to

3

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

ever retreat. *Id.* at 110. Nonetheless, Ramirez did not call his FTO, Officer Kerns, or his Sergeant. Ex. 10 at 49-50. Ramirez did not wait for Pantaloukas to arrive to the location prior to reengaging Daniel. *Id.*

20. Undisputed that this reflects Officer Ramirez's testimony.

21. Undisputed that this reflects Officer Ramirez's testimony.

22. Undisputed that this reflects Officer Ramirez's testimony. Moore, who in any event was inside her apartment, did not characterize Officer Ramirez's tone as "friendly." Ex. 5 at 65.

23. Undisputed that this reflects Officer Ramirez's testimony.

24. Undisputed that this reflects Officer Ramirez's testimony.

25. Undisputed that this reflects Moore's testimony. However, Moore was inside, watching from her dining room window when Officer Ramirez was interacting with Daniel. Ex. 5 at 37.

26. Undisputed that this reflects Officer Ramirez's testimony. *See also supra* ¶ 19.

27. Disputed. The City mischaracterizes Moore's testimony. Moore stated that Daniel "pick[ed] up" a sundial from the wall. Daniel paused about 12 or 15 feet away from Officer Ramirez and was just "standing there" with the sundial over his head before he approached Officer Ramirez. Ramirez Sworn Statement at 8-9, attached as Ex. 11.

28. Disputed. In his initial interview a few months after the incident, Officer Ramirez testified that he told Daniel to drop his object, but not that he warned Daniel he was going to tase him. Ex. 11 at 8-9.

29. It is undisputed that Tyson approached Ramirez while holding an object over his head with both hands. Ramirez then deployed his Taser on Daniel. Daniel then struck Ramirez with the object in his hand. Ex. 7 at 122-23. However, Ramirez testified that he does not recall how the sundial came into contact with his head because he was discharging his Taser at the same time. *Id.* at 170. Additionally, Ramirez testified that he did not "know what [Tyson's] train of thought was" or whether Tyson understood or appreciated his commands. *Id.*

30. Undisputed.

31. Disputed in part. The evidence is not clear that Daniel struck Ramirez with intent. *See supra,* ¶¶ 2, 29.

32. Undisputed. Ramirez was only alone with Daniel for 29 seconds before Officer Pantaloukas arrived. Ex. 6; TASER Analysis, attached as Ex. 12.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

33. Undisputed that this reflects Officer Ramirez's testimony.

34. Undisputed that this reflects Officer Ramirez's testimony.

35. Undisputed that this reflects the officers' testimony. Officer Pantaloukas arrived shortly after Officer Ramirez and began deploying his Taser on Daniel. Ex. 7 at 129, 132; Ex. 8 at 93-95. Officer Kerns, a field training officer, arrived shortly after Officer Pantaloukas and participated in holding down Daniel throughout the encounter with police. Ex. 7 at 132, 143, 152, 154; Ex. 8 at 120-25; Ex. 10 at 71, 75-76, 78, 80.

36. Disputed. This version of events is contradicted by the Police CAD timeline. Timeline of Events by Det. Rillo, attached as Ex. 13. Officer Pantaloukas arrived and called for back-up 29 seconds after Officer Ramirez first deployed his Taser for nine seconds and supposedly had a "constant struggle" with Daniel. *Id.* Officer Pantaloukas deployed his Taser just seven seconds after his call for back-up on the radio. *Id.* According to Officer Pantaloukas's testimony, in seven seconds he had time to make a call for back-up on the radio, try to control Daniel's legs, issue a verbal warning to Daniel, and then move away from Daniel to deploy his Taser to launch the Taser probes into his lower back.

37. Undisputed. *See supra*, ¶ 36 and *infra* ¶ 38.

38. Disputed in part. Officer Pantaloukas did not testify that he gave any warning before deploying his Taser. Ex. 8 at 98-99.

