**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:  16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as Personal
Representative of the Estate of DANIEL TYSON,
deceased,

        Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida Municipal
Corporation,

        Defendant.

_____ /

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**<u>DEFENDANT CITY OF HOLLYWOOD'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, JEAN SUAREZ, individually, and as Personal Representative of the Estate of DANIEL TYSON, submits this response in opposition to Defendant CITY OF HOLLYWOOD's ("COH" or "the City") Motion for Summary Judgment.

## INTRODUCTION

Daniel Tyson died on October 27, 2014 as a direct and proximate result of the actions of City officers and the City's polices, customs or practices. Daniel died after he was tased ten times by COH police officers in a time span of 6 minutes and 30 seconds and smothered by four to six police officers. Following the restraint of Daniel Tyson with both handcuffs and leg restraints, COH officers applied their body weight on various positional points on Daniel's body while in a prone position until the officers discovered that Daniel was unresponsive.

To support its arguments for summary judgment, the City goes to great lengths to mischaracterize the Plaintiff's claims and attempt to bury the evidence in this case. A review of the evidence makes clear, however, that summary judgment is not appropriate in this case.

## FACTUAL BACKGROUND

Daniel suffered from schizoaffective disorder, bipolar type and manic depression. Plaintiff's Response to City's Statement of Facts ("SOF") SOF ¶ 2. Behaviors consistent with schizophrenia include hallucinations, delusions, and agitation. *Id*. Behaviors consistent with a manic episode include yelling, screaming, agitating, mood swings and most often, require hospitalization for stabilization. *Id*.

On October 27, 2014, witnesses observed Daniel naked outside his apartment and seemingly talking to trees. SOF ¶ 19. Officers Ramirez and Pantaloukas were dispatched as a "Signal 20," which is used to identify a mental illness or crisis-related call. *Id*. ¶ 17, 18. The City broadcast over the air and through written communication that Daniel suffered from mental illness and was not taking medication; this information was available to all officers, including Ramirez and Pantaloukas. *Id*. Ramirez and Pantaloukas were both rookie officers in the shadow phase of their training. *Id*. ¶ 17. This meant that they worked in the field while responding to calls with a more experienced officer designated by the City as a field training officer (FTO). *Id*. ¶ 124.

Ramirez was the first to arrive at the scene. SOF ¶ 19. According to Ramirez, when he arrived at Daniel's home, Daniel was standing outside naked, acting erratically, and yelling incoherently. *Id*. Ramirez called Pantaloukas on his cellular telephone (instead of using the police radio) to ask when he would arrive because he was "concerned." *Id*. ¶ 19. Although he admitted

2

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

he could have waited for back-up, Ramirez nonetheless decided to engage Daniel. *Id*. at ¶ 21. At some point, Daniel picked up a sundial and and began approaching Officer Ramirez with it. *Id*. ¶ 27. When Daniel was about 12 or 15 feet away from Ramirez he paused and just stood there before approaching Ramirez again. SOF ¶ 27. Ramirez deployed his Taser on Daniel. *Id*. ¶¶ 29, 30. Daniel then struck Ramirez with the object in his hand. *Id*.

Pantaloukas arrived 29 seconds after Ramirez. *Id*. ¶ 32. Within seven seconds, he made a call for back-up and immediately deployed his Taser on Daniel for a continuous 9 seconds. *Id*. ¶¶ 36, 130. At some point, Detective Kerns, Ramirez's FTO, arrived on the scene. *Id*. ¶ 35. Officer Anthony Flores, who was the FTO who was supposed to be supervising Pantaloukas, only responded to the scene <u>after</u> Daniel was removed from the scene. *Id*. ¶ 124.

In rapid-fire succession over a one-minute period, Pantaloukas tased Daniel four times. *Id*. ¶¶ 36, 40. Pantaloukas obtained neuromuscular incapacitation on each deployment. *Id*. ¶ 40.

Officers then placed Daniel in handcuffs. *Id*. ¶ 42. Eyewitness Robert Brown saw the police encounter at around this time. *Id*. ¶ 39. During this time, he saw police "on top of [Daniel] tasering him." He testified that Daniel "was subdued" and "was not able to move." *Id*. Importantly, he testified that officers "had [Daniel] under control.  They had him on his belly not moving, not able to move." *Id*. Consistent with this account, a COH police officer announced over the radio that Daniel Tyson was "in custody now." *Id*. ¶ 42. Daniel could be heard moaning in the background. *Id*. Police-practices expert Roy Taylor explained that once Daniel was handcuffed, further use of a Taser "served no purpose." *Id*. 135.

Nonetheless, Pantaloukas tased Daniel one to two more times. *Id*. ¶ 59. Daniel was then placed in leg shackles. *Id*. ¶ 45. Eyewitness Leonarda Moore testified that after Daniel was in handcuffs and leg shackles she never saw Daniel "lifting officers off the ground, while trying to get up," as COH officers claim. *Id*. ¶ 46. She also testified that she did not see Daniel do "any kicking because his legs were shackled" and "he was limited in his movements. *Id*. He couldn't really do anything and one of the officers had a taser pressed against his calf." *Id*. Expert Roy Taylor opined that Daniel "was fully restrained" after he was placed in leg shackles *Id*. ¶ 135.

Nonetheless, Pantaloukas tased Daniel somewhere between two to four more times. *Id*. ¶ 63. Notably, an eyewitness and the City's corporate representative agree that Pantaloukas tased Daniel four times after he was face down, in handcuffs and leg shackles. *Id*.

Throughout this time, four to six officers bore down on Daniel's body preventing him from

3

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

breathing. *Id.* ¶ 47.   Officers never placed Daniel on his side or sitting up to prevent him from asphyxiating.  *Id.* ¶ 81.   Throughout his restraint, Daniel was yelling, but was largely incoherent. *Id.* ¶ 79. But although Truntz told eyewitness Moore during their officers' restraint of Daniel that "the only thing [Daniel] needs to do is get[] [in] an ambulance," no medical care was provided at that time. *Id.* ¶¶ 69, 81.

