UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-62215-CIV-DIMITROULEAS

JEAN SUAREZ, individually and as
Personal Representative of the Estate of
DANIEL TYSON, deceased,

      Plaintiff,

vs.

CITY OF HOLLYWOOD, a Florida
municipal corporation,

      Defendants.

_____/

## ORDER GRANTING, IN PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court Plaintiff's Motion for Partial Summary Judgment [DE 102] and Defendant's Motion for Summary Judgment [DE 104]. The Court has carefully considered the motions, the parties' responses [DE 105, 124], their replies [DE 129, 136], the evidence submitted in the record, and is otherwise fully advised in the premises.

## BACKGROUND

Plaintiff Jean Suarez ("Plaintiff" or "Suarez") filed this action on September 9, 2016, on behalf of herself and as personal representative of the estate of her son, Daniel Tyson [DE 1]. Plaintiff filed her Second Amended Complaint [DE 76] on April 4, 2018, alleging claims against the City of Hollywood under Florida's wrongful death statute (Count I), Title II of the Americans with Disabilities Act (the "ADA") (Count II), Section 504 of the Rehabilitation Act ("Rehabilitation Act") (Count III), and 42 U.S.C. § 1983 (Count IV).

1

Plaintiff's claims arise from the death of her son, Daniel Tyson ("Tyson") who died on October 27, 2014. Tyson suffered from schizoaffective disorder, bipolar type and manic depression. Plaintiff's Response to City's Statement of Facts ("PRSOF") ¶ 2. On October 27, 2014, witnesses observed Daniel naked outside of his apartment and seemingly talking to trees. *Id.* ¶ 19.[1] Tyson's landlord called the police, reporting that Tyson was manic depressive and "needs medication." Defendant's Statement of Facts ("DSOF") ¶ 16. Two officers, Alexis Ramirez and Andreas Pantaloukas, were dispatched to response to the scene as a "Signal 20," which identifies a mental illness or crisis-related call. PRSOF ¶ 18. Booth Ramirez and Pantaloukas were rookie officers in the shadow phase of their training, working in the field and responding to call with a designated Field Training Officer ("FTO"). PRSOF ¶ 124.

Ramirez arrived at the scene first and Tyson emerged from his apartment wearing only an open robe, acting erratically and yelling incoherently. DSOF ¶ 20; PRSOF ¶ 19. Ramirez called Pantaloukas on his cell phone to see when he would arrive and then, rather than wait for Pantaloukas or his FTO, Officer Kerns, Ramirez proceeded to engage with Tyson alone. PSROF ¶ 19, 21. Tyson grabbed a sundial from the wall and held it above his head. PSROF ¶ 27. Ramirez told Tyson to drop the object and Tyson then charged Ramirez while holding the object over his head. PRSOF ¶ 29; DSOF ¶ 29. Ramirez deployed his Taser, which did not have any effect on Tyson because one of the two Taser prongs missed contact. DSOF ¶ 30. Tyson then struck Ramirez in the head with the sundial. PRSOF ¶ 29.

Pantaloukas arrived on the scene less than 30 seconds after Ramirez first deployed his

---

[1] The parties' respective Statements of Fact and responses thereto include various citations to specific portions of the record. Any citations herein to the statements of facts and responses thereto should be construed as incorporating those citations to the record.

Taser. DSOF ¶¶ 30, 38. Within seven seconds of his arrival, he made an emergency call for back up and immediately deployed his Taser on Tyson for a continuous nine seconds. PRSOF ¶¶ 36, 130.Tyson and Ramirez struggled on the ground and Tyson began kicking Pantaloukas. DSOF ¶ 36, 37. Pantaloukas deployed his Taser three more times in "drive stun mode," with the Taser physically pressed against the target (*i.e.*, Tyson) within the next minute. DSOF ¶ 40. Each deployment obtained neuromuscular incapacitation and Tyson's body locked up ¶ 40. Officer Kerns arrived at some time during these events and the officers handcuffed Tyson. DSOF ¶ 42.