39. Disputed. Eyewitness Robert Brown saw the police encounter at a time when there were one or two police officers on Daniel. He testified that Daniel "was subdued." Ex. 4 at 18. During this time, he saw police "on top of [Daniel] tasering him." *Id.* at 21. He testified that Daniel "was not able to move" when the officers were on top of him. *Id.* at 20. Importantly, he testified that officers "had [Daniel] under control. They had him on his belly not moving, not able to move." *Id.*

40. Undisputed. Additionally, Pantaloukas testified that he obtained neuromuscular incapacitation each time he deployed his Taser and Daniel's whole body just locked up". Ex. 8 at 111, 130.

41. Undisputed. *See also supra*, ¶ 40.

42. Undisputed. A COH police officer announced over the radio that Daniel Tyson was "in

5

custody now." Daniel could be heard moaning in the background. Audio of Dispatch.[1]

43. Disputed. *See supra*, ¶ 39, 42.

44. Disputed. *See supra*, ¶¶ 39, 42. Additionally, Leonarda Moore testified that the "leg shackles" "were the plastic ones." Ex. 5 at 49-50. Major Millares was unable to confirm what kind of restraints they were because they were never properly photographed as evidence, which was a "clear oversight" by police. Millares Dep. 107–109, attached as Ex. 14.

45. Disputed in part. Daniel was in custody and not kicking his legs. *See supra*, ¶¶ 39, 42.

46. Disputed. Eyewitness Leonarda Moore testified that after Daniel was in handcuffs and leg shackles she never saw Daniel "lifting officers off the ground, while trying to get up," as COH officers claim. She also testified that she did not see Daniel do "any kicking because his legs were shackled." Ex. 5 at 46. She explained: "He wasn't – he was moving around like this, I mean, he was limited in his movements. He couldn't really do anything and one of the officers had a taser pressed against his calf." *Id.*

47. Disputed that there was a struggle. *See supra* ¶¶ 39, 42, 46. In all, four to six officers bore down on Daniel's body after he was placed in handcuffs and leg shackles, preventing him from breathing. Taylor Dep. at 129, 147-48, attached as Ex. 15; Det. Rillo Homicide File TYSON 00927, attached as Ex. 16; Ex. 5 at 46-48, 67-71; Truntz Dep. at 107-15, 118-19, 121, 125, attached as Ex. 17; Falcon Dep. at 57-61, 72-73, 82-83, attached as Ex. 18; Ex. 11 at 70, 74-78, 81, 83-84, 86-88; Wagner Dep. at 122, 124, attached as Ex. 19; Karl Dep. at 89-90, 95, 98, attached as Ex. 20.

48. Disputed that there was a struggle. *See supra* ¶¶ 39, 42, 46. Additionally, Falcon testified that he placed his right knee on Tyson's right shoulder blade and placed his right hand on Daniel's left shoulder blade; there were three officers "on his upper torso area." Ex. 18 at 58-59. Falcon further testified that he weighed 185-190 pounds at the time and maintained pressure until someone realized Tyson was not breathing. *Id.* at 13, 73.

49. Disputed. *See supra*, ¶¶ 39, 42, 46, 47. Additionally, Pantaloukas testified that he weighed 185-190 pounds at the time of the incident. Ex. 8 at 71.

50. Disputed. *See supra*, ¶¶ 39, 42, 46, 47.

51. Disputed. *See supra*, ¶¶ 39, 42, 46, 47. Additionally, Truntz testified that he applied

---

[1] To be provided to Chambers conventionally.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

medium pressure to Daniel's left elbow; following the realization that Tyson went "calm" and his lips were blue, he told the other officers to get off of Daniel. Ex. 17 at 107-08, 131, 140. Truntz further testified that he weighed 160 pounds at the time. *Id.* at 42.

52. Disputed. *See supra*, ¶¶ 39, 42, 46, 47. Additionally, Karl testified that he weighed 210 pounds at the time and that he applied his full body weight to Tyson. Ex. 20 at 24, 89-90.