 Truntz was the first officer who realized that Daniel was not responsive.  *Id.* ¶ 58. He testified that thirty seconds to one minute lapsed between the time when Daniel stopped yelling and the time Truntz realized Daniel's lips were blue.  *Id.* Truntz called for paramedics, announcing that Daniel was not breathing.  *Id.* When they turned his body over, Daniel was lifeless. *Id.*

Plaintiff brought this action individually and on behalf of the Estate of her son, Daniel Tyson.  She asserts four causes of action against the City:  wrongful death; violation of Title II of the American with Disabilities Act ("ADA"); violation of § 504 of the Rehabilitation Act ("Rehab Act"); and violation of 42 U.S.C. § 1983. Second Am. Compl., ECF No. 76.  The City moved for summary judgment on each of these counts.  However, the existence of genuine issues of material fact as to each of these counts precludes summary judgment.

<u>ARGUMENT</u>

**A.  Issues of Disputed Material Facts Remain as to Plaintiff's Wrongful Death Claim.**

**1.  The Evidence Shows that the Actions of the Hollywood Police Officers Caused Daniel Tyson's Death.**

Although the City quotes from the Plaintiff's Complaint, which clearly alleges that Daniel died as a result of being tased <u>and</u> as a result of "multiple officer appl[ying] physical pressure and force to [Daniel's] body," it nonetheless argues that this is "unquestionably" a Taser-death case.[1] In fact, the Plaintiff alleges that "Police used unnecessary and unreasonable excessive force against Daniel . . . by repeatedly discharging a Taser stun gun on Daniel, *as well as applying physical force, after police had restrained him in handcuffs and leg shackles face down on the ground.*" Second Am. Compl. ¶ 1, ECF No. 76.  The City's complete failure to address the disputed evidence showing Daniel's death was caused by police officer's restraint of Daniel is sufficient to deny

---

[1] To bolster this mischaracterization of the Plaintiffs' allegations, the City emphasizes the fact that the Plaintiff went "so far as to sue the manufacturer," without noting that the manufacturer was voluntarily dismissed from this case approximately one year ago, before the Plaintiff filed her Second Amended Complaint.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

summary judgment on this count.

Genuine issues of material fact exist as to the cause of Daniel's death.  What is undisputed is this:  Daniel Tyson died on October 27, 2014 after he was Tased ten separate times by COH police officers in a time span of 6 minutes and 30 seconds and smothered by four to six police officers, while being held face down in handcuffs and leg shackles. *See supra*, 2–4.  Thirty seconds to one minute passed between the time when Daniel stopped yelling and the time officers realized Daniel's lips were blue and he was not responding.  *Id.*

The Medical Examiner ruled Daniel's manner of death to be undetermined, but acknowledged that the Taser and the restraint by police could be potential causes of Daniel's death.  SOF ¶ 86.   Dr. Mark Shuman, Plaintiff's expert, opined that the police officer's prone restraint of Daniel and the use of the Taser were contributing factors to Daniel's death of cardiac arrest.  Id. ¶ 87.  Taser's training materials state that a Taser application is "physically stressful event" and warn that "[s]everal law enforcement groups" have determined that 15 seconds of multiple applications or continuous Taser exposure is a "significant safety point." *Id.* ¶ 121.  Daniel received 54 seconds of multiple applications of Taser exposure. Taser training materials also state that, where a subject may have a pre-existing condition, "[a]ny physiologic or metabolic change may cause of contribute to death or serious injury." *Id.* ¶ 121.  Finally, Taser's user manual warns that the use of a Taser "could result in death or serious injury."  *Id.* ¶ 121.

On the other hand, Dr. Gary Vilke, Defendant's expert, opined that nothing the City police officers did (including Tasing Daniel ten times or four to six officers bearing down on Daniel's body while he was in a prone position, handcuffed and shackled) caused or contributed to Daniel's death.[2]  Id. ¶ 87.  To reach this opinion, Dr. Vilke failed to employ any reliable methodology and ignored critical evidence, including evidence that there were multiple officers on top of Daniel when he stopped yelling, stopped breathing, became unresponsive, and his lips turned blue.  *Id.* ¶ 87.  Instead, Dr. Vilke ruled out positional asphyxiation as a cause of death based on his incorrect assumption Daniel became "calm and quiet" several minutes after the struggle with police officers.  *Id.*  There is no evidence to support that assumption.

Dr. Daniel Wohlegelernter, Plaintiff's rebuttal expert, concluded that the police officers'

---

[2] Plaintiff has moved to exclude the opinions of Dr. Vilke as unreliable.  See Plaintiff's Motion to Exclude the Report and Testimony of Defendant's Experts, ECF No. 110. For the limited purpose of this Opposition, Plaintiff considers the potential testimony of Dr. Vilke as if it were admissible (it is not).

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

prone restraint of Daniel caused Daniel's cardiac arrest. *Id*. In particular, Dr. Wohlegelernter noted that medical records establish that Daniel was exhibiting pulseless electric activity ("PEA") when paramedic evaluated him. *Id*. Having ruled out the other possible causes of PEA cardiac arrest, and based on his extensive experience as a cardiologist, he concluded that the only plausible and possible cause of Daniel's PEA cardiac arrest was hypoxia/hypoxemia due to positional asphyxiation caused by COH police officers' restraint of Daniel. *Id*.

Whether COH police officers' use of Tasers and restraint of Daniel caused his death is a disputed issue in this case and not subject to summary judgment. *See, e.g.*, *Corbitt v. Walgreen Co.*, 3:07-CV-963-J12MCR, 2008 WL 4368583, at *1 (M.D. Fla. Sept. 17, 2008) (summary judgment not appropriate where both parties submitted affidavits in support of their respective positions regarding causation); *Meyerson v. Walgreen Co.*, 05-60025-CIV, 2006 WL 8431622, at *2 (S.D. Fla. Apr. 19, 2006) (even assuming experts were stricken, the fact that medication was "capable of causing" injuries was sufficient to preclude summary judgment).

### 2. The Evidence Shows the Officers' Use of Tasers and Application of Force on Daniel Were Excessive and Unreasonable.

The evidence demonstrates that the City's use of a Taser and application of force on Daniel were excessive and unreasonable. A court analyzes a claim that a law enforcement officer used excessive force in the course of making an arrest or other "seizure" of an individual, under the Fourth Amendment "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). A court must evaluate several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (quoting *Graham*, 490 U.S. at 396). "Police generally may not continue to use force on a subject who is under control and not fleeing or resisting arrest." *Bolander v. Taser Intern., Inc.*, 07-CV-80789, 2009 WL 2004379, at *8 (S.D. Fla. July 9, 2009).