The parties' statements of what happened after Tyson was placed in handcuffs diverge. According to Defendant, despite being placed in handcuffs, Tyson continued, fighting, screaming, and trying to kick the officers or escape. DSOF ¶ 43. It took multiple attempts to place Tyson in leg restraints because he was flailing and kicking and even after Tyson was in handcuffs and leg restraints, Tyson continued to violently resist the officers. DSOF ¶¶ 46-47. At various times during the struggle, the officers place pressure on Tyson's body but Tyson displayed "superhuman strength" and was able to lift the officers. *Id.* ¶¶ 48-55. Over the course of the struggle, including after Tyson was in handcuffs and leg restraints, Pantaloukas deployed his Taser five more times in drive stun mode. *Id.* ¶ 59. During the struggle, there was no indication that Tyson was in pain or could not breathe. *Id.* ¶ 57.

In contrast, Plaintiff cites evidence that after Tyson was handcuffed, he was subdued and not able to move. PRSOF ¶ 39. Tyson's movements were limited and at least one witness stated that she did not see him kicking or lifting officers off the ground. *Id.* ¶ 46. Additionally, once Tyson was handcuffed, an officer reported that he was "in custody." *Id.*¶ 42. After Tyson was handcuffed and in leg restraints and face down on the ground, he was tased four more times. *Id.* ¶

135. Additionally, four to six officers bore down on Tyson's body preventing him from breathing. *Id.* ¶ 47. Officers continued to maintain pressure on Tyson until someone realized that Tyson was not breathing. *Id.* ¶ 48. During the incident, Daniel could be heard moaning and yelling. *Id.* ¶ 42.

Between thirty seconds to a minute lapsed between the time that Tyson stopped yelling and an officer realized he was not responsive and his lips were blue. *Id.* ¶ 58. Paramedics were called; they began to provide treatment, but Tyson was deceased. *Id.* ¶ 58; DSOF ¶ 80-82.

Plaintiff brought this action alleging that the officers used unnecessary and unreasonable excessive force against Tyson, who suffered from mental illness, by repeatedly discharging a Taser stun gun and applying physical force on Tyson, after the officers had restrained him in handcuffs and leg shackles face down on the ground. Plaintiff also alleges that Defendant denied Plaintiff services because of his mental illness and failed to provide him with a reasonable accommodation in its handling and provision of medical care to Tyson after he was no longer a threat to anyone's safety. Plaintiff also claims that Defendant has a widespread practice of overusing tasers on the mentally ill and a practice of failing to train its employees, agents, and officers in the appropriate use of force and use of Tasers on the mentally ill.

### SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Genuine disputes of fact exist when the evidence is such that a reasonable

4

jury could render a verdict for the non-movant. Factual issues are considered genuine when they have a real basis in the record." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (citation omitted).

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings," but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

In deciding a summary judgment motion, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Summary judgment may not be granted where the record reflects conflicting versions of material facts which require credibility determinations. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir.1999); *Van Poyck v. Dugger*, 779 F. Supp. 571 (M.D.Fla.1991); *see also Slusser v. Orange Cnty. Pub. Schs*., 936 F. Supp. 895 (M.D. Fla.1996) (in summary judgment proceedings, court may not weigh credibility of the parties, and if determination of case rests on which competing version of the facts or events is true, case should be presented to trier of fact.) At this stage, the Court's task is not to "weigh the

evidence and determine the trust of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Defendant moves for summary judgment on all of Plaintiff's claims. Plaintiff moves for partial summary judgment on ten of Defendant's affirmative defenses. Therefore, the Court will address Defendant's motion first.

## I.      Defendant's Motion for Summary Judgment

### A.      <u>Plaintiff's Wrongful Death Claim</u>

Defendant moves for summary judgment on Count I, Plaintiff's wrongful death claim, arguing that its police officers' conduct was authorized and did not cause Tyson's death. Defendant first argues that Plaintiff "unquestionably pleaded this case as a Taser-death case" and that the undisputed material facts show that the use of a Taser did not contribute to Tyson's death. As an initial matter, the Court disagrees that Plaintiff pleaded this case as a "Taser-death case." As Plaintiff points out, in her Complaint, Plaintiff alleges that Daniel died as a result of being Tased and the officers' application of physical force to Tyson after he was restrained on the ground. [DE 76] ¶ 1 ("Police used unnecessary and unreasonable excessive force against Daniel . . . by repeatedly discharging a Taser stun gun on Daniel, as well as applying physical force, after police had restrained him in handcuffs and leg shackles face down on the ground.")