53. Undisputed.

54. Disputed. *See supra* ¶¶ 39, 42, 46.

55. Disputed. *See supra*, ¶¶ 39, 42, 46.

56. Disputed. *See supra* ¶¶ 39, 42, 46..

57. Disputed. *See supra* ¶ 42, 47.

58. Disputed. *See supra* ¶¶ 39, 42, 46. Officer Truntz was the first officer who realized that Daniel was no longer responsive. Ex.17 at 129-32, 139-41. Truntz testified that thirty seconds to one minute lapsed between the time when Daniel stopped yelling and the time Officer Truntz realized Daniel's lips were blue and he was not responding. *Id* at 126-28, 138. Moore also testified Daniel was lifeless when officers turned him over. Ex. 5 at 49. Officer Truntz then called out to paramedics, saying "I think he's not breathing." *Id.* at 140.

59. Undisputed. These five deployments of Officer Pantaloukas' Taser occurred after Daniel was "in custody" and in handcuffs. Ex. 13

60. Undisputed.

61. Disputed. *See supra* ¶¶ 39, 42, 46.

62. Disputed. *See supra* ¶¶ 39, 42, 46. Moreover, the officers testified the incident occurred in a fenced-in courtyard, where the exit was secured by other officers. Ex. 7 at 89, 100; Ex. 8. at 94; Ex. 19 at 85.

63. Disputed. Major Millares testified that handcuffs were applied following the fifth deployment of the Taser, i.e., one and a half minutes after Daniel was first tased. Ex. 14 at 118. At that point, a COH police officer announced over the radio that Daniel Tyson was "in custody now." *See supra* ¶ 42. Moore testified that she heard four clicks of Taser after the leg shackles were placed on Daniel. Ex. 5 at 48. Major Millares also testified that Pantaloukas Tased Daniel four times after he was in handcuffs and leg restraints. Ex. 14. at 118-19.

64. Undisputed that this was Pantaloukas's testimony.

7

65. Disputed. *See supra*, ¶¶ 39, 46.

66. Undisputed.

67. Disputed. *See supra*, ¶¶ 39, 46. Moore testified that Daniel was not fighting with the officers, he was "just yelling." Ex. 5 at 45.

68. Undisputed that this reflects Moore's testimony. However, these statements were made early on in the encounter, when officers first arrived on scene. Text messages from Moore to LesMarie, attached as Ex. 21. After he was handcuffed and leg shackled, Moore stated that he was under control and no longer moving. *See supra*, ¶ 46.

69. Disputed. Officer Truntz told eyewitness Leonarda Moore that "the only thing [Daniel] needs to do is get[] [in] an ambulance." Ex. 5 at 47-48. But Daniel was not given medical treatment. *See, e.g.*, Ex. 10 at 90. Rather, he was tased several more times and then became unresponsive. *See supra,* ¶¶ 47, 63.

70. Undisputed. *See also supra*, ¶ 39..

71. Undisputed. *See also supra*, ¶ 39. Brown also testified that he never saw Tyson pop on his feet or try to run away from the officers. Ex. 4 at 31-32. He testified that, Tyson "couldn't physically move his body because he was constrained or under – under their control.." *Id.* at 32.

72. Undisputed, *but see supra* ¶¶ 39, 71.

73. Disputed. Christine Corbo lives on an adjacent property secured by a fence, which prevents Ms. Corbo from having a full view of the property on which the incident occurred. C. Corbo Statement at 3, attached as Ex. 22; J. Corbo Statement, attached as Ex. 23. *See also supra* ¶¶ 39, 46, 71.

74. Disputed. *See supra* ¶¶ 39, 46, 71, 73.

75. Disputed. *See supra* ¶¶ 39, 46, 71, 73. It is also undisputed that the toxicology results establish Daniel was not under the influence of any narcotics at the time of the incident. Autopsy Report and Records at 6, TYSON 04020, attached as Ex. 24.