According to eyewitnesses, Daniel was "subdued" and "not able to move" after his first tasing. SOF ¶ 39. In rapid-fire succession over a one-minute period, Pantaloukas tased Daniel four times. *Id*. ¶¶ 36, 40. Daniel was then placed in handcuffs and assessed by a COH police officer to be safely "in custody." *Id*. ¶ 42. Daniel could be heard moaning in the background. *Id*. Although he was secure, Pantaloukas tased Daniel one to two more times. *Id*. ¶ 59. Daniel was then placed in leg shackles. *Id*. ¶ 45. After Daniel was in leg shackles, he did not kick his legs, he did not try

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

to lift officers off the ground or try to get up as COH officers claim. *Id*. ¶ 46.  The only thing Daniel continued to do was yell incoherently, a symptom of his mental illness and a signal that he was in pain or distress. *Id*. ¶¶ 2, 79. Nonetheless, Pantaloukas proceeded to tase Daniel two to four times after he was in leg shackles and handcuffs, lying face down on the ground. Throughout this time, four to six officers bore down on Daniel's body preventing him from breathing.  *Id*. ¶ 47. Thirty seconds to one minute lapsed between the time when Daniel stopped yelling and when paramedics checked him shortly thereafter, they found him to be pulseless.  *Id*. ¶ 58.

Police-practices expert Roy Taylor, who has a 38-year career with law enforcement, has reviewed over one hundred police misconduct cases, and conducts officer trainings, reviewed the evidence in this case and opined that after Daniel was handcuffed, the police officers' actions were unreasonable; further use of a Taser "served no purpose." SOF ¶ 139. Certainly, after Daniel was placed in leg shackles, Daniel "was fully restrained" and police officers "could have backed away from him." *Id*. The Daniel may have been yelling is not sufficient to justify the excessive use of force in this case.  As one court stated: "multiple applications of a Taser cannot be justified solely on the grounds that a suspect fails to comply with a command, absent other indications that the suspect is about to flee or poses an immediate threat to an officer. This is particularly true when more than one officer is present to assist in controlling a situation."  *Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1149 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008).

Here, the evidence establishes that, at the very minimum, Daniel did not pose a threat to the officers' safety and was not resisting arrest after he was handcuffed, and certainly not after he was leg shackled.  Yet, officers continued to bear down on Daniel's body and tase him repeatedly. Those actions constitute excessive force. *See Meyers v. Baltimore Cty.*, 713 F.3d 723, 734 (4th Cir. 2013) ("It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest."); *cf. Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009) (repeated tasering of plaintiff after plaintiff became compliant was unreasonable and constituted Fourth Amendment violation); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (finding officer used excessive force by striking plaintiff in the stomach when he was not struggling or resisting); *Vinyard v. Wilson*, 311 F.3d 1340, 1343 (11th Cir. 2002) (reversing summary judgment in favor of officer who pepper sprayed arrestee who was drunk and yelling at officers while handcuffed in the back of patrol car).

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

The officers' actions were also plainly in violation of the City's standards and policies. SOP 201 specifically prohibits the use of a Taser on a person who is handcuffed and in control. *Id*. ¶ 139. It also expressly states that an officer "should deploy the Taser for one (1) standard five (5) second cycle and then stop and evaluate the situation." *Id*. Officers must "utilize only the minimum number of repetitive cycles necessary to immobilize the subject(s) and take them into custody." *Id*. Finally, SOP 201 specifically provides that officers "will not use any restraint techniques after a Taser deployment which restricts or impairs the subject's breathing ability." *Id*.

The City cites to several cases discussing de minimus force in the context of qualified immunity. Those cases are distinguishable—they involve minor force or injuries, severe crimes, or prolonged or violent struggles with police. *See, e.g.*, *Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012) (officers tased arrestee who lunged and grabbed officer through patrol car window and threatened to kill him and refused to allow officers to handcuff him for approximately 15 minutes); *Buckley v. Haddock*, 292 Fed. Appx. 791, 794 (11th Cir. 2008) (undisputed facts showed the incident occurred at night on the side of a highway with traffic, the officer could not control plaintiff, and officer "resorted to using the taser only after trying to persuade Plaintiff to cease resisting, after attempting to lift Plaintiff, and after repeatedly and plainly warning Plaintiff that a taser would be used and then giving Plaintiff some time to comply"); *Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274, 1281 (11th Cir. 2004) (arrestee led police on a high-speed vehicle chase, tried to pull officer's gun away, ran away from police, and swung and kicked police officers); *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (plaintiff only suffered bruises that "disappeared quickly" when officers grabbed him, threw him against a van, kneed him in the back, searched his groin area "in an uncomfortable manner" and handcuffed him); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488, 1492 (11th Cir.1996) (officers placed arrestee in handcuffs and leg restraints in a prone position after a 20-minute struggle).

Here, the severity of the crime was relatively minor compared to the grossly disproportionate police response. Daniel admittedly was approaching Ramirez with a sundial at the time he was tased for the first time, but since he was tased <u>before</u> he struck Ramirez and he was suffering from severe mental illness, it is not clear that striking Ramirez was a voluntary or intentional act or a reaction to the electric shock of the Taser. SOF ¶ 29. Moreover, the evidence shows that within two minutes of his first tasing, officers got Daniel face down on the ground, handcuffed, subdued, controlled, and in custody. *See id*. ¶ 39, 42. It should have been clear to

officers after those first two minutes and certainly after leg shackles were in place—just as it was clear to eyewitnesses—that Daniel was not kicking or trying to get up. Nonetheless, police officers continued tase him in quick succession around five more times and smother him. *Id*. ¶ 47, 59. Even police officer testimony establishes that officers continued to bear their weight on Daniel's body for somewhere around one minute while Daniel was completely unresponsive and quiet. *Id*. ¶ 58. There was no "prolonged violent physical resistance" as the City claims.