Moreover, disputed issues of material fact preclude entry of summary judgment regarding Tyson's cause of death. Both parties have presented conflicting expert testimony on the issue.[2] Plaintiff's expert, Dr. Mark Shuman, opined that Tyson's cause of death was "cardiopulmonary

---

[2]  The Court denied the parties' motions to exclude each other's respective experts on November 9, 2018. [DE 146].

arrest following a violent struggle and prone restraint while in a state of excited delirium associated with bipolar disorder," and that "[t]he use of a Taser conductive energy device may have contributed to his death as the result of additional stress caused by pain, but only if there was a temporal association with the cardiopulmonary arrest and the last discharge." PRSOF ¶ 86. Defendant's expert, Dr. Gary Vilke, opined that "Mr. Tyson was exhibiting signs and symptoms consistent with excited delirium syndrome (ExDS), which along with his severely diseased heart and continued exertion from resistance, is the probable cause of his sudden cardiac arrest and death." DSOF ¶ 87. Dr. Vilke further opined that the retraining process and the use of the Taser did not cause or contribute to Tyson's death. *Id.* Plaintiff's rebuttal expert, Dr. Daniel Wohlgelernter opined that Tyson's death was not caused by ExDS but rather "restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA [pulseless electrical activity] cardiac arrest." PRSOF ¶ 87. These conflicting opinions present multiple disputed issues of fact and it is not the Court's role to determine which opinion is correct or to weigh the evidence. *Anderson*, 477 U.S. at 249.

Likewise, the Court cannot grant summary judgment on the reasonableness of the officers' use of force in light of the multiple disputed issues of fact on this issue. According to Defendant, Tyson "violently resist[ed] the officers' attempts to control him" and used his "superhuman strength" to lift the officers off the ground and kick them even after being restrained. Defendant contends that the officers' use of force was necessary compared to Tyson's "tremendous strength and prolonged violent physical resistance." [DE 104] at 9-10. This narrative sharply contrasts with Plaintiff's depiction of Tyson's behavior, for example, that Tyson "did not pose a threat to the officers' safety and was not resisting arrest after he was handcuffed, and certainly not after he was

leg shackled." [DE 124] at 7. After reviewing the record evidence, there are material issues of fact that preclude summary judgment on the excessive force claim. It is a question for the jury whether the force used by the officers violated Tyson's rights.

Where, as here, there is a "claim that law-enforcement officers used excessive force to effect a seizure," the analysis "is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). A court's determination of objective reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Conner*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). This question must be considered "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Plumhoff*, 134 S. Ct. at 2020 (internal quotation marks omitted). The reasonableness calculus therefore "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Applying these well-settled principles, the Court cannot determine whether the officer's use of force was unreasonable. Plaintiff cites evidence that within two minutes after Ramirez first tased Tyson, Tyson was restrained and handcuffed face down on the ground and, although continuing to move, was subdued and not resisting arrest. PRSOF ¶¶ 36, 39, 40, 46. Nevertheless, the officers Tased Tyson two to four times after he was handcuffed and in leg restraints on the

ground (and ten times during the entire six and a half minute incident) and between four and six officers bore down on Tyson's body after he was subdued and "in custody." *Id.* ¶¶ 47, 58. Taking these facts in the light most favorable to Plaintiff as the non-movant, a jury could find the officers' conduct to constitute excess force. *See, e.g., Myers v. Baltimore County, Md.*, 713 F.3d 723 (4th Cir. 2013) ("It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a Taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest."); *cf. Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009) (repeated tasering of plaintiff after plaintiff became compliant was unreasonable and constituted Fourth Amendment violation); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (finding officer used excessive force by striking plaintiff in the stomach when he was not struggling or resisting). Further, the Court finds the cases cited by Defendants are distinguishable from the facts taken in the light most favorable to Plaintiff. Defendant is not entitled to summary judgment on this claim.