76. Disputed. *See supra* ¶¶ 39, 46, 71, 73.

77. Undisputed.

78. Disputed. *See supra*, ¶¶ 39, 42, 45, 46, 71.

79. Disputed. Daniel's last tasing ended at 3:00:01. Ex. 13. Daniel was screaming in pain or distress throughout the tasing. *See supra*, ¶¶ 42, 58.

8

80. Disputed. *See supra* ¶¶ 39, 42, 46, 71.

81. Disputed. Daniel did not "suddenly" become unresponsive. *See supra*, ¶ 58.

82. Undisputed. When paramedics checked Daniel, his EKG registered pulseless electric activity ("PEA"). Ex. 24; Wohlgelernter Dep. at 21, attached as Ex. 25.

83. Undisputed.

84. Disputed and irrelevant. The officers had no knowledge of Tyson's treating psychiatrist prior to arriving on scene or during the incident.

85. Undisputed. However, had Daniel's heart conditions caused cardiac arrest, PEA would not be found. Bell Dep. at 45, attached as Ex. 26; Ex. 25 at 45-47, 59-65.

86. Undisputed. However, the coroner did not review any police reports, statements, or depositions detailing the incident. *See* Ex. 24.

87. Disputed. Dr. Shuman opined that Excited Delirium Syndrome was not the sole cause of Daniel's death, and positional asphyxiation and use of a Taser were contributing factors to Daniel's death. Shuman Report at 5, attached as Ex. 27. Dr. Vilke ruled out positional asphyxiation as a cause of death based on his incorrect assumption Daniel became "calm and quiet" several minutes <u>after</u> the struggle with police officers. Vilke Report at 7-8, attached as Ex. 28. Moreover, Dr. Daniel Wohlegelernter concluded that the police officers' prone restraint of Daniel caused Daniel's cardiac arrest. Wohlegelernter Report at 3, attached as Ex. 29. In particular, Dr. Wohlegelernter noted that medical records establish that Daniel was exhibiting pulseless electric activity ("PEA") when paramedic evaluated him. *Id.* at 3-4. Having ruled out the other possible causes of PEA cardiac arrest, he concluded that the only plausible and possible cause of Daniel's PEA cardiac arrest was hypoxia/hypoxemia due to positional asphyxiation caused by COH police officers' restraint of Daniel. *Id.*

88. Undisputed. It is also undisputed that Excited Delirium Syndrome does not cause PEA. Ex. 26 at 45; Ex. 25 at 45-47, 59-65.

89. It is undisputed that Tyson's Excited Delirium Syndrome was caused by his psychiatric disorder.

90. Undisputed. It is also undisputed that based on the City's records, in 2012, City police officers used Tasers 44 times to detain persons. Eighteen of those 44 Taser uses of force were on Baker Act'ed persons. 2012 Response to Resistance Reports, attached as Ex. 30; 2012 Internal

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

Affairs Unit Annual Report, attached as Ex. 31.

91. Undisputed. Based on the City's records, it is also undisputed that in 2013, Tasers were used to detain 25 persons, eight of which were Baker Act'ed persons. 2013 Response to Resistance Reports, attached as Ex. 32; 2013 Internal Affairs Unit Annual Report, attached as Ex. 33.

92. Undisputed. Additionally, in 2014 there were 24 use of force reports involving a Taser; seven of which involved Baker Act'ed persons. 2014 Response to Resistance Reports, attached as Ex. 34; 2014 Internal Affairs Unit Annual Report, attached as Ex. 35. With regard to all use-of-force reports he reviewed (2012-2014), Taylor opined that "any time a Taser is used for more than three cycles, it should be investigated." Ex. 47 at 51. However, that was not done by the City. Taylor remarked that it "was shocking" was that none of those incidents were referred for administrative review or to internal affairs. Instead, they were "all marked to go to file." *Id.* at 140.