The City also cites to a number of cases that involved no issue of disputed fact and urges the Court to enter summary judgment here. *See Fernandez v. City of Cooper City*, 207 F. Supp. 2d 1371, 1379 (S.D. Fla. 2002) (granting summary judgment where there was "no factual dispute" that the arrestee flicked a burning cigarette at a police officer, fled police on foot, and swung and kicked officers in an encounter that lasted approximately 15 minutes); *Bolander v. Taser Intern., Inc.*, 07-CV-80789, 2009 WL 2004379, at *9 (S.D. Fla. July 9, 2009) (granting summary judgment because "[t]his case does not present a situation where police used force on individual who was already restrained and compliant. There is no evidence the officers tased [arrestee] after he was handcuffed, and Plaintiffs do not allege the officers used excessive force on [arrestee] after the point at which they had him in handcuffs.).

But, as described above, the City's version of events is contradicted by eyewitnesses and Plaintiff's expert, and even its own officers' accounts conflict about what happened. Summary judgment is not appropriate in this case. *See Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016) (denying summary judgment where eyewitness and officer testimony conflicted and a jury could find that the officer's use of a Taser five times was unreasonable force); *see also Salgado v. City of W. Miami*, 85 F. Supp. 3d 1332, 1339–40 (S.D. Fla. 2015) (denying summary judgment where officers tased arrestee multiple times, noting that even granting the officer the "allowance" for the fact that officers must make split-second judgment, "the near-instantaneous re-discharges between each of [the officer's] first four cycles creates a genuine dispute over the reasonableness of the discharges").

### 3. The City Fails to Satisfy the Elements of Its Florida Statute 776.085 Defense.

In summary fashion, the City asks this Court to enter summary judgment on its affirmative defense based on Florida Statute Section 776.085. The City was given leave to add this defense after the close of discovery when the City apparently "came across" it for the first time when answering Plaintiff's interrogatories.

9

It is clear from the Motion, that the City is unable to satisfy the elements of the defense. Florida law provides that "[i]t shall be a defense to any action for damages for personal injury or wrongful death ... that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony." Fla. Stat. § 776.085(1). The City identified the following statutes, which Plaintiff assume are the forcible felonies the City contends are at issue: Fla. Stats. § 784.07 (assault or battery of law enforcement officers), § 843.01 (resisting officer with violence), § 843.02 (resisting officer without violence). Statute 784.07 requires a person to "knowingly" commit an assault or battery upon a law enforcement officer. Section 843.01 requires a person to "knowingly and willfully" resist, obstruct, or oppose an officer by offering or doing violence to the person of such officer. Section 843.02 is a misdemeanor offense, not a felony, and therefore it cannot be a "forcible felony" that supports the City's defense.

The undisputed evidence establishes that Daniel did not have the requisite mental state to commit a forcible felony, and, even assuming Daniel had the mental state to commit a forcible felony, the § 776.085 defense would not apply because his death occurred over seven minutes after he first approached Ramirez after he was already handcuffed and secured. *See Martinez v. City of Pembroke Pines*, 0:14-CV-61303, 2015 WL 13164705, at *6 (S.D. Fla. Apr. 21, 2015), *aff'd,* 648 Fed. Appx. 888 (11th Cir. 2016); *King v. Shoar*, 306-CV-61J-33TEM, 2007 WL 2066173, at *2 (M.D. Fla. July 17, 2007). To avoid setting forth repetitive arguments for the Court, Plaintiff incorporates her arguments in her Motion for Partial Summary Judgment on this issue. *See* Pl.'s Mot. For Summ. J. 12–15, ECF No. 102. The City's failure to present any evidence on Daniel's mental state is fatal to the viability of its affirmative defense.

**B.  Issues of Disputed Material Facts Remain as to Plaintiff's ADA and Rehab Act Claims.**

To succeed on an ADA or Rehab Act claim, the plaintiff must prove: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

**1.  The City Failed to Reasonably Accommodate Daniel's Disability During his Arrest.[3]**

"Police conduct during the arrest of a disabled person is subject to the strictures of the ADA." *Gevarzes v. City of Port Orange*, 12-CV-1126, 2013 WL 610456, at *2 (M.D. Fla. Feb. 19, 2013). Police officers responding to an on-the-street disturbance are "under a duty to reasonably accommodate [a plaintiff's] disability in handling and transporting him to a mental health facility" after the area is secure and there is no threat to human safety. *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). The question for the Court is whether, "given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety." *Bircoll*, 480 F.3d at 1085. "The reasonable-modification inquiry in Title II–ADA cases is a highly fact-specific inquiry." *Id.* (internal quotation marks omitted).

COH police officers violated the ADA and Rehab Act by failing to reasonably accommodate his disability (1) during their encounter with him (including their initial approach of him and their response with use of force) and (2) by not providing proper medical care for him. The City argues it did not fail to reasonably accommodate Daniel because there was "literally" nothing officers could have done differently to accommodate him before he became unresponsive and died.  Relatedly, the City contends that Daniel was not "qualified" within the meaning of the ADA and Rehab Act to receive medical services because he was being combative at all times until he became unresponsive and died.  The City does not contend that mental illness is not a qualifying disability, but argues that Daniel did not meet the "eligibility requirement" because at all times up until he became unresponsive, Daniel posed a threat to the health or safety of others.

Genuine issues of material fact exist as to whether the City reasonably accommodated Daniel.  The City designated the dispatch to Daniel's apartment as a Signal 20 which is used to identify a mental illness or crisis related call.  The City broadcast over the air and through written communication that Daniel suffered from mental illness and was not taking medication; this information was available to all officers, including Ramirez and Pantaloukas.

Ramirez testified that when he approached Daniel Tyson, he observed unusual behavior

---

[3] Plaintiff also alleges in her Second Amended Complaint that the City violated the ADA and the Rehab Act by failing to adequately train or supervise its officers. *See* Second Am. Compl. ¶ 53; Pl.'s Resp. to Amended Interrogatories 7 and 8 (Ex. 49). The City has not moved for summary judgment on that theory of recovery.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

and in turn called on his cellular telephone (instead of using the police radio) to ask when he would arrive because he was "concerned."  SOF ¶ 19. Tyson's behavior at the time, including agitating and yelling, was consistent with a manic episode. *Id*. ¶ 2, 3. Despite his concerns, Ramirez did not call his FTO, Officer Kerns, or his Sergeant. *Id*. ¶19. Ramirez did not use his police radio to dispatch other officers. *Id*. Ramirez did not wait for Pantaloukas to arrive to the location prior to reengaging Daniel Tyson. *Id*. However, officers should have approached the situation "as a person have a mental crisis" and Ramirez should have "waited until the adequate number of officers were there." *Id*. ¶ 134. This is in line with COH SOP 212, which deals with the Baker Act.[4]  COH SOP 212 requires two officers to be dispatched to all potential Baker Act incidents and provides that if an officer believes the person may require emergency admission, the officer may call for back-up assistance. *Id*. ¶ 97. Neither Ramirez nor Pantaloukas had received Crisis Intervention Team ("CIT") training prior to the date of the incident. *Id*. ¶ 127. Falcon, Wagner, and Truntz similarly did not receive CIT training prior to the death of Daniel Tyson. *Id*.