**B.    <u>Defendant's Affirmative Defense Based on § 776.085, Fla. Stat.</u>**

Defendant also moves for summary judgment on Plaintiff's wrongful death claim based on its affirmative defense under § 776.085, Florida Statutes. Under Florida law, "[i]t shall be a defense to any action for damages for personal injury or wrongful death, or for injury to property, that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony." § 776.085(1), Fla. Stat. Defendant sought leave to add this defense after the close of discovery, asserting that there was no prejudice to Plaintiff because Defendant had already plead the "exact same common law defense" as this statutory defense and provided "citations to the specific statutes Tyson violated" in response to interrogatories directed to that common law defense. *See* [DE 89] at 5. In Defendant's interrogatory answers, Defendant

9

identified four statutes in support of its defense: §§ 776.085, 784.07, 843.01, 843.02. As an initial

matter, the Court agrees with Plaintiff, that based on Defendant's representation that the grounds

for its § 776.085 defense were the same as its common law estoppel defense as disclosed in its

interrogatory answer, Defendant is limited to the statutory grounds cited in that answer. *See*

*Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n*, 595 F.3d 1203, 1211 (11th Cir. 2010) (trial

court did not abuse its discretion by excluding evidence regarding legal theory that was not

disclosed in response to interrogatories or disclosed in supplemental answers).

      The felony statutes cited by Defendant as the bases for its § 776.085 defense all require the

conduct to be committed "knowingly."[3]  Plaintiff argues that Tyson, as a result of his mental

illness, did not have the requisite mental state to "knowingly" commit the alleged offenses

underlying Defendant's defense. At the time of the incident giving rise to Plaintiff's claim, Tyson

appeared naked outside his home, agitated, yelling, and talking to trees. Pl.'s Statement of Facts

("PSOF") [DE 105] ¶ 51-52. Defendant alleges that Tyson had the requisite intent because he

acknowledged that he needed help, to recognize others (and could therefore recognize the officers

as law enforcement officers), and respond to verbal communications. Def.'s Resp. Statement of

Facts ("DRSOF") [DE 115] ¶¶ 60-65. However, Defendant asserts elsewhere that on the day of the

incident, Tyson was yelling and mumbling incoherently and exhibiting behavior consistent with a

manic state, *id.* ¶¶ 50-51, and that in the days leading up to that day, Tyson began to show

symptoms of mental illness, *id.* ¶ 57. Defendant cites to *Fernandez v. City of Cooper City*, 207 F.

Supp. 2d 1371 (S.D. Fla. 2002) and *O'Brien v. City of Pembroke Pines*, No. 05-61366 (S.D. Fla.

Aug. 1, 2006), in which the court granted summary judgment on the defendants' § 776.085 defense

---

[3]  Defendant does not respond to Plaintiff's argument that § 843.02, Fla. Stat., is a misdemeanor
offense, not a felony.

under similar facts. However, neither of these decisions addressed the issue of whether the plaintiff possessed the requisite mental state to commit a forcible felony and are, therefore, distinguishable. *See Martinez v. City of Pembroke Pines*, No. 14-61303-CIV, 2015 WL 13164705 (S.D. Fla. Apr. 20. 2015) (distinguishing *Fernandez* and *O'Brien* on this ground and finding that questions of fact remained as to whether plaintiff had the requisite mental state   to commit a forcible felony). Here, disputed issues of fact remain regarding Tyson's mental state. Accordingly, the Court cannot grant summary judgment on Defendant's affirmative defense under § 776.085, Fla. Stat.

**C.**   **Plaintiff's ADA and Rehabilitation Act Claims**

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entities." 42 U.S.C. § 12132. To succeed on ADA or Rehabilitation Act claim,[4]  Plaintiff must prove: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2001) (citing *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001)); *see also Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009) ("A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations.") (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)). Here, the

---

[4]  "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases" and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." *Cash v. Smith*, 231 F.3d 1301, 1305, 1302 n.2 (11th Cir. 2000).

issue is whether Tyson was excluded from participation in, or denied some benefit of, some "services, programs, or activities" of the City of Hollywood police department by reason of his disability or was "subjected to discrimination" by reason of his disability. Viewing the facts in the light most favorable to Plaintiff as the non-movant on these claims, the Court finds that there are disputed issues of material fact that preclude summary judgment.