93. Disputed. Ex. 15 at 108-109; SOP 200, attached as Ex. 36; SOP 201, attached as Ex. 37; SOP 212, attached as Ex. 38. There is no express policy that deals with the use of a Taser on a mentally ill person. *See* Ex. 15; Ex. 36; Ex. 37. Police practices expert Roy Taylor raised concerns about the City's policies because they "do not discuss responding to people with mental illness that are suffering from psychotic episodes." Ex. 15 at 33. Moreover, an independent audit of the Hollywood Police Department's ("HPD") internal affairs department found, "HPD failing to meet even the most essential elements of the generally accepted police practices in internal affairs operations." Independent Assessment of Hollywood at 4, attached as Ex. 39.

94. Undisputed.

95. Undisputed. However, SOP 200, does not provide that officers should consider mental illness as a specific factor when deploying Tasers. Ex. 36. The policies of the City of Hollywood confirm that police officers have complete discretion in how to respond to a call. Basler Dep. at 35-37, 63-64, attached as Ex. 40. Given the number of use of force cases the COH police department has involving the mentally ill, Roy Taylor opined that "additional guidance is needed to limit the use of force against people in those situations." Ex. 15 at 34.

96. Undisputed.

97. Undisputed. However, SOP 212 "only has a few lines about responding and leaves it

10

pretty much open to the officer's discretion." Ex. 15 at 33. SOP 212 also requires two officers to be dispatched to all potential Baker Act incidents and provides that if an officer believes the person may require emergency admission, the officer may call for back-up assistance. Ex. 38.

98. Undisputed, but irrelevant.

99. Undisputed, but irrelevant.

100. Undisputed, but irrelevant.

101. Disputed. The officers consistently testified in deposition that they were not aware of any special policies or procedures for dealing with the mentally ill.  Ex. 18 at 48-50, 52-53; Ex. 20 at 11-12. 50-51, 83-85; Ex. 10 at 20, 43; Ex. 8 at 11-13, 26, 99, 139-40, 146; Ex. 7 at 14, 16, 139-40; Ex. 17 at 104, 142-44; Ex. 19 at 6, 31-33.  Officer Pantaloukas did not know there was a policy on deploying a Taser for more than a five-second cycle. Ex. 8 at 99.

102. It is undisputed that, in October 2014, COH was only reaccredited with conditions by the Commission for Florida Law Enforcement Accreditation, Inc. Accreditation Revocation Letter, attached as Ex. 41.  Additionally, after a review, the Commission voted to revoke COH's conditional accreditation shortly thereafter in March 2015. *Id.* At least as of March 2018, it has not regained its accreditation.  Ex. 40 at 74-75.

103. Disputed. *See* ¶¶ 93, 101. Despite HPD policy and a national standard requiring all citizen complaints to be entered into IAPro, the internal record keeping and tracking system for complaints, HPD has "developed a practice" of failing to do so. Ex. 39 at 4-5. Additionally, Taylor recommended a number of more appropriate policies for dealing with the mentally ill, including using more de-escalation techniques and having a "policy recommending initial EMS activation" would be warranted.  Ex. 15 at 34.  Taylor noted that there are programs around the country that utilize counselors on patrol to assist officers.  *Id.*

104. Undisputed that that is what the cited document states.

105. Undisputed that that is what the cited document states.

106. Undisputed that that is what the cited document states.

107. It is undisputed that this policy exists.  However, it is not followed. *See generally*, Ex. 39.

108. It is undisputed that this policy exists.  However, it is not followed. *See generally*, Ex. 39.

11

109. Undisputed that that is what the cited document states.

110. Disputed.  Major Millares testified that the Police Chief decides whether there will be an internal affairs investigation. Ex. 14 at 17.

111. Disputed.  An independent audit of the HPD's internal affairs department conducted by Charles Gruber found further concluded that a review of IA incidents "indicated a lack of investigative follow up, probing of the alleged complaint, proper identification of the alleged misconduct and appropriate/fair discipline when officer misconduct was or should have been identified." Ex. 39 at 5.