During police officer's tasing and restraint of Daniel, officers never considered Daniel Tyson's mental illness nor the need for medical attention. Upon observation of Officer Ramirez's head injury, the officers met Daniel Tyson's mental illness with aggression without any attempt of de-escalation and instead deployed a Taser in a rapid-fire manner without adequately or properly evaluate Daniel's condition or considering his mental illness when evaluating his reactions to use of force.[5]  Thus, officers also did not consider whether Daniel was moving and yelling due to his mental illness, and they did not properly consider that Daniel may not have been unable to understand or follow commands and/or was unintelligible due to mental illness.  *See Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) (denying summary judgment and noting that "[t]hree tasings in such rapid succession [within one minute] provided no time for [plaintiff] to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply"); *Morais v. City of Philadelphia*, CIV.A.06-582, 2007 WL 853811, at *12 (E.D. Pa. Mar. 19, 2007) ("Because a [severely mentally disturbed person's] disability may prevent him from have a full

---

[4] The Florida Mental Health Act of 1971, Fla. Stats. §§ 394.451-394.47891, commonly known as the "Baker Act," allows the involuntary institutionalization and examination of an individual at a crisis stabilization unit for an involuntary psychiatric examination.  These figures do not reflect many others who may have mental illness and were tased by police officers, but whose illness was not documented in the City's use-of-force reports.

[5] Taser's training materials warn that a person "must be given a reasonable opportunity to comply with officer's directives prior to each [Taser] drive-stun application."

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

understanding of the consequences of his actions, the police have to change certain procedures in order to accommodate his disability, subject to the exigencies of the situation.").

Police-practices expert Roy Taylor opinion that, at a minimum, after handcuffs and leg shackles were placed on Daniel, he was "fully immobilized" and police should have called EMS to transport Daniel. *Id.* ¶ 137. Contrary to the City's contention, the evidence establishes that Daniel no longer posed a threat to the health and safety of others after he was handcuffed. *See supra*, at Part A.2. A jury could concluded that at that point Daniel should have received medical treatment for his known mental illness. *See Schreiner v. City of Gresham*, 681 F. Supp. 2d 1270, 1279 (D. Or. 2010) (allowing ADA and Rehab Acts to proceed where, at the time the officer tased the plaintiff, "the situation was under control and rather than inflicting pain upon her, [the officer] should have consulted with paramedics and administered medical treatment"). Instead, police officers tased him five more times and multiple officers placed force and pressure on his body until he stopped breathing. Incredibly, in its defense, the City states that "there is no dispute" that Daniel received medical care as soon as he became unresponsive. Mot. at 15. In other words, the City takes the position that its response was adequate because paramedics eventually responded to give Daniel medical treatment at time when he was essentially dead.

In any event, it is clear that genuine issues of material fact exist regarding the police's encounter with Daniel and whether any exigent circumstances were present when police repeatedly tased him and held him down until he stopped breathing. Summary judgment is thus inappropriate. *See Torres v. City of Albuquerque*, 12-1048-Civ, 2015 WL 13662387, at *21 (D.N.M. Apr. 22, 2015) (denying summary judgment in ADA claim for failure to provide accommodation to mentally ill man); *Morais*, 2007 WL 853811, at *12 (denying summary judgment where "the exigency of the situation is a materially disputed fact"); *Spencer v. Dawson*, 04 C 5048, 2006 WL 3253574, at *11 (N.D. Ill. Nov. 7, 2006) (denying summary judgment because, accepting plaintiff's version of events as true, "there was no exigent threat to the officers or third parties because [the plaintiff], while agitated and angry, was not threatening anyone's safety").

### 2.   The City is Liable for Its Officers' Deliberate Indifference.[6]

---

[6] The City contends that the Court found that the Plaintiff "failed to allege an intentional discrimination claim." Mot. at 15 n.10 (emphasis added). This mischaracterizes the Court's ruling and the Plaintiff's complaint. The Plaintiff asserts claims for violation of the ADA and the Rehab Act. The Court noted that the Plaintiff can prove discriminatory intent (an element of the claim) by proving intentional discrimination or deliberate indifference. Order on Motion to Dismiss, at 8, ECF No. 17. The Court held that Plaintiff stated claims for violation of the ADA and the Rehab Act by "alleg[ing] sufficient facts under a standard

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

The City argues that the Plaintiff cannot establish that the City is liable for the deliberate indifference of its officers because it cannot point to any official with substantial supervisory authority who acted with deliberate indifference. This Court has previously rejected the City's contention that "the 'official' requirement bars municipal liability under the ADA or Rehabilitation Act." *See* Order on Motion to Dismiss, at 9, ECF No. 17.

Assuming the "official" requirement is applicable, there are genuine issues of fact with respect to this issue. The City posits that the only person that could qualify as an "official with substantial supervisory authority" was Sergeant Ruiz, a person who, according to his declaration, conveniently arrived after the tasing of Daniel was over. However, determining the appropriate "official" is a "necessarily fact-intensive inquiry." *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012). In *Liese*, the court found a reasonable jury could conclude that the doctors who failed to obtain informed consent from a hearing-impaired patient were officials with supervisory capacity because they had complete discretion to decide whether or not to provide the patient with an interpretive aid. *Id.* at 350. Similarly, during a police encounter, officers have discretion in how to respond to an arrestee. In the case of rookie officers still in the shadow phase, such as Officers Ramirez and Pantaloukas, the FTO has supervisory authority. SOF ¶ 124. The City's policies confirm that police officers have complete discretion in how to respond to a call. *Id.* ¶ 95; *cf. Liese*, 701 F.3d at 350 (noting that hospital policies and training give doctors complete discretion on using interpretive aids). Thus, if the "official" requirement does exist in this context, the person with substantial supervisory authority was FTO Kerns, who arrived shortly after Pantaloukas. *See* SOF ¶ 35. Contrary to the City's contention that there was "no indication" that Daniel needed medical assistance until he became unresponsive, the evidence shows that Daniel could be heard moaning on the radio call announcing Daniel was "in custody," Truntz told an eyewitness shortly before Daniel was tased several times that "the only thing [Daniel] needs to do is get[] [in] an ambulance," and Daniel was yelling throughout his restraint by police. *Id.* ¶ 69, 79, 81. A jury could find these were all indications that Daniel was in pain or distress.