### 1. Denial of a reasonable accommodation

Defendant contends that there was "literally nothing that the police could have done differently to accommodate Tyson's mental illness prior to him becoming unresponsive." [DE 104] at 13. In response, Plaintiff argues that genuine issues of material fact exist as to whether Defendant reasonably accommodated Tyson, pointing to Ramirez's failure to call his FTO or his Sergeant and failure to wait for Pantaloukas before engaging Tyson consistent with COH SOP 212; Ramirez and Pantaloukas's lack of Crisis Intervention Team training prior to the incident; and the failure to obtain medical treatment for Tyson after he was retrained in handcuffed and leg shackles. *See* [DE 124] at 12-13.

Analysis of alleged violations of the ADA and the Rehabilitation Act and the reasonable-modification inquiry are highly fact specific inquiries. *Tucker v. Bradshaw,* No. 11-80058-CIV, 2012 WL 13018592, at *5 (S.D. Fla. Dec. 20, 2012) (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997)). "This fact specific nature of the analysis is even more pronounced in the law enforcement context, which triggers concerns about criminal activity and public safety." *Id.* (*citing Bircoll*, 480 F.3d at 1085). Here, the Court agrees that disputed issues of material fact exist as to whether Tyson should have received medical attention after he was handcuffed and in leg shackles. As explained above, the parties' versions of the facts

12

vary sharply but, viewed in Plaintiff's favor as the non-movant, a jury could find that Tyson was no longer a danger once he was restrained in handcuffs and shackles and, at that time, the officers were aware he needed medical assistance should have stopped use of the Taser, stopped applying pressure to his body, and obtained such medical assistance for him.[5] *See Schreiner v. City of Gresham*, 681 F. Supp. 2d 1270, 1279 (D. Or. 2010) (allowing ADA and Rehab Acts to proceed where, at the time the officer tased the plaintiff, "the situation was under control and rather than inflicting pain upon her, [the officer] should have consulted with paramedics and administered medical treatment"); *Morais v. City of Philadelphia*, No. CIV.A.06-582, 2007 WL 853811, at *13 (E.D. Pa. Mar. 19, 2007) (denying summary judgment on ADA and rehabilitation claims based on disputed material facts regarding exigency of the situation where mentally ill plaintiff was confined to his apartment, the area was secured, and the plaintiff had no weapons or means to harm anyone outside the apartment). Whether, as an alternative basis for Plaintiff's claim, the City should have provided a reasonable accommodation during the events leading up to Tyson's being handcuffed and leg shackled can likewise be determined by the jury at trial.

## 2. Deliberate indifference

Defendant also argues that it is entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims because Plaintiff cannot establish that an "official with substantial supervisory authority" acted with deliberate indifference. The Court previously concluded that the "official" requirement was not a bar to municipal liability on Plaintiff's claims as pled. *See* [DE 17] at 9. Whether someone is an "official" for the purpose of attributing deliberate indifference to an entity is a "necessarily fact-intensive inquiry." *Liese v. Indian River County Hosp. Dist.*, 701

---

[5] These same disputed facts prevent the Court from finding that Tyson was not "qualified" to receive medical services because he was combative.

F.3d 334, 350 (11th Cir. 2012) (finding that hospital doctors had sufficient supervisory authority because they had complete discretion in whether to authority use of interpretative aids for hearing impaired patients). Defendant contends that none of the officers present during the incident had the requisite authority, citing the City of Hollywood Police Department Manuel. *See* DSOF ¶ 104. In response, Plaintiff points to the presence of Field Training Officer Kerns, who had supervisory authority over Officers Ramirez and Pantaloukas and City's policies that grant officers complete discretion in how to respond to a call. *See* PRSOF ¶¶ 97 at Ex. 38, 124. Additionally, there is evidence that Tyson was exhibiting signs of pain or distress that were ignored. *Id.* ¶¶ 69, 79, 81,

Here, it is a question for the jury whether one of the officers responding to the scene knew that Tyson was in need of medical assistance, had sufficient discretion and authority to determine whether to provide Tyson with a reasonable accommodation – e.g.,, ceasing using of the Taser on Tyson, removing the pressure on his body, and providing medical treatment – and was deliberately indifferent to Defendant's failure to provide aid. *See Liese*, 701 F.3d at 351.

### 3.  Causation

Finally, Defendant argues in conclusory fashion that Plaintiff cannot prove that Defendant's failure to provide an accommodation caused Tyson's death. In light of the fact disputes regarding Tyson's condition and the officers' conduct in this case, summary judgment is not warranted on this ground.