112. Undisputed.

113. Undisputed.

114. Undisputed.

115. Undisputed. It is also undisputed that the officers were not specifically educated or trained in any special policies or procedures for dealing with the mentally ill regarding Tasers or positional asphyxia.  Ex. 18 at 48-50, 52-53; Ex. 20 at 11-12. 50-51, 83-85; Ex. 10 at 20, 43; Ex. 8 at 11-13, 26, 99, 139-40, 146; Ex. 7 at 14, 16, 138-40, 164-65; Ex. 17 at 104, 142-44; Ex. 19 at 6, 31-33. Moreover, the training is clearly inadequate as officers involved in the death of Daniel consistently testified to not knowing the policies and procedures for use of Taser, dealing with the mentally ill, and use of force, evidencing that the City's training is deficient.  Ex. 18 at 21, 48-50, 52-53; Ex. 20 at 11-12. 50-51, 83-85; Ex. 10 at 20, 37, 43; Ex. 8 at 11-13, 21, 26, 99, 139-40, 146; Ex. 7 at 14, 16, 139-40; Ex. 17 at 104, 142-44; Ex. 19 at 6-7, 31-33.

116. Disputed.  To support this statement, the City cites only to a Police Academy schedule; the record does not reflect whether Ramirez or Pantaloukas were present on those days.

117. Disputed.  The City relies solely on officer testimony for this proposition, rather than any authoritative records on the issue.

118. Disputed. The State certification does not provide information of what is tested or how that information related to these circumstances, and there is no evidence to support this claim.

119. Undisputed.

120. It is undisputed that the officers are provided with the department's policies and procedures during in-house training, and that officers receive additional materials and training on use of a Taser.  However, it is disputed that officers review or know the substance of these

materials or receive additional materials and training on Baker Act procedures and use of force. The officers in this case consistently testified to either not having any knowledge of said procedures or to only receiving the information and/or training after the incident with Tyson. Ex. 18 at 21, 53; Ex. 20 at 11; Ex. 10 at 37; Ex. 8 at 21, Ex. 19 at 6-7.

121. Undisputed that this reflects the testimony of the City. Taser training materials, however, instruct officers to look to their own police department's policies on use of force. Annual CEW User Update PowerPoint, v. 19, at Slide 20, attached as Ex. 42. Moreover, Taser's training materials warn that a person "must be given a reasonable opportunity to comply with officer's directives prior to each [Taser] drive-stun application." Ex. 42 at 10. Taser's training materials state that "[t]he application of the [Taser] is a physically stressful event" and warn that "[s]everal law enforcement groups have set out 15 seconds (multiple applications or continuous) of CEW exposure as a significant safety point." Ex. 42 at 19, 32. Taser training materials also state that, where a subject may have a pre-existing condition, "[a]ny physiologic or metabolic change may cause of contribute to death or serious injury." TASER Certification Course PowerPoint, v. 18, at 26, attached as Ex. 43.

122. Undisputed.

123. Undisputed.

124. Disputed. On October 27, 2014, both Officers Ramirez and Pantaloukas were in week 2, day 1 of the shadow phase of their Field Training Program at the Hollywood Police Department. During the shadow phase of training, the officers worked in the field while responding to calls with a more experienced officer whom had been designated by the City as a field training officer (FTO). Ex. 40 at 113; Ex. 14 at 130–32; Ex. 10 at 65; Ex. 8 at 17–19. On the date of Daniel's death, Officer Anthony Flores, who was the FTO who was supposed to be supervising Pantaloukas, only responded to the scene <u>after</u> Daniel was removed from the scene. Detective Kerns, who was Ramirez's FTO was third on the scene. Taylor criticized the complete failure of supervision of Ramirez and Pantaloukas: "My opinion as a police chief, I would say that the field training officers needed to be on duty and available anytime that their trainee is out on the street answering calls, and especially when they're dispatched to a call where you have, you know, obvious information that this is going to be involving somebody that's experiencing a psychotic episode." Taylor opined that if the officers' field training officers had been