Thus, to the extent the Plaintiff must show that an "official with substantial supervisory authority" failed to respond to the City's discrimination, it has done so, or, at a minimum, issues of fact remain as to whether Sergeant Ruiz was the only "official" that satisfies the requirement.

---

of deliberate indifference." Order, at 9. It did not hold that Plaintiff failed to allege an intentional discrimination claim.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

### 3.   The City's Discrimination Caused Daniel's Death.

The City summarily contends, without more, that there is "no evidence" that the City's violations of the ADA or the Rehab Act caused his death.  "The ADA imposes a 'but-for' liability standard." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996).  As discussed in detail above, the evidence shows that Daniel's death could have been avoided if police officers had received adequate training, if Officer Ramirez had waited for back-up or for his FTO to arrive, if officers had stopped tasing Daniel after he had been handcuffed, if officers had stopped tasing Daniel after he was handcuffed and leg shackled, if multiple officer had stopped holding down Daniel after he had been handcuffed, if multiple officer had stopped holding down Daniel after he had been handcuffed, or if officers had taken into account Daniel's mental illness when responding with force or evaluating whether further force was necessary. *See supra*. Given these facts, a reasonable jury could find that but for the discriminatory actions of the police officers, Daniel Tyson would not have died.

### C.  Issues of Disputed Material Facts Remain as to Plaintiff's Section 1983 Claim.

A plaintiff may sue a municipality under § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978).  A plaintiff may demonstrate that a municipality has such a policy by identifying (1) an officially promulgated policy of the municipality, or (2) an unofficial custom or practice of the municipality shown through the repeated acts of a final policymaker for the municipality." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1330 (11th Cir. 2003). Because a city "rarely will have an officially-adopted policy of permitting a particular constitutional violation," it is sufficient that a plaintiff show that the city "has a custom or practice of permitting" the constitutional violation and the city's custom or practice is "the moving force behind the constitutional violation." *Id*. (internal quotation marks omitted).

"Municipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of inhabitants.'" *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). The Supreme Court has stated that a municipality may be liable under Section

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

1983 *based on a single incident*,[7] if that incident is the "obvious" consequence of a failure to provide specific training. *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997). When relying on prior incidents to show a pattern of deliberate indifference, the prior incidents do not have to be "precisely identical" to the facts in the plaintiff's case. *Vasquez v. City of Miami Beach*, 895 F. Supp. 2d 1275, 1278 (S.D. Fla. 2012).

Plaintiff alleges that (1) the City of Hollywood Police Department had a custom, policy, or practice whereby its police officers used excessive force when attempting to detain mentally ill individuals, including Daniel, by overusing their department-issued Tasers, and (2) the City failed to adequately supervise, discipline, or train its officers in the appropriate and reasonable use of force on the mentally ill and the appropriate and reasonable use of Tasers on the mentally ill. Second Am. Compl. ¶¶ 70–74. Plaintiff's theory of the case is based on an unofficial custom or practice, as well as inadequacies in the City's existing official policies.

The City first argues that there was no constitutional violation, referring to its arguments that the police officers' actions were reasonably necessary under the circumstances. Genuine issues of material fact exist with respect to the reasonableness or necessity of the police officers' repeated use of a Taser and continued restraint of Daniel after he was in custody and in control. Those arguments are set for *supra*, Part A.1& 2. The City's remaining arguments[8] are addressed below.

1. **Whether the City Had a Policy, Custom or Practice That Resulted in the Overuse of Tasers on the Mentally Ill Raises Genuine Issues of Fact for the Jury.**

A reasonable jury could find, based on the disputed facts, that the City had a custom, policy, or practice whereby its police officers used excessive force when attempting to detain mentally ill individuals, including Daniel, by overusing their department-issued Tasers.

The City's express policies are deficient in that they do not provide that officers consider

---

[7] Plaintiff believes liability could be established based on a single incident in this case, given the number of officers involved, all demonstrating insufficient training and supervision.

[8] The City appears to argue that, if a police department is accredited or a policy supposedly meets cherry-picked minimum state or national standards, it cannot be constitutional. First, the City omits that the Hollywood Police Department lost its accreditation in February 2015, just months after the death of Daniel Tyson, and as of March 2018, it has not regained its accreditation. SOF ¶ 102. Second, the City fails to cite any specific evidence to support this proposition. Instead, the City cites generally to its expert's deposition (without bothering to cite any particular portion of the testimony) and cites to a Florida Basic Recruit Training Program documents, also without bothering to cite to any particular portion of the document. Finally, the City fails to support this argument with any caselaw. In fact, such arguments have previously been either disregarded by other courts. *See, e.g.*, *Zikianda v. County of Albany*, 1:12-CV-1194, 2015 WL 5510956, at *47 n. 16 (N.D.N.Y. Sept. 15, 2015).

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

mental illness as a specific factor when deploying Tasers. *Id*. ¶ 95. Additionally, the City has no express policy that deals with the use of a Taser on a mentally ill person. *Id*. ¶ 93. Given the number of use-of-force cases the City has involving the mentally ill, "additional guidance is needed to limit the use of force against people in those situations." *Id*. ¶ 95. Expert Roy Taylor recommended a number of more appropriate policies for dealing with the mentally ill, including using more de-escalation techniques and having a "policy recommending initial EMS activation." *Id*. ¶103. There are also programs around the country that use counselors on patrol to assist officers.  *Id*.