### D.  <u>Section 1983 Claims</u>

Plaintiff also alleges a claim under 42 U.S.C. § 1983, alleging that (1) the City had a custom, policy, or practice whereby its officers used excessive force when attempting to detain mentally ill individuals by overusing department-issued Tasers and (2) the City failed to

14

adequately supervise, discipline, or train its officers in the appropriate and reasonable use of force on the mentally ill and the reasonable use of Tasers on the mentally ill. Second Am. Compl. ¶¶ 70-74. Plaintiff asserts that her claims are based on an unofficial custom or practice, as well as inadequacies in the City's existing official policies.

Respondeat superior liability is unavailable under § 1983 as to a municipal actor; rather, the plaintiff must identify a municipal policy or custom that caused the injury. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). This can be accomplished by either identifying: "(1) an officially promulgated [municipal actor's] policy or (2) an unofficial custom or practice of the [municipal actor] shown through the repeated acts of a final policymaker for the county." *Id.* at 1329 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 694 (1978)). Insofar as a plaintiff takes the latter approach, the plaintiff "must establish a widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law." *Grider v. Cook*, 590 F. App'x 876, 881 (11th Cir. 2014) (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir.1991)).

Municipal policy or custom may include insufficient policy promulgation, inadequate discipline, and failure to provide adequate training, if the deficiency "evidences a deliberate indifference to the rights of inhabitants." *See Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989); *see also Vineyard v. Cnty of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993); *Feliciano v. City of Miami Beach*, 847 F. Supp. 2d 1359, 1365 (S.D. Fla. 2012). To establish a municipal actor's deliberate indifference, "a plaintiff must present some evidence that the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F. 3d 1346, 1350 (11th Cir. 1998); *see*

15

*Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir.2009 ("To establish a [municipality]'s deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'") The Eleventh Circuit "repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Gold*, 151 F.3d at 1351. In addition, the identified deficiency must also be shown to be the "moving force" behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

Moreover, "[w]here a plaintiff attempts to show deliberate indifference through a pattern of past violations and a failure to take appropriate action, '[ a] list of complaints against police officers, without more, is insufficient to create an issue of fact regarding [a municipality's] policy of inadequately investigating or disciplining its police officers. Rather, the Plaintiff must present at least some evidence from which a reasonable jury could infer that the complaints were meritorious.'" *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1373–74 (S.D. Fla. 2013) (quoting *Ayton v. Orange Cnty. Sheriff Dep't,* No. 6:10–cv–1930–Orl–28GJK, 2012 WL 4711911, at *3 (M.D. Fla. Oct. 3, 2012) (quotation omitted)).

Here, the City has presented evidence of its standard operating procedures regarding use of a Taser, dealing with the mentally ill, and use of force generally. At the time of the incident regarding Tyson, the Hollywood Police Department was accredited by the State of Florida. As a condition of employment, all City of Hollywood police officers must attend six months of training and education through the police academy, where they receive training on how to respond to a crisis situation as well as use of force on individuals suffering from disability. DSOF ¶¶ 113-15.

16

Officers receive additional training after the academy on Baker Act procedures, use of force, and use of a Taser. *Id.*¶¶ 119-120.

Plaintiff argues that Defendant's policies are deficient and that the City has a widespread unofficial practice of overusing Tasers on the mentally ill. In support of her claim, Plaintiff points to Defendant's Response to Resistance Reports (or "use of force reports") to show the rate of use of Tasers in encounters with the mentally ill. For example, in 2012, Defendant used Tasers 44 times to detain someone and 18 of those 44 uses were on people who were Baker Act'ed. PSRF ¶ 90. Plaintiff presents similar statistics for 2013 and 2014. Plaintiff contends that these reports demonstrate a practice of overuse of Tasers on the mentally ill and that Defendant failed to take action or investigate these incidents. Plaintiff does not, however, establish that the use of force detailed in these reports was excessive or that there was a finding of misconduct and the City failed to take corrective action.