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

"monitoring more actively" they may have directed the rookie officers to approach Daniel differently. Ex. 15 at 77-78. Additionally, throughout his field training period, Pantaloukas was unsatisfactory in several of the measured criteria. FTO Reports for Pantaloukas, attached as Ex. 44. Every day he was observed in August 2014 and on several occasions in September and October 2014, he was marked unsatisfactory in his knowledge of police department policies and procedures. *Id.* Pantaloukas had difficulty listening to the radio and would fail to retain the information transmitted by dispatch. *Id.* He received negative performance appraisals regarding his ability to control conflict. *Id.* As late as October 15, 2014, Pantaloukas's performance was not at a satisfactory level. *Id.* Throughout his field training period, Ramirez was unsatisfactory in several of the measured criteria. *Id.* In all but one day he was observed in August 2014 and on several occasions in September and October 2014, he was marked unsatisfactory in his knowledge of police department policies and procedures. *Id.* Although supervisors were on notice of these issues, both Pantaloukas and Ramirez were recommended to move on to the shadow phase.

125. Undisputed.

126. Undisputed. However, the substance and the extent of this training is unknown.

127. Undisputed. It is also undisputed that Ramirez and Pantaloukas were without the benefit of CIT Training on the date of the incident and lacked experience. HPD's List of Classes Attended by Ramirez, Ex. 45; Ex. 8 at 21; HPD List of Classes Attended by Pantaloukas, Ex. 46. Officers Falcon, Wagner, and Truntz similarly did not receive crisis intervention training prior to the death of Daniel Tyson. Ex. 18 at 99; Ex. 17 at 160; Ex. 19 at 6-7.

128. Disputed. *See supra*, ¶ 115.

**ADDITIONAL STATEMENT OF FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO COH'S MOTION FOR SUMMARY JUDGEMENT**

**Multiple, Uninterrupted Tasing and continued Weight on Daniel Tyson's Prone Body Caused Daniel's Death on October 27, 2014**

129. In approximately 6.5 seconds, Daniel was tased a total of ten times. Ex. 12.

130. In one of the tasings, Daniel was tased continuously for 9 seconds, in violation of COH Standard Operating Procedure 201. *See* Ex. 12; Ex. 37; Taylor Report, attached as Ex. 347.

131. Even after Daniel was face-down and restrained in handcuffs and leg shackles, officers continued to tase him and exert pressure on top of his body, which prevented him from

14

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

breathing. *See* Ex. 25 at 45; Ex. 5 at 42–45, 49–50, 67–72; Ex. 17 at 97–98, 107–12, 114–15, 121–22; Ex. 18 at 57, 58-59, 60, 72–73, 82–83; Ex. 19 at 70, 73–75, 76–77, 83–84, 86–88; Ex. 7 at 140–141, 148, 152–53; Ex. 10 at 67–68, 72, 75–79,85, 86, 103; Ex. 8 at 98–99, 112–13, 120–22, 129, 130–131; Ex. 20 at 71–72, 77–79, 81, 88, 90, 91; Ex. 15 at 83, 95, 121, 129–30; Ex. 14 at 119, 121.

132. Where a subject may have a pre-existing condition, "[a]ny physiologic or metabolic change may cause of contribute to death or serious injury." Ex. 43 at slide 26.

133. Taser's user manual warns that "[f]ailure to comply with the product instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the user, force recipient, and others." TASER X26E ECD User Manual at 4, attached as Ex. 48.

**Officers' Use of Force was Excessive**

134. Roy Taylor testified that officers should have approached the situation "as a person have a mental crisis" and Officer Ramirez should have "waited until the adequate number of officers were there." Ex. 15 at 91-93.

135. Taylor explained that once Daniel was in handcuffed, further use of a Taser "served no purpose." *Id.* at 87-88. After he was placed in leg shackles face down, Taylor opined that Daniel "was fully restrained. They could have backed away from him. Nobody was in danger. He certainly wasn't able to get up off the ground and run anywhere. There's seven police officers total there. There's only one way out. He's not going to run off." *Id.* at 85.