The City's unofficial practice of overusing Tasers on the mentally ill is widespread.  The City is aware that its officers have regular contact with mentally ill persons. SOF ¶ 138. In its Motion, the City urges this Court to look at overall numbers of encounters with police, but the undisputed evidence shows that when officers decide to use Tasers, they do so at high rates on the mentally ill.  In 2012, City police officers used Tasers 44 times to detain persons.  Eighteen of those 44 Taser uses of force were on Baker Act'ed persons. *Id*. ¶ 90.  In 2013, Tasers were used to detain 25 persons, eight of which were Baker Act'ed persons.  *Id*. ¶ 91. In 2014 there were 24 use of force reports involving a Taser; seven of which involved Baker Act'ed persons. *Id*. ¶ 92. Thus, in about 30-40% of the times a Taser is used by City police officers, it is used on a mentally ill person. Moreover, City records show that in 2012 and 2013, the two years preceding Daniel's death, nine out of twenty-three Baker Act'ed persons who were tased by police officers were tased more than three times and five were tased even after being handcuffed. A chart detailing these incidents, including similarities with this case, is attached as SOF Ex. 50.

The City argues that the Court should not consider the use-of-force reports because they constitute hearsay.  In the Eleventh Circuit, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012). The use-of-force reports fall under the business records or public hearsay exceptions.  Fed. R. Evid. 803.  The reports are being used for a non-hearsay purpose: to show that the City had <u>notice</u> of potential constitutional violations, but did nothing to remedy the situation.  *See Perez v. Miami-Dade Cty.*, 168 F. App'x 338, 341 (11th Cir. 2006) (reversing summary judgment on claim that County had a custom of using excessive force and crediting evidence "that numerous excessive force settlements established the County's notice"); *Marlin v. City of New York*, 15 CIV. 2235 (CM), 2016 WL 4939371, at *20 (S.D.N.Y. Sept. 7, 2016) (use

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

of force audit report put the city on notice of NYPD's excessive use of force); *J.W. v. Birmingham Bd. of Educ.*, 143 F. Supp. 3d 1118, 1172 (N.D. Ala. 2015) (use-of-force reports put police chief on notice of ongoing excessive use of force).

Expert Roy Taylor reviewed the use-of-force reports, including the reports showing multiple uses of a Taser on a Baker Act'ed person. He opined that "any time a Taser is used for more than three cycles, it should be investigated." SOF ¶ 92. However, that was not done by the City. *Id.* Taylor remarked that it "was shocking" was that none of those incidents were referred for administrative review or to internal affairs. Instead, they were "all marked to go to file." *Id.*

Moreover, an independent audit of the Hollywood Police Department's internal affairs department conducted by Charles Gruber[9] found that the department "fail[ed] to meet even the most essential elements of the generally accepted police practices in internal affairs operations." SOF ¶ 93. The COH Police Department "has developed a practice" of failing to do so keep records and track all citizen complaints. Id. ¶ 103. The Audit further concluded that a review of 2012 and 2013 Internal Affairs incidents "indicated a lack of investigative follow up, probing of the alleged complaint, proper identification of the alleged misconduct and appropriate/fair discipline when officer misconduct was or should have been identified." *Id.* ¶ 111. Even worse, the Audit determined that in some cases "the investigation completely ignored the misconduct asserted by the complainant." *Id.* The Audit concluded that "investigations did not properly probe into the allegations of police misconduct and the reviews did not memorialize the issues." *Id.* ¶ 146.

This evidence further supports the City's knowledge of a custom or practice of turning a blind eye to excessive uses of force against the mentally ill and others, and the City's failure to remedy the situation. *See Perez*, 168 F. App'x at 341 (reversing summary judgment on claim that County had a custom of using excessive force and crediting evidence that the County failed to prepare use-of-force reports in numerous incidents); *Rivas v. Figueroa*, 11-23195-CIV, 2012 WL 1378161, at *3 (S.D. Fla. Apr. 20, 2012) (permitting §1983 claim to proceed based on theory that "use of excessive force by Miami Beach officers (without any negative repercussions" was widespread). And even if the City had properly investigated claims of police misconduct, "simply investigating claims of constitutional violations without taking remedial steps to correct

---

[9] The Audit report, like the use-of-force reports demonstrate notice of the part of the City. Moreover, it is capable of being reduced to admissible form at trial. Charles Gruber, the author of the report, is listed on Plaintiff's witness list, and he can be compelled to testify at trial.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

constitutionally offensive acts can constitute deliberate indifference or tacit authorization of the offensive acts." *Vasquez v. City of Miami Beach*, 895 F. Supp. 2d 1275, 1278 (S.D. Fla. 2012) (quoting *Cannon v. Taylor*, 782 F.2d 947, 951 (11th Cir.1986) (internal quotation marks omitted).

> 2. **Whether the City Failed to Adequately Supervise, Discipline, or Train its Officers Raises Genuine Issues of Fact for the Jury.**

A jury must resolve the genuine issues of fact regarding whether the City failed to adequately supervise, discipline, or train its officers in the appropriate and reasonable use of force on the mentally ill and the appropriate and reasonable use of Tasers on the mentally ill. These failures demonstrate a deliberate indifference to the constitutional rights of Daniel and other mentally ill persons. A chart detailing these incidents, including similarities with this case, is attached as SOF Ex. 50.

> a. **Failure to Train.**

The evidence shows that COH officers do not receive specialized training from COH on dealing with mentally ill persons. COH provides no practical training on de-escalation that specifically deals with mental illness. SOF ¶ 103. COH's officers receive no training specifically on the use of Tasers on the mentally ill or someone decompensating as a result of mental illness. *Id.* ¶ 115. COH's officers receive no training in considering mental illness as a factor when deploying Tasers. *Id.* ¶ 95, 115. Officers are not adequately trained to detect and respond to someone who is mentally illness and therefore unable to follow commands. *Id.* ¶ 29, 115.

Although CIT training is available and would be helpful with dealing with the mentally ill, the City does not actually make officers take the training. Thus, neither Ramirez nor Pantaloukas received CIT training prior to the death of Daniel Tyson. *Id.* ¶ 127. Falcon, Wagner, and Truntz similarly did not receive CIT training prior to the death of Daniel Tyson. *Id.* The officers in this case consistently testified to either not having any knowledge of City policies or procedures or to only receiving the information or training after the incident with Daniel. *Id.* ¶¶ 115, 127. Although this was one incident, it reveals the lack of training with respect to at least <u>five</u> different officers, which resulted in a constitutional violation. Moreover, the evidence shows several prior incidents of overuse of Tasers or force on the mentally ill. SOF Ex. 50.