The use of force alone does not necessarily indicate misconduct: "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Buckler v. Israel*, 680 F. App'x 831, 835 (11th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)* Moreover, "the sheer number of use of force incidents, without more, does not establish a widespread custom of acquiescence to the use of excessive force." *Id.*; *see also Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("[T]he number of complaints bears no relation to their validity."); *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1313 (S.D. Ala. 2001) ("[s]imply dumping several thousand pages of investigative files on the Court ... cannot establish a genuine issue of material fact as to whether excessive force was used in any case, [where] the plaintiff offered no testimony from any complainant or other witness

. . . .”). Defendant asserts use of force reports are prepared by a supervisor whenever an officer

uses force in response to a subject's resistance and the subject is charged with resisting with

violence, the use of force resulting in injury, or the use of force involved a weapon, among other

things. DSOF ¶ 107. Thus, the fact that a use of force report was prepared alone does not establish

that a constitutional violation occurred. In fact, Plaintiff herself describes the use of force reports

as showing that "the City had notice of *potential* constitutional violations . . . ." [DE 124] at 17

(emphasis added).

Plaintiff relies on her police practices expert, Roy Taylor, to support her claim but Taylor

does not opine that any of the use of force reports revealed unconstitutional conduct. Likewise,

Plaintiff relies on the Gruber audit report, which addresses issues with the city's internal affairs

operations, to show that Defendant had knowledge "of a custom or practice of turning a blind eyes

to excessive uses of force against the mentally ill and others, and the City's failure to remedy the

situation." [DE 124] at 18. But Plaintiff does not point to anything specific in the report regarding

overuse of Tasers on the mentally ill or use of force and the mentally ill in general.[6] *See Buckler*,

680 F. App'x at 836 ("A plaintiff cannot survive summary judgment by merely providing

hundreds of pages of investigative files supporting only by an expert's general citations to those

volumes).[7]

Additionally, Plaintiff has not proven a "pattern of similar constitutional violations" that

would have put Defendant on notice of the need to train or supervise in a certain area to avoid

---

[6] Plaintiff quotes sections of the Gruber report (none of which relate to the use of Tasers or the mentally ill) but provides no specific citations to any portion of the report, instead citing to the entirety of the report.

[7] Plaintiff's "failure to discipline" claim is based on these same facts and is either subsumed within Plaintiff's claim that the City turned a blind eye to its practice of overuse of Tasers on the mentally ill or fails for the same reasons.

further constitutional violations. *Connick*, 563 U.S. at 62; *see also Whitaker v. Miami-Dade Cty*., 126 F. Supp. 3d 1313, 1324 (S.D. Fla. 2015) (incidents that were not unjustified or unconstitutional could not establish pattern of similar constitutional violations). Again, Plaintiff points to the use of force reports but does not show that the use of force in any of those reports was unconstitutional. Moreover, Plaintiff's support for her failure to train or supervise claims does not meet the stringent standard for the imposition of municipal liability. Based on the evidence before the Court, Plaintiff has not proven that Defendant was on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" such that Defendant can be said to have acted with deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff has failed to establish a genuine dispute of material fact on her claim under § 1983 and the Court grants summary judgment on this claim in Defendant's favor.

## II.    Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on Defendant's fourth, fifth, sixth, seventh, eighth, ninth, tenth, fourteenth, fifteenth, and seventh affirmative defenses. *See* [DE 102]. In response, Defendant asserts that it is will not pursue its fourth, fifth, sixth, seventh, eighth, ninth, tenth, fourteenth, and fifteenth defenses. [DE 116]. Accordingly, the Court deems those defenses withdrawn. As to Defendant's seventeenth affirmative defense pursuant to § 776.085, Fla. Stat. as discussed above in the context of Defendant's motion, there are disputed issues of material fact regarding Tyson's mental state that preclude summary judgment on this defense. Here, taking the facts in the light most favorable to Defendant as the non-movant, a jury could find that Tyson possessed the necessary mental state to knowingly commit the offenses alleged by Defendant.

Accordingly, Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment [DE 104] is **DENIED IN PART** and **GRANTED IN PART** as set forth above;

2. Defendant's Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Fourteenth, Fifteenth Affirmative Defenses are **DEEMED WITHDRAWN**;

3. Plaintiff's Motion for Partial Summary Judgment [DE 103] is **DENIED** as to Defendant's Affirmative Defense 17 and **DENIED as moot** as to Defendant's Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Fourteenth, Fifteenth Affirmative Defenses.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 17th day of November, 2018.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies Furnished to:

Counsel of Record