136. Taylor, who has a 38-year career with law enforcement and conducts officer training, reviewed the evidence in this case and opined that after Daniel was handcuffed, the police officers' actions constituted excessive force. Ex. 47.

137. Taylor opined that, at a minimum, after handcuffs and leg shackles were placed on Daniel, he was "fully immobilized" and police should have called EMS to transport Daniel. Ex. 15 at 113-14.

**City of Hollywood Failed to Supervise Rookie Officers Still in Training**

138. The City is aware that its officers have regular contact with mentally ill persons. Ex. 40 at 108-09; Ex. 8 at 15; Ex. 18 at 95-97; Ex. 17 at 35-37; 72-78.

139. SOP 201 specifically prohibits the use of a Taser on a person who is handcuffed and in

15

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

control. It also expressly states that an officer "should deploy the Taser for one (1) standard five (5) second cycle and then stop and evaluate the situation." Additionally, officer must "utilize only the minimum number of repetitive cycles necessary to immobilize the subject(s) and take them into custody." SOP 201 provides that officers "will not use any restraint techniques after a Taser deployment which restricts or impairs the subject's breathing ability." Ex. 37.

140. The Audit emphasized HPD's lack of any management accountability process as a critical element. Ex. 39. "Simply stated, HPD's leadership failed to provide adequate or appropriate oversight in IA complaint process including intake, investigation, and failure to report publicly (sic) about the activities and cases within the Internal Affairs process." *Id*.

141. In 2014, there were 267 fact-finding investigations based on internal complaints, and in every instance, all police officers were cleared. Ex. 35.

142. COH customarily fails to adequately discipline its employees, agents, and officers because it "lacks a formal, structured, and consistent investigative process. […] Because HPD does not direct HPD investigators with such precision it fails to provide thorough investigations, which is contrary to generally accepted police practice." Ex. 37.

143. Many internal investigations were conducted over the phone. *Id*.

144. In very few cases did the investigator bother to meet with the complainants, collect any evidence, document any investigation or meetings through notes or summaries of discussions, create a statement of work done, or create any other documentation regularly done and expected in an internal affairs file. *Id*.

145. Moreover, "many of the complaints alleged by the complainant were not addressed in the investigative file or concluded in the final outcome of the case. *Id*.

146. Since some of the alleged misconduct was not addressed from the complainant's initial complaint, incomplete cases were found throughout the review process." *Id*. Even worse, the Audit determined that some reports revealed "the investigation completely ignored the misconduct asserted by the complainant." *Id*.

147. As stated in the Audit, any reasons for a deliberate failure to include all of the allegations in the investigation should be properly documented in the IA file. *Id*. However, the Auditors found none. *Id*. The Audit concluded that the "investigations did not properly probe into the allegations of police misconduct and the reviews did not memorialize the issues." *Id*.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

Respectfully submitted,

*s/JOSEPH J. KALBAC, JR*.
JOSEPH J. KALBAC, JR.
Florida Bar No. 628270
jkalbac@colson.com
STEPHANIE A. CASEY
Florida Bar. No. 97483
scasey@colson.com
DENISE H. GEORGES
Florida Bar No. 55861
denise@colson.com
COLSON HICKS EIDSON
Attorneys for the Plaintiff
255 Alhambra Circle, Penthouse
Coral Gables, Florida  33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
E-mail: eservice@colson.com;
nicky@colson.com; mabel@colson.com

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, this 7th day of August, 2018, and a true and correct copy of the foregoing was served either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner of those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing, on: Daniel L. Abbott, Esq., Adam M. Hapner, Esq., Email: dabbott@wsh-law.com; pgrotto@wsh-law.com; ahapner@wsh-law.com; Weiss Serota Helfman Cole & Bierman, P.L., Attorneys for Defendant, City of Hollywood, 200 E. Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301.

*s/JOSEPH J. KALBAC, JR*.
JOSEPH J. KALBAC, JR.
Florida Bar No. 628270