The lack of proper training is also evident from reviewing the files of Officers Ramirez and Pantaloukas. Throughout his field training period, Pantaloukas was unsatisfactory in several of the measured criteria, including being marked unsatisfactory in his knowledge of police department

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

policies and procedures. *Id*. at 124. Pantaloukas had difficulty listening to the radio and would fail to retain the information transmitted by dispatch. *Id*. He received negative performance appraisals regarding his ability to control conflict. *Id*. As late as October 15, 2014, Pantaloukas's performance was not at a satisfactory level. *Id*. Throughout his field training period, Ramirez was unsatisfactory in several of the measured criteria, including in his knowledge of police department policies and procedures. *Id*. Although supervisors were on notice of these issues, both Pantaloukas and Ramirez were recommended to move on to the shadow phase. *Id*.

   b. **Failure to Supervise.**

  During the shadow phase, the City allows its rookie officers who are still in training to: respond to calls involving a mentally ill person without checking in with, or waiting for, their assigned field training officers; engage with a mentally person without waiting for their assigned field training officer, even when the circumstance is such that the rookie officer has time and ability to wait for the field training officer without putting himself or others at risk; deploy a Taser without waiting for their assigned field training officer, even when the circumstance is such that the rookie officer has time and ability to wait for the field training officer before initiating an encounter with the person without putting himself or others at risk.

  FTO Kerns, who was supposed to be supervising Officer Ramirez, was the third officer on the scene. He failed to supervise Ramirez during the initial encounter with Daniel, which resulted in an escalation of the situation and Daniel's first tasing. FTO Flores, who was the field training officer who was supposed to be supervising Officer Pantaloukas, only responded to the scene <u>after</u> Daniel was removed. SOF ¶ 124. These actions display a lack of supervision of rookie officers, which is acknowledged and accepted by the City. FTOs need to be on duty and available anytime that their trainee is answering calls, and especially when they are dispatched to a call involving a mentally ill person. *Id*. Expert Roy Taylor opined that if the officers' field training officers had been "monitoring more actively" they may have directed the rookie officers to approach Daniel differently. *Id*. And although Det. Kerns was present at the scene, he failed to supervise officers in the proper use of a Taser and in properly placing Daniel on his side or sitting up to prevent him from asphyxiating. *Id*. ¶ 35.

   c. **Failure to Discipline**

  It is undisputed that the City had a widespread custom or practice of failing to discipline its officers. As discussed above, an independent audit of the Hollywood Police Department's

20

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

internal affairs department "fail[ed] to meet even the most essential elements of the generally accepted police practices in internal affairs operations."  SOF ¶ 93. The city failed to investigate or discipline officers in cases of police misconduct.  *Id*. ¶ 111, 145. A review of 2012 and 2013 Internal Affairs incidents revealed a failure to impose "appropriate/fair discipline when officer misconduct was or should have been identified." *Id*. ¶¶ 111, 145. Even worse, the Audit determined that some reports revealed that complaints of police misconduct were "completely ignored." *Id*. ¶ 145. Given these findings, it is unsurprising that in 2014, there were 267 fact-finding investigations based on internal complaints, and in every instance, all police officers were cleared.

### d.   The City's Customs and Practices Caused Daniel's Death.

As discussed above, the evidence shows that the actions of the City's police officers caused Daniel's death. Because of their lack of training or inadequate training, as well as the lack of supervision by Detective Kerns, Officer Flores and others, as set forth above: officers failed to deescalate the situation or employ alternative methods to detain him, which resulted in Daniel being tased ten times in a 6.5-minute period; officers did not stop and evaluate the situation before each deployment of the Taser on Daniel, which would have allowed them to assess Daniel's physical condition, including his inability to breathe; officers continued to inflict injury upon Daniel even after he was in handcuffs and leg shackles by continuing to Tase him and by continuing to exert pressure on top of his body, which prevented him from breathing; and officers failed to place Daniel on his side or sitting up to prevent him from asphyxiating. *See LeBlanc v. City of Los Angeles*, 2006 WL 4752614 (C.D. Cal. 2006) (denying summary judgment where police department training materials in the record provided no guidance on how and whether a Taser should be used when dealing with narcotically intoxicated individuals, even though its officers probably confronted such individuals on a routine basis).

Finally, a jury could find that the failure to discipline officers resulted in rampant police misconduct at the Hollywood Police Department, resulting in the ultimate death of Daniel Tyson. See *Vasquez v. City of Miami Beach*, 895 F. Supp. 2d 1275, 1278 (S.D. Fla. 2012) (an "unofficial custom of allowing excessive force claims to go unpunished" may constitute "tacitly agreeing" to the conduct that resulted in a plaintiff's injury).

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Defendant City of Hollywood's Motion for Summary Judgment.

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**

Dated August 9, 2018                    Respectfully submitted,


                                        *s/JOSEPH J. KALBAC, JR*.
                                        JOSEPH J. KALBAC, JR.
                                        Florida Bar No. 628270
                                        jkalbac@colson.com
                                        STEPHANIE A. CASEY
                                        Florida Bar. No. 97483
                                        scasey@colson.com
                                        DENISE H. GEORGES
                                        Florida Bar No. 55861
                                        denise@colson.com
                                        COLSON HICKS EIDSON
                                        Attorneys for the Plaintiff
                                        255 Alhambra Circle, Penthouse
                                        Coral Gables, Florida 33134
                                        Telephone: (305) 476-7400
                                        Facsimile: (305) 476-7404
                                        E-mail: eservice@colson.com;
                                        nicky@colson.com; mabel@colson.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, this 19th day of July, 2018, and a true and correct copy of the foregoing was served either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner of those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing, on: Daniel L. Abbott, Esq., Adam M. Hapner, Esq., Email: dabbott@wsh-law.com;   pgrotto@wsh-law.com;   ahapner@wsh-law.com;   Weiss Serota Helfman Cole & Bierman, P.L., Attorneys for Defendant, City of Hollywood, 200 E. Broward Blvd., Suite 1900, Fort Lauderdale, FL 33301.

*s/JOSEPH J. KALBAC, JR*.

JOSEPH J. KALBAC, JR.

Florida Bar No. 628270

**Colson Hicks Eidson Colson Matthews Martínez Gonzalez Kalbac & Kane**
**255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444**